# EXHIBIT 4

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:16-CV-00581-RBJ-KLM

**SUZANNA F. DAILEY**,

       Plaintiff,

v.

**NIKOS HECHT**,

       Defendant.

---

### PLAINTIFF SUZANNA F. DAILEY'S AMENDED DISCLOSURE [12-05-2016]

---

      Plaintiff Suzanna F. Dailey ("Dailey") hereby submits her amended disclosures pursuant to Rule 26(a)(1) and (2), Federal Rules of Civil Procedure, as follows. Dailey makes her supplemental disclosures without the benefit of completed discovery and reserves her right to amend, modify or otherwise supplement her disclosures as allowed under the Federal Rules of Civil Procedure.

### 1.  Individuals  Likely to Have Discoverable Information

1.    Andrew Hecht, c/o Garfield & Hecht PC, 601 East Hyman Ave., Aspen, CO, (970) 925-1936.
    Andrew Hecht is Nikos Hecht's father, was present at the dinner where the assault occurred and is believed to have information pertaining to events pertinent to this case as well as regarding the Defendant in particular that may be relevant.

2.    Nikos Hecht, Aspen, CO
    Nikos Hecht is the Defendant and has information about this case.

3.    Alison Hecht, (910) 319-8591
    Ms. Hecht was married to Nikos Hecht, was present at the dinner where the

assault occurred and is believed to have information pertaining to events pertinent to this case as well as regarding the Defendant in particular that may be relevant.

4.   Tristin Andlinger, 740 Beach Road, Vero Beach, FL
     Mr. Andlinger is Ms. Dailey's nephew and was present during certain of the events that are the basis of this action.

5.   Jeanne D. Andlinger, 740 Beach Road, Vero Beach, FL, (917) 691-3701
     Ms. Andlinger is Ms. Dailey's sister and was present during certain of the events that are the basis of this action.

6.   Gerhard Andlinger, New York, NY
     Mr. Andlinger is Ms. Dailey's brother-in-law and was present during certain of the events that are the basis of this action.

7.   George Cathers, 405 Lewis Lane, Basalt, CO, (970) 379-0486
     Mr. Cathers is a minor child and is friends with Tristan Andlinger; he was also present during certain of the events that are the basis of this action.

8.   Eli Kaplan, 410 East 9th Street, #115, Claremont, CA
     Mr. Kaplan is Laura Kaplan's son and attended the dinner where the assault by the Defendant occurred.

9.   Laura Kaplan, 1860 Castle Creek Road, Aspen, CO, (970) 544-2042
     Ms. Kaplan was present in Mexico and at the dinner where the assault occurred.

10.  Dr. Betty McGuigan

11.  Any other persons disclosed by the Defendant in this action.

12.  Any witnesses identified in the parties' Scheduling Order(s).

13.  Any witness necessary for impeachment or rebuttal.

## 2.   Documents in the Possession, Custody or Control of Dailey

Dailey has produced documents bates labelled DAILEY000001-000259.

## 3.   Computation of Damages

Dailey does not presently have sufficient information to determine or specify all her damages since this will be the subject of expert testimony and the facts, information and

documents yet to be produced. This notwithstanding, Dailey amends her initial disclosures to state she seeks the following damages from Defendant Nikos Hecht:

Economic Damages

Dailey seeks economic damages in an amount of no less than $11,545 for past medical expenses and undetermined future medical expenses, to be calculated subsequent to issuance of an expert opinion.

Non-Economic Damages

Dailey seeks non-economic damages of $936,030, representing the maximum award allowable under Colorado law pursuant to C.R.S. § 13-21-102.5 (amount to be adjusted for inflation in 2016).

Punitive Damages

Dailey seeks punitive damages in the maximum allowable amount pursuant to Colorado law, which consists of at least doubling actual damages (economic, non-economic, and pre-judgment interest) and, if so allowed by the Court, trebling of Ms. Dailey's actual damages (economic, non-economic, and pre-judgment interest, pursuant to C.R.S. § 13-21-102.5.

Damages for Physical Impairment

Dailey seeks undetermined damages for Defendant's infection of Ms. Dailey with herpes, which is a permanent physical impairment and for which recovery is not limited under Colorado law, to the extent that the evidence supports such a claim.

Pre-Judgment Interest

Dailey seeks prejudgment interest at a rate of 9% per annum, beginning from the date that Ms. Dailey's cause of action accrued, pursuant to applicable Colorado law.

**4. Insurance**

Dailey, at this time, is not aware of any insurance agreement under which any persons carrying on an insurance business may be liable to satisfy all or part of a judgment which may be entered in favor of her or Nikos Hecht, or to indemnify or reimburse the parties for payments to satisfy the judgment.

**5. Expert Witnesses**

**A. Retained Experts**

Dailey designates the following expert witnesses to testify on her behalf.

**i.    Jennifer S. Yeaw, Psy.D., ABPP, Board Certified Forensic Psychologist**
**Benesh & Yeaw Consulting, L.L.C.**

Dr. Yeaw's written report is attached as Exhibit A. Dr. Yeaw's CV is attached as Exhibit B. The disclosure complies with FRCP 26.

**ii.    Dr. Max Wachtel, Ph.D., Licensed Psychologist**
**The Colorado Center For Clinical Excellence**
**1720 S Bellaire Street , Ste. 204**
**Denver, Colorado 80222**

Dr. Wachtel's CV is attached as Ex. C. Dr. Wachtel will perform an independent medical examination ("IME") of Defendant Hecht, should the Court grant Dailey's Motion for an IME. During his IME meetings with Defendant Hecht, Dr. Wachtel will conduct a bio-psycho-social evaluation consisting of a clinical interview as well as objective and projective testing aimed at understanding Defendant Hecht's personality as well as his emotional and inter-personal make up. In addition, Dr. Wachtel will perform a thorough drug and alcohol interview consisting of a

structured interview and psychological testing. The outcome would be a psychological report summarizing his findings, and Dr. Wachtel could then testify at trial regarding the same.

The goal of Dr. Wachtel's IME is to shine a light on Defendant's psychological makeup both at the time of the rape and now. The questions Dr. Wachtel will seek to answer are whether Defendant has a modus operandi and/or pattern & practice as it relates to sexual violence against women with and without drugs, as well as his perception of reality while under the influence of controlled substances. The IME will also analyze Defendant Hecht's perception of his own drug use, his (mis)understanding of its effects on him, as well as his perception of reality both with and without the influence of controlled substances. Dr. Wachtel's opinions will be based upon his work in conducting an IME of Defendant Hecht; thus, his opinions will be based on firsthand knowledge of Defendant Hecht.

## B. Unretained Experts

Ms. Dailey hereby also discloses the following unretained experts.

### i.      Sheriff Joe DiSalvo, Pitkin County Sheriff's Department

Sheriff DiSalvo is expected to present evidence under Federal Rules of Evidence 702, 703, and 705, regarding Defendant Hecht's history of drug use. Sheriff DiSalvo may testify as to his opinion that Defendant Hecht abuses drugs and controlled substances. Sheriff DiSalvo's qualifications are opinions are contained in his deposition in *Dailey v. Hecht*.

### ii.      Deputy Monique Merritt, Pitkin County Sheriff's Department

Deputy Merritt is a former social worker with a Master's Degree in Social Work. Deputy Merritt's qualifications are opinions are contained in her deposition in *Dailey v. Hecht*. She is also a Deputy Sheriff with the Pitkin County Sheriff's Department. As a social worker Deputy Merritt worked with victims of domestic violence and domestic abuse. As a Deputy Sheriff she has attended numerous domestic violence trainings and serves on a law enforcement committee

focused on domestic violence victims. In her current role, Deputy Merritt specializes and focuses on issues of domestic violence.

Deputy Merritt is expected to testify about the wheel of power and control used by domestic abusers and Defendant Hecht's actions that are in consistent with actions recognized as being part of the "power and control wheel." Deputy Merritt will opine regarding Defendant Hecht exercising power and control over both Alison Hecht and Brooke Warfel that is consistent with the actions of domestic abusers. Deputy Merritt is likely to testify as to her opinion regarding Defendant Hecht's pattern of exerting dominion and control over women, and other issues related to Defendant's Hecht's commission of domestic violence. The pattern of behavior will include attempts to control the victim's sexual past, sexual present, social relations, social media, family relations, financial situation, and healthcare. Deputy Merritt will also identify the fact that domestic abusers seek to shame their victims as mothers, for their sexual experiences, and for their drug use—even if the abusers are the source of the drugs—in order to break down their victims. Deputy Merritt will be able to testify that Defendant Hecht's actions, as she witnessed them via her investigation and through other evidence in this case, were consistent with such known practices both against Ms. Hecht and Ms. Warfel.

Deputy Merritt will also be able to testify regarding typical domestic abuse behavior, including false recantations and attachment to the abuser, despite their abuse. Deputy Merritt, through her investigation, will testify regarding the fact that Ms. Warfel's behavior is consistent with such typical victim behavior.

Finally, Deputy Merritt will testify regarding her investigation of Defendant Hecht's abuse of Ms. Warfel in July 2015, facts and circumstances as she perceived them firsthand, the issuance of a protective order against Defendant Hecht, and Defendant Hecht's subsequent violation of the protective order.

iii.     **Betty J. McGuigan, Ph.D., Licensed Psychologist**

Dr. McGuigan is Dailey's treating psychologist. She will testify regarding the detrimental psychological effects of Defendant Hecht's rape on Ms. Dailey. Dr. McGuigan's opinions will be based upon her work as a treating physician.

Dated: December 5, 2016                          Respectfully submitted,


                                                 By */s/ Jennifer G. Altman*
                                                 Jennifer G. Altman, Esq.
                                                 Markenzy Lapointe, Esq.
                                                 BOIES, SCHILLER & FLEXNER LLP
                                                 100 SE 2nd Street, Suite 2800
                                                 Miami, FL 33131
                                                 Tel: (305) 539-8400
                                                 Fax: (305) 539-1307
                                                 jaltman@bsfllp.com
                                                 mlapointe@bsfllp.com


                                                 By */s/ David A. Bovino*
                                                 David A. Bovino
                                                 By */s/ Maria-Vittoria G. Carminati*
                                                 Maria-Vittoria G. Carminati
                                                 BOVINO CARMINATI LLC
                                                 600 East Hopkins Ave., Ste. 301
                                                 Aspen, CO 81611
                                                 Phone: (970) 925-4445
                                                 Fax: (970) 925-5333
                                                 david@bovinolaw.com
                                                 giugi@bovinolaw.com

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on December 5, 2016, a true and correct copy of the foregoing

document was served via the following by email:

*Counsel for Defendant Nikos Hecht*
Michael D. Plachy, Esq.
Douglas B. Tumminello, Esq.
LEWIS ROCA ROTHGERBER CHRISTIE LLP
1200 Seventeenth Street, Suite 3000
Denver, CO 80202-5835
mplachy@lrrc.com
dtumminello@lrrc.com

*Counsel for Defendant Nikos Hecht*
Marci G. LaBranche
David M. Tenner, Esq.
Shanelle N. Kindel, Esq.
RIDLEY, MCGREEVY & WINOCUR, P.C.
303 16th Street, Suite 200
Denver, CO 80202
labranche@ridleylaw.com
tenner@ridleylaw.com
kindel@ridleylaw.com

# Benesh & Yeaw Consulting LLC

15912 Crain Highway, Unit B #430 ◆ Brandywine, Maryland 20613
Phone: 202-868-6806 ◆ Fax: 202-417-3948 ◆ beneshyeaw@gmail.com

# Report of Forensic Psychological Evaluation

**Case Name**
Suzanna F. Dailey, Plaintiff v. Nikos Hecht, Defendant
Civil Action Number 1:16-cv-581
Filed March 10, 2016 in the United States District Court for the District of Colorado

**Reason for Referral and Identifying Information**
Suzanna Dailey is a 68-year-old (date of birth 9-2-1948) divorced Caucasian female with approximately 13 years of education. Her present occupation is exercise instructor (Pilates and Gyrotonic) and business owner.

Ms. Dailey filed a federal tort suit against Mr. Hecht for assault, battery and sexual assault, and intentional infliction of emotional distress. Ms. Dailey alleges that the defendant, Mr. Hecht, forcibly raped her on March 25, 2014 during a dinner party at a restaurant in Mexico. Her complaint asserts that she suffered physical, moral, and psychological injuries as the result of Mr. Hecht's assault.

This report was prepared by Jennifer S. Yeaw, Psy.D., ABPP (Forensic), a board certified forensic psychologist in private practice. My curriculum vita is attached (Enclosure 1). I was retained in the above reference matter by Maria-Vittoria "Giugi" Carminati, counsel for plaintiff, Ms. Dailey. I was asked to conduct a forensic psychological evaluation of Ms. Dailey and to opine on the following issues:

- Ms. Dailey's psychiatric history relevant to her functioning on March 25, 2014; any change in functioning following the alleged events; her present psychiatric diagnosis, if any; and the level of functional impairment caused by her psychiatric diagnosis; and
- An analysis of Ms. Dailey's behavior after the alleged assault in light of known misconceptions about common responses to traumatic events in general and to sexual trauma specifically.

**Statement of Non-Confidentiality**
Ms. Dailey was advised of the parameters of the evaluation verbally and in writing. Specifically, she was told that the evaluation was not for treatment purposes and did not establish a confidential doctor-patient relationship. She was advised that the evaluation was being conducted for her attorneys as part of her lawsuit against Mr. Hecht and that I would communicate the findings with her attorneys in a comprehensive report. She was also advised that my report could become part of the court record, and that I could be called to testify about my evaluation in deposition or at trial. She was advised that the evaluation was voluntary, and she was encouraged to contact her attorney at any time.

Ms. Dailey asked relevant questions about the limits of confidentiality and about how the evaluation would be used. She demonstrated an intellectual understanding of the limits of

confidentiality at the start of the interview.  However, at the start of the second day of the evaluation, she expressed considerable distress about sensitive personal details being disclosed. Some reservations are common and realistic in forensic evaluations; however, Ms. Dailey's degree of anxiety was unusually high.  She reported concerns that her personal history would be inappropriately disclosed to the defendant, and that the information would be used to retaliate against her and her family.  Her concerns persisted despite repeated reassurance, and as described further below, reflected her current psychiatric symptoms.

**Sources of Information**
*Evaluation Procedures*
1. Clinical interviews of Suzanna Dailey on 10-24-2016, 10-25-2016, 11-29-2016, 11-30-16, and 12-1-2016 for a total of 17.5 hours;
2. Telephone interview of Suzanna Dailey on 10-23-2016 for a total of 45 minutes;
3. Psychological assessment of Suzanna Dailey conducted on 11-29-2016 and 11-30-2016 for a total of 6 hours;

*Litigation Records*
1. Plaintiff's Original Complaint, filed March 30, 2016;
2. Plaintiff's Responses and Objections to Defendant's First Set of Interrogatories, dated September 19, 2016;
3. Video deposition of Suzanna Dailey taken September 28, 2016, including transcript and associated exhibits;
4. Video deposition of Nikos Hecht taken September 29, 2016, including transcript and associated exhibits;
5. Video deposition of Andrew Hecht, father of defendant, taken October 10, 2016, including transcript and associated exhibits;
6. Video deposition of Jeanne Andlinger, sister of Ms. Dailey, taken September 20, 2016, including transcript;
7. Video deposition of Gerhard Andlinger, brother-in-law of Ms. Dailey, taken September 20, 2016, including transcript;
8. Deposition transcript of Tristan Andlinger, son of Mr. and Mrs. Andlinger and nephew of Ms. Dailey, taken October 6, 2016;
9. Deposition transcript of Kaelin George Cathers, friend of Tristan Andlinger and witness to alleged events, taken October 17, 2016;
10. Interview of Suzanna Dailey conducted by Inv. Lisa Miller on August 13, 2015;
11. Plaintiff's Original Complaint ICO Brooke Lauren Warfel v. Nikos Hecht, and associated exhibits;

*Medical Records of Suzanna Dailey*
1. Treatment records of Dr. Karen Ferguson (Bates stamped 226-258), gynecologist; and
2. Treatment records from Coastal Gynecology (Bates stamped 192-225).
3. Treatment records of Dr. James Jacobson, psychiatrist.

**Information Requested but Not Available**
- Treatments records of Dr. Betty McGuigan, Ph.D., current treating psychologist of Ms. Dailey - My understanding is that Dr. McGuigan has asserted privilege for her psychotherapy process notes, and that no discovery pertaining to her treatment of Ms.

Dailey is yet available.  Dr. McGuigan did not return my call requesting information as of the date of this report.

- Treatment records of Dr. Creelman, procedural psychiatrist, who has treated Ms. Dailey using transcranial magnetic stimulation (TMS).
- Treatment records of Dr. Denise Tonner, endocrinologist.
- Observations of Sylvia Ann Beard Haft, cousin of Ms. Dailey.  She did not return my call requesting information as of the date of this report.

**Description of Principal Events**

This summary of the alleged events was derived from the sworn depositions listed above and Ms. Dailey's description during the interview.  A complete account is contained in the case file.  Ms. Dailey's account during the interview was consistent with her deposition testimony.  Her description of events before and after the alleged assault was consistent with the accounts of other witnesses.  Mr. Hecht disputes her version of events as described below.

Ms. Dailey did not show or report loss of memory for the alleged assault.  She showed avoidance of discussion of the alleged assault, particularly of the most painful and intimate aspects.  She also showed a change in emotional expression (affect) when describing the alleged assault, with an overall limited expression of emotion (blunted affect).  She also demonstrated increased nervous system activity (increased autonomic arousal, increased psychomotor agitation) when discussing the alleged assault.

In March of 2014, Ms. Dailey traveled to Cabo San Lucas with members of her family for two weeks.  On the trip were Mr. and Mrs. Andlinger, their 14-year-old son Tristan, and Martha Walton, mother of Mrs. Andlinger and Ms. Dailey.  Tristan's friend Dylan was present for the first week, and his friend George Cathers was present for the second week of the trip.  The family stayed for the first week at a residence in El Dorado, a private community, and then at a hotel resort called Las Ventanas for the second week.  Other Aspen families known to the Andlinger's, including the Hecht's and the Kaplan's, were also vacationing in the vicinity.

Nikos and his wife at the time, Alison Hecht, were at their vacation home in El Dorado with their three children, Nikos' father Andy Hecht, and his step-mother, Jody Hecht.  As she was walking on the beach with Tristan and George, Mrs. Andlinger happened to see Mrs. Alison Hecht and her children in their pool.  The children knew the Hecht children from their school.  Mrs. Hecht waived them over and invited them to use the pool.  Mrs. Alison Hecht invited the Andlingers and their family over for drinks later that evening.  Mrs. Andlinger said that she observed Nikos and Alison Hecht drinking that afternoon, and that she thought that they were intoxicated on alcohol and possibly drugs.

Ms. Dailey went to the Hecht residence that evening with the Andlinger's.  She had not previously met Nikos or Alison Hecht.  She reported that the ladies talked at one end of the pool and the men at the other.  Mrs. Hecht suggested that the group have dinner at a local restaurant called Flora Farms during the vacation, and that they invite the Kaplan's, who were staying nearby.

Ms. Dailey and Mr. Hecht gave different accounts of their interactions at the Hecht home that evening. Per Ms. Dailey, she had minimal interaction with Mr. Hecht until the end of the evening. She reported that Mr. Hecht followed her up the stairs from the lower level as they left the house. She said that he remarked that she was in good shape. Ms. Dailey said that she found the comment to be overly personal, particularly considering their difference in age and proximity on the stairs. She described it as "creepy", and said that she thought that he may have been condescending because she felt his remark was not true. She said that she responded with a self-deprecating comment about her weight, and that he replied that men like women with meat on their bones.

In contrast, Mr. Hecht reported in his deposition that Ms. Dailey accompanied him downstairs to light the fire pit. He stated that he thought that it was odd that she would go with him. He also stated that she complimented him on his station in life and his achievements at such a young age. He noted that she said that he had the weight of the world on his shoulders.

Alison Hecht organized a group dinner party on Tuesday, March 25, 2014 at Flora Farms. Flora Farms was described as a large property containing gardens where food for the restaurant is grown. The dinner took place in a private area of the property, in a covered outdoor pavilion adjacent to a lawn for playing games and to pathways leading into the gardens. Present were Nikos and Alison Hecht and their children, Thea (age 10), Amelia (age 8), and Levi (age 5); Andy and Jody Hecht; Laura Kaplan, her mother, and her children Eli (age 18) and Stella (age 16); Eli's girlfriend, Zoe, and his friend Luke O'Callahan; Gerhard, Jeanne, and Tristan Andlinger; Tristan's friend George; Ms. Dailey; and Mrs. Walton.

According to Ms. Dailey, during the evening Nikos Hecht asked her if she would like to see the gardens. She said that he offered her his arm in a gentlemanly fashion, and she believed that this was to help her to walk along the unpaved pathway. She described the gesture as "courtly". She said that she did not perceive any romantic or sexual overture, citing the differences in their ages and the proximity of Mr. Hecht's wife and children. She took his arm and walked with him into gardens on the pathway. She related that he told her a story about his grandfather, and she found him to be polite and respectful at first. She stated that when they were some distance up the path, Mr. Hecht forcibly grabbed her by the neck with his right hand and forced her mouth to his. She said that he then grabbed her right hand with his left hand and placed it on his erect penis. She described being shocked and fearful, that she realized she was in a dangerous situation.

She described him as physically overpowering her. She stated that he forced her down to the ground, pulled his pants down, and then pulled her shorts down to about her knees. She said that she was wearing elastic waist shorts. She said that when she was on the ground, he immediately forcibly penetrated her vagina with his penis. She stated that it was extremely physically painful. She also reported experiencing shock and feeling her body was paralyzed or frozen. She said that her arms were above her head and Mr. Hecht's bodyweight was on top of her. She stated that she tried to push her body back and away but was unable to do so. She stated that she did say, "No, no," but not at a volume that the adults at the party could hear. She stated that she did not cry out or scream. She said that she was frozen in fear and felt that she could not cry out. She also said that she felt ashamed. She said that she did not want to expose the young children and her family to the "filth" that was happening. Ms. Dailey said that Mr. Hecht ejaculated after

a few minutes. She said that he then got up and went back to the party, leaving her on the ground. She then pulled up her pants, got up, and returned to the table.

Early in his deposition, Mr. Hecht denied having any intercourse with Ms. Dailey. He stated that at some point at the end of the evening, Ms. Dailey walked up to him and put her hand on his shoulder. They were about 50 feet from the table where dinner was held. He said that "she started talking about how tight her pussy was, how good it was," and started kissing him. He stated that there was "mutual participation" in the kiss. He reported that after a few minutes, Ms. Dailey got down on her knees, unbuttoned his pants, and put his penis in her mouth for a few seconds. He stated that he thought she was pulling her pants down and touching herself as she sat on the ground. He said that she was pulling hard on his shirt collar, and he fell to his knees and hands. He stated that they were then both on the ground with their pants down, and "I stopped her." He stated that he realized that he was in a "fishbowl". He stated that he told her that they should get back to the others, and returned to the table. He said that he sat next to his wife, and Ms. Dailey walked up shortly after and sat next to him at the table. He stated that she later asked to take his picture and for his phone number, which he gave to her. Mr. Hecht acknowledged in his deposition that he displayed poor judgment. He reported that he used alcohol and prescription pain medication that day. He maintained that Ms. Dailey was the instigator of the encounter and that he was at first a surprised but willing participant.

Tristan Andlinger and George Cathers both testified in deposition that they witnessed Ms. Dailey and Mr. Hecht together during the party at Flora Farms. They said that they noticed them walking with linked arms up a pathway through the gardens. They reportedly found it weird or suspicious and followed them. Tristan and George went into the bushes that lined the path through the gardens. When they caught sight of them again after 1-2 minutes, they saw Mr. Hecht and Ms. Dailey on the ground on the path. George and Tristan hid in the bushes to avoid being seen. They both reported that Mr. Hecht was on top of Ms. Dailey with his pants down. They observed pelvic thrusting by Mr. Hecht and heard grunting noises. Tristan stated that Ms. Dailey's arms were over her head. They both stated that they could not see genitals or penetration from their line of sight. They became scared that they would be seen and returned to the party through the field before Mr. Hecht got up from the ground.

Tristan was 14 years old and George was 13 years old at the time. Both boys were excited and disturbed by what they saw. They both reported that they could have heard Ms. Dailey if she spoke, but she did not. They both testified that they would have intervened if they believed Ms. Dailey was being harmed. Tristan reported that he did not see Ms. Dailey and Mr. Hecht interact after they returned to the party. Tristan and George spoke to Mrs. Andlinger about what they saw that evening and again the next day. The boys also told the other teenagers (Eli, Zoe, Luke, and Stella) during the car ride back to the resort.

Ms. Dailey reported that she did not want to report the event to law enforcement in Mexico. She spoke to her sister about what happened that evening and in the morning. Ms. Dailey said she sought civilian counsel regarding the event after returning to the United States, but eventually dropped the matter. She said that she heard of the allegations made by Brooke Warfel from her sister, and reached out to Ms. Warfel's attorney with the intention of maybe helping another woman.

**Biopsychosocial History of Examination Subject**

*Childhood developmental history*
Ms. Dailey was born in Louisville, Kentucky to an intact family. She is the oldest of 3 sisters; Sallie Donner is currently 68 years old and Jeanne Andlinger is 62. She reported a normal developmental course with no known significant early childhood illnesses or behavioral problems. She reported a ruptured appendix at age 12. Complications related to this illness were thought to be the cause of her infertility.

Her father was an Army intelligence officer until retirement, and then worked for the government. Her mother was a "Southern belle" from a prominent Kentucky family. She completed 2 years of college but did not work outside of the home. Ms. Dailey described her family as affluent and very traditional in terms of gender roles and social expectations. She did not endorse any sexual or physical abuse, and stated that her parents did not use physical discipline.

Their family moved often due to her father's military career. Ms. Dailey said that her father was stationed overseas as an embassy attaché for much of his career, and they had an "international lifestyle" in Caracas. Ms. Dailey's parents divorced following his redeployment from Vietnam. They had a conflictual marriage, and Ms. Dailey reported hearing but not witnessing episodes of spousal abuse. She and her sisters returned to Lexington with her mother after the divorce. Ms. Dailey reported typical psychological distress following her parents' divorce, but maintained good relationships with both parents.

*Family medical and psychiatric history*
Ms. Dailey's mother is currently 92 years old and in relatively good health for her age. Ms. Dailey's father died at age 81 of bone cancer. She said that her mother's brother possibly had multiple sclerosis, but she did not otherwise endorse a family history of neurological illness or early cognitive decline. Ms. Dailey and Mrs. Andlinger both reported a strong family history of substance abuse. Their parents both used alcohol excessively, and all three sisters stopped drinking in their late 20's to early 30's. There is a family history of depression. Her sister, Sallie, has had significant psychiatric problems and a history of suicide attempts. Her primary diagnosis is Borderline Personality Disorder. Sallie also apparently has treatment-resistant depression and has been treated aggressively with over 70 electroconvulsive therapy procedures. Sallie is currently being treated as an inpatient in a long-term psychiatric facility. Sallie also has multiple chronic health problems that are possibly associated with her psychiatric issues. Ms. Dailey's nephew completed suicide at age 15. Concussion was a possible contributing factor.

*Educational History*
Educational records were not available given Ms. Dailey's age. Ms. Dailey described herself as a good student who was social and athletic. She attended international schools and attended boarding school in Pennsylvania while her father was deployed to Vietnam. She did not endorse any disciplinary problems, special education classes, or learning problems. She graduated from high school at approximately age 18. Ms. Dailey attended University of Kentucky for a year before moving to Washington, D.C. and attending the Washington School for Secretaries. The later completed training courses as a Pilates and Gyrotonic instructor.

*Relationship history*
Ms. Dailey reported that she started dating approximately age 16.  Her first significant relationship was in high school and lasted a year and a half.  Ms. Dailey has been married three times.  She and her first husband, Jimmy, were married when she was 20 years old.  They divorced after about five years due to his infidelity and domestic violence.  She married her second husband, Albert, in her late 20's.  They divorced after three years.  She married her third husband, Rusty, in 1998 and divorced in less than a year.  She described the marriage as an "impetuous choice".  She reported a serious relationship that lasted 5 years during the 1990's.  The relationship ended when he started seeing someone else.  Her last significant intimate relationship ended approximately 8 years ago.

*Occupational history*
Occupational and financial records were not provided; however, Ms. Dailey's occupational history was discussed in the sworn depositions of Ms. Dailey and Mrs. Andlinger.  Ms. Dailey described a traditional upbringing in which she was not expected to have a career outside of the home.  She emphasized her need to develop job skills on her own after her first divorce, and described resilience in overcoming personal and occupational setbacks throughout her life.  This seemed an important source of personal pride.  Her sister described her as entrepreneurial, and successful in sales and business.

She was first employed in her mid-twenties at a boutique in Wilmington, Delaware where she resided after her divorce.  She stated that she learned the couture business and found she was good at sales.  She did not continue employment during her second marriage.  She returned to the boutique in Wilmington after her marriage to Albert ended.  Ms. Dailey related that her financial stability was negatively impacted by this divorce.

She moved to New York City full time in 1984.  She reported that she was hired by Ralph Lauren directly to be the first woman to sell men's suits at the Madison Avenue store.  She worked there from 1989 to 1992, when she moved to Aspen, Colorado.  She stated that she worked at the Ralph Lauren retail location in Aspen, and then worked for a businessman named Harley Baldwin in his gallery of shops.

Ms. Dailey operated a retail business selling silver jewelry and accessories at equestrian events beginning in 1993 or 1994.  She closed the business in 1999 or 2000 to pursue Pilates.  She was certified as a Pilates instructor in 2000 and as a Gyrotonic instructor in 2001.  She opened her own studio in Vero Beach, Florida.  She said that she was successful and worked 12-14 hour days.  She estimated her top income from the studio was approximately $90,000.  Her studio moved in 2012, and was closed in May 2014.  She attributed this to a decrease in business due to the recession.  She also reported that after the alleged assault she was unable to continue working one-to-one with her clients and to be unable to cope with the physical contact required.

She currently owns and manages a shoe store in Vero Beach.  The store opened on February 15, 2015.  She stated that she is in the process of shutting down the business due to supply chain problems caused by conflict with a competitor.  She also continues to teach a few Pilates clients out of her home.

*Substance abuse history*

Ms. Dailey first started using alcohol in high school.  She reported that alcohol use was very common among her peers, and that she used frequently in social settings.  Her use increased to 2-3 drinks, usually Scotch whisky, daily or every other day.  She also binged intermittently.  She stopped drinking entirely in June of 1981 and entered Alcoholics Anonymous.  She did not endorse physical withdrawal symptoms except for "night sweats".  She described high motivation and engagement with the program.  She did not attend any other treatment related to alcohol use.  She reported one relapse that she considered to be significant after 18 years of sobriety (around age 49).  She estimated that she has had about 5 glasses of wine since then.  She continues to attend AA meetings.  Ms. Dailey did not endorse any use of illegal drugs or abuse of prescription medications.  No reports of illegal drug use or problems related to substance use were contained in the records.

*Relevant medical history*

Per the records of Coastal Gynecology, Ms. Dailey was seen by Dr. Taryn Gallow on May 5, 2014.  Ms. Dailey reported to Dr. Gallow that she was sexually assaulted two weeks prior.  A clinical examination was conducted.  No gross injuries were observed.  She was tested for transmitted infections, and tested positive for HSV-2.  She was not currently symptomatic, had never had an outbreak or positive test previously.  Ms. Dailey was diagnosed in 2011 with osteoporosis.  Ms. Dailey did not endorse any past head injuries or concussion.

*Legal history*

Criminal records of Ms. Dailey were not available.  According to Ms. Dailey, she was stopped for driving under the influence once in her early 30's but was not cited.  She and Mrs. Andlinger reported that she was arrested once for shoplifting many years ago.  She reportedly became impatient while waiting at Kmart and left the store with 2 compact discs in her bag.  Ms. Dailey filed for bankruptcy in 1991.

In 2003, Ms. Dailey was sued by the Security and Exchange Commission for allegations of insider trading.  She and her sisters allegedly purchased stock based on private information received from her brother in law, Gerhard Andlinger.  The suit was settled without admission of wrongdoing, and Ms. Dailey paid disgorgement of profits and a civil penalty amounting to almost 2 million dollars.  Ms. Dailey reported during the interview that this was a significant financial blow.

*History of traumatic events*

Ms. Dailey reported an early instance of coerced sex during her deposition, and I asked her to describe it during the interview.  She reported that she was dating a boy who had a reputation for moving fast.  She described that when they were kissing after a date, the sexual intimacy escalated quickly, and that sex was "sprung on" her.  She essentially described what today would be called a lack of affirmative consent.  She said that she was "taken advantage of" but that the experience was "not violent."  She said that she felt ashamed afterwards, but she did not endorse increased anxiety, disturbed sleep, nightmares, or other symptoms associated with psychological trauma.

In 2011, Mr. and Mrs. Andlingher's son, little Gerry, died by suicide at age 15.  Ms. Dailey described this as a significant loss.  She stated that she was particularly close to her nephew, and her affection and attachment to him were evident during the interview.  She stated that after he died that she could not talk to anyone.  She stated that she isolated herself and "needed silence." She reported a leaden feeling in her body and that she did not want to move.  She also reported a significant weight gain of more than 30 pounds. The isolation and physical fatigue, and apathy improved after 2-3 months.  She said that she still feels pain and sadness of her nephew's death daily.  She also reported that she felt that the alleged assault would not have happened if her nephew was still alive.

*Psychiatric treatment history*

Ms. Dailey reported receiving mental health treatment off and on since her early 20's.  As described, much of the treatment was for personal growth or in the context of situational stress. Medical records are generally not retained for more than 7-10 years, and most of her treatment records are not available.

Ms. Dailey reported first seeing a psychiatrist in her early 20's in the context of marital stress. She described brief treatment with benzodiazepines that was not helpful. Ms. Dailey attended a few couples counseling sessions with her second husband, Albert, that she did not find helpful.

Ms. Dailey's first significant mental health intervention was through the self-help program Alcoholics Anonymous.  She described a high degree of engagement, and attributed her success with sobriety to the program.  She saw a psychiatrist shortly after getting sober in 1981, reportedly for reassurance that her alcohol use had not caused any lasting damage.  She described cognitive psychological assessment, and reportedly received a clean bill of health.

Ms. Dailey reported receiving psychotherapy with a psychologist in New York from approximately 1986 to 1992.  She reportedly sought counseling because of isolation and stress related to the move to New York.  She described "rebirthing therapy", a method of personal growth popular at the time.  She intermittently attended counseling with an Aspen psychologist after her move there from New York around 1992.  Ms. Dailey reported that this was to help with the stress of the transition.

Ms. Dailey reported that she was first treated with an antidepressant at age 45.  She stated Aspen psychiatrist Dr. Joel Brence prescribed sertraline (Zoloft™), and she immediately felt improvement in her mood.  She saw a Vero Beach psychologist around age 52 pertaining to her divorce from Rusty and her legal suit with the SEC.

Ms. Dailey started seeing her current therapist, Dr. Betty McGuigan, in around 2004.  She is currently seeing psychiatrist Dr. James Jacobson for medication management.  Ms. Dailey reported receiving transcranial magnetic stimulation (TMS), a treatment for depression, from Vero Beach psychiatrist Dr. Creelman in January 2014.  She stated that she found it moderately helpful.

The records of Dr. Jacobson indicated a relatively stable course of treatment for depression and ADD.  He noted a change in her condition in November 2011 due to her nephew's suicide.  In

January of 2014, he described her as stable and free of complaints.  He saw her on March 6, 2014, and noted that she appeared unhappy.  She reportedly said that she was disappointed with the results of TMS.  Her symptoms were reportedly stable for most of 2014 and 2015.  He noted increased depression in June of 2015.  He noted on August 29, 2016 that he depression was worse, and that she seemed more anxious.

Ms. Dailey generally reported having benefited from psychotherapy to improve her mood.  She demonstrated skills commonly taught in psychotherapy, such as cognitive restructuring, behavioral modification, and self-care.

According to Dr. Jacobson, her current medications are:
- Synthroid 50 mcg in the morning;
- Metformin 500 mg twice a day;
- Zocor 20 mg in the morning;
- Deplin (levomefolate-algal oil) one capsule per day;
- Prestiq 100 mg per day;

*History of psychiatric symptoms*
Ms. Dailey reported intermittent sadness, loneliness, and increased alcohol use throughout her early 20's.  She attributed this to relationship stress and a lack of mature coping skills.  Ms. Dailey reported periods of discrete depressive episodes that she described as being "at the bottom of the well."  She said that these periods last as long as 3 weeks and are not prompted by environmental stress.  She described it as "chemical."  She reported increased sleep, hopelessness, anhedonia, apathy, poor concentration, isolation from others.  She said that she cannot get out of bed.  She said that she does not feel suicidal during these periods but has thoughts about dying.  She did not endorse hallucinations or delusional beliefs during periods of depression.  She stated that she has had approximately 10 such episodes in her lifetime.  She could not identify when her first episode occurred or a seasonal pattern. are different from feelings of sadness due to situational stress.  She said that her most recent episode was in the summer of 2015.  She said that her depression has been worse in the last 5-6 years.

**Present Psychological Complaints**
Ms. Dailey reported significant anxiety and distress since the alleged assault.  She stated, "My life is shattered."  She repeatedly emphasized that she did not believe that she was going to live long enough to recover.  She reported disturbed sleep beginning the first 1-3 months after the alleged assault, and stated that it is getting worse.  She stated her sleep decreased from 8-9 hours per night to 4-5 hours per night.

She stated that it is hard for her to connect with other people.  She said she has a "heavy secret".  She described feeling disconnected from the neck down and having no desire to connect with her body.  She stated that this is a big change from her previous experience, particularly given her Pilates training that emphasized the connection between the mind and body.  She stated, "I sometimes feel more in the next world," and that this brings relief.  She said that her life "doesn't feel real" and that "it is all over anyway."  She said that her spiritual life is the "best part of her life" and helps her to cope.  She also described her fears of Mr. Hecht in terms of her spirituality.

She stated that she sees him as evil, and that she does not trust that good will overcome evil as she once did. She said that she cannot experience peacefulness and joy.

## Mental Status Evaluation

The interviews were conducted in a private outpatient setting free of distractions. Ms. Dailey's appearance is younger with her stated age. She dressed casually but appropriately for the setting. She did not show signs of physical discomfort or distress. No abnormalities of gross motor movement were noted. She used prescription reading glasses, but no other sensory limitations were evident.

Ms. Dailey was extremely courteous and polite, consistent with her age group and her cultural background. Rapport developed quickly but was variable over the course of the evaluation. She showed an increase in fine motor activity, particularly when discussing difficult subjects. She arrived late to every session. She did not generally report overt distress, and seemed to tolerate the lengthy interviews well at first. However, it became evident that she had an unusual degree distress during the process and had difficulty tolerating the interviews. She returned for the second day of interviews with significant concerns about the use of the information. She was preoccupied with the idea that the information would be used to harm her or her family. She reported concerns that I would sell her personal information to the press or to the defendant. She maintained persecutory ideas about the evaluation despite significant reassurance. She was reluctant to complete the evaluation. After the first day of evaluation in November, which included a brief clinical interview and psychological testing, she reported nausea, vomiting, and anxiety that prevented her from continuing as scheduled. She acknowledged that her symptoms were likely due to anxiety.

Ms. Dailey was otherwise overtly cooperative and forthcoming. She was difficult to structure, and tended to have a rambling though engaging conversational style. She spoke in an average rate and tone. Distraction and difficulty concentrating were evident. She occasionally had minor word finding difficulty consistent with attention problems. She seemed to be of above average intelligence given her vocabulary and abstract reasoning skills. Her ability to understand language and to express herself verbally was excellent. Her immediate, short-term, and remote memory were intact. She was psychologically insightful.

Ms. Dailey showed avoidance of discussing past traumatic events. She demonstrated increased nervous system activity (autonomic arousal) when describing the alleged rape by Mr. Hecht, and could not tolerate lengthy interviewing. She showed increased vigilance of her environment but did not demonstrate an exaggerated startle response. Her thought process was logical and organized, and she did not endorse or show signs of delusional beliefs or psychotic symptoms. However, her thought content was preoccupied with thoughts of detachment from others and with a foreshortened sense of the future.

## Psychological Assessment Findings

*Test Administered*

- Wechsler Adult Intelligence Scale, Fourth Edition (WAIS-IV) The WAIS-IV is an individually administered intelligence test. It is comprised of several different types of

problem solving tasks (subtests).  It is used to determine the overall level of intelligence as well as relative strengths and weaknesses.

- Minnesota Multiphasic Personality Test – Second Edition (MMPI-2)  The MMPI-2 is a self-report personality and psychopathology inventory.  The scales are used to discriminate various types of psychological problems.  The test contains several embedded symptom validity scales.

- Trauma Symptom Inventory, Second Edition (TSI-2) – the TSI-2 is a self-report inventory of psychological problems associated with past traumatic events.

- Detailed Assessment of Posttraumatic Stress (DAPS) – the DAPS is a self-report inventory of symptoms of Posttraumatic Stress Disorder (PTSD).

- Test of Memory Malingering (TOMM) - The TOMM is a symptom validity test used to detect poor effort and feigned cognitive deficits.

- Structured Review of Reported Symptoms, Second Edition (SIRS-2) - The SIRS-2 is a symptom validity test using several detection strategies to identify feigning of severe psychopathology.

*Assessment of Validity and Response Style*

**Summary:  The test results are a valid and can be clinically interpreted.  Ms. Dailey responded consistently within and across tests.  She did not show a pattern of endorsement associated with symptom exaggeration or feigning.  The findings are consistent with her interview behavior and reported functional level, as well as her relatively high level of perceived distress.**

For psychological test findings to be useful, the examinee must respond with a reasonable degree of consistency and effort, and must report her psychological problems with reasonable accuracy.  This evaluation included symptom validity measures to assist in detection of random responding, highly exaggerated or feigned symptoms, and embellished positive qualities and under-reported symptoms.

Ms. Dailey responded somewhat inconsistently to some items (MMPI-2, VRIN = 62T), possibly due to anxiety or fatigue toward the end of the test (MMPI-2, F-Fb=5).  This level of inconsistency does not indicate random responding, and the clinical findings are valid.  It corresponds with behavioral observations that she read and responded to the items.

Ms. Dailey endorsed an elevated number of semi-rare symptoms (MMPI-2, F = 82T; TSI-2, ATR = 75T).  When compared to the normative sample of the MMPI-2, this finding can suggest an increased possibility of symptom feigning or exaggeration.  However, this score is below the mean for clinical samples with posttraumatic stress disorder.  She did not endorse an elevated number of rare symptoms (MMPI-2, Fp = 42T), a more specific measure of outright symptom feigning.  She also did not highly endorse rare symptoms on the DAPS (NB = 63T).  On the SIRS-2, Ms. Dailey had a clear pattern strongly characteristic of an individual with a genuine

disorder who is making no efforts to overstate her symptoms. She was engaged with the task such that the results were interpretable (SS Index = 30). There were no scales in the definite or probable range. This classification of Genuine Responding has greater than 90% accuracy. Scores on the TOMM were within normal limits (Trial 1 = 50; Trial 2 = 50).

Ms. Dailey reported a wide range of psychological symptoms and personal faults and did not overly endorse positive traits. Ms. Dailey acknowledged a typical number of common social faults (MMPI-2, L = 57T). She does not appear to have tried to present herself in an overly favorable light (MMPI-2, K= 30T, S = 33T; DAPS, PB = 47T).

*Clinical findings*
Ms. Dailey highly endorsed psychological symptoms associated traumatic events across measures (DAPS, PTS-T = 101T; MMPI-2, Pk = 83T). She endorsed an average number of lifetime traumatic events and listed the alleged assault by Mr. Hecht as the most significant (DAPS, RTE = 45T). She reported intrusive re-experiencing of the event (TSI-2, IE = 85T; DAPS, RE = 101T), such as nightmares and painful memories. She endorsed avoidance symptoms (DAPS, AV = 90T; TSI-2, DA = 84T), including avoidance of things that remind her of the experience (DAPS, AV-E = 90T) and blunting of emotional experience (DAPS, AV-N = 108T; TSI-2, IA-RA = 77T). She reported significant anxiety and nervous system activation (DAPS, AH = 107T, TSI-2, AA = 73T, AA-H = 76T). She very highly endorsed dissociative symptoms across measures (DAPS, T-DIS = 136T, TSI-2, DIS >100T). These symptoms include feelings of detachment from the self and from others and experiencing a sense of unreality. She highly endorsed dissociative experiences during the traumatic event (DAPS, PDIS = 90T). Individuals who experience dissociative symptoms during the traumatic event are at increased risk for developing PTSD, and are more likely to have severe symptoms.

Ms. Dailey endorsed a wide range of psychological problems on a general clinical inventory (MMPI-2), with 5 of nine clinical scales significantly elevated. This finding is associated with a high level of subjective distress, as well an increased likelihood of acute and chronic psychological problems.

She reported significant symptoms of depression (D = 77T), including depressed mood (D1 = 79T), apathy and poor concentration (D4 = 79T), and emotional sensitivity (D5 = 78T). She reported worry and tension at a level that is likely evident to others (Pt = 70T). Her level of distress is such that she is experiencing difficult controlling her thoughts (Sc3 = 92T). The endorsed feeling overwhelmed to the point of inertia (Sc4 = 75T).

She reported problems with interpersonal relationships (Pd = 84T), including family conflict (Pd1 = 68T), feeling alienated and rejected from others (Pd4 = 81, Sc1 = 88T; Sc2 = 76T), and pessimism about the motives of others (Pd5 = 92, Pa1 = 93T). This finding is consistent with the persecutory ideas expressed during the interview. She also items associated with feeling special or different from others and misunderstood (Pa2 = 72T).

In summary, the psychological test findings were highly consistent with her known history of chronic depression and acute anxiety associated with a traumatic experience.

*Cognitive functioning*

Ms. Dailey demonstrated strong subjective effort on the WAIS-IV. She was anxious about her performance and expressed distress when she could not answer a question. She remembered verbatim items that were difficult for her, and gave answers the next day. Her behavior was consistent with the validity findings described above.

Ms. Dailey's scores are summarized in the table below:

| Scale | Sum of Scaled Scores | Composite Score | | Percentile Rank | 95% Conf. Interval | Qualitative Description |
|-------|----------------------|-----------------|---|-----------------|--------------------|-------------------------|
| Verbal Comprehension | 36 | VCI | 110 | 75 | 104-115 | High Average |
| Perceptual Reasoning | 31 | PRI | 102 | 55 | 96-108 | Average |
| Working Memory | 21 | WMI | 102 | 55 | 95-109 | Average |
| Processing Speed | 21 | PSI | 102 | 55 | 93-110 | Average |
| Full Scale | 109 | FSIQ | 106 | 66 | 102-110 | Average |

Ms. Dailey performed in the average to high average range of overall intellectual functioning as compared to adults in her age group. She performed in the average to high average range on verbal problem solving tasks. She performed in the average to high average range on visual reasoning and problem solving tasks. She performed in the average range on simple and complex attention tasks. She performed in the average to high average range on mental processing speed tasks.

She showed more variability of performance within clusters of types of tasks. The amount of variability in her scores is common within the general population, and does not indicate a focal cognitive deficit. She generally did better on untimed tasks, a finding associated poor attention and concentration.

**Diagnostic Formulation**

The psychiatric diagnoses were made using the system described in the *Diagnostic and Statistical Manual, Fifth Edition* (DSM5), published by the American Psychiatric Association.

*Malingering*

In a forensic context, there is always the possibility that symptoms might be feigned for exaggerated for some tangible legal benefit. I used objective and clinical detection strategies during this evaluation to critically evaluate Ms. Dailey's symptom report. No single or combined method is foolproof, but by using multiple statistical indices, recognized clinical strategies, and corroboration of self-report, the likelihood of error is reduced.

There are two potential threats to diagnostic validity in this case that should be noted. First, feigned PTSD and other trauma-related disorders are difficult to detect compared with other clinical disorders. Second, I was unable to corroborate Ms. Dailey's symptom report with her current treating therapist. I addressed the first threat to validity by conducting a lengthy interview in which I could observe the presence or absence of her reported symptoms. I compared her interview behavior to common patterns of feigned PTSD.

**In my opinion, to a reasonable degree of psychological certainty, Ms. Dailey does not meet criteria for malingering.** Her responses to statistical symptom validity measures were not consistent with symptom feigning. Rather, the test findings were consistent with known patterns of depression, anxiety, and posttraumatic stress. During the evaluation, I observed behavioral signs of anxiety that are difficult to maintain over a lengthy period. She had a blunted emotional response, an outward sign consistent with her report of emotional numbing. Feigned PTSD is associated with presenting a detailed description of the traumatic event during the interview, as well as the report of prototypical but relatively rare symptoms such as "flashbacks." Ms. Dailey demonstrated the opposite and more credible pattern of avoiding a detailed discussion of known and alleged traumatic events. She demonstrated significant avoidance throughout the whole process. Lastly, Ms. Dailey did not describe her symptoms using diagnostic terms or jargon, or emphasize stereotypical symptoms.

*Posttraumatic stress disorder*
I considered the diagnosis of Posttraumatic Stress Disorder (PTSD). PTSD is the development of specific clusters of symptoms following exposure to one or more traumatic events. Exposure to a qualifying traumatic event is required to make the diagnosis. A traumatic event (Criterion A) is defined as exposure to actual or threatened death, serious injury, or sexual violence by directly experiencing the event, witnessing the event in person as it happened to others, learning that the traumatic event occurred to a close family member or friend, or experiencing repeated or extreme exposure to aversive details of the traumatic event in others.

Ms. Dailey reported 3 qualifying traumatic events during her lifetime:
1. Directly experiencing violence during her first marriage,
2. Learning of the death by suicide of her nephew; and
3. The alleged forcible rape by Mr. Hecht.

Therefore, Ms. Dailey meets Criterion A for PTSD. Mr. Hecht denied that he raped Ms. Dailey, and a determination of what happened on the night of March 25, 2014 is beyond the scope of this evaluation. If the allegations are true, the rape is a plausible cause of her symptoms. There is no clinical method that can definitively link the symptoms of PTSD to a specific event. However, it is noted that Ms. Dailey described new and different psychological symptoms following her trip to Mexico in 2014 and these were documented in the records of Dr. Gallow and Dr. Jameson.

The symptom clusters include intrusive experiences or memories, persistent avoidance of stimuli associated with the traumatic event, negative changes in thoughts or moods, and marked changes in arousal and reactivity. The duration of symptoms must be more than 1 month, cause clinically significant distress or impairment, and not be attributable to the effects of a drug or medical condition.

The following intrusive experiences were noted or reported: Ms. Dailey reported intrusive distressing memories of the alleged assault (B1) during the interview, deposition, and testing. She reported nightmares pertaining to the alleged assault 3-4 times per week (B2) since April or May 2014. In her interview behavior, Ms. Dailey strongly demonstrated intense or prolonged psychological distress (B4) and marked physiological reactions (B5) at exposure to cues that symbolize or resemble an aspect of the traumatic event. Ms. Dailey reported increased fatigue

and anxiety on the second day of the interview.  I observed objective signs of increased arousal as compared to the previous day, as well as an unusual degree of concern about the parameters of the evaluation.  She became physically ill on the fourth day.  She showed both psychological distress and physiological arousal when discussing traumatic events throughout the interview.

The following persistent avoidance symptoms were noted or reported:  Ms. Dailey reported efforts to avoid memories, thoughts, and feelings pertaining to the alleged sexual assault (C1), in that she described staying busy with work.  Avoidance of external reminders (C2) was evident during the interview in that she had difficulty discussing the events in Mexico, and she consistently moved the conversation away from the details.  She also reported difficulty discussing the events with others

The following negative alterations in cognition or mood beginning or worsening after the traumatic event were noted or reported:  Ms. Dailey reported persistent negative beliefs or expectations about herself, others, and the world (D2).  This was perhaps her most prominent and preoccupying symptom.  She repeatedly asserted that she felt that she did not have enough time in her life to recover, and she was permanently damaged.  She stated that she had difficulty teaching because she felt that her experience would somehow be transferred to her clients when she touched them and damage them.  She also expressed that she was afraid that the defendant would physically retaliate or kill her.  She reported a negative emotional state (D4), in that she became fearful of the dark following the alleged assault.  She reported being newly afraid to leave the house after the dark, and that she has trouble sleeping at night.  She showed markedly diminished interest or participation in significant activities (D5), in that she stopped exercising and often did not leave her home.  She described detachment and estrangement from others (D6), in that she felt that a "plexi-glass wall" was between herself and others.  She also reported that she feels more dead than alive, and as if she is more in the "spirit world" than the living world.  She also described an inability to experience positive emotions (D7), in that she felt "robbed of joy" and that "hope and goodness" were taken away.  A sense of meaningless and hopelessness was prominently reported.

Ms. Dailey showed marked changes in arousal and reactivity in the following ways:  She described irritation and uncharacteristic angry outbursts following the alleged assault (E1).  She stated that she feels engaged rather than angry.  Increased arousal and reactivity were noted in the interview.  She shuddered prominently when discussing physical contact with clients.  Highly vigilant during the interview and described similar efforts to reinforce her physical safety at home (E3).  She also reported marked sleep disturbance, with a decrease in overall sleep and difficulty staying asleep.

The onset or worsening of the above symptoms was reported to be in late spring, early summer 2014.  She reported a delayed onset of some symptoms, in that she initially increased her work activity as a coping mechanism.  Ms. Dailey also meets criteria for the additional qualifier "with dissociative symptoms", in that she reports experiencing detachment from her body and her mind (depersonalization) and experiencing her surroundings as unreal (derealization).

*Major Depressive Disorder*
Per Ms. Dailey and her medical records, she has a history of depression that is best classified as
Major Depressive Disorder (MDD), moderate.  She reports discrete periods of depressed mood,
diminished interest in activities, hypersomnia, fatigue, feelings of worthlessness, decreased
concentration, and recurrent thoughts of death.  She reported that her most recent episode was in
July 2015, and her symptoms are currently in partial remission.

*Attention Deficit Disorder*
Per Ms. Dailey and her medical records, she has a history of Attention Deficit Disorder (ADD).
She was reportedly diagnosed in adulthood and experienced symptoms in childhood.  Her
symptoms were evident during the evaluation and deposition, in that she was easily distracted,
had word finding difficulty, spoke impulsively and talked over others, and had relative difficulty
with tasks involving simple attention.

**Forensic Opinion Regarding Behavior in the Aftermath of a Traumatic Event**
There is no single or prototypical behavioral response to general or sexual trauma.  Individual
responses vary based on a multitude of personal, situational, and cultural factors.  No single
reported response is indicative of a "credible" or "real" rape or is conclusive proof that a crime
occurred as alleged.  However, there are common societal misperceptions about the likelihood
frequency of certain reactions to traumatic events that can lead to misjudgments about the
likelihood that a rape has occurred.

For example, when asked to describe the most common or typical rape, the average lay person
describes a violent forcible assault of a sober female by a male stranger using a weapon.  The
victim is described as physically injured and makes an immediate outcry to law enforcement.
Alleged assaults that do not conform to this scenario are thought to be less likely.  However,
based on clinical samples and law enforcement data, sexual assaults are more commonly
perpetrated by an acquaintance.  There are often no identifiable physical injuries.

Ms. Dailey was challenged during her deposition about her actions during and following the
alleged assault.  The behaviors in question are not uncommon in clinical and research samples of
people who report being sexually assaulted.  Ms. Dailey was asked why she did not scream for
help during the assault.  Forcible verbal or physical resistance is not universally reported, and is
less likely to occur during an assault by acquaintance.  She reported experiencing shame and
embarrassment and reluctance for everyone at the event to know; this is a commonly reaction
and a frequently cited reason to delay or refuse to make a report.  Ms. Dailey was also asked why
she did not make an immediate report to law enforcement.  Most sexual assaults are not reported
to law enforcement.  Except in cases in which the victim sustains significant physical injuries,
most initial reports are made to a friend or family member, and reports to law enforcement are
frequently delayed.  Reluctance to report is a frequent reaction, and the reasons cited are
consisted with the ones reported by Ms. Dailey.

Ms. Dailey's reported response during and after the alleged response does not prove the truth of
her allegation.  However, it would be erroneous to dismiss her allegation as atypical based on
behaviors that are actually quite common.

Jennifer S. Yeaw, Psy.D., ABPP
Forensic Psychologist
December 5, 2016

## Benesh & Yeaw Consulting LLC
15912 Crain Highway, Unit B #430 ◆ Brandywine, Maryland 20613
Phone: 202-868-6806 ◆ Fax: 202-417-3948 ◆ beneshyeaw@gmail.com

# Report of Forensic Psychological Evaluation

**Case Name**
Suzanna F. Dailey, Plaintiff v. Nikos Hecht, Defendant
Civil Action Number 1:16-cv-581
Filed March 10, 2016 in the United States District Court for the District of Colorado

**Reason for Referral and Identifying Information**
Suzanna Dailey is a 68-year-old (date of birth 9-2-1948) divorced Caucasian female with approximately 13 years of education.  Her present occupation is exercise instructor (Pilates and Gyrotonic) and business owner.

Ms. Dailey filed a federal tort suit against Mr. Hecht for assault, battery and sexual assault, and intentional infliction of emotional distress.  Ms. Dailey alleges that the defendant, Mr. Hecht, forcibly raped her on March 25, 2014 during a dinner party at a restaurant in Mexico.  Her complaint asserts that she suffered physical, moral, and psychological injuries as the result of Mr. Hecht's assault.

This report was prepared by Jennifer S. Yeaw, Psy.D., ABPP (Forensic), a board certified forensic psychologist in private practice.  My curriculum vita is attached (Enclosure 1).  I was retained in the above reference matter by Maria-Vittoria "Giugi" Carminati, counsel for plaintiff, Ms. Dailey.  I was asked to conduct a forensic psychological evaluation of Ms. Dailey and to opine on the following issues:

- Ms. Dailey's psychiatric history relevant to her functioning on March 25, 2014; any change in functioning following the alleged events; her present psychiatric diagnosis, if any; and the level of functional impairment caused by her psychiatric diagnosis; and
- An analysis of Ms. Dailey's behavior after the alleged assault in light of known misconceptions about common responses to traumatic events in general and to sexual trauma specifically.

**Statement of Non-Confidentiality**
Ms. Dailey was advised of the parameters of the evaluation verbally and in writing.  Specifically, she was told that the evaluation was not for treatment purposes and did not establish a confidential doctor-patient relationship.  She was advised that the evaluation was being conducted for her attorneys as part of her lawsuit against Mr. Hecht and that I would communicate the findings with her attorneys in a comprehensive report.  She was also advised that my report could become part of the court record, and that I could be called to testify about my evaluation in deposition or at trial.  She was advised that the evaluation was voluntary, and she was encouraged to contact her attorney at any time.

Ms. Dailey asked relevant questions about the limits of confidentiality and about how the evaluation would be used.  She demonstrated an intellectual understanding of the limits of

confidentiality at the start of the interview.  However, at the start of the second day of the evaluation, she expressed considerable distress about sensitive personal details being disclosed. Some reservations are common and realistic in forensic evaluations; however, Ms. Dailey's degree of anxiety was unusually high.  She reported concerns that her personal history would be inappropriately disclosed to the defendant, and that the information would be used to retaliate against her and her family.  Her concerns persisted despite repeated reassurance, and as described further below, reflected her current psychiatric symptoms.

**Sources of Information**
*Evaluation Procedures*
1. Clinical interviews of Suzanna Dailey on 10-24-2016, 10-25-2016, 11-29-2016, 11-30-16, and 12-1-2016 for a total of 17.5 hours;
2. Telephone interview of Suzanna Dailey on 10-23-2016 for a total of 45 minutes;
3. Psychological assessment of Suzanna Dailey conducted on 11-29-2016 and 11-30-2016 for a total of 6 hours;

*Litigation Records*
1. Plaintiff's Original Complaint, filed March 30, 2016;
2. Plaintiff's Responses and Objections to Defendant's First Set of Interrogatories, dated September 19, 2016;
3. Video deposition of Suzanna Dailey taken September 28, 2016, including transcript and associated exhibits;
4. Video deposition of Nikos Hecht taken September 29, 2016, including transcript and associated exhibits;
5. Video deposition of Andrew Hecht, father of defendant, taken October 10, 2016, including transcript and associated exhibits;
6. Video deposition of Jeanne Andlinger, sister of Ms. Dailey, taken September 20, 2016, including transcript;
7. Video deposition of Gerhard Andlinger, brother-in-law of Ms. Dailey, taken September 20, 2016, including transcript;
8. Deposition transcript of Tristan Andlinger, son of Mr. and Mrs. Andlinger and nephew of Ms. Dailey, taken October 6, 2016;
9. Deposition transcript of Kaelin George Cathers, friend of Tristan Andlinger and witness to alleged events, taken October 17, 2016;
10. Interview of Suzanna Dailey conducted by Inv. Lisa Miller on August 13, 2015;
11. Plaintiff's Original Complaint ICO Brooke Lauren Warfel v. Nikos Hecht, and associated exhibits;

*Medical Records of Suzanna Dailey*
1. Treatment records of Dr. Karen Ferguson (Bates stamped 226-258), gynecologist; and
2. Treatment records from Coastal Gynecology (Bates stamped 192-225).
3. Treatment records of Dr. James Jacobson, psychiatrist.

**Information Requested but Not Available**
- Treatments records of Dr. Betty McGuigan, Ph.D., current treating psychologist of Ms. Dailey - My understanding is that Dr. McGuigan has asserted privilege for her psychotherapy process notes, and that no discovery pertaining to her treatment of Ms.

Dailey is yet available.  Dr. McGuigan did not return my call requesting information as of the date of this report.

- Treatment records of Dr. Creelman, procedural psychiatrist, who has treated Ms. Dailey using transcranial magnetic stimulation (TMS).
- Treatment records of Dr. Denise Tonner, endocrinologist.
- Observations of Sylvia Ann Beard Haft, cousin of Ms. Dailey.  She did not return my call requesting information as of the date of this report.

**Description of Principal Events**

This summary of the alleged events was derived from the sworn depositions listed above and Ms. Dailey's description during the interview.  A complete account is contained in the case file.  Ms. Dailey's account during the interview was consistent with her deposition testimony.  Her description of events before and after the alleged assault was consistent with the accounts of other witnesses.  Mr. Hecht disputes her version of events as described below.

Ms. Dailey did not show or report loss of memory for the alleged assault.  She showed avoidance of discussion of the alleged assault, particularly of the most painful and intimate aspects.  She also showed a change in emotional expression (affect) when describing the alleged assault, with an overall limited expression of emotion (blunted affect).  She also demonstrated increased nervous system activity (increased autonomic arousal, increased psychomotor agitation) when discussing the alleged assault.

In March of 2014, Ms. Dailey traveled to Cabo San Lucas with members of her family for two weeks.  On the trip were Mr. and Mrs. Andlinger, their 14-year-old son Tristan, and Martha Walton, mother of Mrs. Andlinger and Ms. Dailey.  Tristan's friend Dylan was present for the first week, and his friend George Cathers was present for the second week of the trip.  The family stayed for the first week at a residence in El Dorado, a private community, and then at a hotel resort called Las Ventanas for the second week.  Other Aspen families known to the Andlinger's, including the Hecht's and the Kaplan's, were also vacationing in the vicinity.

Nikos and his wife at the time, Alison Hecht, were at their vacation home in El Dorado with their three children, Nikos' father Andy Hecht, and his step-mother, Jody Hecht.  As she was walking on the beach with Tristan and George, Mrs. Andlinger happened to see Mrs. Alison Hecht and her children in their pool.  The children knew the Hecht children from their school.  Mrs. Hecht waived them over and invited them to use the pool.  Mrs. Alison Hecht invited the Andlingers and their family over for drinks later that evening.  Mrs. Andlinger said that she observed Nikos and Alison Hecht drinking that afternoon, and that she thought that they were intoxicated on alcohol and possibly drugs.

Ms. Dailey went to the Hecht residence that evening with the Andlinger's.  She had not previously met Nikos or Alison Hecht.  She reported that the ladies talked at one end of the pool and the men at the other.  Mrs. Hecht suggested that the group have dinner at a local restaurant called Flora Farms during the vacation, and that they invite the Kaplan's, who were staying nearby.

Ms. Dailey and Mr. Hecht gave different accounts of their interactions at the Hecht home that evening. Per Ms. Dailey, she had minimal interaction with Mr. Hecht until the end of the evening. She reported that Mr. Hecht followed her up the stairs from the lower level as they left the house. She said that he remarked that she was in good shape. Ms. Dailey said that she found the comment to be overly personal, particularly considering their difference in age and proximity on the stairs. She described it as "creepy", and said that she thought that he may have been condescending because she felt his remark was not true. She said that she responded with a self-deprecating comment about her weight, and that he replied that men like women with meat on their bones.

In contrast, Mr. Hecht reported in his deposition that Ms. Dailey accompanied him downstairs to light the fire pit. He stated that he thought that it was odd that she would go with him. He also stated that she complimented him on his station in life and his achievements at such a young age. He noted that she said that he had the weight of the world on his shoulders.

Alison Hecht organized a group dinner party on Tuesday, March 25, 2014 at Flora Farms. Flora Farms was described as a large property containing gardens where food for the restaurant is grown. The dinner took place in a private area of the property, in a covered outdoor pavilion adjacent to a lawn for playing games and to pathways leading into the gardens. Present were Nikos and Alison Hecht and their children, Thea (age 10), Amelia (age 8), and Levi (age 5); Andy and Jody Hecht; Laura Kaplan, her mother, and her children Eli (age 18) and Stella (age 16); Eli's girlfriend, Zoe, and his friend Luke O'Callahan; Gerhard, Jeanne, and Tristan Andlinger; Tristan's friend George; Ms. Dailey; and Mrs. Walton.

According to Ms. Dailey, during the evening Nikos Hecht asked her if she would like to see the gardens. She said that he offered her his arm in a gentlemanly fashion, and she believed that this was to help her to walk along the unpaved pathway. She described the gesture as "courtly". She said that she did not perceive any romantic or sexual overture, citing the differences in their ages and the proximity of Mr. Hecht's wife and children. She took his arm and walked with him into gardens on the pathway. She related that he told her a story about his grandfather, and she found him to be polite and respectful at first. She stated that when they were some distance up the path, Mr. Hecht forcibly grabbed her by the neck with his right hand and forced her mouth to his. She said that he then grabbed her right hand with his left hand and placed it on his erect penis. She described being shocked and fearful, that she realized she was in a dangerous situation.

She described him as physically overpowering her. She stated that he forced her down to the ground, pulled his pants down, and then pulled her shorts down to about her knees. She said that she was wearing elastic waist shorts. She said that when she was on the ground, he immediately forcibly penetrated her vagina with his penis. She stated that it was extremely physically painful. She also reported experiencing shock and feeling her body was paralyzed or frozen. She said that her arms were above her head and Mr. Hecht's bodyweight was on top of her. She stated that she tried to push her body back and away but was unable to do so. She stated that she did say, "No, no," but not at a volume that the adults at the party could hear. She stated that she did not cry out or scream. She said that she was frozen in fear and felt that she could not cry out. She also said that she felt ashamed. She said that she did not want to expose the young children and her family to the "filth" that was happening. Ms. Dailey said that Mr. Hecht ejaculated after

a few minutes.  She said that he then got up and went back to the party, leaving her on the ground.  She then pulled up her pants, got up, and returned to the table.

Early in his deposition, Mr. Hecht denied having any intercourse with Ms. Dailey.  He stated that at some point at the end of the evening, Ms. Dailey walked up to him and put her hand on his shoulder.  They were about 50 feet from the table where dinner was held.  He said that "she started talking about how tight her pussy was, how good it was," and started kissing him.  He stated that there was "mutual participation" in the kiss.  He reported that after a few minutes, Ms. Dailey got down on her knees, unbuttoned his pants, and put his penis in her mouth for a few seconds.  He stated that he thought she was pulling her pants down and touching herself as she sat on the ground.  He said that she was pulling hard on his shirt collar, and he fell to his knees and hands.  He stated that they were then both on the ground with their pants down, and "I stopped her."  He stated that he realized that he was in a "fishbowl".  He stated that he told her that they should get back to the others, and returned to the table.  He said that he sat next to his wife, and Ms. Dailey walked up shortly after and sat next to him at the table.  He stated that she later asked to take his picture and for his phone number, which he gave to her.  Mr. Hecht acknowledged in his deposition that he displayed poor judgment.  He reported that he used alcohol and prescription pain medication that day.  He maintained that Ms. Dailey was the instigator of the encounter and that he was at first a surprised but willing participant.

Tristan Andlinger and George Cathers both testified in deposition that they witnessed Ms. Dailey and Mr. Hecht together during the party at Flora Farms.  They said that they noticed them walking with linked arms up a pathway through the gardens.  They reportedly found it weird or suspicious and followed them.  Tristan and George went into the bushes that lined the path through the gardens.  When they caught sight of them again after 1-2 minutes, they saw Mr. Hecht and Ms. Dailey on the ground on the path.  George and Tristan hid in the bushes to avoid being seen.  They both reported that Mr. Hecht was on top of Ms. Dailey with his pants down.  They observed pelvic thrusting by Mr. Hecht and heard grunting noises.  Tristan stated that Ms. Dailey's arms were over her head.  They both stated that they could not see genitals or penetration from their line of sight.  They became scared that they would be seen and returned to the party through the field before Mr. Hecht got up from the ground.

Tristan was 14 years old and George was 13 years old at the time.  Both boys were excited and disturbed by what they saw.  They both reported that they could have heard Ms. Dailey if she spoke, but she did not.  They both testified that they would have intervened if they believed Ms. Dailey was being harmed.  Tristan reported that he did not see Ms. Dailey and Mr. Hecht interact after they returned to the party.  Tristan and George spoke to Mrs. Andlinger about what they saw that evening and again the next day.  The boys also told the other teenagers (Eli, Zoe, Luke, and Stella) during the car ride back to the resort.

Ms. Dailey reported that she did not want to report the event to law enforcement in Mexico.  She spoke to her sister about what happened that evening and in the morning.  Ms. Dailey said she sought civilian counsel regarding the event after returning to the United States, but eventually dropped the matter.  She said that she heard of the allegations made by Brooke Warfel from her sister, and reached out to Ms. Warfel's attorney with the intention of maybe helping another woman.

**Biopsychosocial History of Examination Subject**

*Childhood developmental history*

Ms. Dailey was born in Louisville, Kentucky to an intact family. She is the oldest of 3 sisters; Sallie Donner is currently 68 years old and Jeanne Andlinger is 62. She reported a normal developmental course with no known significant early childhood illnesses or behavioral problems. She reported a ruptured appendix at age 12. Complications related to this illness were thought to be the cause of her infertility.

Her father was an Army intelligence officer until retirement, and then worked for the government. Her mother was a "Southern belle" from a prominent Kentucky family. She completed 2 years of college but did not work outside of the home. Ms. Dailey described her family as affluent and very traditional in terms of gender roles and social expectations. She did not endorse any sexual or physical abuse, and stated that her parents did not use physical discipline.

Their family moved often due to her father's military career. Ms. Dailey said that her father was stationed overseas as an embassy attaché for much of his career, and they had an "international lifestyle" in Caracas. Ms. Dailey's parents divorced following his redeployment from Vietnam. They had a conflictual marriage, and Ms. Dailey reported hearing but not witnessing episodes of spousal abuse. She and her sisters returned to Lexington with her mother after the divorce. Ms. Dailey reported typical psychological distress following her parents' divorce, but maintained good relationships with both parents.

*Family medical and psychiatric history*

Ms. Dailey's mother is currently 92 years old and in relatively good health for her age. Ms. Dailey's father died at age 81 of bone cancer. She said that her mother's brother possibly had multiple sclerosis, but she did not otherwise endorse a family history of neurological illness or early cognitive decline. Ms. Dailey and Mrs. Andlinger both reported a strong family history of substance abuse. Their parents both used alcohol excessively, and all three sisters stopped drinking in their late 20's to early 30's. There is a family history of depression. Her sister, Sallie, has had significant psychiatric problems and a history of suicide attempts. Her primary diagnosis is Borderline Personality Disorder. Sallie also apparently has treatment-resistant depression and has been treated aggressively with over 70 electroconvulsive therapy procedures. Sallie is currently being treated as an inpatient in a long-term psychiatric facility. Sallie also has multiple chronic health problems that are possibly associated with her psychiatric issues. Ms. Dailey's nephew completed suicide at age 15. Concussion was a possible contributing factor.

*Educational History*

Educational records were not available given Ms. Dailey's age. Ms. Dailey described herself as a good student who was social and athletic. She attended international schools and attended boarding school in Pennsylvania while her father was deployed to Vietnam. She did not endorse any disciplinary problems, special education classes, or learning problems. She graduated from high school at approximately age 18. Ms. Dailey attended University of Kentucky for a year before moving to Washington, D.C. and attending the Washington School for Secretaries. The later completed training courses as a Pilates and Gyrotonic instructor.

*Relationship history*

Ms. Dailey reported that she started dating approximately age 16.  Her first significant relationship was in high school and lasted a year and a half.  Ms. Dailey has been married three times.  She and her first husband, Jimmy, were married when she was 20 years old.  They divorced after about five years due to his infidelity and domestic violence.  She married her second husband, Albert, in her late 20's.  They divorced after three years.  She married her third husband, Rusty, in 1998 and divorced in less than a year.  She described the marriage as an "impetuous choice".  She reported a serious relationship that lasted 5 years during the 1990's.  The relationship ended when he started seeing someone else.  Her last significant intimate relationship ended approximately 8 years ago.

*Occupational history*

Occupational and financial records were not provided; however, Ms. Dailey's occupational history was discussed in the sworn depositions of Ms. Dailey and Mrs. Andlinger.  Ms. Dailey described a traditional upbringing in which she was not expected to have a career outside of the home.  She emphasized her need to develop job skills on her own after her first divorce, and described resilience in overcoming personal and occupational setbacks throughout her life.  This seemed an important source of personal pride.  Her sister described her as entrepreneurial, and successful in sales and business.

She was first employed in her mid-twenties at a boutique in Wilmington, Delaware where she resided after her divorce.  She stated that she learned the couture business and found she was good at sales.  She did not continue employment during her second marriage.  She returned to the boutique in Wilmington after her marriage to Albert ended.  Ms. Dailey related that her financial stability was negatively impacted by this divorce.

She moved to New York City full time in 1984.  She reported that she was hired by Ralph Lauren directly to be the first woman to sell men's suits at the Madison Avenue store.  She worked there from 1989 to 1992, when she moved to Aspen, Colorado.  She stated that she worked at the Ralph Lauren retail location in Aspen, and then worked for a businessman named Harley Baldwin in his gallery of shops.

Ms. Dailey operated a retail business selling silver jewelry and accessories at equestrian events beginning in 1993 or 1994.  She closed the business in 1999 or 2000 to pursue Pilates.  She was certified as a Pilates instructor in 2000 and as a Gyrotonic instructor in 2001.  She opened her own studio in Vero Beach, Florida.  She said that she was successful and worked 12-14 hour days.  She estimated her top income from the studio was approximately $90,000.  Her studio moved in 2012, and was closed in May 2014.  She attributed this to a decrease in business due to the recession.  She also reported that after the alleged assault she was unable to continue working one-to-one with her clients and to be unable to cope with the physical contact required.

She currently owns and manages a shoe store in Vero Beach.  The store opened on February 15, 2015.  She stated that she is in the process of shutting down the business due to supply chain problems caused by conflict with a competitor.  She also continues to teach a few Pilates clients out of her home.

*Substance abuse history*

Ms. Dailey first started using alcohol in high school. She reported that alcohol use was very common among her peers, and that she used frequently in social settings. Her use increased to 2-3 drinks, usually Scotch whisky, daily or every other day. She also binged intermittently. She stopped drinking entirely in June of 1981 and entered Alcoholics Anonymous. She did not endorse physical withdrawal symptoms except for "night sweats". She described high motivation and engagement with the program. She did not attend any other treatment related to alcohol use. She reported one relapse that she considered to be significant after 18 years of sobriety (around age 49). She estimated that she has had about 5 glasses of wine since then. She continues to attend AA meetings. Ms. Dailey did not endorse any use of illegal drugs or abuse of prescription medications. No reports of illegal drug use or problems related to substance use were contained in the records.

*Relevant medical history*

Per the records of Coastal Gynecology, Ms. Dailey was seen by Dr. Taryn Gallow on May 5, 2014. Ms. Dailey reported to Dr. Gallow that she was sexually assaulted two weeks prior. A clinical examination was conducted. No gross injuries were observed. She was tested for transmitted infections, and tested positive for HSV-2. She was not currently symptomatic, had never had an outbreak or positive test previously. Ms. Dailey was diagnosed in 2011 with osteoporosis. Ms. Dailey did not endorse any past head injuries or concussion.

*Legal history*

Criminal records of Ms. Dailey were not available. According to Ms. Dailey, she was stopped for driving under the influence once in her early 30's but was not cited. She and Mrs. Andlinger reported that she was arrested once for shoplifting many years ago. She reportedly became impatient while waiting at Kmart and left the store with 2 compact discs in her bag. Ms. Dailey filed for bankruptcy in 1991.

In 2003, Ms. Dailey was sued by the Security and Exchange Commission for allegations of insider trading. She and her sisters allegedly purchased stock based on private information received from her brother in law, Gerhard Andlinger. The suit was settled without admission of wrongdoing, and Ms. Dailey paid disgorgement of profits and a civil penalty amounting to almost 2 million dollars. Ms. Dailey reported during the interview that this was a significant financial blow.

*History of traumatic events*

Ms. Dailey reported an early instance of coerced sex during her deposition, and I asked her to describe it during the interview. She reported that she was dating a boy who had a reputation for moving fast. She described that when they were kissing after a date, the sexual intimacy escalated quickly, and that sex was "sprung on" her. She essentially described what today would be called a lack of affirmative consent. She said that she was "taken advantage of" but that the experience was "not violent." She said that she felt ashamed afterwards, but she did not endorse increased anxiety, disturbed sleep, nightmares, or other symptoms associated with psychological trauma.

In 2011, Mr. and Mrs. Andlingher's son, little Gerry, died by suicide at age 15.  Ms. Dailey described this as a significant loss.  She stated that she was particularly close to her nephew, and her affection and attachment to him were evident during the interview.  She stated that after he died that she could not talk to anyone.  She stated that she isolated herself and "needed silence." She reported a leaden feeling in her body and that she did not want to move.  She also reported a significant weight gain of more than 30 pounds.  The isolation and physical fatigue, and apathy improved after 2-3 months.  She said that she still feels pain and sadness of her nephew's death daily.  She also reported that she felt that the alleged assault would not have happened if her nephew was still alive.

*Psychiatric treatment history*

Ms. Dailey reported receiving mental health treatment off and on since her early 20's.  As described, much of the treatment was for personal growth or in the context of situational stress. Medical records are generally not retained for more than 7-10 years, and most of her treatment records are not available.

Ms. Dailey reported first seeing a psychiatrist in her early 20's in the context of marital stress. She described brief treatment with benzodiazepines that was not helpful. Ms. Dailey attended a few couples counseling sessions with her second husband, Albert, that she did not find helpful.

Ms. Dailey's first significant mental health intervention was through the self-help program Alcoholics Anonymous.  She described a high degree of engagement, and attributed her success with sobriety to the program.  She saw a psychiatrist shortly after getting sober in 1981, reportedly for reassurance that her alcohol use had not caused any lasting damage.  She described cognitive psychological assessment, and reportedly received a clean bill of health.

Ms. Dailey reported receiving psychotherapy with a psychologist in New York from approximately 1986 to 1992.  She reportedly sought counseling because of isolation and stress related to the move to New York.  She described "rebirthing therapy", a method of personal growth popular at the time.  She intermittently attended counseling with an Aspen psychologist after her move there from New York around 1992.  Ms. Dailey reported that this was to help with the stress of the transition.

Ms. Dailey reported that she was first treated with an antidepressant at age 45.  She stated Aspen psychiatrist Dr. Joel Brence prescribed sertraline (Zoloft™), and she immediately felt improvement in her mood.  She saw a Vero Beach psychologist around age 52 pertaining to her divorce from Rusty and her legal suit with the SEC.

Ms. Dailey started seeing her current therapist, Dr. Betty McGuigan, in around 2004.  She is currently seeing psychiatrist Dr. James Jacobson for medication management.  Ms. Dailey reported receiving transcranial magnetic stimulation (TMS), a treatment for depression, from Vero Beach psychiatrist Dr. Creelman in January 2014.  She stated that she found it moderately helpful.

The records of Dr. Jacobson indicated a relatively stable course of treatment for depression and ADD.  He noted a change in her condition in November 2011 due to her nephew's suicide.  In

January of 2014, he described her as stable and free of complaints.  He saw her on March 6, 2014, and noted that she appeared unhappy.  She reportedly said that she was disappointed with the results of TMS.  Her symptoms were reportedly stable for most of 2014 and 2015.  He noted increased depression in June of 2015.  He noted on August 29, 2016 that he depression was worse, and that she seemed more anxious.

Ms. Dailey generally reported having benefited from psychotherapy to improve her mood.  She demonstrated skills commonly taught in psychotherapy, such as cognitive restructuring, behavioral modification, and self-care.

According to Dr. Jacobson, her current medications are:
- Synthroid 50 mcg in the morning;
- Metformin 500 mg twice a day;
- Zocor 20 mg in the morning;
- Deplin (levomefolate-algal oil) one capsule per day;
- Prestiq 100 mg per day;

*History of psychiatric symptoms*
Ms. Dailey reported intermittent sadness, loneliness, and increased alcohol use throughout her early 20's.  She attributed this to relationship stress and a lack of mature coping skills.  Ms. Dailey reported periods of discrete depressive episodes that she described as being "at the bottom of the well."  She said that these periods last as long as 3 weeks and are not prompted by environmental stress.  She described it as "chemical."  She reported increased sleep, hopelessness, anhedonia, apathy, poor concentration, isolation from others.  She said that she cannot get out of bed.  She said that she does not feel suicidal during these periods but has thoughts about dying.  She did not endorse hallucinations or delusional beliefs during periods of depression.  She stated that she has had approximately 10 such episodes in her lifetime.  She could not identify when her first episode occurred or a seasonal pattern. are different from feelings of sadness due to situational stress.  She said that her most recent episode was in the summer of 2015.  She said that her depression has been worse in the last 5-6 years.

**Present Psychological Complaints**
Ms. Dailey reported significant anxiety and distress since the alleged assault.  She stated, "My life is shattered."  She repeatedly emphasized that she did not believe that she was going to live long enough to recover.  She reported disturbed sleep beginning the first 1-3 months after the alleged assault, and stated that it is getting worse.  She stated her sleep decreased from 8-9 hours per night to 4-5 hours per night.

She stated that it is hard for her to connect with other people.  She said she has a "heavy secret".  She described feeling disconnected from the neck down and having no desire to connect with her body.  She stated that this is a big change from her previous experience, particularly given her Pilates training that emphasized the connection between the mind and body.  She stated, "I sometimes feel more in the next world," and that this brings relief.  She said that her life "doesn't feel real" and that "it is all over anyway."  She said that her spiritual life is the "best part of her life" and helps her to cope.  She also described her fears of Mr. Hecht in terms of her spirituality.

She stated that she sees him as evil, and that she does not trust that good will overcome evil as she once did.  She said that she cannot experience peacefulness and joy.

**Mental Status Evaluation**

The interviews were conducted in a private outpatient setting free of distractions.  Ms. Dailey's appearance is younger with her stated age.  She dressed casually but appropriately for the setting.  She did not show signs of physical discomfort or distress.  No abnormalities of gross motor movement were noted.  She used prescription reading glasses, but no other sensory limitations were evident.

Ms. Dailey was extremely courteous and polite, consistent with her age group and her cultural background.  Rapport developed quickly but was variable over the course of the evaluation.  She showed an increase in fine motor activity, particularly when discussing difficult subjects.  She arrived late to every session.  She did not generally report overt distress, and seemed to tolerate the lengthy interviews well at first.  However, it became evident that she had an unusual degree distress during the process and had difficulty tolerating the interviews.  She returned for the second day of interviews with significant concerns about the use of the information.  She was preoccupied with the idea that the information would be used to harm her or her family.  She reported concerns that I would sell her personal information to the press or to the defendant.  She maintained persecutory ideas about the evaluation despite significant reassurance.  She was reluctant to complete the evaluation.  After the first day of evaluation in November, which included a brief clinical interview and psychological testing, she reported nausea, vomiting, and anxiety that prevented her from continuing as scheduled.  She acknowledged that her symptoms were likely due to anxiety.

Ms. Dailey was otherwise overtly cooperative and forthcoming.  She was difficult to structure, and tended to have a rambling though engaging conversational style.  She spoke in an average rate and tone.  Distraction and difficulty concentrating were evident.  She occasionally had minor word finding difficulty consistent with attention problems.  She seemed to be of above average intelligence given her vocabulary and abstract reasoning skills.  Her ability to understand language and to express herself verbally was excellent. Her immediate, short-term, and remote memory were intact.  She was psychologically insightful.

Ms. Dailey showed avoidance of discussing past traumatic events.  She demonstrated increased nervous system activity (autonomic arousal) when describing the alleged rape by Mr. Hecht, and could not tolerate lengthy interviewing.  She showed increased vigilance of her environment but did not demonstrate an exaggerated startle response.  Her thought process was logical and organized, and she did not endorse or show signs of delusional beliefs or psychotic symptoms.  However, her thought content was preoccupied with thoughts of detachment from others and with a foreshortened sense of the future.

**Psychological Assessment Findings**

*Test Administered*

- Wechsler Adult Intelligence Scale, Fourth Edition (WAIS-IV)  The WAIS-IV is an individually administered intelligence test.  It is comprised of several different types of

problem solving tasks (subtests).  It is used to determine the overall level of intelligence as well as relative strengths and weaknesses.

- Minnesota Multiphasic Personality Test – Second Edition (MMPI-2)  The MMPI-2 is a self-report personality and psychopathology inventory.  The scales are used to discriminate various types of psychological problems.  The test contains several embedded symptom validity scales.

- Trauma Symptom Inventory, Second Edition (TSI-2) – the TSI-2 is a self-report inventory of psychological problems associated with past traumatic events.

- Detailed Assessment of Posttraumatic Stress (DAPS) – the DAPS is a self-report inventory of symptoms of Posttraumatic Stress Disorder (PTSD).

- Test of Memory Malingering (TOMM) - The TOMM is a symptom validity test used to detect poor effort and feigned cognitive deficits.

- Structured Review of Reported Symptoms, Second Edition (SIRS-2) - The SIRS-2 is a symptom validity test using several detection strategies to identify feigning of severe psychopathology.

*Assessment of Validity and Response Style*
**Summary:  The test results are a valid and can be clinically interpreted.  Ms. Dailey responded consistently within and across tests.  She did not show a pattern of endorsement associated with symptom exaggeration or feigning.  The findings are consistent with her interview behavior and reported functional level, as well as her relatively high level of perceived distress.**

For psychological test findings to be useful, the examinee must respond with a reasonable degree of consistency and effort, and must report her psychological problems with reasonable accuracy.  This evaluation included symptom validity measures to assist in detection of random responding, highly exaggerated or feigned symptoms, and embellished positive qualities and under-reported symptoms.

Ms. Dailey responded somewhat inconsistently to some items (MMPI-2, VRIN = 62T), possibly due to anxiety or fatigue toward the end of the test (MMPI-2, F-Fb=5).  This level of inconsistency does not indicate random responding, and the clinical findings are valid.  It corresponds with behavioral observations that she read and responded to the items.

Ms. Dailey endorsed an elevated number of semi-rare symptoms (MMPI-2, F = 82T; TSI-2, ATR = 75T).  When compared to the normative sample of the MMPI-2, this finding can suggest an increased possibility of symptom feigning or exaggeration.  However, this score is below the mean for clinical samples with posttraumatic stress disorder.  She did not endorse an elevated number of rare symptoms (MMPI-2, Fp = 42T), a more specific measure of outright symptom feigning.  She also did not highly endorse rare symptoms on the DAPS (NB = 63T).  On the SIRS-2, Ms. Dailey had a clear pattern strongly characteristic of an individual with a genuine

disorder who is making no efforts to overstate her symptoms. She was engaged with the task such that the results were interpretable (SS Index = 30). There were no scales in the definite or probable range. This classification of Genuine Responding has greater than 90% accuracy. Scores on the TOMM were within normal limits (Trial 1 = 50; Trial 2 = 50).

Ms. Dailey reported a wide range of psychological symptoms and personal faults and did not overly endorse positive traits. Ms. Dailey acknowledged a typical number of common social faults (MMPI-2, L = 57T). She does not appear to have tried to present herself in an overly favorable light (MMPI-2, K= 30T, S = 33T; DAPS, PB = 47T).

*Clinical findings*

Ms. Dailey highly endorsed psychological symptoms associated traumatic events across measures (DAPS, PTS-T = 101T; MMPI-2, Pk = 83T). She endorsed an average number of lifetime traumatic events and listed the alleged assault by Mr. Hecht as the most significant (DAPS, RTE = 45T). She reported intrusive re-experiencing of the event (TSI-2, IE = 85T; DAPS, RE = 101T), such as nightmares and painful memories. She endorsed avoidance symptoms (DAPS, AV = 90T; TSI-2, DA = 84T), including avoidance of things that remind her of the experience (DAPS, AV-E = 90T) and blunting of emotional experience (DAPS, AV-N = 108T; TSI-2, IA-RA = 77T). She reported significant anxiety and nervous system activation (DAPS, AH = 107T, TSI-2, AA = 73T, AA-H = 76T). She very highly endorsed dissociative symptoms across measures (DAPS, T-DIS = 136T, TSI-2, DIS >100T). These symptoms include feelings of detachment from the self and from others and experiencing a sense of unreality. She highly endorsed dissociative experiences during the traumatic event (DAPS, PDIS = 90T). Individuals who experience dissociative symptoms during the traumatic event are at increased risk for developing PTSD, and are more likely to have severe symptoms.

Ms. Dailey endorsed a wide range of psychological problems on a general clinical inventory (MMPI-2), with 5 of nine clinical scales significantly elevated. This finding is associated with a high level of subjective distress, as well an increased likelihood of acute and chronic psychological problems.

She reported significant symptoms of depression (D = 77T), including depressed mood (D1 = 79T), apathy and poor concentration (D4 = 79T), and emotional sensitivity (D5 = 78T). She reported worry and tension at a level that is likely evident to others (Pt = 70T). Her level of distress is such that she is experiencing difficult controlling her thoughts (Sc3 = 92T). The endorsed feeling overwhelmed to the point of inertia (Sc4 = 75T).

She reported problems with interpersonal relationships (Pd = 84T), including family conflict (Pd1 = 68T), feeling alienated and rejected from others (Pd4 = 81, Sc1 = 88T; Sc2 = 76T), and pessimism about the motives of others (Pd5 = 92, Pa1 = 93T). This finding is consistent with the persecutory ideas expressed during the interview. She also items associated with feeling special or different from others and misunderstood (Pa2 = 72T).

In summary, the psychological test findings were highly consistent with her known history of chronic depression and acute anxiety associated with a traumatic experience.

*Cognitive functioning*

Ms. Dailey demonstrated strong subjective effort on the WAIS-IV. She was anxious about her performance and expressed distress when she could not answer a question. She remembered verbatim items that were difficult for her, and gave answers the next day. Her behavior was consistent with the validity findings described above.

Ms. Dailey's scores are summarized in the table below:

| Scale | Sum of Scaled Scores | Composite Score | | Percentile Rank | 95% Conf. Interval | Qualitative Description |
|-------|---------------------|-----------------|---|----------------|-------------------|------------------------|
| Verbal Comprehension | 36 | VCI | 110 | 75 | 104-115 | High Average |
| Perceptual Reasoning | 31 | PRI | 102 | 55 | 96-108 | Average |
| Working Memory | 21 | WMI | 102 | 55 | 95-109 | Average |
| Processing Speed | 21 | PSI | 102 | 55 | 93-110 | Average |
| Full Scale | 109 | FSIQ | 106 | 66 | 102-110 | Average |

Ms. Dailey performed in the average to high average range of overall intellectual functioning as compared to adults in her age group. She performed in the average to high average range on verbal problem solving tasks. She performed in the average to high average range on visual reasoning and problem solving tasks. She performed in the average range on simple and complex attention tasks. She performed in the average to high average range on mental processing speed tasks.

She showed more variability of performance within clusters of types of tasks. The amount of variability in her scores is common within the general population, and does not indicate a focal cognitive deficit. She generally did better on untimed tasks, a finding associated poor attention and concentration.

**Diagnostic Formulation**

The psychiatric diagnoses were made using the system described in the *Diagnostic and Statistical Manual, Fifth Edition* (DSM5), published by the American Psychiatric Association.

*Malingering*

In a forensic context, there is always the possibility that symptoms might be feigned for exaggerated for some tangible legal benefit. I used objective and clinical detection strategies during this evaluation to critically evaluate Ms. Dailey's symptom report. No single or combined method is foolproof, but by using multiple statistical indices, recognized clinical strategies, and corroboration of self-report, the likelihood of error is reduced.

There are two potential threats to diagnostic validity in this case that should be noted. First, feigned PTSD and other trauma-related disorders are difficult to detect compared with other clinical disorders. Second, I was unable to corroborate Ms. Dailey's symptom report with her current treating therapist. I addressed the first threat to validity by conducting a lengthy interview in which I could observe the presence or absence of her reported symptoms. I compared her interview behavior to common patterns of feigned PTSD.

**In my opinion, to a reasonable degree of psychological certainty, Ms. Dailey does not meet criteria for malingering.** Her responses to statistical symptom validity measures were not consistent with symptom feigning. Rather, the test findings were consistent with known patterns of depression, anxiety, and posttraumatic stress. During the evaluation, I observed behavioral signs of anxiety that are difficult to maintain over a lengthy period. She had a blunted emotional response, an outward sign consistent with her report of emotional numbing. Feigned PTSD is associated with presenting a detailed description of the traumatic event during the interview, as well as the report of prototypical but relatively rare symptoms such as "flashbacks." Ms. Dailey demonstrated the opposite and more credible pattern of avoiding a detailed discussion of known and alleged traumatic events. She demonstrated significant avoidance throughout the whole process. Lastly, Ms. Dailey did not describe her symptoms using diagnostic terms or jargon, or emphasize stereotypical symptoms.

*Posttraumatic stress disorder*
I considered the diagnosis of Posttraumatic Stress Disorder (PTSD). PTSD is the development of specific clusters of symptoms following exposure to one or more traumatic events. Exposure to a qualifying traumatic event is required to make the diagnosis. A traumatic event (Criterion A) is defined as exposure to actual or threatened death, serious injury, or sexual violence by directly experiencing the event, witnessing the event in person as it happened to others, learning that the traumatic event occurred to a close family member or friend, or experiencing repeated or extreme exposure to aversive details of the traumatic event in others.

Ms. Dailey reported 3 qualifying traumatic events during her lifetime:
1. Directly experiencing violence during her first marriage,
2. Learning of the death by suicide of her nephew; and
3. The alleged forcible rape by Mr. Hecht.

Therefore, Ms. Dailey meets Criterion A for PTSD. Mr. Hecht denied that he raped Ms. Dailey, and a determination of what happened on the night of March 25, 2014 is beyond the scope of this evaluation. If the allegations are true, the rape is a plausible cause of her symptoms. There is no clinical method that can definitively link the symptoms of PTSD to a specific event. However, it is noted that Ms. Dailey described new and different psychological symptoms following her trip to Mexico in 2014 and these were documented in the records of Dr. Gallow and Dr. Jameson.

The symptom clusters include intrusive experiences or memories, persistent avoidance of stimuli associated with the traumatic event, negative changes in thoughts or moods, and marked changes in arousal and reactivity. The duration of symptoms must be more than 1 month, cause clinically significant distress or impairment, and not be attributable to the effects of a drug or medical condition.

The following intrusive experiences were noted or reported: Ms. Dailey reported intrusive distressing memories of the alleged assault (B1) during the interview, deposition, and testing. She reported nightmares pertaining to the alleged assault 3-4 times per week (B2) since April or May 2014. In her interview behavior, Ms. Dailey strongly demonstrated intense or prolonged psychological distress (B4) and marked physiological reactions (B5) at exposure to cues that symbolize or resemble an aspect of the traumatic event. Ms. Dailey reported increased fatigue

and anxiety on the second day of the interview.  I observed objective signs of increased arousal as compared to the previous day, as well as an unusual degree of concern about the parameters of the evaluation.  She became physically ill on the fourth day.  She showed both psychological distress and physiological arousal when discussing traumatic events throughout the interview.

The following persistent avoidance symptoms were noted or reported:  Ms. Dailey reported efforts to avoid memories, thoughts, and feelings pertaining to the alleged sexual assault (C1), in that she described staying busy with work.  Avoidance of external reminders (C2) was evident during the interview in that she had difficulty discussing the events in Mexico, and she consistently moved the conversation away from the details.  She also reported difficulty discussing the events with others

The following negative alterations in cognition or mood beginning or worsening after the traumatic event were noted or reported:  Ms. Dailey reported persistent negative beliefs or expectations about herself, others, and the world (D2).  This was perhaps her most prominent and preoccupying symptom.  She repeatedly asserted that she felt that she did not have enough time in her life to recover, and she was permanently damaged.  She stated that she had difficulty teaching because she felt that her experience would somehow be transferred to her clients when she touched them and damage them.  She also expressed that she was afraid that the defendant would physically retaliate or kill her.  She reported a negative emotional state (D4), in that she became fearful of the dark following the alleged assault.  She reported being newly afraid to leave the house after the dark, and that she has trouble sleeping at night.  She showed markedly diminished interest or participation in significant activities (D5), in that she stopped exercising and often did not leave her home.  She described detachment and estrangement from others (D6), in that she felt that a "plexi-glass wall" was between herself and others.  She also reported that she feels more dead than alive, and as if she is more in the "spirit world" than the living world.  She also described an inability to experience positive emotions (D7), in that she felt "robbed of joy" and that "hope and goodness" were taken away.  A sense of meaningless and hopelessness was prominently reported.

Ms. Dailey showed marked changes in arousal and reactivity in the following ways:  She described irritation and uncharacteristic angry outbursts following the alleged assault (E1).  She stated that she feels engaged rather than angry.  Increased arousal and reactivity were noted in the interview.  She shuddered prominently when discussing physical contact with clients.  Highly vigilant during the interview and described similar efforts to reinforce her physical safety at home (E3).  She also reported marked sleep disturbance, with a decrease in overall sleep and difficulty staying asleep.

The onset or worsening of the above symptoms was reported to be in late spring, early summer 2014.  She reported a delayed onset of some symptoms, in that she initially increased her work activity as a coping mechanism.  Ms. Dailey also meets criteria for the additional qualifier "with dissociative symptoms", in that she reports experiencing detachment from her body and her mind (depersonalization) and experiencing her surroundings as unreal (derealization).

*Major Depressive Disorder*
Per Ms. Dailey and her medical records, she has a history of depression that is best classified as Major Depressive Disorder (MDD), moderate. She reports discrete periods of depressed mood, diminished interest in activities, hypersomnia, fatigue, feelings of worthlessness, decreased concentration, and recurrent thoughts of death. She reported that her most recent episode was in July 2015, and her symptoms are currently in partial remission.

*Attention Deficit Disorder*
Per Ms. Dailey and her medical records, she has a history of Attention Deficit Disorder (ADD). She was reportedly diagnosed in adulthood and experienced symptoms in childhood. Her symptoms were evident during the evaluation and deposition, in that she was easily distracted, had word finding difficulty, spoke impulsively and talked over others, and had relative difficulty with tasks involving simple attention.

**Forensic Opinion Regarding Behavior in the Aftermath of a Traumatic Event**
There is no single or prototypical behavioral response to general or sexual trauma. Individual responses vary based on a multitude of personal, situational, and cultural factors. No single reported response is indicative of a "credible" or "real" rape or is conclusive proof that a crime occurred as alleged. However, there are common societal misperceptions about the likelihood frequency of certain reactions to traumatic events that can lead to misjudgments about the likelihood that a rape has occurred.

For example, when asked to describe the most common or typical rape, the average lay person describes a violent forcible assault of a sober female by a male stranger using a weapon. The victim is described as physically injured and makes an immediate outcry to law enforcement. Alleged assaults that do not conform to this scenario are thought to be less likely. However, based on clinical samples and law enforcement data, sexual assaults are more commonly perpetrated by an acquaintance. There are often no identifiable physical injuries.

Ms. Dailey was challenged during her deposition about her actions during and following the alleged assault. The behaviors in question are not uncommon in clinical and research samples of people who report being sexually assaulted. Ms. Dailey was asked why she did not scream for help during the assault. Forcible verbal or physical resistance is not universally reported, and is less likely to occur during an assault by acquaintance. She reported experiencing shame and embarrassment and reluctance for everyone at the event to know; this is a commonly reaction and a frequently cited reason to delay or refuse to make a report. Ms. Dailey was also asked why she did not make an immediate report to law enforcement. Most sexual assaults are not reported to law enforcement. Except in cases in which the victim sustains significant physical injuries, most initial reports are made to a friend or family member, and reports to law enforcement are frequently delayed. Reluctance to report is a frequent reaction, and the reasons cited are consisted with the ones reported by Ms. Dailey.

Ms. Dailey's reported response during and after the alleged response does not prove the truth of her allegation. However, it would be erroneous to dismiss her allegation as atypical based on behaviors that are actually quite common.

*Jennifer S. Yeaw, Psy.D., ABPP-F*

Jennifer S. Yeaw, Psy.D., ABPP
Forensic Psychologist
December 5, 2016

# Benesh & Yeaw Consulting LLC

15912 Crain Highway, Unit B #430 ♦ Brandywine, Maryland 20613
Phone: 202-868-6806 ♦ Fax: 202-417-3948 ♦ beneshyeaw@gmail.com

**JENNIFER S. YEAW, PSY.D., ABPP (FORENSIC)**

Curriculum Vitae, 15 September 2016

## SUMMARY

Dr. Yeaw is a board certified forensic psychologist with 10+ years of experience in military behavioral health.  Formerly of the Walter Reed Center for Forensic Behavioral Sciences, she is a leader in military forensic psychology.  She had contributed to over 100 courts-martial as a consultant or an evaluator, including trials for capital murder, military specific offenses, terrorism, and sexual assault.  As a faculty member, Dr. Yeaw has supervised forensic psychology and psychiatry fellows and advised other psychiatrists and psychologists regarding matters pertaining to forensic psychology and behavioral health law.  Dr. Yeaw is now the co-owner of Benesh & Yeaw Consulting, L.L.C., providing forensic psychology evaluations and consultations.

## PROFESSIONAL LICENSURE AND CERTIFICATIONS

Licensed Psychologist, Texas State Board of Examiners of Psychologist
**Texas License Number 32570**                                          **2004**

National Register of Health Service Providers in Psychology
**Registrant # 52895**                                                  **2010**

American Board of Forensic Psychology
**Board Certification in Forensic Psychology, Diploma #7019**            **2011**

Security Clearance
**TS/SCI**                                                              **2013**

## EDUCATION

Pepperdine University
**Doctor of Psychology in Clinical Psychology**                         **1996 - 2003**

Pepperdine University
**Master of Arts in Psychology**                                        **1993 - 1995**

University of Southwestern Louisiana
**Bachelor of Science in Psychology with Minor in Biology**             **1989 - 1993**

## PROFESSIONAL TRAINING EXPERIENCE

Clinical Psychology Internship
**Patton State Hospital, Patton, California**                           **1999 – 2000**
Completed an APA accredited one year internship at the largest maximum-security forensic hospital in the United States.  Provided general, forensic, and neuropsychology treatment and evaluation services to a severely mentally ill patient population.

Psychology Clerkship
**Los Angeles County/University of Southern California Medical Center, Los Angeles**
**1998 – 1999**

Conducted inpatient and outpatient psychological assessments of
children and adolescents at a large metropolitan hospital serving an
ethnically and economically diverse patient population.

Psychology Extern
**Harbor/UCLA Medical Center, Torrance, California**          **1997 - 1998**
Provided individual psychotherapy to outpatient clients with HIV.
Conducted comprehensive neuropsychological evaluations of
individuals with HIV and other cognitive disorders.

Practicum Student
**AIDS Service Foundation**                                              **1997**
Provided individual and group psychotherapy at a community health
agency serving individuals with AIDS and their families.

EMPLOYMENT EXPERIENCE

Co-owner, forensic psychologist
**Benesh & Yeaw Consulting, L.L.C.**                              **2016-present**
**Brandywine, MD and Colorado Springs, CO**
Provide forensic psychology services including court-ordered evaluations of adults, attorney-
consultation pertaining to behavioral health matters, training and consultation for behavioral health
providers and attorneys, and expert witness testimony.  Significant experience in military criminal law.
Areas of expertise include evaluations of competency to stand trial, insanity evaluations, sentencing
evaluations (including risk assessment), consultation regarding sexual assault prosecution, and
competency to waive Miranda rights/suggestibility.  Also provide consultation and evaluation
regarding civil and administrative matters, including military accession and fitness for duty, public
safety personnel selection, independent psychological evaluation, and psychological autopsy.

Forensic Psychologist
**Center for Forensic Behavioral Science**
**Walter Reed National Military Medical Center, Bethesda, Maryland**     **2008 – 2016**
Provided forensic behavioral science evaluations and consultations to
military attorneys, law enforcement agencies, and commanders
throughout the Department of Defense.  Advised stakeholders in the
military medical and legal communities on policy and program needs
as a subject matter expert in the fields of forensic and clinical
psychology.  Supervised psychiatry and psychology trainees at all
levels of progression as faculty member of the National Capitol
Consortium Forensic Psychiatry Fellowship and the Forensic
Psychology Fellowship.  Served as director of the forensic rotation for
the Clinical Psychology Post-Doctoral Residency.

Clinical Psychologist
**Carl R. Darnall Army Medical Center, Ft. Hood, Texas**          **2006 – 2008**
Provided evaluation and psychotherapy to active duty service
members at the primary behavioral health clinic at Ft. Hood.
Provided leadership and supervision to junior psychologists and mid-
level providers as clinical team leader.  Managed a high-acuity case
load during a period of high OPTEMPO. Conducted military specific

administrative evaluations, fitness for duty evaluations, and forensic evaluations.

Staff Psychologist
**Federal Correctional Institution, Three Rivers, Texas**              **2004 – 2006**
Provided a full range of psychology services to federal inmates in a medium-high security federal prison.  Advised security staff of safety and management strategies for psychiatrically ill inmates.  Provided conflict avoidance interventions to prevent use of force and maintain institutional safety as Hostage Negotiation Team Psychologist. Managed the institutional Suicide Prevention Program.

Lecturer I
**University of Texas at San Antonio**              **2003 – 2004**
Taught undergraduate psychology.  Courses included General Psychology, Social Psychology, Health Psychology, and Experimental Psychology Lab.

Adjunct Faculty
**Tarleton State University, Killeen, Texas**              **2003**
Taught graduate-level psychology.  Courses included Standardized Tests and Measurement and Research Design.

Psychology Supervisee
**Schaffer and Associates, Temple, Texas**              **2001-2003**
Provided psychological services at a small private practice. Conducted mental health screening evaluations for students enrolled in Head Start.  Conducted continuing education trainings for educators and health professionals.

Adjunct Faculty
**University of Mary-Hardin Baylor, Belton, Texas**              **2001 – 2002**
Taught undergraduate psychology.  Courses included General Psychology, Theories of Counseling, and Theories of Personality.

Clinical Research Coordinator
**Affiliated Research Institute, Pasadena, California**              **1998 – 1999**
Managed research protocols for FDA clinical trials.  Monitored the progress of patients on experimental psychotropic medications. Administered psychological and neuropsychological tests to study participants.

Psychiatry Intake Counselor
**Cedars-Sinai Medical Center, Los Angeles, California**              **1997 – 1998**
Provided crisis assessment and intervention services in person and telephonically at a large, metropolitan medical center.  Conducted behavioral health intake assessments and facilitated entry into appropriate level of care.  Conducted initial utilization review for third party payers for patients requiring inpatient admission.

Needs Assessment Coordinator
**Charter Behavioral Health System, Mission Viejo, California**              **1994-1997**
Conducted emergency psychiatric assessment and crisis intervention at a private psychiatric hospital.  Facilitated inpatient psychiatric

admission when necessary.  Supervised the activities of the intake department on evenings and weekends.  Provided direct patient care to hospitalized adult and adolescent psychiatric patients.  Facilitated psychotherapy groups and provided supportive counseling.  Conducted staff training on managing suicidal callers.

## ACADEMIC APPOINTMENTS AND COMMITTEES

| | |
|---|---|
| Psychology Faculty, NCC Forensic Psychiatry Fellowship | |
| Walter Reed National Military Medical Center | 2008 – present |
| | |
| Psychology Faculty, Forensic Psychology Fellowship | |
| Walter Reed National Military Medical Center | 2008 – present |
| | |
| Affiliate Medical Staff Member, Walter Reed National Military Medical Center | |
| (formerly Walter Reed Army Medical Center) | 2008 – 2016 |
| | |
| U. S. Army Representative, SME in Forensic Behavioral Science | |
| Department of Defense Integrated Mental Health Strategy #22 Work Group | 2011 – 2016 |
| | |
| Rotation Director and Faculty Member, Clinical Psychology Post-Doctoral Residency | |
| Walter Reed National Military Medical Center | 2013 – 2016 |
| | |
| Affiliate Medical Staff Member | |
| Carl R. Darnall Army Medical Center | 2006 – 2008 |
| | |
| Lecturer I | |
| University of Texas at San Antonio | 2003 – 2004 |
| | |
| Adjunct Faculty | |
| Tarleton State University | 2003 |
| | |
| Adjunct Faculty | |
| University of Mary-Hardin Baylor | 2001-2002 |

## PROFESSIONAL MEMBERSHIPS

| | |
|---|---|
| Fellow, American Academy of Forensic Psychology | 2011 - present |
| American Psychological Association | 2003 - present |
| APA Division 19 Military Psychology | 2005 - present |
| APA Division 41 American Psychology and Law Society | 2008 - present |
| Association of Threat Assessment Professionals | 2012 - 2015 |

## HONORS AND RECOGNITION

| | |
|---|---|
| Director's Letter of Commendation, Federal Bureau of Prisons | 2006 |
| Rookie of the Year, Federal Bureau of Prisons | 2005 |
| Academic Honors Award, Federal Law Enforcement Training Center | 2004 |
| Alumni Association Scholarship, Pepperdine University | 1997 |

## FORENSIC EVALUATIONS CONDUCTED

Conducted 56 R.C.M. 706 Sanity Board evaluations.
Completed 3 evaluations of restoration of competency to stand trial.
Completed over 10 evaluations of federal inmates for competency to receive administrative discipline.

*Dr. Yeaw Curriculum Vitae*
*September 15, 2016*

Conducted over 300 evaluations of competency to be separated from military service due to misconduct.

Completed 2 mentally disordered offender evaluations (CA § 2972) to assess appropriateness for conditional release from a state forensic hospital.

Conducted over 13 evaluations of violent recidivism risk.

Completed 15 evaluations of sex offender recidivism risk.

Completed over 10 evaluations of treatment progress of NGRI (insanity) acquittees.

Completed over 500 assessments of inmate adjustment and risk of institutional violence and/or exploitation.

Completed over 300 assessments of inmate adjustment to administrative segregation.

Completed over 10 evaluations of acutely psychiatrically ill federal prisoners for emergency medical redesignation.

Conducted over 200 assessments of imminent dangerousness.

Conducted 5 security clearance evaluations.

Consulted in 10 federal correctional officer personnel selections.

Conducted over 50 sensitive military occupation personnel selection evaluations.

Completed over 300 evaluations of fitness for military duty.

Completed 5 Line of Duty investigations.

Completed 3 psychological autopsies.

TRIALS AND HEARINGS WHERE QUALIFIED AS AN EXPERT:

*US v. Hilton, 2015.* Qualified as an expert in forensic psychology and testified as a defense witness in a child sexual assault court-martial.

*US v. Jackson, 2014.* Qualified as an expert in forensic psychology and testified as a defense witness in a failure to obey an order, false official statement, and fraternization court-martial.

*US v. Burgher, 2014.* Qualified as an expert in forensic psychology and testified in a R.C.M. 909 hearing (capacity of the accused to stand trial by court-martial).

*US v. Harper, 2013.* Qualified as an expert in forensic psychology and testified as a defense witness in a sexual harassment court-martial.

*US v. D. Johnson, 2013.* Qualified as an expert in forensic psychology and testified as a defense witness in a sexual assault court-martial.

*US v. Horne, 2011.* Qualified as an expert in forensic psychology and testified as a defense witness in an aggravated assault court-martial.

*US v. Grimes, 2010.* Qualified as an expert in forensic psychology and testified as a government witness in a sexual assault court-martial.

*US v. Velghe, 2010.* Qualified as an expert in forensic psychology and testified as a defense witness in an attempted murder court-martial.

*US v. Gaines, 2009.* Qualified as an expert in forensic psychology and testified as a government witness in an aggravated assault court-martial.

*US v. Maloney, 2009.* Qualified as an expert in forensic psychology and testified as a government witness in a sexual assault court-martial.

*US v. Santiago, 2009.* Qualified as an expert in forensic psychology and testified as a government witness in a sexual assault court-martial.

US v. *Barnes 2008.* Qualified as an expert in forensic psychology and testified as a government witness in a sexual assault and possession of child pornography court-martial. Testimony at sentencing involved evaluation of risk and rehabilitation potential.

*US v. Ingle, 2008.* Qualified as an expert in forensic psychology and testified as a government witness in a sexual assault court-martial.

*US v. Chavarillaportillo, 2007.* Qualified as an expert in clinical psychology and testified as a government witness in an appeal hearing concerning recommended separation from active duty service for personality disorder.

*US v. Herrerarivera, 2006.* Qualified as an expert in clinical psychology and testified as a government witness in a pretrial confinement hearing.

EXPERT CONSULTANT EXPERIENCE:

*US v. Davis, 2016.* Employed as an expert consultant for prosecution in a sexual assault court-martial.

*US v. Cox-Borba, 2016.* Employed as an expert consultant for the defense in an aggravated assault court-martial.

*US v. Echiwaudah, 2016.* Employed as an expert consultant for the defense in a sexual assault court-martial.

*US v. C. Smith, 2016.* Employed as an expert consultant for the defense in an assault court-martial.

*US v. Hilton, 2015.* Employed as an expert consultant for the defense in a child sexual assault court-martial.

*US v. Mortensen, 2015.* Employed as an expert consultant for the defense in a sexual assault court-martial.

*US v. Harris, 2015.* Supervised and consulted for the defense in a sexual assault court-martial.

*US v. Angulo, 2015.* Supervised and consulted for the defense in a sexual assault court-martial.

*US v. Fowler, 2015.* Supervised and consulted for the government in a sexual assault court-martial.

*US v. Jackson, 2014.* Employed as an expert consultant for the defense in a failure to obey an order, false official statement, and fraternization court-martial.

*US v. Barbera, 2014.* Employed as an expert consultant for the defense in a homicide court-martial.

*US v. Sinclair, 2014.* Employed as an expert consultant for the defense in a sexual assault court-martial.

*US v. D. Johnson, 2013.* Supervised and consulted for the defense an aggravated sexual assault court-martial.

*US v. Hope, 2013.* Supervised and consulted for the defense an aggravated sexual assault court-martial.

*US v. Blasini, 2013.* Supervised and consulted for the defense in an AWOL court-martial.

*US v. Morgan, 2012.* Supervised and consulted for the defense in a sexual assault court-martial.

*US v. al-Nashiri, 2012.* Employed as an expert consultant for the government in a terrorism tribunal.

*US v. Dorsey, 2012.* Employed as an expert consultant for the defense in a sexual assault court-martial.

*US v. Dalton, 2011.* Employed as an expert consultant for the government in a homicide court-martial.

*US v. Ford, 2011.* Employed as an expert consultant for the government in a sexual assault court-martial.

*US v. Yumul, 2011.* Employed as an expert consultant for the government in a sexual assault court-martial.

*US v. Campbell, 2011.* Employed as an expert consultant for the government in a sexual assault court-martial.

*US v. Law, 2011.* Employed as an expert consultant for the government in a homicide court-martial.

*US v. Johnson, 2011.* Employed as an expert consultant for the defense in a child sexual assault court-martial and sentencing hearing.

*US v. Jones, 2010.* Employed as an expert consultant for the defense in a reckless endangerment court-martial.

*US v. Shannon, 2010.* Employed as an expert consultant for the defense in a sexual assault court-martial.

*US v. Stevens, 2010.* Employed as an expert consultant for the government in a desertion court-martial.

*US v. Grimes, 2010.* Employed as an expert consultant for the government in a sexual assault court-martial.

*US v. Cruz, 2010.* Employed as an expert consultant for the government in a sexual assault court-martial.

*Dr. Yeaw Curriculum Vitae*
*September 15, 2016*

*US v. Velghe, 2009.*  Employed as an expert consultant for the defense in an attempted murder court-martial.

*US v. Chatman, 2009.*  Employed as an expert consultant for the defense in a child sexual assault court-martial and sentencing hearing.

*US v. Williams, 2009.*  Employed as an expert consultant for the government in a sexual assault court-martial.

*US v. Ramirez, 2009.*  Employed as an expert consultant for the defense in a sexual assault court-martial.

*US v. Jarnegan, 2009.*  Employed as an expert consultant for the defense in a sexual assault court-martial.

*US v. Grose, 2009.*  Employed as an expert consultant for the defense in a possession of pornography court-martial and sentencing hearing.

*US v. Martinez, 2009.*  Employed as an expert consultant for the government in a sexual assault court-martial.

*US v. Walker, 2009.*  Employed as an expert consultant for the government in an appellate review of a capital murder conviction.

*US v. Gaines, 2009.*  Employed as an expert consult for the government in a trial competency hearing and aggravated assault court-martial.

*US v. Necaise, 2009.*  Employed as an expert consultant for the defense in a detainee abuse court-martial.

*US v. Maloney, 2009.*  Employed as an expert consult for the government in a trial competency hearing and aggravated assault court-martial.

*US v. Gissendanner, 2008.*  Employed as an expert consultant for the government in a sexual assault court-martial.

*US v. Santiago, 2008.*  Employed as an expert consultant for the government in a sexual assault court-martial.

*US v. Pollard, 2008.*  Employed as an expert consultant for the defense in a possession of child pornography court-martial and sentencing hearing.

*US v. Barnes, 2008.*  Employed as an expert consultant for the government in a sexual assault and possession of child pornography court-martial and sentencing hearing.

*US v. Rountree. 2008.*  Employed as an expert consultant for the government in a sexual assault court-martial.

*US v. Ingle, 2008.*  Employed as an expert consultant for the government in a sexual assault court-martial.

*US v. Miles, 2008.*  Employed as an expert consultant for the government in a sexual assault court-martial.

SPECIALIZED FORENSIC TRAINING EXPERIENCES

Expert Testimony, American Academy of Forensic Psychology, 2015.

Police Officer Selection, American Academy of Forensic Psychology, 2015.

Threat Assessment and Management, Department of State, 2015.

National Security Psychology Symposium, 2015.

Issues of Cultural Diversity in the Psychotherapy Relationship, Walter Reed National Military Medical Center, 2015.

A Structural Summary Approach to Interpreting the Personality Assessment Inventory, Walter Reed National Military Medical Center, 2014.

Ethical Decision Making in Challenging Working Environments, Walter Reed National Military Medical Center, 2014.

Crisis Negotiations, Walter Reed National Military Medical Center, 2014.

National Security Psychology Symposium, 2014.

Symposium on Police Interrogation and False Confessions, Walter Reed National Military Medical Center, 2014.

Symposium on Threat Assessment, Walter Reed National Military Medical Center, 2013.

Threat Assessment On Trial, Association of Threat Assessment Professionals, 2013.

Stalking Case Study, Association of Threat Assessment Professionals, 2012.

Advanced Rorschach Interpretation, Walter Reed National Military Medical Center, 2012.

Dynamic Supervision of Sex Offenders, Walter Reed Army Medical Center, 2011.

Assessment of Malingering:  Theory and Practice, Focusing on the SIRS-2, Walter Reed Army Medical Center, 2011.

Symptom Validity Testing, Walter Reed Army Medical Center, 2011.

Violence Risk Assessment and Management Using Structured Professional Judgment, American Academy of Forensic Psychology, 2011.

Psychological Examinations in Disability Matters, American Academy of Forensic Psychology, 2011.

Evaluations of Criminal Responsibility, American Academy of Forensic Psychology, 2011.

MMPI-RC Research and Interpretation, Walter Reed Army Medical Center, 2010.

Sex Offender Investigator Training Program, U. S. Marshals Service, 2010.

Ethics and Ethical Decision Making for Mental Health Practitioners, Walter Reed Army Medical Center, 2010.

Violence Risk Assessment, Walter Reed Army Medical Center, 2010.

Rorschach Research Review, National Naval Medical Center, 2010.

Malingering and Forensic Practice, American Academy of Forensic Psychology, 2010.

Expert Testimony and Report Writing, American Academy of Forensic Psychology, 2010.

Hare Psychopathy Checklist-Revised, Darkstone Research Group, 2009.

Assessment and Treatment of Complex PTSD, Walter Reed Army Medical Center, 2009.

Advanced Forensic Psychology Practice:  Issues and Applications.  American Academy of Forensic Psychology, 2008.

Advanced MMPI-2 Interpretation.  National Naval Medical Center, 2008.

The Assessment and Treatment of TBI in Theater:  OIF 07-08, Walter Reed Army Medical Center, 2008.

Ethical Decision-Making and National Security Related Activities, Walter Reed Army Medical Center, 2008.

Hostage Negotiation, Federal Bureau of Prisons, 2005 and 2006.

New Psychologist Training, Federal Bureau of Prisons, 2005.

Advanced Forensic Evaluation, Capacity 4 Justice, 2004.

Introduction to Correctional Techniques, Federal Bureau of Prisons, 2004.

Critical Incident Stress Debriefing, 2003.

## BIBLIOGRAPHY

*Original Articles and Case Reports*

Yeaw, J. S.  (2003).  Psychopathy and the orbitofrontal circuit.  (Doctoral Dissertation, Pepperdine University, Malibu, CA).

*Invited Presentations*

Johnson, D. E., Yeaw, J. S., & Candellis, P. (2016, May)  Military sexual assault courts-martial. Symposium conducted at the American Psychiatric Association Annual Conference, Atlanta, GA.

Yeaw, J. S.  (2014).  Sanity boards.  Presented to Division of Behavioral Health, Camp Lejeune, North Carolina.

Yeaw, J. S.  (2014, August).  Military forensic psychology.  Symposium conducted at the American Psychological Association Annual Conference, Washington, D.C.

Yeaw, J. S. (2014).  Admissibility of victim behavior testimony:  Recent developments.  Presented to Defense Counsel Assistance Program Sexual Assault Leadership Training, Ft. Belvoir, VA.

Johnson, D. E., Yeaw, J. S., Smullen, R., White, D., & Chiarella, R.  (2014, May)  Expert consultation and testimony on alcohol intoxication.  Symposium conducted at the American Psychiatric Association Annual Conference, New York, NY.

Yeaw, J. S. (2013).  Rule for Court-Martial 706.  Presented to Prosecuting Mental Health Defenses Training Conference, Army Trial Counsel Assistance Program, San Antonio, Texas.

Yeaw, J. S. (2013).  Capacity of the Accused to Stand Trial by Court-Martial.  Presented to Prosecuting Mental Health Defenses Training Conference, Army Trial Counsel Assistance Program, San Antonio, Texas.

Yeaw, J. S. (2013).  Forensic Psychology.  Presented to Prosecuting Mental Health Defenses Training Conference, Army Trial Counsel Assistance Program, San Antonio, Texas.

Johnson, D. E. and Yeaw, J. S. (2013).  Forensic Behavioral Science.  Presented to Prosecuting Mental Health Defenses Training Conference, Army Trial Counsel Assistance Program, San Antonio, Texas.

Yeaw, J. S. and Van Horn, M. (2006).  Lessons learned from the Atlanta-Oakdale Prison Riots.  Presented to Hostage Negotiation Conference, Texas State University at San Marcos.

# MAXIMILLIAN WACHTEL, PH.D.

PHONE: 303-399-5300   FAX: 303-399-5304
E-MAIL:  mwachtel@thecoloradocenter.com
1720 S. Bellaire St., Suite 204, Denver, CO 80220

**Licensed Psychologist**
Colorado: #PSY-2832
Wyoming: #T-29

## EDUCATION

**Doctor of Philosophy Degree**
2001, Counseling Psychology, University of Denver, Denver, CO
*Areas of Interest:* Group Psychotherapy, Psychological Testing, Cognitive/Neurocognitive Assessment
*Dissertation Title:* Group Co-Therapist Relationship Development Training:  Effects on the Co-Therapist Relationship
*Honors:* 1999 GSAC Outstanding Student

**Master of Arts Degree**
1997, Counseling Psychology, University of Denver, Denver, CO

**Bachelor of Arts Degree**
1995, Trinity University, San Antonio, TX
*Majors:* Psychology and Religious Studies,
*Honors:* Cum Laude, Peter Kiewit Scholar, Psi Chi Honor Fraternity

## PROFESSIONAL EXPERIENCE

Summary

- *Conducted and supervised 500+ evaluations of legal disability for The Department of Disability Services (consultative examinations).*
- *Conducted and supervised 600+ forensic mental health evaluations (pre and post-sentencing) for Denver District Court Probation Department.*
- *Conducted and supervised 300+ assessments of competency to stand trial for the Colorado Mental Health Institute at Pueblo.*
- *Conducted 10+ sanity evaluations in Colorado and Wyoming*
- *Provide private consultation and assessment services to criminal defense and prosecuting attorneys.*
- *Conducted 90+ independent medical (psychological) evaluations.*
- *Expert witness testimony.*
- *Trial consultation services for state and federal courts, and military courts-martial.*

09/2015 - Present

**Psychologist,** The Colorado Center For Clinical Excellence, Denver, CO

Provide forensic psychology and assessment services for adolescents and adults. Conduct psychological and neuropsychological assessments by referral. Co-developer of the *Colorado Method of Forensic Evaluation* (CMFE), a standardized, multi-step evaluation method. Populations: Depression, Bipolar Disorder, Severe/Persistent Mental Illness, Disability, Cognitive Impairment, Neuropsychological/TBI Issues, Couples, Personality Disorders, Malingering.

09/2013 - Present

**9News Psychologist,** 9News, KUSA-TV, Denver, CO

Provide commentary and expert psychological analysis of crime/legal news. Create original content for web (9News.com) and broadcast.

01/2004 to 09/2014

**Psychologist/Owner,** Cherry Creek Psychology, Denver, CO

Owned and managed general and forensic practice. Provided individual therapy, supervision, and consultation to adolescents and adults. Conducted psychological and Neuropsychological assessments by referral. Populations: Depression, Bipolar Disorder, Severe/Persistent Mental Illness, Disability, Cognitive Impairment, Couples, Personality Disorders, Malingering.

07/2012 - 06/2013

**Assistant Clinical Professor,** Counseling Psychology, University of Denver

Taught doctoral and masters level classes in cognitive and psychological assessment, law and ethics, and counseling. Engaged in student orientation, student selection, and student recruitment. Participated in student advising.

09/2010 - 06/2012

**Faculty Lecturer,** Counseling Psychology, University of Denver

09/2001 - 09/2010

**Adjunct Faculty,** Counseling Psychology, University of Denver

Developed curriculum and taught Cognitive Assessment course for doctoral students in counseling psychology program, with a focus on assessment of memory impairment and neuropsychological screening. Developed curriculum and taught Psychological Assessment, with a focus on objective and projective personality measures. Taught Introduction to Group Theory and Practice. Taught Ethical & Legal Issues in Counseling Psychology. Taught Field Placement Class. Supervised students in field placement.

10/2002 - 06/2004

**Program Manager, Adult Outpatient and Access Services,** The Mental Health Center of Denver

Managed the largest adult outpatient clinic in the Rocky Mountain Region (750 clients, 25 staff). Supervised the single-point-of entry call center for MHCD (7staff). Consulted on the clinical work of homeless shelter outreach workers. Supervised 17 clinical staff in their work with clients who were

disabled and/or severely and persistently mentally ill. ***Managed and supervised the development of a forensic treatment program for DOC offenders with severe mental illness.*** Supervised neuropsychological testing.  Managed a combined budget of $2 million. Created a comprehensive Group Therapy Training program. ***Conducted and supervised forensic assessments (appropriateness for outpatient treatment).*** Managed the intake procedure for clients covered under a $15 million/year class action lawsuit.

## 09/2001 - 10/2001

### **Contractor to Qwest Communications,** Short-Term Contractor

Created mentorship program for new hires. Developed training materials for new engineering employees.

## 09/2000 - 09/2001

### **Predoctoral Intern,** Denver Health Medical Center

Provided individual counseling to substance abusing clients through a methadone maintenance program. Conducted HIV Harm Reduction Group. Conducted psychological and neuropsychological assessment of HIV positive clients) focus on memory impairment/HIV-related dementia). Conducted therapy with a wide range of client diagnoses.

## 09/1999 - 09/2000

### **Therapist/Intern,** Denver Veterans Administration Hospital

Provided individual counseling to clients living with chronic pain, clients with spinal cord injuries, and clients interested in smoking cessation. Conducted assessments of chronic pain management by clients. Assessments included several pain-specific instruments, the Personality Assessment Inventory, and the Beck Depression Inventory.  Presented client cases to a multidisciplinary pain team and provided recommendations for treatment and pain management. Provided psychological assessment as part of a multidisciplinary team. That assessed the overall health and well-being of clients with spinal cord injuries.

## 06/1999 - 09/2000

### **Summer Traineeship/Practicum,** Denver Veterans Administration Hospital

Provided individual counseling to clients with chronic pain, spinal cord injuries, and for smoking cessation. Conducted assessments of chronic pain management by clients. These assessments included several pain-specific instruments, the Personality Assessment Inventory, and the Beck Depression Inventory. Presented assessment results to a multidisciplinary pain team and provided recommendations for treatment and pain management.

## 01/1998 - 08/1998

### **Program Administrator,** University of Denver Counseling Clinic

Scheduled appointments for clients. Conducted initial phone screening interview sessions with prospective clients, which involved screening for presenting problem, suicidality, and mode of treatment needed. Conducted individual and family counseling. Participated in a supervision team, providing feedback to student-therapists. Coordinated counselor schedules.

**08/1998 - 06/1999**

**Therapist/Intern/Drug and Alcohol Specialist,** University of Denver Counseling Center

Provided individual counseling to clients suffering from depression, adjustment difficulties, problems with drugs and/or alcohol and and interpersonal relationship difficulties. Crisis intervention with suicidal clients. Provided couples counseling. Developed treatment plans for all clients. Conducted intake interviews and assigned DSM-IV and ICD-9 diagnoses. Performed drug and alcohol abuse/dependence assessments. Provided consultation services to library staff and residence halls staff. Taught drug and alcohol remediation classes.

**03/1997 - 09/1997**

**Student Therapist,** University of Denver Counseling Clinic

Conducted individual counseling with several different types of clients, including those with depression and adjustment difficulties. Provided marriage and family counseling to several couples and families. Provided career counseling to several University of Denver students, including interpretation of the Myers-Briggs Type Indicator and the Campbell Interest and Skills Survey. Participated in peer supervision. Created treatment plans and goals with all clients.

**11/1996 - 09/1997**

**Therapist/Intern,** Adams County Adolescent Day Treatment

Provided individual counseling to adolescents ages 11-18 surrounding behavioral issues, depression, bipolar disorder, ADHD, conduct disorder and oppositional defiant disorder. Created treatment plans for all clients. Co-led relational process groups and music therapy groups. Provided family counseling. Supervised in-school-suspension unit, and supervised classroom activities.

**09/1996 - 09/2000**

**Graduate Research Assistant,** The University of Denver

Department of Educational Leadership and Policy Studies, College of Education, University of Denver

Headed a team that created a comprehensive assessment plan for the Department of Educational Leadership and Policy Studies. Developed the data collection and analysis procedures, both quantitative and qualitative, for the assessment of this department. Conducted literature searches. Coordinated student registration for the Department's School Principal Licensure Program. Responsible for textbook ordering for faculty, and served as a liaison between students and faculty. Created biannual newsletter that was sent to alumni of this department.

## PRESENTATIONS AND PUBLICATIONS

Various Dates (2012-2015): Multiple Digital/Broadcast articles for KUSA TV—9News, Denver, Colorado. Topics: legal issues, sanity, mental health, general psychology, substance abuse, marijuana, traumatic brain injury, mass shootings, health and wellness, parenting, back-to-school, new psychology/social science research.

Wachtel, M. (2014). *The One Rule For Boys: How Empathy and Emotional Understanding Will Improve Just About Everything For Your Son.* Vancouver: Friesen Press.

Milnor, W., Wachtel, M. A., Price, J., Drucker, K. (2004, October).  *Group Therapist Training with the Severely and Persistently Mentally Ill Population.*  Paper presented at the Colorado Behavioral Healthcare Council Annual Conference, Keystone, CO.

Riva, M., & Wachtel, M. A. (2005).  Field studies:  A focus on group research.  In Wheelan, S. (ed.) *Handbook of Group Research and Practice*, Thousand Oaks, CA:  Sage.

Riva, M. T., Wachtel, M. A., & Butcher, G. (2000, March).  *Understanding Group Co-Therapy Relationships: A Developmental Approach*.  Paper presented at the American Counseling Association Annual Conference, Washington, D.C.

Riva, M., Wachtel, M. A., & Lasky, G. B. (2004).  Effective leadership in group counseling and psychotherapy.  In DeLucia-Waack,J. L., Gerrity, D. A., Kalodner, C. R., & Riva, M. T. (eds.)  *Handbook of Group Counseling and Psychotherapy,* Thousand Oaks, CA:  Sage, pp. 37-48.

Wachtel, M. A. (2003, September).  *Quality Leadership: How to effectively Manage, Motivate and Encourage Employees in Trying Times.*  Paper presented at the Colorado Behavioral Healthcare Council Annual Conference, Breckenridge, CO.

Wachtel, M. A. (2001, August).  *Supervision of Group Co-Therapists:  A Developmental Approach*.  Paper presented at the American Psychological Association Annual Conference, San Francisco, CA.

Wachtel, M. A., Riva, M., & Butcher, G. (2000, April).  *Issues in The Development of The Group Co-Therapy Relationship*.  Paper presented at the University of Denver College of Education Research Day, Denver, CO.

Wachtel, M. A. (2012, September). Psychologists As Expert Witnesses: How Proper Preparation for Court Can Increase Credibility. *The Colorado Psychologist*, Denver, CO: Colorado Psychological Association.

Wachtel, M. A. (2012, April). *What does a forensic psychologist do?* Presentation at the Colorado Psychological Association's Flight Night: A Career Sampler for Psychologists, Denver, CO.

Wachtel, M. A. (2012, September). *Disorder In The Court: What Does A Forensic Psychologist In Private Practice Actually Do?* Invited presentation at the Colorado Psychological Association's 2012 Annual Conference.

Wachtel, M. A. (1999).  The Hill, *Fetishes, 4,* Denver, CO:  University of Colorado Health Sciences Press.

Wachtel, M. A. (1999, May).  *A Call For Research on Group Co-Therapy*.  Paper presented at the University of Denver College of Education Research Day, Denver, CO.

Wachtel, M. A. (1998, May).  *Teaching an adolescent to verbally express emotions through the use of lyrical improvisation in music therapy*.  Paper presented at the University of Denver College of Education Research Day, Denver, CO.

Wachtel, M. A. (1998, April).  *Cotherapist communication:  Understanding the nature and practice of self-disclosure between group therapists*.  Paper presented at the Rocky Mountain Psychological Association Annual Conference, Albuquerque, NM.

Wachtel, M. A. (1997, May).  *The Test Anxiety Scale for Children:  Does it really measure what it claims?*  Paper presented at the University of Denver College of Education Research Day, Denver, CO.

## PROFESSIONAL AFFILIATIONS
American Psychological Association
American Psychology & Law Society