1              IN THE UNITED STATES DISTRICT COURT

2                FOR THE DISTRICT OF COLORADO

3
   Civil Action No. 16-CV-0581-RBJ
4

5    SUZANNA F. DAILEY,                    Volume 2 of 5
                                           (Pages 141 - 252)
6         Plaintiff,

7         vs.

8    NIKOS HECHT,

9         Defendant.

10   -------------------------------------------------------------

11                    REPORTER'S TRANSCRIPT
                       Jury Trial - Day 1
12
     -------------------------------------------------------------
13
            Proceedings before the HONORABLE R. BROOKE JACKSON,
14   Judge, United States District Court for the District of
     Colorado, and a jury of seven, commencing on the 16th day of
15   May, 2017, in Courtroom A902, United States Courthouse,
     Denver, Colorado.
16
                          APPEARANCES
17
     For the Plaintiff:
18   JENNIFER G. ALTMAN and SHANI RIVAUX and ARYEH L. KAPLAN,
     Pillsbury Winthrop Shaw Pittman LLP, 333 SE 2nd Ave., Ste.
19   2000, Miami, FL 33131

20   For the Defendant:
     MICHAEL D. PLACHY and DOUGLAS B. TUMMINELLO, Lewis Roca
21   Rothgerber Christie, LLP, 1200 17th St., Suite 3000, Denver,
     CO 80202
22
     MARCI G. LABRANCHE, Ridley McGreevy & Winocur, P.C., 303 16th
23   St., Ste. 200, Denver, CO 80202

24
     Sarah K. Mitchell, RPR, CRR, 901 19th Street, Room A252,
25                  Denver, CO 80294, 303-881-5240

            Proceedings reported by mechanical stenography;
                transcription produced via computer.

16-CV-0581-RBJ          Jury Trial - Day 1              2 - 142

1                          I N D E X

2     OPENING STATEMENTS
         by Mr. Kaplan                                    149
3        by Ms. LaBranche                                 161

4
                         EXAMINATIONS
5
      Plaintiff's Witness                                Page
6        SUZANNA DAILEY
            Direct Examination by Ms. Altman              182
7

8
                     PLAINTIFF'S EXHIBITS
9
      Exhibit                                         Received
10    6                                                   206
      9                                                   206
11    10                                                  206
      19                                                  206
12    31                                                  206
      124                                                 199
13    125                                                 197

14

15                   DEFENDANT'S EXHIBITS

16    Exhibit                                         Received

17     (No exhibits.)

18

19

20

21

22

23

24

25

1

2          *          *          *          *          *

3      (The following proceedings commenced at

4      2:01 p.m.)

5          THE COURTROOM DEPUTY: All rise for the jury.

6      (Jury entered the courtroom at 2:02 p.m.)

7          THE COURT: All right. Have a seat. So, members of

8  the jury, the next stage of our case is that the lawyers have

9  an opportunity if they wish to make an opening statement to

10  you. An opening statement is a relatively short speech by the

11  lawyer meant to outline for you what his or her position is,

12  and what evidence he or she expects will come in, what they

13  expect to present. It's a preview of a sort. There's a

14  difference between an opening statement and the closing

15  argument at the end of the case. What you hear on TV and see

16  in the movies is always the closing argument. That's the

17  dramatic speech where the lawyer asks you to draw inferences

18  from what you've heard. That is not the intent of an opening

19  statement. It's a more just-the-facts type statement.

20          These lawyers have been preparing for this case for

21  some time. They have talked to the witnesses, or in some

22  cases taken depositions of witnesses. Depositions are where

23  the witness is asked to give a sworn statement under oath

24  before a court reporter in advance of trial, and they do these

25  things to learn themselves as to what the evidence is likely

Sarah K. Mitchell, RPR, CRR

1   to be.  Now, of course, there are huge differences between the

2   parties as to what the evidence is going to be.  That's why we

3   have a trial.

4            But these are the opening statements.  That's what

5   they're about.  When lawyers are making speeches, that is not

6   evidence.  Hopefully it is helpful in terms of organizing and

7   understanding where they're coming from, but the lawyers'

8   speeches are not evidence.  If lawyers make objections during

9   the trial, that's not evidence.  If I'm making a speech like

10  right now, that's not evidence.  The evidence is sworn

11  testimony of witnesses and admitted exhibits.  That's the

12  evidence.  That's what you decide the case from.  But the

13  lawyers are entitled to make speeches at the beginning and the

14  end in support of their clients.

15           Once we get by the speeches, then we get into the

16  evidence.  And during this trial and, in fact, in all of my

17  trials, first of all, the jurors are perfectly free to take

18  notes, and I see that Julie has given you notebooks to use.

19  No one has to take any notes.  Some people would rather just

20  listen and concentrate.  Other people would like to take notes

21  to help them remember or help them concentrate.  That's

22  entirely up to you.  When you go to deliberate at the very end

23  of the case, somebody is probably going to have the most

24  notes.  It doesn't mean that person's memory is any better

25  than anyone else's.  The notes are for your own personal use,

1   but you're welcome to do that.

2            In my trials at least, I also permit the jurors to

3   ask questions of witnesses.  I don't know if Julie gave you

4   the forms or not.  She did?  Yes.  That's how we do it.

5   Jurors don't stand up and start firing off questions.  That

6   could create some issues.  And the other thing is the jurors

7   don't know really, aren't expected to know what questions are

8   permitted under our rules.  I mean, everybody from television

9   or whatever knows that lawyers will object to questions.

10  Objection, hearsay.  Objection, relevance.  Objection,

11  foundation.

12           There are -- there's a whole set of rules as to what

13  questions can and cannot be asked, and one of my jobs is to

14  rule on those objections when they're made.  Don't worry about

15  that.  You can ask anything you want.  If there's something

16  about your question that means that it can't be asked, okay, I

17  just won't ask it.

18           Write out your questions, if you have any, on the

19  page.  After the witness is finished, if there are any

20  questions, I'll share your questions with the lawyers, let

21  them make objections at the bench privately to me, and rule.

22  And then if the question is appropriate, I'll ask it.  If it's

23  not, I won't.  Either way, your questions are good.  There's

24  no bad question.  Anything that you think would help you

25  decide the case is a good question, but sometimes there are

1  legal rules that say they couldn't have asked it, and you

2  can't.  It's just the way it works.

3       It is important that you remain focused on what's

4  being said by the witness, so if -- write out your questions,

5  yes, but keep your ear open so you don't miss anything.  If

6  the lawyer asks you a question -- you've written out a

7  question but then the lawyer asks it, well, just strike it

8  out.  We don't need to have that asked.  But if it hasn't,

9  then ask it.  It's fine.

10       So opening statements, then we'll start with the

11 evidence.  Plaintiff goes first.  Then the defendant.

12 Plaintiff will have a chance to make a rebuttal at the very

13 end if they -- if they need to.  Because the plaintiff goes

14 first and the defendant goes second, one thing I'd like to

15 have you do -- I've told you already -- not talk with each

16 other about the case.  Don't exchange opinions.  What did you

17 think of that witness?  I didn't think that witness was

18 telling the truth.  Things like that.  Just keep that to

19 yourself, if you will, because it's important that both sides

20 get a full opportunity to present what they want to present to

21 you.  And then at the end when you've heard everything, then

22 you'll have all the time you need to exchange ideas, discuss,

23 negotiate, reach a verdict.

24       Up until that point, please don't talk with each

25 other about this case.  Of course you'll talk with each other

Sarah K. Mitchell, RPR, CRR

1   about other things.  Please don't talk with anybody or share

2   with anybody outside the process what's going on.  No

3   tweeting, no Facebook, none of those things.  You can tweet

4   all you want.  The President of the United States seems to be

5   into it, and maybe you're into it.  It's fine.  But not about

6   the case.  Facebook, none of that.  We don't take your phones

7   away.  Use them to your heart's content, but just don't share

8   I'll call it highly classified information.  Don't share it

9   outside this room.  You can tell people at home or whatever

10  you're on a jury, it's in federal court, it's expected to last

11  four, maybe five days, and the judge asked that we not talk

12  about it until it's over.

13          I see that you all have your badges on.  It looks

14  like you all do.  That's really helpful to us.  Here's why.

15  Here in the building, there's every chance -- likelihood

16  really that you'll run into people occasionally, people

17  involved in the case.  It could be the lawyers, it could be

18  witnesses, people waiting to be witnesses, and they may not

19  have communication with you.  Again, to keep it squeaky clean.

20  So the lawyers -- if you get in the elevator with one of the

21  lawyers, she isn't going to say, Well, how is it going so far?

22  She isn't going to say, Well, what do you think about the

23  Rockies pitching staff or how do you like the weather here?

24  None of that.  They won't talk to you.  They shouldn't,

25  because they're professionals, and you're off limits.  And the

1   badge that you wear tells everybody you're a juror, and

2   they'll stay away.  Not being discourteous.  Just being

3   professional, and pretty soon they'll recognize you, but the

4   badge helps at first, so that's why that.

5         I ask you not to do any research.  I did research.  I

6   keep track of what's going on out there to take whatever steps

7   I need to make sure it doesn't taint our case, and I saw that

8   there was an article about this case this morning in the Aspen

9   newspaper.  Please, stay away from any media coverage of this

10  case, not that most of you read the Aspen paper, but if it's

11  in the Denver Post, on the local TV, anything -- read the

12  paper to your heart's content, watch TV, listen to the news.

13  But if you hear or see something about this case that's coming

14  up, just change the channel or get out of the room or whatever

15  you have to do.

16        Don't go on the Internet.  Don't look in

17  dictionaries, Bibles, none of that stuff.  Our job -- my job

18  is to referee here.  Their job is to present the case to you.

19  And if they don't present enough information, that's their

20  problem.  Not yours.  Your problem is to make a decision based

21  on what you get right here in the courtroom.  All of you are

22  together, it's done properly.  That way it's fair to

23  everybody.  So they don't present all the information, you can

24  ask questions of witnesses, that you can do, but don't go and

25  try to figure it out on your own, okay?

1       Any questions about anything that's happened or

2   anything you want to ask about at this point?  All right.

3   Anything we can do for you along the way, just let Julie know.

4   Julie will do the very best she can to help you out.

5       All right.  Opening statement for the plaintiff.

6       MR. KAPLAN:  Thank you, Your Honor.  May it please

7   the Court  --

8       THE COURT:  Yes, sir.

9       MR. KAPLAN:  -- opposing counsel, members of the

10  jury.  On March 25th, 2014, Nikos Hecht sexually assaulted

11  Suzanna Dailey.  On March 25th, 2014, this defendant, yards

12  away from where his wife was sitting, feet away from where his

13  young children under the age of ten were, this defendant

14  grabbed Suzanna Dailey's neck and pulled her face into him

15  trying to kiss her.  He took her right arm, and he shoved it

16  onto his penis, and then he overpowered her to the ground.  He

17  took off his pants, and he pulled down hers, and then he tried

18  to thrust inside of her.  He tried to penetrate her, and when

19  she said stop, he didn't listen.  When she said, wait a

20  minute, she pushed back, he didn't stop.  He kept pushing and

21  pushing and going until he was done, until he was done with

22  her.

23       And then, members of the jury, he walked away.  He

24  got up, and he walked away, back to his wife, past his

25  children, sat at a table, and left her on the ground used and

1  disposed of and humiliated, terrorized, by herself, scared,

2  and in shock.  And that's why we're here today.  We're here

3  because Mr. Hecht, this defendant, took what he wanted because

4  no one could stop him and no one would stand in his way.

5  That's what the evidence in this case is going to show.

6        My name is Aryeh Kaplan, and along with my partners

7  Shani Rivaux and Jennifer Altman, I have the privilege of

8  representing Suzanna Dailey.  This is Ms. Dailey.  During the

9  course of this trial, you're going to get to know her.  She's

10  going to explain to you what her life was like before that

11  night, before this defendant sexually assaulted her.  She's

12  going to describe what it was like to be her, and she's going

13  to describe for you in detail how her life was turned upside

14  down that night, how this man took a piece of her she'll never

15  get back, how she was left alone trying to figure out what to

16  do in Mexico.

17        THE COURT REPORTER:  Can you slow down a little bit,

18  please, Counsel?

19        MR. KAPLAN:  I apologize.

20        Members of the jury, this is a very important day for

21  Ms. Dailey, and when she testifies, when you hear the evidence

22  in this case, it's going to be uncomfortable at times, because

23  this is a very uncomfortable subject, and when she talks to

24  you about it, it's going to be scary for you and it's going to

25  be scary for her because she's going to have to live through

1    it again.  But I trust that you're going to focus and give her

2    the attention she deserves.

3         And let me be clear.  We have brought this lawsuit

4    which means we bear the burden to prove the case, and we have

5    the evidence.  We have the evidence that shows that this

6    defendant sexually assaulted Ms. Dailey.  We have the evidence

7    that shows that he left her on the ground, that he went back

8    to his family, and that she was disposed of and tossed aside.

9    And I want to talk to you now about that evidence.  I want to

10   begin at the beginning.

11        In March of 2014, Suzanna Dailey got a call from her

12   sister Jeanne Andlinger.  Her sister said, Susie, do you want

13   to come to Cabo San Lucas, Mexico?  And Susie is going to tell

14   you she was really excited.  She was excited because she's

15   close with her sister.  She was excited because even though

16   they're close, they don't live close by, so it's these types

17   of trips that keep them close as sisters, and she's excited

18   because she wouldn't be traveling alone.  Members of the jury,

19   she was going to take her mother Martha with her, and Susie is

20   going to describe for you how important that is.

21        Ms. Dailey's mother is still alive.  She's 93 years

22   old, and when she traveled with her she was 90.  And it was

23   incredibly important to her that she had the opportunity to

24   share those moments, not just with her sister, but with her

25   mother.  She's going to describe to you how much she cared for

1   her sister and cares for her, how important her mother is in

2   her life today, and how on that trip she would be traveling

3   with her sister Jeanne, her brother-in-law Gary, and her

4   nephew Tristan.  Tristan Andlinger, who was about 14 years old

5   at the time.

6        So, of course, she said yes, because she wanted to go

7   on the trip.  And March rolled around, and she traveled there.

8   Everybody traveled and got together, and the beginning of the

9   trip was really uneventful.  It was a normal trip, a nice

10  vacation that the family was sharing together.  One day Jeanne

11  Andlinger was walking down the beach, and she ran into a woman

12  named Alison Hecht, and Alison Hecht is this defendant's

13  ex-wife.  They were married at the time.  And apparently

14  Jeanne and Alison knew each other because their children for a

15  brief time overlapped in the same school, but there was enough

16  familiarity, members of the jury, that Alison Hecht invited

17  the Andlingers and Susie to come over for sort of a cocktail

18  hour, friendly time at her house.

19       And that evening everybody went over, that included

20  Susie, and they all talked, and it was a pretty uneventful

21  time.  Ms. Dailey is going to describe it for you.  She's

22  going to say with the exception of sort of an off-color remark

23  that Mr. Hecht made on the way out, she didn't really talk to

24  anybody other than her sister, and she just enjoyed her time,

25  again, focused on her family.

Sarah K. Mitchell, RPR, CRR

1          What's important for you is two things.  That that

2    night was the first time in her entire life that Ms. Dailey

3    had ever met Mr. Hecht.  And the second thing, the second

4    thing, members of the jury, is that it was that night that the

5    families made plans to get together at a place called Flora

6    Farms.  And Flora Farms, just to be clear, Flora Farms is

7    where Ms. Dailey was raped, sexually assaulted by Mr. Hecht.

8          A few days later, everybody went to Flora Farms.  And

9    when I say everybody, this was a large group of people, and I

10   want to describe for you some of the people who attended.

11   Obviously Ms. Dailey was there.  Mr. Hecht, he was there.  His

12   wife was there, and his three children were there.

13   Ms. Dailey's mother Martha, who's 90 years old, came along.

14   There were a bunch of different kids there from the age of, I

15   believe, about five all through the teenager years.  People's

16   children were there.  It was a group of a little bit over 20

17   people, and they would all be sitting in this picnic table

18   like area outside the restaurant, and dinner was going to be

19   served family style.  It was fried chicken.

20         And Flora Farms is a farm-to-table restaurant, and

21   it's known for being very beautiful.  It's actually on a farm

22   where sunflowers are grown, there's a bunch of different

23   foliage, crops are grown.  And so everybody was going to be

24   gathering there.  Ms. Dailey showed up along with her sister

25   and her mother and her nephew and her brother-in-law.  And

1   when she got there, nobody was eating yet.  Everybody -- all

2   these 20 people were sort of congregated and talking, and

3   eventually Ms. Dailey and her sister and some of the other

4   women walked over to a popup store.  They shopped for a little

5   bit, and they came back.

6           And Ms. Dailey is going to say it felt like a festive

7   night.  I was enjoying myself.  Her sister is going to tell

8   you there were a lot of people and they were enjoying

9   everybody's company, and they were talking, and eventually

10  dinner gets put down for everyone.  And Ms. Dailey had her

11  camera with her, so she wanted to take pictures of the

12  festivities.  She took pictures of her mother.  She took

13  pictures of her nephew and his friend George.  George was

14  there.

15          THE COURT REPORTER:  I'm sorry, Counsel.  You need to

16  slow down, please.

17          MR. KAPLAN:  Oh, I'm sorry.

18          She took pictures of George.  He was 13 at the time.

19  She took pictures of a lot of the folks at the table, and I

20  would like to actually show you some of the pictures now.

21  This is a photograph of Martha.  This is Ms. Dailey's mother,

22  who was 90 years old at the time, and was sitting at the

23  table.  You can see the food there.  There's fried chicken and

24  mashed potatoes.  You can tell from this picture it's a long

25  table.  It goes quite a bit.  This is a photograph of Tristan,

1   Ms. Dailey's nephew, who was 14 at the time, and George who

2   was 13 at the time.  They're at the table.  You can see the

3   chicken is in front of them.

4          So Ms. Dailey is taking these pictures, and when she

5   took the pictures, she took pictures of as many of the folks

6   as she could when it was convenient.  One of them was this

7   defendant, Mr. Hecht.  There's a picture of him at that

8   dinner.  That's his wife sitting next to him.  So everybody's

9   eating dinner, and when dinner started coming to a close,

10  Ms. Dailey and a bunch of other people were walking around.

11  She walked out past the table to a green path, and Mr. Hecht

12  actually walked over to her and said, Have you seen the

13  gardens?  She said, No.  Well, these are beautiful gardens.

14  Can I show you around?  And he extended his arm.

15         She's going to say that was a very nice offer, and

16  she felt safe.  She felt safe because her mother was there.

17  She felt safe because her nephew and his friend were there.

18  She felt safe because she had no reason to worry.  So she said

19  yes.  It was getting dark out, darker and darker, and so they

20  walked down a path.  I'll show you a picture of what it looks

21  like.  Obviously this is daylight.  It was nighttime.  You can

22  see some of the lights hanging above.  This is where the table

23  would be.

24         They start walking a path in this direction.  They're

25  walking down that path, and when they were just far enough

1   away, when it was just dark enough, when people were just out

2   of reach, when Mr. Hecht's wife was somewhere at the table,

3   and when the kids, as far as Mr. Hecht knew anyway, couldn't

4   see what was going on, he went in.  He grabbed her neck,

5   Ms. Dailey's neck.  He grabbed her neck and pulled her in, and

6   her chest started pounding through, her heart pounding through

7   her chest fluttering because she felt panicked, because this

8   was not a kiss between people who knew each other.  This was

9   an attack.

10          And he took her right hand, and he shoved it onto his

11  crotch, and she -- she'll tell you, I knew I was in for

12  something really bad.  I knew that it was going to be -- that

13  something really bad was happening.  And her mind is racing a

14  thousand miles per hour.  It's moving a thousand -- how could

15  this be happening?  How could this be happening to me?  How

16  could this happen to me?  And it didn't stop there, because he

17  overpowered her.  He put her to the ground, and he pulled down

18  his pants, and he pulled down her white shorts.

19          She was horrified.  She was horrified, and she was in

20  shock that something could happen like this, that somebody

21  could do something like this to her, that this could be

22  happening, and she just wanted to run and be somewhere else.

23  She didn't want to be there.  She couldn't understand what was

24  happening, and she -- for a moment she tried to plant her

25  hands into the ground and push away.  She said, Stop, wait,

1  and he wouldn't stop.  He kept -- he kept -- he kept pushing.

2  He kept pushing.  It felt like a thousand knives were stabbing

3  her.  That's what she's going to tell you.  A thousand knives

4  were stabbing into her.  She was in pain, and she was afraid,

5  and she was panicked.

6       She was worried that her mother was close by and all

7  these kids were around.  She was in a panic and in a daze, and

8  Mr. Hecht did stop.  He stopped when he was done.  He stopped

9  when he took what he wanted and was finished.  He stopped when

10  he decided it was the right time.  And when he did, he got up,

11  pulled up his pants, walked right back up this path, back to

12  the table where Martha was, back to the table where his wife

13  was, back to the same table where his kids were, while

14  Ms. Dailey was on her back horrified, terrorized by what had

15  just happened to her, paralyzed in that moment not knowing how

16  to deal, not knowing how to cope with what this man had done

17  to her, and she was forced to make one of two decisions.  You

18  either stay there or you get up.  There was no not walking

19  back to that table.  She would have to walk back to that

20  table.

21       So she picked up her pants, and she walked up the

22  path trying to figure out how this could have happened to her.

23  She walked up the path, and she got up there, and she could

24  have made a scene.  She could have thrown dishes and flipped

25  over chairs, but she'll tell you she was thinking at the time

1    I don't know how this could happen to me, and she was

2    horrified that his children were there.  There were all these

3    kids there, but she wanted to confront him, and she wanted it

4    to be over, but she gathered the strength in her soul to walk

5    over to him, because she knew what he had done was not right,

6    and she didn't want it to go unchecked.

7            She got behind him, and she tapped him, Nikos, Nikos.

8    He didn't turn around, because he was done, he was done with

9    her.  And so she had to sit back at the table, and she was

10   staring blankly.  Felt like she was hit by a truck, staring

11   blankly, and she sees her sister, and she goes, Jeanne, I got

12   something to say to you.  And that next morning, the morning

13   after, she sat down across from her sister, and she was forced

14   to walk her sister -- explain what had happened.  But, members

15   of the jury, her sister was horrified and stunned, but her

16   sister said, I know.  She said, How could you know?  And she

17   said, Tristan saw it.

18           Mr. Hecht didn't count on the fact that when he took

19   her down a path that was dark, there would be two kids

20   trampling.  Mr. Hecht didn't count on the fact that there

21   would be witnesses.  He was hoping that in the dark there

22   wouldn't be, but two boys saw it, and they went over to Jeanne

23   Andlinger, and they said, We saw Mr. Hecht on top of Susie,

24   Aunt Susie, on top of her bare bottom.  We saw him on top of

25   her.  They didn't see her looking at him.  She was looking

1    away, hands on the side.  That's what they saw.

2           So now Ms. Andlinger is dealing with the -- with that

3    at the same time, and the two women talked to each other, and

4    they comforted each other.  But it happened.  That Mr. Hecht

5    took what he wanted, and nobody could stop him and wouldn't

6    let Ms. Dailey stop him.  Nobody could stand in his way, not

7    his wife at the table or his kids close nearby.  Not Martha

8    sitting at the table, not anybody else there.  There was

9    nobody in his way, and that is why we are here.  That is what

10   the evidence will show.

11          I want to talk to you, though, about how the evidence

12   will be shown to you, who you're going to hear from during

13   this trial, because it's going to come from witnesses.  It's

14   going to come from people who take the stand and swear to tell

15   the truth and explain to you through their eyes and from their

16   ears, from their mouth exactly what they experienced.  One of

17   them obviously --

18          THE COURT REPORTER:  I'm sorry, Counsel.  Can you

19   please slow down?

20          MR. KAPLAN:  I'm sorry.  One of them --

21          THE COURT:  Mr. Kaplan, if you can't slow down, I'll

22   ask you to stop.

23          MR. KAPLAN:  Okay.

24          THE COURT:  You're not making the job possible for

25   the court reporter.

                        Sarah K. Mitchell, RPR, CRR

1         MR. KAPLAN:  I will slow down, Your Honor.

2         THE COURT:  Just slow down, don't repeat, finish up.

3         MR. KAPLAN:  Yes, Your Honor.

4         Ms. Dailey will take the stand, and she'll describe

5    for you what she experienced.  You're going to hear from

6    Jeanne Andlinger, who will do the same.  She's going to

7    describe for you what she experienced and the conversation she

8    had with her sister.  As I said to you, you're also going to

9    hear from Tristan and George.  Now, they're teenagers, so

10   they're not coming live.  You're going to hear their

11   depositions.  They were asked questions.  You're going to hear

12   their answers, and they're going to tell you what they saw.

13        You're going to hear from a woman named Dr. Betty

14   McGuigan.  Dr. McGuigan is going to walk you through -- she is

15   Ms. Dailey's therapist.  She's supported Ms. Dailey before

16   this happened through the ups and downs of life.  She's going

17   to explain to you how that support had to change radically

18   when Ms. Dailey got back.  She's going to talk to you about a

19   different patient that she had to deal with.  She's also going

20   to show you her records.  You're going to see a record from

21   about a week after Ms. Dailey came back.  It's going to

22   document every single thing that I just described for you.

23   You're going to see it for yourself.

24        And, members of the jury, you're also going to hear

25   from a woman named Dr. Yeaw, a psychiatrist who looked at all

 1   of the information in this case, and is going to explain to

 2   you how events like this can change somebody forever, and that

 3   is exactly what happened to Ms. Dailey.

 4          At the close of this case, after you've had all the

 5   evidence, we're going to ask you to reach a verdict, a verdict

 6   that's consistent with that evidence, a verdict that reflects

 7   that evidence, a verdict that reflects what Mr. Hecht did to

 8   Ms. Dailey, a verdict in favor of our client.  Thank you for

 9   your time.  Thank you for your attention.

10          THE COURT:  All right.  Thank you, Mr. Kaplan.

11          Ms. LaBranche.

12          MS. LABRANCHE:  Your Honor, I actually have a

13   PowerPoint that I'll be playing during opening.  I don't know

14   if we can have the jurors put their --

15          THE COURT:  Julie will turn it on for you.

16          MS. LABRANCHE:  I just didn't know if I needed to

17   help them.  No?  Okay.

18          May it please the Court.  This isn't a he said/she

19   said case.  This is a they said/she said case.  And

20   fortunately for my client Nikos Hecht, you're not just going

21   to hear from Ms. Dailey and from him at this trial.  You're

22   going to hear from three different eyewitnesses who all saw

23   parts of what went on that night.  Who saw Ms. Dailey approach

24   Nikos Hecht on the walkway, her approach him, and walk away

25   together.  Who saw Ms. Dailey initiate oral sex on that

1   walkway.  And who saw Ms. Dailey lying on her back with her

2   hands over her head and her legs spread.  This was a

3   consensual act between consenting adults.  It was not

4   something that Mr. Hecht is proud of, and he knows that he --

5   what he and Ms. Dailey did that night was wrong, but it wasn't

6   rape.  It was far from that.

7           Now, Nikos Hecht and the three eyewitnesses are going

8   to make clear -- and the Court's going to instruct you on the

9   definition of consent at the end of this case, and the Court's

10  going to tell you that consent is a willingness to act

11  manifested by words, action, or inaction.  And so in order to

12  understand what happened that night, you need to know what

13  happened in the days leading up to that night.  You're going

14  to hear that that cocktail party, that drinks party that

15  Ms. Dailey's counsel was referring to, was at Mr. Hecht's

16  home.  And you're going to hear that Ms. Dailey had been

17  flirting with Mr. Hecht that evening, coming on to him, so

18  much so that his wife and his chef Sara Willis both kind of

19  teased him about it after the Andlingers and Ms. Dailey left

20  that night.

21          And you're going to hear that Ms. Dailey believed

22  that Mr. Hecht had said something flirtatious to her at that

23  drinks party, and that she was intrigued by him, by his youth,

24  by his prestige, by his wealth.  And so when she was invited a

25  few nights later to go to that dinner at Flora Farms, she

1   looked forward to it.  She got ready.  She did her hair and

2   makeup hoping to attract his attention.  She wore the same

3   shorts to Flora Farms that she had worn two nights earlier.

4          And her counsel didn't go into the vulgar comments

5   that Ms. Dailey is going to say that Mr. Hecht made, but what

6   her belief from that night is that she was walking up the

7   stairs wearing these white shorts.  Mr. Hecht saw her, and he

8   told her she was fit.  Now she says it was a vulgar comment,

9   but she wore those same shorts again when she went to dinner

10  with him two nights later.  And, ladies and gentlemen, perhaps

11  she was looking for an encounter with him.  You're going to

12  hear evidence that she was bare.  She was shaved clean, and

13  that she wasn't wearing any underwear under those shorts at

14  that dinner at Flora Farms.

15         But to understand what happened, you also need to

16  understand what happened right after this encounter between

17  the two of them.  Immediately after the two of them had snuck

18  off together, Ms. Dailey returned to that table where her

19  whole family is at, where his whole family is at.  Within

20  minutes she's back at the table.  Hair, not a hair out of

21  place.  Not a trace of blood anywhere.  Not a trace of dirt

22  anywhere.  Not a trace of grass stains anywhere.  You're going

23  to hear multiple people say that there wasn't anything there.

24         And her own sister, Jeanne Andlinger, who's here

25  today, is going to testify that when Ms. Dailey returned to

1   the table that night, she was her normal, happy self.  She was

2   talking to other people at the table.  She was taking

3   pictures, some of those pictures that you saw.  And you're

4   going to hear that Ms. Dailey did not claim that night that

5   there was a rape.  She didn't claim that there was a sexual

6   assault.  She didn't claim anything nonconsensual.  Instead,

7   what she did was she said to her sister, I have something to

8   tell you.  To which her sister said, I already know, and we'll

9   talk about it tomorrow.  That's how that conversation took

10  place.

11         And once that happened, Ms. Dailey knew people knew

12  what had happened.  Other people at that dinner knew, and she

13  needed a story.  But even once she came up with that story,

14  she still didn't go get medical attention.  She didn't go

15  report it to the Mexican police.  In fact, the first time she

16  talked to a nonfamily member about this was when she talked to

17  civil lawyers, civil lawyers who sue for money.  Not criminal

18  prosecutors, civil lawyers who sue for money.

19         And you're going to hear that those shorts that

20  Ms. Dailey was wearing that night, that she's going to tell

21  you now have blood and semen and whatever else, she took those

22  home from Mexico to Aspen, back to her house in Florida,

23  talked to a lawyer, and burned them.  The shorts are gone.

24  The only thing, the only physical evidence that could have

25  either proven or disproven is gone intentionally, burned.

1          My client Nikos Hecht is going to testify at trial,

2    and he's going to tell you three things that are really,

3    really important.  The first one is he's going to tell you he

4    was completely wrong to have a sexual encounter with

5    Ms. Dailey that night.  He used terrible judgment.  She used

6    terrible judgment.  He regretted it immediately, and he

7    regrets it to this day.  He's going to tell you that.

8          And he's going to tell you that the encounter between

9    the two of them was completely consensual.  He's going to

10   testify to that.  And, again, because you're going to hear

11   from these other eyewitnesses, that's going to be confirmed.

12   Each of these eyewitnesses is going to make it clear that what

13   was going on between them was consensual.  Because it's not he

14   said/she said.  It's going to be they said/she said.

15         And the third thing that Mr. Hecht is going to tell

16   you is he's going to tell you he understands these are really

17   serious claims that are being made.  Serious for her, serious

18   for him.  But for him, this is about justice.  You're going to

19   hear and you're going to see these pictures, and he has this

20   big beautiful house, and he has a lot of money, and it would

21   be so easy to just pay, but he's not doing that because he

22   wants to defend his name against this accusation.

23         I want to tell you just a little bit about my client.

24   Nikos is 48 years old, and he grew up in Aspen, Colorado, and

25   he lives there now.  He's wealthy, and he's worked really hard

1    to earn it.  You're going to hear that he was a nationally

2    ranked tennis player out of high school, and he actually got a

3    tennis scholarship to the University of Pennsylvania, which

4    I'm sure you guys know is an Ivy League school.  And while he

5    was there on the tennis scholarship playing for the tennis

6    team, he also earned a degree from the Wharton School of

7    Business.

8             So when he got out of school, he was a hard worker,

9    and he found financial success at a very young age.  He

10   started working out in Wall Street at the bottom of a Wall

11   Street investment firm, and he worked his way up.  And he

12   worked his way up pretty quickly so that he found himself in

13   the position to be able to start his own investment fund, kind

14   of like a mutual fund.  It grew rapidly, and he did -- he made

15   money quickly, and so you guys are going to see this during

16   trial.  This is the house that he owns in Cabo.  This is the

17   house where the drinks parties took place.

18            In March of 2014, Mr. Hecht was down at this house

19   with his then wife Alison and their three young children.

20   They were all down there for spring break.  They had a chef

21   there with them.  They had a nanny there with them.  And they

22   were all kind of hanging out in this pool area right here when

23   Alison saw Jeanne Andlinger walk by on the beach.  They talked

24   to each other.  They decided to have -- the Hechts decided to

25   have Jeanne and her family over for drinks that night, that

1   afternoon.  And so the reason is that Alison Hecht has kids

2   that go to Aspen Day School, and Jeanne Andlinger had kids

3   that went to Aspen Day School, and so they kind of knew each

4   other mutually through friends of friends in Aspen and kind of

5   that school kind of social circle.

6         Like Nikos and his wife at the time Alison, you're

7   going to hear that Jeanne Andlinger and her husband are also

8   very wealthy.  And you're going to hear about some other

9   friends who were down there from Aspen who were at the Flora

10  Farms dinner, Laura Kaplan and her husband Mike.  They're also

11  very wealthy.  It's Aspen.  And so Alison, Mr. Hecht's wife at

12  the time, Jeanne Andlinger, and Laura Kaplan were all kind of

13  in that same social circle in Aspen.

14        So what ended up happening was after Alison invited

15  Jeanne to come over with her family that day, Jeanne did.  She

16  came down with her husband, with her sister, Suzanna Dailey,

17  and as can kind of happen at these types of functions, when

18  they got there the boys split up from the girls.  And so the

19  women came and kind of sat here on this little cabana while

20  the men kind of sat more in this area.

21        At one point in time during this drinks party Nikos

22  got up and was going to light the pit, the fire pit that's on

23  the beach.  He had to walk across that deck and go down these

24  stairs over here to get there, and he noticed as he was doing

25  that that Suzanna Dailey was following him.  And he didn't

1    think anything of it, because it is a beautiful house, and

2    people often, you know, when they stop by want to see it.  So

3    he was talking, she was walking.

4           And she started talking to him, and she started

5    saying stuff that he thought was kind of odd.  She said, You

6    know, it's so impressive that you have a house like this at

7    your age, and you're like the king of the castle, and you must

8    have the weight of the world on your shoulders.  And it wasn't

9    a very long conversation.  It doesn't take very long to get up

10   there -- to get down there and get back up.  But it was odd.

11          Nonetheless, before the Andlingers and Ms. Dailey

12   left, they all talked about going to Flora Farms and having a

13   dinner party.  Now, Flora Farms is a farm-to-table restaurant,

14   and so it's really hard to get into.  It's supposed to be

15   absolutely beautiful.  It's hard to get into.  And especially

16   on this Tuesday night, they do chicken, fried chicken night,

17   and apparently it's super popular.

18          The Hechts actually had a chef at the time named Sara

19   Willis.  Now, Sara Willis was their chef who was down there

20   with them on this vacation, but she knew the owners of Flora

21   Farms, and so she was able to call the owners and get a

22   reservation, and it ended up being a reservation for, like, 20

23   people, because the Andlingers came, the Hechts came, they

24   brought their kids.  The friend Laura Kaplan that I was

25   talking about was there with her kids, and some other people,

 1   and Ms. Dailey.

 2          The only space, because of the fact that it was such

 3   a popular restaurant, such a big reservation, and such late

 4   notice, the only place that was available was a picnic table

 5   out here in this gazebo.  And just to kind of get you

 6   accommodated to where everything is, where I put this big X,

 7   that's where the main restaurant is at Flora Farms.  Over here

 8   kind of going off this page up here is going to be where the

 9   parking lot is.  And so if you park, you come in, and you go

10   down through here if you're going to go to this gazebo.

11   There's a little gate right here.  And when we heard a little

12   bit about popup shops, these were these jewelry shops on site

13   that had kind of just been popped up so people could go

14   shopping there, those are kind of right there in that area.

15          So everyone started showing up probably around 5:30

16   or so that night.  And so when they got there, they all walked

17   in, and they went over to the gazebo.  The kids were playing

18   around here.  There were adults having drinks in that area.

19   The women left through this gate to go back to the jewelry

20   shop.  And as the sun was starting to go down, Sara Willis,

21   the chef, started to get a little anxious, because it was her

22   friends' place.  They had done her a huge favor by getting her

23   this big reservation, and no one would sit down and eat

24   dinner.

25          And so she was trying to go, and she was trying to

1    round some people up.  She came out to the gazebo area and saw

2    Mr. Hecht standing right about there.  She said, Can I walk

3    with you, wanting to tell him he had to help her get some

4    people to the table.  So they walked a little bit up this

5    path.  She asked him to do that.  He agreed to do that.  They

6    walked back down, and then she went to the kitchen, and Nikos

7    started going down this walkway.  And this walkway is the one

8    that we saw the picture of earlier.  And right here is the

9    pavilion, just to -- or the gazebo -- just to try to get your

10   bearings about you.

11        So he was walking straight down this path to try to

12   look for people to bring them back.  There was vegetation on

13   either side.  You can see if you look really close there are

14   lights that are on top, and so as it's getting dark, the

15   lights will turn on, but the lights don't go all the way down.

16        Now, Nikos will tell you that while he's on this

17   walkway heading down looking for people, Ms. Dailey comes up

18   behind him, and she puts her hand on his shoulder, and they

19   continue to walk together down that path, past the lights,

20   where no one else is around, and where, frankly, they don't

21   think they can be seen.  Ms. Dailey starts to talk dirty to

22   Nikos.  She says things like her pussy is good, and it's

23   tight.  And he's not expecting to hear that, but he's also not

24   shying away from it.  And from there things go really fast.

25        Next thing he knows, Ms. Dailey has kissed him on the

1   mouth, and he went along.  He'll admit he didn't stop her.

2   And all of a sudden she's -- she's at his pants, and she's

3   undoing his pants, and she's on her knees, and she's in front

4   of him, and she starts to perform oral sex.  And it's over

5   like that.  It's really fast.  She pulls herself back.  She

6   sits down.  She pulls her own pants down, and she actually

7   starts touching herself, and she reaches up, and she's like

8   grabbing him to come towards her, and, you know, he -- he

9   does.  He -- his pants are down now.  He gets down on his

10  knees.  He puts his palm on either side of her body.  He's not

11  holding her down.  He's not, you know, covering her mouth.

12  He's not doing anything like that.

13          But he is down now with his hands on either side,

14  he's in between her, and, you know, for -- she's trying to

15  guide him in, and for lack of a better way to put it, it

16  didn't work.  He could not get his penis in, and they couldn't

17  have sex.  And as he's laying there at that moment, and this

18  is happening, he has this realization of what am I doing?

19  Like, my wife is feet away.  My children are feet away.  And

20  he realizes this is a really bad idea, and so he stops

21  himself, and he jumps up, and he pulls his pants up really

22  quickly, and he looks around to see if there's anyone that saw

23  what they did, because they're not far away from this table

24  where everyone is.

25          And he's telling Ms. Dailey, Come on, hurry up, hurry

1   up, get up, get up, and, you know, he's embarrassed.  And

2   she's embarrassed.  And it's, like, uncomfortable, and they

3   both seem really awkward, and he just keeps on trying to get

4   her to get up so they can get dressed, get out of there.  And

5   as soon as she was up off the ground, Mr. Hecht turned and

6   walked back to the seating area, which is what it looked like

7   right there.  He didn't wait for her.  I mean, as soon as he

8   got off the ground, he was gone, because he was thinking if I

9   walk back to this table with her, everybody's going to know

10  what he just did.  Everybody's going to see us, and they're

11  going to know what we just did.

12          So he walked ahead of her.  He doesn't want to be

13  seen with her, and, frankly, you know, he doesn't want to ever

14  talk about it or think about it again.  Now, he enters this

15  gazebo.  He takes a seat next to his wife at the table, and he

16  doesn't want to think about what just happened, but Ms. Dailey

17  enters after him, and she sits down next to him, and she

18  starts, like, trying to get his attention.  And he was not

19  going to turn around.  He's not going to talk to her.  He's

20  worried that someone's going to overhear whatever this

21  conversation is going to be, and then they've both been caught

22  doing what they were doing.

23          Ultimately, Mr. Hecht, Nikos Hecht, left that night,

24  and he was hoping he wouldn't have to ever think about what

25  happened that night again.  That he had shown horrible, awful

1   judgment.  That he wanted to just forget what he and

2   Ms. Dailey had done.  But he couldn't, because she ended up

3   calling him two times after that.  And he didn't answer either

4   time, and he didn't call her back, and he's never talked to

5   her again.  That's what Mr. Hecht's going to tell you took

6   place that night.  But it's also the truth because it's

7   corroborated by three different eyewitnesses.

8          Sara Willis.  Sara Willis is the chef that I was

9   talking to you about who worked for the Hecht family, and

10  she's going to tell you a couple of important things.  She's

11  going to tell you, first of all, she was at that drinks party

12  at the Hecht home, and she noticed Ms. Dailey, because she

13  thought Ms. Dailey, in her words, was glomming on to Nikos.

14  And, in fact, Sara's going to testify that it was so obvious

15  to her that Ms. Dailey was acting that way that Ms. Willis and

16  Mr. Hecht's ex-wife Alison teased Mr. Hecht about it after the

17  Andlinger and Dailey families had left.

18          And Sara's also going to tell you that -- she's going

19  to corroborate the story about being on this path, asking him

20  to go and get people, and then leaving him as he started down

21  the bigger walkway.  But what's most important is she's going

22  to testify that when she left him, she ran back to the

23  kitchen, and she said, you know, put all the kids -- what is

24  it -- I can't remember the term, but basically drop the

25  chicken in the fryers is what she said, basically told them to

1   fire the food up.

2       And so she did that, and she went back to see if he

3   had gotten everyone else to the table.  And when she got back,

4   she saw that Mr. Hecht had moved further down this path, and

5   that Ms. Dailey was with him.  She, Sara Willis, walked up on

6   them, not too close, close enough to see them face-to-face,

7   and she thought that was kind of strange, but she had seen her

8   flirting with him the night before.  And then Ms. Willis saw

9   Ms. Dailey reach for his pants, start to unbutton them and

10  kneel down in front of him.

11      She saw the oral sex start, and so she turned, and

12  she left, and she went back to the kitchen, and she said, You

13  know what, put all the food in the fryer.  And she was angry,

14  and she was annoyed, and she was embarrassed, and this was her

15  friends who had let them come to this reservation, and this is

16  what the people here are doing?  That's what she's going to

17  tell you.

18      The second eyewitness is Tristan Andlinger.  Tristan

19  Andlinger is Ms. Dailey's nephew, so it is Jeanne Andlinger's

20  son.  He was there that night.  You guys saw the picture of

21  him from that night.  Now, Tristan drew a map of Flora Farms,

22  and you're going to see he drew a really good map.  You can

23  see where I was showing you the restaurant.  That's the same

24  place he had it.  Here's the gate with the table and the

25  pathway.  Everyone pretty much agrees that Tristan Andlinger's

1   maps are accurate.  And what Tristan is going to testify to is

2   he's going to testify that when he first saw Mr. Hecht and

3   Ms. Dailey on that walkway, Ms. Dailey was walking up to

4   Mr. Hecht.  Okay.  That's an important point.  She approached

5   him.

6          And Tristan testifies that when he saw Ms. Dailey

7   approach Nikos Hecht, he saw them continue to walk down that

8   path away from that table and away from their families, and

9   he's going to tell you that it looked suspicious to him.  It

10  looked to him like something was going on.  Suspicious enough

11  that he and his friend George, who had been standing here

12  initially, decided to see what was going on, and so they took

13  off all the way around this table.  They didn't want to follow

14  them right behind them, because then they'd be seen.  They

15  went all the way around and ended up back on the side of the

16  path where there's a row of bushes in between.  And you can

17  see when they get there, they're further down.  Here's the

18  table now, and they're further down.

19         And when Tristan and George show up, Ms. Dailey and

20  Mr. Hecht are already on the ground, and they see what they

21  describe as Nikos between her legs thrusting.  Tristan is

22  going to testify that he did not see -- and he's going to say

23  he was close enough that he could see and hear exactly what

24  was going on, but he did not see Ms. Dailey struggling.  He

25  didn't see Mr. Hecht holding her down.  He didn't -- they

1   didn't hear any sounds.  They didn't hear her saying stop or

2   no or anything like that.  And he's ultimately going to say --

3   Tristan Andlinger, the nephew, is ultimately going to say he

4   didn't see anything that made him think this was other than a

5   consensual encounter.

6          To the contrary, it looked so consensual to him that

7   after he saw this, he and his friend ran back to their mom --

8   to his mom, Jeanne Andlinger, and went up to her.  And she's

9   at the gate at this point in time.  She's just gotten back

10   from -- she's just gotten back from the jewelry store.  They

11   ran into her at the gate right there, and they say to her,

12   Aunt Susie and Nikos are an item.  And mom goes, What are you

13   talking about?  We saw them walking on the path together.  And

14   his mom's like, you know, Knock it off.  They were just, I'm

15   sure, going on a walk to look at the gardens.  So he went back

16   again to his mom and said, No, no, no, I have to tell you.  I

17   saw them, and they were doing it.  That's how he described it.

18   They were doing it.

19          Now, Tristan loves his aunt.  He was 14 on that

20   night, and he was 15 when we deposed him.  And I want to play

21   you a clip of his testimony in a minute, and the reason I'm

22   going to do it is because it's important for you to see him in

23   his own words say he loves her, he's protective of her, he

24   wouldn't let anyone hurt her, but that he saw nothing that

25   looked like rape.  And when I play this, watch, because he is

1   a 15-year-old boy, and you can tell this is uncomfortable for

2   him, and you can tell that he doesn't want to talk about it.

3   He doesn't want to say anything that's not going to be helpful

4   for his aunt, Ms. Dailey.  But he tells the truth, and here's

5   what he says.

6        (Video deposition played for the jury.)

7        MS. LABRANCHE:  And that's Tristan Andlinger.  You're

8   going to see his full testimony.  And the third eyewitness is

9   his friend George Cathers, and you all saw the picture of

10  George and Tristan together.  George was down visiting

11  Tristan's family, and so he was at Flora Farms that night.  He

12  testified by deposition as well, and what he's going to tell

13  you is he was there with Tristan when they saw Nikos on the

14  path and Ms. Dailey catching up, and he also thought it was

15  suspicious.

16        And the way he explained it is such a great way for a

17  15-year-old to explain it.  He said he didn't understand why

18  they would walk down a path together if they weren't even

19  married.  That's what he saw.  He saw something that was

20  suspicious.  Maybe it was intimate, illicit, whatever.  And so

21  together with Tristan he ran around that field, and his

22  drawing is not as good, but it's the same concept.  They start

23  out -- he and Tristan start out down here.

24        They see Nikos Hecht walking in front of Suzanna

25  Dailey, her catching up to him.  They follow them around the

1    table, and end up kind of at the side on the other side of the

2    bushes.  Now, what George Cathers will say is that they were

3    so sure it was consensual that he and Tristan Andlinger

4    giggled about it.  And when they rode home that night, and

5    they rode home with, like, a group of other teenagers a little

6    bit older than them, they told all of them about it, and they

7    all kind of giggled about it.

8         And that's three eyewitnesses who saw what happened

9    that night, and you would think that should be enough, but

10   there's more, because you're going to hear from Jeanne

11   Andlinger who is Ms. Dailey's sister.  Now, she's going to

12   confirm that the boys came to her not once but twice.  That

13   the first time they said "an item."  The second time they

14   said, "They were doing it."  And then Ms. Andlinger says that

15   when Ms. Dailey sat back down at the table for dinner, she

16   said, "I have something to tell you."  And when they got up to

17   leave, she said, "I have something to tell you."  And

18   Ms. Andlinger said to her, "I already know.  We'll talk about

19   it tomorrow."  Not, Wow, my boys saw what happened, and you

20   were obviously being assaulted and violated.  Not, We better

21   go get the police right now.  What she said was, "I already

22   know.  I'll come by and see you in the morning."

23        And you're going to hear that Jeanne's reaction makes

24   sense, frankly, because Jeanne has been taking care of

25   Ms. Dailey for a long time.  They're on the Cabo trip because

1   Ms. Andlinger, Jeanne Andlinger, invited Ms. Dailey.

2   Ms. Dailey lives in a home in Vero Beach that her sister

3   Jeanne Andlinger owns, and she doesn't have to pay rent for.

4   She gets a large sum of money from Jeanne Andlinger and her

5   husband.  And while Jeanne describes Ms. Dailey as

6   entrepreneurial-ish, none of it has been particularly

7   lucrative, and so has been kind of -- so Ms. Dailey has been

8   dependent on her sister Jeanne Andlinger for that.

9        You heard Ms. Dailey's attorneys talk a little bit

10  about Dr. McGuigan, who Ms. Dailey had been seeing for normal

11  day-to-day types of issues.  And what you're going to hear

12  during this trial is that Ms. Dailey has a lot of bad symptoms

13  and a lot of bad issues that she's dealing with, and you know,

14  you're going to -- they're going to want you to believe that

15  these symptoms have been caused by a rape, but in reality what

16  we're going to show you is that Ms. Dailey has been dealing

17  with all of this for years and years and years.  That's what

18  her records are going to show and what you look at when

19  Dr. McGuigan testifies, and that's just what the truth is.

20       You're also going to hear Ms. Dailey testify, and she

21  is going to tell you some interesting things that you need to

22  pay attention to.  She's going to tell you that after she's

23  laying on the ground, and after she's been brutally assaulted

24  in her words, that she gets up off the ground, she pulls her

25  white shorts up, with no underwear, and she walks back to the

1    dinner table.  She doesn't go to the bathroom.  She doesn't

2    try to clean herself up in any way.  She doesn't tell anyone

3    what happened.  She goes to the table, and she sits down

4    there.  And first, she tries to talk to Mr. Hecht.  She admits

5    that.  And then she stays, and she takes pictures throughout

6    the course of dinner.

7          And you're going to see -- there's the picture of her

8    mom that you saw.  Look, there's fried chicken, and there's

9    mashed potatoes.  There's the picture of one of their friends.

10   Same thing.  And there's the picture of Mr. Hecht that she

11   took after they both came back to the table.  When she comes

12   back to the table, she walks around, and she asks people to

13   pose for pictures.  Now, Ms. Dailey wants to claim today that

14   this encounter she had with Mr. Hecht occurred after dinner,

15   but that's not what she's been saying up to this point.  And

16   the reason she wants to do that is because she wants to

17   explain those pictures away, because how do you explain those

18   pictures unless it had to have happened after?  But that's not

19   what she said in her deposition.  In her deposition she said

20   it happened before.  She said that food was being served,

21   specifically chicken, when they returned to the table.

22         And in her complaint that she filed with this Court,

23   she said it was before dinner.  And when Jeanne had her

24   deposition taken, she said she was coming back from the

25   jewelry store the first time that Tristan and George came up

1    and talked to her.  Also an excursion that all the women took

2    before dinner.  And it's important that you know that it

3    happened before dinner, and the reason is that Ms. Andlinger

4    is going to come in, and she's going to testify, and she's

5    going to say when they came back to dinner, when she was

6    sitting across from Susie at dinner, that Ms. Dailey was

7    conversational, she wasn't ruffled, she wasn't upset, there

8    were no grass stains, no one saw dirt, no one saw blood, no

9    one saw anything wrong.

10        And, ladies and gentlemen, this is my last point.

11   Because it's not just what everyone else is going to tell you

12   they said.  It's things that Ms. Dailey has said herself about

13   the allegations in this case.  You're going to hear that

14   Ms. Dailey said certain things before she ever filed this

15   lawsuit, and then she said certain things once the lawsuit was

16   filed, once she asked for millions of dollars.

17        In 2015 Suzanna Dailey said, I wasn't bruised, I

18   wasn't bleeding.  But by 2016, she was saying, There were

19   blood and semen in the shorts, the shorts that she destroyed.

20   In 2015, she said, I didn't go to the Mexican police because

21   we were leaving the next day.  But then in 2016, she stayed in

22   Cabo for five more days.  She didn't cut her vacation short.

23   She stayed in Cabo for five more days.  And in 2015, she said,

24   I am obviously not traumatized at this point.  Today, she

25   wants millions of dollars.

                    Sarah K. Mitchell, RPR, CRR

16-CV-0581-RBJ     Jury Trial - Day 1          2 - 182

1            On March 25th of 2014, Nikos Hecht and Suzanna Dailey

2    were two consenting adults.  They both chose to walk away from

3    their families, to walk away from that dinner together alone

4    where they thought they couldn't be seen.  They engaged in

5    conduct that neither one of them is proud of today.  But Sara

6    Willis, she saw it was consent.  Tristan Andlinger, he saw it

7    was consent.  George Cathers, he saw it was consent.

8            THE COURT:  You're getting a little repetitive here.

9            MS. LABRANCHE:  This is a case about bad decisions

10   that were made, but it's not a case about rape.  Thank you.

11           THE COURT:  All right.  Let's try to avoid the

12   repetition as we go forward.

13           First witness?

14           MS. ALTMAN:  Yes, Your Honor.  We're going to call

15   Ms. Dailey.

16           THE COURT:  Okay.  Ms. Dailey, before you sit down --

17   or after you sit down.

18                          SUZANNA DAILEY

19   was called as a witness and, having been duly sworn, was

20   examined and testified as follows:

21           THE COURT:  All right.  Go ahead.

22                       DIRECT EXAMINATION

23   BY MS. ALTMAN:

24   Q.  Good afternoon, Ms. Dailey.

25           MS. ALTMAN:  Your Honor, I do just want to let the

1    Court know, and those in the courtroom, Ms. Dailey does have a

2    bit of a hearing problem, so hopefully she'll be able to hear

3    me fine.  I do have a loud voice, but just in case.

4         THE COURT:  Well, if you'll stay close to that mic

5    and she'll get close to the mic also, I think we'll be fine.

6         MS. ALTMAN:  All right.  Thank you.  Your Honor, the

7    parties are going to move for sequestration.  We're going to

8    invoke the rule.

9         THE COURT:  Okay.

10        MR. TUMMINELLO:  Your Honor, I would just note our

11   objection is to retained expert testimony.

12        THE COURT:  The experts can stay.  All fact witnesses

13   must go, and they cannot be briefed on what has occurred in

14   their absence either.  This simply means, ladies and

15   gentlemen, that witnesses can only come in when it's their

16   turn to testify.  They can't listen to other people's

17   testimony or be told about it.  It's just to keep it clean.

18   Okay.

19        MS. ALTMAN:  Thank you.

20   Q.  (By MS. ALTMAN) Good afternoon.  Can you introduce

21   yourself to the jury, please.

22   A.  Yes.  My name is Suzanna Dailey.

23   Q.  Ms. Dailey, how old are you?

24   A.  I'm 68 years old.  I'll be 69 in September.

25   Q.  Where were you born?

1   A.   Louisville, Kentucky.

2   Q.   Is that where you grew up?

3   A.   I grew up in Caracas, Venezuela and in Kentucky.

4   Q.   And where do you consider home?  Where is your home?

5   A.   Kentucky.

6   Q.   Do you have any sisters or brothers?

7   A.   I do.  I have two sisters.

8   Q.   And what are their names?

9   A.   Sally Donner and Jeanne Andlinger.

10  Q.   And we heard -- we heard Ms. Andlinger's name earlier, and

11  we're going to hear from her later, but who is the oldest

12  sibling?

13  A.   I'm the oldest.

14  Q.   Are you close with your sister Jeanne?

15  A.   Yes.  Very, very close.

16  Q.   Do you share confidences with her?

17  A.   Always.

18  Q.   Do you trust her?

19  A.   I trust her.  She's my best friend.

20  Q.   Would you tell her anything?

21  A.   I'd tell her anything, and I think she would tell me

22  anything.

23  Q.   Would you feel comfortable sharing with her sensitive or

24  confidential information even if it was embarrassing to you?

25  A.   Even if it were embarrassing.  We've shared confidences

1    forever.

2    Q.  Where do you live?

3    A.  I live in Vero Beach, Florida.

4    Q.  How long have you lived there?

5    A.  For about 20 years.

6    Q.  Have you ever had a job?

7    A.  I have.  I've worked for many, many years.

8    Q.  And can you describe for the jury just generally the

9    nature of the jobs that you've had.

10   A.  Yes.  I started my work career in retail, in clothing, in

11   fashion.  And I continued on.  I moved to New York.  I had a

12   job in public relations.  I worked for Ralph Lauren

13   Corporation, and I went with Ralph Lauren Corporation to

14   Aspen, Colorado.  And when that ended, I started a silver

15   jewelry business.  And after that, I had always wanted to have

16   Pilates movement studios.  I studied it for a long time.  And

17   I opened a Pilates studio in Vero Beach.  And when that

18   closed, I opened a shoe store in Vero Beach.

19   Q.  How long was your Pilates studio open?

20   A.  About 14 years.

21   Q.  And when did you close that?

22   A.  I closed that in late spring, early summer of 2014.

23   Q.  And are you working today?

24   A.  I'm not employed by someone else.  My main occupation is

25   caring for my mother.

1   Q.  And how long have you cared for your mother?

2   A.  I've cared for her the past ten years when her health has

3   deteriorated.

4   Q.  And how old is your mother today?

5   A.  Today she's 93.

6   Q.  And your mother's name is Martha; is that right?

7   A.  Pardon me?

8   Q.  Your mother's name is Martha; is that correct?

9   A.  Martha Walton.

10  Q.  And you've indicated that she's getting older, her health

11  is deteriorating; is that right?

12  A.  The past five, six years she's become frail.  Mentally

13  she's a hundred percent, but she's failed enormously.

14  Q.  Is that time consuming for you to care for your mother?

15  A.  It's a full-time job.  I cook for her at night.  I stay

16  there an awful lot of the time overnight.  She doesn't live

17  far from me, two miles.  And I leave usually between 9:30 and

18  10:00, sometimes 11:00.

19  Q.  Is it stressful to care for your mom sometimes?

20  A.  Is it hard?

21  Q.  Is it stressful sometimes to care for your mother?

22  A.  Yes.  I mean, it's -- it's a job I want.  It's some -- I

23  love and adore her.  It's very stressful caring for an elderly

24  parent, but it's something I want to do and I will do.  I'll

25  continue doing that.

1   Q.  Who's caring for her while you're here?

2   A.  I arranged for a care management group to have people come

3   in.

4   Q.  Now --

5   A.  And this is the first time.

6   Q.  Ms. Dailey, do you feel financially comfortable in your

7   life?

8   A.  Yes.

9   Q.  Are you able to support yourself?

10  A.  Yes.

11  Q.  And if you needed something -- you heard -- you heard

12  opposing counsel mention that your sister's affluent; is that

13  correct?

14  A.  She is.

15  Q.  She has resources?

16  A.  Yes.

17  Q.  And if you ever needed anything, could you ask her?

18  A.  Yes.  I wouldn't want to.  And I -- I haven't had to.  I'm

19  comfortable.  I'm not wealthy.  I'm very grateful for what I

20  do have from my brother-in-law and sister and for the

21  opportunities that they've offered me in life with travel and

22  --

23  Q.  Did you file this lawsuit because you needed money?

24  A.  No.

25  Q.  Why did you file this lawsuit against Mr. Hecht?

1  A.  I filed this lawsuit because I wanted to be able to stand

2  up to Mr. Hecht.  I wanted to be heard.  I wanted my story to

3  be heard.  I didn't want to remain a victim at my age.  I

4  wanted to confront him for what he's done to me, what he's

5  taken from me.  It's been a long journey, but it's one I

6  wanted to take.  I'm determined to take it.

7  Q.  Ms. Dailey?

8  A.  I'm good.

9  Q.  Okay.  Who is Tristan Andlinger?  Who is Tristan

10 Andlinger?

11 A.  Tristan Andlinger is my nephew, my sister's son.

12 Q.  You love him?

13 A.  I'm crazy about him.  He's -- he's a light in my life.

14 Q.  Is Jeanne, your sister, married?

15 A.  Yes, she is.  She's married to Gerhardt Andlinger.

16 Q.  And do you have a good relationship with -- may I call him

17 Gary Andlinger?

18 A.  We call him Gary.  Yes.  We've had -- we've always had a

19 good relationship.  He's a wonderful man.  A great

20 relationship.

21 Q.  Now, I want you to put aside for a moment the trip to Cabo

22 San Lucas in March of 2014 for a minute, and ask you have you

23 ever traveled with your sister Jeanne and her husband before,

24 and her son Tristan?

25 A.  Yes, a lot over the years.  It used to be more.  He's now

1   86.  And over the past 20, 25 years we've taken a lot -- they

2   have a boat.  We've taken a lot of boat trips.  We've been to

3   Austria, to Aspen.  We've traveled a lot together.

4   Q.  And does your mother travel with you as well?

5   A.  She did.  She used to.  Not now so much.

6   Q.  Now, prior to the trip to Cabo San Lucas in March of 2014,

7   had you ever met Nikos Hecht?

8   A.  No, never.

9   Q.  Had you ever even heard of him?

10  A.  No.

11  Q.  Were you invited to go to Cabo San Lucas in March of 2014

12  by your sister?

13  A.  Yes.

14  Q.  Who went on that trip with your group?

15  A.  With our group was Jeanne, Gary, Tristan, and a friend.

16  And a friend -- the first week he had one friend, a boy named

17  Dylan.  And the second week George Cathers came.  And my

18  mother.

19  Q.  Now, for shorthand instead of saying Cabo San Lucas, I'm

20  going to say Cabos.  Is that fair?

21  A.  Yes.

22  Q.  Had you ever been to Cabos before?

23  A.  Never.

24  Q.  Was there a time during your trip to Cabos in March of

25  2014, when you met Mr. Hecht?

1   A.  Yes, there was.

2   Q.  How did you -- how did you have occasion to meet

3   Mr. Hecht?

4   A.  Jeanne came back -- we were staying in, like, an apartment

5   at the -- at the area where Mr. Hecht had a home, he and

6   Alison Hecht and their children.  And she said, We've been

7   invited for a drink this evening and -- at the Hecht's.  I

8   know them through Aspen Country Day School, the children.

9   Q.  And now, did you go to that get-together at the Hecht

10  home?

11  A.  Yes.  My mother didn't go.

12  Q.  Your mother did not go?

13  A.  No.

14  Q.  How long was that get-together?

15  A.  An hour, hour to an hour and a half, somewhere in there.

16  Q.  And when you went to the Hecht home that evening, who went

17  with you?

18  A.  Gary and Jeanne, Dylan and Tristan and myself.

19  Q.  Did Dylan and Tristan stay?

20  A.  They went in.  We all went in together.  The boys went

21  off.  I thought they went to the movies or --

22  Q.  And so --

23  A.  They were 13 and 14.  They just went off.

24  Q.  So you were at the home, the Hecht home, with your sister

25  Jeanne and her husband Gary; is that right?

16-CV-0581-RBJ        Jury Trial - Day 1              2 - 191

1   A.  Yes.

2   Q.  And when you got into the Hecht home, did you have any

3   discussions with Mr. Hecht?

4   A.  No.  Other than on -- I spoke to him, How do you do, and

5   introductions, and that was it until we left.

6   Q.  Did you flirt with him?

7   A.  No, I did not.

8   Q.  Did you tell him what an impressive house it was for

9   someone to have at such a young age?

10  A.  No.

11  Q.  Did you tell him he was the king of the castle?

12  A.  No.

13  Q.  Did you tell him that he must have the weight of the world

14  --

15  A.  No.

16  Q.  -- on his shoulders?

17  A.  I never uttered those words.

18  Q.  Did you say anything to Mr. Hecht that night other than

19  when you entered the home and when you left the home?

20  A.  Yes, in response to his remark as we were walking up the

21  stairs.

22  Q.  Is that when you were leaving the home?

23  A.  I was leaving.  I was following my sister and

24  brother-in-law.

25  Q.  So that's why I asked the question this way.  Other than

1    when you entered the home and when you left the home, did you

2    have any other discussion with Mr. Hecht?

3    A.   No.  No conversation.

4    Q.   Did you follow him out to a fire pit?

5    A.   No.

6    Q.   Did you know that there was a fire pit?

7    A.   I didn't.  I never saw a fire pit.

8    Q.   Did you walk around his home?

9    A.   No.

10   Q.   When you entered the home, where did you go?

11   A.   We went downstairs to the floor level, and there were --

12   Mr. Hecht was sitting.  And we were introduced.  And Alison

13   was there, his then wife.  And Jeanne and Alison and I went to

14   the other end of the pool.  And it was a pagoda, what would

15   you say, a daybed.  I thought at the time -- I thought, well,

16   it's like an Asian-style pagoda.  And we sat there and talked.

17   Q.   And when you sat there, who was with you?

18   A.   Jeanne and Alison.

19   Q.   Did you leave that daybed with Jeanne and Alison other

20   than when you entered the home and when you left the home?

21   A.   No, never.  We stayed there.

22   Q.   Was there ever a time when you were alone with Mr. Hecht?

23   A.   No.

24   Q.   Other than when you were leaving the home?

25   A.   No.

1  Q.  And when you were leaving the home, you mentioned that you

2  were walking upstairs; is that correct?

3  A.  Yes.

4  Q.  And at that time did you speak to Mr. Hecht?

5  A.  No.

6  Q.  Did he speak to you?

7  A.  Yes, he did.

8  Q.  Tell the jury what he said to you.

9  A.  He was behind me.  And walking -- I was walking up the

10  stairs.  He was behind me.  And he said -- made some -- made a

11  remark, and I don't remember the exact words, something about

12  being fit.  I was embarrassed, because I was not fit.  I'd put

13  on a good bit of weight.  And I was embarrassed by the remark,

14  and I said, Well, actually I'm a little overweight right now.

15  And he said, Oh, well, men don't like women with just skin and

16  bones.  They like a little meat on their bones.

17  Q.  Other than that discussion, and hello when you arrived,

18  did you have any other discussion with Nikos Hecht while you

19  were in his home that night?

20  A.  Not at all.

21  Q.  And you left that night with your sister and your

22  brother-in-law?

23  A.  I did.

24  Q.  And did you have occasion to see Mr. Hecht again -- and

25  let me just back up a second.  That was the first time you

1   ever met Mr. Hecht, did I understand you correctly?

2   A.  Yes, that's right.

3   Q.  Did you have occasion to see Mr. Hecht again while you

4   were in Cabos?

5   A.  Yes.  At the Flora Farms restaurant.

6   Q.  And did you have anything to do with arranging that

7   get-together?

8   A.  No, I didn't.  It was Alison and Jeanne talking away.  And

9   it was Alison's suggestion why don't we do -- have a dinner

10  with all of us and the Kaplan family, and we'll do it at Flora

11  Farms.  And they have a fried chicken night where they serve

12  everything family style, and so they decided we'd have a

13  dinner.

14  Q.  And now, when you heard about that dinner, did you have

15  any concerns about going to the dinner because Mr. Hecht had

16  made that comment to you about men liking women with a little

17  meat on their bones?  Were you concerned at all about going to

18  that dinner?

19  A.  No.  I just dismissed the remark.  It was a stupid remark.

20  I'm 20 years older.  I didn't pay any attention to it.  I

21  don't know why he'd make a remark like that, but I didn't

22  think anything.  I just dismissed it.

23  Q.  Did you think that you would be sexually assaulted by

24  Mr. Hecht because he made that comment to you?

25  A.  No.  Not in any way.

1  Q.  You mentioned that the dinner was held at Flora Farms; is

2  that right?

3  A.  That's right.

4  Q.  And you knew that the Hecht family was going to attend

5  that dinner; is that right?

6  A.  Yes.  The whole Hecht family, the children and the Hechts.

7  Q.  Did you have any qualms or concerns about attending the

8  dinner --

9  A.  No.

10  Q.  -- with Mr. Hecht --

11  A.  No.

12  Q.  -- given the off-color comment that he made?

13  A.  No.  I never -- it never crossed my mind.

14  Q.  Now, can you describe for the jury, and it's a lot of

15  people, but if you could just generally describe for the jury

16  the people that attended the dinner at Flora Farms.

17  A.  Well, there were the three families, the Kaplan family,

18  the Hecht family, and our family, the Andlinger group.

19  Q.  So let's start with your family.  Who attended from the

20  Andlinger family?

21  A.  Jeanne and Gary, my mother, Tristan, and at that time

22  George had arrived.

23  Q.  Is that George Cathers?

24  A.  George Cathers.

25  Q.  Is that his friend?

1   A.  That's his friend.  His best friend.

2   Q.  Did your mother attend?

3   A.  My mother did.  And myself from our group.  The Kaplan

4   family was Laura Kaplan, her husband wasn't there, Mike

5   Kaplan, and her children, which would have been Eli -- get it

6   right -- Stella, I think Stella was about 17; Ava, about nine,

7   nine or ten; Eli's friend Luke; and Eli's girlfriend Zoë.

8   Q.  And who do you recall attending from the Hecht family?

9   A.  Alison and Nikos and their three children, a nanny, and

10  Andy and Jody Hecht, his stepmother and father, and another

11  couple.  They were contemporaries of his father's and

12  stepmother's.  And Laura Kaplan's mother Connie.

13  Q.  Anyone else that you can think of?

14  A.  I think that's it.

15  Q.  Okay.

16  A.  That's it.

17  Q.  And did you know Laura Kaplan before the dinner that

18  night?

19  A.  I met her several times, but I didn't -- I never spent

20  time with her.  She was my sister's friend.

21  Q.  And now the night at the Hecht home when you were there

22  for an hour, had you met Alison Hecht before?

23  A.  No, never met Alison .

24  Q.  So that was the first time that you met both Nikos Hecht

25  and Alison Hecht; is that fair?

Sarah K. Mitchell, RPR, CRR

1   A.   That's fair.

2   Q.   Now, where at the restaurant was your group seated?

3   A.   We didn't sit in groups when we -- when we came in.

4   People took their -- after they -- we were met, there was a

5   waiter with drinks or beverages.  And the kids -- the kids, to

6   my recall, were racing around, running around, being with each

7   other.  And I got my mother seated first, because she can't

8   stand long.  And the older adults sat at the one end.  Gary,

9   my mother, Andy Hecht, Alison -- not Alison -- Laura's mother,

10  their -- the Hecht's -- Andy and Jody Hecht's friends.  They

11  were all -- and Alison and Nikos -- they were all seated

12  towards the end that was closest to the grass.  And then the

13  kids sat more towards the end.  It was as though three or four

14  picnic tables pushed together in a long --

15  Q.   And we're going to call up Exhibit 125 for identification.

16  I'll represent to the Court that this is a stipulated exhibit.

17           THE COURT:  It's admitted.

18           MS. ALTMAN:  I'm sorry, sir?

19           THE COURT:  It's admitted.  If it's stipulated, I'll

20  admit it.

21           MS. ALTMAN:  Thank you, Your Honor.

22      (Plaintiff's Exhibit 125 admitted into

23      evidence.)

24  Q.   (By MS. ALTMAN) Now, Ms. Dailey, I'll represent to you

25  that this is not a picture you took, but it is a picture from

16-CV-0581-RBJ        Jury Trial - Day 1              2 - 198

1   the Flora Farms website, and I'd like to just ask you if you

2   can identify for the jury if this is the area where your

3   dinner was held in March of 2014.

4   A.  Yes.  It's just like that.

5   Q.  Okay.

6   A.  It was just like that.

7   Q.  Okay.  And that's the long picnic table that you were

8   referring to?

9   A.  Yes.

10  Q.  And you can see in the photograph, do you see the strung

11  lights with the globe lights on it?

12  A.  Yes.

13  Q.  And were those the same lights that were there that night?

14  A.  The same lights.

15  Q.  Uh-huh.  And the flowers you see, sunflowers and plants

16  around that area, do you see that?

17  A.  Yes.

18  Q.  Is that the way the restaurant appeared on the night that

19  you attended?  Was there plants and foliage around?

20  A.  It's the same.

21  Q.  Can you call up --

22  A.  The only thing different I think there weren't cushions.

23  Q.  On the seats?

24  A.  On the seats.

25  Q.  Okay.  Can you call up Exhibit 125, which I'll also

 1   represent to the Court is a stipulated exhibit.  I'm sorry.

 2   124.  I apologize.

 3          THE WITNESS:  May I have some water?

 4          THE COURT:  124 is admitted.

 5      (Plaintiff's Exhibit 124 admitted into

 6      evidence.)

 7          MS. ALTMAN:  Thank you, Your Honor.

 8   Q.  (By MS. ALTMAN) And now --

 9   A.  Sorry.

10   Q.  No problem.  Do you have -- are you looking at

11   Exhibit 124?

12   A.  I am.

13   Q.  Okay.  Now, do you see to the left there there's a

14   pavilion, the roof of a pavilion?

15   A.  Yes.

16   Q.  Okay.  And is that where the dining area was where we were

17   just looking at a moment ago?

18   A.  Yes.  That would be the end where the barrel is, and you

19   don't see the tables, the beginning of the table there, but

20   that would be the part of the table that I was referring to

21   where the older adults sat.

22   Q.  Okay.  And if you look, ma'am, at the photograph, there's

23   a long grassy path.  Do you see that?

24   A.  I do.

25   Q.  And is that the pathway that you walked down with

1  Mr. Hecht that we're going to talk about in a few minutes?

2  A.  Yes.

3  Q.  Okay.

4  A.  It is.

5  Q.  And were you sexually assaulted on that pathway?

6  A.  Yes, I was.

7  Q.  Could you take for me, please, there's a stylus on the top

8  of the computer screen, and just put an X in the area where

9  you were sexually assaulted on the screen.

10  A.  Not there.  Not there.  It's -- it's --

11         THE COURT:  You can erase that and start over if you

12  made the mark in the wrong place.

13         THE WITNESS:  Oh, no.

14         MS. ALTMAN:  It's okay.

15         THE COURT:  That's okay.  You'll get used to it.

16         THE WITNESS:  The part that I'm trying to show --

17         THE COURT:  Why don't you erase that, Julie.  Okay.

18  A.  Right up here.  It's where that --

19  Q.  (By MS. ALTMAN) Can you just make that a little bigger,

20  Ms. Dailey?  Just make it a little bigger.

21  A.  Up here.  It's --

22  Q.  Okay.

23  A.  Not quite.  Let me get it right.  Yep.

24  Q.  Okay.

25  A.  This is it.  But not that -- that lower -- not the lower

1   part where it's -- I don't want to erase it all.

2   Q.  Not the X, but the circle?

3   A.  No, not the X.  It's at the end of the path on the left.

4   Q.  Okay.  And if you can just put your initials there, the

5   letters S and D, please, for a minute.  All right.

6   A.  Okay.

7         THE COURT:  It's going to disappear, though.

8         MS. ALTMAN:  I know.  Okay.

9   Q.  (By MS. ALTMAN) So we're going to talk about that pathway

10  -- we're going to leave it up for just a second.  But this --

11  this grassy area, is this where you entered the restaurant

12  where the pavilion is?

13  A.  At the beginning, yes.

14  Q.  Okay.  How long from when you arrived at the restaurant to

15  when you -- actually dinner was served?  Did they serve dinner

16  right away?

17  A.  Not right away.

18  Q.  So how long from when you arrived at the restaurant to

19  when they served dinner?

20  A.  About 45 minutes to an hour.

21  Q.  And what time do you recall arriving at Flora Farms?

22  A.  About a quarter to six.

23  Q.  Was the sky light or dark?

24  A.  It was light.  It wasn't bright sunlight.  It was the

25  beginning of a setting sun.  It was a soft light.

1   Q.  What did you do for the 45 minutes between when you

2   arrived at the restaurant and when you sat down for dinner?

3   A.  We sat -- mother and the older adults were sitting at that

4   far end.  I sat at the farther end where the kids were.  And

5   Laura and Jeanne -- Jeanne was sitting right across from me,

6   Laura next to her.  And we decided to go -- because dinner

7   wasn't being served so quickly, it was Alison that said, you

8   know, There's a little boutique here, why don't we walk over,

9   so we did.

10  Q.  Now, up until that point in time, have you spoken to

11  Mr. Hecht at all?

12  A.  No, I haven't.

13  Q.  Had you flirted with him?

14  A.  No.

15  Q.  Did you do anything to doll yourself up for the evening in

16  hopes of having some relationship with Mr. Hecht that night?

17  A.  No.

18  Q.  Can you --

19  A.  I don't drink.

20  Q.  But did you do anything special to your hair?

21  A.  No.

22  Q.  Did you do anything -- did you wear special makeup that

23  night for Mr. Hecht?

24  A.  No.

25  Q.  Did you not put on underwear because you thought that you

1    were going to have an interaction with Mr. Hecht that night?

2    A.   No.

3            MS. LABRANCHE:  Objection, leading.

4            THE COURT:  You are leading.  Sustained.  Start over

5    on that question.  That answer is stricken.

6    Q.   (By MS. ALTMAN) Ms. Dailey, can you describe for the jury

7    the shorts you were wearing?

8    A.   Yes.  They weren't new shorts.  They were baggy cargo

9    shorts, meaning that they -- they don't -- they don't come to

10   the waist.  They're below the waist, below the navel, between

11   the waist and the navel.  I had put on weight.  These were not

12   new shorts.  There were pockets on the sides and sort of

13   strings or tie -- they tie at the leg.

14   Q.   How long were they?

15   A.   They were to my knees.  A little bit -- maybe an inch

16   longer.  To the middle of the knee.

17   Q.   Were they tight fitting?

18   A.   No.  They were very -- they were loose.  That's why I wore

19   them.

20   Q.   What about the blouse that you wore?  What kind of blouse

21   were you wearing that night?

22   A.   That night I was wearing a Mexican blouse with embroidery

23   at the top.  And very loose.  You know, I'd just gotten it.

24   Q.   Was it revealing?

25   A.   No.  It was a thick muslin cotton type of blouse.  It was

16-CV-0581-RBJ        Jury Trial - Day 1              2 - 204

1   -- came down to below the hips.

2   Q.  And you heard in the opening that this was the same outfit

3   you had worn to the Hecht house; is that correct?

4   A.  That's correct.  I did wear the same shorts.  I didn't

5   have a lot that fit me in the --

6           MS. LABRANCHE:  Objection, nonresponsive, move to

7   strike.

8           THE COURT:  All right.  Question by question.  She

9   wore the same shorts.  Next question.

10  Q.  (By MS. ALTMAN) Okay.  Susie?

11  A.  Yes.

12  Q.  Did you wear the same shorts to Flora Farms that night?

13  A.  I did.

14  Q.  Did you wear them because you thought Nikos Hecht liked

15  them?

16          MS. LABRANCHE:  Objection, leading.

17          THE COURT:  Sustained.  Try this, Why did you wear

18  those shorts?  Try that one.

19          MS. ALTMAN:  Okay.  Thank you, Your Honor.

20  A.  I wore a different blouse.

21  Q.  (By MS. ALTMAN) It's okay, Ms. Dailey.  Ms. Dailey, when

22  you walked over to the jewelry store, had you spoken to

23  Mr. Hecht at all?

24  A.  No.

25  Q.  Do you know what he was doing in the intervening time

16-CV-0581-RBJ          Jury Trial - Day 1                    2 - 205

1    between when you arrived and when you had dinner?

2    A.  I have no idea.

3    Q.  When you walked over to the jewelry store, who was there?

4    A.  Well, Jeanne and Laura were on the path in front of Alison

5    and I.

6    Q.  So Jeanne, Laura, Alison, and yourself?

7    A.  Yes, the four of us.

8    Q.  And there was a point at which you came back to the

9    restaurant?

10   A.  Yes.

11   Q.  Was dinner being served at that time?

12   A.  Yes.

13   Q.  Did you sit down for dinner?

14   A.  No, I didn't sit down.

15   Q.  At any point did you sit down for dinner?

16   A.  I sat down for dinner after -- after I came back.  I never

17   really ate.

18   Q.  Okay.  Well, did you sit down at the table when dinner was

19   being served with everyone else?

20   A.  No.  No, I had brought a little camera, just a

21   point-and-shoot little camera, and I thought this is a perfect

22   time to get pictures of everyone, and that's when I got up,

23   and I started taking pictures of everyone.

24   Q.  Was everyone else sitting at the table when you were

25   taking pictures?

Sarah K. Mitchell, RPR, CRR

1           MS. LABRANCHE:  Objection, leading.

2    Q.   (By MS. ALTMAN) I'm going to call up Exhibit 6.  Can you

3    describe for the jury who's in that picture?

4    A.   Yes.  To the left is my brother-in-law Gary Andlinger

5    putting a piece of something in his mouth.  And in the center

6    is Andy Hecht.  And the lady with the short hair and the sort

7    of turquoise blouse is my mother.

8           MS. ALTMAN:  And, Your Honor, I'll represent to you

9    that this exhibit, Exhibit 6, is also stipulated to.

10          THE COURT:  All right.  It's admitted.  What you want

11   to do, though, is get it admitted and then put it up, because

12   Julie won't put it up until it's admitted.

13          MS. ALTMAN:  Fair enough.  Your Honor, there's five

14   of them, all of which are stipulated to.  May I read the

15   numbers at one time?

16          THE COURT:  Go ahead.

17          MS. ALTMAN:  It's Exhibits 6, 9, 10, 19, and 31.

18          THE COURT:  All right.  Those five exhibits are

19   admitted, and you can have Julie put them up on the screen one

20   by one if you want.

21      (Plaintiff's Exhibits 6, 9, 10, 19, 31 admitted

22      into evidence.)

23          MS. ALTMAN:  And, Your Honor, Exhibits 124 and 125

24   are both admitted, correct?

25          THE COURT:  That's right.

1  Q.  (By MS. ALTMAN) Now, Ms. Dailey, can you again just

2  identify for the jury who's in this picture in Exhibit 9.

3            THE COURT:  She did that already.

4            MS. ALTMAN:  I don't know that the jury had the

5  picture, Your Honor.

6            THE COURT:  Oh.

7            MS. ALTMAN:  So I was going to have her identify --

8            THE COURT:  Okay.  Fair enough.

9            MS. ALTMAN:  Sorry about that.

10  Q.  (By MS. ALTMAN) Ms. Dailey, can you identify --

11  A.  In the left in the blue shirt is my brother-in-law,

12  Jeanne's husband, Gary Andlinger.  In the center is Andy

13  Hecht, Nikos Hecht's father.  And to -- the lady is my mother,

14  Martha Walton.

15  Q.  Okay.  Did you take that picture?

16  A.  I did.

17  Q.  And you see Gary Andlinger's eating dinner?

18  A.  Yes.

19  Q.  Or eating food at least in this photograph; is that right?

20  A.  I do.

21  Q.  And you see other food on the table; is that correct?

22  A.  Yes.

23  Q.  Was this picture taken before or after Mr. Hecht sexually

24  assaulted you?

25  A.  Before.

1    Q.  Okay.  Can you call up Exhibit 9, please.  And can you

2    identify for the jury who's in this picture?

3    A.  Yes.  The person in the front is Martha Walton, my mother.

4    To her left is Connie, Laura Kaplan's mother.  The man in the

5    short-sleeved blue shirt is Nikos Hecht.  And the hands

6    serving -- offering my mother something, I presume, is Andy

7    Hecht.

8    Q.  Did you take this picture?

9    A.  I did.

10   Q.  Did you take this picture while dinner was being served at

11   Flora Farms?

12   A.  Yes.  Yes, it was being served.  People were eating.

13   Q.  And while people were eating, what were you doing?

14   A.  I was taking pictures.

15   Q.  Okay.  Can you call up Exhibit 10, please.  Do you

16   recognize these two fellows?

17   A.  Yes.

18   Q.  And can you tell the jury who they are?

19   A.  Yes.  It's Tristan on the right and George on the left.

20   Q.  Did you take this picture?

21   A.  I did.

22   Q.  Can you call up Exhibit 19.  Did you take this picture?

23   A.  I did.

24   Q.  And who's in that picture?

25   A.  That's Nikos Hecht in the short-sleeved blue shirt, and to

1  his right is Alison Hecht, his then wife.

2  Q.  And were all of these pictures that we're looking at, were

3  they taken at the same time?

4  A.  Yes, they were, all the same time.

5  Q.  Did you take this picture of Mr. Hecht before or after the

6  sexual assault?

7  A.  This picture -- all the pictures were taken before the

8  sexual assault.

9  Q.  Can you bring up Exhibit 31, please.  Who's that?

10  A.  That's Levi Hecht.  That's Mr. Hecht's little son.

11  Q.  And is this also a picture that you took?

12  A.  It is.

13  Q.  Can you describe generally what the atmosphere was like

14  during the dinner?

15  A.  Yes.  It was happy.  It was light.  It was a light

16  atmosphere.  The children, everyone, the families were happy

17  to be together.  It was very informal.  There was no pretense.

18  Everyone -- very informal clothing.  The kids were having a

19  good time.  They were mingling around.  They all seemed to

20  know each other from before.  And it was just a fun family

21  night.  And I don't get that many of those.

22  Q.  During the time that you were taking these pictures,

23  surrounded by your family and friends, did you feel safe?

24  A.  I knew I was safe.

25  Q.  Did you feel comfortable?

1    A.  I was totally comfortable.

2    Q.  Did you have -- did you have any reason to believe that

3    you were in danger?

4    A.  No.

5           MS. LABRANCHE:  Objection, leading.

6           THE COURT:  Overruled on that question.

7    Q.  (By MS. ALTMAN) I'm sorry.  Did you answer?

8           THE COURT:  She said no.

9           MS. ALTMAN:  Okay.

10   Q.  (By MS. ALTMAN) Now, at this point in time, at the time

11   that you were taking pictures, up until this point in time in

12   the evening, had you had any conversations with Mr. Hecht?

13   A.  No, none.

14   Q.  Do you see Mr. Hecht in the room here today?

15   A.  Yes, I do.

16   Q.  Can you identify him for the jury?

17   A.  Yes.  He's the man with the glasses and the navy jacket

18   on.

19   Q.  Is that the man who sexually assaulted you?

20   A.  Yes, it is.

21   Q.  Did there come a time when you did have a conversation

22   with Nikos Hecht at Flora Farms?

23   A.  Yes.

24   Q.  How did that happen?

25   A.  I was where -- I was -- you've seen the picture of Levi,

                    Sarah K. Mitchell, RPR, CRR

1   and I had been taking -- there's several pictures of Levi

2   because he's a beautiful child and cute.  There's a picture of

3   his father, of Levi on his shoulders.  And at that point,

4   after taking those pictures, Nikos had appeared in that grassy

5   area before -- in front of the end of the table where the

6   adults were sitting.

7   Q.  Can you call up Exhibit 124, please.  Can you show the

8   jury -- when you say he came up to you, where were you

9   standing?

10  A.  About right here in this area.

11  Q.  Okay.  Did he say anything to you when he came up to you?

12  A.  Yes.

13  Q.  What did he say?

14  A.  He said, Would you like to see the gardens?  And I said,

15  Well, sure, because that's what Flora Farms is famous for,

16  these gardens.  She apparently, the owner, took a cornfield

17  and built all these pathways and gardens, and I said, Sure.

18  Q.  Were you concerned for your safety when he asked to show

19  you the gardens?

20  A.  Not at all.

21  Q.  So he offered to show you the gardens.  Tell the jury what

22  happened at that point.

23  A.  At that point --

24         MS. LABRANCHE:  Objection, vague.

25         THE COURT:  Overruled.  Go ahead.

Sarah K. Mitchell, RPR, CRR

1              THE WITNESS:  Go ahead, Your Honor?

2    A.  At that point Mr. Hecht offered me his arm, Would you like

3    to see the gardens?  And he offers me his left arm.  And I was

4    a little -- I was sort of surprised, because it was a very

5    gentlemanly chivalrous sort of thing to do, and I thought

6    maybe he thinks I'm going to slip or whatever.  And I took his

7    -- I took his left arm, put my arm within his arm, and we

8    began walking up the path.

9    Q.  (By MS. ALTMAN) Did you two talk while you were walking up

10   the pathway?

11   A.  Yes.

12   Q.  Tell me, what did you discuss?

13   A.  Mr. Hecht started telling me the story of his grandfather,

14   about how his grandfather had come to this country from

15   Germany as a very young man and began making a life for

16   himself.  He was a talented tennis player in Germany, and he

17   escaped, and how he came to this country with nothing, and

18   developed a life for himself, and went on in the tennis world,

19   and worked with lots of children, lots of kids.  He was -- it

20   was a remarkable story.  It was an impressive story.  One of

21   those wonderful stories of people coming to this country and

22   making a great life.

23   Q.  Now, during that walk up the pathway, was there any point

24   in time where you started discussing your body parts with

25   Mr. Hecht?

1   A.  No.  Never.

2   Q.  Was there anything while you were walking on that pathway

3   where you suggested to Mr. Hecht that you were interested in

4   having a physical relationship with him?

5   A.  No.

6   Q.  Was there any point in time while you were walking on the

7   pathway with Mr. Hecht and he was talking about his

8   grandfather that you suggested to him that you wanted to have

9   sex with him?

10  A.  No.

11  Q.  So you continued on the path.  Were you walking quickly or

12  slowly?

13  A.  Slowly.

14  Q.  How far up the path would you say you ultimately -- when

15  you marked on the exhibit where you ended, how far up the path

16  would you say that was in terms of feet or yards?

17  A.  I'm not good at the feet or yards, the distance.  40, 50.

18  Q.  Okay.  Could you see the end of the pathway closest to the

19  pavilion?  Could you still see that from where you were?

20  A.  I didn't look back.

21  Q.  Okay.

22  A.  It was lighted.  It was lighted.  The strings of lights

23  were all along both sides.

24  Q.  And at the time that you took this walk up the path, what

25  time of day was it?  Was the sun in the sky?  Was it dusk?

1   Can you describe for the jury --

2   A.   It was dusk.  The sun was setting, so I don't think I

3   would have seen shadows.

4   Q.   Was there a point in time when Mr. Hecht stopped talking?

5   A.   Yes.

6   Q.   Tell me what happened.  Tell the jury what happened.

7   A.   It was towards the end of the path, very, very close to

8   the end.  And Mr. Hecht turned around and faced me and took

9   his right hand and placed it on the back of my neck

10  forcefully.  I could feel the force of his fingers, and he

11  pulled me into him or him to me, and put his mouth over my

12  mouth as if a kiss.  There was nothing romantic about it.  He

13  then took my right hand and placed it down on his penis, which

14  was erect, hard.  And the next thing I know I was on my back.

15  Q.   Okay.  Ms. Dailey, I know this is difficult for you, but

16  I'm going to sort of back up what you just said for a minute,

17  and then we'll sort of go forward.  What did -- what was the

18  first thing Mr. Hecht did to you?

19  A.   He grabbed me behind the neck.

20  Q.   Did you ask him to do that?

21  A.   No.

22  Q.   Did you want him to do that?

23  A.   No.

24  Q.   Was there anything about your conversation with him where

25  you suggested to him you were interested in having him kiss

1  you?

2  A.  I never had a conversation with him.

3  Q.  Did he --

4  A.  Other than the thing about his grandfather.

5  Q.  You mentioned that he put his mouth over your mouth; is

6  that correct?

7  A.  That's correct.

8  Q.  Did you want him to kiss you?

9  A.  No.

10  Q.  Did you ask him to kiss you?

11  A.  No.

12  Q.  Did it feel like a kiss?

13  A.  No.  There was nothing romantic.  There was nothing

14  desired.

15  Q.  Now, at the point at which he was kissing you, was his

16  hand still on the back of your neck?

17  A.  Yes.

18  Q.  What was going through your mind at that moment where you

19  said he grabbed you forcefully behind the neck and attempted

20  to kiss you and put his mouth over yours?

21  A.  I was scared.  I knew when he put his hand -- my hand down

22  on his penis and had his hand on my neck that I knew I was in

23  trouble, I was just in trouble.

24  Q.  Now, you said that he put your hand on his penis.  Did you

25  want to touch his penis?

1  A.  Did I want to touch his penis?  No.

2  Q.  Did you ask him to touch his penis?

3  A.  No.

4  Q.  On your own, regardless of whether or not you asked him,

5  did you of your own volition reach out and touch his penis?

6  A.  No.

7  Q.  Now, at this point in time you said he forced you to the

8  ground, or --

9  A.  Yes.

10  Q.  -- the next thing you knew you were on the ground?

11  A.  I was on the ground on my back.

12  Q.  What happened?

13  A.  My hands went behind my head.

14  Q.  Can you show the jury what you mean by that?

15  A.  My hands went back.

16  Q.  On the ground?

17  A.  On the ground.

18  Q.  Okay.

19  A.  My shorts came down.

20  Q.  Did you pull your shorts down?

21  A.  No.

22  Q.  Who pulled your shorts down?

23  A.  Mr. Hecht.

24  Q.  And then what happened?

25  A.  Then he was on top of me pushing his penis into me.

16-CV-0581-RBJ      Jury Trial - Day 1          2 - 217

1            THE COURT REPORTER:  I'm sorry.  I need a minute.

2        (Pause in the proceedings.)

3            THE COURT:  I guess the reporter's computer just went

4    bad.

5            MS. ALTMAN:  Okay.

6            THE COURT:  We need to take a little mechanical

7    break.

8            MS. ALTMANN:  No problem.

9            THE COURT:  So let's do that here.  And as long as

10   we're taking a break, you'll get used to me asking you, how

11   much time would you like?  Sometimes jurors want ten.

12   Sometimes they want 15.

13           THE JURORS:  Ten.

14           THE COURT:  Ten?  Now, I'll warn you the ten often

15   turns into 15.  So we'll take ten.

16           THE COURTROOM DEPUTY:  All rise for the jury.

17       (The jury left the courtroom at 3:55 p.m.)

18           THE COURT:  All right.  Ten minutes.

19       (Break was taken from 3:55 p.m. to 4:07 p.m.)

20           MS. LABRANCHE:  Your Honor, I apologize.  We're

21   missing an attorney.  I'll run and grab him.

22       (Pause in the proceedings.)

23           THE COURTROOM DEPUTY:  All rise for the jury.

24       (Jury entered the courtroom at 4:08 p.m.)

25           THE COURT:  All right.  Onward.

                    Sarah K. Mitchell, RPR, CRR

1   Q.  (By MS. ALTMAN) And, Ms. Dailey, I apologize.  Obviously

2   this is a difficult subject.  And I'm not exactly sure the

3   question I left off on, but I hope I'm pretty close.  After

4   Mr. Hecht -- after you were on the floor and your arms were

5   over your head, what is the next thing that happened?

6   A.  The next thing that happened -- that I felt was his penis

7   pushing into me.  Pushing into me.

8   Q.  Was he -- and, again, forgive me for being indelicate --

9   was his penis inside of your vagina?

10  A.  It was pushing, and I was 65 years old then, and I hadn't

11  been sexually active for a long time, and the vaginal walls

12  thicken --

13          MS. LABRANCHE:  Objection, 702.

14          THE COURT:  Overruled.

15  A.  -- as you get older.  And I've never had children.  And

16  the pain -- my body was rigid.  The pain of this pushing, this

17  thrusting was like -- was like a knife.  It was the most pain

18  I've ever been in.  And I was panicked.  I was terrified.  I

19  just felt paralyzed.  Paralyzed.  My body didn't move.  And he

20  kept pushing it in.  I was ashamed.  How could this happen to

21  me?  Why?  And my pants came down onto the ground.  I could

22  feel the grass, and I was pushing myself -- trying to push

23  myself away to keep his penis from coming in.  I didn't

24  scream.  I just couldn't.  I couldn't scream.  I couldn't --

25  it was like a nightmare where you -- where you -- you wake up

1   and you couldn't find a voice.

2   Q.   (By MS. ALTMAN) Ms. Dailey, I know this is difficult, and

3   I apologize, but did you at any time ask Mr. Hecht to have sex

4   with you?

5   A.   No.

6   Q.   Did you suggest to him with your body language that you

7   wanted to have sex with him?

8           MS. LABRANCHE:   Objection.

9           THE COURT:   Sustained.   You're leading.   We want to

10  hear her testify.

11  A.   I'm an older woman.

12          MS. LABRANCHE:   Objection, Your Honor, there's not a

13  question pending.

14          THE COURT:   Right, relax.   It's going to be okay.

15          Next question.

16  Q.   (By MS. ALTMAN) Ms. Dailey, you said you didn't scream; is

17  that correct?

18  A.   That's correct.

19  Q.   Did you say anything to Mr. Hecht?

20  A.   I did.

21  Q.   What?

22  A.   Twice I remember -- but it was -- it was then a low voice

23  -- Stop, stop.   Like that.

24  Q.   Did he stop?

25  A.   No.

1   Q.  Now, was he on top of you?

2   A.  He was on top of me.  He was on top, yeah.

3   Q.  Did you touch him?

4   A.  No.

5   Q.  Did you touch any part of his body with your hands?

6   A.  No.

7   Q.  Did you look at him?

8   A.  Did I look at him?

9   Q.  Yes.

10  A.  No.

11  Q.  Did you look in his eyes?

12  A.  No.

13  Q.  Was there any -- was there anything about your body

14  language that you believe suggested to Mr. Hecht you wanted to

15  have intercourse with him?

16  A.  No.  There were some -- there was no movement from my body

17  in a reciprocal way.

18  Q.  Ms. Dailey, did you ever unbutton Mr. Hecht's pants?

19  A.  No.

20  Q.  Did you unzip his pants?

21  A.  No.

22  Q.  Did you ever touch his pants?

23  A.  No.

24  Q.  Did you touch any part of his clothing?

25  A.  Not his clothing, not his body, nothing.

1   Q.  Ms. Dailey, did you ever put your mouth on Mr. Hecht's

2   penis?

3   A.  No, never.

4   Q.  Did you ever attempt to give him a blow job?

5   A.  Never.

6   Q.  When you were lying on your back and Mr. Hecht was -- was

7   having sex with you, did he ejaculate?

8   A.  Yes.  He was inside me.

9   Q.  Ms. Dailey, did you ever fight back?  I know you said you

10  didn't scream, but did you ever punch him or hit him or kick

11  him?

12  A.  No.  I was too terrified.

13  Q.  Did he ever punch you, hit you, or kick you?

14  A.  No.

15  Q.  And other than putting his penis inside you and assaulting

16  you, did he do anything else to physically harm your body?

17  A.  No.

18  Q.  What was going through your mind when Mr. Hecht was on top

19  of you having sexual intercourse, sexually assaulting you?

20  A.  I don't know if I could think.  I know what I felt.  I

21  felt terror.  I felt shock, disbelief.  I -- I couldn't

22  believe it.  I felt frozen.  I just wanted it to end.  I just

23  wanted it over.

24  Q.  How long would you say it lasted ?

25  A.  It's hard.  I don't know.  Four minutes, seven minutes.

1   It's hard to know.  It felt at that time forever.  Forever.

2   Q.  After Mr. Hecht ejaculated, what happened next?

3   A.  He jumped up.  He jumped up.  He -- he pulled his pants up

4   and walked quickly away down the path.

5   Q.  What did you do?

6   A.  I just -- I -- I sat there.  I pushed myself up.  I sat

7   there like a piece of garbage, like dog meat on the highway.

8   That's what it felt like.

9   Q.  How long do you think you sat there?

10  A.  Not long.  Not long.

11  Q.  What did you do?

12  A.  I got up, and I started walking back towards the tables.

13  Q.  What did you do when you got back to the area by the

14  tables?

15  A.  I picked up my camera, because I'd placed it under a palm

16  tree.  I knew it was there.  And I went, and I sat down where

17  I'd been sitting before across from Jeanne.  And I just sat

18  there in total shock.  I just -- my legs were trembling.  My

19  general area was throbbing.  I hurt.

20  Q.  Ms. Dailey, after Mr. Hecht sexually assaulted you, did

21  you take any more pictures?

22  A.  No.

23  Q.  You said you were sitting there.  Was there a point at

24  which you approached Mr. Hecht?

25  A.  Yes.

1   Q.  How long from when you sat down to a point at which you

2   approached Mr. Hecht?

3   A.  Maybe five or six, eight minutes.  It's hard to know, but

4   I sat there for -- I was in a rage.  I felt shock.  My legs

5   were trembling.  Why -- I wanted -- it's hard to know what I

6   wanted.  I wanted to confront him.  Why did you do this?  Why?

7   And I got up, and I went over to where he was sitting.  And I

8   sat facing outwardly on a little bit of the bench, and I

9   tapped him on the shoulder.  His back was -- was -- he was

10  leaned towards the person on his left.

11  Q.  What happened when you tapped him on the shoulder?

12  A.  I tapped him twice.  I said to him two times, Nikos,

13  Nikos, and he didn't -- wouldn't turn around.  And I got up

14  and went back to my seat.  I was so -- I was humiliated.  I --

15  my head, I didn't know what to -- I didn't know had I caused

16  this?  I felt -- I felt ashamed.  I felt guilty.  I looked

17  down the table and saw my mother.

18  Q.  Ms. Dailey, do you know what you would have said to

19  Mr. Hecht if he'd turned around?

20        MS. LABRANCHE:  Objection, relevance.

21        THE COURT:  Overruled.

22  A.  I wanted to know, as I said, I wanted to know why did you

23  do this to me?  How crazy.  What did you do this for?  For

24  what?  Why would you -- why would you do this to me?

25  Q.  (By MS. ALTMAN) When Mr. Hecht did not turn around, what

 1  did you do next?

 2  A.  I went back to my spot where I sat before.  I sat in the

 3  same spot the whole time down towards the area where the kids

 4  were.

 5  Q.  And what did you do?

 6  A.  I did nothing.  I just sat there.

 7  Q.  Did you tell your sister Jeanne, Jeanne Andlinger, what

 8  had happened?

 9  A.  No.  I didn't tell her what happened.  I said to her, Do I

10  have something to tell you.

11  Q.  And when you told your sister Jeanne Andlinger do I have

12  something to tell you, at that time did you know that Tristan

13  Andlinger, your nephew, had witnessed part of the assault?

14  A.  No.  Nothing.

15  Q.  So when you told your sister Jeanne Andlinger have I -- I

16  have something to tell you, did you then tell her what it was?

17  A.  No.

18  Q.  Why?

19  A.  There was -- there was -- I wasn't going to -- I didn't

20  want to -- I didn't want to talk, but I couldn't talk.  I sat

21  there.  There were children.  There were -- there were people.

22  This was an -- I was a guest.  I didn't -- I just couldn't

23  talk.  I wouldn't -- I didn't want to talk about it then.  Why

24  -- I didn't -- I wouldn't talk about it then.

25  Q.  Did you leave the restaurant that night?

1  A.  Yes.

2  Q.  With who?

3  A.  With my family, with Gary and Jeanne, and mother.

4  Q.  Did you and Jeanne make any arrangement for when you were

5  going to meet?

6  A.  Yes.

7  Q.  When?

8  A.  We were walking back to our villas.  We had separate

9  villas at some hotel.  And Gary and mother were walking arm in

10  arm very slowly up in front of us, and Jeanne and I were

11  behind.  And I said, Jeanne, I need to talk to you.  And she

12  said, I'll come over tomorrow morning.

13  Q.  And did she --

14  A.  We can't talk now.

15  Q.  And did she come over the following morning?

16  A.  Yes, she did.

17  Q.  And can you describe for the jury what you told her the

18  following morning?

19  A.  Yes.  The next morning Jeanne came over early at 8:30 or a

20  quarter -- it was early.  And she looked very -- she looked

21  serious, very serious.  And we went -- we went towards my

22  room.  First we were in the kitchen.  Then we went towards my

23  room so mother wouldn't -- she had her separate bedroom, but

24  just in case she would hear.  I did not want my mother to know

25  what had happened.

16-CV-0581-RBJ        Jury Trial - Day 1                    2 - 226

1    Q.  Did you tell your sister Jeanne what you've told the jury

2    today?

3    A.  I told her exactly -- exactly the same thing.

4    Q.  What was -- what was your observation of your sister's

5    reaction to what you told her?

6    A.  She was horrified.

7               MS. LABRANCHE:  Objection, relevance.

8               THE COURT:  Sustained.

9    A.  Her face was horrified.

10              MS. ALTMAN:  The judge sustained it.  You can't

11   respond.

12              THE WITNESS:  Excuse me.  Sorry, Your Honor.

13   Q.  (By MS. ALTMAN) So you told your sister what happened?

14   A.  I did.

15   Q.  Had you -- did you call the police?

16   A.  No.

17   Q.  Did you go to the hospital?

18   A.  No.

19   Q.  Why didn't you call the police?

20   A.  That morning before Jeanne arrived, I, of course, was

21   going over everything, and I made a decision for myself, and I

22   thought it through, that I just envisioned going to the police

23   in a foreign country, filing the report.  And I knew if I

24   filed the report, that it would draw my whole family back to

25   Mexico.  That everyone would have to know, my mother.  I

1    didn't want my brother-in-law to know.  I just -- I couldn't

2    -- I didn't want to do it to them.  I couldn't do it.  I

3    wasn't -- I didn't feel cowardly about it.  I made my -- I

4    made my choice.

5    Q.  At this point in time, had Ms. Andlinger told you whether

6    or not Tristan had observed any part of what had happened?

7    A.  Yes, she told me.  She said Tristan and George saw

8    everything.

9    Q.  How did that make you feel?

10   A.  Oh, I was -- I was -- I was -- I could not -- didn't

11   understand at first, and she said -- but she did say they were

12   in bushes.  I mean, none of it made any sense to me, but I

13   felt ashamed.  Ashamed.  Ashamed.  Horrified.  These were 13

14   and 14.  They had -- they had not had any sexual experience.

15   Tristan had never --

16          MS. LABRANCHE:  Objection, Your Honor.  I move to

17   strike as nonresponsive to the question.

18          THE COURT:  All right.  Let's have another question,

19   please.

20   Q.  (By MS. ALTMAN) Ms. Dailey, the day after the rape, can

21   you describe for the jury how you were feeling and what you

22   did?

23   A.  After the rape?

24   Q.  The day after.

25   A.  The day after?

1   Q.  Right.  After you spoke with your sister, can you describe

2   for the jury what you did?

3   A.  After Jeanne left, I made sure mother was -- that I

4   ordered breakfast for her, that she was up and well.

5   Sometimes she's well in the morning.  Sometimes she's not.

6   And I changed my clothes -- changed into my bathing suit.  And

7   I told Jeanne that I'd meet her outside, and I did.  I went

8   outside for about an hour.  I went down to an area near the

9   pool and laid on a chaise there near the pool.  And then I

10  went back to the villa to check on my mother, and I didn't

11  want to be around people, and I stayed there that day.

12  Q.  And did you check on your mother?

13  A.  I did.  And my mother was feeling very, very sick.  And

14  she was having problems breathing.

15  Q.  And when you say she was having problems breathing, did

16  you call her a doctor?

17  A.  Yes.  I -- we had a concierge type of service there for

18  each villa.  His name was Oscar, and I called him, and I said

19  she has to see a doctor, or she has to go to a hospital.  She

20  had a fever.  And he called a doctor to come to the -- to come

21  there to Las Ventanas.

22  Q.  And was your mother feeling okay?

23  A.  No.  No.  She was still -- she was not breathing well.

24  She was sort of a pale grayish color.  It's not a good day.

25  Q.  Were you scared for your mother?

1    A.  Oh, I would -- I didn't know what would happen.  I'd never

2    seen her quite like this.

3    Q.  How long was your mother sick?

4           MS. LABRANCHE:  Objection, relevance.

5           THE COURT:  Overruled.

6    A.  She wasn't well.  They brought in a fellow, a young man

7    with a respirator or a machine.

8    Q.  (By MS. ALTMAN) And how long was she sick?  Did she get

9    better the next day?  How long was your mother sick?

10   A.  No.  She was still not well when we went back to Aspen.

11   Q.  And how long from the rape until you left Cabo?  If the

12   rape was on a Tuesday, when did you leave Cabo?

13   A.  We left on Saturday as planned.

14   Q.  Why did you not leave early?

15   A.  Because I didn't -- I didn't want -- I didn't want to

16   change plans.  I didn't want -- I didn't want -- mother wasn't

17   well.  I didn't want to change the plans.  I made my decision

18   to not go to the police.

19   Q.  What happened --

20   A.  And I knew I could stick -- I was 65, not 25.  I've had

21   some -- had my bumps in life, and I knew I -- I could somehow

22   stick it out till Saturday.

23   Q.  When you returned home, did you return home to Vero Beach?

24   A.  We did, mother and I.

25   Q.  And at that time did you report the assault to anyone?

1   A.   The only person I told was Betty McGuigan, Dr. Betty

2   McGuigan.

3   Q.   And who is she?

4   A.   She's my therapist.

5   Q.   And when did you do that relative to when you returned

6   home?

7   A.   That week.  We arrived back in Florida on Monday, and I

8   believe I usually saw her on a Wednesday if I saw her.

9   Q.   Okay.  And did you tell her anything different from what

10  you told this jury?

11  A.   No.

12  Q.   You told her the same thing?

13  A.   The same thing.

14  Q.   Now, the shorts that you were wearing that night, the

15  white cargo shorts I think you mentioned?

16  A.   Yes.

17  Q.   Did you burn them?

18  A.   I burned them.

19  Q.   When?

20  A.   That week.

21  Q.   Why?

22  A.   I didn't want them -- I unpacked, and I put them on top of

23  the washer.  And I looked at them, and I -- I wanted them out

24  of my life, out of my house, out of my home, and I burned

25  them.

Sarah K. Mitchell, RPR, CRR

1  Q.  Was there any point in time where you reported the rape to

2  the Pitkin County Sheriff's Office?

3  A.  Yes.

4  Q.  Who did you report it to?

5  A.  I reported it to the sheriff's office, Sheriff Joe

6  DiSalvo.

7  Q.  Did you tell Mr. DiSalvo what you told the jury here

8  today?

9  A.  The same thing.

10  Q.  Did you report the rape to anyone else?

11  A.  Yes.  He suggested I call the district attorney's office.

12  Gave me the number.  And I did.  I reported it to the district

13  attorney's office.

14  Q.  Did you report it to anyone else other than the district

15  attorney and Sheriff DiSalvo?

16  A.  Do you mean authorities?

17  Q.  Yeah.  By example, did you report it to an investigator

18  for the district attorney's office?

19  A.  I reported to Sheriff DiSalvo and the district attorney's

20  office.

21  Q.  And do you recall who at the district attorney's office

22  you reported it to?

23  A.  Yes.  I spoke with Lisa Miller, an investigator there.

24  Q.  What prompted you to report it to Sheriff DiSalvo and also

25  to the district attorney's office?

1          MS. LABRANCHE:  Objection, Your Honor.  May we

2   approach?

3          THE COURT:  Sure.

4      (Bench conference on the record and out of the

5        hearing of the jury:)

6          MS. LABRANCHE:  This has been ruled on.

7          THE COURT:  Her answer is going to be because of the

8   domestic violence against Nikos?

9          MS. LABRANCHE:  Because of the past.

10          MS. ALTMAN:  First of all, as I mentioned to

11   Mr. Plachy on the break, we believe they opened the door

12   because in her voir dire she expressly said that there were no

13   charges against Mr. Hecht.  It was in her voir dire.  We can

14   give you --

15          MR. KAPLAN:  At 11:37 a.m.

16          THE COURT:  Would you mind staying out of this?

17          MR. KAPLAN:  Yes, Your Honor.

18          MS. ALTMAN:  So at 11:37 a.m. in their voir dire she

19   mentioned -- I apologize.  I have a loud voice.  I'm sorry.

20          THE COURT:  You do.

21          MS. ALTMAN:  I'm sorry.  At 11:37 a.m. she mentioned

22   to the jury that there were no charges against Mr. Hecht, so

23   we believe they opened the door.

24          THE COURT:  Were there charges against Mr. Hecht?

25          MS. ALTMAN:  Absolutely.  He was arrested.

1           MS. LABRANCHE:  Not in this case.  She's trying to

2    open the door to other cases that you excluded.

3           THE COURT:  Were there charges in this case?

4           MS. ALTMAN:  No, sir.  Not in this case, but she

5    didn't say -- she said there was no charges against Mr. Hecht.

6           THE COURT:  Sustained.

7           MS. ALTMAN:  Okay.  Your Honor, then just for

8    clarification sake, if she says -- because she needs to be

9    able to tell why she called them, can she say she saw an

10   article about Mr. Hecht in the paper without saying that there

11   were criminal charges and that that's what prompted her to

12   call?

13          THE COURT:  She can say that, but that's all she can

14   say.

15          MS. LABRANCHE:  That he was in the paper, not that

16   there's criminal charges.

17          MS. ALTMAN:  I just said that.

18          MS. LABRANCHE:  I couldn't hear.

19          THE COURT:  Make sure she doesn't go beyond that.

20          MS. ALTMAN:  Okay.

21          MS. LABRANCHE:  Your Honor, one other thing -- I

22   apologize.  I think we're going to wrap up soon.  I probably

23   have a good hour and a half, and I'm not feeling great.  If we

24   could break earlier, I think we have some legal issues to

25   address anyway, and then let me get started in the morning, I

1    would appreciate it.

2              THE COURT:  Okay.

3              MS. LABRANCHE:  Thank you.

4              MS. ALTMAN:  Your Honor, I just want to ask if I can

5    approach her to make sure --

6              THE COURT:  Yes.

7              MS. ALTMAN:  Okay.

8         (The following proceedings were held in open

9         court:)

10             THE COURT:  All right.  Let's start with another

11   question here.

12   Q.  (By MS. ALTMAN) Ms. Dailey, what prompted you to call the

13   Pitkin County sheriff, Sheriff DiSalvo?

14   A.  My sister called me and told me to look at the front page

15   of the Aspen Times, and I did.  And I saw an article that

16   prompted me to call the sheriff's office.

17   Q.  What was your purpose in calling Sheriff DiSalvo?

18   A.  I wanted Sheriff DiSalvo to have this information.

19   Q.  What --

20   A.  I just wanted him to have this information if he ever

21   needed it.

22   Q.  Was your purpose at the time you called Sheriff DiSalvo to

23   -- to bring charges relating to your claim against Mr. Hecht?

24   A.  No.  No.

25   Q.  When you called the district attorney, what was your

1   purpose in calling the district attorney?

2   A.   The same information that I gave Sheriff DiSalvo I gave

3   the district attorney's office because I wanted them to have

4   this information.

5   Q.   Did you report to the district attorney the same thing

6   you've reported to this jury today?

7   A.   Yes, I did.

8   Q.   Did you tell the district attorney that to the extent that

9   they needed you to testify at any time or to explain what you

10  had told the district attorney, that you'd be willing to do

11  that?

12  A.   Yes, I did.

13  Q.   Prior to the rape, had you been seeing a therapist?

14  A.   Yes.

15  Q.   And who is that?

16  A.   Dr. Betty McGuigan.

17  Q.   Why did you go to a therapist?

18  A.   I went to a therapist, and I've been seeing her quite a

19  long time, for someone to talk to.  I had not lived at home

20  since I was 18, and I was in a small town with my family

21  surrounding me, and I -- I found it challenging sometimes.

22  And I had my own business.  I opened my studio -- my first

23  studio, and I wanted to -- I was going through changes, and I

24  wanted someone to talk to that was a contemporary about

25  handling life.  I mean, situations came up, family situations.

1   It was -- it was comforting.

2   Q.  Did you go to Dr. McGuigan regularly?

3   A.  Off and on.  When I felt -- when something came up that

4   perhaps I hadn't handled well in the family, I felt -- I

5   wanted to -- I wanted to handle things well.  We all lived

6   right there, and at that time Jeanne and Gary were there as

7   well.  And it was very helpful.

8   Q.  Do you --

9   A.  It felt good to talk to someone.  I didn't have a best

10  friend there.

11  Q.  Did you continue to see Dr. McGuigan after the sexual

12  assault?

13  A.  Yes.  Much, much more.

14  Q.  And why is that?

15  A.  Because I -- I was -- I was having problems.  I didn't

16  understand -- I was seeing changes in myself.  I wasn't coping

17  well.  I couldn't sleep.  I had not had a full night's sleep,

18  not one day.  I don't understand these things.  I stayed in

19  high anxiety.  I don't go out at night.  I don't socialize.  I

20  -- I isolate.  I live with a great sense of loss.  I feel like

21  damaged goods.  I feel like an invisible person, unwanted.  My

22  enthusiasm for life is -- it just isn't there.  And I'm angry,

23  irritable.  I've had -- I feel my -- my brain doesn't function

24  well.  I'm disorganized in my functioning.  I couldn't go to

25  my own business for weeks at a time.  It's -- it's not

1  depression, because I have to hide it.  I have to hide it from

2  my mother that I'm not right.  That I'm not the -- I'm not the

3  same person.  I don't feel like the same woman.  At a time

4  when I thought in my 60s that I wanted some peace -- I wanted

5  peace, I want some joy, just in everyday living, and I don't

6  have that, and I can't seem to get it.  I have -- I have

7  thought, and I guess I lay there, I think, God, if you want to

8  take me, I'm willing to go, because I don't feel like I did

9  before.  And I'm not depressed.  I just don't feel alive.  I

10  don't understand it all.  I don't -- and I'm fearful.  I'm

11  fearful that I'm going to go on like this.

12  Q.  Ms. Dailey, if I understood you correctly, you said that

13  the amount of time that you see Dr. McGuigan now is more

14  frequent than when you saw her before?

15  A.  Yes.

16  Q.  How many times a week do you see Dr. McGuigan now?

17  A.  I would say -- she's semiretired.  I see her -- each

18  session is two hours.  I'll see her once, twice.  She's

19  willing to see me on a Saturday.  I've seen her on a Sunday.

20  Q.  How much would you say that you've spent after the rape in

21  seeing Dr. McGuigan?

22  A.  In excess of 12,000.

23        MS. ALTMAN:  Now, Your Honor, we have a series of

24  checks that are stipulated, and I'm not sure if you want me to

25  go through check by check with Ms. Dailey or what your

 1    preference is, but they are Exhibits 133 through 153.

 2              THE COURT:  Is there a dispute about the amount here?

 3              MS. LABRANCHE:  Just one moment, Your Honor.  I think

 4    that if there is, it's within a tiny --

 5              THE COURT:  All right.  While they're talking to each

 6    other, stipulated simply means the parties agree that a

 7    document can be admitted.  That's all.  If there is a fact

 8    that they agree to, then they would say we stipulate that that

 9    is true, that is a fact.  We haven't heard that yet, but

10    they've stipulated to some of these documents so that they

11    don't have to go through the process of getting them admitted

12    one by one, which they could do, but it takes time.  If

13    there's no dispute about it, Courts, let's say, urge them to

14    stipulate.

15              MS. LABRANCHE:  With the Court's permission, may I

16    ask Ms. Altman a question?

17              THE COURT:  Yeah, go ahead.  So I know somebody had a

18    question about that, Julie told me, and that's the answer.

19         (Pause in the proceedings.)

20              MS. ALTMAN:  I apologize.  One minute, Ms. Dailey.

21         (Pause in the proceedings.)

22              MS. LABRANCHE:  I think we figured it out, Your

23    Honor.  We do -- we have a stipulation, Your Honor.

24              THE COURT:  What is it?

25              MS. LABRANCHE:  It's Exhibits 133 through 140, and

1   then 141A, and then 142 through 153.  So there was just a

2   redaction on one of the -- 141A to be redacted.

3           THE COURT:  Right.  But that really wasn't my

4   question.  Do we have to put all those checks into evidence,

5   or is there an agreement on the amount she's paid

6   Dr. McGuigan?  You can dispute whether that has anything to do

7   with this case or not.  That's fair game.  But in terms of

8   just how much she's paid, there shouldn't be a dispute.

9           MS. ALTMAN:  The stipulated amount is $11,554.

10          THE COURT:  Since this --

11          MS. ALTMAN:  Yes.

12          THE COURT:  -- incident happened?

13          MS. ALTMAN:  Yes, Your Honor.

14          THE COURT:  All right.  So that's a stipulation of

15  fact now.  We don't have to go through all the checks.  She's

16  paid 11,000 whatever the number is.

17          MS. ALTMAN:  $11,545.

18          THE COURT:  So far in bills to this Dr. McGuigan.

19  Okay.  Onward.

20  Q.  (By MS. ALTMAN) Now, Ms. Dailey, I know you said that you

21  saw Dr. McGuigan before the rape; is that right?

22  A.  That's correct.

23  Q.  And can you tell the jury what your life was like before

24  you were sexually assaulted.

25  A.  Yes.  My life -- it was a quiet life, a normal life.  I

                    Sarah K. Mitchell, RPR, CRR

1  had my business.  I had my mother.  And I have had my

2  difficult times.  I have had depression in my life, and I've

3  dealt with that as an adult.  And I would have times when I'd

4  be down.  I'd have good days.  Like everyone I had some bad

5  days.  I was -- I always functioned.  I taught body movement.

6  That's what I did for a living, and I would be tired at night.

7  In my 50s I worked a lot, and I would spend time at night with

8  my mother afterwards.

9  Q.  Did you have joy in your life?

10  A.  I did.

11  Q.  Were you happy?

12  A.  I was happy.  Not delirious, but I had interests, things I

13  liked to do.

14  Q.  And after the rape, can you describe for the jury how your

15  life is different after the sexual assault at Flora Farms?

16  A.  My life is different because I'm different, I think.  I

17  feel numb, all the things that I described before.  I think

18  the isolation and the difficulty in being around people has

19  changed my life.  I don't have the desire to participate in

20  life like I always have.  I have my responsibilities, and I --

21  I do those.  But it's -- that's -- I have -- I have friends,

22  but I'll talk on the phone as opposed to seeing them.  I don't

23  -- I've always had a great sense of humor, my whole family

24  does, and I don't know where it's gone.  I don't -- I don't

25  look forward to the future, and that makes me so angry.  The

 1  greatest pleasure I've had is -- I lost my dog last year, and

 2  I got a new dog, a small dog.  Spiritually I feel -- I feel

 3  sound.  I don't -- there's a lot I don't understand as to why,

 4  but in my -- my spiritual life has always been strong.  And

 5  I've had times when I'm angry with God, but then anger is a

 6  part of a good relationship.  And I can't read -- I was always

 7  a reader -- because I can't remember the paragraph before, so

 8  I've quit reading books.  I've quit exercising.  It's been

 9  very hard.

10  Q.  Ms. Dailey, are you angry at Mr. Hecht?

11  A.  No, I wouldn't say angry.  I'd say I'm rageful.

12  Q.  Is that why we're here today?

13  A.  We're here today because I'm -- I am not a woman without

14  courage.  It's taken a lot of courage to do this, to put my

15  name out there for this, and to be shamed by some, I suppose,

16  but I wanted to do it for me.

17          MS. ALTMAN:  Your Honor, I have no further questions.

18          THE COURT:  Okay.  Well, it's 4:52.  We didn't get

19  eight minutes from you today.  We don't dock your pay, though.

20  Well, wait a minute.  There isn't any pay.  Let's stop.  It's

21  been enough for one day.  Now, tonight, do the best you can to

22  just not think about the case.  I know that isn't possible

23  probably, but don't talk about it.  Don't do research on it.

24  I won't repeat those things.  You heard me.

25          Try to have a good evening.  The Rockies are playing,

1   if you're baseball fans.  Maybe they'll have a good game.

2   That will be good.  Whatever.  Just have a nice evening.  We

3   appreciate the time you've given us.  We appreciate your

4   service.  It's not easy.  I have something on the docket in

5   the morning at 8:30, which I normally do, but it is not going

6   to take more than 30 minutes, and so let's start at nine.

7   9 o'clock in the morning.  Thank you.

8           THE COURTROOM DEPUTY:  All rise for the jury.

9       (Jury left the courtroom at 5:19 p.m.)

10          THE COURT:  Okay.  Now, briefly, you said there was a

11  legal issue you wanted to discuss.  So what is it?

12          MS. LABRANCHE:  I apologize.  I thought you wanted to

13  raise something about me mentioning children in the --

14          MS. ALTMAN:  Oh, I mentioned it to him, to

15  Mr. Plachy, and if you guys weren't going to raise it again

16  then -- the issue was -- I apologize, Your Honor.

17          THE COURT:  If it's not an issue, you don't have to

18  tell me.

19          MS. ALTMAN:  Okay.

20          THE COURT:  Now, do you have something else you want

21  to tell me?

22          MS. ALTMAN:  Yes.  Yes.  I do want to ask you -- I

23  guess we had set the *Daubert* motion for tomorrow at three, and

24  I think all of us had anticipated we would probably be done

25  with our case, and that it would be an appropriate time to

1   have the *Daubert*.  So I would just ask if we can do it on

2   Thursday instead of tomorrow, so that we don't interrupt our

3   case, since --

4          THE COURT:  Probably, but let's talk about it.  I'm

5   glad you brought that up, because I read the fellow's report.

6   I don't really see it as a *Daubert* hearing.  You call it that,

7   but I can't imagine that you are questioning his credentials.

8   He seems very highly credentialed and qualified.  I don't

9   know, but it doesn't appear to me that he's gone out in left

10  field with some off-the-wall theory or method that doctors

11  like him don't use.  My impression is that what this is is

12  just the latest round of concern about keeping from the jury

13  some of the salacious stuff that's in the history of both of

14  these people.  Is that what it's about?

15         MS. ALTMAN:  No, sir.  No, sir.

16         THE COURT:  What is it about?

17         MS. ALTMAN:  Well, it -- I hope it's not construed

18  ever as the latest round.  Dr. Hudson -- and I don't have the

19  report in front of me -- but Dr. Hudson throws out, and you'll

20  see it in his report, and certainly it's documented in our --

21         THE COURT:  I read the report, and I read your

22  motion.

23         MS. ALTMAN:  So in his report, by example, he throws

24  out probably -- and I don't want to misstate the number --

25  five different theories.  Oh, there's some research that says

 1   X.  Oh, there's some research that says Y.  He never once --

 2          THE COURT:  Well, doctors always do that.  They

 3   always talk about the research.

 4          MS. ALTMAN:  But he never once ties it to the facts

 5   of this case.  He has absolutely no methodology.  So he'll

 6   throw out a random theory that says something, but not once in

 7   his report does he ever tie it to the facts of this case.  And

 8   so he has no -- and I think what we will demonstrate through a

 9   *Daubert* hearing, he has absolutely no methodology such that he

10   should be qualified to testify.  I'm not suggesting that he's

11   not a well-regarded doctor or that his CV is not such that he

12   would be qualified to testify in a court.  What I'm saying in

13   this case with this report when you look at the report,

14   there's probably five --

15          THE COURT:  The report that you misinterpreted and

16   misrepresented in your motion, that report?

17          MS. ALTMAN:  Your Honor, I disagree with that.  In

18   what way?

19          THE COURT:  No, you did, and this is how.  You said

20   that he assumes that the rape did not happen.  That is not

21   what his report says.  What his report says is that you can't

22   make, in his opinion, a diagnosis of post-traumatic stress

23   disorder, PTSD, unless you assume that a trauma event

24   occurred.  Sounds like common sense to me.  So he's saying

25   that he isn't of the opinion that the event occurred or did

1   not occur.  That's for the jury to decide.  What he is saying

2   is a psychiatrist cannot say she has PTSD without assuming it

3   occurred.  He also said the psychiatrist can properly say

4   she's got symptoms that are similar to what would support a

5   diagnosis of PTSD, but he's not saying that she has PTSD or

6   doesn't.

7            MS. ALTMAN:  Your Honor, that -- you just hit on

8   precisely what's wrong with his report.  He goes through a

9   significant discussion of how he did this SCID analysis, which

10   is the gold standard for analysis of PTSD, and then never

11   cites his SCID findings in his report.  And then it took us

12   quite a while to actually get his SCID findings, and, Your

13   Honor, his SCID findings qualify as PTSD, and that's why he

14   doesn't cite them in his report.  So his exact findings --

15            THE COURT:  You've got an expert on your side that

16   says just what you've just said, and that's fair game for

17   cross-examination, for opposing viewpoints, but it doesn't to

18   me mean that he isn't a relevant or reliable witness.  The

19   concern I've got about him is not what you're talking about.

20   The concern I have about him is he recites Ms. Dailey's entire

21   history, and if those things are important to his conclusion,

22   then you have to help me in understanding how he can support

23   his opinion without going into things that I have previously

24   said are off limits.  I don't know the answer, and that's

25   where your hearing could be valuable to me.

                        Sarah K. Mitchell, RPR, CRR

1           For example, he mentions in the report that she had

2     problems with the SEC and that she had been very -- at least

3     the implication is that was possibly a cause of her

4     depression.  Okay.  I have never thought that it was necessary

5     for the jury to hear about the details of what her troubles

6     with the SEC were.  I mean, we get into the question was it

7     her, was it her then husband?  How did she get involved in it?

8     It was resolved without an admission of guilt.  I just don't

9     think we need to get into all of that.

10          But if the fact that she was involved in litigation

11    with the SEC is itself important to his diagnosis or his

12    conclusion, then it seems to me, and I don't know if it is or

13    not, because sometimes they just list everything that was told

14    to them, and some of it doesn't really affect their opinion,

15    but if that's something that's important to his opinion, then

16    it seems to me that he's got to at least be able to say, well,

17    one thing was she is involved in litigation with the SEC.

18    Same with the bankruptcy.  Same with the fact that she's had

19    three different marriages fail.  The same with the fact her

20    shoe store didn't work out.

21          I don't know which parts of that really are important

22    to what he finally concludes.  I can't tell that.  He can tell

23    me that, but there's got to be a way for him to express his

24    opinion and express a basis for his opinion without

25    necessarily getting into this 403 territory.  I'm trying to

1   keep the 403 stuff out on both sides.  I've tried hard to do

2   that, because I want to be fair to both sides and give them a

3   fair trial on what happened here.  But naturally she's

4   claiming emotional distress, and naturally we're going to hear

5   from these psychotherapists, and it gets difficult.

6           That's what I want to hear about at the hearing, not

7   whether or not he's qualified to express an opinion.  I'll

8   hear you, yes.  But, at least initially, it doesn't seem to me

9   to be the issue here.  Now, that may help you, it may not help

10  you, in terms of preparing for the hearing.  I don't care when

11  you have the hearing, whether it's tomorrow afternoon or

12  Thursday afternoon.  That doesn't really matter.  You need to

13  have it before he testifies.

14          MS. ALTMAN:  Correct, Your Honor.

15          THE COURT:  And when's he going to testify?

16          MS. ALTMAN:  I would be guessing for them.  I would

17  imagine Thursday or Friday, and Friday at the earliest

18  probably.

19          THE COURT:  Well, I don't know.  Tell me.  You don't

20  call these doctors out from Harvard and have them sit around

21  for two days at the Holiday Inn waiting to be heard.  You give

22  them a specific date and time, and you say, This is when

23  you're going to testify.

24          MR. TUMMINELLO:  Your Honor, if I can speak to some

25  of these issues.  He's the last witness we are calling, and so

1   whenever the last day of testimony is, he'll be the end of it.

2   He is out here.  He came out here today because we're

3   currently scheduled for a *Daubert* hearing tomorrow.

4          THE COURT:  Well, then why don't we do it tomorrow?

5          MR. TUMMINELLO:  If I can speak to the bigger issue

6   and the one that you raised, the life history of Ms. Dailey.

7   He did the exact same thing that their retained expert

8   Dr. Yeaw did, which is went through a standard structured

9   interview which goes through all the life stressors from

10  beginning to end.  So it's the same issue.  I'm going to get

11  to a point on this.  But they go through the marriages,

12  marital abuse, down to alcoholism when she was a younger

13  woman, all the way down through.  The difficulty that we have,

14  of course, is the 403 ruling that you've entered and how we

15  deal with some of these issues.

16         What we know from Dr. Yeaw's report is she has

17  determined in her judgment that there were three qualifying

18  traumatic events, if you will, in Ms. Dailey's life that could

19  be significant enough to qualify for a PTSD diagnosis.

20         THE COURT:  Well, that's her opinion.  I don't know

21  if it's his opinion.

22         MR. TUMMINELLO:  Well, it's the sexual assault that's

23  alleged here, it's domestic violence in a prior marriage, and

24  the death of her nephew, which is in the relative recent past.

25  So those to Dr. Yeaw were sufficient.  Where we've come down,

1   quite frankly, in all of this is really focusing on those

2   types of events, because you're right, his opinion is going to

3   be she is diagnosed with depression.  That's consistent with

4   his view.  She has been diagnosed with ADHD.  That's

5   consistent with his view.  But when it comes to a PTSD

6   diagnosis, there has to be a qualifying traumatic event, which

7   is the entire issue of this trial, so you can't just make that

8   diagnosis with the expectation then that the jury can sort of

9   back into a factual determination the sexual assault occurred.

10           THE COURT:  I think that's exactly what he said.

11   But, for example, Ms. Altman or Mr. Kaplan could say to him, I

12   want you to assume that this happened hypothetically, and if

13   you assume that, does she have PTSD?  That they can do.

14           MR. TUMMINELLO:  They can certainly ask that

15   question, sure.

16           THE COURT:  And by the same token, you can say, I

17   want you to assume that it didn't happen.  And he'll say,

18   Well, if it didn't happen, there wasn't any PTSD.  And if he

19   assumes that it did happen, I don't know if he'll say there

20   was or wasn't.

21           MR. TUMMINELLO:  The things that he'll be speaking to

22   are her symptoms that she's exhibited throughout life

23   including before and after the alleged rape.

24           THE COURT:  Well, that's -- and, frankly, again, I'm

25   not close to this case like you guys are, but in a way I'd say

1   so what?  So what if she's had all this stuff that he talks

2   about?  That doesn't mean this didn't happen.  That doesn't

3   mean that this didn't cause a substantial injury.  Sometimes

4   people who have -- who are mentally and emotionally frail are

5   more susceptible to injury.  So I don't know really why the

6   plaintiffs are so concerned about it, but I've made my

7   rulings.

8         But I also think that your doctor has to be given a

9   fair degree of ability to explain his opinion.  And then, of

10  course, you guys are dancing around, you know, on the verge of

11  opening the door all day long.  I mean, she's just told us

12  about her life and the ups and downs, and, you know, in theory

13  she's opened the door to exploration of that.  I think what

14  you better do is think hard and long tonight about where you

15  want to take your respective experts and case.  But let's do

16  -- since he's here -- since he's here, you don't want to just

17  call him?  Are you going to make him sit around until Friday

18  or Thursday?

19        MR. TUMMINELLO:  We don't want to try to put him on

20  in the middle of their case, Your Honor.  It's not fair to

21  them.  It's fine.  He's carved out the time in his schedule.

22        MS. ALTMAN:  And, Your Honor, I do just want to add a

23  footnote to all of it.  At the end of the day -- the experts

24  are going to talk about a PTSD diagnosis, but at the end of

25  the day, Ms. Dailey doesn't have to be diagnosed with PTSD to

16-CV-0581-RBJ       Jury Trial - Day 1            2 - 251

1    recover damages for her claim.

2         THE COURT:  Well, of course she doesn't.

3         MS. ALTMAN:  Right.

4         THE COURT:  Of course she doesn't.

5         MR. TUMMINELLO:  From our perspective, if the

6    decision was there's no testimony from Dr. Yeaw, no need for

7    rebuttal testimony from Dr. Hudson, we are fine with that

8    approach, and she can argue what she will by way of symptoms

9    or what have you.

10        THE COURT:  Well, if you want to make that proposal

11   to Ms. Altman, you can make it.  That's between the two of

12   you.

13        MS. ALTMAN:  We'll certainly -- I'll talk about it

14   with the team later.

15        THE COURT:  So let's get -- because jurors get tired.

16        MS. ALTMAN:  Yes, Your Honor.

17        THE COURT:  Judges get tired.

18        MS. ALTMAN:  Yes, Your Honor.

19        THE COURT:  I'm tired.  I just came out of an

20   exhausting long trial to go right back into this one and go

21   right into another one Monday.  I'm older than she is.  She's

22   a babe compared to me.  I mean, she's a youngster compared to

23   me.  I get tired.

24        MS. ALTMAN:  We understand, Your Honor, and I think

25   everyone is trying to be as judicious as they can with your

16-CV-0581-RBJ        Jury Trial - Day 1            2 - 252

1   time.

2            THE COURT:  Let's try to do it -- how about 3 o'clock

3   tomorrow?  We'll let -- unless you come to some stipulation or

4   agreement that changes the landscape, we'll give you two hours

5   tomorrow afternoon.

6            MR. TUMMINELLO:  That's fine.

7            THE COURT:  Is that going to work?

8            MR. TUMMINELLO:  That's fine, Your Honor.  Yes, sir.

9            THE COURT:  Okay.  What else can I do tonight?

10            MS. ALTMAN:  I think that's it, Your Honor.  We'll do

11   whatever you want.  It had been our original hope that we

12   could do it after we rested.

13            THE COURT:  Whatever I want?  Fine.  Go settle the

14   case tonight.  That's what I want.

15            MS. ALTMAN:  Okay.  I'll do my best, Your Honor.

16            THE COURT:  Have a nice evening.

17            THE COURTROOM DEPUTY:  All rise.  Court is in recess.

18       (The proceedings were concluded at 5:20 p.m.)

19

20

21

22

23

24

25

                    Sarah K. Mitchell, RPR, CRR

1

2                        REPORTER'S CERTIFICATE

3

4           I, SARAH K. MITCHELL, Official Court Reporter for the

5    United States District Court for the District of Colorado, a

6    Registered Professional Reporter and Certified Realtime

7    Reporter, do hereby certify that I reported by machine

8    shorthand the proceedings contained herein at the time and

9    place aforementioned and that the foregoing pages constitute a

10   full, true and correct transcript.

11          Dated this 4th day of January, 2018.

12

13

14

15               /s/ Sarah K. Mitchell

16               SARAH K. MITCHELL
                 Official Court Reporter
17            Registered Professional Reporter
               Certified Realtime Reporter
18

19

20

21

22

23

24

25

                    Sarah K. Mitchell, RPR, CRR