IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 16-CV-00581-RBJ

SUZANNA F. DAILEY,

     Plaintiff,

vs.

NIKOS HECHT,

     Defendant.
_____

REPORTER'S TRANSCRIPT
Jury Trial - Day 2

_____

          Proceedings before the HONORABLE R. BROOKE JACKSON,

Judge, United States District Court for the District of

Colorado, commencing at 9:06 a.m., on the 17th day of May,

2017, in Courtroom A-902, United States Courthouse, Denver,

Colorado.

     Proceeding Recorded by Mechanical Stenography, Transcription
     Produced via Computer by Janet M. Coppock, 901 19th Street,
        Room A-257, Denver, Colorado, 80294, (303) 893-2835

| | |
|---|---|
| 1 | APPEARANCES |
| 2 | Aryeh Lev Kaplan, Jennifer G. Altman and Shani Rivaux |
| 3 | of Pillsbury Winthrop Shaw Pittman, LLP, 333 SE 2nd Avenue, |
| 4 | Suite 2000, Miami, FL 33131, appearing for the Plaintiff. |
| 5 | Marci Gilligan LaBranche of Ridley McGreevy & Winocur, |
| 6 | P.C., 303 16th Street, Suite 200, Denver, CO 80202; |
| 7 | Douglas B. Tumminello and Michael D. Plachy of |
| 8 | Lewis Roca Rothgerber Christie LLP, 1200 17th Street, One Tabor |
| 9 | Center Suite 3000, Denver, CO 80202-5855, appearing for the |
| 10 | Defendant. |
| 11 | *   *   *   *   * |
| 12 | PROCEEDINGS |
| 13 | THE COURT:  All right.  So let's start, for the |
| 14 | benefit of Janet, who doesn't know you, to enter your |
| 15 | appearances so she can start to understand who is talking. |
| 16 | On plaintiff's side. |
| 17 | MS. ALTMAN:  Jennifer Altman. |
| 18 | MR. KAPLAN:  Aryeh Kaplan.  And the plaintiff is here |
| 19 | in the white sweater. |
| 20 | MS. DAILEY:  Good morning.  I am Suzanna Dailey. |
| 21 | THE COURT:  How about the defendant's side? |
| 22 | MS. LaBRANCHE:  Marci LaBranche. |
| 23 | MR. TUMMINELLO:  Doug Tumminello. |
| 24 | MR. PLACHY:  Mike Plachy.  And this is our client, |
| 25 | Nikos Hecht. |

 1          THE COURT:  Last week during the trial after about the

 2     third straight day I asked the lawyers if they had taken a

 3     course in law school on preliminary matters because every day

 4     at the beginning of trial they had preliminary matters.

 5          I am told you have preliminary matters.  What are

 6     they?

 7          MS. LaBRANCHE:  Your Honor, it's me.  I am the guilty

 8     one.

 9          There are a few different preliminary matters.  One is

10     Ms. Altman talked to Ms. Dailey yesterday and got testimony

11     from her about a statement she had made to Investigator Miller.

12     Investigator Miller is the investigator for the DA's office.

13     So the question Ms. Altman asked was:  Did you tell them

14     everything -- did you tell her everything that you told the

15     jury here today?

16          Obviously, I need to ask her questions about

17     inconsistencies between that statement and what she did

18     yesterday.  Now, I do want to ask her --

19          THE COURT:  How do you know that there were

20     inconsistencies?

21          MS. LaBRANCHE:  Because I have the statement.

22          THE COURT:  Do you have a transcript of what she told

23     the DA?

24          MS. LaBRANCHE:  Correct.  We all do.  And so I want to

25     ask her if she talked to her in August of 2015, not because I

1   want to claim she didn't go to the authorities sooner, but

2   because the jury needs to understand that she made certain

3   statements before she filed this lawsuit and she is making

4   certain statements now.

5          THE COURT:  You have heard an expression, be careful

6   what you ask for.  You can't tip toe through this.  If you

7   start cross-examining on that statement, you are opening the

8   door to what that statement contained in its entirety, so be

9   careful.

10          MS. LaBRANCHE:  Well, Your Honor --

11          THE COURT:  That was my ruling.  What's your next

12   issue?

13          MS. LaBRANCHE:  The next issue is that there are

14   records that are medical records that I would like to ask her

15   about.  The plaintiff's attorneys had her testify about what

16   her life was like before March 25th of 2015 and what it's like

17   after.  I have some very specific questions about appointments

18   and symptoms she had in January of 2014 forward, which I think

19   is legitimate and fair to be able to ask about.

20          THE COURT:  Here is what's off limits, at least until

21   I hear what Hudson has to say.  Off limits are the details of

22   the Security and Exchange Commission litigation, her

23   shoplifting arrest and her sexually transmitted disease.  Those

24   are things you may not ask her about, at least not now.

25          MS. LaBRANCHE:  I understand, Your Honor, and I did

1    not intend to ask her about those.

2         The secondary issue with that is we had the records

3    produced by these two doctors, Dr. Creelman and Dr. Jacobson.

4    At the time they produced the records, they also produced

5    business records certifications that went with them.  I would

6    like to be able to introduce Dr. Creelman and Dr. Jacobson's

7    actual medical records through Ms. Dailey.

8         THE COURT:  What's wrong with that?

9         MS. ALTMAN:  Your Honor, there is various things wrong

10   with that.  No. 1, it lacks foundation, it's hearsay.  It lacks

11   foundation.  They had the opportunity to depose either of these

12   gentlemen.  They chose not to.  It was their choice.  Neither

13   of them are here to testify.  There is clearly no evidence --

14        THE COURT:  What's good for the goose is good for the

15   gander.  If they can't put her medical records in, neither can

16   you.  If they can't have their expert talk about her medical

17   records, neither can your expert.  Now, which is the way you

18   want to play it?

19        MS. ALTMAN:  There are a couple of separate issues.

20   These are medical records where they are not offering a

21   physician.  Ms. Dailey has never seen the medical records.

22   They are not offering a physician here to testify about them.

23   Dr. McGuigan, who is going to testify who is an un-retained

24   expert in the sense that she is a treater, is going to testify

25   about her own medical records.  We are not introducing any

 1   other medical records.

 2        So the only medical records we would be seeking to

 3   introduce through McGuigan would be her own medical records.

 4   We are not seeking to introduce them through our client.  So I

 5   think they are really apples and oranges with respect to these

 6   records.

 7        The issue we had with the certification is the

 8   certification doesn't identify any documents that were attached

 9   to it and the certification actually is Bates stamped later in

10   time than the documents, so there was no way and they didn't --

11   there was no way to tie the actual documents to the

12   certification.  But more importantly, there is no foundation.

13   It's hearsay.  They didn't depose the doctor and they didn't

14   bring him here, so those are our objections with respect to

15   those doctors.

16        And finally, as a separate matter, as Your Honor may

17   recall, and this is putting aside Dr. Hudson and Dr. Yeaw, the

18   two actual testifying experts, which I suspect we will get to

19   at some point today, with respect to these doctors, one of the

20   other issues about the medical record that she wants to

21   introduce was something we believe was constrained within Your

22   Honor's 403 rulings.  These records are talking about things 20

23   years ago.  So in 2014 --

24        THE COURT:  I didn't say anything about 20 years.  I

25   identified specific subject matters where I think the marginal

1   relevance, if any relevance, is substantially outweighed by the

2   danger of unfair prejudice.  There is no need to tell this jury

3   she had a shoplifting problem as an example.  There is no need

4   to talk about her sexual transmitted disease.  You try to use

5   or she tried to use a sexually transmitted disease as a sword.

6   It turned out not to be a sword and now you don't like it; but

7   I agree with you, it shouldn't come in.

8            But the fact that something happened 20 years ago

9   doesn't make it irrelevant.  It depends on what it is.

10           MS. ALTMAN:  I understand that's Your Honor's

11  position.  I think we still have very legitimate objections to

12  the exhibits coming in because she doesn't know -- she has

13  never seen these records.  They are not her records.  They are

14  hearsay.

15           THE COURT:  They are not her records?

16           MS. ALTMAN:  Meaning they are not her personal

17  records.  They are the records of a physician who is not here

18  to testify about this.

19           THE COURT:  She gave her releases so the records could

20  be produced.  They were produced to both sides.

21           MS. ALTMAN:  Correct, but she can't testify about

22  them.  She has not seen them.  She didn't author them.

23           THE COURT:  Why do you need the records in evidence

24  anyway?

25           MS. LaBRANCHE:  Your Honor, it depends frankly on how

1    the examination goes.

2         THE COURT:  You put something in evidence, a document,

3    if you want the jury to read it, to read it entirely.  There is

4    no other reason to put it into evidence nor is there a

5    legitimate reason to put it in evidence.  Why should these

6    jurors be reading medical records?  They are going to hear from

7    doctors.  The doctors can be examined about the medical

8    records.  Ms. Dailey can be examined about statements she is

9    alleged to have made to the doctors in those records.  You

10   don't need to put the records in.  It just clutters up things.

11        MS. LaBRANCHE:  Your Honor, if I cross-examine

12   Ms. Dailey and she denies knowledge of these very particular --

13        THE COURT:  Then you have a prior inconsistent

14   statement.  That's a different issue.  You can impeach with a

15   prior inconsistent statement.  The prior inconsistent statement

16   doesn't come into evidence, but it can be considered by the

17   jury for impeachment purposes, right?  Right.

18        MS. LaBRANCHE:  Yes.

19        THE COURT:  If she says now that's inconsistent with

20   something she told Dr. Jones, then you can say, well, really?

21   Take a look at this.  See if that refreshes your memory.  In

22   fact, you told Dr. Jones Y, not X.  You can do that.

23        MS. LaBRANCHE:  Your Honor, well, I understand the

24   Court's ruling on that.  I do feel very strongly about

25   Investigator Miller, and I would like to make a brief record to

1  the Court on why I think we should be able to get into

2  statements with her.

3       THE COURT:  I didn't say you could make a statement.

4  I said you take the bad with the good.

5       MS. LaBRANCHE:  If I ask anything --

6       THE COURT:  You can't just cherry pick it and say, did

7  you say this, did you say that?

8       MS. LaBRANCHE:  It's a prior inconsistent statement.

9       THE COURT:  Consistent statement?

10       MS. LaBRANCHE:  It's a prior inconsistent statement.

11  She testified yesterday that the entire encounter lasted four

12  to seven minutes, but she told Investigator Miller it lasted

13  three minutes.

14       THE COURT:  You can do that.  You can use that piece

15  for a prior inconsistent statement.  That doesn't get it into

16  evidence.

17       MS. LaBRANCHE:  Perfect, and I apologize.  Perhaps I

18  misunderstood the Court.

19       THE COURT:  You understand me now.  Let's get the

20  jury.

21       (Jury present:)

22       THE COURT:  Good morning, ladies and gentlemen.  How

23  are my favorite jurors this morning?

24       THE JURY:  Good.

25       THE COURT:  Good.  We have a new court reporter today.

Suzanna F. Dailey - Cross

1    This is Janet.  Yesterday it was Sarah.

2            Okay.  Let's go.  Still in the -- well,

3    cross-examination of the plaintiff.

4            *MS. LaBRANCHE:*  Thank you, Your Honor.

5                    **CROSS-EXAMINATION CONTINUED**

6    *BY MS. LaBRANCHE:*

7    *Q.*  Good morning, Ms. Dailey.

8    *A.*  Good morning.

9    *Q.*  Ms. Dailey, your attorney asked you yesterday about the

10   white shorts that you were wearing in Cabo.  Do you remember

11   that?

12   *A.*  Could you repeat that, please?  I am sorry.

13   *Q.*  Your attorney asked you yesterday about the white shorts

14   that you were wearing when you were down in Cabo.

15   *A.*  Yes.

16   *Q.*  I need to ask you some things about those shorts that you

17   didn't testify about yesterday.

18   *A.*  All right, sure.

19   *Q.*  When you testified yesterday, you didn't mention that there

20   was semen in the shorts, correct?

21   *A.*  Correct.

22   *Q.*  But, in fact, you have previously testified that there was

23   semen in the shorts.

24   *A.*  Yes.

25   *Q.*  And when you testified yesterday, you didn't mention that

Suzanna F. Dailey - Cross

1   there was blood in the shorts, correct?

2   A.  No, I didn't.

3   Q.  But when you previously testified, you said there in fact

4   was blood in the shorts.

5   A.  I did.  There was -- there were blood droplets mixed with a

6   mucous.

7   Q.  And you understand that it's important for the jury to know

8   that having semen or blood in those shorts would be actual

9   physical evidence of what you are saying took place, right?

10  A.  Yes, I can understand that now.

11  Q.  And the reason that there was the blood and the semen in

12  the shorts that night partly was because you weren't wearing

13  underwear, correct?

14  A.  Yes, it would have gone -- any mucous, any liquid, would

15  have gone onto the shorts.

16  Q.  Because you weren't wearing underwear?

17  A.  That's right.

18  Q.  And so when you were invited to the dinner at Flora Farms,

19  you knew that the Hecht family was going to be there; is that

20  right?

21  A.  Yes.

22  Q.  And you had been at the Hecht home just a few days before

23  that dinner, correct?

24  A.  Yes.

25  Q.  And you testified yesterday that Mr. Hecht had made a

Suzanna F. Dailey - Cross

1    comment to you as you were leaving his house from the party?

2    A.   Yes.

3    Q.   And that comment was about you being fit?

4    A.   Something to that effect.

5    Q.   And you previously testified that when he made that

6    comment, he was actually walking behind you up the stairs,

7    correct?

8    A.   That's right.

9    Q.   And that he was looking straight at your derriere?

10   A.   I don't know where he was looking.  He was walking behind

11   me.

12   Q.   Do you remember being deposed in this case in September of

13   2016?

14   A.   Do I remember being deposed?

15   Q.   Yes.

16   A.   Of course.

17   Q.   I am sorry, it was September of 2016.

18   A.   I do.

19   Q.   And in that deposition, you were obviously there.

20   A.   Of course.

21   Q.   And your attorneys were there.

22   A.   Of course.

23   Q.   And there was a court reporter who was there.

24   A.   Yes.

25   Q.   And you were placed under oath just like you were today?

Suzanna F. Dailey - Cross

1    A.   Yes.

2    Q.   And Mr. Tumminello asked you a series of questions?

3    A.   Yes.

4    Q.   And you gave truthful answers, right?

5    A.   And I beg your pardon?

6    Q.   You gave truthful answers?

7    A.   Yes.

8    Q.   And do you remember at that deposition Mr. Tumminello

9    asking you:  What did he say?

10           And you said:  For a gentlemen to be behind you

11   looking straight at your derriere and make a remark like that

12   on your physical appearance, I thought it was appalling.

13           Do you remember saying that?

14   A.   Yes.

15   Q.   And yet the next time you were going to see Mr. Hecht you

16   wore the same shorts?

17   A.   I did.

18   Q.   I want to talk to you a little more about that comment that

19   you testified that Mr. Hecht made.  At the time he made the

20   comment, you and your sister and your brother-in-law were all

21   leaving the Hecht home, correct?

22   A.   Yes.

23   Q.   And you are all walking up towards the door, yes?

24   A.   Yes.

25   Q.   And your brother-in-law Gery --

Suzanna F. Dailey - Cross

1    A.   Gery.

2    Q.   Thank you.  Gery and your sister Jeanne were walking ahead

3    of you.

4    A.   Yes.

5    Q.   And you are all kind of walking in a line?

6    A.   They were ahead of us and we weren't together walking in a

7    line.

8    Q.   And Mr. Hecht was behind you?

9    A.   Yes.

10   Q.   And Gery and Jeanne were within earshot, right?

11   A.   No, I don't think so.  I am not sure.

12   Q.   Do you remember testifying at that deposition we just

13   talked about?

14   A.   Yes.

15   Q.   And at that deposition Mr. Tumminello asked you:

16            Could they hear you?  Could you hear them?

17            And you said:  If I were to speak loudly.  It wasn't

18   that long or large of an area or distance.

19            Do you remember that?

20   A.   Yes.  I think that's consistent with what I just said.

21   Q.   Now, you testified yesterday that after you heard that

22   remark, you just dismissed it?

23   A.   I dismissed it.

24   Q.   And you said that you didn't really pay attention to it.

25   A.   No, I didn't think about it again.

1   Q.  But I want to talk to you about what you said at the

2   deposition in September because in September you said that that

3   statement made you very uncomfortable.

4   A.  At that moment, it did.

5   Q.  And you said you thought it was vulgar?

6   A.  I did.

7   Q.  And that you felt disgusted.

8   A.  At that moment, yes.  I didn't carry it with me.

9   Q.  And you thought it was just offensive?

10  A.  I did.  I thought it was socially offensive.

11  Q.  And nonetheless, the next time that you saw Mr. Hecht, you

12  testified that he asked to show you the gardens and you said

13  yes?

14  A.  Yes.

15  Q.  And you previously described it as being a very gallant and

16  chivalrous manner that he came to you; is that right?

17  A.  That's right.

18  Q.  Now, the gardens at Flora Farm are beautiful; is that

19  correct?

20  A.  That is.

21  Q.  If I could pull up Exhibit 124.  Do you recognize that

22  picture?

23  A.  I do.

24  Q.  And this is the picture that your attorney, Ms. Altman,

25  asked you about yesterday, correct?

Suzanna F. Dailey - Cross

 1   A.   Correct.

 2   Q.   And this shows right here is the pavilion where the dinner

 3   table was set up, correct?

 4   A.   Correct.

 5   Q.   This is the walkway that you and Mr. Hecht walked down?

 6   A.   Yes.

 7   Q.   And there is all sorts of vegetation growing on either

 8   side?

 9   A.   Yes.

10   Q.   And Flora Farms has like these flowers growing up around

11   that pathway, right?

12   A.   It has flowers.  It has vegetation.  At that time I

13   remember cornstalks, sunflowers, herbs.

14   Q.   And that's kind of what Flora Farms is known for is being a

15   beautiful place?

16   A.   Yes.

17   Q.   You testified yesterday that you arrived at Flora Farms at

18   about 5:45 or 6:00 o'clock; is that right?

19   A.   I think I said quarter of 6:00 to 6:00.

20   Q.   And that dinner wasn't served for another 45 minutes to an

21   hour.

22   A.   That's correct.

23   Q.   And you testified yesterday that when you arrived quote, it

24   was the beginning of the setting of the sun.  Do you remember

25   that?

1  *A.*  Yes.  I think what I said was that it was a soft sun.  It

2  wasn't a noontime, 1:00 o'clock bright sun, but it was light.

3  *Q.*  You said it was the beginning of the setting of the sun.

4  *A.*  Yes.  It was soft.  It wasn't sunset and it wasn't bright.

5  *Q.*  And you testified that you were taking a lot of pictures

6  that night at Flora Farms, correct?

7  *A.*  I did take pictures, I think a lot of pictures.

8  *Q.*  Because you wanted to kind of capture everything that

9  night?

10  *A.*  Yes.

11  *Q.*  And you had never been to Flora Farms before?

12  *A.*  No.

13  *Q.*  And yet when Mr. Hecht asked you to walk down that pathway

14  with him, according to you, you stopped and you put your camera

15  down.

16  *A.*  I did.

17  *Q.*  Is that right?  So even though you are in a beautiful place

18  that's known for these beautiful gardens, you stopped and you

19  actually put your camera down.

20  *A.*  Yes.

21  *Q.*  You testified yesterday that when you and Mr. Hecht were

22  walking down the pathway, it was dusk.  Do you remember that?

23  *A.*  It was dark.

24  *Q.*  It was dusk.

25  *A.*  Dusk, yes.

Suzanna F. Dailey - Cross

1   Q.  But you also testified that it was after dinner.

2   A.  It was.

3   Q.  But that's not what you have said before, correct?

4   A.  I don't recall saying it wasn't after dinner.

5   Q.  Well, let me ask you, back to that deposition that we are

6   talking about in September of 2016.  You were specifically

7   asked during that deposition:

8          So after you got up and walked back to the table, how

9   long was it before dinner was served?

10         And you replied:  They had already started serving it,

11  the chicken.

12         Do you remember that?

13  A.  After -- I want to be sure that I understand.  Would you

14  mind reading that again?

15  Q.  Absolutely.  Mr. Tumminello was asking you a series of

16  questions about what happened on the pathway and you were

17  talking about you were laying down.  You were in the dirt on

18  the pathway.  And he said to you --

19         THE COURT:  What was the question?

20         MS. LaBRANCHE:  The question he asked?

21         THE COURT:  Yes.

22  BY MS. LaBRANCHE:

23  Q.  So after you got back up and walked back to the table --

24         MS. ALTMAN:  Your Honor, improper impeachment.

25         THE COURT:  Overruled.  It's not improper impeachment,

Suzanna F. Dailey - Cross

 1  but I want to hear the question and the answer.

 2        *MS. LaBRANCHE:*  The specific question he had asked,

 3  they had been having a conversation about what had happened on

 4  the pathway.  And his question was, so after you -- after you

 5  had got up and walked back to the table, how long was it before

 6  dinner was served, to which Ms. Dailey answered:  They had

 7  already started serving it, the chicken.

 8        *THE COURT:*  Okay.  What's your question?

 9        *MS. LaBRANCHE:*  Does she recall that.

10  *A.*  I didn't recall that.

11  *BY MS. LaBRANCHE:*

12  *Q.*  Do you recall that testimony?

13  *A.*  I recall, as I recall, and I know and I have testified that

14  we went to the boutique.  We came back from the boutique,

15  dinner was being served.  As in the pictures that we saw with

16  my brother-in-law and my mother, I went and sat down.  I hadn't

17  started taking pictures yet.  I had dinner.  I ate some

18  chicken, some mashed potatoes, and I got up and started taking

19  pictures.

20  *Q.*  Well, let me ask you about the complaint that was filed in

21  this case, because in the complaint that was filed in this

22  case, you said that you walked down the pathway and had the

23  encounter with Mr. Hecht during the dinner, but before food was

24  served, correct?

25  *A.*  May I seat the complaint?

Suzanna F. Dailey - Cross

 1          MS. ALTMAN:  Your Honor, we would object.  They are

 2   asking about a complaint drafted by attorneys.  It's not

 3   appropriate impeachment for this witness.

 4          MS. LaBRANCHE:  Your Honor, I can explain what it is.

 5          THE COURT:  Well, it is a document drafted by the

 6   attorneys.  Is it a verified document?

 7          MS. ALTMAN:  No, Your Honor.

 8          MS. LaBRANCHE:  I can ask some questions about during

 9   the deposition, if that would help.

10          THE COURT:  I am not going to tell you what you can

11   do.  I am just trying to rule on her objection.  She didn't

12   write the complaint.

13          MS. LaBRANCHE:  That's true, Your Honor.

14          THE COURT:  The lawyers wrote the complaint.  They put

15   all kinds of things in the complaint, but I am not saying that

16   that's her words because it's not.

17          MS. LaBRANCHE:  If the Court would like, I can back up

18   for a minute and I think lay a better foundation for this

19   question.

20          THE COURT:  It might be a good idea.

21          MS. LaBRANCHE:  Thank you, Your Honor.

22   BY MS. LaBRANCHE:

23   Q.  Ms. Dailey, during your deposition in September of 2016,

24   you were specifically asked about the accuracy of the complaint

25   in this case, correct?

Suzanna F. Dailey - Cross

1   *A.*   I don't remember being asked about the document.  I

2   remember being asked about the sequence of actions or sitting,

3   dining, pictures.  May I see the document, please?

4   *Q.*   See?

5   *A.*   The complaint?  I didn't write the complaint.

6   *Q.*   I can show you the complaint in just one moment, but I need

7   to ask you some questions.

8           During the deposition, Mr. Tumminello asked you:

9           Did you review this complaint before it was filed?

10          And you replied:  Yes, I did.

11  *A.*   Yes.  I would have read it.

12  *Q.*   And then he asked you:

13          Well, the big picture stuff was accurate as far as the

14  allegations of the rape, the timing sequence and the time lines

15  and those types of things?

16          And you said:  Yes, sir.

17  *A.*   Yes.  I said yes, that's correct.

18  *Q.*   And in the complaint, it said that this occurs during

19  dinner but before the food was served, correct?

20          *MS. ALTMAN:*  Your Honor, it's improper impeachment.

21  It's also blatantly mischaracterizing the complaint.  And if

22  you would like, we can come side bar.

23          *THE COURT:*  I don't need any side bar and I disagree

24  with your objection.  It's overruled.  But fair warning, be

25  careful what you ask for.

Suzanna F. Dailey - Cross

1   BY MS. LaBRANCHE:

2   Q.  Now, Ms. Dailey, I would like to pull up Exhibit 31.

3   Yesterday your attorneys showed you this picture, Exhibit 31,

4   correct?

5   A.  Yes.

6   Q.  And you remember that exhibit?

7   A.  Do I remember taking it?  Yes.

8   Q.  And this was a picture that you took of Mr. Hecht's son,

9   Levi; is that correct?

10  A.  Yes.

11  Q.  And you testified yesterday that you took this picture

12  before you started walking down the pathway with Mr. Hecht; is

13  that correct?

14  A.  Yes.  The pictures, those were the end of the pictures that

15  I took.

16  Q.  And I would like to -- we have a stipulation to Exhibit 29.

17  I would like to pull up Exhibit 29.

18          THE COURT:  It's not in evidence yet, but it's a

19  stipulated exhibit you say?

20          MS. LaBRANCHE:  It is, Your Honor.

21          THE COURT:  So it's admitted, and now you can pull it

22  up.

23  BY MS. LaBRANCHE:

24  Q.  Do you recognize Exhibit 29?

25  A.  Yes, I do.

Suzanna F. Dailey - Cross

1  Q.  Okay.  And is this a picture that you took that evening at

2  Flora Farms?

3  A.  I did.

4  Q.  Who was this a picture of?

5  A.  The little boy, I see Levi Hecht, and he is sitting on his

6  grandfather's shoulders, Andy Hecht.

7  Q.  In your deposition of 2016, do you remember talking about

8  this particular picture?

9  A.  Do I remember talking?

10  Q.  Talking about this particular picture.

11  A.  Yes.

12  Q.  And you testified at that deposition that this was the last

13  picture you took right before you and Mr. Hecht walked down the

14  pathway, correct?

15  A.  I don't know if that was precisely the right -- the last

16  picture, but it was in that group.  And I believe there were

17  two pictures like this.

18  Q.  What you testified to in September of 2016, you testified

19  that you specifically remembered this picture because of an

20  interaction you had with Andy Hecht about this picture,

21  correct?

22  A.  That I had an interaction?

23  Q.  Yes.

24  A.  Yes.

25  Q.  And the interaction was that you were encouraging Andy

1   Hecht to put his grandson on his shoulders so you could take

2   that picture.

3   *A.*  Yes.

4   *Q.*  And you remembered this specifically because you remembered

5   Andy Hecht saying to you, Do you know this is the closest he

6   has ever been to me?

7   *A.*  That's true.

8   *Q.*  And then you said after this picture all of the sudden in

9   the grassy space at the path Nikos was there.  Do you remember

10  that?

11  *A.*  Yes.

12  *Q.*  And it's from there that you two walked down the pathway,

13  correct?

14  *A.*  Yes.

15  *Q.*  Now, Ms. Dailey, just so the jury is clear, when you got

16  back to your house in Vero Beach, you burned the shorts that

17  you were wearing that night; is that right?

18  *A.*  I did, I did.

19  *Q.*  So because you burned them, they couldn't be tested for

20  physical evidence.

21  *A.*  Obviously not.

22  *Q.*  So your lawyers couldn't test them?

23          *THE COURT:*  They couldn't be tested.  They were

24  burned.  Next question.

25  *BY MS. LaBRANCHE:*

Suzanna F. Dailey - Cross

 1   *Q.*  And you agree that that was physical evidence that could

 2   have corroborated what you are here saying today?

 3          *THE COURT:*  She has already said yes, it could have

 4   had evidence.  She has already said the evidence was destroyed.

 5          Let's go on to something she hasn't already said.

 6   *BY MS. LaBRANCHE:*

 7   *Q.*  Ms. Dailey, yesterday when you were testifying, you said

 8   that you returned home to Vero Beach and that you didn't report

 9   the assault to anyone except for Dr. McGuigan.  Do you remember

10   saying that?

11   *A.*  Yes.

12   *Q.*  So I want to make sure I understand.

13          You got back to your house in Vero Beach on Monday,

14   March 31st of 2014.

15   *A.*  I'm not sure it was the 31st.  It was Monday.

16   *Q.*  Okay.  And shortly after you arrived home, you actually

17   called a civil lawyer and talked to that civil lawyer about

18   this, correct?

19   *A.*  No, that's not correct.

20   *Q.*  Within a few weeks you had called and talked to a civil

21   lawyer.

22   *A.*  I spoke to a friend that's a retired lawyer.

23   *Q.*  Okay.  A lawyer --

24   *A.*  As a friend, not as legal advice.

25   *Q.*  And then you eventually did talk to other lawyers in the

Suzanna F. Dailey - Cross

1  weeks that followed.

2  *A.*  Subsequently, yes.

3  *Q.*  I would like to have 154A.

4       Ms. Dailey, do you recognize this document?

5  *A.*  I do.

6  *Q.*  What do you recognize this document as?

7       *MS. ALTMAN:*  We don't have A in the binder you gave

8  us, so Your Honor, there is just an objection.  They redacted

9  something on the document.

10      *MS. LaBRANCHE:*  I would be happy to approach if the

11 Court would like to hear about that.

12      *THE COURT:*  This is a handwritten list of the

13 witnesses in this case?

14      *MS. LaBRANCHE:*  That's correct.

15      *THE COURT:*  And one piece of it is blacked out?

16      *MS. LaBRANCHE:*  That's correct, Your Honor.

17      *THE COURT:*  Who blacked it out?  You did?

18      *MS. LaBRANCHE:*  Yes, we did, Your Honor.

19      *THE COURT:*  Show me the one you are operating from.

20 Put it up for me to see without the redactions.

21      Who wrote this list?

22      *MS. LaBRANCHE:*  I am going to lay the foundation with

23 Ms. Dailey who put this list together.

24      *THE COURT:*  Who wrote the list?

25      *MS. LaBRANCHE:*  Ms. Dailey.  She made the list.

Suzanna F. Dailey - Cross

1            THE WITNESS:  Pardon me?  Did I write this?

2            THE COURT:  I don't know.

3            THE WITNESS:  Yes, I did.  That's my handwriting.

4            THE COURT:  Okay.  I will see you at the bench.  This

5    looks like a real rabbit trail, a diversion from this lawsuit.

6        (At the bench:)

7            What's this all about ladies?

8            MS. LaBRANCHE:  It has to be based -- I want to ask

9    her about creating this document because she created this

10   document after talking to civil lawyers, but this piece here is

11   403.  It's based completely on hearsay.  She has absolutely no

12   basis for that.

13           THE COURT:  What is she claiming?

14           MS. LaBRANCHE:  Sara Willis, who is the chef who is

15   going to testify later in the case, which Ms. Altman is going

16   to ask her if she had an affair with Mr. Hecht.  She is writing

17   down alleged --

18           THE COURT:  She is going to ask her if she had an

19   affair with Mr. Hecht?

20           MS. ALTMAN:  Ask Ms. Dailey or the chef?

21           MS. LaBRANCHE:  The chef.

22           MS. ALTMAN:  I will answer the question, but I would

23   also like to mention about that document, just to orient the

24   Court, that was a document that was privileged that Your Honor

25   required us to produce, so that's why it was produced.

 1           THE COURT:  What's the relevance of the document?

 2           MS. LaBRANCHE:  I want the jury to know she is back

 3     there within weeks making a list of who to sue in a civil case.

 4     She is back there making a list of all potential witnesses so

 5     that she can sue him civilly.

 6           THE COURT:  This is on the letterhead of the Harvard

 7     Medical School.  This must have been done when she was seen by

 8     the Harvard doctor?

 9           MS. ALTMAN:  No.

10           MS. LaBRANCHE:  She just had that.

11           MS. ALTMAN:  She has seen doctors at the Harvard

12     Medical Center.  They have friends.

13           THE COURT:  When did she do this?

14           MS. ALTMAN:  She did it probably within a month, month

15     and a half.

16           THE COURT:  So you can ask her about that, if she

17     created this.

18           MS. LaBRANCHE:  Right.

19           MS. ALTMAN:  Our issue is the redaction.  If they are

20     going to ask her about the document they created, for

21     completeness they should ask her about the entirety of the

22     document or they can just ask her if she ever made a list and

23     who was on it.

24           THE COURT:  You have a choice, but I agree with

25     Ms. Altman.  If you put this in evidence, you put the original

Suzanna F. Dailey - Cross

1    in evidence; otherwise, just ask her the question.

2              (In open court:)

3    *BY MS. LaBRANCHE:*

4    *Q.*  Can we pull up Exhibit 154, please.

5              *THE COURT:*  All right.  You want 154 in evidence?

6              *MS. LaBRANCHE:*  No.  I want to ask Ms. Dailey.  I just

7    want to have it there in case she needs to refresh her

8    recollection.

9              *THE COURT:*  Fine.

10   *BY MS. LaBRANCHE:*

11   *Q.*  Ms. Dailey, when you were back, within the first six weeks

12   when you were back in Vero Beach, you had met with civil

13   attorneys, correct?

14   *A.*  With a lawyer?

15   *Q.*  With civil lawyers, yes.

16   *A.*  No, I didn't meet with civil lawyers.  This was my friend,

17   a close friend.

18   *Q.*  And after him --

19   *A.*  I told him about the rape.

20   *Q.*  And after you spoke to him, you also spoke to other civil

21   lawyers.

22   *A.*  I did.

23   *Q.*  And, in fact, you made a list of all of the people who had

24   been at the dinner?

25   *A.*  I did.

Suzanna F. Dailey - Cross

1   Q.  And you put it in a file.

2   A.  I put it in a folder.  It was suggested to me by my friend

3   that, as I said, was a retired attorney, and he said, You have

4   to be clear about who was there.  I had never up to that point

5   written anything out.  I was still in a terrible condition

6   emotionally, and I wrote it out.

7   Q.  Thank you.  We can take that exhibit down.

8        I want to talk to you a little bit about your sister,

9   Jeanne.

10  A.  Okay.

11  Q.  Jeanne used to live in Aspen, correct?

12  A.  Yes.

13  Q.  And you yourself lived in Aspen in the nineties for about

14  five years; is that right?

15  A.  Yes.  I lived there -- yes, in the nineties.

16  Q.  And you haven't lived there since 1998?

17  A.  That's correct.

18  Q.  And so when you were down at Flora Farms and in Cabo and

19  you went to this dinner, those were primarily your sister's

20  friends; is that fair?

21  A.  That's very fair.

22  Q.  Because you and Laura Kaplan didn't have a relationship

23  outside of your sister?

24  A.  No.

25  Q.  But your sister and Laura knew each other because all of

Suzanna F. Dailey - Cross

1   their kids had gone to Aspen Day School together?

2   A.  Yes.

3   Q.  As had Mr. Hecht's children?

4   A.  That's right.

5   Q.  I want to talk to you a little bit about your physical

6   condition at Flora Farms prior to anything that went on, okay?

7   A.  Yes.

8   Q.  How tall were you at that point in time?

9   A.  I am five-seven and a half.

10  Q.  And how much did you weigh at that point in time?

11  A.  Probably about 155, 160.

12  Q.  And at that point in time you were actually employed as a

13  strength and fitness teacher; is that right?

14  A.  I was a pilates teacher, yes.

15  Q.  You were pilates and also a --

16  A.  Gryotonic.

17  Q.  And pilates is like a strength and fitness system?

18  A.  Yes, a movement discipline.

19  Q.  And gryotonic?

20  A.  Gryotonic is movement discipline.

21  Q.  You actually had been teaching at that point in time in

22  2014, you had been teaching pilates since 2001?

23  A.  2002 -- 2000.

24  Q.  And you had your own pilates studio?

25  A.  I did.

Suzanna F. Dailey - Cross

1   Q.   You were actually regularly teaching classes?

2   A.   Yes.

3   Q.   And you had students that you were teaching?

4   A.   I did.

5   Q.   Now, your attorney asked you about some pictures from the

6   dinner yesterday, and I want to ask you about just one other.

7         MS. LaBRANCHE:  If I could pull up Exhibit 24.  Your

8   Honor, this is stipulated, so I would move to admit it.

9         THE COURT:  It's admitted.

10  BY MS. LaBRANCHE:

11  Q.   Do you see that picture in front of you, Ms. Dailey?

12  A.   I do.

13  Q.   Do you recognize that?

14  A.   Yes.

15  Q.   Is that a picture that you took that night?

16  A.   It is.

17  Q.   And who is in that picture?  For example, who is this?

18  A.   That would be Andy Hecht.

19  Q.   And who is this?

20  A.   My mother.

21  Q.   Who is this over here?

22  A.   I am not sure.  I think that might be -- I am not sure if

23  that's Allison or Jeanne.

24  Q.   But that's a picture that you took that night?

25  A.   But I took the picture, yes.

Suzanna F. Dailey - Cross

 1   *Q.*  Thank you.  We can take that down.

 2           You testified yesterday about a conversation that you

 3   had with your sister about you walking down the pathway with

 4   Mr. Hecht.  Do you remember that?

 5   *A.*  Yes.

 6   *Q.*  And you testified yesterday that you told your sister at

 7   the table that night, You won't believe what I have to tell

 8   you.

 9   *A.*  Yes.

10   *Q.*  And then you actually brought it up a second time when you

11   and your sister had got back to the villas that you were

12   staying at, Las Ventanas; is that right?

13   *A.*  Yes, that's right.

14   *Q.*  And at that point in time when you were back there and you

15   were walking to your villas and you said that to your sister,

16   she said to you, I already know, didn't she?

17   *A.*  When we were walking back, mother and Gery were in front of

18   us.  I didn't go into details at all.

19   *Q.*  I understand.  My question is your sister said -- when you

20   said to her you wanted to talk, she said to you, I already

21   know.

22   *A.*  I am not sure that she said that.

23   *Q.*  And she told you that Tristan and George had seen

24   everything.

25   *A.*  She didn't tell me -- I don't recall her telling me on that

1   walk that Tristan and George saw everything.

2   Q.  And she told you that she would talk to you about it the

3   next day?

4   A.  That, she did say.  I will come over early in the morning.

5   Q.  And it was the next day when you talked to your sister,

6   which was the first time that you told anyone that Mr. Hecht

7   had sexually assaulted you?

8   A.  Did you say the third time?

9   Q.  The first.

10  A.  The first.

11  Q.  That next morning.

12  A.  Yes, that was the first time I told her exactly what

13  happened.

14  Q.  And so but you didn't talk to anyone else.  Between the

15  time your sister told you, I'll talk to you the next day, and

16  when you actually talked to her --

17  A.  I did not.

18  Q.  -- you didn't talk to anyone else about it.

19  A.  No.

20  Q.  And you and your sister Jeanne are close; is that correct?

21  A.  That's right.

22  Q.  And you rely on her for financial support, don't you?

23  A.  They, Gery, in 2008, set up a trust fund for me and my

24  other sister, Sally, that renders between 25 and $35,000 a year

25  before taxes, that's correct.  And I live in their home, the

Suzanna F. Dailey - Cross

1    home that Jeanne owns, a two-bedroom small house, and I don't

2    pay rent.  I pay maintenance and expenses, and all for which I

3    am very grateful.

4    Q.  And at this point in time in 2014, you were also receiving

5    about $10,000 a year from Gery Andlinger's company as well,

6    right?

7    A.  Yes.

8    Q.  And you were on their health insurance?

9    A.  Yes.

10   Q.  And putting all of that money together, between 35 and

11   $45,000 a year?

12   A.  That would be about right, at the most.

13   Q.  And at that point in time, that was the majority of the

14   money that you were making; is that fair?

15   A.  I am not sure it was the majority.  I made the money with

16   my studio.

17   Q.  Do you remember testifying previously that you had been

18   making approximately 60 to $65,000 a year, which included that

19   money that you got from your sister and her husband?

20   A.  I remember testifying that.

21   Q.  And that trip that you took to Cabo in 2014, that was a

22   trip that your sister and her husband paid for?

23   A.  Yes.

24   Q.  You did not seek any medical attention in Mexico, correct?

25   A.  That's correct.  I didn't feel I needed hospitalization.

Suzanna F. Dailey - Cross

1    *Q.* You didn't feel like you needed to see a doctor at all.

2    *A.* No, no, I did not need medical attention.  I wasn't

3    bruised.  I wasn't -- I didn't have a wound from which I was

4    bleeding that needed stitches.  I didn't have any broken bones.

5    *Q.* And the day after the dinner at Flora Farms, you testified

6    yesterday that a doctor actually came to your villa, correct?

7    *A.* Yes, for my mother.

8    *Q.* To see your mother.  But you knew having a doctor come

9    privately to your villa was an option for you.

10   *A.* I never thought of it.  That's the first -- this is the

11   first time that I've heard something like that.  It would never

12   occur to me, not now and certainly not then, to have brought

13   anything up that drew attention to what happened to me in the

14   presence of my mother.

15   *Q.* And then you stayed down in Cabo for four more days.

16   *A.* Yes.

17   *Q.* And your sister -- you had flown down on her private jet,

18   right?

19   *A.* We did.

20   *Q.* So she could have flown you back if you wanted to leave.

21   *A.* You mean -- well, to begin with, I don't make travel plans.

22   I was a guest.  If I had been hysterical with crying, with

23   screaming, with shouting, creating a drama, a scene around what

24   had happened to me, it would have blown up a situation for my

25   mother, 90, Gery, 83 -- he is very much in command of -- he is

1    the head of the family.  He views himself that way.  I didn't

2    want this to be a blown-up situation for my family.  The

3    violation was enough.

4    Q.  And then when you got back to Florida, you didn't

5    immediately go for medical attention then either, right?

6    A.  No, I didn't.  As I said, I didn't.  I didn't have an open

7    wound that needed suturing.  I didn't have broken bones.  I

8    didn't have lacerations.

9    Q.  The first time you went and saw a doctor when you got back

10   to Florida was almost six weeks later.

11   A.  May 5th.

12   Q.  And that was part of your regularly scheduled yearly exam?

13   A.  Yes.  I usually go at the end of season after clients have

14   left and gone north.  I take care of my medical -- my eyes, my

15   gynecological, physical.

16   Q.  You testified yesterday part of the reason you didn't go to

17   the Mexican police, you didn't want to make your family have to

18   come back to Mexico for a trial; is that right?

19   A.  Yes.  I testified I thought about it in the early morning

20   hours before my sister arrived.  And it was my choice not to go

21   to the police, involve a report in a foreign country.  I grew

22   up in a foreign country in Latin America and it was my choice

23   not to drag my family, young boys, my mother, Gery.  It would

24   have meant -- who knows what it would have meant?  It would

25   have meant staying there, going there, staying there, going

1   back, coming back.  I knew that it would be a horribly

2   drawn-out thing.

3   Q.  But your family has been back down there since this date,

4   right?

5   A.  My family?

6   Q.  Uh-huh?

7   A.  Yes.

8   Q.  Multiple times.

9   A.  I don't know how many times.

10  Q.  And they have actually been back to Flora Farms, right?

11  A.  My sister -- yes, my sister mentioned that she went there

12  for dinner.

13  Q.  And they can travel easily back and forth because your

14  sister has the private jet.

15  A.  She has what?  Pardon me?

16  Q.  A private jet.

17  A.  No, she doesn't own a private jet.

18  Q.  Does she have access to her private jet?

19  A.  One of her people did that and I don't know that they fly

20  privately.  She doesn't fly privately on her own.

21  Q.  Just to be clear, you did grow up, I think you said, in

22  Venezuela?

23  A.  Caracas, Venezuela.

24  Q.  So you do speak fluent Spanish?

25  A.  Yes.

Suzanna F. Dailey - Cross

1   Q.   Your attorney asked you some questions yesterday asking you

2   to describe what your life was like before March of --

3   March 25th of 2014 and after.

4   A.   Yes.

5   Q.   Do you remember that?

6   A.   Yes.

7   Q.   And your attorney had you walk through a number of symptoms

8   that you were feeling; is that right?

9   A.   Yes.

10  Q.   And the reason that you talk about these symptoms is

11  because that's what you want the jury to consider as your

12  damages.

13  A.   No, that's not true at all.

14  Q.   Well, Ms. Dailey --

15  A.   I was asked what I felt my symptoms were, and I truthfully

16  told the jury how I felt.

17  Q.   And some of these symptoms that you described, it's fair to

18  say that you've dealt with those sort of symptoms for a long

19  period of time, correct?

20  A.   That I don't feel these symptoms?

21  Q.   That you have dealt with them for an extended period of

22  time.

23  A.   Yes.

24  Q.   You dealt with them --

25  A.   I have lived with them.

1    Q.  But you were dealing with these symptoms prior to

2    March 25th of 2014.

3    A.  No.  I -- no, I am sorry, I think I was quite explicit that

4    the symptoms that I had felt were very different than how -- if

5    I had emotions that I found difficult or a situation that I

6    found difficult which I would seek counseling and advice.  This

7    was very different.  This was completely different.

8    Q.  Well, let me ask you about that, because in January of

9    2014, you started seeing a doctor named Dr. Creelman, correct?

10   A.  I saw him once.

11   Q.  And you saw him because you were feeling more depressed and

12   you wanted to be considered for transcranial magnetic

13   stimulation treatment, correct?

14   A.  That's correct.  I had been --

15   Q.  Thank you.  That's the answer is yes.

16   A.  Oh, all right.

17   Q.  And so you met with him in January of 2014, correct?

18   A.  That was in January '14.

19   Q.  And he did the examination, correct?

20   A.  That was my initial meeting with Dr. Creelman.

21   Q.  He determined that you were depressed, right?

22   A.  That I had --

23           MS. ALTMAN:  Your Honor, I think that's hearsay.

24           THE COURT:  Overruled.

25   BY MS. LaBRANCHE:

Suzanna F. Dailey - Cross

1  *Q.*  That you were depressed.

2  *A.*  Yes.

3  *Q.*  And you described to him your depression as having been

4  something that you had suffered for 20 years, right?

5  *A.*  That would be right, off and on.

6  *Q.*  And you described it as being in a state where you lost

7  interest in life.

8  *A.*  That I said that?

9  *Q.*  Yes.

10  *A.*  Yes.  I think when one is depressed, you feel lethargic.

11  You don't feel animated.  You don't feel enthusiastic.  You

12  feel -- sort of feel like an amoeba.

13  *Q.*  And you told Dr. Creelman in January of 2014 that you had

14  extreme lethargy, correct?

15  *A.*  Yes.  Would you like to know why?

16  *Q.*  No.

17  *A.*  Oh.

18  *Q.*  And you told Dr. Creelman in January of 2014 that you had

19  lost your desire to attend to the activities of everyday

20  living, correct?

21  *A.*  At that period of time, I did.  I obviously felt that way.

22  *Q.*  And you told him in January of 2014 that you didn't want to

23  get out of bed in the mornings.

24  *A.*  Yes.  Depression can make you feel that way.  I didn't want

25  to get out.

Suzanna F. Dailey - Cross

1   Q.   And you said that you were, quote, "in a deep, dark hole of

2   depression."

3   A.   That's how it feels.

4   Q.   And Dr. Creelman agreed that you were suffering from

5   chronic and major depressive illness of a severe degree.

6   A.   That's not how he put it to me.  Perhaps he put it on paper

7   that way.

8   Q.   And he actually did have you go for TMS treatments,

9   correct?

10   A.   Yes.

11   Q.   And you actually had 30 of those treatments before

12   March 6th of 2014.

13   A.   Yes, in order to -- in order to --

14   Q.   Ms. Dailey, I need you to just answer the questions I ask.

15   A.   I'm sorry, yes.  Sorry.

16   Q.   Now, Dr. Jacobson is a psychiatrist that you have been

17   seeing since 2006, correct?

18   A.   That's right.

19   Q.   And when you see him, you discuss your mental health with

20   him?

21   A.   No, I don't.  I have Dr. Betty for that.

22   Q.   And so -- but he is your treating psychiatrist, correct?

23   A.   He is a pharmaceutical psychiatrist that's required every

24   three months, one should go every three months.

25   Q.   You have to share with him your current mood so that he

Suzanna F. Dailey - Cross

1  knows what medications to be prescribing to you.

2  A.  In an overall view.

3  Q.  And you saw him in January of 2014, correct?

4  A.  Yes.

5  Q.  And then you saw him again in March of 2014, correct?

6  A.  Yes.

7  Q.  And in March 2014, this was before you went to Cabo?

8  A.  Yes, it was.

9  Q.  And at that appointment you told him that the TMS that

10  Dr. Creelman was doing wasn't helping, right?

11  A.  Was what?  Pardon me?

12  Q.  When you met with Dr. Jacobson in March of 2014 before you

13  went down to Cabo, you told Dr. Jacobson that the TMS treatment

14  you were getting with Dr. Creelman wasn't helping.

15  A.  I didn't think it was such an effective treatment

16  particularly.

17  Q.  You actually said -- you told him that your depression had

18  been worse.

19  A.  I don't recall saying that.

20  Q.  And you didn't make an appointment to see him immediately

21  when you returned from Mexico, right?

22  A.  No.  I see him every three months, so the next time would

23  be June.

24  Q.  And at that point in time you reported no depressive or

25  anxiety symptoms?

Suzanna F. Dailey - Cross

1  *A.*  I'm presuming you are reading it.  Yes, I am sure you are

2  right.

3  *Q.*  And you saw him again in October of 2014, right?

4  *A.*  June -- yes, probably October.

5  *Q.*  And at that point in time you again denied that you had any

6  depressive or anxiety symptoms?

7  *A.*  I wouldn't talk to Dr. Jacobson extensively about my

8  feelings.

9  *Q.*  But you denied to him that you had any depressive or

10  anxiety symptoms.

11  *A.*  I don't know.  If that's what you are reading, I am sure

12  you are correct.

13  *Q.*  Ms. Dailey, I want to get back to the night at Flora Farms

14  and I want to talk to you about when you got back to the table

15  that night, okay?

16  *A.*  Yes.

17  *Q.*  You testified yesterday that Mr. Hecht ejaculated in you,

18  right?

19  *A.*  Yes.

20  *Q.*  But you didn't go to the bathroom?

21  *A.*  I didn't.

22  *Q.*  You didn't go clean up anywhere?

23  *A.*  No.  All I can tell you, I don't know why, I went straight

24  back to my seat.  I sat down.  My body was shaking.  My legs

25  were shaking.  That's what I did.

Suzanna F. Dailey - Cross

1   *Q.* And you said in your previous deposition that you sat at

2   the table with your legs crossed so nothing would come out,

3   right?

4   *A.* Nothing was what?

5   *Q.* So nothing would come out.

6   *A.* That's right.

7   *Q.* And then you went and you sat next to my client, Nikos

8   Hecht, yes?

9   *A.* I waited a while.  As I said yesterday, I was in a rage.  I

10  wanted to know why he had done this to me, why.

11  *Q.* Ms. Dailey, my question is did you go and sit next to my

12  client, Nikos Hecht?

13  *A.* Yes.  I got up and went and sat right next to him.

14  *Q.* And you tried to talk to him?

15  *A.* I did.

16  *Q.* And he wouldn't talk to you?

17  *A.* He would not turn around.

18  *Q.* And you didn't know Mr. Hecht before that night?

19  *A.* Did I know him before that?  No.

20  *Q.* You had met him for just a few minutes at the party at his

21  house?

22  *A.* I had just been raped by Mr. Hecht.

23  *Q.* My question is you had met him for five minutes a few

24  nights previously, correct?

25  *A.* Yes.

Suzanna F. Dailey - Cross

1   Q.  Other than that, you didn't know him.

2   A.  No.

3   Q.  So if he had really brutally raped you, how could he have

4   known you wouldn't have come back to that table and made a

5   scene?

6   A.  How would I know?

7   Q.  How could he have known that?

8   A.  That what?

9   Q.  You wouldn't come back to the table and make a scene.

10       MS. ALTMAN:  Your Honor, objection, speculation.

11  A.  I don't know what he would have done.  How would I have

12  known?  I didn't know what he would have done.  I wouldn't have

13  taken the walk had I known who -- how he was.

14  BY MS. LaBRANCHE:

15  Q.  Well, when you describe what happened on the pathway, you

16  don't ever say that he threatened you to be quiet, right?

17  A.  No, I never said that.

18  Q.  Because that didn't happen.

19  A.  That he didn't threaten me?

20  Q.  To be quiet.  He didn't tell you you need to be quiet and

21  not say anything.

22  A.  No, I have never said that.

23  Q.  And he didn't tell you, When we both get up and get back to

24  that table, you better not tell anyone.

25  A.  That's not how it happened.

Suzanna F. Dailey - Cross

1   *Q.* And he didn't say, You better not say a word about this,

2   right?

3   *A.* Mr. Hecht never spoke to me.

4   *Q.* And so he --

5   *A.* Ever.

6   *Q.* But after that night you called him twice, didn't you?

7   *A.* I did, I did.

8   *Q.* You called him twice and you left voice mails?

9   *A.* I did.

10   *Q.* And he never called you back.

11   *A.* No.  I called him for the same reason --

12   *Q.* Ms. Dailey, Ms. Dailey, he didn't call you back.

13   *A.* Uh-huh, no.

14       *MS. LaBRANCHE:*  Your Honor, may I have a moment?

15   *BY QUESTIONER:*

16   *Q.* Ms. Dailey, when you testified yesterday, you said that you

17   thought the encounter with Mr. Hecht took between --

18   *A.* Pardon me?

19   *Q.* You said you thought the encounter with Mr. Hecht took

20   between four and seven minutes; is that right?

21   *A.* Yes, that's what I said.

22   *Q.* When you spoke to Investigator Miller, you actually told

23   her that it was three minutes; is that right?

24   *A.* Yes.

25   *Q.* And you told her that the actual sex only lasted for 30

1   seconds; is that correct?

2   A.  That what lasted?

3   Q.  Actual sex lasted for 30 seconds.

4   A.  I don't know if I used the word sex, actual sex.

5   Q.  Now --

6   A.  I don't think so.

7   Q.  You have testified today or yesterday that Mr. Hecht

8   penetrated your vagina with his penis.

9   A.  That's correct.

10  Q.  But you told Investigator Miller that, He didn't enter me

11  completely, right?

12  A.  What I recall is that I told her he penetrated me.  As I

13  said yesterday, the penetration was not an easy one.

14  Q.  And, in fact, what you said to her was, I wasn't responding

15  to accommodate him, so to speak, where bodies synchronistically

16  move together.  That wasn't happening.

17  A.  That didn't happen.  There was no synchronicity or movement

18  from my body.

19  Q.  You told her that because of the size of his penis, you

20  just couldn't accommodate him.

21  A.  I have trouble understanding you.  It's my problem, I am

22  sorry.

23  Q.  No, I apologize.  At any point in time let me know if you

24  need me to speak up.

25          You said that because of the size of his penis, that

1  you just couldn't accommodate him, right?

2  *A.*  Yes.

3  *Q.*  Ms. Dailey, we talked a little bit about your friend who

4  was the attorney who you had spoken to.

5  *A.*  Yes.

6  *Q.*  And you actually spoke to him on March 31st, the night you

7  returned, correct?

8  *A.*  I may have, yes.

9  *Q.*  And then the date that you burned your shorts was actually

10  the next weekend, which was April 7th, correct?

11  *A.*  Yes.

12  *Q.*  And that was your friend who was the lawyer?

13  *A.*  My friend.

14  *Q.*  Who was the lawyer?

15  *A.*  Yes, a retired lawyer.

16  *Q.*  And I just have one final question, and I am going to ask

17  if we can pull up Ms. Dailey's deposition, Page 213.  And I

18  understand that's not going to be in front of the jury, but I

19  just am told I may not have been entirely clear and I want to

20  make sure I am clear.

21       So Ms. Dailey, when I was asking you earlier about

22  after you had gotten back up from being on the pathway, this

23  was the question I was asking you:

24       So after you got up and walked back to the table, how

25  long was it before dinner was served?

Suzanna F. Dailey - Cross

1      And you answered:  They had already started to serve

2   it, the chicken, correct?

3   A.  Yes.  They had already -- they served dinner before I was

4   taking pictures.  People were eating.  I had eaten.

5   Q.  But Ms. Dailey, look at the text below that.  You finished

6   your answer and you said:  He got up.  If you would like me to

7   continue with completing the story, he jumped up and I was

8   still lying there.

9      You are talking about when you got up from being on

10  the ground with Mr. Hecht, you got back to the table and they

11  had started serving the chicken?

12  A.  No, that's not correct.

13  Q.  Is that what your deposition says, this deposition

14  transcript here in front of you?

15  A.  What I see, they had already started serving the chicken.

16  They had started serving the chicken after we got back from the

17  boutique before I started taking pictures.  I had dinner.

18  Q.  Ms. Dailey, I don't want to argue about this.  And what you

19  already said here is they had already started serving it, the

20  chicken.  I -- he got up -- if you'd like me to continue with

21  completing the story, heed jump up and I was still lying down.

22      THE COURT:  That deposition piece is subject to

23  different interpretations.  Let's let the jury interpret it.

24  Put it in front of them.

25      MS. LaBRANCHE:  Excuse me?

Suzanna F. Dailey - Redirect

1          THE COURT:  Put it in front of them.

2          MS. LaBRANCHE:  All right.  I move for the admission.

3          THE COURT:  That page?

4          MS. LaBRANCHE:  Your Honor, I would be happy to play

5     the clip, if that would be easier.

6          THE COURT:  We don't need the clip.  I think the jury

7     should determine if there is an inconsistency or not.

8          MS. LaBRANCHE:  I agree.  I move for the admission of

9     this --

10          THE COURT:  The page is 213.  It's admitted.

11          MS. LaBRANCHE:  Page 213, Lines 10 through 14.

12          THE COURT:  No, page 213 is admitted.

13          MS. LaBRANCHE:  Fine.  Thank you, Your Honor.

14      (Recess at 10:15 a.m.)

15      (Reconvened at 10:33 a.m.)

16          (Jury present:)

17          THE COURT:  All right.  Have a seat.

18          Redirect examination, Ms. Altman?

19          MS. ALTMAN:  Thank you, Your Honor.

20                     **REDIRECT EXAMINATION**

21     BY MS. ALTMAN:

22     Q.  Good morning, Ms. Dailey.

23     A.  Good morning.

24     Q.  You heard counsel ask you some questions about

25     Dr. Jacobson.  Do you recall that?

Suzanna F. Dailey - Redirect

1   A.   Yes, I do.

2   Q.   How long are your visits with Dr. Jacobson?

3   A.   15, sometimes 20 minutes.

4   Q.   What are the purpose of those meetings or visits with

5   Dr. Jacobson?

6   A.   The purpose is to -- he is a pharmacologist -- to review my

7   medication.

8   Q.   And by medication, are you referring to antidepressants?

9   A.   I am.

10  Q.   Are you taking antidepressants?

11  A.   I do.

12  Q.   And how long have you been taking them, approximately?

13  A.   Well, I --

14  Q.   Strike that.  Let me ask you differently.

15        Were you taking antidepressants before the rape?

16  A.   Yes, I was.

17  Q.   At different points in your life have you experienced bouts

18  of depression?

19  A.   I have.

20  Q.   Can you describe for the jury what your sensation is when

21  you experience depression?

22  A.   When -- well, I started menopause early, and that's when I

23  noticed a vast change in my moods, in my general outlook, I

24  guess.  And I would feel not just a little low, I would feel

25  really low.  And I never felt -- I had never gone to a really

Suzanna F. Dailey - Redirect

1   low place emotionally.

2        And that's when I spoke to someone about it, to a

3   doctor about it.  And I found it very helpful.  I noticed that

4   I felt more -- when I began antidepressant medication, I

5   noticed that I felt normalized, equalized, as one should say.

6   Q.  Ms. Dailey, can you describe for the jury how your symptoms

7   after the rape are different from those you experienced before

8   the rape?

9   A.  Well, I expressed -- I hope I expressed myself clearly

10  yesterday as to the emotions that I struggle with and my sense

11  of my worth or a lack of worth.  It's not -- it doesn't feel

12  the same.  It doesn't feel like a depression.  It doesn't feel

13  like a mood swing.  What I am struggling with is a condition.

14  It's a lack of proper -- of good functioning, a desire to

15  function, an outlook that doesn't -- I really struggle with

16  doing the best I can do.

17        Depression, even with medication, is from what I

18  understand a condition, a biological condition.  And over the

19  years I have learned how to cope along with medication,

20  exercise, meditation, sleep, good social relations, food.  If

21  those components are missing, then I'm not taking care of

22  myself and not -- I am not taking my responsibility for what I

23  know is -- it keeps it at bay.  You feel healthy.  You feel

24  well.  And if I'm missing any of those, not enough sleep, no

25  exercise, I know that without those components, you know, the

Suzanna F. Dailey - Redirect

1  boogeyman is going to come and get me.

2  Q.  And you have just described your depression.

3  A.  Yes.

4  Q.  If you could explain to the jury how you feel after the

5  rape as opposed to how you felt before the rape.

6  A.  Yes.  After the rape my issues have been coping with

7  everyday functioning, living in a continual state of anxiety,

8  the inability to sleep a night's sleep through, lack of desire

9  to be with people, a feeling of needing to be alone because

10  people make me anxious.

11       I don't go out in the dark.  I don't travel to see

12  friends.  I like to talk to friends on the phone, but I don't

13  enjoy getting together.  I don't go out at night.  I don't feel

14  like exercising, which has been my occupation.  I said

15  yesterday that I think the worst part of it is feeling that --

16  I wish I didn't have to keep living at times.  There have been

17  times like that.  And it's -- I am ashamed to say that.  It's

18  very difficult to hide this condition from most.  It's

19  exhausting.  I am always tired.

20  Q.  Ms. Dailey, when you want to talk to someone about how you

21  feel, do you talk to Dr. Jacobson or Dr. McGuigan?

22  A.  Dr. McGuigan.

23  Q.  And is it a fair sort of summary to refer to her as a talk

24  therapist?  Is that --

25  A.  Is she a talk therapist?  I think so.

Suzanna F. Dailey - Redirect

1  Q.  When you have had issues either before or after the rape,

2  is she the person that you confide in from a mental health

3  perspective?

4  A.  Yes, yes.  She is not only helpful; she is a confidante.

5  Q.  Ms. Dailey, you were here for opening arguments, correct?

6  A.  I was.

7  Q.  And you heard opposing counsel stand before the jury and

8  suggest to them that you were clean shaven.  Do you recall that

9  in the opening statement?

10       MS. LaBRANCHE:  Objection, beyond the scope.

11       THE COURT:  That objection is overruled.  You may

12  answer.

13  BY MS. ALTMAN:

14  Q.  Ms. Dailey, do you recall a statement like that being

15  suggested to this jury, that you went that evening to Flora

16  Farms clean shaven?

17  A.  I surely do.

18  Q.  Is that a true statement?

19  A.  That is not a true statement, not at all.

20  Q.  Did you shave your pubic area before you went to Flora

21  Farms that evening?

22  A.  No.

23  Q.  Did you time the amount of time it took for Nikos Hecht to

24  rape you?

25  A.  No.

Suzanna F. Dailey - Redirect

1   Q.  Did you have a stop watch?

2   A.  No, I didn't.

3   Q.  When you said to Investigator Miller, who she indicated you

4   said you couldn't accommodate him, do you recall that?

5   A.  Yes.

6   Q.  What did you mean by that?

7   A.  I meant by that that the entrance into my -- the vaginal

8   canal, my vaginal canal would not -- he didn't, for lack of a

9   better way of explaining, slip it in.  It wasn't like that at

10  all.

11  Q.  Ms. Dailey, as you sit here today, do you have any doubt or

12  question as to whether or not Mr. Hecht's penis was inside your

13  vagina?

14  A.  I know it was inside my vagina.

15  Q.  As you sit here today, do you have any doubt that Mr. Hecht

16  ejaculated inside of you?

17  A.  No, I have no doubt.

18  Q.  And to eliminate any confusion, did Mr. Hecht rape you

19  before or after dinner?

20  A.  It was after dinner for sure.

21  Q.  And again, just to eliminate any confusion, the pictures

22  that you took, some of which have been shown, were those taken

23  before or after dinner?

24  A.  They were before the rape.

25  Q.  I am sorry.  I withdraw the question.  The pictures that

Suzanna F. Dailey - Redirect

1    you took, were they taken before or after Mr. Hecht raped you?

2    I apologize.

3    A.  Before.

4            MS. ALTMAN:  Can you call up Exhibit 19 --

5            THE WITNESS:  Pardon me?

6            MS. ALTMAN:  -- which has been admitted?

7    BY MS. ALTMAN:

8    Q.  Do you see that picture?

9    A.  I do.

10   Q.  You took that picture, correct?

11   A.  I did.

12   Q.  And that's Mr. Hecht, correct?

13   A.  That's Mr. Hecht.

14   Q.  He is grinning ear to ear?

15   A.  Yes.

16   Q.  Was that picture taken before or after he raped you?

17   A.  Before.

18           MS. ALTMAN:  I have no further questions, Your Honor.

19           THE COURT:  Do you have any other questions?

20           MS. LaBRANCHE:  No, Your Honor.

21           THE COURT:  All right.  Questions from the jurors?

22           JUROR:  Yes.

23           THE COURT:  All right.

24        (At the bench:)

25           THE COURT:  So I hand you a question, and you take a

Suzanna F. Dailey - Redirect

1   look at it and you tell me if you object and on what basis.

2   Question No. 1.

3            MS. ALTMAN:  We don't have an objection.

4            MS. LaBRANCHE:  Your Honor, that's the basis of the

5   objection *in limine*.  That's exactly why we didn't want them to

6   be able to say what they saw in the newspaper at all.

7            THE COURT:  Objection is sustained.  The objection was

8   sustained to Question 1.

9            Question No. 2.

10           MS. ALTMAN:  We don't have an objection.  Plaintiff

11  doesn't have an objection.

12           MS. LaBRANCHE:  We don't have an objection.

13           THE COURT:  Thank you.

14           Question No. 3.

15           MS. ALTMAN:  I don't have an objection.

16           MS. LaBRANCHE:  I don't have an objection.

17           THE COURT:  Question No. 4.

18           MS. LaBRANCHE:  I don't have an objection.

19           MS. ALTMAN:  I don't have any objection.

20           THE COURT:  Question No. 5.

21           MS. LaBRANCHE:  The same as the question before.

22           MS. ALTMAN:  Plaintiff doesn't have an objection.  And

23  I would only note that that was on the whole issue of

24  completeness in order for her to properly tell the story.

25           THE COURT:  Ms. Altman, you already basically told the

Suzanna F. Dailey - Redirect

1   story cleverly.  They are going to use their imagination now.

2           MS. LaBRANCHE:  I know.

3           THE COURT:  Objection is sustained.

4           MS. ALTMAN:  Thank you, Your Honor.

5           THE COURT:  Remember, ladies and gentlemen, if I don't

6   ask a question, it doesn't mean it was not a good question.  It

7   just means there is some legal reason why.  And once the case

8   is all over, as I will tell you at the time, I will be happy to

9   meet with you and explain things that are related to questions

10  that weren't asked and explain why.

11  BY THE COURT:

12  Q.  All right.  Question from the jurors for you:

13          You stated that the assault occurred 40 to 50 away

14  from the dinner table/gazebo area, but did not specify feet or

15  yards.  Was it 40 to 50 yards or 40 to 50 feet away?

16  A.  I think it's yards.  I'm not sure if it's feet.  It was a

17  long way.

18  Q.  40 yards would be four-tenths of a football field.

19  A.  40 yards is a football field?

20  Q.  No, 40 yards is under half of a football field.

21  A.  It would be under half of a football field.

22  Q.  For sure.  Half a football field from end zone to end zone

23  would be 50 yards.  I don't know how long this courtroom is.

24  A.  This would be -- may have been as long as from this wall to

25  that wall.

Suzanna F. Dailey - Redirect

1   *Q.*  The total length of the courtroom?

2   *A.*  Pardon me?

3   *Q.*  The length of the courtroom?

4   *A.*  Yes, sir.

5   *Q.*  And you say may have been.  Is that your best estimate as

6  to how far away it was?

7   *A.*  It is.  I'm not great at distance.  It's hard to -- when I

8  got up and when this happened, I don't recall light, dark.  I

9  don't recall -- my sensations were not about distance and

10  light, but it wasn't far.  I don't know if it's that far.  I

11  don't think.

12       *THE COURT:*  Julie, would you e-mail Jeff Colwell and

13  see if he can tell us how long this courtroom is.  I can sort

14  of estimate based on my golf shots and I can say without

15  hesitation that I can blow a shot of this distance as easily as

16  every other shot that I try, but maybe we can find out exactly

17  how long the courtroom is.

18       *THE WITNESS:*  Your Honor, I believe the lawyers were

19  there.

20       *THE COURT:*  Right, but they can't testify.  Anyway, we

21  will see if we can't get an answer to that and then come back

22  to the question.

23  *BY THE COURT:*

24  *Q.*  Next question:  Were the string lights illuminated at the

25  time of the assault?

Suzanna F. Dailey - Redirect

1   *A.*  Pardon me?

2   *Q.*  Were the lights that were on the string?

3   *A.*  Yes, they were like Japanese lanterns, round.

4   *Q.*  Yes.

5   *A.*  Yes, they were on.

6   *Q.*  They were on, okay.

7        Question:  Did you change your meds after the rape?

8   *A.*  No, I didn't.

9   *Q.*  Okay.  Question:  What was said in the voice mails you left

10  for Mr. Hecht?

11  *A.*  I said exactly, Nikos, this is Suzanna Dailey calling.

12  Would you please call me back?  And I left my number.

13       *THE COURT:*  Okay.  Any other questions, folks?

14       Ms. Altman, would you like to ask any follow-up

15  questions to the jury questions and her answers to those?

16       *MS. ALTMAN:*  No, Your Honor.

17       *THE COURT:*  How about you, Ms. LaBranche?

18       *MS. LaBRANCHE:*  No, thank you, Your Honor.

19       *THE COURT:*  Okay.  All right.  Go ahead and step down.

20       And if we get an answer on the length of the

21  courtroom, then we will possibly revisit that issue.

22       Who is the next witness?

23       *MS. ALTMAN:*  Your Honor, Jeanne Andlinger.

24       (**Jeanne Andlinger** was sworn.)

25       *THE WITNESS:*  I do.

Jeanne Andlinger - Direct

1          *THE COURT:*  Would you have a seat right there at that

2   chair.  And there is a microphone there, if you can speak into

3   it, but move right up next to it just so everybody can hear

4   your answers.

5          *THE WITNESS:*  Okay.

6          *THE COURT:*  Go ahead, Ms. Altman.

7                      **DIRECT EXAMINATION**

8   *BY MS. ALTMAN:*

9   *Q.*  Good morning, Ms. Andlinger.

10  *A.*  Good morning.

11  *Q.*  Can you please introduce yourself to the jury?

12  *A.*  Yes.  My name is Jeanne Andlinger.

13  *Q.*  Do you know Suzanna Dailey?

14  *A.*  Yes, I do.

15  *Q.*  How do you know her?

16  *A.*  She is my sister.

17  *Q.*  Is she older or younger?

18  *A.*  She is my older sister, oldest sister.

19  *Q.*  Growing up were you close to your sister, Suzy?

20  *A.*  Very much so.

21  *Q.*  How would you describe her?

22  *A.*  Boy, I would describe Suzy as being a loving, generous,

23  thoughtful, vivacious, extremely caring, fun.  She is just the

24  best sister.

25  *Q.*  Where do you live?

Jeanne Andlinger - Direct

1    *A.*  I live in Manhattan.

2    *Q.*  As adults today, have you remained close to your sister,

3    Suzy?

4    *A.*  Yes, I have.

5    *Q.*  Are you married?

6    *A.*  Yes, I am.

7    *Q.*  To whom?

8    *A.*  To Gerhart Andlinger.

9    *Q.*  How long have you been married?

10   *A.*  23 years.

11   *Q.*  Do you have a son?

12   *A.*  Yes, I do.

13   *Q.*  What's his naming?

14   *A.*  Tristan.

15   *Q.*  And how old is he?

16   *A.*  He just turned 18.

17   *Q.*  Do you ever take trips with your sister, Suzy?

18   *A.*  Yes, I do.

19   *Q.*  How often?

20   *A.*  Over the years, I would say the past -- well, I would say

21   it averages it out to like once a year, but to be specific,

22   over this past, say, 10 years, once a year.

23   *Q.*  What's your mother's name?

24   *A.*  Martha.

25   *Q.*  How old is she?

Jeanne Andlinger - Direct

1  *A.*   93.

2  *Q.*   Who cares for your mother, Martha?

3  *A.*   Suzy does.

4  *Q.*   How long has she cared for her?

5  *A.*   As long as I can remember.  She has cared for mother,

6  really hands-on cared for her the past, I would say, 10 years,

7  but she has always been there for mother.

8  *Q.*   Can that be stressful?

9  *A.*   Oh, absolutely.

10  *Q.*   Does she talk to you about that?

11  *A.*   Yes.

12  *Q.*   Does your mother -- well, strike that.  Did you travel to

13  Cabo San Lucas, Mexico with your sister in March of 2014?

14  *A.*   Yes, I did.

15  *Q.*   Did you pay for that trip?

16  *A.*   Yes.

17  *Q.*   Who went on that trip?

18  *A.*   My mother, my husband, my son, Suzy and myself.  And there

19  was a friend of my son's with us.

20  *Q.*   Is that Dylan?

21  *A.*   The first week it was Dylan.  The second week it was

22  George.

23  *Q.*   How old is your husband today?

24  *A.*   86.

25  *Q.*   And he would have been 83 or 84 at the time of the trip to

1  Cabo in 2014?

2  *A.*  Yes.

3  *Q.*  Ms. Andlinger, are you financially comfortable?

4  *A.*  Yes, I am.

5  *Q.*  Is that a blessing?

6  *A.*  It is a blessing.

7  *Q.*  Does your sister expect you to pay for things for her?

8  *A.*  No.

9  *Q.*  If she asked you to --

10  *A.*  No.

11  *Q.*  -- needed something, would you?

12  *A.*  If she needed something, I would.  I would always be there

13  for her.

14  *Q.*  When you take Suzy and your mother on trips, when you have

15  taken them, why is that?

16  *A.*  Well, selfishly I like to be with them.  I like for them --

17  I just like to be with them.  They are pretty much the only

18  people I take trips with is my family.

19  *Q.*  You mentioned who was on the trip from Cabo in March of

20  2014.  How old was Tristan at that time?

21  *A.*  14.

22  *Q.*  Was this a preplanned trip?

23  *A.*  Yes, it was.

24  *Q.*  Was this during Tristan's spring break at school?

25  *A.*  Yes, it was.

Jeanne Andlinger - Direct

1   Q.   Where is Tristan today?  And by today, I mean today when we

2   are sitting here in this courtroom.

3   A.   I hope he is in school, but he is in New York and he is in

4   school.

5   Q.   How old is he today?

6   A.   18.

7   Q.   What -- at what level is he in high school, senior?

8   A.   He is a junior in high school.

9   Q.   Would Tristan like to have been here today?

10  A.   Yes, very much so.

11  Q.   Is he preparing for SATs right now?

12  A.   Yes, he is.

13  Q.   Before the trip to Cabo in 2014, did you know who Nikos

14  Hecht was?

15  A.   Yes, I did.

16  Q.   Did you know him well?

17  A.   No, not at all.

18  Q.   How did you know him?

19  A.   I only -- well, I didn't know him.  I mean, I knew of him.

20  I knew his wife only because I had -- our children went to the

21  same school and I had met her in the drop-off line, you know,

22  when you drop off the kids at school.  And I knew that she was

23  also friends with a friend of mine.

24  Q.   Prior to the trip in March of 2014, had you ever socialized

25  with Nikos or Allison Hecht?

Jeanne Andlinger - Direct

1    *A.*  No, other than in the drop-off line when I first met

2    Allison, we were both talking about some plans or something

3    about going back east, and she said she was going to fly back

4    east the next day.  And I said, Oh, I am too.  Would you like a

5    ride with us so that we can save fuel, you know.

6         And that's the only time I ever socialized with them.

7    *Q.*  And do you recall generally what year that was?

8    *A.*  Well, let's see.  My son would have been in eighth grade,

9    so that was quite a bit of time ago.

10   *Q.*  Because he is in 11th grade now; is that right?

11   *A.*  Yes.

12   *Q.*  Now, when you planned your trip to Cabo in 2014, did you

13   know that Nikos Hecht and his family would be there?

14   *A.*  No, I didn't.  I wasn't aware of that.

15   *Q.*  At some point in your trip did you run into Nikos and

16   Allison Hecht?

17   *A.*  Yes, I did.

18   *Q.*  How did that happen?

19   *A.*  Well, Tristan and Dylan, his friend, and myself took a walk

20   on the beach, and we passed this house and there was somebody

21   waving at us.  And Dylan, who knows the Hecht family, said, Oh,

22   that's Allison.  And she was motioning for us to come up.  We

23   were really warm.  It was very warm there and we walked up and

24   jumped in the pool.

25   *Q.*  With the Hechts?

1    *A.*  As I can remember, except for I don't know if Allison, say,

2    leans over her pool and waved or whether she was standing, but

3    yes, we were all in the pool.

4    *Q.*  Was Ms. Dailey, was your sister with you when this

5    happened?

6    *A.*  No.

7    *Q.*  Where was she?

8    *A.*  She was back at our rental with mother.

9    *Q.*  Now, while you were at the Hecht home that day, was there

10   any discussion of a get-together later that evening?

11   *A.*  Yes.  They invited us over for cocktails.

12   *Q.*  Did you agree to go?

13   *A.*  Well, I agreed, yes.  I agreed to come over.

14   *Q.*  As best you can recall, who attended the get-together at

15   the Hecht home?

16   *A.*  Suzy, myself and Tristan and Dylan.

17   *Q.*  Did Tristan and Dylan stay at the house?

18   *A.*  No, they didn't.

19   *Q.*  So who remained at the house?  Yourself, your sister.  Was

20   Gery Andlinger there?

21   *A.*  Yes, he was.

22   *Q.*  Was Allison Hecht there?

23   *A.*  Yes, she was.

24   *Q.*  Was Nikos Hecht there?

25   *A.*  Yes, he was.

1    Q.  Was there anyone else that you can recall?

2    A.  There was a woman that was serving drinks.  I don't drink,

3    so she was serving, you know, things to drink and, yeah, I

4    didn't know whether, you know, she was just there as a helper.

5    Q.  How long would you say you were at the Hecht home that

6    evening?

7    A.  Maybe 45 minutes.

8    Q.  Can you sort of generally describe for the jury what

9    happened at that get-together?  For example, did you sit inside

10   or outside?

11   A.  Well, they have kind of an indoor/outdoor house type of

12   situation, but I sat under this -- at the end of the pool, as I

13   can remember, there is this platform that people have that's

14   kind of this Indian-style platform where you can all sit.  And

15   we sat there.  And there weren't chairs.  You just kind of --

16   it's like you were sitting on pillows or something.

17   Q.  And when you say we, who is the "we" that sat there?

18   A.  Suzy, Allison and myself.

19   Q.  Was Mr. Hecht, Nikos Hecht, sitting there with you?

20   A.  No.

21   Q.  Did he come over and sit with you at any point in time?

22   A.  No.

23   Q.  Did you ever see your sister speak to Mr. Hecht that

24   evening?

25   A.  No.

1  *Q.*  Did you ever see your sister flirting with Mr. Hecht that

2  evening?

3  *A.*  No.

4  *Q.*  Did you ever see your sister go with Mr. Hecht to a fire

5  pit?

6  *A.*  No.  I don't remember a fire pit.

7  *Q.*  Was your sister with you the entire time you were sitting

8  on the -- I will call it a daybed.

9  *A.*  Yes.

10  *Q.*  Ms. Andlinger, you mentioned to the jury earlier that

11  you're financially comfortable; is that correct?

12  *A.*  Yes.

13  *Q.*  Do you have any reason to be impressed by Mr. Hecht's

14  wealth?

15  *A.*  Not at all.

16  *Q.*  Do you remember your sister being impressed in any way by

17  Mr. Hecht's wealth?

18  *A.*  No, no.  Suzy has been exposed to a lot of wealth and

19  she -- Mr. Hecht's wealth would not impress her.

20  *Q.*  Do you remember how your sister was dressed that evening at

21  the Hecht home?

22  *A.*  Yes.  She had on a blouse that I think it was kind of a

23  Mexican style blouse and she had on these cargo shorts.

24  *Q.*  Was the blouse tight fitting?

25  *A.*  No.  She wears -- it was a Mexican blouse or maybe it was

1    like a tunic.  That's where I get a little confused, you know,

2    whether -- she wears these full blouses, these kind of tunic

3    tops that everybody wears.  They come kind of down to your mid

4    thigh and then you can put a pair of slacks on or leggings on

5    or shorts on, but it kind of hides everything in the middle.

6    Q.  So the shirt was loose fitting?

7    A.  Yes.

8    Q.  What about the shorts or what she was wearing on her

9    bottom?

10   A.  The shorts were horrendous.  They are cargo shorts and I

11   never liked those shorts, but yes, they are white like

12   drawstring at the knee.  I think you can buy them on-line or

13   something.

14   Q.  Were they tight fitting?

15   A.  No.

16   Q.  Were they baggy?

17   A.  Yes.

18   Q.  Was there ever a time that night at the Hecht home that you

19   saw Ms. Dailey alone with Mr. Hecht?

20   A.  No.

21   Q.  That night did you make a plan to meet with the Hechts

22   again while you were in Cabo?

23   A.  I didn't make the plan, but --

24   Q.  Did you hear of a plan?

25   A.  It was suggested --

1   *Q.* Did you learn of a plan that night?

2   *A.* Yeah.  It was suggested, Allison had said that there was

3   this really neat place, it's kind of a farm-to-table place,

4   outdoor situation, and you can have big picnic tables.  We had

5   a lot of kids, you know, in the -- in the group by that time

6   that were vacationing on spring break and it was a really cool

7   place and delicious food and would we like to go.

8   *Q.* And you said yes?

9   *A.* Uh-huh.

10  *Q.* Who is Laura Kaplan?

11  *A.* She is a friend of mine.

12  *Q.* Was she also in Cabo during March of 2014 when you were

13  there?

14  *A.* Yes, she was.

15  *Q.* And who was she there with?

16  *A.* With her family.

17  *Q.* Now, did you end up going to dinner at Flora Farms?

18  *A.* Yes.

19  *Q.* Before we talk about that dinner, can you tell the jury

20  what period of time elapsed between when you were at the Hecht

21  house to when the dinner occurred?

22  *A.* The Hecht house was on a Saturday and the dinner, because

23  they serve fried chicken on Tuesday nights, the dinner was on a

24  Tuesday.

25  *Q.* Is that your best recollection of what those dates were?

Jeanne Andlinger - Direct

1  A.  I specifically remember that it was a Tuesday.

2  Q.  Who attended the dinner at Flora Farms?  Why don't we start

3  with your family.  Who from your family went?

4  A.  Okay.  It was myself, my husband, my mother, my son, my

5  son's friend George, who had just come in on Sunday because

6  Dylan left and George came in for the second part.  Okay,

7  that's my family.

8  Q.  Was your mother there?  I am not sure if I heard you say

9  that.

10  A.  Yes, my mother was.

11  Q.  Suzy was there?

12  A.  Suzy was there.

13  Q.  From the Kaplan family, who do you recall?

14  A.  From the Kaplan family, it was Laura, her mother, her son

15  Eli, her daughter Stella, her other daughter Ava.  Oh, and

16  there was a friend of Eli's, Luke was his name, and then there

17  was a girlfriend, Zoe, that was Eli's girlfriend.

18  Q.  Would it be fair to say that Luke, Eli, Eli's girlfriend

19  and Stella were all teenagers?

20  A.  Yes, they were teenagers.

21  Q.  And how old was Ava?

22  A.  Ava was under 10, so I would say maybe she was nine then,

23  eight or nine.

24  Q.  Who came from the Hecht family, as best you recall?

25  A.  As best as I can recall, it was Nikos, his ex-wife Allison,

Jeanne Andlinger - Direct

1   his daughter, his eldest daughter.  I don't remember -- he has

2   two daughters.  I don't remember the second daughter -- and his

3   young son Levi, his stepmother, his father Andy, and there was

4   another couple who I didn't know.  Allison --

5   Q.  Was Laura Kaplan's mother there?

6   A.  Yes, she was.

7   Q.  And with respect to Mr. Hecht, you mentioned his ex-wife,

8   Allison.  At the time were they still married?

9   A.  Yes, they were.

10  Q.  Can you just give the jury a general feel what the mood was

11  at the dinner?  People talking, having fun?

12  A.  Yeah.  It was a festive occasion.  It was a time all of us

13  were looking forward to.  We were in Mexico, you know.  We were

14  on a vacation.  Everybody was excited to be together and to be

15  there.

16  Q.  Where physically did you eat at Flora Farms?  And by that I

17  mean did you eat in the actual restaurant or did you eat

18  somewhere else?

19  A.  We ate on the grounds of where the restaurant was.  It was

20  a big, big piece of property, and there were lots of different

21  gardens and it looked like mazes of garden.  From what I was

22  told, it was a farm-to-table situation and they had a private

23  area where they could hold like, you know, wedding parties and

24  stuff like that, and that we could eat there.  So you have to

25  go through, say, a garden gate, a half of a gate, and then you

1    are in this private area where you don't see any of the public.

2            MS. ALTMAN: Can you call up Exhibit 125, please.

3    BY MS. ALTMAN:

4    Q. Ms. Andlinger, I am going to show you a photograph, and I

5    will represent to you it's one that came from the Flora Farms

6    website.

7            Do you recognize the area we are talking about in

8    Exhibit 125?

9    A. Yes, I do.

10   Q. And what is that?

11   A. Well, that's a pavilion-type -- that's where we ate. And

12   it's a building that services I am assuming people that want to

13   have private dinners. You know, it has the concrete slab of

14   like, say, in a park where you have the picnic tables on a

15   concrete slab, and then it has an overhang.

16   Q. And that's the area where you had dinner that night?

17   A. Yes.

18   Q. Around what time did you arrive at Flora Farms?

19   A. I would say 6:00, 6:30.

20           MS. ALTMAN: And I am going to show you a couple of

21   photographs and ask you if you can identify who is in these

22   photographs.

23           If you could call up Exhibit 3.

24           And I will represent to the Court that this is a

25   stipulated exhibit.

 1          THE COURT:  Okay.  It's admitted.

 2   BY MS. ALTMAN:

 3   Q.  Who is the woman in that photograph?

 4   A.  That's my friend, Laura.

 5   Q.  Laura Kaplan?

 6   A.  Yes.

 7   Q.  Who is behind Laura Kaplan?

 8   A.  That's her daughter, Ava.

 9   Q.  And can you tell me -- I know it may be hard to see -- who

10   is next to Ms. Kaplan?

11   A.  Her mother, Connie.

12          MS. ALTMAN:  Can you call up Exhibit 7, please.

13          And I will represent to the Court that's also a

14   stipulated exhibit.

15   BY MS. ALTMAN:

16   Q.  Do you recognize these guys?

17   A.  I do.

18          THE COURT:  It's admitted.

19          MS. ALTMAN:  Thank you, Your Honor.

20   BY MS. ALTMAN:

21   Q.  Can you identify for the jury, who is the gentleman in the

22   red shirt?

23   A.  That's my son, Tristan.

24   Q.  And who is the gentleman next to him in what appears to be

25   an orange shirt?

Jeanne Andlinger - Direct

1    A.   That's his best friend, George.

2    Q.   Across from Tristan, do you recognize that person?

3    A.   Yes.  That's Stella Kaplan, Laura's daughter.

4    Q.   And further down, do you recognize either the blond woman

5    or the woman with the blue and white striped shirt?

6    A.   Oh, that's the woman I didn't know.

7    Q.   The blond woman?

8    A.   Yeah.

9    Q.   And the woman in the blue and white striped shirt?

10   A.   That's Andy's wife, Nikos' stepmother.

11   Q.   Is that Jody?

12   A.   Yes.

13          MS. ALTMAN:  Can you call up Exhibit 43, please?

14          Your Honor, it's also a stipulated exhibit.

15          THE COURT:  All right.  It's admitted.

16   BY MS. ALTMAN:

17   Q.   Who is the little girl next to your son Tristan in that

18   picture?

19   A.   That is Allison and Nikos' daughter.

20   Q.   Is that the daughter you mentioned attended the dinner?

21   A.   Yes.

22   Q.   Do you know how old she is at the time?

23   A.   Not exactly.  I would only say that she is the same as Ava

24   because they were best friends, so, you know, eight or nine,

25   somewhere in there, eight or nine or 10.

1           MS. ALTMAN:  And if you could call up Exhibit 48.

2           Your Honor, that's also a stipulated exhibit.

3           THE COURT:  It's admitted.

4           MS. ALTMAN:  Thank you, Your Honor.

5    BY MS. ALTMAN:

6    Q.  Ms. Andlinger --

7    A.  Yes, that's George.

8    Q.  -- is that the gentleman you identified earlier as

9    Tristan's friend?

10   A.  Yes, that's George.

11   Q.  Who is that next to him?

12   A.  That's myself.

13   Q.  And behind you?

14   A.  Then there is mother.

15   Q.  That's Martha?

16   A.  Yes.

17   Q.  And who is to your immediate right?

18   A.  That's Laura.

19   Q.  And the gentleman standing up with the white shirt, who is

20   that?

21   A.  That's Andy Hecht.

22   Q.  Do you know who took these pictures?

23   A.  Yes, I do.

24   Q.  Who?

25   A.  Suzy.

Jeanne Andlinger - Direct

1   Q.  Was that during dinner?

2   A.  Yes, it was.  It had to be.  I mean, we were sitting down.

3   I don't see -- yeah, it was during dinner.

4   Q.  Once you arrived at the restaurant, did you eat right away?

5   A.  No, no, we didn't.

6   Q.  So what was going on before dinner was served?

7   A.  Everybody was milling around.  I let my son go and, you

8   know, I wasn't paying attention to where anybody was.  I was

9   trying to get my husband settled where he wanted to be, where

10  mother was and, you know, there was -- you know, everybody was

11  just getting settled.  And we were the last to arrive, so

12  everybody was there when we arrived.

13  Q.  Was there a time when you went over to a jewelry store?

14  A.  Yes, there was.

15  Q.  And who was at that jewelry store when you were there?

16  A.  Allison was there, Laura was there and myself.

17  Q.  Was your sister Suzy there?

18  A.  And Suzy was there.

19  Q.  Was there any time prior to dinner that you saw your sister

20  Suzy associating with Nikos Hecht?

21  A.  No, no.

22  Q.  At any point in time before dinner, did you see her talking

23  to Nikos Hecht?

24  A.  No.

25  Q.  How long between when you left the jewelry store to when

1   dinner was served?

2   A.  I would say that -- maybe 20 minutes.

3   Q.  And so when you went back to -- when you walked back over

4   to the pavilion, did you just hang around and talk to folks?

5   A.  When I went back over there, you know, it was getting

6   cooler.  It's getting a little bit darker, yeah.

7   Q.  When you arrived at the restaurant, was it light out?

8   A.  Yes.

9   Q.  And when you ate dinner, was it still light out?

10  A.  It was dusk.

11  Q.  So was it dark?

12  A.  It was getting dark.

13  Q.  So it was in between light and dark?

14  A.  Right.  It was in between and it was also getting cooler.

15  Q.  Did you ever see your sister at any time that night at

16  Flora Farms flirting with Nikos Hecht?

17  A.  No, I didn't.

18  Q.  Did you ever see her engaging in conversation with Nikos

19  Hecht at all?

20  A.  No, I didn't.

21  Q.  I am going to show you what's Exhibit 124.  Now, to the

22  left, is that the pavilion where you ate dinner?

23  A.  To the left, yes.

24  Q.  And I know we are looking straight down a path, but when

25  you said, you mentioned that you entered through a gate that

1   took you to this private dining area -- did I understand you

2   correctly?

3   A.   Yes.

4   Q.   Does the gate -- I know you can't see it in the image, but

5   when you walk through the gate, does it lead you down this

6   path?

7   A.   Yes.  If you wanted to go straight down that path, that's

8   where you could go.

9   Q.   But the entrance to get to the private pavilion was sort of

10  at the beginning of this path?

11  A.   Yes.  You take a hard left there right after you come in

12  that garden gate, and that's where we ate.

13  Q.   Now, you can see in this picture -- and I will represent to

14  you that it's one that came from the Flora Farms website -- but

15  you see lots of foliage and plants and it's very green out.

16  What was the, for lack of a better word, the topography, the

17  foliage?  Was it a lot of greenery?  Was it shrubbery?  Was it

18  sort of winter, just planted, or was it fully grown out?

19  A.   It seemed fully grown out.  It was very lush.  It was full.

20  Q.   Did you ever walk down this pathway, what is up in front of

21  you, Exhibit 124?

22  A.   No.  I mean, I only walked -- I only was around that -- the

23  pavilion area walking around, but I never walked to see where

24  the path went.

25  Q.   So when you say around the pavilion, do you mean -- and

1   there is a stylus, if you want to mark it -- but do you mean

2   where the croquet mallets, in that sort of general area?

3   A.   Yeah, it looks like there is almost a bench there, even

4   though I didn't sit on the bench.  And that dark spot right

5   there, that's where I was hanging out, all in that area.  I

6   didn't go all the way.  This area is -- this area is where I

7   would say.

8   Q.   Was there anything unusual about your sister's demeanor

9   during dinner?  And by that, I mean while dinner -- while she

10  was sitting at the table having dinner, was there anything

11  unusual about her demeanor?

12  A.   No, not during dinner.

13  Q.   Did she seem happy?

14  A.   Yeah.

15  Q.   Did you observe her talking to people and chatting with

16  people?

17  A.   Yes.  My observation was, and I remember this very

18  distinctly, that I was happy that Suzy was having a good time,

19  that she was sitting down by all the teenagers and hamming it

20  up with them, and that I thought I am glad that she is having a

21  good time and that they are getting to know her because she is

22  a lot of fun.

23  Q.   And your mom was sitting closer to you?

24  A.   Well, she was sitting on the other side of Connie, so the

25  older folks were sitting at the end, or let's say the more

1  mature folks were sitting at the end.

2  *Q.*  So that would be your husband, Gery?

3  *A.*  Pardon me?

4  *Q.*  Is that your husband, Gery?

5  *A.*  Yes.

6  *Q.*  Mr. Andy Hecht?

7  *A.*  Yes.

8  *Q.*  Your mother, Martha?

9  *A.*  Yes.

10  *Q.*  And Laura's mother, Connie?

11  *A.*  Yes.

12  *Q.*  And as you came from the other end of the table from that,

13  did the age generally decrease?

14  *A.*  Yeah.  They were all -- that was the loudest part of the

15  table.

16  *Q.*  The side with the mature folks or the side with the --

17  *A.*  With the teenagers.

18  *Q.*  Okay.  Did you ever see your sister's demeanor change that

19  night?

20  *A.*  Yes, I did.

21  *Q.*  How?

22  *A.*  At the end of the night when I was rounding everybody up to

23  go, I noticed -- I looked over at the table and Suzy was just

24  sitting there by herself just like a post.  She was staring at

25  me.  And I looked at her and she looked at me and she said, I

1  have something to tell you.  And I looked at her and I said,

2  later.  Just -- later.  I have got -- in my head I was saying I

3  have got to get Gery to the car because he has a bad leg and I

4  didn't want him to trip over anything.

5         And it wasn't really that well lit.  I had to find out

6  how George and Tristan were going to get back to the hotel, who

7  they were going to ride with.  I was just, you know, I was just

8  having to get organized to leave.

9  Q.  Now, at the time that your sister made this statement to

10  you, I have something to tell you, had you told her that

11  Tristan witnessed Mr. Hecht raping her?

12  A.  No.

13  Q.  So at the time she made this statement to you, I have

14  something to tell you, she was unaware that Tristan had

15  witnessed what had happened?

16         THE COURT:  Sustained.

17         MS. LaBRANCHE:  Objection.

18  BY MS. ALTMAN:

19  Q.  At the time your sister made the comment to you, I have

20  something to tell you, you had not communicated to her that

21  Tristan had observed anything between her and Mr. Hecht; is

22  that right?

23  A.  No, no.  She didn't know that I knew and she didn't know

24  that Tristan knew, but I didn't know from her what had taken

25  place.  I just heard something from Tristan.

Jeanne Andlinger - Direct

1    Q.   And I am going to get to that.

2         My next question is when she said, I have something to

3    tell you, if I understood your response, at that moment you

4    said, Later, because you were sort of trying to corral

5    everybody to leave the restaurant.  Did I understand that

6    right?

7    A.   Yes.  I didn't have time to go over there.  I knew this was

8    going to take a lot of time and I didn't have time to go over

9    there and sit down and go through all this.

10   Q.   At that point in time, had you spoken to Tristan?

11   A.   Yes.

12   Q.   And Tristan at the time was 14; is that right?

13   A.   He was.

14   Q.   Would you describe him as a mature 14 or immature 14 or

15   just kind of every run-of-the-mill 14-year-old?

16   A.   I would describe him as a run-of-the-mill 14-year-old, more

17   on the -- more on the immature side.

18   Q.   And his friend, George, was 13 at the time?

19   A.   That's right.

20   Q.   And was there a point in time when Tristan and George came

21   to tell you something that night after dinner?

22   A.   Yes.

23   Q.   And when you first spoke to Tristan and George, it was --

24   was it after dinner?

25   A.   Yes.

Jeanne Andlinger - Direct

1   Q.  And tell the jury, please, about your conversation with

2   your son, Tristan, and George after dinner.

3   A.  Okay.  Well, I was standing again because I was waiting for

4   dessert, so I needed to get up.  So Tristan came up to me with

5   George and they were kind of -- they were kind of -- they

6   looked agitated, you know, sort of like bouncing up and down.

7           And Tristan said, Mom, I've got something to tell you.

8           And I said, What?  And he said -- I said, What is it,

9   Tristan?  And he said, Mom, Nikos and Aunt Suzy are an item.  I

10  looked at him and I went, Tristan, what are you talking about?

11  He said, I saw them.  I saw them doing it.

12          No, no.  That was the second time.  The first time he

13  said, Mom, mom, Tristan -- I mean, Nikos and Aunt Suzy, I've

14  got something do tell you.  Nikos and Aunt Suzy are an item.

15  And I said, What are you talking about?  And he said, They were

16  walking up the path arm in arm.

17          I said, Tristan, you know, I mean, that's not an item.

18  They were probably just being polite and looking at the gardens

19  and whatnot.  So he laughed.

20  Q.  Was there a point in time where he approached you again?

21  A.  Yes.

22  Q.  And what time was that relative to when you were trying to

23  get out to leave?

24  A.  It was right as I was trying to get out to leave to round

25  up, you know, to make sure Gery -- it was right when I was

1    leaving, just to make sure I had my purse or mother was going

2    to leave and just standing there by the gate, the garden gate.

3    Q.  Can you tell me what happened during that conversation?

4    A.  Yeah.  So Tristan and George came up to me again and

5    Tristan said, Mom, mom, no, really, I have got something to

6    tell you.  I said, Tristan, what is it?  And he said, They are

7    really an item.  I said, Why do you say that?  And he said, I

8    saw them.  I said, What did you see?  And he said, I saw them

9    doing it.  I said, Woe, wait a minute.  Doing what?  He said, I

10   saw them doing it.

11        And I looked at him like, just in disbelief, like

12   what?  And I said, Did you see a bare bottom?  And he said,

13   Yes.  And then I went, ut-oh, something has really gone wrong.

14        And I looked at Tristan.  I said, Tristan and George,

15   I said -- and poor George, he just kind of is the most shy boy

16   and just standing there staring at me -- I said, Okay, look.

17   We can't -- you can't say a word.  You cannot say a word about

18   this.  I want to know what took place.

19   Q.  At that moment did Tristan tell you whose bare bottom he

20   saw?

21   A.  No.  You know, all I needed to hear was a bare bottom.

22   Q.  Did you say who was on top of who at that point in time?

23   A.  That, I don't recall.

24   Q.  And so when you said -- well, strike that.

25        When Tristan told you what he saw, what was going

1    through your mind?

2    A.   That's a hard one to articulate.

3    Q.   Okay.

4    A.   I knew for sure, now, that's, you know, that's just from my

5    intellect, that my sister --

6            MS. LaBRANCHE:  Objection, calls for speculation.

7            THE COURT:  Overruled to that question.

8            Go ahead.

9    A.   Okay.  I was just --

10   BY MS. ALTMAN:

11   Q.   You can answer the question.

12   A.   I can?

13   Q.   Yes.

14   A.   Okay.  I was in shock.  I was in shock that something has

15   happened.  This was really, really bad.  I just, you know, what

16   was going through my mind was that is Suzy okay?  What has

17   Nikos done?  I wanted to get the story straight.  I was -- you

18   know, the fact that my son saw this of his aunt and somebody

19   who didn't know Nikos Hecht, he didn't know, occupied such a

20   space in my head that I was thinking, oh, my gosh.  What -- you

21   know, Tristan loves Suzy so much and he doesn't get to spend a

22   lot of time around her.  And all I could feel was compassion

23   for Suzy, concerned for Tristan.  I was in no way doubtful that

24   Suzy --

25            MS. LaBRANCHE:  Objection, non-responsive.

1      THE COURT:  Sustained.

2   A.  Okay.  It just -- you know --

3      THE COURT:  Let's have another question here.

4   BY MS. ALTMAN:

5   Q.  Ms. Andlinger, when Tristan told you what had happened, did

6   you think in your mind at that moment that what had happened

7   was consensual?

8   A.  No.

9      MS. LaBRANCHE:  Objection, relevance.

10      THE COURT:  Sustained.  Answer is stricken.

11  A.  No way.

12      THE COURT:  No, don't say that, okay?  Just stop.

13  When I say sustained, you shouldn't answer.  But if you have

14  already answered, I just ask the jury to disregard it.  And

15  when I do that, don't come back and give the answer again,

16  okay?

17      THE WITNESS:  Okay.

18      THE COURT:  I am not blaming you.  You are just a

19  witness, but it's got to be done in a proper way, that's all.

20      THE WITNESS:  Okay.

21      THE COURT:  Okay.  Onwards.

22  BY MS. ALTMAN:

23  Q.  Ms. Andlinger, your son was 14 at the time?

24  A.  Yes.

25  Q.  Were you concerned for your son?

1   A.   Yes.

2   Q.   Were you trying to figure out what to do next?

3   A.   Yes.

4   Q.   So what was the next thing you did?

5   A.   The next thing I did was tell Suzy, We'll talk, but we have

6   to leave.  It was late.  I was really tired.  Suzy and mother

7   and Gery and I were in a van driven by somebody from the hotel.

8   I didn't want to talk about it in the car.

9   Q.   Why?

10   A.   Because I didn't want my mother to hear it.  I didn't want

11   anybody to hear it.  I didn't want my husband to hear it.  I

12   wanted to hear what happened.

13          And so as we left the van, in order to help mother and

14   Gery -- there are a lot of steps to negotiate down to our

15   bungalows, and we were really close.  It wasn't like Suzy and I

16   could walk separately from mother and Gery.  Suzy had mother.

17   I had Gery.  That's how we walked, arm in arm.  And I said --

18   and Suzy and mother's bungalow was first, the first drop-off?

19   So I said, Suzy, I am going to be over here first thing in the

20   morning.  And that's what happened.

21   Q.   Now, when you had those conversations with Tristan, was

22   there any point in time when Tristan told you that your sister

23   had walked up to Mr. Hecht?

24   A.   No.

25   Q.   Was there any point in time where your son told you that

1   your sister had been flirting or hanging around Mr. Hecht?

2   A.   No.

3   Q.   And if I understood your testimony, what your son told you

4   was that Nikos had his arm with your sister's arm through it;

5   is that right?

6   A.   That's right.

7   Q.   That's the way he described it, arm in arm?

8   A.   Yes.

9   Q.   And they were just walking on the path; is that right?

10  A.   That's right.

11  Q.   And both of your conversations with your son, Tristan,

12  occurred after dinner, correct?

13  A.   Correct.

14  Q.   Now, was there any point in time where you discussed with

15  your sister what had happened?

16  A.   That night?

17  Q.   I think you said -- actually, strike that because that was

18  one other question.

19         Did your son, Tristan, ever tell you that he saw your

20  sister Suzanna Dailey perform oral sex on Nikos Hecht?

21  A.   No.

22  Q.   Did your son, Tristan, ever tell you that he saw Suzanna

23  Dailey kissing Mr. Hecht?

24  A.   No.

25  Q.   Did Tristan ever tell you that he saw Suzanna Dailey taking

1   Mr. Hecht's pants off?

2   *A.*   No.

3   *Q.*   So you mentioned that the next morning you were going to

4   speak to your sister; is that right?

5   *A.*   Yes.

6   *Q.*   Did you do that?

7   *A.*   Yes, I did.

8   *Q.*   Where did that happen?

9   *A.*   In her bungalow.

10  *Q.*   Can you describe for the jury that conversation?

11  *A.*   Well, to the best of my ability, which is I went over to

12  her bungalow and we went into the living room.  It was like a

13  suite, two bedrooms and a suite.  And we sat down and I said,

14  you know, Tell me what happened.  What's going on?

15          And she told me what had happened.

16  *Q.*   What did she tell you?

17  *A.*   She told me that Nikos had sexually assaulted her and that

18  he pulled her pants down -- first he kissed her, you know.  I

19  wanted do hear her whole story.  First he put his hands on the

20  back of her neck and pushed her to him.  He laid a kiss on her.

21  He pulled her down.  He put her hand on his penis.  He pulled

22  her pants down and he sexually assaulted her.

23  *Q.*   What was your sister's demeanor like when she was

24  describing to you what had happened?

25  *A.*   Her demeanor?

1  *Q.*  Yes.

2  *A.*  You know, the way I could describe it is that -- oh, how

3  would I describe it?  She was deflated, just deflated.  She is

4  a strong person and she can really take things head-on and, you

5  know, she was just overcome with her own emotions.

6  *Q.*  What was your reaction when your sister told you that

7  story?

8          *MS. LaBRANCHE:*  Objection, relevance.

9          *THE COURT:*  You are too fast for me.  What did you

10  say?

11          *MS. LaBRANCHE:*  I apologize, Your Honor.  I said

12  objection, relevance.

13          *THE COURT:*  Sustained.

14  *BY MS. ALTMAN:*

15  *Q.*  Did you say anything to your sister when she told you that?

16  *A.*  Yes.  I said, Suzy, what are we going to do?  What can we

17  do about this?  Mother is here.  Gery is here.  Tristan is

18  here.  Everybody is here.  And she said -- she said, I've got

19  to -- I've got to think about this.  And I said, I'll be here

20  for you and I'll do whatever you want to do.

21  *Q.*  Now, if Suzanna, your sister, had wanted to go to the

22  authorities, would you have done that?

23  *A.*  Absolutely, absolutely.

24  *Q.*  And if she wanted to leave the next day, could you have

25  made that happen?

1   *A.*  I could have made that happen, absolutely.  Whatever she

2   wanted to do I would be willing to do.

3   *Q.*  Did she tell you what she wanted to do?

4   *A.*  She told me she needs to give this a lot of consideration

5   because mother is there and, you know, it was obvious.  It was

6   obvious.  It was obvious that this is a situation that, you

7   know, everybody was there on a vacation and -- you know,

8   besides that, the vacation thing, my mother and my husband were

9   there.  It was really disgusting to put them -- it would have

10  been really disgusting to put them through this.

11  *Q.*  And when you say to put them through this, what do you

12  mean?

13  *A.*  To go to the police, to have police come to the hotel, to

14  investigate everybody that was at the dinner, to pull everybody

15  into this.

16  *Q.*  Were you concerned about Tristan?

17  *A.*  Yes, I was.

18  *Q.*  Were you concerned about George?

19  *A.*  Yes, I was, and still am, yeah.

20  *Q.*  That day, the day after the rape, which I guess would have

21  been a Wednesday since Tuesday was fried chicken Tuesday,

22  right?  The next day would be Wednesday?

23  *A.*  Yes.

24  *Q.*  Did your mother fall ill that day?

25  *A.*  Yes, she did.

Jeanne Andlinger - Direct

1   *Q.   Can you describe for the jury what happened that day?*

2   *A.   Mother has a really bad bronchial issue and she also has a*

3   really bad GI issue.  And she just got really sick.  And when

4   she gets sick like that, she can't get out of bed or she can,

5   but she is nauseous.  She is coughing a lot.  She stays in bed.

6          And we called the doctor.  We called the doctor that

7   was outside of the hotel to come over.

8   *Q.   And did he do that?*

9   *A.   Yes, he did.*

10  *Q.   And what happened?*

11  *A.   Well, they brought a nebulizer over.  And the focus was on*

12  mother at that point.

13  *Q.   Was Suzy looking after your mother?*

14  *A.   Yes, she was.*

15  *Q.   And how long was your mother sick?*

16  *A.   You know, she is very stoic, so she stayed in bed a couple*

17  days until we were to leave on Saturday.

18  *Q.   So she fell ill on Wednesday, and your mother was feeling*

19  ill between Wednesday and Saturday; is that correct?

20  *A.   Yes.*

21  *Q.   Who cared for her during that period of time?*

22  *A.   Suzy.*

23  *Q.   When your sister told you what had happened, did you*

24  believe her?

25  *A.   Yes, absolutely.*

1   Q.  Was there any point in time where you thought your sister

2   was lying?

3   A.  No.

4   Q.  If your sister had told you when she said to you, I have

5   something to tell you, and she came home that night and told

6   you she had had consensual sex, would you have disowned her?

7          MS. LaBRANCHE:  Objection, calls for speculation.

8          THE COURT:  Sustained.

9   BY MS. ALTMAN:

10  Q.  If your sister had a consensual encounter, do you believe

11  she would have told you?

12         MS. LaBRANCHE:  Objection, speculation, relevance.

13         THE COURT:  Sustained.

14  BY MS. ALTMAN:

15  Q.  Ms. Andlinger, during your -- you said you are younger than

16  Suzy; is that right?

17  A.  Yes.

18  Q.  She is 68?

19  A.  Yes.

20  Q.  So I am not going to ask you your age, but during your life

21  together, has Suzy told you good things she has done and bad

22  things she has done?

23  A.  You know, unless it's something I don't know, Suzy shares

24  most everything with me.

25  Q.  Has she talked to you over the years about relationships

 1  that she has had with men?

 2  *A.*  No.  I mean, yes, somewhat.  I don't go into detail about

 3  her personal -- her super personal life or her sexual life.

 4  *Q.*  Do you think there would be any reason why she wouldn't

 5  share that with you?

 6      *MS. LaBRANCHE:*  Objection, relevance, calls for

 7  speculation.

 8      *THE COURT:*  Sustained.

 9      *MS. ALTMAN:*  Go ahead.

10      *MS. LaBRANCHE:*  Objection.

11      *MS. ALTMAN:*  Wait.  I am going to ask you another

12  question.

13  *BY MS. ALTMAN:*

14  *Q.*  Do you have a close relationship with your sister?

15  *A.*  Yes, I do.

16  *Q.*  Do you talk about everything?

17  *A.*  I would think so.

18  *Q.*  And in connection with that, is there anything that your

19  sister could tell you?

20      *THE COURT:*  Is that the question?

21      *MS. ALTMAN:*  No, it's not, but I was just --

22      *MS. LaBRANCHE:*  I can already tell it's going to be

23  objection, speculation.

24  *BY MS. ALTMAN:*

25  *Q.*  Now I am going to change the question about that.

Jeanne Andlinger - Direct

1          Ms. Andlinger, if Ms. Dailey had a consensual sexual

2    encounter with Mr. Hecht, based upon what you -- if you had

3    believed that, would you have disowned your sister?

4    *A.*  No.

5    *Q.*  What is more upsetting to you?  Would it have been more

6    upsetting for you for your sister to have had a consensual

7    sexual encounter or a rape?

8               *MS. LaBRANCHE:*  Objection, relevance.

9               *THE COURT:*  Sustained.

10   *BY MS. ALTMAN:*

11   *Q.*  Has what your sister told you been traumatic for you?

12              *MS. LaBRANCHE:*  Objection, relevance.

13              *THE COURT:*  Sustained.

14   *BY MS. ALTMAN:*

15   *Q.*  Ms. Andlinger, has Tristan's witnessing of what transpired

16   that night been painful for you and your husband?

17              *MS. LaBRANCHE:*  Objection, relevance.

18              *THE COURT:*  Sustained.

19   *BY MS. ALTMAN:*

20   *Q.*  After you spoke to Suzy that morning, did you have a

21   discussion with Laura Kaplan?

22   *A.*  Yes, I did.

23   *Q.*  When was that?

24   *A.*  Laura came over to my bungalow early in the morning to tell

25   me -- I mean, she asked me to come outside and we sat outside

1   on a bench.  And she said, I heard something that took place

2   last night.  Is it true?  And I said to her, Look, all I know

3   is something that Tristan told me, but I haven't talked to Suzy

4   yet, so I don't know.

5   Q.  Did you talk to Laura Kaplan after you spoke to Suzy?

6   A.  A little bit.

7   Q.  Did you describe to Ms. Kaplan what Suzy had told you?

8   A.  Yes.

9   Q.  Did you describe it in the same way that you described it

10  for the jury here today?

11  A.  Yes.

12  Q.  Can you tell the jury, as best you recall, what you said to

13  Laura Kaplan?  And was that on that Wednesday right after the

14  rape?

15  A.  Yes.

16  Q.  What did you tell Ms. Kaplan?

17  A.  So after I spoke with Suzy, I spoke with Laura, then she

18  left and I went over to speak with Suzy.  And then I went out

19  to the pool area and there was -- it's a huge grassy area with

20  lots of chaises and stuff.  Laura was already out there.  And

21  so it was kind of in the vein of, Oh, tell me what happened,

22  because at that point I knew the seriousness of what had

23  happened.

24          So I told Laura that Nikos attacked Suzy and that he

25  raped her, but I told her he -- you know, I told her that he

1   had put her hands on his penis and forced himself on her.  And,

2   you know, we didn't talk about it from that point on, Laura and

3   I didn't.

4   Q.  Was there any point in your conversation with Ms. Kaplan

5   where you suggested it was consensual?

6   A.  No, no.

7   Q.  Over the course of the next few days before you left Cabo,

8   did you have occasion to speak to your sister on Wednesday,

9   Thursday, Friday and Saturday before you left?

10  A.  Yes, I did.

11  Q.  Did you discuss this subject at all at any point in time?

12  A.  Not over and over and over and over again because, you

13  know, I wanted Suzy to make her own decision about what she

14  wanted to do about this.  I wasn't going to be -- I didn't want

15  to take responsibility for talking her into going to the

16  police.  This is -- this is a matter of she is a mature woman

17  that can make her decisions based on herself, but I know that

18  everything is always with my mother in consideration.

19  Q.  Is that true for you as well?

20  A.  Yes, it is, but it seems that Suzy has a -- I have a close

21  relationship with mother.  I love my mother.  But Suzy, you

22  know, she doesn't have any children, and I have often thought,

23  oh, mother is like her child.  She really does take -- she

24  really does take responsibility for being the sole nurturer for

25  mother, so it does make me feel better because I don't live in

Jeanne Andlinger - Direct

1   the same town.

2   *Q.*  Have you ever had a conversation with Allison Hecht about

3   what happened in Cabo?

4   *A.*  No.

5   *Q.*  Have you ever called Allison Hecht?

6   *A.*  No, I haven't.

7   *Q.*  Have you ever apologized to Allison Hecht?

8   *A.*  No, never.

9   *Q.*  Was there ever a point in time where you spoke to Andy

10  Hecht?

11  *A.*  Yes.

12  *Q.*  When was that?

13  *A.*  When I got back from Cabo, the week that I returned from

14  Cabo.

15  *Q.*  And Andy Hecht is Nikos Hecht's father?

16  *A.*  Yes, he is.

17  *Q.*  Did you make an appointment with Mr. Andy Hecht?

18  *A.*  I did.

19  *Q.*  Why?

20  *A.*  I was really angry.  I was angry and I wanted to let him

21  know.

22  *Q.*  During your meeting with Mr. Hecht, did you tell him that

23  his son, Nikos Hecht, assaulted Ms. Dailey?

24  *A.*  Yes, I did.

25  *Q.*  Was that difficult for you to tell a parent, that their son

 1  had assaulted your sister?

 2          *MS. LaBRANCHE:*  Objection, relevance.

 3          *THE COURT:*  Overruled.

 4  *A.*  Can I answer that?

 5  *BY MS. ALTMAN:*

 6  *Q.*  Yes, ma'am.

 7  *A.*  Oh, yes.  Okay.  Yes, it was very difficult.  It was very

 8  difficult to tell him that his son had these sexual, you know,

 9  these sexual difficulties.  It was very difficult to have to

10  tell a father that his son was -- something wasn't right with

11  him.  That's difficult.

12  *Q.*  And how long from when you returned from Cabo until you had

13  that meeting with Mr. Andy Hecht?

14  *A.*  It was that -- I can't be specific, but it was like

15  definitely within that week and a half after I returned.

16  *Q.*  So if you returned on a Saturday, it would have been within

17  a week and a half of that Saturday?

18  *A.*  It was either on that Friday or maybe on the Monday.

19  *Q.*  Ms. Andlinger, I know this happened now more than three

20  years ago, but is there anything about your testimony that you

21  believe is not fully accurate?

22  *A.*  No.

23  *Q.*  As you sit here today, would it be worse -- would it be

24  worse for you to think your sister was raped --

25          *MS. LaBRANCHE:*  Objection, relevance.

1      THE COURT:  Yes, let's get off that topic.  Sustained.

2  And it's about noon, if this would be a convenient time to

3  break.

4      MS. ALTMAN:  If you would like, that's fine, Your

5  Honor.

6      THE COURT:  No.  If you are just about to wrap up,

7  that's fine, too.

8      MS. ALTMAN:  Well, I do have a few more questions, so

9  I will leave it to the Court.

10     THE COURT:  All right.  Let's stop and take our lunch

11  recess.

12         Ladies and gentlemen of the jury, how much time would

13  you like today?

14         THE JURY:  An hour.

15         THE COURT:  An hour, 1:00 o'clock.  You got it.

16         (Jury excused.)

17         THE COURT:  Okay, 1:00 o'clock.

18     (Recess at 12:00 p.m.)

19     (Reconvened at 1:04 p.m.)

20         (Jury present.)

21         THE COURT:  Just so everybody knows, I have been

22  informed this courtroom is approximately 40 feet wide and

23  65 feet long, so there you have it, 40 by 65.

24  BY MS. ALTMAN:

25  Q.  Good afternoon, Ms. Andlinger.  I just have a couple more

Jeanne Andlinger - Direct

1   questions.

2           Is your sister different after the rape?

3   *A.*  Yes.

4   *Q.*  Can you describe for the jury how -- the things that you

5   have observed about your sister that are different after the

6   rape?

7   *A.*  Yes.  I used that word deflated once before, and that's how

8   I -- I feel her personality is -- has been compromised and that

9   she just doesn't seem to have the enthusiasm and the

10  spontaneity and the joy and...  You know, for instance, if I

11  ask her to come up to New York to see me, she doesn't want to.

12  She hasn't been up there.  She doesn't want to do anything.

13          I see where she has put weight on.  I see where she

14  doesn't answer her phone like she used to.  I worry about her

15  more.  I see that she is more isolated.  She just -- she pretty

16  much just is on one track and that's -- she is always tired,

17  that's in order to take care of mother.  That's all she is

18  interested in.

19  *Q.*  Ms. Andlinger, why are you here today?

20  *A.*  Pardon me?

21  *Q.*  Why are you here today?

22          *MS. LaBRANCHE:*  Objection, relevance, vague.

23          *THE COURT:*  Why?

24          *MS. ALTMAN:*  Are you asking to repeat the question or

25  why I am asking the question?

Jeanne Andlinger - Cross

1      *THE COURT:*  Yes, why are you asking that?

2      *MS. ALTMAN:*  I want the jury to know why Ms. Andlinger

3   flew from New York City to testify in this hearing.

4      *THE COURT:*  Isn't that pretty obvious?

5      Sustained.

6      *MS. ALTMAN:*  I have no further questions.  Thank you.

7      *THE WITNESS:*  Thank you.

8      *THE COURT:*  All right.  Cross-examination.

9                      **CROSS-EXAMINATION**

10  BY MS. LaBRANCHE:

11  *Q.*  Hello, Ms. Andlinger.

12  *A.*  Hello.

13  *Q.*  My name is Ms. LaBranche.

14      And we have met before, haven't we?

15  *A.*  Yes, we have.

16  *Q.*  We met at your deposition and when I took your husband's

17  deposition, Gery, correct?

18  *A.*  That's right.

19  *Q.*  I wanted to start by asking you, and I just want to be

20  clear, you don't have any idea when it is that Mr. Hecht and

21  Ms. Dailey walked down that path, correct?

22  *A.*  Do I have any idea when they walked down there?

23  *Q.*  Yes.

24  *A.*  No, because I didn't see them.

25  *Q.*  Right.  You didn't see them at all that night at Flora

Jeanne Andlinger - Cross

1  Farms interacting with each other.

2  A.  Not interacting with each other, no.

3  Q.  And so you don't have any personal knowledge about when

4  they went down that path, correct?

5  A.  That's correct.

6  Q.  You don't have any personal knowledge about where they went

7  on that path, correct?

8  A.  Well, not at the time.  I found out later.

9  Q.  Because you heard from other people, but you don't have any

10  personal knowledge yourself.

11  A.  Well, I do, because I heard it from my sister and my son.

12  That's -- I trust what they say.

13  Q.  Okay.  And that's obvious, you do.  You trust what your

14  sister has told you and you believe her, correct?

15  A.  Absolutely.

16  Q.  Because you love your sister.

17  A.  Yes, I do.

18  Q.  And you want to support her.

19  A.  Yeah, but that doesn't mean I believe everything she says.

20  Q.  You did not see Mr. Hecht and Ms. Dailey, you didn't see

21  their encounter on that path that night, correct?

22  A.  I did not see the encounter, no.

23  Q.  So all you know is what your sister, Ms. Dailey, told you

24  and what your son, Tristan Andlinger, told you?

25  A.  That's right.

Jeanne Andlinger - Cross

1    Q.  You arrived at Flora Farms at about 5:30 or 6:00 that

2    night?

3    A.  6:00, 6:30.

4    Q.  6:00, 6:30?  You said you were about the last people to

5    arrive?

6    A.  Yes.

7    Q.  It was about 45 minutes from when you arrived until dinner

8    was served, correct?

9    A.  Thereabouts.

10   Q.  During that 45 minutes, one of the things you did is you

11   went over to this pop-up jewelry store that was kind of like on

12   the premises.

13   A.  Yes.

14   Q.  And while you were over there, you saw your sister,

15   Ms. Dailey?

16   A.  Yes.

17   Q.  And then the next time you saw her was when she was sitting

18   at the dinner table, correct?

19   A.  Yes.

20   Q.  And at that point in time the sun was going down?

21   A.  Yes, it was.

22   Q.  And dinner was being served?

23   A.  Yes.

24   Q.  You described the atmosphere at dinner as everyone being

25   happy and being engaged, correct?

Jeanne Andlinger - Cross

1   A.  Yes.

2   Q.  And when you saw Ms. Dailey at the dinner table, she was

3   the same as everyone else, correct?

4   A.  Yes.

5   Q.  She was polite?

6   A.  Yes.

7   Q.  She was conversational?

8   A.  Yes.

9   Q.  She didn't appear ruffled?

10  A.  That's right.

11  Q.  Didn't appear upset?

12  A.  No.

13  Q.  Didn't appear to you to be physically harmed?

14  A.  I am sorry?

15  Q.  Didn't appear to you to be physically harmed?

16  A.  No.  At the time that we were having dinner?

17  Q.  Yes.

18  A.  No.

19  Q.  Her clothes weren't stained with any grass or any dirt?

20  A.  No.

21  Q.  Now, you talked about a conversation that you had with

22  Ms. Dailey towards the end of dinner.  Do you remember that?

23  A.  Yes.

24  Q.  And you testified that she told you, I have something to

25  tell you.

1   A.   That's the end of dessert because there is the end of

2   dinner and then there is the end of dessert.

3   Q.   Okay.  So she told you that --

4   A.   Because I got up after dinner.  I got up from the table

5   after dinner.

6   Q.   And so --

7   A.   Because I was waiting for dessert.

8   Q.   So you are saying that when she told you, I have something

9   to tell you, that was at the end of dinner.

10  A.   That was at the end of dessert.

11  Q.   And you guys were sitting at the picnic table, correct?

12  A.   No.  I was standing at the -- at the garden gate, at the

13  half gate leading to the outside as we were thinking about

14  going to the parking lot.

15         MS. LaBRANCHE:  And Your Honor, if I may have my

16  technician pull up Page 103 of the deposition transcript.

17         THE COURT:  Sure.

18         MS. LaBRANCHE:  Actually, I think the bottom of 103

19  going on to 104, if that's possible.

20  BY MS. LaBRANCHE:

21  Q.   Ms. Dailey, I want to ask you, you previously testified in

22  a deposition in this case, correct?

23  A.   Yes.

24  Q.   And in that deposition I put that up in front of you to see

25  if maybe I could refresh your recollection.

Jeanne Andlinger - Cross

1   A.   Okay.

2   Q.   You were asked some questions about whether Ms. Dailey

3   appeared physically harmed in any way, and you said that at the

4   end of dinner, when we were all getting ready to leave, she

5   looked up at me very seriously and said, I have something to

6   tell you.

7        Is that correct?

8   A.   Yes, but that isn't correct today because -- because it

9   wasn't at the end of dinner.

10  Q.   So now you are saying it was at the end of dessert?

11  A.   Well, yeah, because I got up after dinner because it was

12  taking some time for the dessert to come in.  And that's when

13  my son came up to me for the first time and said, Mom, I've got

14  something to tell you.

15  Q.   Well, let's talk about that because you have this

16  conversation with your son, Tristan, and there is actually two

17  conversations that night, correct?

18  A.   Correct.

19  Q.   So the first one is before dessert is served, correct?

20  A.   After dinner, yeah.

21  Q.   But before dessert is served?

22  A.   Correct.

23  Q.   And he comes up to you and he says, Mom, I have something

24  to tell you, right?

25  A.   Yes.

Jeanne Andlinger - Cross

1  Q.  And what he tells you is that he saw Aunt Suzy and Nikos

2  Hecht walking down the path together; is that right?

3  A.  Yes.

4  Q.  And what he described to you was that Aunt Suzy and Nikos

5  were an item, right?

6  A.  Yes.

7  Q.  That's the word he used, an item.

8  A.  An item.

9  Q.  And you told him, No, they were just going to look at the

10  garden together, correct?

11  A.  Yes.

12  Q.  And he said to you, No, no.  And then he laughed.

13  A.  No, he didn't say, No, no.  I mean, he could have -- I

14  mean, you know, he wasn't trying to disagree with me, but, you

15  know, he said, I saw Aunt Suzy and Nikos walking arm and arm.

16  They are an item.  I said, Tristan, settle down.  You know,

17  they are just taking a walk.  They are not an item.

18  Q.  And he said, No, and started laughing, correct?

19  A.  Well, he ran off.  He ran off.  I mean, I don't know.  I

20  can't say that he said no then.  All I can say is he ran off

21  after that.  He didn't go into any further discussion after

22  that.

23       MS. LaBRANCHE:  May I pull up Page 116 of

24  Ms. Andlinger's deposition?

25       THE COURT:  Yes, of course.

Jeanne Andlinger - Cross

 1  *BY MS. LaBRANCHE:*

 2  *Q.*  Ms. Andlinger, if you can take a moment to read that, I am

 3  really looking at that bottom line there.

 4  *A.*  Okay.

 5  *Q.*  Does that refresh your recollection about what you

 6  testified to previously?

 7  *A.*  Yes.

 8  *Q.*  That Tristan had said, No, no, and then laughed.

 9  *A.*  Yes.

10  *Q.*  But I want to back up because I want to talk to you

11  about -- let me finish with Tristan.  So you then had a second

12  conversation with Tristan, correct?

13  *A.*  Yes.

14  *Q.*  And that was after dessert?

15  *A.*  Yes, it was.

16  *Q.*  So the first one was before.  The second time was after?

17  *A.*  Yes.  Sorry.

18  *Q.*  And during that second conversation, Tristan told you,

19  Nikos and Aunt Suzy were doing it.

20  *A.*  Well, he didn't come up to me and say that initially.  I

21  kind of had to get it out of him, what was happening.

22  *Q.*  That was the terminology he used is that they were doing

23  it, right?

24  *A.*  Yes.

25  *Q.*  And so when Tristan came up to you on both of those

1  occasions, he didn't come up and say, Aunt Suzy is being raped,

2  correct?

3  A.  He wouldn't know that word.

4  Q.  And he didn't come up and say, Aunt Suzy is being

5  assaulted.

6  A.  He wouldn't that know word.

7  Q.  And he didn't come up and say, Mr. Hecht was being

8  physically violent with Aunt Suzy.

9  A.  No, because he was confused.

10  Q.  And he didn't come running to you while this was going on

11  and say to you, Mom, hurry, hurry.  You've got to come back and

12  see what's going on, see what Nikos is doing to Aunt Suzy.

13       He didn't do that at all.

14  A.  No.  It's not something he -- he was stunned.

15  Q.  Just answer the question, Ms. Dailey.  Did he say that?

16  A.  Now, say that again.

17  Q.  He didn't come and run and get you and say, Mom, mom, come

18  quick.  Nikos is hurting Aunt Suzy.

19  A.  No, no, because he was confused.

20  Q.  Okay.  Now, you talked about one conversation that you had

21  with Ms. Dailey at Flora Farms, but there is also a second

22  conversation that you had with her that night, correct?

23  A.  Conversation, no.

24  Q.  A brief verbal exchange?

25  A.  A brief verbal exchange, yes.

1  *Q.*  Okay.  And that was -- so you and Ms. Dailey were both

2  staying at these villas in a place called, and I always do

3  this, Las Ventanas; is that right?

4  *A.*  That's right.

5  *Q.*  You were staying in one of the villas with your husband and

6  Tristan and George, correct?

7  *A.*  Yes.

8  *Q.*  And Ms. Dailey was staying in another one with -- it was

9  just her and your mother?

10  *A.*  Yes.

11  *Q.*  And you guys were staying only like two or 300 feet apart

12  from each other; is that right?

13  *A.*  That's right.

14  *Q.*  And so after dinner at Flora Farms when you all got up and

15  left, you rode back, you, your husband, Ms. Dailey and your

16  mom, all rode back in the same car to together?

17  *A.*  Yes.

18  *Q.*  And you were talking -- when you testified earlier, you

19  were talking about how the four of you were kind of walking two

20  and two towards the villas when you arrived?

21  *A.*  Yes.

22  *Q.*  And I know that you thought you were maybe walking with

23  your husband and Ms. Dailey was walking with your mom.

24  *A.*  Yes.

25  *Q.*  But is it possible, thinking back on the deposition that

1  you gave, that it may have been you and Ms. Dailey together and

2  your mom and your husband up front?

3  A.  That wouldn't -- that could have been for a couple of

4  steps, but it wouldn't have been for the entire walk because I

5  always walk next to my husband whenever there are steps or a

6  hill or anything like that.

7  Q.  Okay.  But for a few steps you and Ms. Dailey were walking

8  together and that's when you had that verbal exchange, correct?

9  A.  Yes.

10  Q.  And during that verbal exchange, she said to you, I have

11  something to tell you.

12  A.  No, it wasn't at that time.

13       MS. LaBRANCHE:  If I could go ahead and pull up

14  Page 115.

15  BY MS. LaBRANCHE:

16  Q.  I want to show you your transcript and, first of all, see

17  if that perhaps refreshes your recollection on that

18  conversation.

19  A.  Which number so I don't have to read the whole thing?  I am

20  a slow reader.

21  Q.  Absolutely.  If you want to go from like Line 7 until

22  Line 19.

23  A.  Okay.

24  Q.  I don't know if it helps for him to highlight or it makes

25  it worse, but we can highlight it, if you'd like.

Jeanne Andlinger - Cross

1    A.  Okay.  Yeah, I recall that.

2    Q.  Let me just walk you through that.

3         So you and Ms. Dailey are back at the villas and you

4    are walking next to each other, correct?

5    A.  Well, yes.

6    Q.  For the brief verbal exchange.

7    A.  Okay.

8    Q.  And she says to you again, I have something to tell you,

9    correct?

10   A.  Yes.

11   Q.  And you said, I already know, right?

12   A.  That's right.

13   Q.  That's what you said to her that night is, I already know.

14   A.  Yes.

15   Q.  Because you did know because you had these conversations

16   with Tristan.

17   A.  That's correct.

18   Q.  Now, you did not go to talk to Ms. Dailey that night,

19   correct?

20   A.  I did not go --

21   Q.  To her villa to talk to her.

22   A.  No, I didn't.

23   Q.  And you said you needed time to process the information?

24   A.  Yes, that's correct.

25   Q.  And that you were confused; is that right?

Jeanne Andlinger - Cross

1  A.  Not confused.  I was, you know, dumbfounded.  I wasn't

2  confused.

3  Q.  Well, let me pull up Page 125.

4  A.  Well, I might have said it then, but, you know, I was

5  shocked.

6  Q.  Actually, 125 from 17 to 25 and 126 from 1 to 5 -- or 1 to

7  3, actually.

8  A.  Okay, confused.

9  Q.  And I understand this was three and a half years ago that

10  all this took place, right?

11  A.  That's right.

12  Q.  Ms. Altman asked you that.  And this deposition was

13  September of 2016, right?

14  A.  That's right.

15  Q.  So it's a little bit closer in time to when everything

16  happened, correct?

17  A.  Yes.

18  Q.  Details were probably a little fresher in your mind.

19  A.  No.

20  Q.  Well, usually when the longer things have been in the past,

21  the more forgetful we become.

22  A.  Not me.

23  Q.  You remember things better later on?

24  A.  I have a mind like a steel trap.

25  Q.  Well, in this particular instance when I was asking you

1  about why you didn't talk to Ms. Dailey that night, one of the

2  reasons did end up being that you were confused, right?

3  *A.*  Yes.

4  *Q.*  And you were tired?

5  *A.*  Yes.

6  *Q.*  And you had been surfing all day?

7  *A.*  Yes.

8  *Q.*  And you just didn't want to get into the details that

9  night.

10  *A.*  It wasn't about me.  It was about giving Suzy some room to

11  handle this.  I was not going to address her and push her into

12  a corner to explain to me what happened to her.

13  *Q.*  And you also said you needed to hear the whole story --

14  *A.*  That's right.

15  *Q.*  -- from Ms. Dailey, correct?

16  *A.*  Yes.

17  *Q.*  And so you ended up talking to her the next morning, yes?

18  *A.*  Yes.

19  *Q.*  And I know that you testified earlier today, you said you

20  went over to her condo or her villa and talked to her there; is

21  that correct?

22  *A.*  Yes.

23  *Q.*  Do you remember when you testified at your deposition in

24  this case talking about how the first time you two spoke about

25  it was out at the pool the next day?

Jeanne Andlinger - Cross

1    A.   Yes, I remember that.  And I regret saying that because I

2    did speak to her a little more at the pool, but not in detail,

3    just basically saying, Are you okay, and stuff like, I just

4    can't believe this is happening, as simple as that.

5    Q.   And Ms. Andlinger, what you are actually asked during the

6    deposition that we took was:

7            So tell me what happened the next morning.

8            And your response was:  So I got up and I went out to

9    the pool, and lots of seating around the pool, and Suzy came

10   out, and I said, Okay.  Tell me what happened.

11   A.   Well, I was mistaken.

12   Q.   You were mistaken, then?

13   A.   I mean, I went to the villa before I went to the pool to

14   hear the whole story.  I am not going to listen to her whole

15   story out by a pool.

16   Q.   But that's -- but this is what you testified to when you

17   were in your deposition, correct?

18   A.   Yeah.

19   Q.   After you had that conversation with Ms. Dailey, you all

20   didn't cut your vacation early, correct?

21   A.   No, we didn't.

22   Q.   You all spent another five days down there?

23   A.   Well, Wednesday, Thursday, Friday, Saturday, four days.

24   Q.   You surfed?

25   A.   I didn't surf after that, no.

Jeanne Andlinger - Cross

1    *Q.*  Went to the beach?

2    *A.*  No, I didn't go to the beach either.

3    *Q.*  You just stayed --

4    *A.*  You can't swim there.  You can go to the beach, but you

5    can't swim there because of the undertow, so, you know, that

6    Wednesday was -- was a total wash.

7    *Q.*  That was because of the issues you had with your mom,

8    correct?

9    *A.*  Yeah.

10   *Q.*  Your mom had some medical issues?

11   *A.*  Yes.

12   *Q.*  Now, Ms. Altman asked you -- well, let me back up.

13        We already established that you didn't actually see

14   what happened on the pathway, right?

15   *A.*  Right.

16   *Q.*  But your sister told you the next morning.

17   *A.*  Yes.

18   *Q.*  And you testified that when she told you the next morning,

19   she told you that she had been raped; is that right?

20   *A.*  Yes.

21   *Q.*  And that she had been sexually assaulted, correct?

22   *A.*  That's right.

23   *Q.*  And then Ms. Altman asked you about other people that you

24   talked to about what Ms. Dailey had told you.  Do you remember

25   that?

Jeanne Andlinger - Cross

1   *A.*   That's right.

2   *Q.*   And so one of the other people that you talked to the next

3   day was Laura Kaplan, correct?

4   *A.*   Yes.

5   *Q.*   And Laura Kaplan is a close friend of yours, correct?

6   *A.*   Yes.

7   *Q.*   You guys have been friends for quite a while?

8   *A.*   For a long time, yes.

9   *Q.*   And you previously described you two have a very open,

10  close relationship, correct?

11  *A.*   We -- we raised our boys together.  We don't share a lot

12  of -- like we wouldn't share family situations together.  We

13  have never shared any marital situations together.

14  *Q.*   But you shared this with her the next day?

15  *A.*   Yeah.  It was -- it was concerning -- this is a lot

16  different than asking -- than expecting to share something

17  about somebody's life about their marital status and, you know,

18  all that stuff.

19  *Q.*   Okay.  But you did talk to Ms. Kaplan the next day,

20  correct?

21  *A.*   Yes.

22  *Q.*   And you told her -- you testified that you told her what

23  Suzy had told you.

24  *A.*   Yes.  No, no, no, I didn't, because I spoke with Laura

25  before I had spoken to Suzy.  Laura came over to my bungalow in

1   the morning, early in the morning, and we sat outside on a

2   bench outside my bungalow.  She came to me and said, I heard

3   something happened last night to Suzy.  I said, What are you

4   talking about?  She said, Well, the boys were talking about it

5   in the van, because my son had gone home with them in the van.

6   And I said, Yes, something happened.  I've got to go over and

7   talk to Suzy.

8   Q.   Okay.  But you then eventually, after you talked to

9   Ms. Dailey, you did talk to Ms. Kaplan and tell her what --

10  A.   Yes.

11  Q.   -- Ms. Dailey had told you?

12  A.   Yes, that's right.

13  Q.   You previously testified that you told her that Nikos

14  sexually assaulted Ms. Dailey, correct?

15  A.   Yes.

16  Q.   And that's what you are telling us today is that's what you

17  had told her?

18  A.   Yes, that is.

19  Q.   And that --

20  A.   Well, I put it a little more graphic because she wanted to

21  know.

22  Q.   And you also told Ms. Kaplan that Nikos raped Ms. Dailey,

23  correct?  That's your testimony?

24  A.   I said he sexually assaulted Suzy.

25  Q.   But you also said in your deposition that you told her

1   raped, correct?

2   A.   Right.

3   Q.   Then you testified when Ms. Altman was asking you questions

4   about a conversation you had with Andy Hecht after you came

5   back to Aspen.  Do you remember that?

6   A.   Yes.

7   Q.   And you said that you went to go see Andy Hecht at his

8   office.

9   A.   I did.

10  Q.   And that you told him that Nikos had sexually assaulted

11  your sister, correct?

12  A.   Yes, I did.

13  Q.   But that's not really what you told him, is it?

14  A.   Oh, yes, it is.

15  Q.   Didn't you actually tell him that Ms. Dailey and Mr. Hecht

16  had both shown poor judgment that night?

17  A.   No, no, because I went over there as a segue --

18  Q.   Ms. Andlinger, the answer is yes or no.  Did you say that

19  or not?

20  A.   What was that?

21  Q.   The answer was isn't it true that what you told him was

22  Ms. Dailey and Nikos had both shown poor judgment?

23  A.   No, I did not say that to him, absolutely not.

24  Q.   So Ms. Altman also asked you about whether you had any

25  conversations with Allison Hecht when you got back from Cabo.

Jeanne Andlinger - Cross

1   Do you remember that?

2   *A.* I have never -- no, I did not have a conversation with

3   Allison.

4   *Q.* Isn't it a fact that after you got back from Cabo, you

5   actually called Allison Hecht and apologized for your sister

6   having an affair with Nikos at Flora Farms?

7   *A.* No.  I don't have her number on my phone.  You can check my

8   phone.  I have never talked to Allison on the phone.  There

9   would be no reason why.  I have never socialized with her.

10  *Q.* So your answer is no, you never made that call.

11  *A.* No, I never made that call.

12  *Q.* You never had that conversation?

13  *A.* Absolutely not.

14        *MS. LaBRANCHE:*  Okay.  Your Honor, may I have just a

15  moment?

16        *THE COURT:*  Yes.

17  *BY MS. LaBRANCHE:*

18  *Q.* Ms. Andlinger, I just have a few more questions.

19        When you got back to the villas and your sister

20  wanted -- said, I have something to tell you, and you said you

21  would talk to her later, right?

22  *A.* Yes.

23  *Q.* And the reason that you said you would talk to her later

24  was because you hadn't gotten any indication from Tristan that

25  Ms. Dailey had been violently assaulted that night, right?

1  *A.*  He wouldn't have known.

2  *Q.*  And you didn't get any indication from Ms. Dailey herself

3  that she had been violently assaulted that night.

4  *A.*  Yes.  Well, I didn't have to talk to her to see that

5  something was wrong.

6  *Q.*  And you didn't actually see anything yourself that led you

7  to believe while you were at Flora Farms that she had been

8  violently assaulted that night.

9  *A.*  As -- what's the question again?

10  *Q.*  You didn't see -- there was nothing that you saw that

11  indicated that she had been violently assaulted that night.

12  *A.*  Oh, yeah, there was.  I mean, I saw her sitting at that

13  picnic table like a stone.

14  *Q.*  And if that's the case, Ms. Andlinger, why didn't you go

15  see her?

16  *A.*  I -- I didn't know what took place.  I knew that she looked

17  clearly upset.  My son -- I was already informed as to what

18  took place.  I am not, like I said before, I am not going to go

19  over to Suzy and have a long discussion and find out what took

20  place.  I had my husband there.  I had my mother there.  I had

21  my son there to figure out where he was going to go and in what

22  car.  And I knew that there would be a time and a place for me

23  to sit down and in depth talk to Suzy and find out what she

24  was -- what she was upset about and what took place.

25  *Q.*  And Ms. Andlinger, my point just is if you really

Jeanne Andlinger - Redirect

1  thought -- if you could tell by looking at your sister that

2  there was something so wrong with her yet you didn't go to the

3  villa that night, right, correct?  You didn't go over to her

4  villa that night, correct?

5  A.  Correct.

6  Q.  You didn't even call her that night, correct?

7  A.  Correct.

8  Q.  You didn't send anyone else to come over and check up on

9  her, correct?

10  A.  Correct.

11           MS. LaBRANCHE:  No more questions.

12           THE COURT:  Redirect.

13                    **REDIRECT EXAMINATION**

14  BY MS. ALTMAN:

15  Q.  Ms. Andlinger --

16  A.  Yes.

17  Q.   -- you heard counsel ask you some questions about whether

18  you spoke to Suzy at the pool or in the room.  Do you recall

19  that?

20  A.  Yes.

21  Q.  Regardless of whether it was in the -- by the pool area or

22  in her room, the testimony that you gave today with respect to

23  what Ms. Dailey told you and what your conversation was, is

24  that accurate?

25  A.  Yes, it is.

Jeanne Andlinger - Redirect

1   Q.  So is it your recollection that that occurred in her room?

2   A.  Yes, it is.

3   Q.  And you testified, if I understood you correctly, that at

4   that time in her room that next morning she described to you

5   precisely what had happened; is that correct?

6   A.  Yes.

7   Q.  And in connection with what counsel was asking you, that

8   testimony is the same that you testified in your deposition,

9   correct?

10          MS. LaBRANCHE:  Objection, vague.

11          THE COURT:  I think you could be a little more

12  specific on that.  Sustained.

13  BY MS. ALTMAN:

14  Q.  Your testimony with respect to what Ms. Dailey told you

15  about the sexual assault by Mr. Hecht of her was the same today

16  as it was in your deposition, correct?

17  A.  Yes, except --

18          MS. LaBRANCHE:  Objection, vague.

19          THE COURT:  I think that's right.  There are a lot of

20  things in the deposition.

21  BY MS. ALTMAN:

22  Q.  Ms. Andlinger --

23  A.  Yes.

24  Q.  -- we spoke earlier about what Ms. Dailey told you about

25  the sexual assault.  Do you recall that?

Jeanne Andlinger - Redirect

1   A.  Yes.

2   Q.  Has your testimony been truthful and accurate here today?

3   A.  Yes, it has.

4   Q.  Now, counsel asked you a few moments ago why you didn't

5   call the room that night, why you didn't go to the room that

6   night.  Do you recall that testimony?

7   A.  Yes, I do.

8   Q.  Can you tell the jury why you didn't call that night and

9   why you didn't go to the room that night.

10  A.  Yes.  I regret not going to the room.  It wasn't because I

11  didn't care about what took place, but I was overwhelmed by the

12  information.  I mean, it was -- it was, as I said before, it

13  just took up a lot of space in my mind thinking how am I going

14  to handle this with my son in relationship -- since he

15  witnessed this and he didn't know whether it was consensual or

16  whether it was --

17         MS. LaBRANCHE:  Objection, Your Honor.  I don't want

18  her to be opining on whether things were consensual or not.

19         THE COURT:  Yeah, let's not talk about what he knew.

20  A.  All right.  Anyway, I was really concerned about my son and

21  what his perception of sex was.  He had never had sex.

22         MS. LaBRANCHE:  Objection, irrelevant.

23         THE COURT:  Overruled, overruled.

24  BY MS. ALTMAN:

25  Q.  You can keep going.

1        THE COURT:  She is explaining her state of mind now.

2   A.  I was very concerned about him.  I was very concerned about

3   Suzy.  Of course, I was, but, you know, she is my oldest

4   sister.  She has -- if she had -- if it had been consensual --

5   Suzy has always admitted her defects of character.  She has

6   always taken responsibility for things that she has done.  And

7   she is, you know, an older woman.  It's not like -- she is her

8   own person.  And if it was consensual, she would have said,

9   Yeah, yeah, I made a mistake.

10       But I'm a very organized person and keeping things in

11  their boxes, and I knew I had a lot on my plate.  And I knew

12  Suzy was going to be okay.  She was going to be okay.  You

13  know, my husband -- I was not going to bring this whole thing

14  out in the open without Suzy's consent.  And I was really -- I

15  thought we've got to really process this because this is

16  serious, serious stuff.  And that's all I can say.

17  BY MS. ALTMAN:

18  Q.  Now, Ms. Andlinger, counsel asked you some questions about

19  you not seeing your sister go up the path with Nikos and

20  essentially, you know, you not being able to account for her

21  whereabouts.

22       But you testified earlier you saw Ms. Dailey at the

23  dinner table having dinner and taking pictures, correct?

24  A.  Yes.

25  Q.  And so there are many times throughout that night at Flora

Jeanne Andlinger - Redirect

1   Farms where you did see your sister, correct?

2   *A.*   Yes.

3   *Q.*   You saw her at the dinner table during dinner, correct?

4   *A.*   Yes, I did.

5   *Q.*   You saw her during dinner taking pictures, correct?

6   *A.*   Yes, I did.

7   *Q.*   You saw her at the jewelry store, correct?

8   *A.*   Yes, I did.

9   *Q.*   She came to the restaurant with you, correct?

10          *MS. LaBRANCHE:*  Objection, leading.

11          *THE COURT:*  It's leading and it's repetitive.  We have

12   heard all this already.

13          *MS. ALTMAN:*  Fair enough, Your Honor.

14   *BY MS. ALTMAN:*

15   *Q.*  Ms. Andlinger, was there any time during the period you saw

16   your sister that you ever saw her talk to Nikos Hecht?

17   *A.*   No.

18   *Q.*  Is there any time where you saw her approach Nikos Hecht?

19   *A.*   No.

20          *MS. ALTMAN:*  Thank you, Your Honor.  No further

21   questions.

22          *THE COURT:*  Any questions from the jury?

23      (At the bench:)

24          *MS. ALTMAN:*  Your Honor, this one is not really

25   comprehensible as a question that could be asked.  It's kind

Jeanne Andlinger - Redirect

1    of --

2            THE COURT:  Pardon me?

3            MS. ALTMAN:  This one, Your Honor, No. 6, is not

4    really comprehensible as a question.  I don't know how you

5    would answer that.

6            MS. LaBRANCHE:  I don't either, to be honest.

7            THE COURT:  Let me take a look.

8            Julie, would you give this question back and ask

9    whomever it is to try to rewrite it.  We can't really

10   understand it.

11           All right.  Question 7.

12           MS. LaBRANCHE:  I think this has been asked and

13   answered.

14           MS. ALTMAN:  It's been asked and answered.

15           THE COURT:  Okay.  I am going to sustain that.

16           Do you have any objection to it?

17           MS. LaBRANCHE:  I do because I think it's prejudicial.

18   In addition, because we have gone over and over it, it's

19   cumulative, and that may have been a question frankly that was

20   written before redirect because I think she just went over it.

21           MS. ALTMAN:  We don't have any objection.

22           THE COURT:  I do agree with you that it's been asked

23   and answered, but if a juror asks a question, to me that means

24   he or she just didn't get the answer.  If that happens -- so

25   overruled.  I can't say I would never sustain one of those, but

Jeanne Andlinger - Redirect

1    I want the jurors to be able to understand.

2              Here is the new No. 6.

3         MS. ALTMAN:  I don't have any problem with that, Your

4    Honor.  It's two questions really.

5         MS. LaBRANCHE:  I mean, again, I think these have been

6    asked and answered, and I am not really sure, I mean, I am not

7    really sure what the bottom part was, what the bottom part

8    still means.

9         THE COURT:  I am going to call it 6A just so we keep a

10   good record here.

11             Is somebody objecting to it?

12        MS. LaBRANCHE:  I am, Your Honor, to the bottom.  I

13   just don't understand what the bottom part means.

14        THE COURT:  Okay.  I think I understand it, what she

15   is saying, so overruled.

16             No. 8?

17        MS. ALTMAN:  I don't think -- that's not what she

18   said, so I am not really sure how to address it.

19        THE COURT:  The question is were the shorts tight when

20   she first met Hecht there.

21        MS. ALTMAN:  This is Jeanne, not Suzy.

22        THE COURT:  Yes, yes, but the question is about Suzy.

23        MS. LaBRANCHE:  I think that's fine, Your Honor.  I

24   think they see where you are going.  You asked a question about

25   that, so I think they are probably looking for clarification.

1         THE COURT:  She is asking this woman whether Suzy's

2    shorts were tight.

3         MS. ALTMAN:  Is that the way you are going to read the

4    question?

5         THE COURT:  Yeah.

6         MS. ALTMAN:  Okay, that's fine, if that's the way you

7    read the question, were her shorts tight.

8         THE COURT:  I am not going to read it as if they were

9    her shorts.  I think she said, her exact words, where she had

10   put on weight, I think is what she said.  There is plenty of

11   evidence in the record that at the time she was a little bit

12   overweight.  Are you objecting or not objecting?

13        MS. ALTMAN:  No.  I said no if that was the question

14   you were going to ask.

15        THE COURT:  Here is No. 9.

16        MS. ALTMAN:  I don't understand.

17        THE COURT:  You don't understand it?

18        MS. ALTMAN:  I am still reading.  Sorry.

19        MS. LaBRANCHE:  Your Honor, I think the danger of

20   asking this question is that it gets into the 403 that the

21   Court already excluded about drugs.  I am concerned if you ask

22   Ms. Andlinger that, she is going to say that it was because she

23   thought he had a drug problem.

24        THE COURT:  I can't predict what her answer is going

25   to be.

1        MS. LaBRANCHE: If the Court is going to ask it, I ask

2    that she be instructed beforehand not to open that door because

3    that's not a question that we asked.

4        THE COURT: If that's what she is going to say, then I

5    will sustain the objection.

6        MS. ALTMAN: I should say I am pretty confident.

7        THE COURT: No. 10 here.

8        MS. LaBRANCHE: So I don't think this -- I don't think

9    this witness can answer this question. I think other witnesses

10   will testify about this, but she has testified she doesn't know

11   exactly where it happened.

12       MS. ALTMAN: Correct, other than what she heard from

13   other sources, from Tristan, her son.

14       THE COURT: It's easy to say was this -- were other --

15   had people told you it happened close to the gate or the other

16   way?

17       MS. LaBRANCHE: That's fine.

18       THE COURT: Here is No. 11.

19       MS. LaBRANCHE: I am fine with that. I mean, I don't

20   think it's relevant at all.

21       MS. ALTMAN: I agree, it's not relevant, but if you

22   want to ask it, Your Honor, we don't object.

23       THE COURT: Okay. Nobody is objecting.

24       MS. ALTMAN: We don't think it's relevant.

25       THE COURT: Neither one of you does, but you are not

Jeanne Andlinger - Redirect

1  objecting.

2          *MS. LaBRANCHE:*  I am not objecting.

3          *THE COURT:*  You are smiling.

4          *MS. LaBRANCHE:*  I am smiling.  Go ahead.

5          *THE COURT:*  If you are going to object, tell me you

6  object.

7          No. 12, maybe that will give you something to object

8  to.

9          *MS. LaBRANCHE:*  That's not this witness.

10         *THE COURT:*  It's the wrong witness.

11         *MS. LaBRANCHE:*  Yeah, right.  I think, because it's

12  not the right witness, I object.

13         *THE COURT:*  And you agree, don't you?

14         *MS. ALTMAN:*  Yes.

15         *THE COURT:*  Sustained.

16         Okay.

17         (In open court:)

18  *BY THE COURT:*

19  *Q.*  Ms. Andlinger --

20  *A.*  Yes, sir.

21  *Q.*  -- I have several questions from the jurors for you.

22         The first question really gets into your mother and

23  her illness.  And it says:  Weren't they concerned about

24  mother?  If so sick?  What was more important, mother or the

25  situation?  That's the question.

Jeanne Andlinger - Redirect

1  *A.* Let me think for a second.  My mother, my mother is always

2  the most important to me because I know that my sister can

3  handle -- she can handle what's given to her, I mean, unless,

4  you know, somebody stabbed her or something.

5  *Q.* I think what the question was getting at was the priority

6  that next morning, dealing with your mother's illness or

7  dealing with this situation here.  I think that's the question.

8  And if that's the question, what's your answer?

9  *A.* Would be Suzy's situation.

10 *Q.* And the reason is?

11 *A.* The reason is that occurs quite often with mother, so I

12 instinctively know it's not like she is on her death bed.  I

13 just know that we have to get her, you know, some assistance as

14 soon as we can, but mother has these flare-ups that really, it

15 could ultimately lead to death, but it never has before,

16 obviously, but that, I guess I just kind of went on knowing,

17 okay, we'll handle mother because we have always handled mother

18 being ill.  And that's -- so it was Suzy.  Suzy was my main

19 priority to get to in the morning.

20        And for one, I didn't realize that mother was so sick

21 that morning.  It wasn't until I went over there that I knew

22 that mother was not feeling well.

23 *Q.* Next question says:  If you two sisters were so close, why

24 didn't you talk with each other that night about what happened

25 if such a terrible thing had happened?

Jeanne Andlinger - Redirect

1  *A.*  Personally, I didn't negate the fact that it was a

2  horrific, terrible thing, but I knew that I needed to come over

3  there in the morning and really sit down and talk in depth

4  about what took place.  I could tell that she wasn't hurt.  You

5  know, she didn't have any gashes on her face or that she could

6  talk, she could talk to me.  She was clearly upset, but I was

7  really tired.

8          I needed to get Gery back to the bungalow with myself.

9  And I just knew I had -- that it would be okay if I talked to

10  her in the morning.  I know that sounds crazy, but when there

11  is so much going on, I knew that she was going to be -- she

12  could -- she could handle this until I could talk to her about

13  it in the morning.

14  *Q.*  Okay.  Here is the next question:

15          It says, Suzy once said she was chubby.  Were her

16  shorts tight that first evening when you first had cocktails

17  with the Hecht family?

18  *A.*  No.  They were those typical baggy cargo shorts that come

19  down just a little past her knee.  They used to call them pedal

20  pushers.

21          *THE COURT:*  Whoa, that goes back to my childhood,

22  pedal pushers.  I haven't heard that for a while.  Okay.

23  *BY THE COURT:*

24  *Q.*  All right.  Now, next question.  We know because you have

25  told us several times.  You didn't see this thing happened, but

1   you have been told by people where the incident occurred,

2   right?

3   *A.*   Correct.

4   *Q.*   The question is:  That place where you have been told it

5   happened, was that by the entrance gate or the other way?

6   *A.*   It's the other way.

7   *Q.*   Next question:  If there are dollars -- and I think that

8   means money -- if there is money, everybody says people have

9   money.  You have money.

10          If there is money, why didn't you have nurse's

11  services to help out?  Why don't you have nurse's services to

12  help out with your mother if money is available to have that?

13  *A.*   Nurses services for mother?

14  *Q.*   Yes.  And it says, So Ms. Dailey, meaning Suzy, wouldn't be

15  stressed?  In other words, if taking care of your mother, of

16  her mother is stressful to her, then why not just hire, you

17  know, professional nursing services to take care of her?

18  *A.*   Oh, that's easy.  She is difficult and Suzy likes to be in

19  control of things.  And mother is never satisfied when somebody

20  comes in.  They don't last.  And that's the bottom line.

21          Suzy doesn't have children.  She loves to take care of

22  mother.  And she -- and I love for her to take care of mother.

23  And mother, she doesn't -- she is kind of a country woman.  She

24  doesn't want a lot of people she doesn't know around her.  It's

25  really difficult to keep anybody.  We have had nurses -- I mean

 1   nurse's aides, nurse's aides.

 2         THE COURT:  Okay.  Any other questions from the jury?

 3         Now, follow-up questions.

 4         Ms. Altman, do you have further questions?

 5         MS. ALTMAN:  No, Your Honor.

 6         THE COURT:  Ms. LaBranche?

 7         MS. LaBRANCHE:  No, Your Honor.

 8         THE COURT:  All right.  Then Ms. Andlinger, you are

 9   excused and free to go.  Thank you for your testimony.

10         THE WITNESS:  Thank you.

11         THE COURT:  Now that you have testified, if you wish,

12   you can stay and watch.

13         THE WITNESS:  Thank you.

14         THE COURT:  Or you can go back to Manhattan, whichever

15   you prefer.

16         Okay.  Next?

17         MS. ALTMAN:  Yes, Your Honor.  We are going to play a

18   videotape deposition of Tristan Andlinger.

19         THE COURT:  How long does it take, please?

20         MS. ALTMAN:  I understand it's about a minute and 45

21   or --

22         MR. TUMMINELLO:  An hour 45.

23         MS. ALTMAN:  I'm sorry, an hour and 45?

24         THE COURT:  Okay.  Well, we are not going to watch it

25   all in one piece.  That's for sure.  So members of the jury,

1    would you rather -- what I would recommend now is that we watch

2    a little bit of it and then take a break after a while.  It can

3    be difficult to stay focused on a video, but the video

4    testimony deserves the same attention as the regular testimony.

5    It is testimony.  So we'll take a break after a little bit.  If

6    you folks have a particular place you want to break, you can

7    tell me; otherwise, I will arbitrarily pick a place.

8            Now, during the playing of the video, is it agreed

9    that Janet doesn't have to type the words?

10           *MS. ALTMAN:*  Correct, Your Honor.  These are the

11   designations that were submitted by the parties that were then

12   ruled on by you, so there should be --

13           *THE COURT:*  Right, because you have a written and a

14   video record.

15           *MR. TUMMINELLO:*  That's correct.

16           *THE COURT:*  So Janet can sit here and wait for

17   something untoward to happen, but other than that, she is not

18   typing, right?

19           *MS. ALTMAN:*  Correct, Your Honor.

20           *MR. TUMMINELLO:*  Agreed.

21           *MS. ALTMAN:*  I think we are all hoping nothing

22   untoward happens.

23           *THE COURT:*  You never know with me, Ms. Altman.

24           Julie reminds me of another thing, and that is are you

25   still in need of a hearing later this afternoon?

 1          *MS. ALTMAN:*  I think what we decided, and I don't want

 2    to speak for Doug, I think we decided we were going to allow a

 3    live witness to go tomorrow and we were going to make a final

 4    decision at that juncture as to how our respective sides were

 5    going to proceed at that point.

 6          *MR. TUMMINELLO:*  I think, Your Honor, what you were

 7    asking was the *Daubert* hearing portion of it?

 8          *THE COURT:*  You don't need it today, right?

 9          *MS. ALTMAN:*  I think the issue, what I explained to

10    Doug is the sort of *Daubert* component we discussed yesterday we

11    are not going to proceed with.  We will do it on cross.  But

12    there was that other component, the 403, that I think we will

13    decide after this other witness testifies, whether these other

14    witnesses are going to testify.  And then Your Honor may want

15    to have that sort of 403 component of the hearing.

16          *MR. TUMMINELLO:*  So the only question was whether Your

17    Honor wanted to have the *Daubert* hearing on those issues and if

18    not --

19          *THE COURT:*  I was doing it for you.  Wasn't doing it

20    for me.  I already told you what the ground rules were pretty

21    much.

22          Okay.  Let's go ahead before we spend any more time

23    yapping and start the process of the video.  Go ahead.

24          Let's take a break here.  You can probably figure if

25    you need a restroom break, the judge probably does, too.

1          (Recess at 2:06 p.m.)

2          (Reconvened at 2:17 p.m.)

3               (Jury present.)

4          *MS. ALTMAN:*  Your Honor, before we play Tristan

5     Andlinger's deposition, we have some stipulated exhibits that

6     relate to that deposition that we would like to move into

7     evidence.

8               *THE COURT:*  Okay.

9          *MS. ALTMAN:*  And that is Exhibit 128, Exhibit 129 and

10    Exhibit 130.

11              *THE COURT:*  All right.  Those exhibits are admitted.

12              *MS. ALTMAN:*  Thank you, Your Honor.

13              *THE COURT:*  And you are going to put those up on the

14    screen when they come up?

15         *MS. ALTMAN:*  This fine gentleman is going to do that.

16              *THE COURT:*  Okay.

17         (Videotape of Tristan Andlinger was played:)

18         *THE COURT:*  I just want to explain to you the reason

19    it's jumping like that is because it has been edited to shorten

20    it.  You will be thankful for that, but that's why.  Sometimes

21    depositions go on for hours, but they have edited it to get

22    down to the meat of the coconut, so to speak.

23              (Videotape of Tristan Andlinger was continued:)

24              Let's stop the tape.  It's been going an hour.  Why

25    don't we all take a short break and refresh.  How much time

 1   would you like, folks?

 2        *JUROR:*  10 minutes.

 3        *THE COURT:*  All right.  Let's take 10 minutes.

 4        (Jury excused).

 5     (Recess at 3:16 p.m.)

 6     (Reconvened at 3:27 p.m.)

 7        *MR. TUMMINELLO:*  Your Honor, we were going to have you

 8   just direct the jury that Tristan is eating at his deposition

 9   because it was in the evening after school and he was eating

10   some snacks and water.

11        *MS. ALTMAN:*  We wanted to make sure, if Your Honor

12   thinks it's important to mention that, but if you want me to, I

13   will.  We just don't want the jury to think he is being

14   impolite.

15        *THE COURT:*  I am not making the impression he is being

16   impolite as well.  He is a young man and you put snacks in

17   front of him and he found it irresistible.

18        (Jury present:)

19        *THE COURT:*  All right.  Well, every case has its

20   mysteries and the lawyers have asked me to clear up one of

21   them, and that mystery is what was he eating.  Jurors are very

22   observant.  Apparently, this was just after school.  He was

23   hungry.  And the people that were in attendance kept filling

24   that bowl, and he could not resist, but he wasn't trying to be

25   impolite.  He is just hungry.

 1            Onward.

 2            (Videotape of Tristan Andlinger was continued:)

 3       THE COURT:  Okay.  Well, I can't ask you if you have

 4  any questions for him because he isn't here.

 5            Next witness.

 6       MS. ALTMAN:  Your Honor, we are going to play another

 7  video of George Cathers, and I believe it's 45 minutes.

 8       THE COURT:  Well, we won't finish it, but you can

 9  start it.

10       MS. ALTMAN:  Understood.  Your Honor, there is also

11  another stipulated exhibit, Exhibit 131.

12       THE COURT:  It will be admitted.

13            (Videotape of George Cathers was played:)

14       THE COURT:  Let's stop it here.

15            Ladies and gentlemen, it's 5:00 o'clock.  I think you

16  served valiantly and long.  It's time for us to let you go.  We

17  are making progress and I appreciate your time, very much so.

18            Any questions?

19            All right, then.  Let's see you at 9:00 o'clock in the

20  morning.  Have a nice evening.

21            (Jury excused.)

22            All right.  The jury has been excused.  I want to ask

23  about the jury instructions.  I know that you sent them in.  I

24  haven't even had time to look at them yet.  What kind of

25  condition are they in, in your opinion?

1       MS. LaBRANCHE:  Your Honor, everything is stipulated

2  to except the verdict form.

3       THE COURT:  Very good.

4       Anything else you need to talk about on the record

5  tonight?

6       MS. ALTMAN:  No, Your Honor.

7       MR. PLACHY:  Your Honor, if I may, it is agreed that

8  they are in the form that you ordered in the pretrial

9  conference.  I don't want to suggest that they are stipulated

10  in terms of the parties waived those objections when they had

11  those instructions when originally submitted to you.

12       THE COURT:  Well, if you have got objections to any of

13  them, then I want to make another record.

14       MR. PLACHY:  We will need to do that, then, but they

15  are in the form you ordered us to put them in.

16       THE COURT:  Do you remember which numbers you object

17  to?

18       MR. PLACHY:  Yes.

19       THE COURT:  What?

20       MS. ALTMAN:  And, Your Honor, I don't have them with

21  me, so I would just ask that we can respond in the morning.

22       THE COURT:  Well, yes, but if I know which ones they

23  are objecting to, then I can take a harder look at those.

24       MS. ALTMAN:  Understood.  I was just pointing out, I

25  have not memorized the ones we may have objections to where you

1   ruled the other way.

2         MR. PLACHY:  As we discussed at the pretrial

3   conference.

4         THE COURT:  I don't remember that and I don't have a

5   transcript of that either.

6         MR. PLACHY:  Understood.  We have objected in advance

7   of that conference to 29, 30, 31, 36, 32, 33, 34, 35, 30 -- I

8   think I am repeating myself, 41, 47 and 28.

9         THE COURT:  Wow, there are plenty you are objecting

10  to.

11        All right.  See you at 9:00 o'clock.  I do have a

12  sentencing at 8:30, so you will have to clear the table.

13        (Recess at 5:03 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                              INDEX

 2    Item                                               Page

 3    WITNESSES

 4        Suzanna Dailey

 5            Cross-Examination Continued By Ms. LaBranche   262

 6            Redirect Examination By Ms. Altman             303

 7        Jeanne Andlinger

 8            Direct Examination By Ms. Altman               314

 9            Cross-examination By Ms. LaBranche             357

10            Redirect Examination By Ms. Altman             378

11                            EXHIBITS

12    Exhibit        Offered   Received   Refused   Reserved   Withdrawn

13    3                          328

14    7                          328

15    24                         284

16    29                         274

17    43                         329

18    48                         330

19    128                        394

20    129                        394

21    130                        394

22    Depo P. 213                303

23

24

25
```

1                          REPORTER'S CERTIFICATE

2          I certify that the foregoing is a correct transcript from

3     the record of proceedings in the above-entitled matter.  Dated

4     at Denver, Colorado, this 23rd day of January, 2018.

5

6                                    S/Janet M. Coppock

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25