1   IN THE UNITED STATES DISTRICT COURT
2   FOR THE DISTRICT OF COLORADO

3   Civil Action No. 16-CV-00581-RBJ

4   SUZANNA F. DAILEY,

5       Plaintiff,

6   vs.

7   NIKOS HECHT,

8       Defendant.
_____

9
10  REPORTER'S TRANSCRIPT
    Jury Trial - Day 3

11  _____

12          Proceedings before the HONORABLE R. BROOKE JACKSON,

13  Judge, United States District Court for the District of

14  Colorado, commencing at 9:05 a.m., on the 18th day of May,

15  2017, in Courtroom A-902, United States Courthouse, Denver,

16  Colorado.

17
18
19
20
21
22
23  Proceeding Recorded by Mechanical Stenography, Transcription
    Produced via Computer by Janet M. Coppock, 901 19th Street,
24  Room A-257, Denver, Colorado, 80294, (303) 893-2835

25                      APPEARANCES

1               Aryeh Lev Kaplan, Jennifer G. Altman and Shani Rivaux

2       of Pillsbury Winthrop Shaw Pittman, LLP, 333 SE 2nd Avenue,

3       Suite 2000, Miami, FL 33131, appearing for the Plaintiff.

4               Marci Gilligan LaBranche of Ridley McGreevy & Winocur,

5       P.C., 303 16th Street, Suite 200, Denver, CO 80202;

6               Douglas B. Tumminello and Michael D. Plachy of

7       Lewis Roca Rothgerber Christie LLP, 1200 17th Street, One Tabor

8       Center, Suite 3000, Denver, CO 80202-5855, appearing for the

9       Defendant.

10                       *   *   *   *   *

11                            PROCEEDINGS

12          *THE COURT:*  I am giving you a revised set of jury

13      instructions and verdict form.  And we'll be taking your

14      comments at the end of the day, so please be prepared for that,

15      if you can.

16          Good morning.  Any preliminary matters today?

17          *MS. ALTMAN:*  I think, Your Honor, when we left

18      yesterday, there was some colloquy about jury instructions and

19      Your Honor wanted us to put our objections again on the record

20      that were raised at the pretrial and we are prepared to do

21      that.

22          *THE COURT:*  Well, read the instructions first.  I have

23      significantly reorganized them and a new verdict form.

24          *MS. ALTMAN:*  Okay.  Thank you, Your Honor.

25          *THE COURT:*  They are pretty much the same.  I just

```
 1   tried to make them read a little better, a little more plain
 2   English.  I have reorganized it a little bit.  Whatever time
 3   you spend on it is well spent.  There is no real substantive
 4   change there.
 5        MR. PLACHY:  Would it be worth to get an electronic
 6   copy to see a red line or is it --
 7        THE COURT:  I didn't do it in track changes.
 8        MR. PLACHY:  We can probably do a comparison if we
 9   need to.  We will figure it out.
10        THE COURT:  I just didn't have time to do that.  But
11   if you want an electronic copy, that, I can give you.
12        MR. PLACHY:  We will check.  We will go through them.
13   Thank you.
14        (Jury present:)
15        THE COURT:  Okay.  Have a seat.  Good morning, ladies
16   and gentlemen.
17        THE JURY:  Good morning.
18        THE COURT:  How are my favorite, indeed the best,
19   jurors in Colorado this morning?
20        JUROR:  You say that every time.
21        THE COURT:  We didn't give you the best weather today,
22   did we?
23        Okay.  Let's go.  Are we going to start by finishing
24   the little last bit of that George deposition?
25        MS. ALTMAN:  That's correct, Your Honor.  And I
```

Betty McGuigan - Direct

1  understand it's approximately 10 minutes, 15 minutes -- 15

2  minutes left.

3          THE COURT:  Okay.

4          MS. ALTMAN:  Thank you.

5          (Videotape of George Cathers was continued:)

6          THE COURT:  Okay.  Next?

7          MS. RIVAUX:  Our next witness is going to be

8  Dr. McGuigan.

9      (**Betty McGuigan** was sworn.)

10          THE WITNESS:  I do.

11                    **DIRECT EXAMINATION**

12  BY MS. RIVAUX:

13  Q.  Good morning, Dr. McGuigan.

14  A.  Good morning.

15  Q.  Could you tell us what you do for a living?

16  A.  Yes.  I am a clinical psychologist.

17  Q.  And where do you live?

18  A.  I live in Sebastian, Florida.

19  Q.  How do you know Ms. Dailey?

20  A.  She is one of my clients.

21          THE COURT:  Would you speak into that microphone.  You

22  don't have to have it right up to your mouth.  There will be

23  feedback, but close enough that your voice projects.

24          THE WITNESS:  Is that better?

25          THE COURT:  Better, thank you.

Betty McGuigan - Direct

1   *BY MS. RIVAUX:*

2   *Q.*  Was Ms. Dailey your client in March of 2014?

3   *A.*  Yes, she was.

4   *Q.*  How long has she been your client?

5   *A.*  Since 2003.

6   *Q.*  Is she currently your client?

7   *A.*  Yes, she is.

8   *Q.*  Dr. McGuigan, what were you asked to testify to today?

9   *A.*  I was asked to testify according to my records, according

10  to her treatment and diagnosis, her mental health status prior

11  to April the 4th of 2014 and after April 4th, 2014.

12  *Q.*  And are all the opinions you are giving today to a

13  reasonable degree of scientific certainty?

14       *MR. TUMMINELLO:*  Objection, Your Honor.  She is not a

15  forensic expert.

16       *THE COURT:*  The objection is overruled, but you don't

17  need that question anymore.

18  *BY MS. RIVAUX:*

19  *Q.*  Dr. McGuigan, let's talk a little bit about your

20  background.

21       You mentioned you are a clinical psychologist.  What

22  does a clinical psychologist do?

23  *A.*  A clinical psychologist works with an individual, a client,

24  to help them make changes in their life, reach their goals,

25  know a little bit more about themselves.

Betty McGuigan - Direct

1    *Q.*  And why did you become a clinical psychologist?

2    *A.*  I became a clinical psychologist to help other people.

3    *Q.*  Did you ever consider becoming a researcher?

4    *A.*  I did not.

5    *Q.*  Why not?

6    *A.*  It was more of an interest to me to work with people.

7    *Q.*  And do you need to have a license to be a clinical

8    psychologist?

9    *A.*  Yes, I do.

10    *Q.*  And do you have that license?

11    *A.*  Yes.  I am licensed in it the state of Florida.

12    *Q.*  And how long have you had that license?

13    *A.*  Since 1999.

14    *Q.*  And do you hold any other licenses?

15    *A.*  Yes.  I have a certification they call it.  I am certified

16    as a clinical social worker in Michigan and practice there.

17    *Q.*  And how long have you had that license?

18    *A.*  Since 1988.

19    *Q.*  Do you keep those licenses current?

20    *A.*  I do.

21    *Q.*  And what degrees did you earn before becoming a clinical

22    psychologist?

23    *A.*  I have a bachelor's in psychology from the University of

24    Detroit.  I have a master's in diction counseling from Siena

25    Heights University.  I have a specialist degree in humanistic

Betty McGuigan - Direct

1    clinical psychology and education from the Center of Humanistic

2    Psychology.  I have a doctorate from Union Institute of

3    Clinical Psychology.

4    Q.  And did you complete any internships in your training to

5    become a clinical psychologist?

6    A.  I did.

7    Q.  Can you tell us about those internships?

8    A.  Yes.  My first internship was at Flower Hospital in Toledo,

9    Ohio.  And at that time I worked with clients who were

10   inpatient for drugs and alcohol.  Then I worked at the center

11   for -- the Awareness Center, the Family Awareness Center in

12   Adrian, Michigan.  And that year I worked with child victims of

13   sexual abuse along with sexual offenders.  For my doctorate I

14   worked at Miami heart, which was in gerontology working with

15   the aging, and I did inpatient and outpatient treatment.

16   Q.  Where do you currently work?

17   A.  I work in Sebastian, Florida, in a private practice.

18   Q.  How long have you had that private practice?

19   A.  Since 1999.

20   Q.  In at private practice do you specialize in any area of

21   clinical psychology?

22   A.  Yes.  I generally work with clients or assess clients for

23   ADHD, mood disorders and posttraumatic stress disorder.

24   Q.  And about how many patients do you currently treat?

25   A.  I see around 20 clients per week.

Betty McGuigan - Direct

1    *Q.*  And over your 30-year practice have you worked with

2    patients who were sexually assaulted?

3    *A.*  Yes, I have.  My current practice at this time, I have

4    about 44 -- 40 percent of my clients who have been sexually

5    assaulted.

6    *Q.*  And have you worked with patients who have suffered some

7    emotional harm as a result of sexual assault?

8    *A.*  Yes, I have.

9    *Q.*  Have you ever been paid to give testimony in any case?

10   *A.*  No, I have not.

11   *Q.*  Are you being paid for your time today?

12   *A.*  No, I am not.

13   *Q.*  Have you ever testified in any court proceeding?

14   *A.*  No, I have not.

15   *Q.*  Did you do anything to prepare to testify today?

16   *A.*  I reviewed my records.  I met with Suzy's attorneys and we

17   went over some of the legal procedures.

18   *Q.*  And in preparation for the trial and for testifying, did

19   you review medical records of any other treating physicians

20   that Ms. Dailey might have?

21   *A.*  I did not.

22   *Q.*  Did you read any deposition transcripts?

23   *A.*  I did not.

24   *Q.*  Did you read the complaint in this case?

25   *A.*  I did not.

409

Betty McGuigan - Direct

1    *Q.*  And why didn't you do any of those things?

2    *A.*  I am a treating physician for Suzy Dailey and I can only

3    present about what I know.

4    *Q.*  Let's switch topics for a moment, Dr. McGuigan.

5            When you see a client, when a client comes to you, do

6    you create treatment records and medical records for your

7    clients?

8    *A.*  Yes, I do.

9    *Q.*  And is that part of your treatment and diagnosis of your

10   clients?

11   *A.*  Yes.

12   *Q.*  And you keep these records confidential?

13   *A.*  I do.

14   *Q.*  Why do you keep these records confidential?

15   *A.*  For several reasons.  First of all, I am obligated by the

16   laws and rules of the state of Florida in my profession to keep

17   my records confidential.  Secondly, the whole process of

18   psychotherapy is to allow the client to be in a situation where

19   they are free to speak freely, process who they are and make

20   changes.  It's very scary to do that.  And in order to assure

21   that the process continues, they have to know that I am not

22   going to go out and blab everything they tell me.

23   *Q.*  And so do you tell your patients that the records are

24   confidential?

25   *A.*  Yes.  We go over that.

1    Q.  And did you tell Ms. Dailey that her records would be

2    confidential?

3    A.  Yes.

4    Q.  And did you tell her that her records would be confidential

5    before she ever filed this lawsuit?

6    A.  In 2003 when she came in to see me.

7    Q.  And when Ms. Dailey came to you for treatment, did she

8    expect that her records would remain confidential?

9    A.  I explained to her the limitations of confidentiality, as I

10   do all my clients, so that I would be required to report sexual

11   abuse, abuse to the aging.  If she signs any release, then I

12   would be obligated to at least report whatever she needed or

13   wanted.

14   Q.  Did she ever expect that her records would be used in

15   litigation here?

16          MR. TUMMINELLO:  Objection, Your Honor, speculation.

17          THE COURT:  Sustained.

18   BY MS. RIVAUX:

19   Q.  Why did you end up producing records in this case?

20   A.  I was subpoenaed by the defendant to produce records.

21   Q.  And do you know how many records you produced,

22   approximately?

23   A.  200.

24   Q.  I would like to next turn to your treatment of Ms. Dailey.

25          You mentioned you started treating Ms. Dailey in

Betty McGuigan - Direct

1    December of 2003; is that right?

2    A.   Correct.

3    Q.   How did you meet Ms. Dailey?

4    A.   I decided that I wanted to try to do a little more exercise

5    pilates, so I saw there was a pilates studio about 15, 20

6    minutes from my office.  I stopped in one day and spoke to Ms.

7    Dailey for about 10 minutes.  And after that within a few days

8    I heard from Ms. Dailey and she said that she wanted to come

9    and see me as a psychologist.

10   Q.   So did you end up taking classes with Ms. Dailey?

11   A.   No.  It would be a conflict of interest.  No, at that time.

12   Q.   Let's talk a little bit about what you do to assess and

13   treat patients and the approaches you take for the purposes of

14   diagnosis and treatment.  In part of what you do, do you rely

15   upon what your patient reports to you regarding their symptoms?

16   A.   Yes, I do, just as any other doctor.

17   Q.   And do you rely on anything that's nonverbal in terms of

18   nonverbal cues in their behavior when assessing, diagnosing

19   your patients?

20   A.   Yes.  No, that's part of my training is to observe.

21   Q.   And what kind of nonverbal cues do you look for?

22   A.   You look for how someone stands, how they sit, how they

23   move, their body posture, how they speak, their intonation, if

24   they speak quickly or slowly, if they will give you what their

25   affect looks, total outward appearance, behavior.

Betty McGuigan - Direct

1   Q.  Let me stop you.  What do you mean by affect?

2   A.  The expression on their face.

3   Q.  And is your process an interactive process with your

4   clients?

5   A.  Yes.  I come from a private background.  And in

6   psychotherapy you listen, you ask questions, you interact, so

7   that they are gentle questions, but they are questions that

8   allow the client to better understand themselves and the

9   relationship in the world and what they want to do.  And there

10  are questions like:  How do you feel?  What's going on for you?

11  What does that mean?  What would you do differently?

12  Q.  And for most of your patients do you see them on an ongoing

13  basis?

14  A.  I do.

15  Q.  And so do you have an opportunity to compare their behavior

16  over time and over sessions?

17  A.  Yes.  When you are doing this, this interactive business,

18  it's my job to analyze the situation, all the information,

19  what's written, what's observed.  And I am doing a process

20  constantly of questioning, analyzing for the purpose of knowing

21  how to treat the client, what would be most helpful, and to see

22  if there is a congruence between what they are saying, how they

23  are presenting themselves; and if there is an incongruence,

24  then to question that and analyze -- and help them.

25  Q.  I would like to now talk about your treatment of Ms. Dailey

Betty McGuigan - Direct

1  | starting with the time period of 2011.

2  | A.  All right.

3  | Q.  And when Ms. Dailey started coming to you in 2011, what

4  | were you treating her for?

5  | A.  I was treating her for -- she came in with a diagnosis of

6  | major depression by history, so 2011 I was treating her for

7  | major depression and ADHD.  And at that point we were looking

8  | at managing her condition, her depression, and processing

9  | helping her make future goals.

10 | Q.  And you mentioned that she came in with a history of

11 | depression.  Was Ms. Dailey proactive in managing her

12 | depression?

13 | A.  Yes.

14 |       MR. TUMMINELLO:  Objection, Your Honor, speculation.

15 |       THE COURT:  Overruled.

16 | BY MS. RIVAUX:

17 | Q.  And what did she do to manage her depression?

18 | A.  Yes.  She came consistently to psychotherapy.  She was

19 | compliant.  She saw her psychiatrist and reported to me that

20 | she took her medications on a regular basis.

21 | Q.  And were there times when Ms. Dailey's medication would

22 | sometimes need to be adjusted?

23 | A.  I am -- I can recollect at least one time, but I am sure

24 | that she saw him on a basis that he would be adjusting it.

25 | Q.  And when she would be adjusting medications, would she

Betty McGuigan - Direct

1    sometimes have more depressive symptoms?

2    *A.*   I can recollect one time that there was an adjustment and

3    it didn't go well.   There was a time where she was definitely

4    more depressed.

5    *Q.*   And would that adjustment be temporary?

6    *A.*   Yes, it was.   It was brief and it was quickly resolved.

7    *Q.*   What role did meditation and spirituality and prayer play

8    in Ms. Dailey's management of her depression?

9    *A.*   Ms. Dailey has a very spiritual side about her.   She and I

10   have both been to some monasteries, different ones.   We had

11   discussions about spiritual facets.   She does meditation.   We

12   talk about her relationships with spirituality and her

13   connection with God.

14   *Q.*   Based upon your personal observation and treatment of

15   Ms. Dailey, talking about the time period from 2011 until March

16   of 2014 before she reported the sexual assault, what symptoms

17   did Ms. Dailey have?

18   *A.*   She would have symptoms that are typical for the most part

19   of the general population.   Her feelings, if she was

20   frustrated, they would be relevant to the situation.   If there

21   was sadness, it was relevant to the situation.   She was

22   still --

23   *Q.*   Well, let me ask you, was Ms. Dailey functioning from this

24   time?   What was her level of functioning between 2011 and March

25   of 2014?

1   A.  In my awareness and observation, she was managing to

2   function well in the sense that she was able to care for her

3   mother.  She came, you know, clean and neat, and she went to

4   work on a regular basis.

5   Q.  You mentioned caring for her mother.  Did Ms. Dailey report

6   having stressors by caring for her mother?

7   A.  Yes, she did.  It's very hard to be a caretaker.  And she

8   discussed what would be common frustration feelings, upset,

9   overwhelmed, tired, fatigued for caring for her now 90-year-old

10  mother.

11  Q.  How important was it for Ms. Dailey to care for her mother

12  during that time period?

13  A.  At that time we would discuss that.  You know, this is

14  something you don't have to do.  There is other arrangements

15  you could make.  We discussed how she could have help.  We did

16  some problem solving, what you would call how there are other

17  ways to help her mother.  In the long run -- she might be

18  frustrated.  She might come and tell me about it and we would

19  talk about it.  She would vent about her feelings, but in the

20  long run she loved her mother and she made a choice to help her

21  and to help care for her.

22  Q.  And what impact of the stress of care giving would you say

23  it had on Ms. Dailey's life between 2011 until March of 2014?

24  A.  The fact that she came and she talked to me.  Otherwise --

25  she saw me.

Betty McGuigan - Direct

1   Q.  Between 2011 and Ms. Dailey's report of the sexual assault

2   to you in 2014, did you ever have a change in her diagnosis?

3   A.  No, I did not.

4   Q.  When Ms. Dailey returned from Mexico in 2014, did she come

5   to see you?

6   A.  Yes, she did, on April 4th.

7   Q.  So you recall a session that you had with Ms. Dailey on

8   April 4th, 2014?

9   A.  I do.

10  Q.  And you do have your treatment record from that day, but

11  before we talk about that record, do you have an independent

12  recollection of that date?

13  A.  I do.

14  Q.  Can you tell us what you remember about Ms. Dailey from

15  that date when you first saw her.

16  A.  Okay.  I noticed that she came into the session and she was

17  moving slowly.  She was not looking at me or greeting me.  She

18  was -- her head was down as she is moving very slowly towards

19  where she generally sits.  And as she sits down, she -- her

20  affect is flat.  It's not having any expression.

21         She appears to me to be confused and shocked,

22  disoriented.  And as she is sitting there, she is staring out

23  away from me, looking distant, dazed.  And it appeared as if

24  she wasn't there.  And I had seen that look before on Vietnam

25  war vets and it looked like what they call the hundred mile

Betty McGuigan - Direct

1   stare.

2   Q.   And have you ever before this session, had you ever seen

3   Ms. Dailey look like that?

4   A.   No, I have not.

5          MS. RIVAUX:   We do have your record from that date.   I

6   would like to call up Exhibit 204.012 through 013 for

7   identification.

8          MR. TUMMINELLO:   Your Honor, we will be objecting to

9   the admission of this record.

10          THE COURT:   You will be objecting when?

11          MR. TUMMINELLO:   Your Honor, if the intent is to try

12   to introduce it into evidence, we will be objecting.

13          MS. RIVAUX:   We do intend to enter it into evidence.

14          THE COURT:   Which exhibit number is it now?

15          MS. RIVAUX:   204.012 through 013.

16          THE COURT:   Well, you are going to have to do it the

17   old-fashioned way, then.

18   BY MS. RIVAUX:

19   Q.   Dr. McGuigan, do you recognize this record?

20   A.   I do.

21   Q.   And what is it?

22   A.   This is my progress note for Suzy Dailey on April the 4th,

23   2014.

24   Q.   And was this record created for the purpose of medical

25   treatment and diagnosis?

Betty McGuigan - Direct

1    A.   Yes, it was.

2    Q.   And when did you create this document?

3    A.   April the 4th of 2014.

4    Q.   Are you the only one that wrote on this document?

5    A.   I am.

6    Q.   And do you regularly write treatment records for your

7    patients when they come in for your sessions?

8    A.   Yes, I do.

9    Q.   And do you keep this record in the regular course of

10   business?

11   A.   I do.

12        MS. RIVAUX:  I would like to have this record admitted

13   into evidence.

14        MR. TUMMINELLO:  Your Honor, we object under 403 and

15   it's also not a -- it contains hearsay within the record which

16   does not fit within the medical diagnosis exception under 803.

17        THE COURT:  What's the exhibit number?

18        MS. RIVAUX:  204.012, and it actually has a second

19   page, 013.

20        THE COURT:  The objection is overruled.  012 and 013

21   of 204 are admitted.

22   BY MS. RIVAUX:

23   Q.   Dr. McGuigan, if you could, take a look at the document.  I

24   would like to walk through it with you.

25             So you mentioned that you created this record on

Betty McGuigan - Direct

1   April 4th, 2014.

2   A.   I did.

3   Q.   And how long was your session with Ms. Dailey that day?

4   A.   It was two hours.

5   Q.   And is that typical for your sessions with Ms. Dailey?

6   A.   Yes, it is.

7   Q.   And I would like to turn your attention to the area we talk

8   about under Objective Data here.

9   A.   Yes.

10  Q.   And can you tell us what this objective data that you see,

11  can you read to us what it is that you wrote?

12        THE COURT:  Can you make it bigger, please.  Okay.

13  Now erase the line.

14  BY MS. RIVAUX:

15  Q.   Dr. McGuigan, you see that?  Can you read that for us?

16  A.   Yes.  What I noted is flat affect, looking detached,

17  distant, in shock, agitated, confused, numb.  And then I

18  note -- yes.

19  Q.   And is this consistent with what you were telling us about

20  what you remember from Ms. Dailey on that day?

21  A.   Yes, it is.

22  Q.   All right.  I would like to go on to the section that you

23  referred to in the Assessment at the bottom of that record.

24  And if you can blow up the part that says Assessment.

25  A.   I may be able to read it.

Betty McGuigan - Direct

1    Q.  Thank you.  Can you read that for us, please?

2    A.  Yes.

3            Client reported sexual assault in Mexico.  She was at

4    dinner with family and friends, Jeanne and Gery, mother and

5    Suzy, Nikos and Allison, Tristan and Nikos' son, another couple

6    from Colorado and their son.  After dinner Nikos asked her if

7    she had seen the garden.  "They were beautiful."  We were

8    walking.  He grabbed me by the back of the neck and pushed me

9    down.  "I felt like a victim.  I was pinned."  The client

10   stated she told him to stop/wait.  "He didn't listen.  I felt

11   numb."

12   Q.  Now, there is a second page of 204.13.

13   A.  The client began asking herself why would he do this?  I'm

14   a 65-year-old woman.  He is a younger man.  I was wearing long

15   shorts and a peasant top.  I didn't suspect at all.  I felt

16   safe with family and friends.  Why should I be concerned?

17   Q.  Now, Dr. McGuigan, in your opinion, what's the clinical

18   significance of Ms. Dailey stating to you, I felt like a

19   victim?

20           MR. TUMMINELLO:  Objection, Your Honor.

21           THE COURT:  Where does it say, I felt like a victim?

22           MR. TUMMINELLO:  It's on the page before, 214.012 at

23   the bottom.

24           THE COURT:  Oh, I see it.  All right.

25           What's the objection?

Betty McGuigan - Direct

1          MR. TUMMINELLO:  Your Honor, this is not for a medical

2    diagnosis.  This is just a reiterating of what she was told, so

3    this is hearsay.

4          THE COURT:  Okay.

5          MR. TUMMINELLO:  Also, this is a 702 opinion.

6          THE COURT:  Subject to an exception to the hearsay

7    rule, the objection is overruled.  It's admitted.

8    BY MS. RIVAUX:

9    Q.  So what is the clinical significance when Ms. Dailey

10   reported to you, I felt like a victim?

11   A.  She is describing the sexual encounter and the significance

12   of it, that she is feeling not in control of the situation, not

13   powerful, not consent.

14   Q.  And what is the significance -- you also noted that she

15   stated, and this is on the next page, stating, I felt safe with

16   family and friends.

17   A.  Yes.  She is beginning to question herself about, you know,

18   how could this happen?  She wasn't aware and just really not --

19   not thinking about having to keep herself safe.  She is with

20   family and friends in a social setting.

21   Q.  And what was the significance of Ms. Dailey reporting to

22   you what she wore that night?

23   A.  Again, she is trying to figure out how a younger man would

24   be attacking her.  She is not dressed provocatively.  She is

25   wearing --

Betty McGuigan - Direct

1          MR. TUMMINELLO:  Objection, Your Honor, speculation.

2   Move to strike.

3          THE COURT:  Sustained.  That part is stricken.

4   A.  She is wearing clothes that are loose.

5          MR. TUMMINELLO:  Objection, Your Honor, speculation.

6   Move to strike.

7   BY MS. RIVAUX:

8   Q.  Can I ask the question of whether she reported to you that

9   her clothing was loose?

10         THE COURT:  Please do.  Rephrase the question.

11  BY MS. RIVAUX:

12  Q.  Did Ms. Dailey report to you that her clothing was loose?

13  A.  Not necessarily.  She just said she was wearing a peasant

14  top and long shorts.

15  Q.  Do you have an opinion of what it was -- of why she was so

16  thinking about what it was that she was wearing?

17         MR. TUMMINELLO:  Objection, Your Honor, speculation

18  and irrelevant.

19         THE COURT:  Yes.  I don't understand the question.

20  Sustained.

21  BY MS. RIVAUX:

22  Q.  I will move on.

23         Based on your observation of Ms. Dailey, did she

24  convey to you in any way that she consented to sexual contact

25  with Mr. Hecht, but was feeling regretful about it?

Betty McGuigan - Direct

1    *A.*  No, she did not.

2    *Q.*  And when Ms. Dailey came to see you on April 4th of 2014

3    and based on your observation, did Ms. Dailey convey to you

4    that she was embarrassed that her nephew had witnessed her

5    having sex with Mr. Hecht?

6    *A.*  No, she did not.

7    *Q.*  And as we are looking at this record, do you see any new

8    symptoms that Ms. Dailey is showing that you had not observed

9    with Ms. Dailey before?

10   *A.*  Yes.  Can you blow it up a little bit?

11          Yes.  She is displaying feeling -- or what I am

12   observing is her outer look and my conclusions of it by what

13   she presented, how her movement was, how she was speaking,

14   slowly, low, taking in the affect, taking in her movements.

15   All those areas I am seeing disorientation, shock, her eyes

16   detached, agitation.  That was certainly new to this extent.

17          On the second page at the bottom, the

18   self-questioning, self-doubt about -- I am sure she questions

19   and doubts in other situations, but not related to feelings of

20   safety.

21          *MR. TUMMINELLO:*  Objection, Your Honor, speculation.

22   It's not contained within the notes.

23          *THE COURT:*  Sustained, stricken.

24   *BY MS. RIVAUX:*

25   *Q.*  Did you notice now that Ms. Dailey was concerned for her

Betty McGuigan - Direct

1  safety?

2  A.   Yes.   That is what we are talking about.

3  Q.   And had safety been a concern for her during your diagnosis

4  and treatment of her previously between 2011 and March of 2014?

5  A.   Not at all.   Suzy was a very gregarious outgoing person in

6  the sense that she liked people.   She discussed talking about

7  people --

8           MR. TUMMINELLO:   Objection, Your Honor, move to

9  strike, non-responsive.

10          THE COURT:   Overruled.

11 BY MS. RIVAUX:

12 Q.   I would like to turn to the next session that you had with

13 Ms. Dailey.   If we could bring up 214.014 for identification.

14          And Dr. McGuigan, do you recognize this document?

15 A.   I do.

16 Q.   And what is -- and is the purpose of this record for

17 medical diagnosis and treatment?

18 A.   It is.

19 Q.   And when did you create this record?

20 A.   April 7th, 2014.

21 Q.   Is that the same date that Ms. Dailey came to see you?

22 A.   It is.

23 Q.   And did anyone else write on this record?

24 A.   No, they did not.

25 Q.   And do you regularly create treatment records in the course

Betty McGuigan - Direct

1  of your business?

2  A.  I do.

3  Q.  And is this a record that you keep in the regular course of

4  business?

5  A.  It is.

6      MS. RIVAUX:  I would like to have this record

7  admitted.

8      MR. TUMMINELLO:  Your Honor, we object again on the

9  same basis of hearsay and it's unnecessarily cumulative.

10  Ms. Dailey is testifying, as is Dr. McGuigan, and so the notes

11  are unnecessarily cumulative.  To the same degree, Your Honor,

12  the statements, sort of reiterating of what Dr. McGuigan was

13  told --

14      THE COURT:  Let's not make speeches, Mr. Tumminello.

15  Just tell me your objection.

16      MR. TUMMINELLO:  Thank you, sir.

17      THE COURT:  The objection is overruled.  As I said

18  before, yes, it is hearsay but it's subject to one or more

19  exceptions to the hearsay rule.  It's admissible.

20  BY MS. RIVAUX:

21  Q.  And Dr. McGuigan, I would like to turn your attention again

22  to that same objective data that you recorded up here in that

23  area.

24  A.  Yes.

25  Q.  Can you tell us what it is that you observed on that day?

1  *A.*  Yes.  Sadness, shame, anger, anxiety, fear, self-blame.

2  The client is reporting, I felt like dirt, feeling violated,

3  tearful, helpless, noting she can't sleep.

4  *Q.*  And I would like now to turn to, if you could, review for

5  us the Assessment.

6  *A.*  I am sorry?

7  *Q.*  The Assessment, and we are going to blow that up for you.

8  *A.*  Okay.

9  *Q.*  Can you read what you reported, what you wrote?

10 *A.*  Yes, I can.

11       The client stated:  It's on my mind, the rape, all the

12 time.  It was an assault.  He didn't listen.  I told him to

13 stop.  I felt numb.  I was pinned.  He raped me.  The client

14 then began to blame herself.  I let it happen.  I felt like a

15 victim.  I couldn't say anything.  The client was reassured by

16 this psychologist she will recover.

17       The client is displaying symptoms of PTSD.  Trust is

18 becoming an issue.  The client believes Nikos is a killer out

19 of control.  The client states she is fearful for herself.

20 *Q.*  Now, what is the significance where you noted on top on

21 self-blame or you also note in the Assessment, Client then

22 began to blame herself?

23       What was the clinical significance to you of that?

24 *A.*  I am sorry, I didn't hear one part of the sentence.  I want

25 to make sure I understood exactly what you are asking.

Betty McGuigan - Direct

1  *Q.* No problem.  I asked what is the clinical significance to

2  you in writing self-blame and then also -- well, let's start

3  with that, with the self-blame.  What was the clinical

4  significance to you of that?

5  *A.* Well, in this context, Ms. Dailey is blaming herself for

6  not being able to stop the incident.  She is -- this is

7  conducive, common for clients that have been through a sexual

8  assault.

9  *MR. TUMMINELLO:* Objection, Your Honor.  This calls

10  for 702 testimony.  Move to strike.

11  *THE COURT:* The objection is overruled.

12  *BY MS. RIVAUX:*

13  *Q.* And is that similar or is that any different than her

14  reporting, I felt like a victim?

15  *A.* That again also is related to powerlessness, not being able

16  to keep yourself safe, not being able to stop the incident.

17  *Q.* And you had also noted -- well, let me ask you first, is

18  the sense of blaming herself, is it -- or let's just say that

19  she feels ashamed, is she feeling any sense of shame or

20  embarrassment because her family has found out about what

21  happened?

22  *A.* Not in my notes, nothing, no.

23  *Q.* Do you have a recollection that she is reporting that to

24  you?

25  *A.* No.

1  Q.  And you also note up here that she said that she felt like

2  dirt.

3  A.  Yes.

4  Q.  And what was the significance to you when you heard her

5  say, "I felt like dirt"?

6  A.  That is also a common kind of response to someone after a

7  sexual assault.

8  Q.  And then just one other part that I would like to ask you

9  about is you note here, "It's on my mind (rape) all the time."

10  What significance did that have to you?

11  A.  That, for me, it has a significance that she is

12  reexperiencing the sexual assault continually.  She can't get

13  away from it.  She is reliving it, reexperiencing it

14  physically, psychologically, and is not able to adjust, take it

15  off of her mind, get it off of her mind, which is typical also

16  of someone with a sexual assault since it's a very visceral

17  experience.

18  Q.  And taking a look at this record, are there new symptoms

19  you see Ms. Dailey showing at this time?

20  A.  New symptoms?

21  Q.  Are there new symptoms that you see at this point in your

22  treatment of Ms. Dailey that you had not seen prior to March of

23  2014?

24  A.  Yes, the fear, the reexperiencing, the intrusive thoughts,

25  feelings of violation, powerlessness in the sense, I was

1   pinned, I let it happen, the self-blame.

2   *Q.*  And one thing you mentioned was the fear.  Are you saying,

3   you know, most people have fears, and had Ms. Dailey expressed

4   fears to you in the past?

5   *A.*  I am sure she has.

6   *Q.*  And are the fears she expressed to you prior to 2014, are

7   they different than the fears that she is expressing to you

8   now?

9   *A.*  Yes, several -- of course, the fear of remembering of the

10  incident, specifically the fear of Nikos, Mr. Hecht, that I

11  mentioned down here.  This was very strange because in our

12  conversation she is very fearful of him and the discussion was

13  that she thought he was going to come and kill her.

14      *MR. TUMMINELLO:*  Objection, Your Honor.  This is

15  unduly prejudicial.

16  *A.*  This is what she told me.

17      *THE COURT:*  This is what?

18      *MR. TUMMINELLO:*  Under 403, Your Honor, this is

19  nothing more than hearsay.

20      *THE COURT:*  All right.  It's overruled.

21  *BY MS. RIVAUX:*

22  *Q.*  All right.  If we can turn to the next exhibit, I will call

23  up Exhibit 204.015 through 016.

24      *THE COURT:*  Now, before you go any further, I am going

25  to ask you to save Mr. Tumminello the effort of objecting, how

Betty McGuigan - Direct

1   many of these do you have?

2        *MS. RIVAUX:*  This is the last one that I plan on using

3   with her.

4        *THE COURT:*  All right.  Then go ahead with your

5   foundation.

6   *BY MS. RIVAUX:*

7   *Q.*  Dr. McGuigan, do you recognize this document?

8   *A.*  I do.

9   *Q.*  And what is this document?

10  *A.*  This is a progress note for Suzy Dailey completed on April

11  the 14th of 2014.

12  *Q.*  Was the purpose of this record for medical treatment and

13  diagnosis?

14  *A.*  It was.

15  *Q.*  And when did you create this record?

16  *A.*  On April the 14th of 2014.

17  *Q.*  So the same day that you saw Ms. Dailey?

18  *A.*  Yes.

19  *Q.*  And did anyone else write on this document?

20  *A.*  No, they did not.

21  *Q.*  And do you regularly create these records for treatment of

22  your patients?

23  *A.*  I do.

24  *Q.*  And do you keep this record in the regular course of

25  business?

Betty McGuigan - Direct

1    *A.*  I do.

2              *MS. RIVAUX:*  I would like to have this record admitted

3    into evidence.

4              *MR. TUMMINELLO:*  Same objection, Your Honor.

5              *THE COURT:*  What now, 015?

6              *MS. RIVAUX:*  204, 015 through 016 is the two pages.

7              *THE COURT:*  Objection is overruled, but the Court

8    requests that you have her focus on only what's new.  We don't

9    need to see the same thing repeated again and again.  If there

10   are new things here, focus on those, please.

11             *MS. RIVAUX:*  Sure.  All right.  If we can blow up the

12   area again about her mood.

13             *THE COURT:*  Ask her what there is here that's new and

14   different, and then we will see what needs to get blown up.

15             *MS. RIVAUX:*  Sure.

16   *BY MS. RIVAUX:*

17   *Q.*  Dr. McGuigan, can you tell us what is new in this session

18   that you see with Ms. Dailey?

19   *A.*  I see that she is -- she is mentioning sick to her stomach

20   and stating numb in my heart.  I am not sure I used the word

21   detached and disassociated before, same concept we are talking

22   about before, but maybe different words.

23   *Q.*  And what about in the lower half of the Assessment section?

24             *THE COURT:*  Let her look at it before you blow it up,

25   please.  And then if there is something new there, you may have

Betty McGuigan - Direct

1   it blown up.

2   *BY MS. RIVAUX:*

3   *Q.*  Can you take a look and tell us what you see that's new in

4   the area regarding the Assessment that she reported to you?

5   *A.*  She is saying that she is having -- she is reporting to me

6   an out-of-body experience.  The wording is different.  I don't

7   want to sit still.  I cannot work.

8         *THE COURT:*  All right.  Then you can go ahead and blow

9   it up so that we can all read it.

10  *BY MS. RIVAUX:*

11  *Q.*  And --

12  *A.*  She begins to --

13  *Q.*  Let me ask you the question.

14        Can you show us and direct us where it is that you are

15  referring to that are new symptoms that you are stating?  Can

16  you read the new symptoms that you're stating?  I think you had

17  mentioned, "I feel like I'm having an out-of-body experience."

18  *A.*  Right. I did say that.

19  *Q.*  And what was the clinical significance of that?

20  *A.*  Again, it relates to disassociation, not being -- and this

21  is relevant to any diagnosis.  It is new symptoms.

22  *Q.*  And what about Ms. Dailey's reference here when she

23  reports, "I don't want anything to do with people"?

24  *A.*  That is very significant because that is a different

25  behavior for her, a different -- wanting to be with people

Betty McGuigan - Direct

1    versus fearful of them at this point.

2    Q.  And what about Ms. Dailey's reference to "I can't go on

3    forever," is that a new symptom?

4    A.  It's definitely a deeper -- it's a despondency rather than

5    just sad feelings.

6    Q.  And can you tell us in your own words, what changes did you

7    see in Ms. Dailey's health following her report of the sexual

8    assault to you?

9    A.  What she is reporting and what I am seeing is increased

10   symptomatology.  She isn't coming into the office greeting me,

11   smiling to me.  She is either more agitated or she is moving

12   more slowly.

13   Q.  And does her feelings of happiness, have those changed?

14   A.  Right.  And that's what I was saying, that it doesn't --

15   according to my ability to assess, if someone comes in

16   consistently for three years and they don't have a positive

17   affect, that they are experiencing lack of joy, feelings of

18   happiness.

19   Q.  And you had mentioned one of the new symptoms you had seen

20   about Ms. Dailey of not wanting to have anything to do with

21   people.  How does that manifest to you even current day in your

22   treatment of Ms. Dailey?

23   A.  It's -- it's -- she is experiencing distrust of people,

24   which she never did before.  Also, in my practice, it's like if

25   I would lean over to touch her hand, she would recoil and she

Betty McGuigan - Direct

1  had never done that before.

2  *Q.*  And that was significant to you?

3  *A.*  Yes, very significant.  She was having -- just different.

4  I couldn't comfort her in any way with touch.

5  *Q.*  Did you observe that Ms. Dailey's underlying depression has

6  worsened?

7  *A.*  Let me explain that.  That would be -- I would not be doing

8  that normally with clients.  I don't normally touch them

9  because many of my clients have been abused or been through

10  trauma and it's not advisable.

11        The situation with Ms. Dailey is that, you know,

12  comforting her in some way or patting her on the hand would

13  have been nothing before, whereas for the last three years it's

14  been a factor that I could not even do that without her

15  immediately recoiling from the contact.

16  *Q.*  And in your opinion, do you believe that Ms. Dailey will be

17  able to make a full recovery?

18        *MR. TUMMINELLO:*  Objection, Your Honor.  This calls

19  for a future diagnosis and it exceeds the scope of the

20  testimony.

21        *THE COURT:*  Sustained.

22        *MS. RIVAUX:*  Your Honor, can I approach?

23        *THE COURT:*  Did she write her report?

24        *MS. RIVAUX:*  She did.

25        *THE COURT:*  That has that in it?

Betty McGuigan - Direct

1        *MS. RIVAUX:*  Yes.

2        *THE COURT:*  Then I have to see it.

3        *MS. RIVAUX:*  May I approach, Your Honor?

4     (At the bench:)

5        *THE COURT:*  What's your objection, that she didn't

6  disclose it?  What's your objection?

7        *MR. TUMMINELLO:*  Your Honor, she is a non-disclosed

8  expert.

9        *THE COURT:*  Yes, I know.

10        *MR. TUMMINELLO:*  She is a treating expert.  This

11  report was made for the purposes of litigation.  And previously

12  you addressed this issue that you noted that her opinions --

13  you specifically said, Your Honor, that she can't express any

14  opinions about her future problems and things like that.

15        *THE COURT:*  That's right, because I didn't think she

16  had prepared a report.

17        *MS. RIVAUX:*  This is a summary of her opinions before

18  she produced the medical records that she prepared that

19  included --

20        *THE COURT:*  Which paragraph?

21        *MS. RIVAUX:*  The last paragraph.

22        *THE COURT:*  I didn't know this before, but there it is

23  right there.  It was disclosed back in February.

24        *MR. TUMMINELLO:*  This was disclosed, Your Honor, as

25  part of the effort to get the records, which she refused to

1   produce, and then she produced these instead.

2          THE COURT:  I know, but you did have this, right?

3          MR. TUMMINELLO:  We had it when it was produced back

4   in --

5          MS. RIVAUX:  February.

6          THE COURT:  The objection is overruled.

7      (In open court:)

8          The objection is overruled.

9   BY MS. RIVAUX:

10  Q.  Dr. McGuigan, in your opinion will Ms. Dailey ever be able

11  to make a full recovery?

12         THE COURT:  Why don't you rephrase the question to fit

13  what was in that report.

14         MS. RIVAUX:  Sure.

15  A.  Can I look at my report by any chance?  If not, I will

16  answer it, that's okay.

17         THE COURT:  She can look at it, yes.

18         MS. RIVAUX:  May I approach, Your Honor?

19         THE COURT:  She can testify to what's in her report,

20  but that's it.

21  BY MS. RIVAUX:

22  Q.  Dr. McGuigan, what is your prognosis of Ms. Dailey?

23  A.  My prognosis of Ms. Dailey is there will be most likely

24  given the symptoms -- can I -- I can talk and explain a little

25  bit, yes?

Betty McGuigan - Cross

1    THE COURT:  Yes, but just explain the sentences there

2    in your report.

3    A.  Okay.  What I have read in here is that it's

4    undeterminable.  Therapy will most likely be likely costly,

5    financially and emotionally.  I've worked with Ms. Dailey for

6    three years.  She still is exhibiting increased symptoms and

7    increased intensity of the symptoms.

8        MS. RIVAUX:  That's all I have on direct, Your Honor.

9        THE COURT:  Cross-examination.

10                      **CROSS-EXAMINATION**

11   BY MR. TUMMINELLO:

12   Q.  Good morning, Dr. McGuigan.  My name is Doug Tumminello and

13   I represent the defendant, Nikos Hecht.

14   A.  Good morning.

15   Q.  Good morning.

16       Doctor, you would agree that a diagnosis of

17   posttraumatic stress disorder or PTSD requires that a person be

18   exposed to a qualifying traumatic event.

19       MS. RIVAUX:  I am going to object.  It's outside the

20   scope.

21       THE COURT:  It's cross-examination, overruled.

22   BY MR. TUMMINELLO:

23   Q.  Did you understand my question, ma'am?

24   A.  Would you repeat it.

25   Q.  Sure.  You would agree that a diagnosis of PTSD requires

Betty McGuigan - Cross

1   that a person be exposed to a qualifying traumatic event.

2   *A.*   Yes.

3   *Q.*   And PTSD is a psychological disorder and it's characterized

4   by a failure to recover after experiencing that traumatic

5   event.

6   *A.*   You cannot diagnose PTSD unless they exhibited, reported

7   the symptoms for more than a month.

8   *Q.*   In fact, though, to qualify for a diagnosis of PTSD, a

9   person has to actually experience a traumatic event.

10  *A.*   Not necessarily.   However, in this situation, Ms. Dailey

11  reported that she did experience the situation.

12  *Q.*   So your testimony is that a person does not have to

13  actually experience a traumatic event to suffer from PTSD?

14  *A.*   I would have to look at the exact wording in the DSM in

15  order to explicitly -- I generally do not report.   I generally

16  pull down the text and look at it.   There is another way,

17  according to the DSM, but it's not relevant to Ms. Dailey.

18  *Q.*   And so, ma'am, by the DSM, you are referring to the

19  Diagnostic and Statistical Manual of Mental Disorders?

20  *A.*   I am.

21  *Q.*   And the DSM is the gold standard or the guide that

22  clinicians use to diagnose mental illnesses?

23  *A.*   It is used by psychiatrists, psychologists, medical

24  doctors, mental health counselors, yes.

25  *Q.*   You would agree that the DSM defines a qualifying traumatic

Betty McGuigan - Cross

1   event as death, threatened death, actual or serious injury or

2   actual or threatened sexual violence?

3   A.   Yes.

4   Q.   And so in the absence of one of those traumatic events, a

5   person cannot have PTSD; isn't that right?

6          MS. RIVAUX:   I would object, Your Honor.

7          THE COURT:   I am confused.  Has she diagnosed PTSD?

8          MS. RIVAUX:   She did not testify as to her diagnosis

9   of anything.

10          THE COURT:   Are you thinking that she has diagnosed

11   PTSD?

12   BY MR. TUMMINELLO:

13   Q.   Dr. McGuigan, have you diagnosed --

14          MS. RIVAUX:   I would object to that question since it

15   was not something she testified to on direct.

16          THE COURT:   Wait a minute.  We are all trying to find

17   out what her opinion is, right?  She is your expert.

18          MS. RIVAUX:   Correct, Your Honor.

19          THE COURT:   He is asking questions about PTSD.

20          MS. RIVAUX:   Yes, Your Honor.  Right, Your Honor.  She

21   is a treating physician.

22          THE COURT:   She is not a physician.  She is a

23   psychologist.

24          MS. RIVAUX:   She is a psychologist.  She is a treater.

25          THE COURT:   Yes.  But my question is did she or did

1   she not diagnose PTSD?  And if the answer is no, we move on to

2   something else, right?

3          MS. RIVAUX:  Can I approach, Your Honor?

4          THE COURT:  No.

5          Doctor, did you diagnose PTSD or did you not?

6          THE WITNESS:  I did.

7          THE COURT:  You did?

8          THE WITNESS:  I did.

9          THE COURT:  All right.  There you are.

10         Onward.

11  BY MR. TUMMINELLO:

12  Q.  So in the absence of a qualifying traumatic event, a person

13  cannot have PTSD per the DSM; is that correct?

14  A.  If they have not experienced those three things, yes,

15  according to my understanding of it.

16  Q.  According to your understanding, that person cannot have

17  PTSD.

18  A.  They would not be diagnosed.

19         MS. RIVAUX:  She had mentioned that she usually pulls

20  down the DSM and there are several versions.  I don't know

21  which version Mr. Tumminello is referring to.

22         THE COURT:  I don't either, but it's a dialogue

23  between him and her.

24         What was your question, in the absence of one of those

25  three things?

Betty McGuigan - Cross

1  *BY MR. TUMMINELLO:*

2  *Q.*  A person cannot have PTSD either under the DSM-IV or the

3  DSM-V.

4       *THE COURT:*  Okay.  What's the answer to that question?

5  *A.*  Could I -- do you have a copy of the DSM here?  I don't

6  mean to be difficult.

7       In my recollection, you would need to meet the

8  criteria of the DSM, and it is specific that the event is a

9  life threatening event of those three options.  You would not

10  diagnose if they did not meet those three -- those criteria.

11       However, I am a licensed psychologist.  I have been

12  treating clients since 1988.  I have seen probably hundreds to

13  make -- hundreds of clients who have been diagnosed and have

14  the same symptoms that meet the criteria.  And the symptoms

15  that -- whether we look at a diagnosis or not, the symptoms are

16  similar.  They are the symptoms that meet the criteria of

17  posttraumatic stress disorder, whether I diagnose this or not.

18  And it's the symptoms that are different that she experienced

19  prior, prior to the event and after the event.  I had not seen

20  them before.  They are consistent.  They continue to be

21  consistent.  They are negative symptoms.  She is reporting

22  them.  I am using my professional experience with many, many,

23  many clients that she is exhibiting the same symptoms and

24  severity.

25  *BY MR. TUMMINELLO:*

Betty McGuigan - Cross

1    *Q.*  In Ms. Dailey's case, Doctor, if she was not sexually

2    assaulted by Mr. Hecht by definition under the DSM, she cannot

3    have PTSD, correct?

4    *A.*  Probably not.  She still might be diagnosed given my -- my

5    subjective, objective data, my intuition, my years of

6    experience.

7    *Q.*  Your diagnosis assumes that Ms. Dailey was raped by

8    Mr. Hecht, correct?

9    *A.*  Again, that's misleading in the sense that we are talking

10   about meeting a criteria that's written down.  I can't say that

11   the rape happened.  I don't know that.  However, what I do know

12   is that Ms. Dailey presented functioning prior, a different

13   affect, feeling joy.  Afterwards she is a different person.

14   She is presenting different symptoms and a severity of symptoms

15   that is affecting her life in serious ways.

16   *Q.*  You were speaking with Ms. Dailey's counsel just a bit ago

17   about your treatment of Ms. Dailey.

18         You have been treating her with psychotherapy since

19   before 2011, correct?

20   *A.*  Yes.

21   *Q.*  And many of your sessions with Ms. Dailey are two hours

22   long or even longer?

23   *A.*  Not longer, no.

24   *Q.*  But two hours long?

25   *A.*  Are we talking about the time between 2011 and 2016?

Betty McGuigan - Cross

1   *Q.*  Sure.

2   *A.*  Yes, her sessions were two hours.

3   *Q.*  In 2011, you treated Ms. Dailey with psychotherapy 22 times

4   that year, correct?

5   *A.*  Yes.

6   *Q.*  And in 2012, you continued your treatments with Ms. Dailey.

7   *A.*  Yes, but it was a reduced number of times.

8   *Q.*  In 2013, which would be a year prior to Ms. Dailey's

9   allegations in this case, you treated her with psychotherapy 20

10  times?

11  *A.*  I believe that's correct.

12  *Q.*  And in 2014, which is the year that Ms. Dailey's

13  allegations arise, you treated her six times prior to the trip

14  to Cabo San Lucas.

15  *A.*  Yes.

16  *Q.*  And you even treated her two weeks prior to that trip to

17  Cabo San Lucas, which was in March of 2014?

18  *A.*  I am afraid -- I have like hundreds of pages here.  Unless

19  you show me, I may not be able to get the numbers correct.

20  *Q.*  Does that sound accurate?

21  *A.*  What did you say?

22  *Q.*  That you treated her within a couple of weeks prior to her

23  trip to Cabo San Lucas.

24  *A.*  I treated her -- I believe -- do you want to show me the

25  date?

Betty McGuigan - Cross

1        *THE COURT:*  What's the record?  What's the date?

2  *A.*  I can guess, but I'd rather not guess.

3        *MR. TUMMINELLO:*  Can you pull up 204.001?

4  *A.*  I treated her on March the 7th.

5  *BY MR. TUMMINELLO:*

6  *Q.*  Does that refresh your memory of having treated her within

7  a couple of weeks prior to her going to Cabo?

8  *A.*  I treated her on March the 7th, correct.

9  *Q.*  You agree that Ms. Dailey has a history of depression?

10 *A.*  She came in with a history of depression, and yes, we are

11 managing a depressive disorder.

12 *Q.*  And she had been under the treatment of depression for

13 years?

14 *A.*  I would not say -- I don't know in great detail prior to

15 when I saw her.

16 *Q.*  Do you know of her treatment by her psychiatrist,

17 Dr. Jacobson?

18 *A.*  I know of it.  She -- you know, I know of that.  She met

19 with Dr. Jacobson.

20 *Q.*  Do you know Dr. Jacobson?

21 *A.*  I do not.

22 *Q.*  Were you coordinating in your therapy with Dr. Jacobson?

23 *A.*  I had no contact with him.  She reported she saw him.  I at

24 times had to write down what her medications were and they were

25 in the record.  And any questions I referred to him.  If she

Betty McGuigan - Cross

1   were mentioning any complications, I would refer them back -- I

2   would refer her back to Dr. Jacobson.

3   *Q.*   And you understand Dr. Jacobson to be a psychiatrist, not

4   just a pharmacologist.

5   *A.*   Right.  He is a psychiatrist.

6   *Q.*   And Dr. Jacobson had also diagnosed Ms. Dailey with ADHD,

7   attention deficit hyperactivity disorder, I believe you said.

8   *A.*   Yes.  I referred also -- yes.

9   *Q.*   By March of 2014 in addition to being treated by you and

10  Dr. Jacobson, do you understand that Ms. Dailey was also being

11  treated by a psychiatrist named Dr. Creelman?

12  *A.*   Yes, I know that.  Can you -- do you know what record you

13  are referring to?

14  *Q.*   For Dr. Creelman?

15  *A.*   Yes, or that I know that, which I don't.

16  *Q.*   If you can pull up 204.008.

17  *A.*   Yes.  This --

18  *Q.*   If you can take a look down in the assessment section.

19  *A.*   Okay.  This -- okay.  May I ask what this has to do with me

20  knowing or anything about Dr. --

21  *Q.*   Dr. Creelman?

22  *A.*   Yes.

23  *Q.*   Did you understand that Dr. Creelman was providing

24  Ms. Dailey with a therapy called TMS, transcranial magnetic

25  stimulation?

1   A.  Yes, I did.  Ms. Dailey asked me about -- on a particular

2   date she asked me about TMS.  And I said that I was not

3   knowledgeable on that date.  And I referred her back to

4   Dr. Jacobson in order to make sure that the treatment was

5   advisable and was not contraindicated with her medications.

6   Q.  And do you understand that she undertook that therapy?

7   A.  I am sorry, I missed a word.  What did you say?

8   Q.  That she undertook that therapy.

9   A.  Yes, I did.  I did not.  Yes, I did.

10          MR. TUMMINELLO:  Your Honor, we move to admit 204.008.

11          MS. RIVAUX:  No objection.

12          THE COURT:  It's admitted.

13  BY MR. TUMMINELLO:

14  Q.  Dr. McGuigan, I would like to focus on the therapies that

15  you used with Ms. Dailey starting in the year 2011.  In the 22

16  treatment sessions you had with her that year, the therapy

17  approaches that you used included cognitive behavioral therapy?

18  A.  Yes.

19  Q.  And eye movement desensitization of reprocessing therapy?

20  A.  I did.

21  Q.  And cognitive behavioral therapy is a type of talk therapy,

22  if you will, in which negative thought patterns about the

23  person's self or the world are challenged?

24  A.  That's correct.

25  Q.  And EMDR or eye movement desensitization and reprocessing,

Betty McGuigan - Cross

1   that's a psychotherapy that enables people to heal from the

2   symptoms and emotional distress resulting from disturbing life

3   experiences?

4   *A.*   That was what it was originally utilized for.  I use it for

5   many methods in addition to that, to reduce feelings, to

6   just -- if someone comes in and they are feeling extreme stress

7   over an incident, I would use it to reduce those feelings so

8   that they feel better.

9   *Q.*   And so that would include treatment for the stress from

10  traumatic memories?

11  *A.*   Yes.

12  *Q.*   And you were using that therapy with Ms. Dailey back in

13  2011.

14  *A.*   I am sorry, what did you say?

15  *Q.*   That you were using that treatment therapy, EMDR.

16  *A.*   I lost what was ever on the sheet, what you were referring

17  to.

18  *Q.*   I am not referring to that sheet, ma'am.

19  *A.*   Oh, can you tell me what you are referring to, what note

20  that you are indicating so that I could know what was going on

21  at that time?

22  *Q.*   Well, if you can look at your report that we were talking

23  about earlier, which is 207.

24  *A.*   I don't have anything in front of me, sir.

25          *MR. TUMMINELLO:*  Your Honor, we would move for the

Betty McGuigan - Cross

1    admission of the unredacted version of this document.  I am

2    looking at this document.  It contains redactions.  I think

3    that that record is 207A.

4              THE COURT:  Which document?

5              MR. TUMMINELLO:  Exhibit 207.001.

6              MS. RIVAUX:  We would object both to the redactions

7    and the introduction of this report.

8              THE COURT:  Well, what you are saying is you object to

9    the report whether it has redactions or not.

10             MS. RIVAUX:  Right.

11             THE COURT:  But that's the summary report that you

12   just had me look at in order to have her make her diagnosis.

13             MS. RIVAUX:  Well, the reason, the issue really is the

14   redactions that we have with this, Your Honor, because there

15   are issues that violate the motions *in limine*.

16             THE COURT:  Well, let's redact it.  How can I tell if

17   I don't see the whole thing?

18             MR. TUMMINELLO:  Your Honor, I will have to move on.

19   We are going to have to pull out an unredacted version of this

20   to take a look at because we would move that the unredacted

21   version be admitted into evidence, but in the meantime I will

22   go on with Dr. McGuigan.

23             THE COURT:  Well, okay.  If you are going to withdraw

24   the offer, then that's that.

25             MR. TUMMINELLO:  Well, it's not loaded on the system,

Betty McGuigan - Cross

1   Your Honor.  We don't have an unredacted version that's on the

2   system currently.

3          THE COURT:  Well, let me see it.  I can look at it.

4          MR. TUMMINELLO:  That's what I am saying.  We are

5   going to get it.

6          THE COURT:  I can look at it in paper.

7          MR. TUMMINELLO:  Your Honor, can we take a break and

8   we will grab that and then we will come back.

9          THE COURT:  How much time would you like today, folks?

10  10 minutes?  Okay.

11      (Recess at 10:32 a.m.)

12      (Reconvened at 10:43 a.m.)

13         THE COURT:  Let me see the report now, if you've got

14  it.  Yes, go get the client, sure.

15         MS. RIVAUX:  Your Honor, of course I note the

16  unredacted version is not on their exhibit list when we

17  submitted a joint exhibit list.  Only the redacted version is

18  on their list.

19         THE COURT:  Okay.  I know about that.  We are very

20  familiar with that report.

21         MS. RIVAUX:  One --

22         THE COURT:  Would you stop talking for a second,

23  please?  I don't want to be rude, but I can't listen and read.

24         MS. RIVAUX:  I am sorry, Your Honor.

25         THE COURT:  All right.  Now.

Betty McGuigan - Cross

1         MS. RIVAUX:  If I could just clarify what the issue is

2    for us with the report itself is that based on the discussion

3    that we had with Your Honor a couple days ago about the issue

4    of PTSD -- should we excuse the witness for this discussion?

5    Okay -- and whether or not since we don't need to prove PTSD

6    for anything, we are really limited on the witness' direct, so

7    that she talked about her treatment and not raise the issue of

8    all her diagnoses.

9         We also have another expert that talks specifically

10   about PTSD and Dr. Hudson was only disclosed as a rebuttal to

11   Dr. Yeaw.  He did have some opinions as a rebuttal to

12   Dr. McGuigan, but only as a forensic expert, and Your Honor had

13   ruled that she is only a treater so that --

14        THE COURT:  Okay.  I think you are paranoid.  That's

15   not a medical diagnosis, by the way.  That's a Judge's probably

16   improper use of the word.

17        You've got a person here.  She isn't a forensic

18   expert.  She has never testified before, apparently, but she is

19   here to tell us about what she has done.  The rest of these

20   people are just hired for the case.  This is the one that has

21   met with the patient.

22        MS. RIVAUX:  Correct.

23        THE COURT:  I am very familiar with Dr. Hudson's

24   report.  It's a very good report.  And from what I am hearing,

25   my interpretation is what she is doing is consistent with what

Betty McGuigan - Cross

1   she should be doing.  She hasn't -- what she just said in her

2   long answer was, I don't know if there was a rape or not, and

3   she has to say that.

4           MS. RIVAUX:  Absolutely.

5           THE COURT:  Nobody knows that except the two parties.

6   But she says, I see things that I consider to be symptoms.

7   Okay.  That's consistent with Dr. Hudson's report, in my

8   opinion.

9           MS. RIVAUX:  Our concern is they are trying to use

10  this to open the door as to all these other issues that Your

11  Honor has excluded on 403.

12          THE COURT:  I agree with you on one, and that is the

13  redaction on page -- well, Page 4 of her numbers, 2013, toward

14  the bottom, I agree with you that the whole business about the

15  herpes -- maybe I am on the wrong page there.

16          MR. PLACHY:  That's Page 5, Your Honor, I think.

17          THE COURT:  Correct, Page 5.  I agree that that ought

18  to be redacted because it is a 403 issue.  The fact that she

19  had herpes at some point in her life has nothing to do with

20  this case and it ought to be redacted, but these other things

21  strike me as fair ground because they are possible alternative

22  explanations of her depression and that's their causation

23  issue.  For example, well, the thing about drinking, to me

24  that's totally irrelevant.  She stopped drinking way years ago.

25          MS. RIVAUX:  Right.  And there has been no evidence of

Betty McGuigan - Cross

1  it in the case.  And to bring it up like this, and you have

2  excluded it.

3       THE COURT:  I don't care.  I don't know why they care.

4  I don't know why you care.

5       MS. ALTMAN:  Your Honor, you excluded our ability to

6  inquire of the defendant about his drug use and alcohol use, as

7  you may recall.  And at the same time --

8       THE COURT:  Yes, but this isn't a goose and gander

9  issue.  They are totally different issues.  She doesn't have an

10  alcohol problem at all.  That was not an issue in this case.

11       MS. ALTMAN:  But references to it are included in this

12  report.

13       THE COURT:  If it's that important to you, I don't

14  care.  It's not relevant to the defense either.  But when you

15  get over to the stuff about the unfortunate issue concerning

16  the death of her nephew, that could be conceivably an

17  alternative explanation of some of the depression.  That's fair

18  game.  And that's on Page 3.  It's again on Page 4.

19       MS. RIVAUX:  Well, she testified that Ms. Dailey had

20  depression.  That's not the issue.  The issue is the

21  exacerbation.

22       THE COURT:  The issue is what caused the depression.

23  You are saying that what caused the exacerbation of this

24  depression was this incident.

25       MS. RIVAUX:  Correct.

Betty McGuigan - Cross

1          THE COURT:  They are saying the incident didn't happen

2     and there are other causes that they want to contend explain

3     it.

4          MS. RIVAUX:  But she conceded that she had depression

5     beforehand.

6          THE COURT:  Yes, she certainly has.

7          MS. RIVAUX:  And she had not prior diagnosed her with

8     symptom of PTSD.

9          THE COURT:  Okay.  The Court's ruling is that the

10    redaction of the information concerning the drinking is okay.

11    The redaction of the information about the herpes is okay.

12    That can be redacted, stay redacted.  The other redactions are

13    inappropriate and the entire report with the two redactions

14    that I mentioned is admitted.

15          A clean copy is not admitted and the over-redacted

16    copy is not admitted.  And that's the ruling for better or for

17    worse.  Now, let's move on.  The way to accomplish that, folks,

18    is to take a black marker right now and strike out the parts

19    that I said are properly redacted unless you can do it on the

20    computer.

21          MR. TUMMINELLO:  We are doing it on the computer, Your

22    Honor.

23          THE COURT:  My redaction method is old school.  Then

24    again, I am old school.  In fact, I am old.

25          MS. RIVAUX:  Your Honor, we believe this to be a 403

454

Betty McGuigan - Cross

1   issue.  It's extremely prejudicial.

2          THE COURT:  Which one?

3          MS. RIVAUX:  On the nephew suicide.

4          THE COURT:  It's not prejudicial.  It's not extremely

5   prejudicial.  It's not unfairly prejudicial.  And the

6   reconsideration request is denied for better or for worse.  I

7   make a ruling, that's it, but I will tell you this.  If the

8   defense wants to make an issue of it, they are going to look

9   like they are picking on her.  That's what I think.  If I were

10  the defendant, I would stay away from it with a 50-foot pole,

11  but that's your tactics.  It's not mine.

12         MS. ALTMAN:  Understood, Your Honor.  I think the only

13  challenge is that we relied on the Court's' rulings and our

14  witnesses have already been introduced.

15         THE COURT:  I never ruled on the suicide issue before.

16         MS. RIVAUX:  You did, Your Honor.

17         THE COURT:  When? I did?

18         MS. ALTMAN:  Yes.

19         THE COURT:  If I did, then that's that.  Why have you

20  then tried to get around that?

21         MR. TUMMINELLO:  Your Honor, the nephew's suicide is

22  instrumental to Dr. Yeaw's, their expert's expert report as an

23  alternative cause for PTSD.  Dr. Yeaw identified three --

24         THE COURT:  I don't know that.  I haven't read Yeaw's

25  report.  Nobody asked me to.  Is Yeaw talking about the suicide

Betty McGuigan - Cross

1   in her report?

2          *MS. ALTMAN:*  Your Honor, what we talked about the

3   other day was, as you may recall, we had a discussion about we

4   don't need to prove PTSD to prove this case.  And at that point

5   Mr. Tumminello and I said, well, then we won't call Yeaw and

6   they won't call Hudson.  What they are trying to do -- because

7   that's the discussion we had.  We won't call Yeaw.  You don't

8   call Hudson.  PTSD doesn't come in and that's the way it goes.

9          And now what they are trying to do is somehow call

10  Dr. Hudson in rebuttal to Dr. McGuigan, who is not an expert,

11  was not a disclosed expert other than is a treater, so that's

12  why they are trying to open the door so that they can then

13  suggest that Dr. Hudson can rebut Dr. McGuigan.

14         *THE COURT:*  Wait a minute, wait a minute.  You say you

15  had some sort of a deal between you?

16         *MS. ALTMAN:*  So what happened, Your Honor, the other

17  day when we were talking about the *Daubert* hearing and Your

18  Honor made very clear you didn't think on the *Daubert* issues

19  that we were going to be able to keep Dr. Hudson out, but then

20  you raised all of these 403 issues attendant to his report.

21  And you thought, well, because of those you thought he should

22  be able to testify about those.

23         We stood in front of Your Honor and I made the comment

24  about, but we don't need PTSD to prove our case.  And you said

25  yeah, then why do you guys need that?  And we both looked at

Betty McGuigan - Cross

1    each other and said, yes, that's right.  And we did it here and

2    we stepped outside and said, well, if you don't call Yeaw, we

3    won't call Dr. Hudson, because he is only a disclosed rebuttal

4    expert to Dr. Yeaw, not to Dr. McGuigan.

5         And so as a result of that, we said, okay.  We won't

6    call Dr. Yeaw.  You won't call Dr. Hudson because he is a

7    rebuttal expert.  But then yesterday he said to me, well, we

8    need to hear Dr. McGuigan testify because we may have something

9    to discuss -- have him as a rebuttal to her.  And we, in fact,

10   called for clarification.

11        THE COURT:  You are filibustering now.  You are

12   officers of the Court.  I am inclined to trust you.  Either you

13   had an agreement or you did not.  I didn't step outside the

14   court and hear what you had to say.  No one presented an

15   agreement to me.  Now, if there is an agreement, no Yeaw, no

16   Hudson, there is an agreement.  If there is no agreement, there

17   is no agreement.

18        Now, honestly, folks, is there or is there not?

19        MR. TUMMINELLO:  There is not, Your Honor.

20        And I had this conversation as late as last night with

21   their other counsel.  And what we said between us was with

22   respect to Yeaw and Dr. Hudson, that nobody would be able to

23   make a determination as to the scope of their testimony until

24   we heard what Dr. McGuigan would have to say because we had no

25   idea what she was going to get up and say.

Betty McGuigan - Cross

1          Then this morning --

2          THE COURT:  Go ahead.

3          MR. TUMMINELLO:  Then this morning, Your Honor, we

4   come and Dr. McGuigan starts talking about PTSD.  And they move

5   to put --

6          THE COURT:  She didn't say a peep about PTSD until you

7   did in cross-examination.

8          MR. TUMMINELLO:  She talked about the symptoms of

9   PTSD, Your Honor.

10          THE COURT:  You asked the questions about PTSD.  And

11   if I were you, I would be very sorry that I did because what

12   you did is opened the door to an answer that she gave that was

13   a very positive pro plaintiff answer.

14          MR. TUMMINELLO:  Your Honor, it's in the exhibit.

15          MS. RIVAUX:  It was not a diagnosis of PTSD.  All she

16   wrote is she saw symptoms of PTSD in the exhibit.

17          THE COURT:  One more time, is there an agreement or

18   not on Daubert to not call Yeaw and not call Hudson?  You say

19   no, there isn't.  Yes or no?

20          MS. ALTMAN:  From my perspective, yes, Your Honor.  I

21   cannot speak for Mr. Tumminello.  It was my understanding that

22   we had an agreement with the exception of yesterday -- we have

23   the transcript where he said it in front of Your Honor.  And

24   then what happened was yesterday he said, well, we want to see

25   what happens with McGuigan, and then he said and then we might

Betty McGuigan - Cross

1  want to use Dr. Hudson to rebut her, but he was not disclosed

2  to rebut her.

3      THE COURT:  There is no way for me to understand what

4  the agreement was or wasn't, and in that case there is no

5  agreement.  You call Yeaw.  You call Hudson.  Fine.  As far as

6  this business about the death of the nephew, to me it's greasy

7  kid stuff.  It's a very stupid thing for the defendant to go

8  into and badger the plaintiff with, but that's not my call.  My

9  call is as a judge.  And any ruling I make *in limine* is just

10  that, it's a ruling *in limine* subject to revisiting in the

11  context of the evidence that's given.

12      And I have revisited it and I am saying that they can,

13  if they are foolish enough to want to do it, leave that part of

14  what this expert says in her report.  That's it.

15      Now, are you going to leave it in or take it out?

16      MR. TUMMINELLO:  I think we have to leave it in, Your

17  Honor, because in Yeaw's report she talks about the nephew's

18  suicide.

19      THE COURT:  You do what you need to do.  I have given

20  you good advice.  Sometimes people don't listen and they walk

21  down the road of possible victory and then snatch defeat from

22  it.  So you go ahead and do that.  Those are the rulings.  No

23  more discussion.

24      Bring the jury in.

25      MS. ALTMAN:  And I just want to put on the record we

Betty McGuigan - Cross

1    are prepared not to call Dr. Yeaw if they are --

2             THE COURT:  You can call him or not call them.  That's

3    up to you.

4             (Jury present:)

5             THE COURT:  All right.  It wasn't that I forgot that

6    it was a 10-minute recess.  It was that we had some issues that

7    came up during the recess that I had to discuss with the

8    parties, so we are ready now to continue.

9    BY MR. TUMMINELLO:

10   Q.  Exhibit 207, please.

11            THE COURT:  207 is her summary report.

12            MR. TUMMINELLO:  Yes.

13            THE COURT:  And it's partially redacted by orders of

14   the Court.

15            MR. TUMMINELLO:  Yes, sir.

16            THE COURT:  And the partially redacted version is

17   admitted.

18            MS. RIVAUX:  We have our objection as we noted

19   previously.

20            MR. TUMMINELLO:  207 was already admitted, as I

21   understand it.

22            THE COURT:  The issue just discussed, Mr. Tumminello,

23   was what could and what could not be redacted.  That was

24   resolved during the break.

25            MR. TUMMINELLO:  Yes, sir.

Betty McGuigan - Cross

1      THE COURT:  And ladies and gentlemen, don't speculate,

2  please, about what is behind the black door.  There are a

3  couple of things in there that the Court has ordered should be

4  removed because they were not relevant to this case and for

5  legal reasons they need to be removed.  But other than that,

6  you have got the full story.  Everything that's relevant to

7  this case you have got there.

8      Onward.

9  BY MR. TUMMINELLO:

10  Q.  Dr. McGuigan, I think before we took the break, I was

11  asking you about therapies that you were giving to Ms. Dailey

12  in 2011.  And the therapies I was asking you about included

13  EMDR and CBT or cognitive behavioral therapy?

14  A.  Correct.

15  Q.  And those are the therapies that you were providing for

16  Ms. Dailey in 2011.

17  A.  There are probably a few more.  I don't know.  I don't have

18  all my -- I might have mentioned other supportive therapy, you

19  know, but I did -- I did those two.

20  Q.  And I am simply referring to Exhibit 207 at Page 4 of

21  Exhibit 207.

22  A.  Do I need to see a copy of that one?

23  Q.  I am going to move on because this is the redacted version

24  of it.

25      THE COURT:  Well, wait a minute.

Betty McGuigan - Cross

1          MR. TUMMINELLO:  I will withdraw that question.

2          THE COURT:  You better withdraw that redacted version

3    because that's not the way I ordered it to be redacted.  Can

4    your fellow reduce the copy that is redacted the way I

5    instructed?

6          MR. TUMMINELLO:  We did.  It's Exhibit 222, Your

7    Honor.

8          THE COURT:  All right.  So 222, not 207 is admitted.

9          All right.  What's the question?

10   BY MR. TUMMINELLO:

11   Q.  It was confirming the treatment therapies in 2011, EMDR and

12   cognitive behavioral therapy.

13   A.  I utilized those.  I still don't know what date you have

14   unless I have a note of that date.  On that particular day are

15   you talking about or just in general?

16   Q.  No, just in general.

17   A.  Okay.  Do you have a way of circling what you are talking

18   about?  I just can't remember what all -- okay, yes.  I mention

19   those.  They were the most significant types of therapy I would

20   have been using then.

21   Q.  And Dr. McGuigan, in 2012 you continued your therapy with

22   Ms. Dailey?

23   A.  Yes, yes, I did.

24   Q.  And in 2012, you note that you are treating Ms. Dailey to

25   process her feelings and concerns regarding her sister, Sallie,

1 | and her sister's mental health, correct?

2 | *A.*   Yes, I do.

3 | *Q.*   And you referred Ms. Dailey to a therapist named John

4 | Connelly?

5 | *A.*   I did.

6 | *Q.*   And Mr. Connelly uses a type of therapy called rapid trauma

7 | resolution?

8 | *A.*   That's correct.  Let me explain a little bit.  Ms. Dailey

9 | had been expressing feelings of sadness related to the death of

10 | her nephew, who she was very close to and had a close

11 | relationship.  I do not have my dates and are not explained in

12 | great detail here, but at this period of time it was still less

13 | than a year, so that I am just looking at the symptoms.  It is

14 | just a way of helping her feel less grief at that point.

15 | When it is less than a year, people do experience

16 | sadness related to normal grief.  And I do utilize PTSD or I do

17 | utilize EMDR in other situations besides traumas and PTSD.  I

18 | use it all the time someone comes in because it's an immediate

19 | response.

20 | *Q.*   In 2012, Ms. Dailey noted to you that she received minimum

21 | response from the rapid trauma resolution therapy?

22 | *A.*   Yes, she did.  However, in my notes, which I can't tell you

23 | which ones or whatever, that she was beginning to feel better

24 | sometime down the line.  So sometimes clients tell me, you

25 | know, they don't feel good, like they are looking better, but

1  they actually down the line would be expressing some

2  improvement.

3         And in therapy I would just -- they would not remember

4  what they said perhaps five sessions before, but down the line

5  I would probably be just saying, well, I know that you are

6  feeling better, you know.

7  Q.  And in Ms. Dailey's case, she continued to show difficulty

8  or symptoms from the continuous treatment that she was having

9  to provide to her mom and Sallie; is that correct?

10 A.  She would come in and discuss, you know, her feelings about

11 caring for them, like any caretaker would do.  You know, it was

12 difficult at times.  She is working -- you know, she is being

13 there on a consistent basis, yes.

14 Q.  Now, your therapies with Ms. Dailey continued into 2013.

15 A.  It did.

16 Q.  And the goals for that therapy in 2013 were to decrease her

17 depression?

18 A.  Yes, depressive feelings.

19 Q.  And to support her personal business goals?

20 A.  Correct.

21 Q.  And in 2013 one of Ms. Dailey's therapy goals included

22 integrating who she is and to obtain a more defined chosen

23 image of herself?

24 A.  Yes.  She was having future goals, you know, making

25 personal goals for the future.  Normally what a person would do

1    when they come to psychotherapy, that would be a traditional

2    thing, yes.

3    Q.  You note that 2013, as the year began, she had a severe

4    bout of depression.

5    A.  I believe without looking at it, I could look at in 2013

6    that date, but there was a time in 2013 I believe it implies

7    there about medication management and that there was an

8    adjustment made by Dr. Jacobson due to a medical condition.

9    And there was a brief period of time that there was a bout of

10   depression, but it was quickly resolved.

11          But if you want me to look at the note, if it's not

12   too much trouble, then I would be glad to do that, if someone

13   could provide that note.

14   Q.  We will probably move to that note here in just a bit.

15   Right now just to focus on your summary.

16          So again the year 2013, the therapies that were

17   continued with Ms. Dailey included the cognitive behavioral

18   therapy?

19   A.  Yes.

20   Q.  As well as EMDR?

21   A.  Yes.

22   Q.  And EMDR is the eye movement desensitization therapy?

23   A.  It's eye movement desensitization and reprocessing, yes,

24   which again, yes, I am reducing feelings of symptoms of grief,

25   yes.

Betty McGuigan - Cross

1   Q.  And the additional therapies that was used with Ms. Dailey

2   included hypnoses?

3   A.  It did.

4   Q.  And emotional freedom therapy?

5   A.  Yes.

6   Q.  What is emotional freedom therapy?

7   A.  It is a technique in my mind.  I've been using it so

8   that -- with EMDR there is a protocol to it.  The therapist,

9   the psychologist, administers the approach.  I consider EFT as

10  a technique that a client can use such as visualization,

11  breathing exercises.

12          Some clients find that it reduces feelings of stress,

13  so it's something, a little tool, that they can use on their

14  own without me.  And that was the reason I utilized it.  I'm

15  not -- I don't use it all the time, but sometimes I do.  If a

16  client likes it, I use it.

17  Q.  And, Doctor, Exhibit 207 is a summary of your records that

18  you prepared in connection with this lawsuit; is that right?

19  A.  I am sorry, what did you say?

20  Q.  Exhibit 222 is a summary of the records or your treatment

21  of Ms. Dailey that you prepared in connection with this

22  lawsuit.

23  A.  Okay.  This record had to do with being subpoenaed for the

24  records, for my records for Ms. Dailey.  And rather than

25  provide the records, as an option in the state of Florida, I am

1   able to write a summary.  Generally, my summaries go with the

2   client.  In this particular incident, they went to you because

3   there was a subpoena and the Judge ordered that I provide them.

4   I didn't know -- I had -- I guess I was clueless.  I had no

5   idea that I would be here or they would be here, but without

6   the me, I guess it's very difficult.

7   Q.  Dr. McGuigan, I would like to focus on the symptoms that

8   Ms. Dailey exhibited prior to March of 2014, so prior to the

9   Cabo San Lucas incident.  Prior -- in the years of your

10  treating her, both seeing her from a period of 2011 to early

11  2014, you were treating Ms. Dailey for depression throughout

12  that time frame?

13  A.  Correct.  However, we were doing management of depression,

14  you know, so that we were managing her symptomatology so that

15  with her ability to come in psychotherapy and medication, that

16  she is functioning, she can function, continue her world, her

17  business, go to work, take care.  It's a lot.  She was doing

18  that.

19  Q.  By the time 2013 came around, though, she was still showing

20  the signs of severe depression; is that correct?

21  A.  She was displaying symptoms of grief, okay?  And it appears

22  to me that my notes and everything that I have written down is

23  related to Ger's death, and that would be normal grief for the

24  most part.  At least that's what that appears to be talking

25  about.

1  *Q.* Can we pull up 203.006?

2  *A.* And may I add that it would be a normal response to grief

3  with a close relationship as Ms. Dailey reported to me about

4  her nephew.

5  *Q.* Dr. McGuigan, you treated Ms. Dailey on February 19 of

6  2013; is that correct?

7  *A.* It is.  I did.

8  *Q.* And this is a treatment note from you that -- your

9  treatment note from that day?

10  *A.* It is.

11  *Q.* And this is a note that you prepared in the ordinary course

12  of your treatment of Ms. Dailey?

13  *A.* Yes, it is.

14      *MR. TUMMINELLO:* Your Honor, we would move for the

15  admission of 203.006.

16      *MS. RIVAUX:* No objection.

17      *THE COURT:* It's admitted.

18  *A.* May I also see the session prior to this as well?  I mean,

19  we can read this, we can look at this, but I would also like to

20  see it before.

21  *BY MR. TUMMINELLO:*

22  *Q.* Would you like to look at that one first?

23  *A.* That might be helpful.  Thank you.  Let's read this.  It's

24  right here.

25  *Q.* So if we can take a look at the mood section of this

1  report.  You noted that Ms. Dailey presented as dysthymic and

2  anxious.

3  A.   Correct, it does note that.

4  Q.   Dysthymic means essentially depressed?

5  A.   It means bad feeling.

6  Q.   And anxious is the ordinary use of the term, means anxious?

7  A.   Yes.

8  Q.   And if we can take a look at the Assessment section of this

9  note.

10  A.   Okay.  The client is considering TMS for depression.

11  Administered the BDI, the depressive inventory, and the Beck

12  Anxiety Inventory.  And she was showing severe levels on the

13  depressive inventory and moderate levels on the anxiety side.

14  Part of it, this is where the client is asking me about should

15  she be considering TMS, which I told her, as I explained

16  before, I am not knowledgeable about and referred her back to

17  her psychiatrist to get his assent and see if it would be

18  contraindicated.  I also noted that Jeanne agreed to pay for

19  the treatment.

20  Q.   And you also noted that mother and Sallie are keeping their

21  conflict with Ms. Dailey going.

22  A.   I do.

23  Q.   And that's based auto Ms. Dailey's report?

24  A.   Yes, it is.

25  Q.   And that circumstance was causing Ms. Dailey anxiety?

1   *A.*  Yes, normal anxious family conflict.  I would like to see

2   the report before, thank you.

3   *Q.*  So if we can pull up 203.005.

4        This is a therapy note from February 15 of 2013?

5   *A.*  Yes, it is.

6   *Q.*  And this is a note that you prepared during your therapy of

7   Ms. Dailey on that day?

8   *A.*  I did.

9        *MR. TUMMINELLO:*  Your Honor, we move to admit 203.005.

10       *MS. RIVAUX:*  No objection.

11       *THE COURT:*  It's admitted.

12  *BY MR. TUMMINELLO:*

13  *Q.*  And on that day, if we focus on the Mood section of the

14  notes?

15  *A.*  Correct.

16  *Q.*  She was presenting to you on that day as being dysthymic?

17  *A.*  Yes.

18  *Q.*  And again, in lay terms, that means depressed?

19  *A.*  I better look at it first.  Let's look at it.  Okay.

20  Please.  Okay.  So it says here that due to blood pressure, she

21  had stopped taking her meds for depression.  She was working

22  with Dr. Jacobson.  So this is the experience that I was

23  telling you where due to a medical condition, Ms. Dailey

24  stopped taking her medication and was therefore feeling

25  significant feelings of depression this week, the next week.

1            And this is common with a medication adjustment.  And

2     if my notes, if you look at my notes past this, it will show

3     that she, after the adjustment, she went back to being stable.

4     This is very common.

5     *Q.*  And your treatment of Ms. Dailey for depression continued

6     into early 2014 and then beyond.

7     *A.*  I am sorry, sir?

8     *Q.*  Your treatment of Ms. Dailey for depression continued into

9     2014 and beyond?

10    *A.*  Oh, yes, it did.

11    *Q.*  And one of Ms. Dailey's goals for treatment from 2014 was

12    to reduce depression?

13    *A.*  Could you show me my report in 2014?  But I am sure if

14    nothing else, it would say management, management of

15    depression.  That's a ongoing factor for anyone that's been

16    diagnosed.

17    *Q.*  Sure.  If we can pull up 204.004.

18    *A.*  And it's an up and down kind of ride.  And as human beings,

19    we all experience --

20            THE COURT:  There is no question pending, so let's get

21    back to the question and answer.

22    *BY MR. TUMMINELLO:*

23    *Q.*  You see in front of you what's been marked as

24    Exhibit 204.004?

25    *A.*  Yes, yes.

Betty McGuigan - Cross

1   Q.  And this is a treatment plan effective January 16 of 2014?

2   A.  Right.

3   Q.  You prepared this during your treatment with Ms. Dailey?

4   A.  I did.

5        MR. TUMMINELLO:  Your Honor, move to admit.

6        MS. RIVAUX:  No objection.

7        THE COURT:  It's admitted.

8   BY MR. TUMMINELLO:

9   Q.  So Dr. McGuigan, you see the treatment goal for Ms. Dailey

10  in 2014 was reducing depression?

11  A.  Yes.  Those are my words.  I am writing it.  So I would be

12  talking about reducing feelings of depression, yes.

13  Q.  I want to focus now on dysthymia.  So between the period of

14  2011 and 2014 and prior to the Cabo San Lucas trip, you

15  consistently referred to Ms. Dailey's mood as dysthymic; is

16  that right?

17  A.  Or I am noting that as I do.  I am noting it, either that

18  or it's just what we're looking at.

19  Q.  And her mood presented to you as dysthymic throughout that

20  period of time from 2011 to the beginning of 2014?

21  A.  Not exactly.  I would say these notes are for me.  They are

22  kind of a -- I never expected anyone else to see them.

23  Basically what I say in the bottom is also helpful to interpret

24  what's going on, but the general progress or the way that

25  depression works is similar to having diabetes.

1          It's like if you take your medication, you follow your

2   nutrition, it's -- you're stable.  It's like it's moving along

3   in a hum.  If you don't do either one of those things, you are

4   going to have a negative effect.  Depression works the same

5   way.

6          So I am always looking, I am always analyzing, I am

7   always focusing on how does the client look?  How are they

8   handling life?  What are they reporting?  And if they are

9   taking medication, if they are being compliant, they come to

10  therapy, they get a chance to talk about their feelings,

11  release --

12  Q.  Dr. McGuigan, can I ask you a question?

13  A.  Yes.

14  Q.  Can we focus on the records?

15  A.  Yes.

16  Q.  Can you answer the questions that I ask?

17  A.  It's misleading.  It's --

18  Q.  Let me ask you this.  Let me refer you to Exhibit 201.013.

19         This is a therapy note from February 21, 2011; is that

20  right?

21  A.  Yes.

22         MR. TUMMINELLO:  Your Honor, move to admit 201.013.

23         MS. RIVAUX:  No objection.

24         THE COURT:  It's admitted.

25  BY MR. TUMMINELLO:

1   *Q.* And in the Mood section, you characterize Ms. Dailey as

2   dysthymic; is that right?

3   *A.* Yes.  In my infinite wisdom, at least that day, I noted the

4   decrease arrow going down, which shows it's reduced.

5   *Q.* And if we turn to Exhibit 201.016.

6        And this is your therapy note for treatment of

7   Ms. Dailey on April 1, 2011?

8   *A.* Okay.

9   *Q.* Is that correct?

10  *A.* Yes, it is.

11       *MR. TUMMINELLO:* Your Honor, move to admit.

12       *MS. RIVAUX:* What was the page again?

13       *MR. TUMMINELLO:* 201.016.

14       *MS. RIVAUX:* No objection.

15       *THE COURT:* It's admitted.

16  *BY MR. TUMMINELLO:*

17  *Q.* Again, if we focus on the Mood section of this note, you

18  character her as dysthymic and anxious; is that correct?

19  *A.* I am noting it, yes.  And I also note down here the anxiety

20  is related to -- in some ways she is worried about her health,

21  so I am hoping that's at the bottom of the page.  I don't know

22  that everybody else sees.  I have got half of it.

23  *Q.* And if we can turn to your notes at Page 202.005.

24  *A.* Right.  So what I note here, that the client has -- it

25  disappeared.

Betty McGuigan - Cross

1        MR. TUMMINELLO:  I am sorry.

2   A.  I want to go back to that one, please.  I want to explain.

3        THE COURT:  What happened is he hadn't offered it into

4   evidence.  You can still see it, but the jurors can't see it

5   until it's admitted.

6        MR. TUMMINELLO:  We moved down to 202.005, which has

7   not been admitted.

8        MS. ALTMAN:  201.016 was the one that was admitted

9   without objection and that's the one --

10       THE COURT:  Yes, that was, but then I thought he

11  jumped on to another one.

12       MS. ALTMAN:  She was trying to finish her answer.

13       THE WITNESS:  And he didn't let me finish.

14       THE COURT:  Well, you can ask her that question when

15  you are on redirect.  He doesn't have to ask a question if he

16  doesn't want to.

17       Now, what do you want to ask about?

18  BY MR. TUMMINELLO:

19  Q.  202.005.  This is a treatment note of Ms. Dailey?

20  A.  Yes, it is.

21  Q.  And your treatment was June 1, 2012?

22  A.  It was.

23  Q.  And in this particular note in the Mood section, you

24  characterize Ms. Dailey as dysthymic and angry.

25  A.  I do.  Are you going to let me see what it says on the

Betty McGuigan - Cross

1    bottom so I can explain what it's related to?  I would like to

2    do that.  I think that's important.

3         Okay.  She is discussing normal feelings regarding

4    self-care.

5    Q.  And she is discussing her relationship with her sister and

6    her mother?

7    A.  The care that she is giving to them.

8         THE COURT:  Do you want this to be visible?

9         MR. TUMMINELLO:  I thought we had moved to admit, Your

10   Honor.  I apologize.  Move to admit.

11        MS. RIVAUX:  No objection.

12        THE COURT:  It's admitted.

13   A.  If I can just add, this is the normal things that anybody

14   would come in and talk about, their feelings.  I am not talking

15   about severe depression or anxiety.  I am just talking about

16   things that happen in life to people.  People come and tell me

17   things.  That's why I am very concerned about being

18   misunderstood, that I am here to explain my notes.  And here we

19   are just talking about her feelings, what people do and have in

20   the normal course of life.

21   BY MR. TUMMINELLO:

22   Q.  Now, if we can pull up Exhibit 203.007.

23   A.  And if I may add, the end of that session of the note she

24   felt better.

25        MR. TUMMINELLO:  Move to strike, Your Honor.

Betty McGuigan - Cross

1    Non-responsive.

2              THE COURT:  Sustained.

3    BY MR. TUMMINELLO:

4    Q.  203.007 is your treatment note of Ms. Dailey from

5    February 25th, 2013.

6    A.  Correct.

7              MR. TUMMINELLO:  Move to admit.

8              MS. RIVAUX:  My only objection, Your Honor, is it's

9    incomplete.  There is a prior page to this.  202 -- am I

10   looking at the right one?

11             THE COURT:  I don't think so.

12             MS. RIVAUX:  I am looking at the wrong one.  I am

13   sorry, Your Honor.  I have no objection.

14             THE COURT:  It's admitted.

15   BY MR. TUMMINELLO:

16   Q.  Dr. McGuigan, this is a treatment note from February 25 of

17   2013; is that correct?

18   A.  Yes.

19   Q.  And in this particular note, you note that Ms. Dailey, her

20   mood is dysthymic and that she appears mentally exhausted; is

21   that correct?

22   A.  Yes, that's how -- what I noted.  And again, can I see what

23   it's in relationship to?

24   Q.  And in your assessment of her, you processed EMDR regarding

25   her commitment to herself, correct?

1   *A.*  Yes.  I have really -- I have no recollection of why it was

2   in detail about that.  She is coming in and she is talking

3   about looking to the future and at the end of the session using

4   the EMDR.  Her mood is improved.  That's why I use it in many

5   other situations besides a major depressive episode.  When I am

6   noting about depression or anxiety, they could be just

7   depressive feelings, bad feelings.  They could just be feeling

8   normal anxiety in a regular routine day.

9   *Q.*  Now, Dr. McGuigan, let me turn to the negative self-talk

10  and negative self-thoughts that Ms. Dailey expressed to you

11  during the period between 2011 and 2014.

12  *A.*  Okay.  Is this on my report, sir?

13  *Q.*  Yes, ma'am.

14  *A.*  Okay.

15  *Q.*  Throughout that time frame you did note or see that

16  Ms. Dailey exhibited negative self-talk?

17  *A.*  Could I see that, please?

18  *Q.*  Do you have an independent memory of that?

19  *A.*  I don't.  Except for that day or that -- on my report or

20  that particular day that you gave, I don't.

21  *Q.*  If we can pull up 201.015.

22  *A.*  There is a lot of records over a lot of years.

23  *Q.*  Is that because Ms. Dailey had a lot of emotional issues

24  over a lot of years?

25  *A.*  No, not necessarily.  I think that people come in and they

1   talk about a lot of different things and a lot happens.  People

2   are very complex.

3   Q.  In front of you is 201.015.  That's a therapy note from

4   March 7 of 2011.

5   A.  Yes.

6   Q.  And if we can go down into the Assessment section.

7           MR. TUMMINELLO:  Move to admit, Your Honor.

8           MS. RIVAUX:  No objection.

9           THE COURT:  It's admitted.

10  A.  I would like to go back -- I don't know what you are

11  referring to, but okay, just that at that particular session I

12  did note the depression was reduced.

13  BY MR. TUMMINELLO:

14  Q.  But she was still suffering from depression?

15  A.  Depressive feelings.  When I am marking that note, it would

16  be depressive feelings.  People come in and say they are sad

17  about issues, so at the end of this session she is feeling

18  better.

19  Q.  So if we look on the Assessment section, you write a

20  notation that she is confronting negative scripts.

21  A.  Yes.

22  Q.  Is that --

23  A.  That's my language.

24  Q.  Is that a language for negative self-talk?

25  A.  Not necessarily.  Generally when I say it that way, what it

1   means to me about is negative beliefs about yourself.  It's a

2   more cognitive thing.  People aren't constantly repeating

3   negative beliefs about themselves.  They don't think like that.

4   And it does affect their ability to function, such as, to give

5   an example, that let's say that you believe that you're not

6   able to present in court, that you don't usually present

7   yourself and explain yourself.  That's not -- you know, you

8   don't do that.  And you might say that's going to be difficult.

9   You would confront that and say you can do it.  It's that kind

10  of thing.

11  Q.  So in this session in 2011, she was having to confront

12  these negative thoughts?

13  A.  It's a belief, sir.

14  Q.  Belief, excuse me.

15  A.  Yes.  That might cause feelings, but more about your

16  ability to function.  What we believe about ourselves is

17  affecting how we work in the world.

18  Q.  And if we can pull up 201.022.  And this is a treatment

19  note from July 29, 2011?

20  A.  Yes, it is.

21          MR. TUMMINELLO:  Move to admit.

22          MS. RIVAUX:  No objection.

23          THE COURT:  It's admitted.

24  BY MR. TUMMINELLO:

25  Q.  If we can move down to the Plan section of this note.

Betty McGuigan - Cross

1          In the Plan section, you make a notation of

2     confronting negative self-talk.

3     A.   I do.

4     Q.   Is there a difference between negative self-talk and

5     negative scripts?

6     A.   Yes.  Again, I explained it before, beliefs.  The client

7     has been focusing on other family matters this week, caring for

8     her mother, dissention between the sisters, Sallie's

9     instability.  Even despite this I am noting decreased

10    depression at the top.  Helped to process family relationships.

11    Client able to shift and affirm.  "I'm capable of having loving

12    supportive relationships."

13          Probably -- this is for her.  And as you noted back at

14    the top, we did some affirmative work, you know, talking to

15    yourself in a positive way so that you can go ahead and make

16    changes and behave differently in the world.  So I am merely

17    talking about here in the realm of this information that

18    supporting herself, feeling good about herself despite what's

19    going on in life, that she can be positive no matter what's

20    going on with her mother, what's going on with her sister, that

21    kind of thing.

22    Q.   So she was addressing the relationship with her mother and

23    her sister?

24    A.   I have no idea for sure.  I can only document here that

25    there was difficulty.  I am not knowing exactly.

 1  *Q.*  And in 2013, she continued to fight negative feelings; is

 2  that correct?

 3  *A.*  I am sorry, sir.  What did you say?

 4  *Q.*  In 2013, she was coping with fighting negative feelings?

 5  *A.*  What are you referring to, Mr. Tumminello?

 6  *Q.*  If we could pull up Exhibit 203.012.

 7        This is your treatment record from that particular

 8  day?

 9  *A.*  Yes, it is.

10        *MR. TUMMINELLO:*  Move to admit.

11        *MS. RIVAUX:*  Can I see the whole document?  No

12  objection.

13        *THE COURT:*  It's admitted.

14  *A.*  Did you want me to say something?

15  *BY MR. TUMMINELLO:*

16  *Q.*  This is your treatment note from that day?

17  *A.*  Yes, it is.

18  *Q.*  And again, you are recommending EFT?

19  *A.*  No.  I am actually doing EMDR and I am doing a little bit

20  of EFT.  And the note shows that she is more positive by the

21  end of the session.  Yeah, it is the EFT since I marked off the

22  EMDR.

23  *Q.*  Let me move to Ms. Dailey's feelings of self-esteem

24  throughout this period.

25  *A.*  Okay.  Can you go down to the bottom, please?

1    Q.  I am referring to a different note now.

2         THE COURT:  You just have to answer his questions.

3         MR. TUMMINELLO:  If I can pull up 203.013 -- excuse

4    me, 203.019.  And this is a note from July 1 of 2013.

5    A.  Yes, it is.

6    BY MR. TUMMINELLO:

7    Q.  And in July 1 of 2013, you note again that she is --

8    Ms. Dailey is dysthymic?

9    A.  And more positive.

10        MR. TUMMINELLO:  Your Honor, move to admit 203.019.

11        MS. RIVAUX:  Can I see the whole document, please?

12        THE COURT:  I couldn't hear you.

13        MS. RIVAUX:  I just asked to see the whole document.

14        THE COURT:  Just a second.  Do you have an objection

15   or you don't?

16        MS. RIVAUX:  No, we don't have an objection.

17        THE COURT:  It's admitted.

18   A.  Can I explain a little?

19   BY MR. TUMMINELLO:

20   Q.  No, ma'am.  Just answer the questions that I am asking,

21   please.

22   A.  Yes, sir.  What did you ask?

23   Q.  In 203.019 she presented you with a tic?

24   A.  It did appear at that time.  I noted it in my record.

25   Q.  Is that a physical response to an emotional feeling?

Betty McGuigan - Cross

1   *A.*  I wasn't sure, so I referred her to Dr. Jacobson.

2   *Q.*  And Dr. Jacobson treated her?

3   *A.*  Yes.  I wanted her to reevaluate the medications.

4   Sometimes it's due to a medication.  I must not have noticed it

5   prior to that and therefore noticed it in that moment.

6          It could be many things.  It could be a normal

7   response to anything, but I for some reason not having seen it

8   before, noting that, if I can't even remember what at the top

9   that the stress was down or the depression was down, I did not

10  believe it was psychological or emotional at that time, so I

11  did --

12  *Q.*  If I can pull up 203.018.  This is a treatment note from

13  June 21 of 2013.

14         *MS. RIVAUX:*  I have an objection on this one.

15         *THE COURT:*  You do?

16         *MS. RIVAUX:*  Yes.  It's relating to one of your

17  pretrial orders.

18         *THE COURT:*  All right.  Let me look at it, then.  I

19  can't see it.  It's too small.

20         *MS. RIVAUX:*  You have to go down to the bottom.  It's

21  in the parenthetical, Your Honor.

22         *THE COURT:*  Overruled.  The document is admitted.

23  *BY MR. TUMMINELLO:*

24  *Q.*  And in June 21 of 2013, Ms. Dailey was discussing with you

25  her depression due to weight gain.

1   A.  Okay.  I did write that.

2   Q.  And did she discuss with you --

3   A.  I did mention that she was having some sad thoughts.

4   Q.  Regarding weight gain?

5   A.  Yes.

6   Q.  If we can go to 203.020.

7   A.  Oh, okay.  Am I going to get a chance to explain later?

8        THE COURT:  That would be up to the other side's

9   counsel.

10  A.  I -- I would like to discuss that one later.

11  BY MR. TUMMINELLO:

12  Q.  Could you look at 203.020?  This is a note from July 19,

13  2013.

14  A.  Yes.

15  Q.  Is this your note from that day?

16  A.  It is.

17        MR. TUMMINELLO:  Move to admit.

18        MS. RIVAUX:  The only objection is what we had

19  discussed earlier.

20        THE COURT:  Okay.  Now I need to be able to read it.

21  The objection is overruled and 203.020 is admitted.

22  BY MR. TUMMINELLO:

23  Q.  In July of 2013, she was expressing you her distress about

24  weight gain and not sleeping well.

25  A.  She is reporting feelings of sadness about her weight gain,

Betty McGuigan - Cross

1   which is typical for almost every woman in the world.  We are

2   very conscious of putting on weight.  And she is also talking

3   in here about disappointment about going to Alaska.  Her mother

4   is not well enough -- with the family and also about Garrett's

5   dad.

6   Q.  And not going to Alaska was a stressor for her?

7   A.  It was a disappointment, not getting to go on vacation.

8   Q.  If we can move to 204.008.

9        And this is a treatment note from February 12 of 2014?

10  A.  Yes.

11  Q.  So the month prior to the Cabo San Lucas trip?

12  A.  Yes.  And I am noting here under --

13       THE COURT:  The answer is yes.

14       MR. TUMMINELLO:  Your Honor, move to admit.

15       THE COURT:  It's already admitted.

16  BY MR. TUMMINELLO:

17  Q.  In this document you note she is seeing an endocrinologist

18  for weight gain?

19  A.  Yes.

20  Q.  So she was presenting that issue to you in this section,

21  correct?

22  A.  It is.  We are talking about nutrition and exercise, yes.

23  Q.  Let me turn to the topic of sleep issues that Ms. Dailey

24  had.

25       In the years that you were treating her between 2011

Betty McGuigan - Cross

 1   and 2014, she regularly reported having issues with sleep; is

 2   that correct?

 3   A.   I really cannot remember in great detail anything without

 4   regard to the notes.  I am sorry.  There is just too many

 5   papers involved.

 6   Q.   If we can turn to Exhibit 203.004.

 7   A.   Okay.  I just see on -- okay.

 8   Q.   Is this --

 9   A.   This is a form that the client advised me that she was

10   taking, yes.

11   Q.   And so she advised you that she was taking Ambien?

12   A.   That's correct.

13   Q.   And the Ambien is a sleep medication?

14   A.   Yes.  And that was being managed and prescribed by her

15   psychiatrist, Dr. Jacobson, correct.

16        MR. TUMMINELLO:  Your Honor, move to admit this

17   Exhibit 203.004.

18        MS. RIVAUX:  I have the same objection I had on one of

19   the earlier exhibits on the third line there related to your

20   pretrial order.

21        MR. TUMMINELLO:  Your Honor, I am going to withdraw,

22   actually, that particular exhibit and replace it with the

23   redacted version.  It's 203.004.  It's the same exhibit number.

24   I just think the wrong one was displayed, so I move to admit

25   this one, Your Honor.

Betty McGuigan - Cross

1        *MS. RIVAUX:*  No objection.

2        *THE COURT:*  Okay.  Admitted.

3  BY MR. TUMMINELLO:

4  *Q.*  And so you understood that Ms. Dailey had been prescribed

5  Ambien for her sleep issues?

6  *A.*  Yes, as I look at this, yes.

7  *Q.*  And that continued through 2014; is that correct?

8  *A.*  I don't know what Dr. Jacobson was prescribing her or for

9  how long.

10  *Q.*  If we can turn to Exhibit 204.011.

11        And this is your notation of a patient medication

12  sheet from March of 2014?

13  *A.*  Yeah, and she is taking --

14        *MR. TUMMINELLO:*  Your Honor -- before you answer the

15  question, Your Honor, move to admit.

16        *MS. RIVAUX:*  No objection.

17        *THE COURT:*  It's admitted.

18  BY MR. TUMMINELLO:

19  *Q.*  And you noted that she was under prescription for Ambien

20  for sleep issues?

21  *A.*  Yes, and she is taking a lower dosage.

22  *Q.*  And this is prior to her trip to Cabo San Lucas, correct?

23  *A.*  Yes, it was.

24  *Q.*  Ms. Dailey also consistently complained to you of having a

25  lack of energy prior to 2014; is that right?

Betty McGuigan - Cross

1    *A.*   I don't know what I wrote in my records, sir.

2    *Q.*   And if your records say that that's what she was

3    discussing, you would not have any issues to quarrel with that?

4    *A.*   I don't know, sir.  It's all interpretation according to

5    all the information, what's there, what's presented.  I would

6    hesitate to say anything if I don't know what you are referring

7    to.  And if you are asking me to remember what's going on for

8    years of treatment, I am sorry, I don't feel I could do that.

9    *Q.*   So if we could turn to Page 203.018.

10          This is your treatment note for Ms. Dailey on June 21

11   of 2013?

12   *A.*   Yes.

13   *Q.*   Do you see that?

14   *A.*   Yes.

15          *MR. TUMMINELLO:*  Move to admit this exhibit.

16          *THE COURT:*  It's already admitted.

17   *BY MR. TUMMINELLO:*

18   *Q.*   And in this treatment note you tell that she tells you that

19   she doesn't have enough energy and I think possibly feels

20   alone.

21   *A.*   I don't have energy, that's all she is stating.  And you

22   look up at the top.  I can only say what I write, but that

23   isn't saying that.

24   *Q.*   That is saying that?

25   *A.*   It says, I don't have enough energy.  That's what she told

1   me.  If you look up at the top in the Mood section -- let me

2   look at that, please, because she is saying that she is

3   drained.  Yes, she is still affirming still being positive, so

4   she is reporting she has a lack of energy.  Yes, I would --

5   there is days I have a lack of energy.

6   Q.  During your treatment of Ms. Dailey in that same period,

7   she complained to you of struggles with boredom and connection;

8   is that right?

9   A.  I am sorry, could you show me a copy of what you are

10  referring to?

11  Q.  Sure.  203.014.  This is your treatment note from May 10 of

12  2013.

13  A.  Yes.

14          MR. TUMMINELLO:  Move to admit.

15          MS. RIVAUX:  I have no objection.

16  BY MR. TUMMINELLO:

17  Q.  And in the Assessment section, you note that Ms. Dailey

18  struggled --

19          THE COURT:  It's admitted.

20  BY MR. TUMMINELLO:

21  Q.  -- with boredom and connection.

22  A.  Noted there, yes, sir.

23  Q.  And you also note that she is investing in fantasy?

24  A.  I am not -- okay.  It's noted there.  I have no idea what

25  it's in relationship to.

Betty McGuigan - Cross

1    Q.   That's something that she explained to you?

2    A.   I have no recollection of what it's regarding.

3    Q.   But you don't have any reason to believe that you wrote

4    down what she told you incorrectly.

5    A.   I am not sure what I am referring to, sir.  I can't tell.

6    She is having, you know, boredom.  We are talking about just

7    healthy choices related probably to past mention of the weight

8    and then just continued plans of moving and exercise.  I have

9    no idea, sir.  I am sorry.

10   Q.   Thanks.  During your treatment of her, you discussed with

11   her her difficulties of functioning in life; was that right?

12   A.   I would have to know what you are referring to, sir.

13   Q.   If we turn to 201.003.

14        MR. TUMMINELLO:  I believe this one was admitted

15   already.

16        THE COURT:  I don't think so.

17   BY MR. TUMMINELLO:

18   Q.   This is an Admission Form from February of 2011?

19   A.   Yes, it is.

20        MR. TUMMINELLO:  I move to admit.

21        MS. RIVAUX:  I have no objection.

22        THE COURT:  It's admitted.

23   BY MR. TUMMINELLO:

24   Q.   In this Admission Form about halfway down, you write the

25   reason for treatment and the identified problem.  Do you see

Betty McGuigan - Cross

1  that?

2  *A.*  This is where the client comes in and she writes down --

3  yes, she completes this form herself and it's under Reason for

4  Treatment and Identified Problem.

5  *Q.*  So she identified the Reason for Treatment and Identified

6  Problem as review of history, depression, functioning with life

7  future?

8  *A.*  That's correct.

9  *Q.*  So you understood that was her identified problem that she

10  was seeking treatment from you?

11  *A.*  Nuances of it, that she was in my understanding always with

12  this situation, since it was just managing the depression again

13  and functioning.  She has future based here, wanting to make

14  plans for the future, yes.

15  *Q.*  During your treatment of Ms. Dailey between 2011 and 2014,

16  she discussed with you her concerns about safety and trust in

17  relationships; is that right?

18  *A.*  I have no knowledge of that.  I am sorry, you would have to

19  tell me.  Right offhand I can't --

20  *Q.*  If we turn to 201.030.

21  *A.*  Yes.

22  *Q.*  And this is a treatment note from November 14, 2011?

23  *A.*  Correct.  I am also the noting that depression is down.

24          *MR. TUMMINELLO:*  Move to admit.

25          *MS. RIVAUX:*  No objection.

Betty McGuigan - Cross

1            *THE COURT:*  It's admitted.

2     *BY MR. TUMMINELLO:*

3     *Q.*  In this section, if we look down at the Assessment,

4     Ms. Dailey was assessing her relationships, and she was

5     discussing with you positive, trusting and safe qualities for

6     relationships; is that right?

7     *A.*  What -- this is my writing, sir, and she is processing

8     personal relationships.  That's what I am referring to, I am

9     talking about.  I had no idea which and what relationships.  We

10    were discussing in broad terms here choosing relationships that

11    are reciprocal.

12            This is probably something that I would discuss with

13    anyone if you are looking at past relationships and future

14    relationships, what kind of -- you want to have a relationship

15    that supports you, you support them.  It's reciprocal.  We are

16    talking in generalities perhaps.  I have no other recollection.

17    This would be a common discussion with me with every client or

18    most clients.

19    *Q.*  Did Ms. Dailey, during your treatment of her, did she

20    discuss with you reality checks with respect to her life

21    choices?

22    *A.*  Sir, you would have to be specific.

23    *Q.*  If we look at --

24            *THE COURT:*  Well, we will be specific after the lunch

25    recess.  How much time would you like today, folks?  Well, I

Betty McGuigan - Cross

1   can't ask that question.  Here is why.  I have got a

2   1:00 o'clock and a 1:30, but we moved the 1:30 to 1:15.  So how

3   about we take one and a half hours today?  I have to take these

4   other cases.  I can't help it.  All right.  See you at 1:30.

5            (Jury excused.)

6            The jury has been excused.

7            How much more would you estimate you have,

8   Mr. Tumminello?

9            *MR. TUMMINELLO:*  I think half an hour, sir.

10           *THE COURT:*  Here is some advice.  Listen, everybody in

11   the courtroom.  It goes better and it's more impressive if the

12   witness just answers the question as asked.  1:30.

13       (Recess at 12:00 p.m.)

14       (Reconvened at 1:35 p.m.)

15           (Jury present.)

16   *BY MR. TUMMINELLO:*

17   *Q.*  Good afternoon, Dr. McGuigan.

18   *A.*  Good afternoon.

19   *Q.*  So before we took the lunch break, Doctor, I was speaking

20   to you generally about symptoms that you noticed Ms. Dailey

21   experiencing in that period of 2011 prior to the Cabo San Lucas

22   trip in 2014.

23   *A.*  Yes.

24   *Q.*  So I am going to continue on that for just a bit.  And I am

25   going to try to keep my questions short and fast and ask you do

1   the same with your answers so we can push through this quickly,

2   okay?

3   A.   Okay.

4   Q.   So the next symptom I want to discuss with you is that of

5   fearfulness.  It's true, is it not, that Ms. Dailey discussed

6   with you a variety of fears she had during that time frame?

7   A.   Can you show me what you are referring to, please?

8   Q.   Let's pull up 203.009.  And this was a treatment record

9   from March 11, 2013.

10  A.   Yes.

11  Q.   If we can move down to the -- does this refresh your

12  memory?

13  A.   Yes, it does.  She is discussing fears around aging.

14  Q.   Also she expressed fears to you of being alone, losing her

15  mother and physical limitations in a different session.  Do you

16  recall that?

17  A.   It would probably be helpful to look at it.

18  Q.   Yes, ma'am.  Let's pull up 203.011.

19  A.   It sounds like a normal fear, however.

20  Q.   I am sorry?

21  A.   It sounds like a normal fear, however.

22  Q.   So we are looking at a treatment record from April 15 of

23  2013.  If we can take a look down.

24        THE COURT:  Do you want these in evidence?

25        MR. TUMMINELLO:  No, sir.

1  *BY MR. TUMMINELLO:*

2  *Q.*  So my question was whether she expressed fear to you

3  regarding losing her mother, physical limitations, things like

4  that.

5  *A.*  Yes, she did.  It's noted there on that record.

6  *Q.*  And fear of being alone.

7  *A.*  Yes, I noted that.

8  *Q.*  Throughout your treatment of Ms. Dailey throughout that

9  same time frame, 2011 through the beginning of 2014, she

10  expressed feelings of sadness to you.

11  *A.*  At times.  Are you referring to anything specific,

12  Mr. Tumminello?

13  *Q.*  No, ma'am.  I am talking about generally through that

14  period she expressed to you feelings of sadness?

15  *A.*  For various reasons I recollect, yes.

16  *Q.*  Likewise, during that same period she expressed to you

17  feelings of isolation?

18  *A.*  You would need to locate the record, please.

19  *Q.*  Okay.  Refer to 201.020.  And this is a treatment note from

20  June of 2011.

21  *A.*  Yes.  It has on it -- it is noted there.

22  *Q.*  So within that note she expressed feelings of isolation and

23  withdrawing?

24  *A.*  Right.

25  *Q.*  And the need to be alone?

Betty McGuigan - Cross

1  A.  Yes, she did.

2  Q.  She also expresses a feeling or an awareness of feeling

3  numb?

4  A.  Yes, she did.

5  Q.  During this same time frame she discussed with you feelings

6  of despondency and hopelessness?

7  A.  You would have to put it up for me, sir.

8  Q.  Let's pull up 201.028.

9       And this is a treatment note from the fall of 2011?

10  A.  Okay.

11  Q.  And she expresses to you feeling helpless and hopeless?

12  A.  It's noted in my records.

13  Q.  Okay.  And if you'll pull up exhibit -- strike that.

14       Do you recall the medications that Ms. Dailey was on

15  as of March of 2014?

16  A.  I do not.

17  Q.  If we can pull up 201.011.  And I believe this document is

18  already in evidence.  This is a patient medication sheet

19  where --

20       *THE COURT:*  It's not in evidence according to my

21  notes.

22  *BY MR. TUMMINELLO:*

23  Q.  Does this refresh your memory as to the medications

24  Ms. Dailey was on as of March 7, 2014?

25  A.  This is what she reported to me and I noted down.  As to if

Betty McGuigan - Cross

1   she were actually prescribed those, I could not attest to.

2   Q.  So she reported to you that she was on Effexor?

3   A.  Yes.

4   Q.  That's an antidepressant medication?

5   A.  Yes.

6   Q.  And she reported to you she was taking Dexamphetamine?

7   A.  Yes.

8   Q.  That's a medication used to treat ADHD?

9   A.  I would not be able to say exactly why the physician

10  prescribed that particular medication.

11  Q.  Okay.  You can take that down.

12          After the incident in Cabo in March of 2014 when she

13  was in treatment with you, she almost immediately began

14  discussing the possibility of hiring a lawyer; is that correct?

15  A.  You would have to pull up exactly what day it was or she

16  was discussing it.

17  Q.  If we can pull up 204.018.

18  A.  On April 23rd we were discussing.

19  Q.  You were discussing what happened in Mexico?

20  A.  Okay.  She actually told me that she was calling a lawyer

21  on Friday.  I really don't know, but yes, she reported that to

22  me.

23          Can I expand or not, Your Honor?  No?

24  Q.  No, ma'am.  Let's move on to the next question.  You can

25  put that down.

Betty McGuigan - Cross

1    Ms. Dailey's care for her mother and her sister are

2  continuing as a significant stressor in Ms. Dailey's life; is

3  that correct?

4  A.  Yes.  Being a caretaker is difficult for most people.  It's

5  a normal response.

6  Q.  And in 2014 after the Mexico trip, she discussed with you,

7  Ms. Dailey did, closing the pilates studio; is that correct?

8  A.  Yes, she did.

9  Q.  And closing a business such as that can certainly bring a

10  psychological reaction, can it not?

11  A.  You know, I feel your questions are a little misleading.

12  It's sort of like the way I looked at it, it was more a matter

13  of --

14  Q.  Ma'am, I just need for you to answer the question because

15  Ms. Dailey's lawyers can certainly ask you more about it if

16  they would like.

17  A.  What was the question?

18  Q.  The closing of a business can bring about a psychological

19  reaction?

20  A.  I am sure that she would have feelings about it.  I

21  wouldn't state it your way.

22  Q.  And did she have feelings about closing the pilates studio?

23  A.  I am sure she had feelings about closing.

24  Q.  And in the fall of 2014, she opened a new business; is that

25  correct?

499

1  A.  That is correct.

2  Q.  And it was significant enough of an issue that she

3  discussed that with you as well; is that right?

4  A.  Yes.

5  Q.  And that was a stressor in Ms. Dailey's life?

6  A.  It was -- it was a diversion.  It was a way of not focusing

7  on the way she had been feeling.

8  Q.  I just need for you to answer the question, ma'am.

9        That was a stressor in her life, opening that

10  business?

11  A.  I am not sure it was a stressor.  From Suzy's behavior it

12  was -- it was a pleasure to -- or at least an adventure,

13  something to look forward to, rather than thinking about the

14  feelings of the assault.

15  Q.  And that business quickly went out of business, did it not?

16  A.  I would have to know the dates for sure.  I am sorry.  But

17  it was not a long period.  I don't know what the dates are.

18  Q.  But you understand it went out of business?

19  A.  Yes, I do.

20  Q.  And that caused stress in Ms. Dailey's life?

21  A.  I couldn't -- I could not say that.  I wouldn't be able to

22  say that was stressful.

23  Q.  In 2016, Ms. Dailey's dog died.  Do you recall that?

24  A.  Yes, I do.

25  Q.  And that was a significant event to Ms. Dailey.

Betty McGuigan - Cross

1   *A.*  She missed her dog.

2   *Q.*  And she missed her dog enough to express grief over that

3   loss to you for some period of time; is that right?

4   *A.*  She expressed sadness, I recollect that.

5   *Q.*  If I can pull up Exhibit 206.036.

6          And this is a note of a telephone call that you had

7   with Ms. Dailey on September 4 of 2016; is that correct?

8   *A.*  Yeah.

9   *Q.*  And if you can see the second line down, Ms. Dailey stated

10  to you that she felt severely affected by Garbo passing.  Do

11  you see that?

12  *A.*  Yes.

13  *Q.*  And Garbo was Ms. Dailey's dog, correct?

14  *A.*  Yes.  So she reported to you that she felt severely

15  affected by her dog's passing.

16  *A.*  Yes.  She missed her dog.

17  *Q.*  And that severe sadness lasted close to two months; is that

18  correct?

19  *A.*  I have no knowledge of how long it lasted, how many

20  discussions we had on it.  It did not seem to be a huge -- it

21  was a normal passing of an animal you would find.

22  *Q.*  It was significant enough for you to make a note of it,

23  correct?

24  *A.*  I am writing the notes for myself, sir.  I am just noting

25  what's happening in her life.

Betty McGuigan - Redirect

1          *MR. TUMMINELLO:*  No further questions.

2          *THE COURT:*  Redirect?

3                         **REDIRECT EXAMINATION**

4    *BY MS. RIVAUX:*

5    *Q.*  Dr. McGuigan, I have one question for you.

6          Before March of 2014, had you ever diagnosed

7    Ms. Dailey with PTSD?

8    *A.*  No, I had not.

9          *MS. RIVAUX:*  Thank you.  No further questions.

10         *MR. TUMMINELLO:*  Nothing, Your Honor.

11         *THE COURT:*  Questions from the jury?  Are there any?

12   Yes, there are.  Okay.

13      (At the bench:)

14         *THE COURT:*  This is question 13.  Objection or no?

15         *MR. TUMMINELLO:*  I will object.

16         *THE COURT:*  I can't read it upside down.

17         *MS. ALTMAN:*  That's why we didn't have client testify

18   about it because he was out and now we don't have our client to

19   testify.  She did say, she did, Dr. McGuigan did say --

20         *THE COURT:*  Your client?

21         *MS. ALTMAN:*  I am saying Dr. McGuigan did say it was

22   her nephew.  Dr. McGuigan said that is what I am saying.

23         *THE COURT:*  I don't know if you are objecting or not

24   or just talking to me.

25         *MR. TUMMINELLO:*  It's cumulative.  It's already been

Betty McGuigan - Redirect

1   said.

2          THE COURT:  Okay.  So defendant is objecting, having

3   raised the whole Ger issue in the first place.  How about you?

4          MS. ALTMAN:  They raised that and --

5          THE COURT:  And now they are objecting to it and they

6   want to think more about it.

7          MS. ALTMAN:  I understand, Your Honor.

8          THE COURT:  I don't get it, but whatever.

9          MS. ALTMAN:  The challenge is did not come out through

10  her testimony, Your Honor, that it was a suicide.

11         THE COURT:  So what?  It was a suicide.  What's your

12  point?

13         MS. ALTMAN:  I am saying it didn't come out in her

14  testimony.

15         THE COURT:  That's why he is asking.  Okay.

16  Overruled.

17         MR. TUMMINELLO:  I thought there was other questions.

18         THE COURT:  I was waiting for you to look at them and

19  tell me what you objected to.

20         MS. ALTMAN:  I don't understand this.  I don't know

21  what it is.

22         THE COURT:  I don't either because I don't have these

23  memorized.

24         MR. TUMMINELLO:  I don't know what that means.  I

25  understand.  Yes, no objection.

Betty McGuigan - Redirect

1          *THE COURT:*  Thank you.

2          (In open court:)

3    *BY THE COURT:*

4    *Q.*  All right.  The jurors have some questions for you.

5          The first question is:  Who is Ger or little Ger?

6    *A.*  It's little Ger.  It's her nephew by her sister.  And they

7    had a close relationship together, they did, and she missed

8    him.

9    *Q.*  What was the cause of death, if you know?

10   *A.*  I do know.  I believe it was suicide.

11   *Q.*  Who is Sallie?

12   *A.*  Sallie is another sister, not Ger's mother, another sister.

13   And she is the sister that -- with the emotional problems that

14   Suzy helped to care for.

15   *Q.*  And this next question refers to one of the documents and

16   it's 201.003, so let's see if we can find that.

17         And the question is:  There is a reference to

18   Admission Form.  Admission to what.

19   *A.*  It is a form, admission to treatment for whatever reason.

20   I don't know why.  I had not seen Suzy very much in -- I have

21   no idea why I had her fill it out again.  Sometimes I fill it

22   out because they moved, there is different information.  I have

23   no idea exactly at that point, but I did, so it gives her

24   regular information.  It could have been phone numbers,

25   anything like that.  And then when you go down, it lists what

1    she wanted to work on that year.

2    *Q.*   Okay.   So what it is not is an admission to a hospital or

3    something?

4    *A.*   Oh, no, no, it is not.   It's for my record just identifying

5    information of who her doctor is.

6            THE COURT:   Any other questions, ladies and gentlemen?

7    No?

8            All right.   Follow-up, plaintiff first.

9            *MS. RIVAUX:*   I don't have any follow-up questions,

10   Your Honor.

11           *THE COURT:*   Follow-up from the defense?

12           *MR. TUMMINELLO:*   None, Your Honor.

13           *THE COURT:*   All right.   Thank you.   You are excused,

14   but if you want, you are welcome to stay and watch.   That's up

15   to you.   You are free to go either way.

16           Next witness?

17           *MR. TUMMINELLO:*   Your Honor, I understand that

18   plaintiff is not calling Dr. Yeaw as a witness and we are not

19   calling Dr. Hudson as a witness.

20           *THE COURT:*   Okay.

21           *MS. ALTMAN:*   In light of that, we will rest.

22           *THE COURT:*   Okay.   Now, do you need to make a motion?

23           *MR. TUMMINELLO:*   Yes, Your Honor.

24           *THE COURT:*   All right.   Let's excuse the jury.

25           (Jury excused.)

1        *MR. PLACHY:*  Are you ready for us, Your Honor?

2        *THE COURT:*  Yes, sir.

3        *MR. PLACHY:*  I am sure it comes as no surprise that we

4   would move for directed verdict on the plaintiff's assault

5   claim only.  As we have discussed in the past, we think that

6   case is not only unnecessary, we don't think the plaintiff has

7   established any facts showing that there was a threat to

8   Ms. Dailey.  There was no evidence of a threat or threatened

9   conduct.  Mr. Hecht touched her.  She didn't even know he was

10  going to do it.  So we don't believe the elements of assault

11  have been made and so under Rule 50 we would move for directed

12  verdict on the assault claim only.

13       *THE COURT:*  All right.  Thank you.

14       Ms. Altman?

15       *MS. ALTMAN:*  Yes, Your Honor.  If Your Honor is so

16  inclined, we would be happy to brief the issue, but if you want

17  just brief remarks now, I think our position would be very

18  clear.

19       Mr. Plachy suggested to this Court there is no

20  evidence in the record to show that Ms. Dailey felt threatened.

21  And I think Mr. Plachy takes the word threatened to mean there

22  had to have been a verbal threat.  There is no evidence that

23  suggests that; and, in fact, the opposite is true.  All of the

24  evidence in the record in this case demonstrates that

25  Ms. Dailey, who was the victim in this case, was indeed

1   threatened by Mr. Hecht in numerous ways when he grabbed her

2   neck, when he forced his face upon her face, when he pushed her

3   to the ground, when he pulled her shorts down, and when he

4   hoisted his penis inside of her repeatedly, which is consistent

5   with the testimony of the two young children who testified by

6   deposition yesterday, as well as the testimony of Ms. Dailey

7   herself.

8           So all of the record evidence in this case shows that

9   the defendant threatened Ms. Dailey.  And so we believe any

10   kind of judgment given the record would be wholly

11   inappropriate.  With respect to the law itself, we would be

12   happy to turn around a brief by tomorrow so that Your Honor had

13   the full weight of the authority in this area, but ...

14       THE COURT:  I don't want a brief.  I want you to

15   explain to me what is the difference between the assault and

16   the battery, because it seems like everything you just said

17   goes to the battery claim.

18       MS. ALTMAN:  May I respond?

19       THE COURT:  Yes.

20       MS. ALTMAN:  So, Your Honor, I think the way it's

21   being posited is that they are two mutually exclusive things.

22   And something that is a battery can also be an assault and

23   something that is an assault can sometimes be a battery.  And

24   it's almost like a Venn diagram where you have a portion of it

25   that overlaps.  And I think the way that the defendants are

1    trying to frame the issue is to suggest to this Court, I

2    believe incorrectly, that they are mutually exclusive and they

3    are not.

4            If you look at Jury Instruction No. 7 --

5            THE COURT:  That's what I've got right in front of me.

6    That's what I am staring at.

7            MS. ALTMAN:  Okay.  So it says, No. 1, Mr. Hecht

8    intended to cause an offensive or harmful physical contact with

9    Ms. Dailey -- clearly that's been established in the record --

10   or he intended to place Ms. Dailey in an apprehension of such

11   contact.  He did both of those things.  And the record evidence

12   fully supports that.

13           And No. 2, he, Mr. Hecht, placed Ms. Dailey in

14   apprehension of immediate physical contact.  Ms. Dailey

15   testified extensively about her feelings with respect to

16   apprehension, fear, shock.  It was extensive testimony on those

17   very subjects.  There was also extensive testimony with respect

18   to whether or not any of Mr. Hecht's advances towards her were

19   welcome by her, were suggested by her, were wanted by her.

20           And so I think the way the defendants are trying to

21   sort of tease this out is to suggest to this Court that an

22   assault claim has to be some verbal assault.  But the law is

23   absolutely contrary to that.  And I think Jury Instruction

24   No. 7 that this Court has --

25           THE COURT:  They didn't say anything about verbal.

1            *MS. ALTMAN:*  He didn't.

2            *THE COURT:*  Let me be the devil's advocate here

3    because I want to hear how you answer it.

4            According to the evidence you presented, which I must

5    construe in your favor, Ms. Dailey and Mr. Hecht were walking

6    along a path arm in arm when suddenly unexpectedly he faces

7    her, grabs her behind the neck and pulls her body and his body

8    together.  And then from there her claim is that he put her

9    down on the ground and got on top of her and so forth.

10           So the physical contact, the battery, if you will, by

11   your theory of the case occurred, began the second he puts his

12   hand on her.  Before that she didn't even see anything coming.

13   She felt safe.  She felt secure.  And then all of the sudden

14   out of the blue he puts his hand, pulls her, down she goes.

15   Where does the apprehension come in other than the battery

16   itself?

17           *MS. ALTMAN:*  Because, Your Honor, you are construing

18   the assault as only the initial grab of the hand behind the

19   neck, but there were multiple sequence --

20           *THE COURT:*  No.  I am asking you where did the

21   assault -- look, on Element No. 1, Mr. Hecht intended to cause

22   an offensive or harmful physical contact, yes.  Your evidence

23   as construed in your favor, inferences are drawn in your favor,

24   a rational juror could find that.

25           But No. 2, Mr. Hecht placed Ms. Dailey in apprehension

1    of immediate physical contact.  Where did he do something that

2    placed her in apprehension of immediate physical contact?

3            MS. ALTMAN:  And I was about to answer that, Your

4    Honor, and I probably wasn't fast enough, I guess.

5            So after he first grabbed her neck, right, every

6    physical contact after that.  She could see.  She could feel.

7    So while --

8            THE COURT:  Once he grabbed her neck, then that

9    contains apprehension of additional physical contact.

10           MS. ALTMAN:  She is apprehending what's going to

11   happen.  When he grabs her neck, she doesn't know what the next

12   series of events that are going do happen to her are.  She

13   doesn't know he is going to rape her.  She doesn't know

14   immediately when she feels this jarring grip behind her neck

15   whether he is pulling her out of harm's way.  She doesn't know

16   any of the sequences that follow, any of the events that

17   follow, so they are sequential.

18           First he grabs her by the neck.  She has an immediate

19   reaction and apprehension --

20           THE COURT:  Okay.  I get it.  What's your response to

21   that?

22           MR. PLACHY:  That's the perfect description of a

23   battery if that is, in fact, what happened, Your Honor.

24           THE COURT:  But she is saying that what she calls the

25   battery began with the hand behind the neck.  But as soon as he

1   put the hand behind the neck and pulls on her, then, and I

2   think she even said, she became terrified or something like

3   that as to what was going to happen next.  And so she is saying

4   that the assault was the apprehension that she felt between the

5   neck and everything that followed.

6           *MR. PLACHY:*  Yeah.  I just think that's splitting

7   pretty fine hairs, Your Honor.  I mean, we are clearly now in

8   battery land where the fear at that point that results is from

9   the contact that has happened.  She has been battered at that

10  point, if the facts are true.  It is not an apprehension or

11  fear of future physical contact, and I think that's the

12  distinction.

13          *THE COURT:*  That's your spin on it and you can argue

14  it that way, but I am persuaded to Ms. Altman's view.  The

15  motion is denied.

16          *MS. ALTMAN:*  Thank you, Your Honor.

17          *THE COURT:*  Now, is the defense case ready to go?

18          *MR. PLACHY:*  We are ready to go.  I think, Your Honor,

19  we are likely to have this thing done tomorrow for your

20  planning.

21          *THE COURT:*  I have this two-week trial starting

22  Monday.  For reasons that should never have happened but

23  happened, the trial prep conference is Friday afternoon.  I

24  have got to make a decision.  Are we going to get this to the

25  jury by tomorrow afternoon, in which case I can be holding that

1   conference while they are deliberating, or do I need to tell

2   them come in Monday morning for that conference and we will

3   start the trial Tuesday?

4         *MR. PLACHY:*  I don't think there is any way we can get

5   this case to the jury by noon tomorrow.  Would you agree?

6         *MS. ALTMAN:*  Yes.  And this was something we discussed

7   outside,  we were very concerned.  We certainly understand the

8   Court's time and we want to get you to your next trial as much

9   as you want to be there, but we are concerned that we would

10  need certainly the entire day and it could potentially spill

11  over, although we certainly hope not.

12        *THE COURT:*  Well, I can tell you also that the jurors

13  are telling me they are very worried about Monday, one or two

14  of them are anyway.

15        *MS. ALTMAN:*  Can we ask one question, Your Honor?  If

16  they rested tomorrow morning and you had your conference

17  tomorrow afternoon, could we close Monday morning and let the

18  jury deliberate?

19        *THE COURT:*  No.

20        *MS. ALTMAN:*  Then the only choice would be for us to

21  go straight through tomorrow.

22        *THE COURT:*  Mary, are you listening?  I will go tell

23  Mary and you go get the jury.

24        (Jury present:)

25        *THE COURT:*  All right.  We will have the defendant's

Nikos Hecht - Direct

1  witnesses now.  Just so you know, folks, given this most recent

2  development with their eliminating two quite lengthy witnesses,

3  I think there is a reasonable chance we will get finished by

4  tomorrow.  I can't promise that, but we are all trying, and I

5  think now it's potentially doable.  I know some of you are

6  concerned about that.

7          Onward.

8          *MR. PLACHY:*  Thank you, Your Honor.  The defense calls

9  Nikos Hecht.

10     (**Nikos Hecht** was sworn.)

11          *THE WITNESS:*  I do.

12                    **DIRECT EXAMINATION**

13 *BY MR. PLACHY:*

14 *Q.*  Sir, please tell the jury your name.

15 *A.*  Nikos Hecht.

16 *Q.*  Mr. Hecht, you have been in the courtroom all week and

17 heard Ms. Dailey's allegations against you, correct?

18 *A.*  I have.

19 *Q.*  Let's cut to the chase, then.

20          Did you rape Ms. Dailey?

21 *A.*  No, I did not.

22 *Q.*  Did you sexually assault her in any way?

23 *A.*  No, I did not.

24 *Q.*  Did you have a sexual encounter with her?

25 *A.*  Regrettably, I did.

513
Nikos Hecht - Direct

1   Q.  Was it consensual?

2   A.  Completely.

3   Q.  Mr. Hecht, how can you be sure that this was a consensual

4   encounter?

5   A.  Ms. Dailey was asking to have sex.  Ms. Dailey never said

6   no.  She never said stop, never said wait.

7   Q.  Do you regret having had this consensual sexual encounter

8   with Ms. Dailey?

9   A.  Almost more than I can express.  It's caused enormous pain,

10  difficulty, and I think about my children most of all.

11  Q.  Let's back up.  How old are you?

12  A.  47.

13  Q.  Where do you live?

14  A.  I live in Aspen, Colorado.

15  Q.  Are you married?

16  A.  I am divorced.

17  Q.  What's your ex-wife's name?

18  A.  Allison Hecht.

19  Q.  When did you and Allison marry?

20  A.  We got married September 1st, 2002.

21  Q.  When did your divorce become final?

22  A.  About July 2015.

23  Q.  Do you and Allison have children?

24  A.  We do.  We have three.  We have Thea who is 13, Amelia who

25  is 11 and Levi who is seven.

Nikos Hecht - Direct

1    Q.  Where did you grow up?

2    A.  I grew up also in Aspen, Colorado.

3    Q.  Who are your parents?

4    A.  My father's name is Andy Hecht.  My mother's name is Brooke

5    Newman and my stepmother is Jody Hecht.  They have been married

6    for 30 odd years.

7    Q.  And the jury will get a chance to meet your father probably

8    tomorrow.

9         Does your dad, your step mom and your mom still live

10   in Aspen?

11   A.  They all live in Aspen.

12   Q.  Do you have brothers or sisters?

13   A.  I do.  I have one full sister who lives in New York City.

14   I have two half brothers from my mom's side who live in Aspen.

15   And I have a half sister who lives in Boulder.

16   Q.  Would you describe your family as a close one?

17   A.  Very.

18   Q.  After high school when you graduated, I assume, did you

19   leave Aspen?

20   A.  I did.  It was a different town.  It didn't have the glitz

21   it does today and it was a normal small town, so I left to go

22   to college in Philadelphia.

23   Q.  What school did you attend?

24   A.  University of Pennsylvania, the business school there.

25   Q.  And the name of that business school is?

1  A.   The Wharton School.

2  Q.   What kind of grades did you have in high school to get into

3  Penn?

4  A.   I did well in high school, A's.

5  Q.   What did you study at the University of Pennsylvania?

6  A.   Like I said, the Wharton School is a dual degree.   I

7  studied history and I got a degree in finance from Wharton.

8  Q.   After you graduated, what did you do?

9  A.   I went to Wall Street, went to New York and took a regular

10  job in the investment management or investment banking field.

11  Q.   Did you make big money right out of college?

12  A.   No.   Seemed like big money to me then.   I probably was

13  making $40,000 a year maybe.

14  Q.   Had to climb the ladder like everyone else?

15  A.   I did.   I was fortunate.   I climbed it fast, but I started

16  at the very bottom.

17  Q.   You mentioned you worked with several investment firms.

18  What did you do after that?

19  A.   I started an investment fund on my own.

20  Q.   What does that mean?

21  A.   It means that I invested in various companies, researched

22  those companies and make investments, hopefully make money.

23  And people gave me money or would invest money in my fund.

24  Q.   Kind of like a mutual fund?

25  A.   Yeah, like a mutual fund.

Nikos Hecht - Direct

1   Q.  Was that fund successful?

2   A.  That's where I did very well.  It was about 15 years and we

3   made a lot of money for the investors or for our clients, and I

4   made a lot of money also.

5   Q.  Was that fund based in New York?

6   A.  It was.

7   Q.  Did you meet your ex-wife, Allison, while you were in New

8   York?

9   A.  Yes.  I met Allison in 1999 and we married three years

10  later.

11  Q.  And so the two of you lived in New York together for a

12  time?

13  A.  That's right.  We lived in New York until 2004.  And we had

14  Thea in 2003, so we moved to Aspen really to a better place to

15  raise a family.  It was a -- New York is a tough place to raise

16  kids.

17  Q.  Was it important for you to get your kids back closer to

18  your family?

19  A.  That was at least half the reason, you know.  I wanted my

20  parents to see my kids grow up and I had a great relationship.

21  I wanted them to go hiking, biking, tennis, outdoor stuff, so

22  it's been a blessing to have them be able to be in Aspen five

23  minutes away.

24  Q.  You mentioned tennis.  You used to be a tennis player?

25  A.  Feels like a long time ago, but I was.

Nikos Hecht - Direct

1  Q.  Tell us about your tennis career.

2  A.  I was a junior tennis player in Colorado.  I was top

3  ranked.  And I played tennis in college at University of

4  Pennsylvania.  And I played a little bit of professional

5  tennis, although not all that successful, and then I went to

6  work.

7  Q.  Who did you get your tennis talent from?

8  A.  My grandfather was top five in the world.  He was from

9  Czechoslovakia and he immigrated here before the war in 1938.

10  Actually, Hitler asked him to play the Davis Cup.  We are not

11  here to hear those stories.  And he moved to America.  And my

12  father was also a good college player, so it's in the blood.

13  Q.  We heard, Mr. Hecht, that you owned a home in Cabo San

14  Lucas; is that correct?

15  A.  I owned.  I since have sold the home, but I did.

16  Q.  When did you purchase that home?

17  A.  I actually purchased land in 2007 and built a home and it

18  was completed in 2009.  And it was a really close place and a

19  nice place to get out of the snow in Aspen and take the kids.

20  So in 2009 Thea was six and Amelia was four and Levi was just

21  born.

22  Q.  Is that home located in a housing development?

23  A.  I guess you could call it a development.  It was called the

24  El Dorado.  Better to have a home, I guess, in Mexico where

25  it's a little protected and gated.

Nikos Hecht - Direct

1   Q.  Can you describe the house for us?

2   A.  It was a nice house, nicer house than I thought I would

3   ever own, but it was on the beach, had a pool overlooking the

4   ocean and whales would come by.  It was great, four, five

5   bedrooms or so.

6   Q.  Did the home ever appear in any magazines?

7   A.  It was.  It was on the cover of Architectural Digest, so it

8   was.

9   Q.  Did you and your family vacation there often?

10  A.  We used it a lot.  We went three or four times a year with

11  the kids on their breaks.  And Allison and I would go down for

12  a long weekend a couple times a year or so.

13  Q.  You mentioned the kids' break.  Did you typically go down

14  on spring break?

15  A.  As the kids got deeper into school for second, third grade,

16  we could only take them out Christmas and spring, so those were

17  two two-week periods.

18  Q.  Do you remember vacationing with your family in Cabo San

19  Lucas in March of 2014?

20  A.  I do.  I am reminded a lot about it.

21  Q.  Fair enough.  That was -- the events in this case took

22  place around the 25th of March 2014.  Do you recall that?

23  A.  That's right.

24  Q.  Had you vacationed frequently during that same time of year

25  in Cabo San Lucas over the years?

1  A.  That was give or take a day or two always the two-week

2  period we went down, so it was the last week of March, first

3  week of April give or take.  That's when spring break was.

4  Q.  What time does the sunset in Cabo San Lucas the last week

5  in March, based on your observations?

6  A.  I know this because we went a lot, but I also know because

7  Allison and I would plan dinners if we were going without the

8  kids to see the sunset different places, so 6:30.

9  Q.  When you traveled to your home in Cabo San Lucas, how

10  frequently did your parents come with you?

11  A.  When you say parents, two sets, but my mother would come

12  down pretty frequently.  And then the kids are very close to

13  both sides.  My father and stepmother, Jody, are very close to

14  the kids.  They spend a lot of nights there, so they would come

15  down half the time, I would say.

16  Q.  Do you remember being in Cabo San Lucas in March of 2014?

17  A.  I do.

18  Q.  Who was with you during that trip?

19  A.  It was Allison, Thea, Amelia and Levi, so all three kids.

20  We have a nanny still.  She has been with us 10 or 11 years,

21  Analise, and that's it.  We have a chef also named Sara.  She

22  was down there.  She met us down there usually.

23  Q.  Tell us Analisa's last name, please?

24  A.  Lodge, L-O-D-G-E.

25  Q.  And Sara's last name?

1   *A.*  Willis.

2   *Q.*  Was your dad, Andy, and your step mom, Jody, in Cabo San

3   Lucas that trip?

4   *A.*  They -- if I remember, they came down.  They were staying

5   with friends about 10 minutes away and weren't staying with us

6   until the second half of the trip, so maybe four or five days

7   at the end.

8   *Q.*  Mr. Hecht, how tall are you?

9   *A.*  How tall I am?  Five-nine, if I am fudging, and

10  five-eight-and-a-half, if I am telling the truth.

11  *Q.*  Back in March of 2014 how much did you weigh?

12  *A.*  160, 65 pounds.

13  *Q.*  Do you know Gery and Jeanne Andlinger?

14  *A.*  I do.

15  *Q.*  Did you see the Andlingers during that trip?

16  *A.*  We did.  We saw them twice.

17  *Q.*  Who are the Andlingers?

18  *A.*  The Andlingers are a family in Aspen and Gery and Jeanne

19  have kids -- or really had kids that were in school older, but

20  the same school as my kids, Aspen Country Day.

21  *Q.*  How well in March of 2014 did you know the Andlingers?

22  *A.*  Pretty well, I mean, acquaintances.  I once had lunch with

23  Gery to raise money for a charity.  I think someone spoke of us

24  sharing an airplane.  We did that.  So enough to say hi.  I

25  think Allison knew Jeanne a bit better.

1   Q.  You mentioned sharing this airplane.  Whose airplane was

2   that?

3   A.  That was the Andlingers'.  I had a meeting in New York and

4   Allison was going to come with me, and they invited us to

5   kindly share their private airplane.

6   Q.  So the Andlingers were in Mexico at the same time as you.

7   Was that preplanned?

8   A.  No.  They happened to be there.  I am sure they were

9   working around the same spring break we were.

10  Q.  We have already heard testimony that Jeanne Andlinger and

11  her son, Tristan, and his friend, Dylan, came over to your

12  house one afternoon.  Do you recall that?

13  A.  I do.

14  Q.  Tell us what you recall from that afternoon.

15  A.  I know that Jeanne and Tristan and Dylan were walking down

16  the beach.  I know Dylan a little bit.  He is friends with

17  Allison, another family.  And I remember I was in the pool with

18  Allison or had my feet in and Allison waved Jeanne up from the

19  beach.

20          And Jeanne came up.  I think the boys came up as well

21  and had a little chat.  I think, I know at one point I went

22  down the beach.  I think I took Levi and he watched for part of

23  it, but we tossed the football around and played football with

24  Tristan and Dylan.

25  Q.  Did the -- let me ask this.  Sorry about that.  Was

1    Ms. Dailey present that afternoon?

2    *A.*   She was not.

3    *Q.*   Did the Andlingers come back to your house again that

4    night?

5    *A.*   They -- they did, not too much later, two or three hours

6    maybe.   Allison had made plans with Jeanne to have an hour of

7    drinks.   I think they had dinner later that night, so just a

8    quick drink.

9    *Q.*   And how long did that evening last, to your recollection?

10   *A.*   I remember it being very short because they had plans

11   already, so I think they were considering buying a property

12   down there or something and they wanted to get a feel for maybe

13   what our house was like or maybe what it's like to be there.

14   *Q.*   Who attended that -- those drinks that night?

15   *A.*   That night I have heard different people, but my

16   recollection is Gery, Jeanne, so Mr. and Mrs. Andlinger,

17   Ms. Dailey, and I don't remember Jeanne's, Ms. Dailey's mother

18   being there, and I don't remember any kids being there except

19   mine, so that was it.

20   *Q.*   On your side of the family who was there?

21   *A.*   It was Analise, Sara, Allison, me, and then the three kids,

22   my three kids.

23   *Q.*   Did you greet the Andlingers when they arrived?

24   *A.*   I didn't formally greet them.   I certainly said hello as

25   they came further into the house.   I remember Sara answering

Nikos Hecht - Direct

1  the door.  And we are pretty informal, so it's not like a

2  greeting party, but I said hello to everybody.

3  Q.  Were you introduced to Ms. Dailey that night?

4  A.  I don't remember a formal introduction, but I do remember

5  being introduced at some point by Jeanne.

6  Q.  Had you ever met Ms. Dailey prior to that evening?

7  A.  I had not.

8  Q.  Prior to this evening at your home, did you know anything

9  about Ms. Dailey?

10  A.  Nothing.

11  Q.  Where in your home was this little gathering held?

12  A.  The home is one of those indoor/outdoor homes, so there

13  is -- you walk in.  There is a living room and you go down a

14  few steps.  And then all the doors were open, so sort of an

15  indoor/outdoor and the living room goes out to a bit of stone

16  and then a bit of lawn and then a pool and then the beach.

17      So we had set up some chairs half stone, half lawn.

18  And I think the women were sitting in an area that everyone

19  talked about, this daybed sort of thing, off at one end of the

20  pool.

21      MR. PLACHY:  Can you pull up Exhibit 114, please.

22  BY MR. PLACHY:

23  Q.  Mr. Hecht --

24      MS. ALTMAN:  Your Honor, we objected to -- there is a

25  whole series of these.

Nikos Hecht - Direct

1      THE COURT:  Okay.  And what are you objecting to?

2      MS. ALTMAN:  Relevance is one objection.  There is no

3  indication from the photographs when they were taken, by whom

4  they were taken in terms of whether the property looked the

5  same in March of 2014 as opposed to when these photographs were

6  taken.

7      THE COURT:  Well, it doesn't matter who took them or

8  when they were taken.  Whether they depict it properly is

9  something that's part of the foundation that he has to lay.

10  BY MR. PLACHY:

11  Q.  Mr. Hecht, what is this a photograph of?

12  A.  This is my house in Cabo that we were talking about.

13  Q.  Is your photograph, Exhibit 114, a true and accurate

14  depiction of how your home looked in March of 2014 when

15  Ms. Dailey and the Andlingers came over for a drink?

16  A.  With the exception that there is no furniture on the stone

17  area, so it must be an off season picture.  And you can see the

18  blinds are all pulled, so I think that also, but besides the

19  furniture, it's exactly accurate.

20  Q.  Does this truly and accurately depict the area where the

21  cocktail party was held that night?

22  A.  Yes.

23      MR. PLACHY:  Move to admit 114.

24      MS. ALTMAN:  We renew our objection.  Obviously, the

25  discussions have been about people sitting on furniture and

Nikos Hecht - Direct

1   where the furniture was located, so it's not an accurate

2   depiction of what transpired at the time.

3            THE COURT:  Objection is overruled.  Exhibit 1 is

4   admitted.

5            MR. PLACHY:  114, Your Honor, yes.

6   BY MR. PLACHY:

7   Q.  Okay, Mr. Hecht.  This photograph is now displayed for the

8   jury.  Tell us what we are seeing here.

9   A.  This is --

10           THE COURT:  Wait a minute, 114?

11           MR. PLACHY:  It's 114, Your Honor.

12           THE COURT:  Oh, I thought you said one.

13           MR. PLACHY:  Sorry about that.

14           THE COURT:  Is what's up here 114 or 1?

15           COURT DEPUTY CLERK:  114.

16           THE COURT:  Where have I been the last minute?  114,

17   but that's this picture here.  It's admitted.

18           MR. PLACHY:  Thank you, Your Honor.

19           THE COURT:  Exhibit 1 is the same picture, right?

20           MR. PLACHY:  No, Your Honor.

21           THE COURT:  It's not?  All right.  Anyway, this one is

22   admitted.

23   BY MR. PLACHY:

24   Q.  Mr. Hecht, tell the jury what we are seeing here.

25   A.  What you are seeing is my family's home in Cabo, and you

1   would be sitting at -- this was taken from the daybed that the

2   women have said they were sitting at during the cocktail party.

3   Q.  And I am going to pull out my stylus and try to draw on

4   this screen.

5         What is this area that we are seeing down here?

6   A.  If you took a few more steps toward where you are pointing,

7   there would be a fire pit down there.  There is a brown door

8   right there -- that's not it.  Right there -- that has beach

9   toys and that's right next to the fire pit.

10  Q.  And the area I circled, is that the beach itself?

11  A.  That's the beach.

12  Q.  Was the cocktail party that evening held on this back lawn

13  and patio area?

14  A.  That's exactly where it was held.  We sit on chairs, if I

15  can show you, right there.

16  Q.  Very good.

17        Tell us about the events that night.  What happened?

18  A.  The Andlingers and Ms. Dailey came by, I think it was about

19  5:00 o'clock.  Like I said, we greeted them, and it wasn't much

20  time.  We had a drink.  I was really talking almost exclusively

21  to Gery Andlinger that night.  And I think the women were, as I

22  said, sitting from where the picture was taken.  I was just

23  going to say it was pretty quick, but everyone mingled a little

24  bit, and it was about an hour.

25  Q.  Did you have a chance to speak with Ms. Dailey that

1   evening?

2   *A.*  It was very brief, but I did speak with her.

3   *Q.*  Do you recall any specific conversation that you had with

4   her?

5   *A.*  I -- I do.  It was peculiar, I remember, at that time.

6   Allison, my wife, had asked me to go light the fire pit because

7   where you were pointing is that fire pit.  And when it's lit,

8   it looks nice and it was approaching getting to sundown.  So I

9   ran in and grabbed one of those longer torches because

10  sometimes it's a flip of the switch and sometimes it doesn't

11  work so well.

12        So I was walking across the lawn to go do that and

13  Ms. Dailey came, walked up to me.  And I think we were walking

14  across the lawn and she told me where she was from.  I told her

15  where I was from.

16        In this little area is a very shallow end of the pool.

17  It's like this deep.  So I remember, I am not sure what the

18  deal was, but I do remember Amelia and Levi being in that other

19  pool and there was a little football, so I stopped and tossed

20  it to them a couple times.  And I walked down these stairs.

21  Ms. Dailey came with me, I think, for either all or most of it,

22  but it's very narrow at the bottom.

23  *Q.*  Can you mark on the screen where those stairs are?

24  *A.*  Yes.  They would be right there.  There are only five of

25  them -- four.

Nikos Hecht - Direct

1   Q.  There is a line in the photograph directly almost parallel

2   to the line you just drew.  Is that the handrail?

3   A.  That's the handrail.  And then it would loop around the

4   corner here, so the fire pit would be right behind the pool

5   that you can't see right now.

6   Q.  Let me stop you for a minute and pull up another photograph

7   just so we can get a better sense of what this fire pit looks

8   like.

9        MR. PLACHY:  Greg, can we see Exhibit 117, please.

10  BY MR. PLACHY:

11  Q.  Mr. Hecht, what is this a photograph of?

12  A.  That's the fire pit.

13  Q.  Is that a true and accurate depiction of the way that the

14  fire pit and your pool appeared on the evening Ms. Dailey and

15  the Andlingers came to your house in March of 2014?

16  A.  That's how it is.  And this, the area before, this area is

17  that shallow end of the pool.

18       MR. PLACHY:  We would move to admit Exhibit 117, Your

19  Honor.

20       MS. ALTMAN:  No objection, Your Honor.

21       THE COURT:  It's admitted.

22  BY MR. PLACHY:

23  Q.  All right.  Mr. Hecht, as we pull this exhibit up, there is

24  a little squiggly line in the pool area.  Is that the line you

25  just drew where the kids were playing?

1    A.   I just drew that.  That's where Amelia and Levi were.

2    Q.   So this is the fire pit and off to the right of the fire

3    pit are the steps leading down to it; is that right?

4    A.   That's right.

5    Q.   Why did you light the fire pit that night?

6    A.   It looks pretty.  I think Allison wanted -- especially as

7    it gets more to dusk, and I think Allison wanted it to look

8    good even though it was close to the time that Ms. Dailey and

9    the Andlingers were leaving.

10   Q.   So I interrupted you and I apologize.

11   A.   That's all right.

12   Q.   You are walking down to the fire pit.  Tell us what

13   happened.

14   A.   So as I said, there is a switch.  The switch would be right

15   under there under where I just drew.  I don't really think

16   there was room.  Ms. Dailey stopped right around the bottom of

17   the stair.  I leaned over and was lucky.  It was lucky -- I was

18   going to say lucky night, but lucky moment -- the fire pit went

19   on with the switch.  I didn't have to use the torch.

20        I came back and Ms. Dailey and I walked back up the

21   stairs, and that's where she made what I have said before, I

22   think I alluded to really peculiar comments.

23   Q.   Did you invite Ms. Dailey to come to the fire pit with you?

24   A.   No.  I had never spoken to her except maybe an

25   introduction.

1   Q.  And you said she made comments that you found peculiar.

2   What did she say?

3   A.  She said that it was a great house.  I am very young to own

4   that house.  And it's impressive that I am king of the castle,

5   she said.  And she said I must have the weight of the world on

6   my shoulders.  And I found that -- it was overly complimentary

7   and it was more personal than -- you wouldn't even say it, I

8   don't think, even if you were really close friends with

9   someone, but it was far more personal than we were at that time

10  or any time.

11  Q.  Were you flattered by her comments?

12  A.  I am not someone who really likes compliments, so it was

13  more awkward, so no.

14  Q.  Did you have any other conversations with Ms. Dailey that

15  evening?

16  A.  No, besides goodbye, I mean, everybody saying goodbye at

17  the same time.

18  Q.  How long did the drinks party last?

19  A.  Like I said, it was around an hour, give or take.

20  Q.  So the Andlingers at some point left your home?

21  A.  They did.

22  Q.  Along with Ms. Dailey?

23  A.  She did.

24  Q.  Did the Andlingers and Ms. Dailey all leave at the same

25  time?

Nikos Hecht - Direct

1  A.  They all left at the same time.

2  Q.  How did they leave your home?

3  A.  Allison and I, and I think Sara, too, walked them toward

4  the door when they said they had to go.

5  Q.  And what door are we talking about?

6  A.  Front door, the same door they came in.  It's a big brown

7  door and it's up about 5 feet on the landing before you walk

8  down into the living room.

9  Q.  Let me pull up a photograph so we can look while you are

10  talking about it.

11       MR. PLACHY:  111, please.

12  BY MR. PLACHY:

13  Q.  Mr. Hecht, this is Exhibit 111, which has not yet been

14  admitted into evidence.

15       What are we seeing in this photograph?

16       MS. ALTMAN:  Your Honor, we have the same objections

17  as before with respect to this exhibit.

18       THE COURT:  All right.  Well, at this point he is just

19  trying to lay a foundation for it.

20  BY MR. PLACHY:

21  Q.  Mr. Hecht, what are we seeing in this photograph?

22  A.  This photograph is the living room.  And the front door

23  that I was speaking about where Ms. Dailey and the Andlingers

24  came in is right there.

25  Q.  I am sorry, I have got to ask you a couple more questions

Nikos Hecht - Direct

1   so we can show this to the jury.

2        That is the door that the Andlingers and Ms. Dailey

3   exited through that evening?

4   A.  That is.

5   Q.  And is this photograph a true and accurate depiction of how

6   this area of your home looked on that evening in March of 2014?

7   A.  Yes.

8        MR. PLACHY:  Your Honor, we would move to admit

9   Exhibit 111.

10       MS. ALTMAN:  No objection, Your Honor.

11       THE COURT:  It's admitted.

12  BY MR. PLACHY:

13  Q.  Okay.  Before I interrupted you, the Andlingers and

14  Ms. Dailey are preparing to leave.  Tell us what happened.

15  A.  They were preparing to leave.  We, the three of us, Sara,

16  Allison and myself, were standing here, here and here.

17  Q.  Let me interrupt you there because it looks like you are

18  drawing on the top of the couch.

19  A.  Right, which that's effectively what it was.  I remember

20  leaning, holding the arms of the couch, leaning back.  And so

21  my behind is on the edge of the couch.  And I remember Allison

22  to my left -- I remember this vividly -- and Sara to my right.

23  Q.  So are you standing between the couch and the chair railing

24  we see?

25  A.  I would say there is about 2 and a half feet.

Nikos Hecht - Direct

1   Q.  And that's where you are standing?

2   A.  That's where I am standing, yes.

3         So the Andlingers -- obviously, if you can see, I

4   think the way it works is that we all walked this way where

5   there is more space, all six of us.  We came to the -- Allison,

6   Sara and I were standing at the bottom of the stairs.  We were

7   saying goodbye to them.  And the Andlingers and Ms. Dailey were

8   walking this way up these stairs, which are about 3 feet wide,

9   and there is a little -- which makes them narrower.  There is

10  next to the yellow wall, there is sort of a -- they look like

11  they are floating, so you've got about a foot of air.  So they

12  are normal stairs except the edge, so there is not a lot of

13  room for a lot of people to walk.  They are almost single file.

14  Q.  Okay.  And did they walk out single file?

15  A.  They walked out single file.  They got up to the landing.

16  We said goodbye.  I know Allison had made plans at that time

17  with Jeanne to do this dinner at Flora Farms, and Sara was

18  confirming that she would make a call and see if we could get

19  in.

20  Q.  So as the Andlingers and Ms. Dailey were walking up those

21  stairs, where are you standing?

22  A.  Right there, the middle.

23  Q.  As the Andlingers reached the landing in front of the front

24  door, where are you standing?

25  A.  Still there.  I didn't move.

1   *Q.*  As Ms. Dailey reaches the front door to leave the home,

2   where are you standing?

3   *A.*  Same place.

4   *Q.*  Once she is outside the door, outside the house, where are

5   you standing?

6   *A.*  Same place.

7   *Q.*  Did you follow her up the stairs as she was leaving?

8   *A.*  No.

9   *Q.*  Did you step foot on those steps when she was leaving?

10  *A.*  No.

11  *Q.*  As Ms. Dailey was leaving your home that night, did you

12  make any statements about her physique?

13  *A.*  No.

14  *Q.*  Did you tell her that she looked good?

15  *A.*  No.

16  *Q.*  Did you tell her that she looked fit?

17  *A.*  No.

18  *Q.*  Did you tell her that men liked women with some meat on

19  their bones?

20  *A.*  No.

21  *Q.*  Did you say anything other than goodbye?

22  *A.*  No.

23  *Q.*  Now, we started -- you started to talk about this.

24          During this gathering at your home, were plans made to

25  have a dinner later in the week at a restaurant called Flora

1  Farms?

2  *A.*  Yes.  Allison, I think, made those plans with Jeanne, and

3  Sara was the contact, if you would, to get us in.

4  *Q.*  Was it your idea to have that dinner?

5  *A.*  No.

6  *Q.*  Did you have any involvement in the planning of that

7  dinner?

8  *A.*  None.

9  *Q.*  Had you ever been to Flora Farms prior to March 2014?

10  *A.*  I had.  It was a place we went, you know, three, four

11  times.

12  *Q.*  I think you said it's a busy place, popular place?

13  *A.*  It is.  It was fairly new, I think, at that time, and it

14  was hard to get in.  It's sort of a unique concept, the outdoor

15  and farm right there, and so especially for a 20-person dinner

16  and I guess it was three days coming.

17  *Q.*  So how did you pull off the reservation?

18  *A.*  Sara's best friends are the owners there.  And Sara had

19  worked there sometimes helping periodically as a chef, and so

20  she was able to manufacture a reservation, I guess, or

21  something.

22  *Q.*  Now, you mentioned Sara, the chef.  That's Sara Willis?

23  *A.*  That's Sara Willis.

24  *Q.*  How long did Sara work as your personal chef?

25  *A.*  She has been working with me, with my family, for almost

1   the beginning of Cabo, so 2009.  Seven, eight years.

2   Q.  She is still working for you?

3   A.  She is.  She just gave notice, unfortunately, because she

4   is leaving to start a new business.

5   Q.  What was her background when you hired her?

6   A.  She has always been a chef and she started restaurants, but

7   she has an entrepreneurial fire to her.  She always has wanted

8   to start something, a business.

9   Q.  You mentioned she has given notice, but she is sticking

10  around through the summer.  Why such a long lead time?

11  A.  Sara lives in Oregon.  We have another chef, a lady who

12  comes and helps also.  And she has cancer, unfortunately, so

13  she has treatment this summer and Sara is going to help until

14  she is hopefully on her feet.

15  Q.  You mentioned Sara is going to work for this new company.

16  What's the name of that company, if you know?

17  A.  It's her company, so she is going to be working for

18  herself.  It's called Saucefly.

19  Q.  What does Saucefly do?

20  A.  It's small now, but it sends food boxes to people who want

21  to cook for themselves but want some great sauces, great mixing

22  dishes, some great recipes, a dessert here or there, so makes

23  things easy.

24  Q.  Cooking sauces.  Is that what it is?

25  A.  Cooking sauces, so it's like a subscription.  That's what

1   she wants it to be.  You pay something every month and you get

2   maybe something that holds like an appetizer and a chili sauce,

3   and so it might not make me a good chef, but it can make an

4   average chef a good chef.

5   Q.  Did you invest in Saucefly to help Sara get started?

6   A.  I have.

7   Q.  Tell us about that.

8   A.  I believe in the idea.  I believe in her.  And she has

9   always come to me with ideas, and I have invested about

10  $30,000.

11  Q.  Do you have any role in the management of the company?

12  A.  No.

13  Q.  Are there other investors besides you?

14  A.  There is at least one or two.  I don't know them, but there

15  are other investors.

16  Q.  Have you helped Sara with any other investment ideas she

17  came up with?

18  A.  We've talked about a lot of them, but we made a land and

19  then built a home investment, or she did, and I invested in

20  that with her.

21  Q.  Tell us about that.

22  A.  She found a piece of land in Oregon that she really thought

23  was amazing and thought was cheap, so I lent her the, I think,

24  $250,000 to buy the land.  And then she really oversaw -- even

25  though she didn't have a lot of the experience, but she is a

1   real doer, and she oversaw the building of the home that she

2   was either going to sell and we were going to split the profits

3   or she thought about living there and then refinancing.

4           So she ends up that she is living there and she built

5   the home.  So all told, I lent her $600,000 to buy land, build

6   a home.

7   Q.  Was that loan documented with a formal promissory note and

8   a mortgage deed?

9   A.  It was a note secured by the property just like a bank

10  would.

11  Q.  Did you charge interest?

12  A.  I did.

13  Q.  Was it market rate?

14  A.  Yes, maybe a little better, but I don't want to --

15  Q.  Don't tell her that.

16  A.  No, not by much if it was.

17  Q.  Has she repaid that loan?

18  A.  She has repaid $415,000 of the 600.  So now I have a

19  $185,000 loan and the bank gave 415,000, paid me off.

20  Q.  Mr. Hecht, before we get into what happened at Flora Farms

21  in March of 2014, let me ask you, did you give sworn deposition

22  testimony in this case?

23  A.  I did.

24  Q.  During that deposition, did you testify under oath

25  truthfully about what happened at Flora Farms that night?

Nikos Hecht - Direct

1    *A.*  I did.

2    *Q.*  At the time you gave your sworn testimony, had Tristan

3    Andlinger or George Cathers been deposed yet?

4    *A.*  No.  I gave my testimony first.

5    *Q.*  At the time you gave your testimony in this case, did you

6    know what Tristan and George were going to say?

7    *A.*  I didn't know what they were going to say.  I knew they had

8    embarrassingly seen the whole incident.

9    *Q.*  No other details?

10   *A.*  No.  I didn't know.  I knew they saw everything, so I

11   didn't know what they were going to say, though.

12   *Q.*  Let's talk about the evening at Flora Farms.

13           Was the sun still out when you arrived?

14   *A.*  It was near sunset, but it was still out.  We arrived at

15   six-ish give or take a few minutes.

16   *Q.*  Are you familiar with the layout of that restaurant?

17   *A.*  I am.

18   *Q.*  Let's pull up 126, please.

19           Mr. Hecht, you have Exhibit 126 in front of you.

20           *MS. ALTMAN:*  Your Honor, this is an exhibit we have an

21   objection to.

22           *THE COURT:*  Well, why don't you wait until he offers

23   it.

24           *MS. ALTMAN:*  I just want the Court to know I don't

25   think he can lay a foundation with this witness, but I will

1   wait until he offers it.

2           *THE COURT:*  Go ahead.

3   *BY MR. PLACHY:*

4   *Q.*  What is this a photograph of, Mr. Hecht?

5   *A.*  This is a photograph of Flora Farms.

6   *Q.*  And does it fairly and accurately show the layout of Flora

7   Farms as it existed on -- in March 25, 2014?

8   *A.*  Looks to me to be exactly.

9           *MR. PLACHY:*  We move to admit Exhibit 126, Your Honor.

10          *MS. ALTMAN:*  Your Honor, we would object.  This is an

11  aerial photograph.  He didn't take the aerial photograph.

12  There is no testimony that he is -- by example, you saw the

13  photographs where there is lots of foliage.  This looks nothing

14  like what it looked like in March of 2014, which is what they

15  just suggested to this Court.

16          *THE COURT:*  It doesn't matter who took the photograph,

17  but I agree you have to lay enough foundation for his personal

18  knowledge.  Sustained at this point.

19  *BY MR. PLACHY:*

20  *Q.*  Mr. Hecht, how many times prior to March 25, 2014 had you

21  been to Flora Farms?

22  *A.*  At least half a dozen, maybe more.

23  *Q.*  And so you were familiar with the layout of that

24  restaurant?

25  *A.*  Very.

1  Q.  And does this depict all of the buildings that were at

2  Flora Farms in March 2014?

3  A.  Every one that I know.

4  Q.  Are the pathways the same as they were in March of 2014?

5  A.  Every one that I know.

6  Q.  Does this photograph depict the area where the dinner was

7  held that night?

8  A.  Exactly.

9  Q.  And are the crops in the exact same position as they were

10  at Flora Farms in March of 2014?

11  A.  I remember some of the trees, so yes, I remember a lot of

12  this foliage.

13       MR. PLACHY:  We would ask again that Exhibit 126 be

14  admitted.

15       MS. ALTMAN:  Your Honor, again, it's the same

16  objection.

17       THE COURT:  Do you want to voir dire on the

18  photograph?

19       MS. ALTMAN:  Your Honor, Mr. Hecht has no ability to

20  testify that all of the crops were in the same place and the

21  plants were in the same place.

22       THE COURT:  Of course not.  Nobody could.  The

23  objection is overruled.  That's a matter of cross-examination.

24  The document is admitted.

25       MR. PLACHY:  Thank you, Your Honor.

Nikos Hecht - Direct

1   *BY MR. PLACHY:*

2   *Q.*  So Mr. Hecht, let's use this aerial photograph to have you

3   walk us through what happened that night.

4   *A.*  Okay.

5   *Q.*  If you can, sir, please use your little stylus and show us

6   where the dinner table was that evening.

7   *A.*  Okay.  The dinner table is under this gazebo.

8   *Q.*  And did the dinner guests gather near the gazebo that you

9   just marked when they arrived that evening?

10  *A.*  We all did, yes.

11  *Q.*  Where did you go when you arrived at Flora Farms that

12  night?

13  *A.*  Again, it seems like it was this gender gathering of

14  where -- by this I mean the men kind of all stood around in

15  this area and then the women were closer to the table.  And

16  then I think a lot of people said they saw -- and I don't know

17  exactly who went, but I did see most or all of them go to the

18  shops that are here.

19  *Q.*  Who went to the shops?  I am sorry?

20  *A.*  The women.

21  *Q.*  So who were you standing with that night when you arrived?

22  *A.*  I was standing right here and I was talking to Gery

23  Andlinger, my dad was in the group, my dad's friend who had

24  stayed earlier in the week, Willy Jordan, and myself.

25  *Q.*  Were food and drinks served at that point prior to dinner?

1   A.  I think there was a little bit of food, and I think the

2   kids had a little bit of food, and that there were drinks, I

3   guess, served.

4   Q.  What were the kids doing prior to dinner?

5   A.  They were playing.  They were all over the place playing.

6   Q.  How long did you stand around before it was time to eat and

7   everyone went to the dinner table?

8   A.  It felt like a little too long.  It was give or take an

9   hour.  It could have been 45 minutes, but it was closer -- felt

10  like an hour.

11  Q.  Did Sara Willis attend this dinner?

12  A.  She did.

13  Q.  What was her role that night?

14  A.  She really was the reason we got the reservation, so she

15  was there to coordinate and make sure everything ran smoothly

16  and to help out, because it was a big favor by the owners to

17  give us this table and this time.  And she was anxious because

18  they would certainly have had a full house.  They did have a

19  full house.  So to get the kitchen not too bogged down, we

20  committed to this earlier -- earlier table, earlier seating.

21  Q.  So did you and Sara do anything to try to get people seated

22  that night?

23  A.  There was one point, and this is part of the reason I know

24  it went too long before we all were seated for dinner, is

25  because Sara was off, I can show you where, right about there

Nikos Hecht - Direct

1   exactly there, actually by the table.  Like I said, I was

2   standing here with the group of guys talking and I could see

3   Sara sort of look at me and wave to me to walk over.

4           She wanted to talk to me.  She was frustrated that we

5   hadn't sat and that she couldn't tell the kitchen to fire

6   everything up and it was getting later and later.  And it was

7   stressing her out.

8   Q.  So what happened?

9   A.  So I think I walked over and left this group and I went to

10  talk to Sara.  I also am not -- I wanted to move things along.

11  I know that the kids were playing, but they can get antsy, and

12  so we didn't want to have everybody here, that we wanted to

13  move this along.

14          So Sara and I walked 15 to 20 feet right about here

15  and then turned and walked right back to the same place.  And

16  that conversation was just let's move things along.  Let's get

17  this going, get this done, out of here.  And she said, I am

18  going to go to the kitchen and tell them to start firing

19  everything up.  And why don't you go gather the kids.  Maybe

20  the adults will follow.

21  Q.  So did you do what Sara asked you to do and tried to round

22  up the kids?

23  A.  Not well, but I tried.  Sara, I think, from here went off

24  to the kitchen.  And I had seen Levi, and I don't know who

25  else, but I remember Levi playing up here on the path about

1  five or 10 minutes ago from where I was standing with the

2  group.

3  Q.  So what did you do?

4  A.  So I turned and I started walking up this part of the path

5  looking for Levi.  And I walked probably to this point roughly,

6  maybe 20 feet or so, and that's when Ms. Dailey came up behind

7  me and put her hand on my shoulder.

8  Q.  Did you ask her to follow you down the path?

9  A.  No.  I had no idea she was even in the area.  I didn't ask

10  her, didn't make a comment.  She just came up behind me.

11  Q.  And you mentioned you had seen Levi playing a little

12  further down the path a bit earlier.

13       At this point when Ms. Dailey approached you, did you

14  still see Levi?

15  A.  I didn't see Levi then, and I continued down the path with

16  finding him in mind.  Ms. Dailey joined me in the middle of the

17  path.  I guess I thought it was odd, but maybe not in light of

18  she seemed like just a -- either flirtatious or overly friendly

19  person, maybe, for not knowing her, but it wasn't -- I didn't

20  think it was totally inappropriate, but I just thought it was

21  more intimate than the relationship was.

22       So we walked together another 20 or 30 feet, and I was

23  still looking for Levi.  And it got darker and darker.  I

24  didn't see him.  I got to the point where he was and he was

25  nowhere that I saw.

Nikos Hecht - Direct

1    Q.  Did you see any other kids in the area?

2    A.  I didn't see anyone in the area.

3    Q.  Did you think you and Ms. Dailey were alone on the path at

4    that point?

5    A.  At that point I didn't think we needed to be alone, but I

6    did think we were alone.

7    Q.  There has been some testimony that there are some lights

8    that hang over a portion of this path.  Is that consistent with

9    your memory?

10   A.  I do remember those.

11   Q.  When your walk with Ms. Dailey came to an end, were you

12   still underneath those lights?

13   A.  No.  We had gotten out from under those lights by 30 or

14   40 feet.

15   Q.  What was the lighting like at that point?

16   A.  Dark.  The sun was down.

17   Q.  Could you see the gardens at that time?

18   A.  No.  You couldn't see at that point -- you know, 10 feet in

19   front of you, you probably couldn't see.  Just under that,

20   maybe 7 feet in front of you.

21   Q.  Let me ask you this.  Did you -- when Ms. Dailey came up

22   behind you, did you extend her arm to walk arm in arm with her?

23   A.  I have been hearing that.  I have heard it from enough

24   people that I don't disbelieve it, but I just don't remember

25   doing that.  It's not the way I normally would walk.  It's sort

1  of old-fashioned, but it's possible, but I don't remember.

2  *Q.*  So what happens next?

3  *A.*  So we got to this area where I had seen Levi, didn't see

4  Levi and a bit beyond.  And Ms. Dailey came around to my side

5  and was really close to my face for a second and just leaned in

6  and kissed me.  And I was -- I was shocked and didn't initiate

7  it, but I am not going to say I didn't participate.

8  *Q.*  Did you initiate that kiss?

9  *A.*  Not at all, no.  I maybe kissed back, but I don't remember.

10  It wasn't a kiss like we wanted to --

11  *Q.*  What happened next?

12  *A.*  Ms. Dailey started talking dirty to me.  It was

13  inappropriate talk.  I know I have to recite it, but she said

14  she wanted me inside of her.  She said that she has had no

15  kids.  I am sorry for this, but her pussy is so tight.  She has

16  a great pussy, I am going to love it.  Those things, it's like

17  vivid.

18  *Q.*  What was your reaction to that?

19  *A.*  You know, it was -- I was reacting.  I was shocked.  I

20  was -- I'm not a choir boy.  I'm not a choir boy, so I was a

21  willing participant, but she initiated this in a way that was

22  just over the top.

23  *Q.*  Did you at any time reach around and put your hand on the

24  back of Ms. Dailey's head?

25  *A.*  Never.

1  Q.  Did you grab her neck?

2  A.  Never.

3  Q.  How far are you from the table at this point?

4  A.  We're 50 to 75 feet.  I think the length of this courtroom

5  that Ms. Dailey described is pretty accurate.

6  Q.  I want to go back to the kids.

7          You had seen the kids in this area earlier.  You

8  acknowledge now at this point you are a willing participant in

9  this.  Aren't you afraid your kids are going to see you?

10  A.  My judgment was awful.  You know, hearing this and hearing

11  it over and over, I have thought about this whole -- during

12  this whole process, you know, how am I going to have to tell my

13  kids if they read about this stuff?  I didn't rape Ms. Dailey.

14  I didn't assault Ms. Dailey.  But just the stupidity of the --

15  of participating in this, it's, it's just galactically stupid,

16  but I have to admit right then -- I was five minutes before,

17  but I was not thinking about my kids.  I snapped to it too

18  late, but earlier than could have -- could have been, so

19  nothing good.

20  Q.  So you discuss this kiss and the statements that you say

21  Ms. Dailey made to you.  What happens next?

22  A.  Ms. Dailey undid my pants.  She went to her knees and she

23  put my penis in her mouth.

24  Q.  What kind of pants were you wearing that night?

25  A.  Just some jeans, but not tight jeans, just normal.

1  Q.  Were you wearing a belt?

2  A.  No.

3  Q.  So you mentioned Ms. Dailey got down on her knees.  Were

4  you touching her at all when she went from standing to her

5  knees?

6  A.  I never -- I never encouraged, touched, nothing.  It was

7  all on her volition.

8  Q.  You didn't make any threatening motions to her to try to

9  force her to the ground?

10  A.  Not at all.

11  Q.  So at this point Ms. Dailey has your penis in her mouth.

12  Are you erect, sir?

13  A.  That -- yes, yes.

14  Q.  So tell us what happened next.

15  A.  It was -- it was measured in five, less than 10 seconds.

16  My penis was in her mouth and she is on her knees.  She pulled

17  down her own pants to her knees, obviously, and I remember she

18  was wearing no underwear.  And she reached up and grabbed my

19  collar and pulled me into her.  And it was fairly hard, but it

20  wasn't as though I was overpowered.  I was just off balance

21  and, like I said, a stupid participant.

22       So she went -- she had me up by the collar.  She went

23  to her butt, sort of slid her legs under, went to her butt, and

24  leaned back and went on her back.  I fell to my knees in

25  between her legs and then at some point put my hands on either

1   side of her head.

2   Q.  Were you -- did you at any point see Ms. Dailey's genitals?

3   A.  I did.  She was completely bare.  She had neither shaved or

4   however, however that.

5   Q.  So, Mr. Hecht, what happens next?

6   A.  Ms. Dailey's legs I remember were bent but spread.  And I

7   remember she put her hands over her head through my arms and --

8   there was no penetration, but I tried a couple times.  There

9   was no good fit.  It was stupid to begin with, but I don't

10  think I was that erect anymore.  She wasn't lubricated.  And

11  maybe it was at that time that made me also say, what am I

12  doing?  This is galacticly stupid and wrong and inappropriate.

13          So I felt like I was in a fishbowl at that moment.  I

14  felt the table is behind us.  I don't know where the kids are.

15  It sort of just dawned -- woke me up.  And I -- I got up and

16  said, This is crazy.  We have to go, to Ms. Dailey, and pulled

17  my pants up.

18  Q.  Let me clarify something before we move forward.

19          So at the time when you are on your hands and knees

20  above Ms. Dailey, at any time did you place your hands on her

21  body?

22  A.  Not at all.

23  Q.  Did you hold her down in any way?

24  A.  Never.

25  Q.  Did you force her to the ground?

1    A.   No.

2    Q.   Did you threaten her or tell her she needed to stay quiet?

3    A.   I didn't say a word and nothing like that.

4    Q.   And did she say anything to you at any time during this

5    encounter other than the dirty talk you mentioned at the

6    beginning?

7    A.   Nothing.  Again, no.

8    Q.   Did she ever say anything to you that led you to believe

9    that this was not consensual?

10   A.   There was no stop, no no, no wait, not a word.

11   Q.   Did Ms. Dailey, when the two of you were on the ground,

12   ever try to scoot or move away from you?

13   A.   Never.

14   Q.   Did you kiss her or did she kiss you at any point while you

15   were on the ground?

16   A.   No.  I was on my hands and knees and I was away from her

17   face.

18   Q.   Did you do anything to cover her mouth to keep her quiet?

19   A.   No.  My hands stayed on the ground the whole time except I

20   think I grabbed my own -- grabbed myself and tried to put it

21   into her vagina once or twice.

22   Q.   Did she say or do anything that led you to believe she

23   wanted you to stop?

24   A.   Never once; the opposite.

25   Q.   Now, are the two of you on the path itself at this point?

Nikos Hecht - Direct

1   *A.*  Completely on the path, completely stupidly on the path and

2   stupid altogether, but totally on the path.  At the edge, but

3   on the --

4   *Q.*  Not in the bushes on the edge.  You are on the path?

5   *A.*  Totally on the grass.

6   *Q.*  Did you thrust your pelvis into Ms. Dailey?

7   *A.*  I have heard this from the boys and I don't know what it

8   looks like and feel terrible about it.  I can see why they

9   might have thought it was intercourse, but I never was inside

10  of her.  And that thrusting may have been the attempt to have

11  intercourse, but no, nothing other than that.

12  *Q.*  Did you ejaculate?

13  *A.*  No.

14  *Q.*  So you are unable to penetrate.  You stand up.  Tell us

15  what happened.

16  *A.*  I stood up.  I was embarrassed.  It took a little bit of

17  urging, but Ms. Dailey stood up.  I think I said, Come on.  We

18  should get back.  This is not smart.  I pulled my pants up.  At

19  some point, not too long, Ms. Dailey stood up, pulled her pants

20  up.  And I wasn't trying to be rude.  Honestly, I just thought

21  that we shouldn't walk back together.  So I walked ahead

22  10 feet or so and especially started walking a little bit

23  faster when I looked and knew she was walking back following

24  me.

25  *Q.*  Were you trying to be rude when you had -- you walked ahead

1    of her?

2    *A.*   No.   It wasn't a good way to approach that situation.   It

3    wasn't a good thing to be in that situation.   There was no good

4    way to leave it, but I -- I didn't want to tell anybody.   I

5    didn't want to tell my wife.   I didn't want anybody to see us

6    walking back together because it would look really odd, which I

7    regret, so I thought if we were walking a bit separated, it

8    would be disguised.   I laugh because it's not very disguised

9    now.

10   *Q.*   When you got up to leave, what was Ms. Dailey's reaction?

11   *A.*   She was embarrassed, just like I was, but not upset, not

12   angry, not -- just embarrassed, but there were no real words

13   spoken.

14   *Q.*   So you get up and start walking.   Where do you go?

15   *A.*   I went back to the table.

16   *Q.*   What did you do when you reached the table?

17   *A.*   I sat down right next to Allison on the bench.   There was a

18   seat, and --

19   *Q.*   Where were your kids?

20   *A.*   The kids, Levi was still sort of running around in that

21   area.   He had eaten some pizza already.   And Thea and Amelia

22   were seated at the other end of the table, I made sure.

23   *Q.*   So you sit next to Allison.   What happened next?

24   *A.*   I tried to join in the conversation of whatever it was.

25   And I remember I think Tristan in that video said I was hyper.

1    I am sure I was, like overly trying to get into the party

2    conversation or whatever it was, but I just joined in.  I think

3    the appetizers, like the beans, bean salad was being served,

4    and then the fried chicken.  I just ate and acted like almost

5    myself, like nothing happened.

6    Q.  Did Ms. Dailey return to the table?

7    A.  You know, a matter of seconds after, yes.

8    Q.  Where did she go?

9    A.  It wasn't a seat, but she perched right next to me.  I

10   don't even know if her legs, to be honest with you, were under

11   the picnic table, but she was sitting next to me.

12   Q.  And what happened?

13   A.  I distinctly remember half trying to -- not ignore her, but

14   I wanted to focus on Allison, but also try to bring her into

15   the conversation, like talk to everybody, so that she wouldn't

16   feel like I was being a jerk, or I don't know what I was trying

17   to accomplish exactly, but it was awkward.  I do remember she

18   tapped me on the shoulder at one point.

19   Q.  So tell us about that.

20   A.  She tapped me on the shoulder to try to get my attention.

21   I didn't know for what.  But people said I didn't turn around.

22   That's correct, I didn't turn around.  I think that's one of

23   the points that I tried to include her in the conversation, but

24   I didn't want to turn and have some direct at eye level with

25   her as if -- I was about to say it would be inappropriate, like

Nikos Hecht - Direct

1   everything wasn't anyway.

2   Q.  Did she sit next to you the entire dinner?

3   A.  No.  She moved.  I mean, she got up -- those pictures that

4   everybody is talking about or a lot of those pictures were

5   taken right after that.  She got up.  She was taking pictures

6   of the food.  She was telling people to smile.  She was telling

7   people to pose.

8           And one of those pictures she tapped me again and

9   called my name and told me to turn around and smile.  I looked

10  like a deer in the headlights.  That's sort of what it was.

11  Q.  I think you mentioned there was fried chicken for dinner;

12  is that right?

13  A.  That's right.

14  Q.  What was for dessert?

15  A.  There was -- I think it was a coconut cream pie.  It's my

16  favorite.

17  Q.  After you got back to the table, how long did dinner last?

18  A.  Everything was served in rapid succession then.  We have

19  kids.  I am convinced people are mistaken about the timing and

20  stuff.  My recollection is clear.  You know, the bean salad,

21  the chicken and the dessert all kind of came in rapid

22  succession.  30 minutes we were there at the longest.

23  Q.  Were these three separate courses that the beans were the

24  appetizer and the chicken was main the course and the pie was

25  the dessert?

1  A.  Yes, except it's a family-style restaurant.  It's not, you

2  know, waiter service.  You just bring the stuff out.  And I

3  remember the pizza was primarily for the kids and Sara and I

4  were talking about the adults having some too, so that was kind

5  of there.  So it was just food out, eat, leave.

6  Q.  Was there a gap in time between when the fried chicken was

7  served and when the pie was served for dessert?

8  A.  Minutes.

9  Q.  You mentioned that when you came in, they were serving

10  drinks.  Did you have a drink that night?

11  A.  I don't remember a specific drink.  I am going a little bit

12  off of a photograph where I do see they have these mixed drinks

13  that sometimes have a watermelon something.  I didn't -- I

14  didn't drink any wine that night, but maybe I had one of those

15  or half of one of those, nursed one of those.

16  Q.  Is it possible you had more than one drink that night?

17  A.  No.  I am not a drinker.  I am not a big drinker.

18      MR. PLACHY:  Can you pull up Exhibit 19, which I

19  believe has been previously admitted.  Thank you.

20  BY MR. PLACHY:

21  Q.  Who is that guy?

22  A.  That's me.

23  Q.  I take it that's the deer in the headlights that you were

24  talking about.

25  A.  Yeah, yes, yes.

Nikos Hecht - Direct

1    Q.  Who took this picture?

2    A.  Ms. Dailey.

3    Q.  Was this picture taken before or after you returned from

4    the field with Ms. Dailey?

5    A.  After.

6    Q.  Tell me how this picture came about.

7    A.  This is just after Ms. Dailey -- that I said if you see the

8    space, if I can just mark there, that's the space that I was

9    saying there was very little space to sit, but Ms. Dailey sat

10   there.

11   Q.  Is that a bench or a chair?

12   A.  It's a bench.  That arm doesn't -- that doesn't have an

13   arm.  It doesn't really exist.  The bench is open.

14   Q.  Are you saying that's the arm to the chair next to the

15   bench?

16   A.  Exactly.

17   Q.  Okay.  Keep going.

18   A.  So Ms. Dailey sat there.  She stood up from that seat and

19   walked around the table kind of -- I am motioning this way, but

20   was taking pictures of -- a bunch of pictures.  I remember this

21   was just one of them.

22   Q.  Did she -- how did she get your attention to take a

23   picture?

24   A.  She said my name.  She said, Smile.  And it's like a bad

25   smile, but I smiled.

Nikos Hecht - Direct

1    Q.   During the dinner did you ever leave the dinner table?

2    A.   I think I got up because Levi was right behind me playing.

3    I think I got up and Amelia wanted to talk to me, so maybe one

4    minute here or there, once.

5    Q.   When you got up, did you leave the immediate area of the

6    table?

7    A.   No.  I would have went 10 feet, probably, of the seat.

8    Q.   Once dinner is over, you had the chicken, you had the pie,

9    did people stick around and chat?

10   A.   Left.

11   Q.   Do you recall if the kids, the teenage kids, left before

12   the adults?

13   A.   I don't remember how -- what the order.  I know that

14   everyone -- it was an exodus out really 10 or 15 minutes after

15   that picture.  And it was getting cool and it was dark.  It was

16   just -- it was over.

17   Q.   So let me ask you about that.  You have spent a lot of time

18   in Cabo.  That time of year at night, what's the weather like

19   in Cabo?

20   A.   It's nice.  When the sun is down -- that's a desert place,

21   so when the sun goes down, it can drop 20, 25 degrees.  So it

22   can be -- go from 70 to 50, no doubt.

23   Q.   So the dinner is over.  After dinner did you speak to

24   Ms. Dailey ever again?

25   A.   If I could just add to it.  At that point Levi had just

1   turned or almost turned five, so he -- you know, bedtime is

2   7:30 normally, so we could even put him down at 8:00.  Same

3   with Amelia.  So a lot of these kids were young kids, but -- I

4   am sorry.  As we were leaving the dinner, I had one more

5   conversation with Ms. Dailey.

6   Q.  Tell us about that, please.

7   A.  There is a gate that's shown as everyone is leaving that

8   area and walking toward the parking lot.  Right about that gate

9   Ms. Dailey asked to exchange phone numbers and said that she is

10  staying at Las Ventanas if I get some time and want to come

11  over.

12  Q.  Did you exchange numbers with her?

13  A.  I gave her my number.  I remember thinking about it,

14  contemplating that I didn't want to give her a fake number

15  because that would look -- that just would be not nice.  And

16  when she gave me her number, I was pretending to put it in, but

17  I wasn't plugging it in.

18  Q.  You said --

19  A.  I was making, you know, the touching the screen motions,

20  but not really putting the numbers in.

21  Q.  Did Ms. Dailey ever call you?

22  A.  She called me the next day.

23  Q.  How do you know that?

24  A.  I am quite positive, but not a hundred percent.  It was

25  from Las Ventanas.  I had no other reason to get a call from

Nikos Hecht - Direct

1   that hotel.  And I didn't answer it.

2   Q.  Did she leave a message?

3   A.  I don't have voice mail on my cellphone.

4   Q.  After that night at Flora Farms, did you ever speak with

5   Ms. Dailey again?

6   A.  Never.

7   Q.  After the incident, did you tell your wife, Allison, what

8   happened?

9   A.  No, I didn't -- I didn't tell my wife.  There is a good way

10  to handle it and a bad, but even the good is bad.  But I didn't

11  even do the good.  I just didn't tell her, you know.  And then

12  I don't know how she would have reacted if I told her, but she

13  didn't react well when she was told.

14  Q.  What was your reaction, Mr. Hecht, when you learned that

15  Ms. Dailey was suing you for money?

16  A.  Disbelief, because even when Allison was told, there was no

17  mention of anything like rape or assault.  I could not believe

18  the -- it was bad enough.  You know, there has been a lot of

19  dislocation, emotional turmoil, but the idea that I would be

20  accused of rape, it's -- it's really disturbing and it's beyond

21  me.  And it's -- it has to be monetary or embarrassment.  In my

22  opinion, I don't know, but it's awful.

23  Q.  Why are you here trying this case?

24  A.  Because I only have this forum to show my kids and

25  primarily my kids, I mean, people think of me what they want to

1  think, but my kids, I didn't do this.  And I am standing up and

2  saying I didn't do this.

3  Q.  Did you rape Ms. Dailey?

4  A.  No.

5       MR. PLACHY:  Thank you, Mr. Hecht.  Nothing further,

6  Your Honor.

7       THE COURT:  Thank you.  Would you folks like a short

8  break, too?  How much time?

9       THE JURY:  10 minutes.

10       THE COURT:  10 minutes.  Let's do it.

11       (Jury excused.)

12     (Recess at 3:22 p.m.)

13     (Reconvened at 3:34 p.m.)

14     MS. ALTMAN:  Your Honor, before we bring the jury in,

15  I think there is some open-the-door issues that I would rather

16  raise with you, if it's your preference, before I go forward,

17  but it's up to the Court.

18       THE COURT:  No, go ahead.

19       MS. ALTMAN:  There is several of them.

20       One of them is Mr. Hecht repeatedly said how close he

21  is with his family, how much his children mean the world to him

22  and statements of that order.  I intend and will make a proffer

23  that I will be asking Mr. Hecht questions about whether or not

24  at or about the same time in March of 2014 he was, in fact,

25  texting another woman about how his kids are, for example,

1  killing him and things of that nature.

2          THE COURT:  Kids are killing him?

3          MS. ALTMAN:  Yes, Your Honor.

4          THE COURT:  Show me.

5          MS. ALTMAN:  May I approach?

6          THE COURT:  Yes.

7          MS. ALTMAN:  For the record, it's Warfel 002751.

8          THE COURT:  You don't have to do it at the bench.  The

9  jury isn't in here.

10          MS. ALTMAN:  It's the fourth line, Your Honor.  That's

11  one of them.  Warfel 002751.

12          THE COURT:  And this is a text to whom?

13          MS. ALTMAN:  Your Honor, I don't know.  Maybe we

14  should have the witness step out.  I don't really want to go

15  through my whole cross in front of him.  It's a text to someone

16  he was sleeping with that was not his wife.

17          THE COURT:  How do you know that?

18          MS. ALTMAN:  They have both testified in a separate

19  proceeding.

20          MR. PLACHY:  The Warfel, it's the plaintiff in the

21  other lawsuit.

22          MS. ALTMAN:  And he by example --

23          THE COURT:  Just a second.  It doesn't come in.

24          What's next?

25          MS. ALTMAN:  There are other examples of a similar

1  nature by example.  He said how much he loved his family and

2  yet there is another text saying that sometimes he hates his

3  wife to the same woman or, I am sorry, I hate my wife.

4       So he is trying to depict to this jury that he is

5  someone other than the person he was.  And I think that's a

6  false representation of the person that he is.  He by

7  example --

8       THE COURT:  And you see, if you were showing me

9  something where he said in some text or e-mail to somebody, I

10  hate my wife, then I might agree with you because that arguably

11  contradicts his testimony and his image, but that's not what

12  you want.  What you want is to use that as an excuse to open

13  the door to all this salacious stuff in the other court in this

14  building and I am not going to do that.

15       MS. ALTMAN:  Your Honor, I have the text that says, I

16  hate my wife.  Would you like that one?  Because he said that

17  as well.

18       THE COURT:  When?

19       MS. ALTMAN:  I believe it's -- let's see, about a week

20  or so before -- two weeks before the rape, March 8, 2014.

21       THE COURT:  So how do you propose to do this?  Are you

22  going to do something like this:

23       You said you are really close to your family.

24       Yes, I did.

25       Actually, two weeks before the Cabo trip, you told

1   someone not in your family that you hated your wife; isn't that

2   true?

3          And he will say yes or no.

4          But that's not where you are going to stop.  You are

5   going to want to use that to open the door to say, whom was he

6   texting to, and to get into this whole Warfel thing.  I am not

7   going to let you do that.

8          *MS. ALTMAN:*  First of all, Your Honor, we can put

9   those in two separate buckets.

10          *THE COURT:*  What I just told you you can do, you can

11   do, but you have to stop there.

12          *MS. ALTMAN:*  And is the same true with respect to his

13   children?  He made the statement.

14          *THE COURT:*  That's out of context.  In the context

15   here, it says, I live my kids and put a ton to them, but they

16   are also killing me.  That doesn't mean that he doesn't like

17   his kids.  It doesn't mean that he isn't close to his kids.

18   Come on.

19          *MS. ALTMAN:*  I think, Your Honor, you have to put it

20   in the context of the fact that he has now admitted under oath

21   that he was engaging in sexual encounters with someone a few

22   feet away from the kids.  And I think that the jury is entitled

23   to infer from that that his statements on the record today are

24   not true.

25          *THE COURT:*  May I speak?

Nikos Hecht - Direct

1         MS. ALTMAN:  I apologize.

2         THE COURT:  Denied.

3         MS. ALTMAN:  There are a few other issues, so I would

4   like to get them on the table.

5         The other issue is Mr. Hecht repeatedly sort of

6   apologized to the jury about language.  I don't use this kind

7   of language.  You know, I apologize.

8         MS. LaBRANCHE:  He never said that.

9         THE COURT:  Ms. LaBranche, if you don't mind, stay out

10  of it.

11        MS. ALTMAN:  About having to use foul language, we

12  have numerous texts, transcripts, where Mr. Hecht used

13  unbelievably inappropriate language.

14        THE COURT:  There is a difference when you are

15  concerned about using bad language in court.  I hear that all

16  the time.  I have even used bad language myself occasionally.

17  For example, when my driver goes slicing off into the pool on

18  No. 9, but I don't use that in the courtroom.

19        Next.

20        MS. ALTMAN:  I am just making sure we have a record

21  and I am happy to make a proffer as well.  He also made

22  comments that he did not drink alcohol.  If he did, he only had

23  one drink that evening.  And he said he had a precise -- or I

24  can give you the exact language.

25        THE COURT:  He said he might have had a part of a

Nikos Hecht - Direct

1    cocktail or nursed it and he didn't drink any wine that night.

2         *MS. ALTMAN:*  He said he had absolute precision recall

3    of the evening implying everyone else did not, but in fact, he

4    testified under oath that he had actually taken multiple

5    opioids that day.  So he tried to create the impression in

6    front of the jury that he was absolutely sober and had perfect

7    recollection when, in fact, he was on opioids.

8         *THE COURT:*  You don't have any evidence of the opioids

9    that he took that day, which he has admitted, had anything to

10   do with this.  Now, on the alcohol, if you want little points,

11   you have got a little point there.

12        *MS. ALTMAN:*  Your Honor, he represented to the Court

13   that he had a precise recollection of events.  And I think -- I

14   don't take drugs, but I suspect that the jury could

15   reasonably --

16        *THE COURT:*  If you have a doctor that will say taking

17   any opioids that day could affect his memory, it's in.  That's

18   all you need.  But you can't just throw that out and hope that

19   maybe somebody on the jury is a doctor.  They are not.

20        *MS. ALTMAN:*  How is it any different from alcohol?

21        *THE COURT:*  The alcohol point you got is he denied

22   that he had any wine and he thought maybe he had a drink or

23   nursed one.  If you look at the picture, a glass of wine and

24   the alcohol are sitting there.  The drink was sitting right on

25   his place mat.

Nikos Hecht - Cross

1          *MS. ALTMAN:*  Correct.

2          *THE COURT:*  So you can cross-examine him about that.

3    That's fair game.

4          *MS. ALTMAN:*  And we, Your Honor, respectfully, we

5    think that the opioids are fair game as well.

6          *THE COURT:*  I don't.  Denied.

7          *MS. ALTMAN:*  Then I guess we are ready to bring the

8    jury in, Your Honor.

9          *MR. PLACHY:*  May I make a statement regarding the

10   e-mail regarding his wife, Your Honor?  We searched the live

11   transcript.  He said he loved his kids, but he didn't say

12   anything about his wife in the testimony, so I think that is

13   improper impeachment.

14         *THE COURT:*  I don't think so.  He says he is very

15   close to his family and he is skating right on the edge.  He is

16   trying to give a look at me clean wonderful image, and I know

17   that that's not accurate.

18         *MR. PLACHY:*  Understood, Your Honor.  The statement

19   about his family was parents and brothers and sisters, but I

20   understand what you said.

21         (Jury present.)

22         *THE COURT:*  Okay.  Cross-examination.

23

24         *MS. ALTMAN:*  Thank you, Your Honor.

25                        **CROSS-EXAMINATION**

Nikos Hecht - Cross

1   *BY MS. ALTMAN:*

2   *Q.*   Good afternoon, Mr. Hecht.

3   *A.*   Good afternoon.

4   *Q.*   We have met before, correct?

5   *A.*   We have.

6   *Q.*   And I am going to ask you a few questions this afternoon.

7   And certainly if you don't understand any of them, I am happy

8   to rephrase them or repeat them for you; fair?

9   *A.*   That's fair.

10   *Q.*   Now, if I understood you correctly, you testified that

11   Ms. Dailey approached you about having sexual contact, correct?

12   *A.*   That's correct.

13   *Q.*   And I am going to get to all of the details of that sexual

14   contact in a minute, but just as an initial matter, she

15   approached you.  She was the aggressor; is that right?

16   *A.*   She was the initiator.  I don't know if I would say

17   aggressor, but that's correct.

18   *Q.*   Well, sir, do you recall giving your deposition in this

19   case?

20   *A.*   I do.

21   *Q.*   And do you recall being sworn under oath?

22   *A.*   I do.

23   *Q.*   And do you recall being asked the question, so at this

24   point --

25            *MR. PLACHY:*  May I have the page and line, please.

Nikos Hecht - Cross

1          *MS. ALTMAN:*  I apologize, 283, Line 9.

2     *BY MS. ALTMAN:*

3     *Q.*  Before I get to the question, you understood at the time

4     you were under oath?

5     *A.*  I did.

6     *Q.*  Obligated by law to tell the truth?

7     *A.*  I did.

8     *Q.*  You understood if you didn't, you could suffer the

9     penalties of perjury?

10    *A.*  I did.

11    *Q.*  And do you recall being asked this question:

12          So at this point she is being completely active in

13    engaging you in this sexual act.  You yourself are not active.

14          And the answer:  No.  That's not entirely true.  She

15    was the aggressor.  She was the instigator, but I was a mutual

16    participant.

17          Do you recall that testimony?

18    *A.*  I do, and that's all accurate.  I was just finding a better

19    word.

20    *Q.*  But when you were deposed under oath, you said that

21    Ms. Dailey was the aggressor, the instigator, correct?

22    *A.*  Correct.

23    *Q.*  Again, I am going to get to all of the sequence of the

24    events at Flora Farms.  I just want to focus on one thing for a

25    minute.

1          So according to you, Ms. Dailey was using dirty talk,

2    correct?

3    A.  She was.

4    Q.  And again, we will get to the substance of it, but she was

5    really being aggressive towards you, instigating sexual

6    conduct, correct?

7    A.  She was instigating it, yes.

8    Q.  Very much so.  She was the aggressor, correct?

9    A.  Very much so.

10   Q.  And you at some point became a willing participant,

11   correct?

12   A.  I did.

13   Q.  And according to your testimony, though, once Ms. Dailey

14   was on the ground, she pulled you on top of her, and then you

15   decided it was not a good idea to have sexual intercourse,

16   correct?

17   A.  With the portion that I told earlier, yes.

18   Q.  And again, we are going to get to the very specific

19   details, I promise you.  I just want to get -- are we generally

20   on the same page?  That's what you said?

21   A.  We are.

22   Q.  Okay.  And you said that -- you said to Ms. Dailey in words

23   or substance, This is silly.  We need to get back.  You jumped

24   off.  You stood up.  You pulled up your pants.  And you,

25   according to you, tried to urge her to get up, and then you

Nikos Hecht - Cross

1  decided to leave her there, correct?

2  A.  I decided to leave with her, but her behind me, that's

3  correct though.

4  Q.  And you said that she was embarrassed, right?

5  A.  We both were.  She was.  I was.

6  Q.  Well, I am not asking about you.

7       Do you recall testifying that she was embarrassed by

8  what had happened?

9  A.  Yes.

10  Q.  And do you recall suggesting that Ms. Dailey was

11  embarrassed because you were leaving.  You didn't want to

12  finish having sexual activity with her, correct?

13  A.  I didn't refer to that as the only reason she was

14  embarrassed.  The whole scene and situation and what we had

15  done was embarrassing.  I think that was her embarrassment.

16  Q.  And then you testified, if I understood you correctly, that

17  right after this horribly embarrassing event, Ms. Dailey came

18  and sat right next to you while you were sitting next to your

19  wife; is that right?

20  A.  You said it was horribly embarrassing.  I think it was

21  embarrassing.  I don't know the degree, but it was

22  embarrassing.  I saw that she looked like that and she sat

23  right next to me, yes.

24  Q.  Were you horribly embarrassed?

25  A.  I was embarrassed and anxious, yes, but not -- you are

Nikos Hecht - Cross

1   using this horrible.

2   *Q.*  So it wasn't horrible to you.  You were not horribly

3   embarrassed?

4   *A.*  I was embarrassed.

5   *Q.*  But not horribly embarrassed?

6   *A.*  Can you tell me the difference in your mind?

7   *Q.*  Can you tell me the difference in your mind?

8        *MR. PLACHY:*  Objection.  It's argumentative.

9   *A.*  Horribly embarrassed, I don't know.  The word horribly is

10  giving me apprehension.  I was really embarrassed.  I was

11  embarrassed.

12  *BY MS. ALTMAN:*

13  *Q.*  Fair enough.  You were really embarrassed, right?

14  *A.*  I was really embarrassed.

15  *Q.*  And Ms. Dailey was embarrassed, right?

16  *A.*  She seemed embarrassed as well, yes.

17  *Q.*  Awkward and uncomfortable, correct?

18  *A.*  Yes, seemed awkward.

19  *Q.*  And you testified that you went and you sat down next to

20  your wife, correct?

21  *A.*  That's correct.

22  *Q.*  And that Ms. Dailey, immediately upon coming back from the

23  pathway, came and sat next to you, correct?

24  *A.*  That's correct.

25  *Q.*  And she tapped you on the shoulder; is that right?

Nikos Hecht - Cross

1   *A.*  A little while after she was sitting next to me, she tapped

2   me on the shoulder.

3   *Q.*  So she first just came and sat there next to you?

4   *A.*  Yes.

5   *Q.*  And if I understood you correctly, did she call your name,

6   Nikos?

7   *A.*  She didn't call my name at that point.  I assume you are

8   referring to the photograph.

9   *Q.*  And we are going to get there.  So she came, she sat next

10  to you, and she just sat there; is that right?

11  *A.*  She sat next to me and just sat there, yes.

12  *Q.*  Did you turn around and see who was sitting next to you?

13  *A.*  I either saw it out of my peripheral vision or knew, but I

14  didn't engage.

15  *Q.*  Well, if I understood you correctly, you were sitting next

16  to your wife and you were trying to jump into the conversation,

17  correct?

18  *A.*  I was trying to participate as if nothing had happened,

19  that's right.

20  *Q.*  Right.  And at that point you were -- you would have had

21  your back to Ms. Dailey, correct, because you were engaging in

22  the conversation with your wife and the other individuals at

23  the table, correct?

24  *A.*  But some of the individuals were on my left and some

25  directly across from me and some to my right, so I was trying

Nikos Hecht - Cross

1   to include everyone in that conversation.

2   Q.  So just describe for the jury when Ms. Dailey came and sat

3   next to you, how were you facing?  Were you facing forward,

4   were you facing sideways to Ms. Dailey or were you facing

5   towards your wife?

6   A.  I was facing -- I was not -- my back wasn't to her

7   completely.  I was facing angled roughly, although it shifted

8   depending on who was talking, so angled toward my wife, but

9   looking at everyone across from the table and then also at

10  times someone was sitting to my left, so...

11  Q.  So you were moving about in your chair; is that right?

12  A.  And my head was moving and my body, I imagine, was moving a

13  little bit.

14  Q.  Because I am sorry.  I thought I understood you to say, and

15  maybe I just misunderstood, maybe you can clarify it for me,

16  that you didn't want to turn around because you didn't want to

17  I think you said look her in the eyes or have eye contact.

18  Isn't that what you said?

19  A.  No.  What I meant was when I felt her tap me on the

20  shoulder, I didn't want to engage directly with her in a

21  two-person conversation as opposed to engaging the whole table.

22  Q.  So, again, I just want to understand you.  Your testimony

23  is that Ms. Dailey was next to you.  She tapped you on the

24  shoulder.  At that point in time when she tapped you on the

25  shoulder, was it your left shoulder or your right shoulder?

Nikos Hecht - Cross

1    *A.*  It was my left.

2    *Q.*  So you had your back like this to her, right, for her to

3    tap you on your shoulder?

4    *A.*  No, not completely turned to her.  It was, as I say, it was

5    either next to or slightly angled, so...

6    *Q.*  Why don't you turn in your chair and show the jury how you

7    were sitting when Ms. Dailey came and sat next to you.

8    *A.*  Not being able to be exact, but --

9    *Q.*  I understand.

10   *A.*  I would say something like this.  My wife would be here.

11   Ms. Dailey was here.  And I was talking like this.

12   *Q.*  So you are facing forward, then?

13   *A.*  Whatever this is.

14   *Q.*  What do you think that is?  Do you think that's facing

15   forward?

16   *A.*  This is facing at an angle, I think.

17   *Q.*  Okay.  But that's how you were sitting when Ms. Dailey sat

18   next to you?

19   *A.*  More or less.  It may have changed during the time that I

20   was talking.

21   *Q.*  Now, the chair that you were sitting on, it was a bench,

22   right?

23   *A.*  Correct.

24   *Q.*  And it didn't swivel, right?

25   *A.*  No.

Nikos Hecht - Cross

1   *Q.*  So in order for you to move, you would have had to move

2   your body, right?

3   *A.*  A little bit, right.

4   *Q.*  So was there any time where you moved your body and you

5   were looking at Ms. Dailey?

6   *A.*  No.

7   *Q.*  Never.

8   *A.*  I don't remember looking at Ms. Dailey, and I purposefully

9   didn't want to turn to look to her directly.

10  *Q.*  Because you were embarrassed?

11  *A.*  I was embarrassed.  And it seemed as that would be the

12  give-away from something I was trying to conceal.

13  *Q.*  Trying to conceal from who?

14  *A.*  My wife.  I chose -- I wanted to pretend like nothing

15  happened.

16  *Q.*  You wanted to deceive your wife?

17  *A.*  I guess it was deceitful, yes.

18  *Q.*  And so I just want to understand, so you didn't want to

19  look, make eye contact with Ms. Dailey at all, right?

20  *A.*  I didn't want to make eye contact that was exclusively and

21  intimately at her, but I remember trying to engage her, bring

22  her into the conversation as opposed to addressing her alone.

23  *Q.*  And how did you do that?  How did you try and bring

24  Ms. Dailey into the conversation?

25  *A.*  You know, when there is a conversation going on and there

1  are one, two and three, four, five, six people involved, it's

2  sort of the way you talk and body language and a glance to look

3  like you are bringing people, making them involved.

4  Q.  So, again, I just want to understand because I wasn't

5  there.  Show me some of the body language that you used to

6  try -- or words that you used to try and include Ms. Dailey in

7  this conversation.

8  A.  Without an actual conversation going on, it's a little --

9  it's like an acting class, but I don't remember any words that

10  I spoke to her directly.  I don't think there were.  But I was

11  talking -- when I would answer a question or when it was

12  someone else's turn to talk, I might speak to people as the

13  group, looking this way and turning this way, in the normal way

14  that you would talk to a number of people at the same time.

15  Q.  Well, was one of the number of people you were talking to

16  Ms. Dailey?

17  A.  Well, of course.  She was in the group.

18  Q.  So you spoke to Ms. Dailey, then.

19  A.  There was no conversation that I was directing at

20  Ms. Dailey.  It was a conversation that whatever the topic was.

21  Q.  Well, I recall you saying in your testimony today that you

22  had like a precision-like memory of that night.  Do you recall

23  saying that?

24  A.  A precision-like memory?  I don't remember saying that.  I

25  think I have a good memory.  I think I remember the night

1  fairly well, but not with precision, I don't think.

2  *Q.*  So you don't remember the night with precision, then,

3  correct?

4  *A.*  I take precision to mean almost in a measurement fashion,

5  so I don't remember the night with precise detail.

6  *Q.*  Okay.  So I understand.  I just want to make sure I am

7  understanding you.  You don't remember that night precisely,

8  correct?

9  *A.*  I remember that night.  I don't remember every detail

10  precisely.

11  *Q.*  Fair enough.  And do you remember any detail about the

12  conversation that you were allegedly including Ms. Dailey in at

13  the table?

14  *A.*  I do remember we were talking about fried chicken.  And I

15  remember talking to Ms. Dailey's mother and Laura Kaplan

16  because I think -- I don't remember, but they might have been

17  from Kentucky and that's a fried chicken place.  I remember

18  talking about that.  I remember playing a tennis tournament

19  when I was a kid in Louisville.  I think that's down south, so

20  I was trying to participate.

21  *Q.*  How long was Ms. Dailey sitting next to you?

22  *A.*  About five to eight minutes.

23  *Q.*  Five to eight minutes.  In the five to eight minutes that

24  you testified Ms. Dailey was sitting next to you, tell me

25  anything Ms. Dailey said.

Nikos Hecht - Cross

1    A.   I remember her talking about Louisville because I was

2    talking about a country club.  I think was it was the Bellaire

3    Country Club where I played this tournament.  And I remember

4    her talking about how she knew of it or had some friend, I

5    think, that was a member of it.

6    Q.   And that's while she was sitting next to you next to your

7    wife, correct?  Is that your testimony?

8    A.   That's correct.  I was in between the two.

9    Q.   And so again, I am just trying to understand, you testified

10   that you were really embarrassed, not horribly embarrassed, but

11   really embarrassed.  And Ms. Dailey was embarrassed, correct?

12   A.   You are taking measurements of embarrassment.  I don't know

13   how embarrassed Ms. Dailey was.  I was embarrassed.  She

14   appeared to be embarrassed.

15   Q.   Okay.  You were really embarrassed.  And according to your

16   testimony, you said that she was embarrassed, correct?

17   A.   I said she was embarrassed and I just said I was really

18   embarrassed.  Whatever differentiation is I am not sure, but I

19   was, yes.

20   Q.   So then at some point Ms. Dailey got up; is that right?

21   A.   At some point Ms. Dailey got up.

22   Q.   And then it's your testimony -- did Ms. Dailey then tap you

23   on the shoulder again or call your name?

24   A.   I think the second time she called my name.

25   Q.   She said, Nikos.

Nikos Hecht - Cross

1  A.  That's my name.

2  Q.  Yes.  And is that what she said?

3  A.  That's what she said.

4  Q.  And did she say it in a loud voice, a quiet voice, normal

5  voice?  How did she say that?

6  A.  A normal voice, but like to be taking a picture, you know,

7  Smile.

8      MS. ALTMAN:  So let's pull up Exhibit 19 talking about

9  pictures and smiles.

10  BY MS. ALTMAN:

11  Q.  Now, I just want to make sure I understand your testimony

12  and the jury understands your testimony.

13      Your testimony is that after Ms. Dailey solicited you

14  for sex and, if I understood your testimony correctly, was

15  talking about how -- I apologize, talking about how tight her

16  pussy was, that she had engaged in this sexual encounter with

17  you and you left her there.  You got up and left because you

18  found your conscience.  You left her on the path 10 to 15 feet

19  ahead of you.  That Ms. Dailey, who you testified was

20  embarrassed came over to you, called your name, Nikos, asked to

21  take your picture.  And you smiled at her and took the picture,

22  right?  Is that right?

23  A.  There is a lot of detail in that that you explained

24  differently than I would.  I didn't leave her there.  I noticed

25  she was coming behind me.  She didn't ask me if she could take

1  my picture.  She just said my name and said, Smile.

2          I deal with embarrassment by pretending I am not

3  embarrassed, so I -- if there was embarrassment, I don't know

4  how she was dealing with it.  I don't know, but I know how I

5  was.  But other than that, after sitting next to me, she took

6  my picture.

7  Q.  Okay.  And we are again going to get to all the details.  I

8  just want to make sure I understand.

9          The woman that you testified was embarrassed from the

10  failed sexual encounter came back to you later that evening to

11  take your picture, right?

12  A.  I don't know if she was embarrassed because of the failed

13  sexual encounter.  It was the sexual encounter, you know, it

14  was embarrassing.  I don't know what particular part the whole

15  thing was for me.

16  Q.  Well, sir, you said a moment ago you recall I think

17  testifying in court here today, but you also recall giving a

18  deposition, correct?

19  A.  I do.

20  Q.  And you were under oath, correct?

21  A.  I was.

22  Q.  And do you recall these questions and answers:  Page 295,

23  beginning at Line 5.

24  A.  I don't have that --

25  Q.  I am going to read it to you, sir.

Nikos Hecht - Cross

1          Did she seem disappointed?

2          Answer:  I didn't sense -- I didn't sense that -- it

3    was awkward.

4          Question:  Did she seem hurt by the fact that you

5    stopped this act that she clearly, according to you, wanted to

6    engage in?

7          Answer:  It was awkward.  I couldn't get a great sense

8    of her emotional state, but it wasn't distraught.  It wasn't --

9    you know, it wasn't too much one way or the other.

10          Question: Right.  In other words, I can describe it

11   that, if I may, if you disagree with that word, tell me.  Did

12   she seem indifferent to your suggestion let's cut it out?  This

13   is silly?  Let's go?  They are waiting for me?

14          Answer:  If anything, I think she was a little

15   embarrassed.

16          Do you recall that testimony?

17   A.   That sounds like my testimony and I would agree with that.

18   Q.   Okay.  And I just want to make sure also your testimony is

19   and you want the jury to believe that this woman, after you

20   have had this awkward, to use your words, and embarrassing, to

21   use your words, encounter, came back to you to try and take a

22   photograph, correct?

23   A.   That's just what happened, yes.

24   Q.   Now, prior to the night at Cabo San Lucas at Flora Farms,

25   did you get the sense -- and let's just keep it up to the

Nikos Hecht - Cross

1  moment where you say she approached you on the pathway.  Prior

2  to that at any point in time, whether at your home or at Flora

3  Farms up to that moment, was there any sense from you that

4  Ms. Dailey was attracted to you?

5  A.  I didn't think of it in those terms.  I felt she was

6  flirting with me or was just overly personal.  I didn't analyze

7  it that closely prior to that.

8  Q.  Okay.  So there was never a point in time, just so I

9  understand you, that you thought for some reason that

10 Ms. Dailey was attracted to you or wanted to have some kind of

11 relationship with you; is that right?

12 A.  She was flirtatious.

13 Q.  And by flirtatious, are you referring to the comment that

14 you testified to at the -- allegedly that happened at the fire

15 pit where she said you were, I believe, king of the castle?

16 A.  I am referring to that.  She said it up on the lawn, but

17 yes, when I went to light the fire pit, yeah.

18 Q.  Was that comment to you, king of the castle, flirtatious?

19 A.  That was a little odd or flirtatious and the others as

20 well.

21 Q.  I am going to get to the others.

22      Was it odd or was it flirtatious or was it both?

23 A.  I think it was overly personal and flirtatious and odd.

24 Q.  So you thought the fact that Ms. Dailey said to you, You

25 are king of the castle, was flirtatious, correct?

Nikos Hecht - Cross

1   *A.*   I thought so, yes.

2   *Q.*   And you thought -- what did you think of the statement that

3   you testified to where Ms. Dailey allegedly said to you, I

4   believe it was something to the effect of, You're such a young

5   man to have this -- this house?  Was that flirtatious?

6   *A.*   I think it's all three again, odd for how little we knew

7   each other, flirtatious and overly complimentary or personal.

8   *Q.*   And I think the other comment she made to you was you had

9   the weight of the world.  You look like you have weight of the

10  world on your shoulders; is that right?

11  *A.*   It was like that, yes.

12  *Q.*   And it was flirtatious to you?

13  *A.*   It was peculiar, sort of congratulatory or personal in a

14  strange way.  Yes, I found it flirtatious.  It was -- yes.

15  *Q.*   Okay.  So each of those three comments, when you say that

16  she was flirtatious, those are the comments that you are

17  referring to, correct?

18  *A.*   Yes.

19  *Q.*   And there was no other comment that Ms. Dailey made to you

20  that night, correct?

21  *A.*   No.

22  *Q.*   Now, Mr. Hecht, on that night at your house at -- is it

23  El Dorado?

24  *A.*   Yes.

25  *Q.*   When you had that get-together at your house that you

Nikos Hecht - Cross

1    testified lasted an hour, did you notice that Ms. Dailey was

2    older than you?

3    A.   I didn't pay much attention.  I was talking to Gery most of

4    the time.  I really didn't -- I didn't notice.

5    Q.   So is that no?

6    A.   That's no.

7    Q.   And what about at Flora Farms, did you notice that

8    Ms. Dailey was older than you?

9    A.   I didn't notice there either.

10   Q.   And if I understand your testimony correctly, you didn't

11   have any discussions with anyone about Ms. Dailey being older

12   than you, right?

13   A.   I don't remember any discussions.  The only discussion,

14   there was a little bit of teasing that my wife and Sara teased

15   me, but I don't think it was about her being older.

16   Q.   Okay.  So neither Sara nor your wife teased you about

17   Ms. Dailey being older than you, right?

18   A.   No.

19   Q.   What did they tease you about?

20   A.   That she was being flirtatious.

21   Q.   And again, I just want to unpack it a little.

22        If I understood your testimony, the only interaction

23   you had with Ms. Dailey was when you two -- actually, no,

24   according to your testimony, when Ms. Dailey followed you down

25   that little pathway to the fire pit, correct?

1    *A.*  The interaction was a little on the lawn and then the

2    following me down to the fire pit and then back up the steps

3    and then on the lawn again.

4    *Q.*  Right.  And you and Ms. Dailey were alone during that point

5    in time, correct?  That was your testimony in your deposition,

6    right?

7    *A.*  I don't -- we were within 10 feet, 15 feet of the kids at

8    all times and maybe within eyesight, 15, 20 feet, 30 feet maybe

9    of the house, so alone, but visible.

10   *Q.*  So if you were visible, all anybody would have seen was you

11   and Ms. Dailey walking to light the fire pit, right?

12   *A.*  That's all you could see.

13   *Q.*  Right.  And Ms. Dailey didn't touch you, right?

14   *A.*  No.

15   *Q.*  And she didn't -- she wasn't overly physical with you in

16   any way, was she?

17   *A.*  No.  She didn't touch me.

18   *Q.*  In any way, right?

19   *A.*  Didn't touch me.

20   *Q.*  Right.  And it's not your testimony to this jury that

21   people that are 20 feet or more away from you could have heard,

22   according to your testimony, Ms. Dailey say that you were the

23   king of the castle, right?

24        *MR. PLACHY:*  Calls for speculation, Your Honor.

25        *THE COURT:*  Rephrase it, please.

Nikos Hecht - Cross

1          *MS. ALTMAN:*  No problem, Your Honor.

2     *BY MS. ALTMAN:*

3     *Q.*  Mr. Hecht, are you aware of anyone else who heard the

4     conversation that you have repeated in this courtroom where

5     Ms. Dailey allegedly told you you were the king of the castle?

6     *A.*  I am not aware.  I don't know what they heard or could

7     hear.

8     *Q.*  And what about the other two comments you made that

9     allegedly Ms. Dailey said to you?

10    *A.*  I am not aware of anyone hearing it or what they could

11    hear.

12    *Q.*  Okay.  And other than that exchange with Ms. Dailey, that

13    was your only encounter with Ms. Dailey that night, correct?

14    That's what you testified?

15    *A.*  That's correct, besides maybe the introduction and the,

16    Thank you, have a good night type thing, but that was to the

17    group.

18    *Q.*  So if you could help the jury understand, why would your

19    wife -- ex-wife, I apologize -- and Ms. Sara Willis be teasing

20    you about Ms. Dailey flirting with you?  Where was the basis

21    for the alleged comments to you or teasing?

22         *MR. PLACHY:*  Objection, calls for speculation, Your

23    Honor.

24         *THE COURT:*  Overruled.  Please answer.

25    *A.*  I have a joking relationship with both Sara and my wife.

Nikos Hecht - Cross

1   And it wasn't -- they weren't fixated on it, but they saw her

2   follow me maybe down to the fire pit and maybe back and

3   chatting.  You would have to ask them, but I think it was just

4   a little ribbing about she looked like she was flirting with

5   you.  I don't -- you know, it was just that.

6   BY MS. ALTMAN:

7   Q.  Well, I wasn't there, but you were.  So why don't you

8   explain to the jury exactly what they said to you, the ribbing

9   about Ms. Dailey when the only conversation you had with her

10  that night you have already described for the record, alleged

11  conversation.

12  A.  Right.  So all they said is, Wow, she likes you.  She was

13  flirting with you, in sort of a teasing way, and -- and that's

14  it.  That's all I remember.  It was just -- I think Sara made

15  the comment and Allison laughed.  It wasn't serious.  It was

16  just meant to tease.  It wasn't confronting with some, you

17  know, what was going on there?  It was just a little teasing.

18  Q.  And, well, did you say when they were -- strike that.

19         Did you laugh?  You said there was laughing.  Did you

20  laugh?

21  A.  I laughed.  I laugh at myself.  It's not that big a deal.

22  Q.  So when they, Ms. Willis and your ex-wife, made the

23  comments to you about how Ms. Dailey was flirting with you, did

24  you say to them in words or substance, What are you talking

25  about?  I haven't even spoken to Ms. Dailey.  I had a

1  two-second conversation with her down by the fire pit.

2  A.  I think I rolled my eyes as to say that's not true, but I

3  don't take myself so seriously that I am going to object

4  strenuously to that.  That's just not how I am, but -- it

5  wouldn't bother me whether it was true or not true or I am not

6  going to try to defend myself over just a joke.

7  Q.  You mean you are not going to try to defend yourself to

8  your wife?

9  A.  That's not -- that is not the way it was intended by my

10  wife and it wasn't an accusation of anything serious.  She was

11  just teasing.  If it sounds strange, it's just the relationship

12  I had with the two of them, not because there was something

13  serious at stake.

14  Q.  So, Mr. Hecht, that night, you testified earlier today,

15  they showed you a picture -- perhaps you can bring it up -- of

16  the staircase at your house.

17        MS. ALTMAN:  It is Exhibit 111, I think.  And it's

18  been admitted, Your Honor.

19  BY MS. ALTMAN:

20  Q.  All right.  See that?

21  A.  I do.

22  Q.  And I think you testified -- who took this picture, by the

23  way?

24  A.  There are a lot of pictures of the house.  I don't know.

25  Q.  Well, did you take it?

Nikos Hecht - Cross

1   A.  I don't -- I don't know.

2   Q.  So if I understood you correctly, there is about 2, 2 and a

3   half feet behind your sofa, is that right, between your sofa

4   and the wall of the stairs?

5   A.  Could be three, but not much more, if any more.

6   Q.  What's that -- forgive me, I don't have the best eyesight.

7   Is that a rolled-up rug?  What is that thing behind the sofa

8   there?

9   A.  That's a rolled-up rug, just cleaning under the floors.

10  Q.  I am sorry?

11  A.  That's a rolled-up rug because they were cleaning -- I

12  think cleaning the floors.  The white -- they were cleaning

13  this floor and maybe even these tiles here, mopping under.

14  Q.  Okay.  So was that rug under the furniture?

15  A.  Yes.

16  Q.  Right.  And I am just trying to understand.

17        So when they mop and clean your floors, they lift all

18  the furniture and roll up the rug?

19  A.  Periodically.

20  Q.  Okay.  So was this picture taken at or about the time

21  Ms. Dailey was at your house?

22  A.  I -- I wouldn't -- I don't know when it was taken.

23  Q.  Well, do you know whether or not the rolled-up -- is that

24  rug like -- is that 9 by 12?  How big is that rug?

25  A.  I don't -- I don't know exactly.  It's not a huge living

Nikos Hecht - Cross

1   room.  Most of the house is outdoor space, so it's -- I'd be

2   guessing.  It's under some, but not all, of the furniture.

3   Q.  So rolled up it's maybe 2 feet wide?

4   A.  Rolled up, yeah, it could be 2 feet wide.

5   Q.  Okay.  And --

6   A.  Maybe not quite.

7   Q.  Now, when people come and go from your house, just as a

8   practical matter, as a general rule, do you normally wave them

9   off from the living room or do you walk them to the door?

10  A.  We are not very formal, so I wouldn't meet and greet people

11  at that front door.  Often we would be in the pool or

12  something.  We don't have a lot of company.  I'm not like a

13  cocktail party person generally.

14  Q.  Understood.  But let's just say you had guests coming over,

15  let's just say the Andlingers.  And let's say they knocked on

16  the door or used the doorbell.  It's not your testimony that

17  they would have just entered your house, right?

18  A.  They didn't.  Some people would, though, but in this case

19  Sara would have greeted them.

20  Q.  So you didn't greet the Andlingers or Ms. Dailey at the

21  door; is that right?

22  A.  Not up at the door.  There is also not a lot of space up

23  there.

24  Q.  Right.  So did you or did you not greet them at the door?

25  A.  I did not.

Nikos Hecht - Cross

1   Q.  Okay.  Where were you when the Andlingers and Ms. Dailey

2   arrived at your house?

3   A.  I don't know exactly, but I wasn't there.

4   Q.  Where were you?

5   A.  I don't know exactly, but I wasn't there.

6   Q.  Meaning you don't know where you were in the house?

7   A.  I can't say exactly where I was in the house or out of the

8   house, but I do know the reason Sara opens the door sometimes

9   is because she is in the kitchen a lot where you can hear the

10  door.  I am usually outside with the kids or something.

11  Q.  Okay.  I am looking at the picture, Exhibit 111.  You see

12  the stairs going up to, I assume, the bedrooms.  Is that where

13  that landing goes to the left of that big brown door?

14  A.  Those are the kids bedrooms and there is a guest bedroom.

15  Q.  And you would agree with me, sir, that the width of those

16  stairs is the same width as the other stairs that people had to

17  walk up to get out of your house, correct?

18  A.  No.

19  Q.  Is your testimony that the stairs -- that the landing that

20  takes the same stairs up is not the same width of the stairs?

21  A.  Correct.  There is an area on the side of each side of the

22  landing right there and right there that is probably this deep

23  and it's just lights coming up.  And it's about that wide, so

24  it gives the impression that this landing area is floating.

25          And it also takes place going down these stairs on the

Nikos Hecht - Cross

1  yellow wall side of the stairs.  There is a gap between where

2  the stair ends and the yellow wall begins or where the landing

3  ends and the yellow wall begins going out the door, but not on

4  the stairs going up to the bedrooms.

5  Q.  So let's just make sure you understood my question.

6      What are the width of the stairs there?  What's the

7  width of those stairs?

8  A.  I would be guessing, but -- I don't know exactly.

9  Q.  Well, it's your house, right?

10  A.  Yes.

11  Q.  Okay.

12  A.  It's not anymore.

13  Q.  So you sold the house?

14  A.  I did.

15  Q.  So how wide do you think those stairs are?  It looks to me

16  to be about 4 feet wide?

17  A.  I was going to say three, but something like that.

18  Q.  And how many people can walk up those stairs side by side?

19  A.  Comfortably?

20  Q.  Comfortably, uncomfortably.  How many people do you think

21  can walk side by side on those stairs?

22  A.  I wouldn't want to walk with more than two, one person next

23  to me.

24  Q.  Okay.  So two people.

25  A.  Two people could walk up these stairs.

Nikos Hecht - Cross

1   Q.  Okay.  And now these stairs, are they the same width as the

2   stairs that we were just talking about?

3   A.  They are the same -- these stairs are the same width as

4   these stairs.

5   Q.  Okay.  Perfect.  So you would agree with me, then, that two

6   people can walk up those stairs, correct?

7   A.  Yes.

8   Q.  And if I understood your testimony, these other stairs that

9   have your markings all over them --

10  A.  Sorry.

11  Q.  No, no, it's quite all right.  How wide are those stairs?

12  A.  Those stairs are a foot less.

13  Q.  So they are 2 feet, approximately.

14  A.  If those are 3 feet, which I guess that, those are 2 feet,

15  which I am guessing at.

16  Q.  So you think it's about a foot smaller.

17  A.  I do.

18  Q.  Would you agree with me that if they wanted to, two people

19  could walk up those stairs together, correct?

20  A.  Those are just a little bit trickier because you don't want

21  to put your foot down in that -- next to the yellow wall there

22  is a gap.

23  Q.  Understood.  But two people could walk up those stairs side

24  by side, correct?

25  A.  Uncomfortably.

Nikos Hecht - Cross

1   Q.  Okay.  But I hope you would at least agree with me that one

2   person could walk up those stairs, correct?

3   A.  Yes.

4   Q.  And one person after the other could also walk up the

5   stairs, correct?

6   A.  Yes.

7   Q.  So Ms. Dailey could have been walking up the stairs and you

8   could have been walking behind her, correct?

9   A.  It didn't happen, but it could have physically happened.

10  Q.  Understood.  I just think your testimony was a little

11  confusing to me and I want to make sure I understood.  I

12  thought you were suggesting to the jury that you could not have

13  been walking up the stairs behind Ms. Dailey when she was

14  leaving, that they were two small.  And you went into the

15  discussion of the lights and the -- so I just want to make sure

16  the jury understood.

17      You could have been walking up behind Ms. Dailey up

18  those stairs, correct?

19  A.  Physically, yes.  Two people could be single file.

20  Q.  And two people could walk side by side, but according to

21  you, it would be uncomfortable, right?

22  A.  I have just seen people put their foot down in that area

23  and it's -- we caution people to not get too close to the

24  yellow side.  So there is light coming up from there usually or

25  in the night.

1    *Q.*  So was that the first time you had met Mr. Andlinger?

2    *A.*  I had met him before two other times, but it had been some

3    years.

4    *Q.*  Okay.  Would you agree with me he is an elderly gentleman?

5    *A.*  He didn't seem like it so much when I met him before, but

6    he had this injury, I think he said getting off a plane he hurt

7    his shin, so he was not hobbling, but a little limping.

8    *Q.*  Okay.  When the Andlingers were leaving your house and

9    Mr. Andlinger was limping, and I think you just were talking

10   about you have seen people step off and put their feet in the

11   lights, do you recall just saying that?

12   *A.*  I do.

13   *Q.*  Were you at all concerned about Mr. Andlinger getting out

14   of your house safely?  Did you want to at least warn him about

15   the potential for danger on the stairway?

16   *A.*  I remember him holding on to the railing.  So as long as

17   you are on that side holding on to this railing, you are okay.

18   I mean, you were far enough from those stairs that you are not

19   going to put your foot in.

20   *Q.*  So it's your testimony -- I just want to make sure I

21   understand it -- Mr. Andlinger was on that left side, correct?

22   *A.*  He was.

23   *Q.*  And was his wife next to him?

24   *A.*  No.  I remember them all three single file.

25   *Q.*  Okay.  But you also recall you did not tell Mr. Andlinger,

Nikos Hecht - Cross

1   Mrs. Andlinger or Ms. Dailey to be careful because of the

2   stairs, correct?

3   A.  I don't think I did.  I don't remember if Allison or Sara,

4   did, but I do remember watching him grab on to the railing.

5   Q.  If I understood your testimony, just for the jury's

6   purposes, you -- was your wife next to you or Ms. Willis --

7   A.  Both.

8   Q.  -- as you were standing behind the sofa?

9   A.  Both.

10  Q.  Was one on one side and one on the other?

11  A.  Yes.

12  Q.  Who was on your right side?

13  A.  Sara.

14  Q.  And on your left side was your wife?

15  A.  Correct.

16  Q.  And so where this rug is, that's the area where you said

17  you were standing, right?

18  A.  Yeah, but leaning against the sofa.

19  Q.  Okay.  So you were leaning back a little against the sofa?

20  A.  Just like butt.

21  Q.  And none of you walked out, saw them to the door, opened

22  the door or walked outside with them, right?

23  A.  We all stayed down there.

24  Q.  And just waved them off?

25  A.  Yes.  It's only about 5 feet where the runner is.  There is

Nikos Hecht - Cross

 1 | a runner here.  That's only about 5 feet, so it's a few steps
 2 | up.
 3 | Q.  Are there stairs going out the front of the house?
 4 | A.  You have to get about 10 feet away from the house, maybe
 5 | 12 feet, and then there is two stairs and then two more stairs.
 6 | No, just those two stairs, actually, one set of two stairs.
 7 | Q.  Now, that night I think you testified you became aware of a
 8 | future dinner, right, at Flora Farms, correct?
 9 | A.  Correct.
10 | Q.  Before we get to that, you said you are about five-nine?
11 | A.  Yes, on my best day.
12 | Q.  Okay.  And on your worst day?
13 | A.  Five-eight-and-a-half.
14 | Q.  And I think you testified for the jury you are -- I don't
15 | know if recall it -- were you a professional tennis player or
16 | semi pro?
17 | A.  I was professional.  I just didn't make a lot of money
18 | doing it.
19 | Q.  But you were a fit guy, right?  You still play tennis?
20 | A.  I don't play -- I am not -- I was fit, but this is 25 years
21 | ago, so I am less fit.  Not fit, I am okay.
22 | Q.  You are okay, right?
23 | A.  Yes.
24 | Q.  You were playing football on the beach with your son, Levi;
25 | is that right?

Nikos Hecht - Cross

1    A.  Yes.

2    Q.  And Tristan?

3    A.  Yes, I guess normal for 47, 45 then.

4    Q.  Fair enough.  So you are about five-nine,

5    five-eight-and-a-half, normal level fitness, correct?

6    A.  Yes.

7    Q.  In March of 2014, what kind of exercise were you doing?

8    A.  Prior to that I was doing more -- I did a lot of yoga and a

9    little bit of tennis.  It was spotty by then.  I have been not

10   so good the last few years.

11   Q.  Okay.  I am just trying to focus on March of 2014.

12        At that time by example what were you doing when you

13   were in Cabo?  Were you engaging in any kind of activities,

14   exercise?

15   A.  There was a guy I played tennis with down there, and I

16   usually would get in a week once, maybe twice; otherwise, just

17   playing with the kids.

18   Q.  You played football with your kids?

19   A.  Throw the football -- they are young -- or go -- I would go

20   for a walk along the beach with Allison, dive in the ocean, but

21   it's sort of just dive in, dive out and come out.

22   Q.  Did you do any surfing?

23   A.  No.

24   Q.  Any other kind of physical activity?

25   A.  By that time there was -- no.

Nikos Hecht - Cross

1  Q.  Now, you said earlier that you are not a choir boy.  Do you

2  remember that?

3  A.  Yes.

4  Q.  What did you mean by that?

5  A.  I didn't mean anything specific.  I just -- I have had sex

6  with, you know, I guess I would not say a number.  I am not

7  trying to give the impression that I am not innocent when it

8  comes to sex and things, but I am not -- but I wasn't the

9  aggressor and there was no assault.

10  Q.  I understand.  And actually, I don't think you used that

11  term or phrase when we were talking about the assault.  I think

12  you were just talking about -- you made a comment just, I am

13  not a choir boy.

14  A.  I am not innocent.  I am sorry.

15  Q.  No problem.  I am just trying to understand, and I think

16  the jury wants to understand, what you meant when you said

17  that.

18  A.  You know, a choir boy is very innocent, virginal, so to

19  speak, figuratively.  And I am not that.

20  Q.  And is that all you meant by it?

21  A.  Yes.  I am not innocent.

22  Q.  Okay.  Did you have anything else in mind when you said

23  that?

24  A.  No.  I think it's a figure of speech is the way I meant it.

25  Q.  Now, sir -- and again, we are going to go through

Nikos Hecht - Cross

1    excruciating detail.  You testified today, if I heard you

2    correctly, that Ms. Dailey pulled you on top of her.  And

3    again, if you could just walk me through because I am trying to

4    understand, did you penetrate Ms. Dailey or did you not

5    penetrate Ms. Dailey?

6    A.  There was no penetration, no.

7    Q.  None whatsoever.

8    A.  None whatsoever.

9    Q.  And so because there was no penetration, you would agree

10   with me, then, there could have been no thrusting, right?

11   A.  I was not inside of her vagina, but I was -- it's possible

12   that the thrusting that was described was an attempt.  There

13   were two attempts.

14   Q.  So I am sorry, just help me out.  Did your penis touch her

15   vagina or not?

16   A.  I -- I don't -- I don't know if it touched.  It could have

17   touched.  I don't think it did.  It just was not -- I was not

18   able to.  I was not erect at that time and it just -- it didn't

19   line up.

20   Q.  Again, I apologize, and I don't mean to be indelicate, but

21   when you say it didn't line up, what does that mean?  Does it

22   mean you missed?

23   A.  I think I might have missed.  I think that could have been

24   the issue.  I don't know if I was in the right place.

25   Q.  Well, did your penis hit the grass?

Nikos Hecht - Cross

1   A.   No.

2   Q.   So did it hit her leg?

3   A.   I don't know where on her body it hit, but it was not -- it

4   was not -- it was not intercourse and it was not going to work.

5   I could tell.  Maybe it was mentally I didn't want to or -- and

6   it just wasn't, you know, it wasn't going to be able to go in

7   and I wasn't in the right place.  I believe that's probably

8   what was happening.

9   Q.   Right.  And so just at least at this moment, I am not

10  trying to understand where you were mentally.  I am just trying

11  to understand the mechanics of it.

12          So you testified there was absolutely no penetration,

13  correct?

14  A.   That's correct.

15  Q.   And I think you said it didn't line up, right?

16  A.   Correct.

17  Q.   And you didn't touch the grass?

18  A.   I don't know.  Could my penis have touched the grass?

19  Q.   Well, where were you thrusting, sir, if it wasn't inside

20  Ms. Dailey?

21  A.   When you were trying to put the penis near the vagina or

22  toward it or in it, you move your hips.  I don't know how else

23  to describe it.

24  Q.   Well, hopefully I can help you describe it just so that I

25  can understand and the jury can understand.

1            Ms. Dailey is on her back, right?

2    *A.*  That's right.

3    *Q.*  And according to you, she pulled your pants down and she

4    was already on the ground, right?

5    *A.*  You said she was on her back.  She didn't pull my pants

6    down when she was on her back.

7    *Q.*  We will just do it now.  I apologize, you are right.  So

8    Ms. Dailey, she came up behind you, right, when you were on the

9    pathway?

10   *A.*  Correct.

11   *Q.*  And today you testified that she started making some small

12   talk with you, is that right, about where she is from and -- is

13   that right?

14   *A.*  No, I don't think where she is from, like a hello.

15   *Q.*  Okay.  Well, let's see.  I think you said, and I apologize

16   if I don't get this right, but I believe you said that

17   Ms. Dailey walked up to you, and before the dirty talk

18   happened, she just struck up a more generic conversation.  Is

19   that -- did that happen or not happen?

20   *A.*  It was some kind of a greeting.  That's all I really

21   remember.  There was not a conversation as we were walking.

22   *Q.*  And I just want to -- I just want to test your memory

23   because I think you testified earlier you remember with

24   precision.

25            Do you remember anything Ms. Dailey said to you before

1   she started talking dirty to you?

2   A.   I don't remember specifics, but I don't remember saying

3   that I remembered with precision.  I think we were just

4   debating that, but --

5   Q.   No, sir.  I apologize.  I am not trying to debate you at

6   all.  I am really not.  I am just trying to understand what

7   happened.

8          So Ms. Dailey walks up to you.  She taps you on the

9   shoulder.  When she tapped you on the shoulder, were you

10  moving?

11  A.   She put her hand on my shoulder and I was walking, yes.

12  Q.   So when you started off on the path, you were walking, if I

13  understood you correctly, to go find Levi; is that right?

14  A.   That's right.

15  Q.   And were you walking briskly?

16  A.   No, because I was looking at -- sort of looking everywhere

17  panning to see where he was.  I didn't see him there.  I was

18  trying to get a little closer because I didn't know if he was

19  maybe further down the path, and I didn't really -- I wasn't

20  walking to a particular direction all that quickly.

21  Q.   Okay.  How would you describe your gait for the jury, how

22  you were walking.  Were you walking slowly?  Were you

23  meandering?  Were you moving briskly?  How would you describe

24  how you were walking?

25  A.   I was looking for my kid or some kids to get them to

Nikos Hecht - Cross

1   dinner, so it was probably a medium to slightly slower than

2   medium walk.

3   Q.  And were you panning from left to right looking for your

4   son, Levi?

5   A.  If not left to right, certainly around the area where I saw

6   him five, 10 minutes before.

7   Q.  Fair enough.  And isn't it true, sir, that Levi was playing

8   croquet at the bottom of the path?

9   A.  He wasn't there then.  I didn't see him then because I

10  would have -- that would have been right where I started

11  walking.

12          MS. ALTMAN:  Okay.  So can we call up Exhibit 124.

13  BY MS. ALTMAN:

14  Q.  All right.  Do you see that?

15  A.  Yes.

16  Q.  All right.  So why don't you show the jury where you

17  started your trek down the path.

18  A.  Right -- right there.

19  Q.  So right by the pavilion, right by the table?

20  A.  Correct.

21  Q.  And when you were looking down the path, when you were

22  about to walk down the path, who was on it?

23  A.  I don't remember seeing anybody on it.

24  Q.  So the path was completely empty.

25  A.  Certainly as I was looking down -- up the path, down the

1   path this way.  I will trying to draw an arrow.  Certainly that

2   direction there was nobody on the path.

3   Q.  So when you are about to -- if I understood you correctly,

4   Ms. Willis had asked you to go round up the kids, right?

5   A.  Correct.

6   Q.  So when you looked down the path and saw no one there, did

7   you turn around the other way to see if they were behind you?

8   A.  I would have been standing there with Sara, and she as well

9   would have been looking in this area for sure.

10  Q.  Okay.  So no one was there, correct?

11  A.  I didn't see any kids there.

12  Q.  Did you see other people there?

13  A.  There were other people there.  I just had left the men I

14  was talking to.

15  Q.  So who was there?  When you were standing there with

16  Ms. Willis, who was there?

17  A.  Gery Andlinger, Willy Jordan, my dad.

18  Q.  Okay.

19  A.  And I was there before.

20  Q.  So if I understood your testimony, Ms. Willis came up to

21  you and asked you to sort of meander down a side path for I

22  think you said 25 feet and came back?

23  A.  She come up to me.  I could see she wanted to talk to me.

24  She gave me the eyes and sort of waved me over.

25  Q.  Was she in front of you or behind you?

1   A.  Ms. Willis was standing here, here where I ended up leaving

2   here.  I was standing here talking with the group and the other

3   three.

4   Q.  It's your testimony none of the kids were there, right?

5   A.  At that time I don't know.  I am focused on my kids.  I

6   don't know if -- there were no kids to round up.  That's what

7   we were talking about.

8   Q.  So then they weren't there, right?

9   A.  There were no kids here at that time.

10  Q.  Okay.

11  A.  So I walked over to Sara.  And in order to not have this

12  conversation within earshot of these people, but also there

13  were some people in this area, we just walked down, there is a

14  path.

15  Q.  Well, what was so secret or personal that you -- Sara

16  couldn't say in front of the other guests, hey, we need to get

17  folks sitting down for dinner?

18  A.  It wasn't a secret or personal, but it was just she was

19  frustrated.  What's going on?  Let's get this party going.  And

20  I said, I want to get out of here too, so it was just, you

21  know, conversation.  And I think she would rather have as the

22  organizer of this not in front of people.  She doesn't want to

23  tell them, You are late to sit down, you know, something like

24  that.  So it's just -- maybe it would be the type of talk that

25  people in the kitchen would have about guests out in the front

Nikos Hecht - Cross

1   of the house, so it was more like that, nothing personal.

2   Q.   Right.  You just didn't want to have it in earshot of

3   Mr. Andlinger or your father or the other guests, correct?

4   A.   Yeah, yeah.

5   Q.   How far was it in terms of distance between where you said

6   you were and where Ms. Willis was that you were concerned about

7   anyone hearing you?

8   A.   Well, this distance maybe is 8 feet, maybe less even.  And

9   this distance, if there was some other people, there could have

10  been some other -- a few people already sitting, to take a

11  seat, that was 2 feet.

12  Q.   So Ms. Willis asked you to go find Levi, correct, and any

13  other kids?

14  A.   Not just Levi.  She said, If you can round up the kids, and

15  I take that to mean my kids.

16  Q.   So I know you have been in court this week, right?

17  A.   Yes.

18  Q.   And yesterday when you were in here, you were reading your

19  deposition; is that right?

20  A.   Yesterday I was reading my deposition?  I don't --

21  Q.   Were you?

22  A.   You mean sitting at the table here?

23  Q.   Yes, sir.

24  A.   I don't remember reading -- I might have looked at some

25  paper, but I don't remember what I was looking at.

Nikos Hecht - Cross

1   Q.  Okay.  So you don't remember whether or not during the

2   proceedings yesterday you were reading your deposition?

3   A.  No.

4   Q.  So when Sara Willis asked you to round up the kids, and I

5   know you heard, if you were listening to the testimony,

6   Mr. Tristan Andlinger say that from way up on the path where

7   the rape occurred, which I think you called a consensual

8   encounter, he could yell way up on the path 30, 40 feet,

9   50 yards, whatever it is, and people could still hear him at

10  the table, right?

11  A.  I think that's right.

12  Q.  And George said the same thing, correct?

13  A.  That's correct.

14  Q.  So why didn't you just call your son's name?

15  A.  I don't yell for my kids.  That's not how I look for them.

16  I don't -- I don't yell at my kids.

17  Q.  Well, you wouldn't necessarily have to yell.  Did you call

18  his name?

19  A.  If I got to the point where I thought he was lost, then

20  yes, I would be yelling for him, but I walked down the path to

21  where he would have been playing.  I didn't assume he was in

22  the dark, so I am not going to be yelling out.  I wasn't

23  worried about him.  I was just telling him dinner was ready.

24  Q.  No, I understand.  I wasn't suggesting you were worried

25  about him.  I was just asking why you just didn't call his

1    name.  And I don't think I said yell.  I just said, Why didn't

2    you just call his name?

3    A.   I -- I was just visually looking for him.  I don't know.

4    Q.   Right.  But when you didn't see anyone on the path in front

5    of you, why didn't you just call his name?

6    A.   Because I assumed he wasn't there.

7    Q.   He wasn't on the path.

8    A.   He wasn't on the path and I don't think he would have been

9    in the gardens in the dark.

10   Q.   Okay.  I agree with you.  So then why did you walk up the

11   path?

12   A.   Because he had just been playing right there.  It was

13   darker, so it is possible that from the table to where he was

14   playing I wouldn't have seen him from where I was standing

15   likely.  I mean, that was 30 feet maybe on the other side of

16   the path, so it's far enough that I would have had to get

17   closer.

18   Q.   A hundred percent understand you, sir.

19        You just testified that because you didn't see him,

20   you didn't think he was on the path and you didn't think he

21   would be in the gardens.  So then why did you walk up the path?

22   A.   I was just going to correct not far into the gardens.  If

23   he was in the gardens a few feet, it's possible.  So I was

24   walking up to see if he was in the same vicinity as he was

25   before.

Nikos Hecht - Cross

1   Q.  So when you say in the same vicinity as he was before, is

2   it your testimony he was actually up the path before?

3   A.  He was up the path before.

4   Q.  Okay.  How far up the path?

5   A.  30 feet.

6   Q.  30 feet.

7   A.  40 feet maybe.

8   Q.  30 to 40 feet.

9   A.  Yes.

10  Q.  Now, if I understood you correctly, you said based upon

11  your vast experience in Cabo, you thought the sunset was

12  6:30 p.m. that day; is that right?

13  A.  I do.

14  Q.  Okay.  Now, did you look that up?  Did you try and look

15  that up before trial?

16  A.  No.  I mean, that's something that I planned dinners around

17  for almost 10 years.

18  Q.  Okay.  Well, you would agree with me sometimes the sun sets

19  in Cabo at 7:30, correct?

20  A.  In the time when I am usually not there.  Maybe that's

21  June?

22  Q.  No, in March, right?  In March, sometimes the sun sets at

23  7:30.

24  A.  I don't -- no, I don't agree.

25  Q.  What time did the sun set this year in Cabo in March?

1    A.   6:30.  I think it sets the same time every year.

2    Q.   Okay.  And it's your testimony it never sets at 7:30 or

3    8:00 o'clock; is that correct?

4    A.   In March?

5    Q.   In March.

6    A.   If there is no daylight savings, the years I have been

7    there, which is almost 10 years, it sets at 6:30.

8    Q.   Okay.  Now, you said you arrived at -- what time was it?

9    A.   About 6:00, maybe 5:45 at the earliest, but around 6:00.

10   Q.   Based upon your testimony, by 6:30 it was dark.

11   A.   That's when the sun sets, so you get a little bit of light

12   after that.

13   Q.   So at 6:30 what was the light like?

14   A.   That dimming, quickly dimming light where it goes to dark.

15   I am just estimating here probably 10 more minutes of some

16   light.

17   Q.   And by 6:45 for sure it was dark.  Is that your testimony?

18   A.   It's -- it's pretty close to it, if not 7:00 would be the

19   latest and it's dark, yes.

20   Q.   Like pitch dark?

21   A.   I think it's probably dark at 3:00 in the morning, but it's

22   pretty darn dark.

23   Q.   Well, I think you said maybe you could see 7 feet in front

24   of you, but not 10, right?

25   A.   If you were around the lights, you could probably see 20,

1    30 feet, you know, if you had the lights behind you or around

2    into the dark basically, down the path.  But if you're -- if

3    you were in a place with no lights anywhere near you, it's --

4    it would be hard for me to see much beyond the court reporter.

5    I forget your name, sorry.

6    Q.  So at the place where you claim you stopped with Ms. Dailey

7    where she forced herself on you, how close was that to where

8    the light stopped?

9    A.   That was another -- I think it was 50 to 70 feet, about

10   maybe 50 from we were.  I am not sure how far the lights go,

11   but it was dark where we were.

12   Q.  Dark meaning you were not getting any of the glow from

13   those lights.  Is that your testimony?

14   A.   It's possible a little bit.

15   Q.  Well, I don't want you to guess.  I am asking you to use

16   your memory of that night, which I think you said you recalled.

17   A.   It was dark, but you might be able to see a little bit more

18   than if there were no light anywhere, but it was -- it was more

19   or less dark.

20   Q.  And I don't want to mince words and I am not trying to

21   trick you.  I am just trying to understand.  I don't want to

22   know what might have happened.  I want to know what did happen.

23        When you got to the place where Ms. Dailey I guess --

24   did she turn you around to pull you in to kiss you?

25   A.   When she walked around to my side, it was just a stopping

 1  moment, so I don't think she touched me to do that, didn't turn

 2  me.

 3  Q.  You were walking up the path side by side, right?

 4  A.  Yes.

 5  Q.  Arm in arm?

 6  A.  I don't -- I can't say that that's not true, but I don't

 7  remember that being --

 8  Q.  Fair enough.  But you were side by side, right?

 9  A.  Correct.

10  Q.  And you are both walking forward, right?

11  A.  Yes.  At that point I didn't -- I'm not -- I wasn't focused

12  on finding the kids anymore.

13  Q.  I understand.  I wasn't asking about the kids.  I am just

14  asking if you were walking side by side with Ms. Dailey.

15  A.  Yes.

16  Q.  All right.  So you are walking, though, right?  You are

17  moving.

18  A.  Yes.  The reason I brought up the kids, it was much slower.

19  Q.  Meaning you were walking slower when you were looking for

20  the kids and now with Ms. Dailey you were walking quickly?

21  A.  No, meaning I had -- thinking the kids weren't in that

22  area, I remember thinking should I turn around and look for

23  them.  I was getting to the point where the kids were clearly

24  not there.

25  Q.  Okay.  But you were walking with Ms. Dailey, right?

Nikos Hecht - Cross

1   A.  Still, yes.

2   Q.  So right.  So the question is she is walking side by side

3   with you, correct?

4   A.  Correct.

5   Q.  If I understood your testimony, she started talking dirty

6   to you, correct?

7   A.  She walked beside me.

8   Q.  Was she on your left or your right?

9   A.  She was on my left, closer to the bushes.

10  Q.  Well, there is bushes on both sides, right?

11  A.  Right, but farther right is -- it's 10 to 12 feet before

12  you get to bushes.

13  Q.  Okay.

14  A.  A little bit more.

15  Q.  So she is on your left?

16  A.  Correct.

17  Q.  You are walking, correct?

18  A.  We are walking.

19  Q.  While you are walking, she is talking dirty to you,

20  correct?

21  A.  No.

22  Q.  So you stop.  Okay.  What caused you to stop?

23  A.  She sort of sped up and turned to me, whether she really

24  touched me to turn me or just stopped herself, and I turned to

25  look at her.  It was one of those things where it wasn't an

1    abrupt move that she made.  She didn't turn me.

2    *Q.*  Okay.  So if I understand you, you were walking down the

3    path side by side, and at some point she got essentially in

4    front of you to block your way to go further; is that right?

5    *A.*  Not so much in front, but enough to the side where she

6    was -- where she was facing now the middle of the path and I

7    turned to face her.

8    *Q.*  Okay.  Now, prior to that when that happened, she turned to

9    you and you turned to her, had she said anything to you that

10   was of a sexual nature?

11   *A.*  No.

12   *Q.*  Okay.  So did she ask you to stop at that moment like,

13   Mr. Hecht or Nikos or King of the Castle, can we stop and talk?

14   *A.*  She didn't ask me to stop.  I don't remember that, no.

15   *Q.*  So who stopped first, you or her?

16   *A.*  Her.

17   *Q.*  So she stopped.  What did you do?

18   *A.*  She stopped and turned toward me.

19   *Q.*  But you were still moving, right?  You didn't stop?

20   *A.*  I think her shoulder may have brazed or I saw her body

21   language stop, so I stopped as well.

22   *Q.*  Is that when she talked dirty to you?

23   *A.*  She was close to my face and she leaned in and kissed me

24   first.

25   *Q.*  So before she started talking dirty, Ms. Dailey kissed you.

Nikos Hecht - Cross

1   *A.*   Correct.

2   *Q.*   Now, Mr. Hecht, you recall giving a deposition in this

3   case, correct?

4   *A.*   I do.

5   *Q.*   And you recall being under oath.

6   *A.*   I do.

7   *Q.*   You gave your deposition and you did not mention that

8   Ms. Dailey started -- well, actually, let me ask you if you

9   remember this.

10          You remember you were under oath, right?

11  *A.*   I am under oath.

12          *THE COURT:*  You said that four or five times now.  He

13  was under oath.

14  *BY MS. ALTMAN:*

15  *Q.*   I want to see if you remember this question and answer.

16          And she put her hand -- I am sorry, 276, I apologize,

17  Line 14.

18          Question:  And she put her hand on the back of your

19  shoulder.

20          Answer:  Yes.

21          Question:  What did she say to you?

22          Answer:  She immediately started talking dirty to me.

23          Question:  Tell us about that.  What did she say?

24          Answer:  She started talking about how tight her pussy

25  was, how good it was, how I would love it, and started kissing

 1   me before that and -- and then --

 2        Question:  She kissed you?

 3        Answer:  She did.

 4        Do you recall hearing those questions and giving those

 5   answers?

 6   A.  That's -- that's the answer I gave, that's correct.

 7   Q.  Okay.  So in your deposition you testified that the first

 8   thing she did when she tapped you on the shoulder, sir, was

 9   started talking dirty.  That's what you said, right?

10   A.  That's what I said.

11   Q.  But that's not what you said today.

12   A.  I think that's still what I am saying today.

13   Q.  No, sir.  You were very clear that when you stopped and

14   turned, she kissed you and then the dirty talk began, correct?

15   A.  I may be getting the order wrong of the kiss and the dirty

16   talking.  You know, I was six months closer to it then.  I

17   don't -- it's not -- I am trying my best to remember the

18   sequence of things.

19   Q.  Okay.  And I just think the jury wants to know what

20   happened.

21        So did she tap you on the shoulders as you testified

22   in your deposition?

23   A.  She turned my shoulder, yes, by stopping -- my shoulder

24   touched hers.  She probably turned my shoulder.

25   Q.  So we are not at that yet.  I am talking about initially,

Nikos Hecht - Cross

1   right?  You said she walked up and tapped you on the shoulder.

2   She came out of nowhere and tapped you on the shoulder.  Do you

3   remember?

4   A.  There are two occasions that she put her hand on my

5   shoulder or touched my shoulder with her shoulder.

6   Q.  So we are not at the kiss yet.  We are at when she

7   initially approached you, your testimony is that she put her

8   hand on the back of your shoulder, right?

9   A.  That's right.

10  Q.  And maybe let's just back up a question.  Maybe that will

11  help you.

12  A.  This was earlier in this interlude.  She walked up behind

13  me, put her hand on my shoulder and that's when we started

14  walking together.  But again after either her hand or shoulder

15  was touching mine and that's what turned me.

16  Q.  Understood.  So let's just stick with the first one for a

17  minute, okay?  All right.

18         So in the first one, you testified under oath that she

19  touched your shoulder and then -- and I am reading your answer,

20  sir -- she immediately started talking dirty to me.  Is that

21  true?

22  A.  That's true.

23  Q.  So she didn't -- as you say, you didn't walk down the path.

24  She didn't stop and turn you around.  She didn't kiss you.

25  A.  She did all those things.

620
Nikos Hecht - Cross

1  Q.  Well, not first, though, because she immediately started

2  talking dirty to you after she tapped you on the shoulder,

3  correct?

4       MR. PLACHY:  Your Honor, she is misrepresenting the

5  deposition testimony she just read.

6       THE COURT:  Well, then he should be the one to clarify

7  it, not counsel.

8  A.  I can clarify it.

9  BY MS. ALTMAN:

10  Q.  Do you want a copy of your deposition?

11  A.  I don't need it.  I can clarify it, I think.

12  Q.  I would like to talk about what you said under oath in your

13  deposition, so would you like a copy?

14       THE COURT:  You will have to read pretty quickly

15  because it's two minutes before 5:00.

16       MS. ALTMAN:  Does Your Honor want me to give it to

17  him?

18       THE COURT:  His Honor doesn't care whether you give it

19  to him or not, but you have two minutes.

20       MS. ALTMAN:  May I approach, Your Honor?

21       THE COURT:  Of course.

22  BY MS. ALTMAN:

23  Q.  276 is the page.  Now, I will represent to you, sir, if you

24  go to Page 276, it's that bottom right-hand square.  And why

25  don't we start with the question at Line 7.

Nikos Hecht - Cross

1        And it says:  And how far from the table did that

2    encounter -- again, I am pointing to the right.  It's outside

3    of the page because it's not -- this is looking at your

4    diagram.  The way you drew it, it's not wide enough to include

5    it, but you are saying to the right of it is where this would

6    have happened.

7        You said:  That's correct.

8        And then the next thing is -- and this is where you're

9    describing her approaching you:

10       And she put her hand on the back of your shoulder.

11       Did I read that correct?

12   A.  There are two occasions that she either put her hand on my

13   shoulder the way it's described.

14   Q.  Right.  And this is the first one, correct?

15   A.  This is the second one.

16   Q.  Well, sir, if you look up the kiss -- we can keep reading,

17   but you will see the kiss follows it.

18   A.  Okay.  So I think this would be a better recollection of if

19   the kiss is after the dirty talk or before.  It's -- we are

20   talking about seconds.

21   Q.  Okay.  But I just want to make sure we have your story

22   straight.

23   A.  That's fair.  It's not a story.  It's the truth.

24   Q.  I hear you, sir.  I am just trying to make sure I

25   understand your truth, okay?

1          *THE COURT:*  One more question.

2     *BY MS. ALTMAN:*

3     *Q.*  So would you agree with me, sir, in your deposition you

4     testified that Ms. Dailey walked up to you, touched you on the

5     shoulder, immediately started talking dirty talk and then

6     kissed you; is that right?

7     *A.*  If you are referring to the second time that my shoulder

8     was touched further down the path, that's correct.  I guess I

9     am getting wrong whether the dirty talk happened before or

10    after the kiss, but there is only one truth.  You said my

11    truth.  There is only one truth and I am telling you.

12          *THE COURT:*  Okay.  So you can ponder those things

13    overnight.  I am going to excuse the jury until 9:00 in the

14    morning.  Thank you for your service today everybody.  We will

15    hopefully be able to conclude this tomorrow.

16          (Jury excused.)

17          You can step down, Mr. Hecht.

18          The jury has been excused.

19          Where are we now with the jury instructions that I

20    gave you, the revised ones?  Let's just take them from the top

21    starting with No. 1.  What's the first one we get to where

22    either side has any objection at all?  Any objection to No. 1?

23          *MR. PLACHY:*  No, Your Honor.  We don't start until 7.

24          *THE COURT:*  Plaintiff, any objection to 1 through 6?

25          *MS. RIVAUX:*  No.

1          THE COURT:  Okay.  So we get to No. 7, and now there

2     is an objection by the defendant.  To what?

3          MR. PLACHY:  Seven and 8, Your Honor, reiterating what

4     we were are saying on the directed verdict that the assault

5     shouldn't go to the jury.  I kind of got these bunched together

6     because the arguments are the same.  On 7, 9 and 13, that's the

7     issue we discussed at the trial prep conference where we

8     believe consent should be an element of the plaintiff's claim.

9          We understand that Your Honor has addressed that issue

10    and determined otherwise, but the Restatement makes clear that

11    consent is an element.  And there is no Colorado case law to

12    the contrary.  There is a 10th Circuit case *Benavidez* 177 F.3d

13    that we believe supports our position that consent should be an

14    element.  And that was covered in the trial prep.

15         THE COURT:  Okay.  Now, I guarantee you both sides,

16    you don't want a mistake made on that.  It's not going to make

17    a nickel's worth of difference.  If the law is that it's part

18    of the elements, then it should be.  And if the law is

19    otherwise, it shouldn't be.  I would like to get it right.

20    You, more than me, should want to get it right.  We talked

21    about it before and I was under the impression and concluded

22    apparently that it's an affirmative defense.

23         Plaintiffs?

24         MS. RIVAUX:  We agree it's an affirmative defense,

25    Your Honor, that goes with the stock instruction.

1          THE COURT:  You are willing to risk your verdict on

2     that, yes?

3          MS. RIVAUX:  We believe it's an accurate statement of

4     the law.

5          THE COURT:  And what case law do you rely upon?

6          MS. RIVAUX:  I don't have a case with me now, but I do

7     remember seeing a case on it.  I just don't have it with me

8     right now.

9          MS. ALTMAN:  We could send it to the Court when we get

10    back to --

11         THE COURT:  I don't want you to send it to the Court.

12    The Court is going to watch the second ballgame after the

13    Rockies won the first game.  I want you to get it right.

14         I don't know who is going to win this case.  Your

15    stories are so in conflict that I just can't even hazard a

16    guess.  What I do want is that once a decision is made, it

17    holds up and you are done --

18         MS. ALTMAN:  We agree, Your Honor.

19         THE COURT:  -- for everybody's sake.  So don't be --

20    you know, look up his case and think about it.  Right now I am

21    satisfied with what I said before, but I could be wrong.  It's

22    happened.

23         MS. ALTMAN:  We appreciate that, Your Honor.  We

24    commit to you we will look at it again tonight and we will let

25    opposing counsel know later.  For now we agree with the way

1    that it is, but if we change our mind this evening, we will let

2    Mr. Plachy know.

3            THE COURT:  That same thing applies to 8 -- not 8, but

4    9.

5            MR. PLACHY:  Nine and 13, Your Honor.

6            THE COURT:  13 is a little different, as I recall, but

7    at least on 8 and 9 you have made your objection and they

8    responded.

9            Now, moving on, 10.  Any issue there?

10           MR. PLACHY:  Your Honor, again another bunch, so in 7,

11   8, 9, 10, 11, 12, there is this word "harmful" that shows up.

12   We discussed this also at the trial prep conference.

13           THE COURT:  Is the harmful in the standard

14   instruction?

15           MR. PLACHY:  It is, yeah.

16           THE COURT:  Well, if it's in there, then that's what I

17   am going to use.

18           MR. PLACHY:  Understood.

19           THE COURT:  This is a Colorado law case.  They chose

20   to bring it in federal court.  I wish they hadn't, but they

21   did.  And we are going to follow CJI unless there is a good

22   reason not to.

23           MR. PLACHY:  May I briefly make a record on that?

24           THE COURT:  Yes, yes.

25           MR. PLACHY:  Our concern is that the use of the word

1    "harmful" is misleading here because harmful contact is defined

2    as causing physical pain, injury, et cetera.  There has already

3    been testimony that Ms. Dailey had difficulty accommodating, I

4    think was the language, Mr. Hecht, and that it was painful, the

5    intercourse was painful.  And so that's our issue.  We think it

6    is -- we think it is painful, but consensual intercourse, of

7    course, would not be a battery.  That's our concern.

8         THE COURT:  If there was consensual intercourse, you

9    win this case.

10        MR. PLACHY:  I believe that's how it should go.  Our

11   fear is that she has testified that the intercourse, whether

12   consensual or not, was painful and resulted in bleeding and

13   things like that.

14        THE COURT:  Yes, but if you look at the consent

15   instruction, it says you win if there was consent.

16        MR. PLACHY:  Agreed, but that's our affirmative

17   defense where we bear the burden of proof.  The harmful

18   contains in the elemental instructions as well.

19        THE COURT:  That's why I say it's not going to make a

20   nickel's worth of difference whether it's an affirmative

21   defense or not.  They are going to decide if her story is the

22   true story or his story is the true story.  That's it.  If they

23   believe her, there was no consent.  She wins.  If they believe

24   him, there was consent.  She loses.  I don't know how to say it

25   any more simple than that.  I don't think it's going to make

1  any difference as to who has the burden of proof on that.  I

2  would like to get it right because that's the kind of

3  technicality you get reversed on if you are wrong.

4         Okay.  I am not concerned about the word "harmful."

5         Onward.  No. 8, any concern about 8?

6         MR. PLACHY:  There is potential inconsistency.  Do you

7  mind if I remain seated?

8         THE COURT:  I do not mind.

9         MR. PLACHY:  In Instruction 8 it begins by stating

10  that apprehension is a state of mind experienced when a person

11  anticipates immediate harmful or offensive physical contact,

12  but the rest of the definition speaks only to the apprehension

13  of physical contact, not harmful or offensive physical contact.

14  So I think it's perhaps not entirely consistent.

15         THE COURT:  Maybe.  What does the standard instruction

16  say?

17         MR. PLACHY:  I will have to pull that up, Your Honor.

18  I can't remember if that's a stock or not.  There is no

19  citation on this instruction, so I am trying to thumb through

20  to find where that instruction appears.  I believe it's a stock

21  instruction, Your Honor, but I'm not sure.

22         THE COURT:  Well, we can easily confirm it.  I'll go

23  get my books.

24         What's the number of the battery instructions?

25         MR. PLACHY:  I think it's Chapter 20.  And I think

 1    this is a combination of 20:2 and 20:3.

 2              *THE COURT:*  20:2 is the first sentence.

 3              *MR. PLACHY:*  Correct.  It's the one that talks about

 4    harmful or offensive physical contact.  The rest of the

 5    definition only speaks to apprehension of physical contact.  So

 6    those two, they don't fit together.

 7              *THE COURT:*  Sounds like to me he has got a point

 8    because if you look at the basic one, 20:1, it says the

 9    defendant intended to cause an offensive or harmful physical

10    contact.  20:2 says anticipates immediate harmful and offensive

11    physical contact.  20:3 just says physical contact.  So which

12    way do you want to do it?

13              *MS. RIVAUX:*  I think you have to go back and look at

14    No. 7 because -- then it will be inconsistent with that as

15    well.

16              *THE COURT:*  No. 7 actually says offensive or harmful

17    physical contact.

18              *MS. RIVAUX:*  Right.  And then it says in apprehension

19    of immediate physical contact.

20              *THE COURT:*  Do you folks agree or disagree to change

21    these to be consistent?  It's a combination of two book

22    instructions.  They say there is an inconsistency in the book

23    instruction.  I am thinking that there might be, but I am

24    asking if you agree or disagree with that.

25              *MS. ALTMAN:*  Since we have to look at that other

 1   issue, can we think about this tonight also and get back to

 2   them tonight?

 3        THE COURT:  Okay.  I will leave it as it is for now.

 4        Now, No. 9.

 5        MR. PLACHY:  I think we have said all we need to say

 6   on our side, Your Honor, all the way up to 21.

 7        THE COURT:  And that has the harmful or offensive in

 8   it.  So when you are doing your thinking tonight, look at 9,

 9   too.

10        All right.  They have no more until we get to 21.

11        Do you have any between 10 and 20 that you want to

12   object to?

13        MS. RIVAUX:  On Jury Instruction No. 13, we have

14   raised this before as well.  In the last sentence of

15   Paragraph 1, consent may be manifested by words, actions or

16   inactions and need not be communicated to the actor.  I just

17   think that's particularly misleading in this case.

18        THE COURT:  What is the wording of the book

19   instruction on consent, 20:11?  So look at that.

20        MS. RIVAUX:  I do not have that language.  I think

21   that language was added.

22        THE COURT:  Yes.  It doesn't have that language, so

23   where does that come from?

24        MR. PLACHY:  I think from the restatement, Your Honor.

25   I am trying to dig that up.

1    MS. RIVAUX: There may be circumstances that may be

2    appropriate, but given the facts of this case and the way it's

3    been argued, it just seems extremely misleading.

4    MS. ALTMAN: Not to take you off task. Would it be

5    all right if I let Ms. Dailey go?

6    THE COURT: Yes.

7    MR. PLACHY: Mr. Hecht as well, Your Honor?

8    THE COURT: Yes.

9    All right. Well, unless you can give me a Colorado

10   case of the book instruction as well, which means that in

11   Paragraph No. 1 we will strike the second and third sentence.

12   All right. Next? Anything else between 13 and 20?

13   You can chalk that one up as a victory.

14   MS. ALTMAN: I guess the bright side is you really

15   can't be golfing in this weather.

16   THE COURT: 14, any objection?

17   MS. RIVAUX: I am up to 19.

18   THE COURT: Both sides agree, but let me talk to you

19   about 15 for a minute. I am okay with it, but I just point out

20   to you, you've dealt with consent differently, right? In 15,

21   there is no consent affirmative defense. You simply define

22   extreme and outrageous conduct and you say, however, conduct is

23   not extreme and outrageous if Ms. Dailey consented to the

24   conduct. Are you happy with that?

25   MS. RIVAUX: No. That was at the time we were trying

1    to talk to opposing counsel on it.  And the reason they -- from

2    my recollection, the reason they wanted -- their argument was

3    that if she consented -- the fact that all of this happened

4    near the family, then the jury could think this was extreme and

5    outrageous.

6         THE COURT:  Not if she consented to it.

7         MS. RIVAUX:  Right.  So I think we don't need it.

8         THE COURT:  Well, I am not saying -- yeah, of course,

9    you don't want it, but that's not my question.  My question is,

10   is it okay in this instance not as an affirmative defense?  I

11   think it's fine, but I'm pointing out that.  It jumped out at

12   me particularly when I was framing the verdict form.

13        MS. RIVAUX:  Right.

14        THE COURT:  Well, defendant, they are kind of struck

15   mute here.  What do you say?

16        MR. PLACHY:  We think it's right the way it is for the

17   reasons we discussed.

18        THE COURT:  I am not going to take it out.  If you

19   don't have something that says it's an affirmative defense, I

20   will leave it the way it is.

21        All right.  16.  No objections to the rest of these

22   you said until we get over to something.  What's the next one

23   where somebody has an objection?  Is it 21?

24        MR. PLACHY:  It's 21 for us.

25        THE COURT:  What's your objection to that?

1        MR. PLACHY:  As we discussed at the trial prep

2  conference, and this follows the stock, there is no doubt about

3  it, our argument is based on the exemplary damages statute

4  13-25-127.  It says that you can only award exemplary damages

5  when you prove beyond a reasonable doubt the commission of a

6  wrong.  So we think under the language of the statute to get

7  exemplary damages plaintiff has to prove the elements of her

8  claim beyond a reasonable doubt, that's the wrong, and also

9  establish beyond a reasonable doubt malice or willful or wanton

10  conduct, so there is two parts to it.

11        THE COURT:  No.  The beyond a reasonable doubt applies

12  to the malicious and willful and wanton manner.  Otherwise, you

13  would be changing the whole case back to beyond a reasonable

14  doubt just because they asked for punitive damages.  No, I am

15  not going to do that.

16        MR. PLACHY:  I don't want to mislead the Court, Your

17  Honor.  I am not suggesting that they have to prove their

18  claims beyond a reasonable doubt.  I am saying to get exemplary

19  damages on those claims, they have a heightened burden.  In

20  other words, the jury would find preponderance to award normal

21  damages on the claim, but to get punitives they have to show

22  they are entitled to it by -- but I understand.

23        THE COURT:  That's what this says.

24        MR. PLACHY:  It doesn't include a statement that they

25  have to prove their claims beyond a reasonable doubt.  It just

1    says they have to prove the willful and wanton, as you

2    suggested.

3         THE COURT:  And you say prove their claims.  You mean

4    the elements of the offenses?

5         MR. PLACHY:  Agreed, to get punitive damages only, not

6    to get regular damages.

7         THE COURT:  No.  You will have to show me a case that

8    says that.  I have never heard of that.

9         MR. PLACHY:  And Your Honor, while we are on it, we

10   have the same objection to Question 7 on the verdict form.

11        THE COURT:  Okay.  22, nobody objects to that, I

12   assume.

13        23, hard to object to that one.

14        Verdict form.  I have simplified it, obviously.  Does

15   plaintiff have any objection to the verdict form?  Fill in the

16   blanks to the instructions it refers to, but I haven't filled

17   them in yet because we haven't had this conference yet.

18        MR. PLACHY:  Your Honor, while they are looking at

19   that, a quick record on Instruction 13 because I couldn't

20   figure out where we were coming from on that.  The language

21   that was -- that is in the current version of 13 before you

22   made your revisions was based on Restatement Second of Torts

23   892, Subsection (1) and (2).  That's what we discussed at the

24   trial prep conference when we changed this instruction

25   originally.

1          What it says is:  Conduct is willingness in fact for

2     conduct to occur.  It may be manifested by action or inaction

3     and need not be communicated to the actor.

4          If words or conduct are reasonably understood by

5     another to be intended as consent, they constitute apparent

6     consent and are effective as consent in fact.

7          THE COURT:  Okay.  Has Colorado adopted that?

8          MR. PLACHY:  I can't say that definitively, Your

9     Honor.  I believe so, but ...

10         THE COURT:  You show me by tomorrow and we will leave

11    it the way it is.

12         MR. PLACHY:  We'll do.

13         THE COURT:  Verdict form.

14         MS. RIVAUX:  I am just trying to make sure it's

15    following the instruction.

16         MR. PLACHY:  Other than the objection we had to

17    Question 7 we raised a moment ago, we are fine with the verdict

18    form.

19         THE COURT:  Question 7 is the one about the punitive

20    damages.  Okay.

21         MS. ALTMAN:  I think we are fine up to the part where

22    it says, If you have either answered Question 1 and 2.

23         THE COURT:  That's a little awkward, I admit, but I

24    didn't know how better to do it.  If you can come up with a

25    better way to do it.

1          MS. ALTMAN:  Can we add that to our "to do" list and

2     send it to defense counsel?  Can someone send it us in Word?

3          THE COURT:  We are not going to be doing it tonight.

4          MS. ALTMAN:  If somebody sent it to us, we can fudge

5     around and send it to them if you want.

6          THE COURT:  The whole set?

7          MS. ALTMAN:  The verdict form.

8          THE COURT:  We can give you the whole set.  We can

9     give you the verdict form.

10         MS. ALTMAN:  We will take whatever you give us and we

11    will see if we can clean up that one part and then send it to

12    counsel and --

13         THE COURT:  How about if we e-mail these instructions

14    the way I did them and the verdict form to both sides.  That

15    will give your legal beagles the opportunity to spend all night

16    on this important work.

17         THE COURT:  Good night.

18       (Recess at 5:30 p.m.)

19

20

21

22

23

24

25

```
 1                              INDEX
 2    WITNESSES
 3       Betty McGuigan
 4            Direct Examination By Ms. Rivaux           404
 5            Cross-examination By Mr. Tumminello        437
 6            Redirect Examination By Ms. Rivaux         501
 7          Nikos Hecht
 8            Direct Examination By Mr. Plachy           512
 9            Cross-examination By Ms. Altman            568
10                             EXHIBITS
11    Exhibit       Offered  Received  Refused  Reserved  Withdrawn
12    111                    532
13    114                    525
14    117                    528
15    126                    541
16    201.003                490
17    201.013                472
18    201.015                478
19    201.016                473
20    201.022                479
21    201.030                492
22    202.005                475
23    203.004                487
24    203.005                469
25    203.006                467
```

```
 1                        INDEX (Continued)

 2                           EXHIBITS

 3    Exhibit       Offered  Received  Refused  Reserved  Withdrawn

 4    203.007                  476

 5    203.012                  481

 6    203.014                  489

 7    203.018                  483

 8    203.019                  482

 9    203.020                  484

10    204.004                  471

11    204.008                  446

12    204.11                   487

13    204.012                  418

14    204.013                  418

15    204.014                  425

16    204.015                  431

17    204.016                  431

18    222                      461

19                     REPORTER'S CERTIFICATE

20        I certify that the foregoing is a correct transcript from

21    the record of proceedings in the above-entitled matter.  Dated

22    at Denver, Colorado, this 23rd day of January, 2018.

23

24                                S/Janet M. Coppock

25
```