IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 16-CV-00581-RBJ

SUZANNA F. DAILEY,

    Plaintiff,

vs.

NIKOS HECHT,

    Defendant.

_____

REPORTER'S TRANSCRIPT
Jury Trial - Day 4

_____

       Proceedings before the HONORABLE R. BROOKE JACKSON,
Judge, United States District Court for the District of
Colorado, commencing at 9:05 a.m., on the 19th day of May,
2017, in Courtroom A-902, United States Courthouse, Denver,
Colorado.

Proceeding Recorded by Mechanical Stenography, Transcription
Produced via Computer by Janet M. Coppock, 901 19th Street,
Room A-257, Denver, Colorado, 80294, (303) 893-2835

1                        APPEARANCES

2              Aryeh Lev Kaplan, Jennifer G. Altman and Shani Rivaux

3   of Pillsbury Winthrop Shaw Pittman, LLP, 333 SE 2nd Avenue,

4   Suite 2000, Miami, FL 33131, appearing for the Plaintiff.

5              Marci Gilligan LaBranche of Ridley McGreevy & Winocur,

6   P.C., 303 16th Street, Suite 200, Denver, CO 80202;

7              Douglas B. Tumminello and Michael D. Plachy of

8   Lewis Roca Rothgerber Christie LLP, 1200 17th Street, One Tabor

9   Center Suite 3000, Denver, CO 80202-5855, appearing for the

10  Defendant.

11                     *   *   *   *   *

12                       PROCEEDINGS

13         *THE COURT:*  Good morning.

14         *MS. RIVAUX:*  We didn't know if you wanted to do the

15  instructions first thing.

16         (Jury present.)

17         *THE COURT:*  How are you doing this morning?

18         *THE JURY:*  Good.  Thank you.

19         Okay.  Let's go.

20         Good morning, Ms. Altman.

21         *MS. ALTMAN:*  Good morning, Your Honor.

22         *THE COURT:*  Mr. Hecht, you are still under oath.

23     (**Nikos Hecht** was previously sworn.)

24                 **CROSS-EXAMINATION CONTINUED**

25  *BY MS. ALTMAN:*

Nikos Hecht - Cross

1   *Q.*  Good morning, Mr. Hecht.

2   *A.*  Good morning.

3   *Q.*  So we are going to walk through a little bit of your

4   testimony from yesterday, but what did you do last night to

5   prepare for your testimony today?

6   *A.*  Slept.

7   *Q.*  Okay.  Do you feel rested?

8   *A.*  Yes.

9   *Q.*  Okay.  So as I understand your testimony from yesterday,

10  Ms. Dailey tapped you on the shoulder and immediately started

11  talking dirty to you, correct?

12  *A.*  There was a point that she touched my shoulder with her

13  shoulder, or my hand, and immediately started talking dirty to

14  me, but there was a prior kiss.  And I wish I would have read

15  my deposition because that's the same thing I said in my

16  deposition.

17  *Q.*  So you have no independent recollection of the sequence of

18  events.  You would have needed to look at your deposition in

19  order to recall the truth?

20  *A.*  No.  The account I gave, you were making it sound like it

21  was different from my deposition.  When I went back and read

22  it, it was exactly like I said.

23  *Q.*  Sir, actually, it's different from your deposition.  And we

24  read it into the record and the jury heard it, so they are

25  going to get to decide.

Nikos Hecht - Cross

1        But my question is when you were going back to look at

2   your deposition last night, I guess for your account of what

3   happened, my question is, if I understand your testimony from

4   yesterday, Ms. Dailey immediately started talking dirty to you,

5   right?

6   *A.*  She started talking dirty to me, but there was a kiss prior

7   to that.

8   *Q.*  And you would like this jury to believe that the sum total

9   of your conversations, as you testified yesterday, with

10  Ms. Dailey is you were the king of the castle, that you seemed

11  so young to have such a nice home and you had the weight of the

12  world on your shoulders, right?

13  *A.*  I would like the jury to believe that because it's the

14  truth.

15  *Q.*  And it's your testimony that up to that point, other than

16  those three comments, and up to the point where Ms. Dailey

17  started talking dirty to you, you had had no other

18  conversations with Ms. Dailey, correct?

19  *A.*  Nothing besides a greeting or a hello, goodbye, yes.

20  *Q.*  And Ms. Dailey had not received any signals from you that

21  you might be interested in a romantic interlude, correct?

22        *MR. PLACHY:*  Objection, calls for speculation.

23  *BY MS. ALTMAN:*

24  *Q.*  I will rephrase the question.

25        Mr. Hecht, you had not suggested in any way to

1   Ms. Dailey from the point you first met her at your house for

2   that one-hour get-together until the point at which she

3   approached you allegedly on the pathway to start talking dirty

4   to you, you had not sent her any signals that you might be

5   interested in having a romantic interlude with her, correct?

6   A.  That's correct.  She initiated.

7   Q.  I am sorry?

8   A.  She initiated that, that flirtation, if that's the way you

9   describe it.

10  Q.  Well, that's the way you described it, right?

11  A.  That's correct.

12  Q.  Calling you king of the castle was -- allegedly calling you

13  king of the castle was flirtatious, right?

14  A.  It was overly personal and flirtatious.

15  Q.  I am trying to understand other than those comments and the

16  moment at which Ms. Dailey started talking dirty to you, you

17  had sent her no signals with your body language, with your

18  communications, that you would in some way invite her being the

19  aggressor to you, correct?

20  A.  That's correct.

21  Q.  And you want this jury to believe that Ms. Dailey, then a

22  65-year-old woman, having received no indicia from you through

23  words, body language or anything that you would have any

24  interest in having a romantic interlude with her, on her

25  volition, in front of your wife, in front of your three

Nikos Hecht - Cross

1  children, in front of her mother, with her sister there and her

2  nephew, came up to you on the pathway and started talking about

3  how tight her pussy was.  That's your testimony, right?

4  A.  That is.

5  Q.  Right.  And I think you testified yesterday, if I heard you

6  correctly, that Ms. Dailey said her pussy was tight because she

7  never had kids.  Do you recall saying that yesterday in court?

8  A.  I do.

9  Q.  And now, you never said that in your deposition, correct,

10  sir?

11       MR. PLACHY:  Objection, Your Honor.  It's improper

12  impeachment.

13       THE COURT:  Sustained.

14  BY MS. ALTMAN:

15  Q.  Sir, have you ever told -- have you ever told that story

16  before, that account, that Ms. Dailey told you that her pussy

17  was tight because she never had kids?

18       MR. PLACHY:  Same objection, Your Honor.

19       THE COURT:  No, that's a different question.

20  Overruled.

21  A.  Are you asking me if I told that account in my deposition?

22  BY MS. ALTMAN:

23  Q.  Well, let's start with that.

24       Did you?

25  A.  I would have to look at it.

644

Nikos Hecht - Cross

1            THE COURT:  That was the question that I sustained the

2    objection to.  The second question said:  Have you ever told

3    anybody that?  It's a different issue.

4            MS. ALTMAN:  Understood.  I asked him that question

5    and he asked me a question back.  I apologize.

6            Do you understand the question, Mr. Hecht?

7            THE WITNESS:  Can you repeat it, just so I will be

8    clear.

9    BY MS. ALTMAN:

10   Q.  Yes.  Have you ever told anyone as you testified yesterday

11   that Ms. Dailey said to you that her pussy was tight because

12   she never had children?

13           MR. PLACHY:  Your Honor, I object.  That potentially

14   calls for information covered by the attorney/client privilege.

15           THE COURT:  Potentially?

16           MR. PLACHY:  He may have discussed it with counsel,

17   Your Honor, is my point.

18           THE COURT:  All right.  Modify your question to

19   eliminate conversations with counsel for the purpose of seeking

20   legal advice.

21   BY MS. ALTMAN:

22   Q.  Mr. Hecht, you have been deposed twice, correct?

23   A.  Yes, I have been deposed -- in my life I have been deposed

24   two or three times.

25   Q.  Okay.  And, Mr. Hecht, I want you to eliminate from your

Nikos Hecht - Cross

1    response any conversations that you had with your lawyers in

2    this case.

3           And my question is simply other than for the first

4    time in court yesterday when you said that Ms. Dailey said that

5    her pussy was tight because she never had children, had you

6    ever given that account before?

7    A.  Can you clarify if we are excluding this deposition, too?

8           THE COURT:  No, ever.

9           THE WITNESS:  Ever, so including this.

10   BY MS. ALTMAN:

11   Q.  Correct.  I will represent to you it's not in the

12   deposition, so that's my question.

13   A.  So can I look at the deposition?

14   Q.  Sure.

15   A.  Okay.

16   Q.  Well, it's not there, sir, so I can't direct you to a page.

17   So feel free to look at it.

18          THE COURT:  You can direct him to where that subject

19   came up, I assume.

20          MS. ALTMAN:  Sure.  I would be happy to.

21   BY MS. ALTMAN:

22   Q.  Sir, if you can turn to Page 274.  And you can read on 274,

23   275, 276, and in particular at the bottom of page 276, starting

24   with Line 17.

25   A.  I am just confused.  Okay, yup.  It looks like I say --

Nikos Hecht - Cross

1    okay.  I don't see here the never had children part, so I --

2    that's a difference.

3    Q.  Right.  That's a difference in what you testified under

4    oath, correct, sir?

5    A.  Yes.

6    Q.  Okay.  Now, you testified yesterday under oath that

7    Ms. Dailey, after kissing you and talking dirty to you in an

8    open pathway, right?  You were in an open pathway, according to

9    your testimony?

10   A.  It was the grass pathway we talked about, the 10 to 15 feet

11   wide, right.

12   Q.  It was open, right?

13   A.  Yes, it was open.

14   Q.  Okay.  And according to your testimony, everybody could

15   see.  Anybody who wanted to look up the pathway could see,

16   right?

17   A.  You would have needed to get -- I haven't stood at the

18   gazebo with light behind me and looked down, so it was close

19   enough to be terrible judgment.  Could everybody see?  I don't

20   know.

21   Q.  I am sorry, my question was probably confusing.  I just

22   meant if somebody is standing on the pathway, you were in plain

23   view, right, on the pathway, right?  You weren't in the shrubs,

24   correct, according to your testimony?

25   A.  On the pathway.

647

Nikos Hecht - Cross

1   *Q.*  On the pathway.  So if somebody was standing in the

2   pathway, they could potentially see you, according to your

3   testimony, right?

4   *A.*  They could potentially see me.  I haven't stood there and

5   seen how far you could see, but I think yes.

6   *Q.*  Well, you stood on the pathway, right?

7   *A.*  Yes.

8   *Q.*  How far could you see?

9   *A.*  I could see -- well, that's, in fact, at least fairly

10   accurate because I could see Levi 10 minutes before.

11   *Q.*  So you could see down the pathway?

12   *A.*  Yes.

13   *Q.*  So you would agree with me, then, that other people

14   potentially could see down the pathway as well, correct?

15   *A.*  They did.  They did, in fact, see us on the pathway, so

16   yes.

17   *Q.*  Okay.  And you were in plain sight, right?

18   *A.*  We were.  If you were looking, yes, you could have seen us.

19   *Q.*  Now, you testified that in this open pathway in plain sight

20   Ms. Dailey, then a 65-year-old woman, after talking dirty to

21   you, being the aggressor, the instigator, got down on her knees

22   and unfastened your pants.  Did I get that part right?

23   *A.*  To be accurate, I think she unfastened my pants and then

24   got on her knees.

25   *Q.*  Fair enough.  So when she unfastened your pants, did she

Nikos Hecht - Cross

1   bend over or was she standing upright, standing straight up?

2   A.   I remember her standing fairly straight up.

3   Q.   Okay.  She was standing straight up in front of you.  She

4   unfastened your pants.  Did it have a button or a snap?

5   A.   It would have been a button.

6   Q.   It would have been or it was?

7   A.   Well, I don't think I owned the snap type of jeans, so --

8   Q.   You don't think or you know?

9   A.   I am fairly certain that it was a button.

10   Q.   Okay.  Did it have a zipper?

11   A.   Yes.

12   Q.   Were you wearing underwear?

13   A.   Yes.

14   Q.   So Ms. Dailey unbuttoned your pants, unzipped your pants,

15   correct?

16   A.   Correct.

17   Q.   She pulled them down?

18   A.   They fell easily, but she gave them a head start, yes.

19   Q.   She gave them a head start by doing what exactly?

20   A.   Pushing my pants at the waistband down.

21   Q.   So she grabbed your waistband, is that right, of the pants?

22   A.   Yes.

23   Q.   Did she touch you?

24   A.   My skin you mean?

25   Q.   Yes.

Nikos Hecht - Cross

1  A.  Yes.  I don't remember skin or, you know, shirt or jeans.

2  Q.  Let me ask you this, and we will get back to that subject.

3       Now, you were how old at the time?

4  A.  I was 44.

5  Q.  44.  And Ms. Dailey was 65, right?  You were here for her

6  testimony, correct?

7  A.  If she said she was 65, I believe that, of course.

8  Q.  So how many times up into your life at age 44 had a

9  65-year-old woman approached you in plain sight aggressively

10  towards you instigating sexual contact and started talking

11  about her tight pussy?  How many times had that happened up

12  until that night at Flora Farms?

13       MR. PLACHY:  Objection, Your Honor, relevance.

14       THE COURT:  Overruled.

15  A.  It was a unique and odd situation, no doubt, so it had not

16  happened before to me.

17  BY MS. ALTMAN:

18  Q.  So Ms. Dailey pulls your pants down, correct?

19  A.  Correct.

20  Q.  And now where were her hands exactly?  Can you show me?

21  Just in the air?  Were they in the side?  Were they in the

22  front?  Were they in the back?

23  A.  They would be between the button and the side.  They were

24  loose fitting jeans.

25  Q.  Right.  I understand.  I understand you said they are loose

Nikos Hecht - Cross

1    fitting.  I am just wondering where her hands were.

2    A.  Between the -- my button and my side, as best as I can

3    recall.  That's not precise as we were talking about.

4    Q.  Well, you just testified this was a unique situation,

5    right?

6    A.  It was, yes.

7    Q.  And it probably stands out for a lot of reasons, not the

8    least of which that you are a defendant in a lawsuit, correct?

9    A.  It does stand out.

10   Q.  And as you sit here today, can you tell the jury where her

11   hands were?  Do you know?

12   A.  I just did.  I, without being precise, within inches they

13   were near my button and I would say close to the button and the

14   sides, but in between the two.

15   Q.  So you could understand, right, why it would be important

16   to be precise with this jury, why it's very important for them

17   to know specific details about what happened so they can make

18   an informed decision?  You would agree with that, wouldn't you?

19   A.  Yes.  I am not brushing it off.  I am just doing my best to

20   give you as close to as accurate as you want it.  I think

21   it's --

22   Q.  All right.  Let's just continue on with as close as

23   accurate testimony you can give me.

24        Now, you said she took your pants down.  She took out

25   your penis, right?

Nikos Hecht - Cross

1    *A.*   She did.

2    *Q.*   Was your penis erect when she took it out?

3    *A.*   It was between -- somewhere between the time that my pants

4    came down and I was in her mouth, so the answer is yes.

5    *Q.*   Before Ms. Dailey put her mouth on your penis, your penis

6    was erect, correct?

7    *A.*   Yes.   I think more erect once she put it in her mouth, but

8    yes.

9    *Q.*   But it was erect before her mouth was on your penis,

10   correct?

11   *A.*   It was -- I don't know how to describe it.   It wasn't

12   flaccid.   It wasn't totally erect.   It was somewhere in between

13   there.

14   *Q.*   And while Ms. Dailey did this, you were facing down the

15   pathway, correct?

16   *A.*   We were facing each other and we were -- we weren't

17   facing -- we were facing each other.   I would be facing the

18   bushes.

19   *Q.*   Okay.

20   *A.*   She would be facing the middle of the path, basically.

21   *Q.*   Okay.   So while Ms. Dailey allegedly put your penis in her

22   mouth, were you looking down the pathway?   Did you turn your

23   head to the left, knowing that your five-year-old son and your

24   two daughters and a bunch of teenagers and your father and

25   Ms. Dailey's mother -- were you keeping a lookout?   Were you

Nikos Hecht - Cross

1   looking down the pathway to see if anyone was coming?

2   A.  I can't defend how bad my judgment was.  I was not -- I

3   didn't have my children in mind.  That's hard to forgive.  I

4   feel terribly about it.  I was clearly not looking because --

5   Q.  So that's my question.  I understand you have expressed

6   what you claim to be remorse, and I appreciate that, but my

7   question is just when you were turned to the side, according to

8   your own testimony, and you claim that Ms. Dailey put your

9   penis in her mouth, knowing that you are in plain view, were

10  you keeping a lookout to see if anyone was coming or looking?

11  A.  It felt dark enough, I wasn't looking.

12  Q.  So the answer is no, right?

13  A.  The answer is no.

14  Q.  And the person that you testified yesterday was so

15  concerned about somebody finding out about this interlude, you

16  didn't look even once, according to you, down the pathway to

17  see if anyone was coming, correct?

18  A.  I didn't feel anyone was there, so I wasn't keeping a

19  lookout.

20  Q.  When you say you didn't feel anyone was there, what does

21  that mean?

22  A.  I didn't see Levi there as I was scanning to the right of

23  the path where he had been.  Where I had looked it felt empty

24  of people.

25  Q.  Okay.  And as you sit here today, you didn't see any

1   gentlemen, a group of gentlemen standing at the end of the

2   path, correct, the gentlemen you said you were talking to

3   earlier, I believe it was you said your father; is that right?

4   *A.*   Yeah.

5   *Q.*   And Gery Andlinger; is that right?

6   *A.*   He was in that group.

7   *Q.*   And forgive me, there was another gentlemen whose name

8   escapes me.

9   *A.*   He is a close friend of my father's, Willy Jordan.

10  *Q.*   Willy Jordan, thank you very much.  You didn't see those

11  three gentlemen there, right?

12  *A.*   That was the length of this courtroom and I -- I didn't

13  look there.  I don't -- I don't -- don't recall seeing them,

14  no.  So the answer is no.

15  *Q.*   So -- and hopefully my voice carries because it's loud.  I

16  just want to make sure that we are on the same page.

17          So it was the length of the courtroom and you were at

18  approximately where the judge was?

19  *A.*   Approximately.

20  *Q.*   And the end of the pathway was approximately here, correct?

21  *A.*   More or less.

22  *Q.*   Can you see me?

23  *A.*   This was dark with lights at the --

24  *Q.*   Can you see me now?

25  *A.*   I can see you now, yes.

1  Q.  And your testimony is you didn't see those three gentlemen,

2  correct?

3  A.  Correct.

4  Q.  How long is Ms. Dailey's mouth on your penis?

5  A.  Very short, seconds.

6  Q.  How many seconds?

7  A.  I would be guessing, but it was five to 10 seconds.

8  Q.  Five to 10 seconds.  And while her mouth was on your penis,

9  you were standing up, right, correct?

10  A.  Yes.

11  Q.  Now, if I understood you correctly, the next thing that

12  happened is Ms. Dailey pulled down her own shorts, correct?

13  A.  Correct.

14  Q.  Sat on the ground.  She was kneeling when she was having

15  your penis in her mouth; is that right?

16  A.  She was kneeling when she was doing that, yes.

17  Q.  Well, I think in your deposition you refer to it as a

18  blow-job, correct?

19  A.  Yes, that's what it is, correct.

20  Q.  So when Ms. Dailey was allegedly giving you, using your own

21  words, a blow-job that lasted about -- I think you just said

22  five to 10 seconds; is that right?

23  A.  That's my best guess, yes.

24  Q.  When she was doing that, she was on her knees, according to

25  you, correct?

655

Nikos Hecht - Cross

1   A.   That's right.

2   Q.   Then according to you, she sat down.  She pulled her shorts

3   down and sat down; is that right?

4   A.   She pulled her shorts down when she was on her knees.

5   Q.   Right. Then what did she do?

6   A.   She grabbed my collar.

7   Q.   Okay.

8   A.   She sort of slid her legs around her body and got to her

9   butt.

10  Q.   Is that your best recollection of what happened?

11  A.   That's what happened.

12  Q.   Okay.  So let's just unpack that.

13       She pulled her shorts down.  She then grabbed your

14  shirt; is that right?

15  A.   She grabbed my shirt.

16  Q.   Collar.

17  A.   Yeah, right here.

18  Q.   So right around here.

19       She reached up from a kneeling position, kind of

20  pulled her shorts down and grabbed your collar, correct?

21  A.   From the kneeling position, she grabbed my collar.

22  Q.   I think that's what I said.  I apologize.  I am not trying

23  to trick you.  I am just trying to understand.

24  A.   I just didn't hear the last part.

25  Q.   No problem.  She is on her knees.  She pulls her shorts

Nikos Hecht - Cross

1    down.  She grabs your collar from a kneeling position, correct?

2    A.  Correct.

3    Q.  Then what happens?

4    A.  Then again, I am not precise, but I remember her knees

5    down, going out to the side, and her -- and falling to or

6    leaning to her butt.

7    Q.  And at the same time she was holding your shirt?

8    A.  She was holding my shirt.

9    Q.  So when she is falling to her butt, she is essentially

10   pulling you on top of her; is that right?

11   A.  Yes.

12   Q.  Okay.  And you, if I understood your testimony correctly,

13   you fell on top of her with your hands at either side of her;

14   is that right?

15   A.  I was off balance and I was -- I was not fighting, fighting

16   to get away.  I am not suggesting that.  I was a participant,

17   but I fell to my knees.

18   Q.  Right.  And where were your hands?

19   A.  And at some point after that, not long, seconds, my hands

20   went to the ground beside her head.

21   Q.  All right.  And, now, you remember giving a deposition in

22   this case, correct?

23   A.  I do.

24   Q.  All right.  Can we turn to Page 282?  And I am going to ask

25   you if you recall the following question and the following

Nikos Hecht - Cross

1   answer:

2          Line 23 beginning on Page 282:  Okay.  And she comes

3   upon you and she does this.  And did you -- after that happened

4   did you walk away from her?  Did you say thank you?  What

5   happened at that time?

6          Answer:  Soon thereafter I stopped her and walked

7   away, but not before she -- this blow-job stopped.  She started

8   I think pulling her pants down as she sat down.  She then sort

9   of grabbed my penis again.  I think she was touching herself

10  still talking to me.  You are going to like this.  At some

11  point she was pulling on my waist and then my shirt collar.

12          Do you remember that question and answer?

13  A.  I -- I remember it well now and I remember telling that,

14  that --

15  Q.  So you remember?

16  A.  Yes.

17  Q.  And you were under oath when you made that statement,

18  correct?

19  A.  Yes.

20  Q.  And it's accurate, correct?

21  A.  Yes.

22  Q.  So for the jury's benefit, since you just said your

23  testimony was accurate, Ms. Dailey performed a blow-job on you

24  for five to 10 seconds, right?

25  A.  Correct.

Nikos Hecht - Cross

1   Q.  And then she sort of grabbed your penis again, right?  She

2   didn't grab your shirt.  She allegedly sort of grabbed your

3   penis again, correct?

4   A.  After she was down.

5   Q.  Right.  But that wasn't my question.

6   A.  Okay.  I am sorry, yes.

7   Q.  Before she grabbed your shirt, as you just testified to

8   this jury, she actually grabbed your penis again, right?

9   A.  This is the blow-job.

10  Q.  Well, no, sir.  Actually, it's not.  So let's just go back

11  to your testimony.  It says:  This blow-job stopped.

12          Do you see that part of it?

13  A.  I do.

14  Q.  Okay.  So it wasn't part of the blow-job, right?

15  A.  I understand.

16  Q.  Sir, I am sorry, I wasn't there, so I really need your

17  help.  Did the blow-job stop?

18  A.  The blow-job stopped.

19  Q.  You are reading from your deposition.  That's how you know?

20  A.  I am reading from my deposition, and I also know it was

21  five or 10 seconds and it stopped.

22  Q.  You just said a minute ago when she grabbed your penis

23  again, it was part of the blow-job.

24  A.  I thought you were referring to the blow-job.  I am sorry.

25  Q.  So she grabbed your penis again, correct?

Nikos Hecht - Cross

1   A.  Correct.

2   Q.  All right.  And you think she was touching herself, right?

3   A.  No.  I remember her touching herself.

4   Q.  Okay.  And she was -- was she talking to you at the time?

5   A.  At some point as we went -- as I got to my knees, I mean,

6   this is within seconds again, she said something else and then

7   stopped talking.

8   Q.  For the rest of the duration, correct?

9   A.  Did not talk, not a word.

10  Q.  Not a single word, correct?

11  A.  Correct.

12  Q.  And so you said you knew she was touching herself, right?

13  A.  It appeared that way.  It appeared that way.  She had her

14  hand on her vagina.  I don't know -- that's touching herself, I

15  think, so yes.

16  Q.  Okay.  But so I am just trying to understand the mechanics.

17  You are standing up.  She is on her knees.  According to your

18  deposition, but not your trial testimony before we looked at

19  your depo, she was grabbing your shirt.  Were you looking down?

20  How was it that you saw Ms. Dailey allegedly touching herself?

21  A.  I don't think there is inconsistencies.

22  Q.  Sir, I am not asking if you think there is inconsistencies.

23  I am asking how you are able to tell this jury you know

24  Ms. Dailey was touching herself.  That's my question.

25  A.  As she was pulling me, I was leaning over and looking down,

1    yes.

2    Q.   So you saw, according to you, Ms. Dailey touching herself;

3    is that correct?

4    A.   That's correct.

5    Q.   Sir, didn't you testify yesterday it was dark out and you

6    couldn't see?

7    A.   I could see that far.

8    Q.   Okay.  So you could see as Ms. Dailey is sitting on her

9    bottom, right, you could see her vagina?

10   A.   I could see her vagina, yes.

11   Q.   And that's how you were able to suggest to this jury that

12   Ms. Dailey allegedly had shaved herself for you; is that right?

13   A.   I don't think -- I don't know if she shaved herself for me.

14   I don't know if she shaved.  I just remember there being no

15   hair there.

16   Q.   In the dark you remember this.

17   A.   Yes.  I was 2 feet away.

18   Q.   And this whole exchange you said, I think, was seconds,

19   right?

20   A.   The whole exchange from when to when?

21   Q.   From the blow-job to the time you were on top of her with

22   her hands beside her head.

23   A.   I don't know the exact amount of time.

24   Q.   I don't think I asked you the exact amount.  I just asked

25   if it was seconds.

Nikos Hecht - Cross

1  *A.*  I think I have been referring to seconds as between each --

2  each event that you've been trying to not pick apart in any bad

3  way, just describe.  So that entire interlude, 30 seconds to a

4  minute.  But again, it's not crystal clear as to how long.

5  *Q.*  So it could have been longer.

6  *A.*  Of course, it could have been longer, not materially, but

7  it could have been longer.

8  *Q.*  But no matter what, according to you, it could not have

9  been more than a minute; is that right?

10  *A.*  No.  I just said it could have been longer.

11  *Q.*  So it could have been longer than a minute, but not

12  materially longer, right?

13  *A.*  Yes, that's --

14  *Q.*  So tell the jury what materially longer would be because

15  they just need to understand what the possible duration of this

16  exchange was.

17  *A.*  It wasn't four or five minutes.  It felt something like

18  more of a minute.  If it was two or three minutes, I wouldn't

19  be surprised.

20  *Q.*  Okay.  Now, Mr. Hecht, you testified that Ms. Dailey was

21  the aggressor and she was using a lot of dirty talk.  And then

22  as soon as you fell down sort of upon her with your hands

23  beside, all of the sudden she went quiet, right, radio silence.

24  You just told the jury that, not another word, correct?

25  *A.*  She didn't say anything else.

Nikos Hecht - Cross

 1   *Q.* Not one more word.  So at the moment that Ms. Dailey, who

 2   apparently must have been greatly anticipating this exchange so

 3   much so that she walked up to you, a stranger on a path, and

 4   started talking about her tight pussy and how great it was

 5   going to be, and she proceeded to take your pants off and give

 6   you a 10-second blow-job and pull you on top of her, this

 7   65-year-old woman, all of the sudden it was radio silence,

 8   right?

 9   *A.* I didn't hear her say anything.

10   *Q.* Right.  Didn't that strike you as odd, this woman who was

11   so interested in having this sexual encounter with you, she was

12   talking dirty to you and she was the aggressor, all of the

13   sudden at really the pinnacle of what's going to happen, she

14   said nothing?

15   *A.* It doesn't seem odd to me.

16   *Q.* It doesn't.

17   *A.* You know, I can't account for when -- when dirty talk

18   happens.  There was no intercourse, so it was again a brief

19   attempt, so I -- I can't account for it, but there was nothing

20   said.

21   *Q.* Right.  And isn't the reason, sir, that you're telling this

22   jury that nothing was said is because both Tristan Andlinger

23   and George Cathers testified they never heard a word from Suzy

24   Dailey, but they heard you grunting; isn't that right?

25   *A.* My deposition was, first of all, before theirs.  And that's

Nikos Hecht - Cross

 1   not correct, my testimony had nothing to do with theirs.

 2   Q.  Right.  But that question wasn't asked to you in your

 3   deposition, so that's why I am asking you here today.  Isn't

 4   that correct?

 5   A.  No.  I haven't manufactured testimony based on their

 6   testimony.  It's what happened.

 7   Q.  Okay.  And this wasn't surprising to you at all in the

 8   moment that all of the sudden Ms. Dailey went quiet, said not a

 9   word, not like, Oh, my god, this is going to be incredible.

10   Oh, please, Mr. Hecht, enter me.  I want you.

11          Nothing?

12   A.  It does not seem odd to me as I am sitting here.  I didn't

13   remark on it and it's not -- it doesn't stand out.

14   Q.  Okay.  So you just mentioned to the jury again that there

15   was no intercourse, correct?

16   A.  Correct.

17   Q.  And you testified there was, in fact, no penetration,

18   correct?

19   A.  That's correct.

20   Q.  And I think you testified yesterday, and I don't want to go

21   back over it, but that you were so concerned about your wife

22   or, I guess, anyone finding out, that you walked down the path

23   before Ms. Dailey, correct?

24   A.  While this incident was going on, I said I didn't have my

25   kids in mind, family in mind.  I am not proud of that, but I

1    wasn't thinking about them.

2    *Q.*  No, I understand.  And again, I am not asking whether you

3    are proud about it or not.  I am just asking just to refresh

4    your recollection.

5            Yesterday you testified that you were very concerned

6    about your wife or anyone finding out, so you went down the

7    path ahead of Ms. Dailey, correct?

8    *A.*  Right.  As I was walking down the path, that was a concern

9    of mine.

10   *Q.*  And you also testified you were very concerned when you sat

11   down at the picnic table.  You were nervous.  You wanted to

12   quick engage in a conversation so nobody could detect what had

13   happened, right?

14   *A.*  Yes.  I was -- I was trying to act normal, and which was

15   deceitful, but I was just trying to engage in what everyone

16   else was doing.

17   *Q.*  Okay.  Well, I will get back to that, but you testified

18   Ms. Dailey came and sat next to you.  And you were very

19   concerned about somebody picking up either on your body

20   language or through discussion that there had been some

21   exchange between you and Ms. Dailey, correct?

22   *A.*  I was concerned if we walked back together.  And I didn't

23   want to have direct personal one-on-one conversation with her

24   there because it would have seemed nuts, so those things

25   concerned me.

Nikos Hecht - Cross

1  *Q.* It would have seemed nuts for you to speak to another guest

2  at a dinner party who was an invited guest?  That would have

3  seemed nuts to you?

4  *A.* I guess if there was nothing I was guilty about, maybe not;

5  but in addition, in general if there is table conversation, you

6  are usually engaged in it.  But I guess that's true, sometimes

7  you might be talking to one person.

8  *Q.* So I am just trying to understand your testimony, sir,

9  because again, I wasn't there and neither was the jury.

10        You testified yesterday that Ms. Dailey came and sat

11  next to you.  You didn't want to look her in the eyes because

12  you were concerned that somebody might pick up on something,

13  whether it was something she might say to you, something you

14  might say to her, a sideways glance, something.  That's what

15  you testified, right?

16  *A.* That's correct.

17  *Q.* All right.  And you were very concerned about anyone

18  finding out, so you really wanted to limit any contact, direct

19  contact with Ms. Dailey, right?

20  *A.* I wanted to talk to everyone, including Ms. Dailey, to make

21  a group conversation.

22  *Q.* Right.  And you didn't want to be seen alone with

23  Ms. Dailey after this point because somebody might see

24  something or feel something, right?

25        *THE COURT:*  You are getting a little repetitive.

Nikos Hecht - Cross

1  *BY MS. ALTMAN:*

2  *Q.* Okay.  Let me just ask the question, then.  I apologize.  I

3  am not trying to be repetitive.

4          Mr. Hecht, can you explain to the jury how it is that

5  you were so concerned that somebody might see you with

6  Ms. Dailey or might pick up on the fact that you guys had an

7  exchange, that according to your own testimony yesterday, you

8  stood alone with Ms. Dailey at the gate and exchanged phone

9  numbers and, in fact, took out your phone and pretended to put

10  her phone number in it.  Can you explain that to the jury?

11  *A.* It wasn't alone.  There were pretty much all 20 people were

12  moving together out of the gate, and so there were a few people

13  around.

14  *Q.* Right. So there were people around, according to you,

15  watching you exchange phone numbers with Ms. Dailey, correct?

16  *A.* That's correct.

17  *Q.* Okay.  I just wanted to make sure the jury understood.

18  Now, you testified yesterday that you were shocked by what

19  Ms. Dailey said to you, right?

20  *A.* Can I ask, just to clarify, what you are referring to when

21  you are referring?

22  *Q.* While you were here yesterday with us.

23  *A.* I was shocked at -- I met her twice.

24  *Q.* At the dirty talk.

25  *A.* At Flora Farms you are talking about.

Nikos Hecht - Cross

1 *Q.* Yes, I am sorry.

2 *A.* Definitely, I was shocked.

3 *Q.* Shocked.  And you said it was inappropriate, right,

4 inappropriate talk?

5 *A.* I thought it was again flirtatious, but overly personal and

6 shocked.  It's raunchy.  It's not -- it was well beyond where

7 the relationship or lack thereof was.

8 *Q.* Right.  So you testified to the jury yesterday you are not

9 a choir boy, right?

10 *A.* Yes.  I am not.  I said that, right.

11 *Q.* And that you are not innocent, correct?

12 *A.* I am innocent of rape or sexual assault.  I am not innocent

13 when it comes to the things I was referring to, nothing

14 specific, but the choir-boy-type reference.

15 *Q.* I was just trying to acknowledge that's what you said

16 yesterday.

17    You are not innocent, right?

18 *A.* That's a general question that -- not innocent of what?

19 *Q.* Sir, you said it.  They were your words, correct?

20 *A.* They are my words.  I said that, but I was referring to a

21 concept.

22 *Q.* I understand.  But my only question was you said that,

23 right?

24 *A.* I said that, but I am just trying to clarify that it was

25 not in relation to anything, but I haven't been -- I haven't

1    been without sin.  I am trying to use a -- it's not a literal

2    term.  It's a term of art, you know.

3    Q.  Okay.  So you hadn't been without sin.  You are not

4    innocent.  You are not a choir boy.  It's a term of art.

5            Why don't you explain to this jury, why don't you

6    explain to this jury what you are trying to tell them about

7    yourself.

8            MR. PLACHY:  Objection, Your Honor.  It's

9    argumentative and it's redundant.

10           THE COURT:  Sustained.

11   BY MS. ALTMAN:

12   Q.  Sir, have you ever used vulgar, inappropriate language?

13           MR. PLACHY:  Objection, Your Honor.  Relevance, 403.

14           THE COURT:  Sustained.

15   BY MS. ALTMAN:

16   Q.  Sir, do you think it's okay to lie or be deceptive when it

17   suits you?

18           MR. PLACHY:  Objection.  It's argumentative.

19           THE COURT:  Overruled.

20   A.  I don't think it's the right thing to do, but I have lied

21   in my life.

22   BY MS. ALTMAN:

23   Q.  And you lied to your wife that day, correct?

24   A.  I did.

25   Q.  And you lied to your father?

Nikos Hecht - Cross

1    *A.*  I did.

2    *Q.*  And your children?

3    *A.*  I did.

4    *Q.*  And so would you agree with me, sir, that you think it's

5    okay to be deceptive when it suits you.

6           *MR. PLACHY:*  Objection, redundant and argumentative.

7           *THE COURT:*  It's been asked.  Let's move on.

8    *BY MS. ALTMAN:*

9    *Q.*  Sir, you testified yesterday, and I just want to make sure

10   I understood, that the reason you knew, you know, you sort of

11   needed to get out of the restaurant fairly quickly in terms of

12   the duration you were there, because it gets really cold in

13   Cabo at night -- or not really cold.  I think you said it can

14   drop 20 degrees, right?

15   *A.*  I think that's my guess.

16   *Q.*  Did it drop 20 degrees that night?

17   *A.*  I don't know exactly the temperature range.

18   *Q.*  Well, if I represented to you, sir, that the high in Cabo

19   San Lucas that day was 86 and the mean was 75 degrees

20   Fahrenheit, do you have any reason to dispute that?

21   *A.*  No, but the mean isn't the low.

22   *Q.*  Do you know what the low was?

23   *A.*  No.

24   *Q.*  And so as you sit here today, when you made the statement

25   to the jury trying to imply that it was getting very cold, I am

1    just trying to understand, did it get cold that night, sir?

2    A.   I am from Colorado and I am used to that temperature

3    differential.  And I have been to Cabo and so I wasn't trying

4    to make it an accurate amount of degrees.  I was trying to

5    suggest that it got a lot colder.

6    Q.   It got a lot colder?

7    A.   So you'd need a sweater or jacket.  It was less comfortable

8    outside.

9    Q.   Was there any point that night that you were uncomfortable

10   with the temperature?

11   A.   I don't remember specifically, but I remember people being

12   cold.  And I know that's -- that's why even under that gazebo,

13   as I recall, they have heat lamps at the restaurant.

14   Q.   Mr. Hecht, so you testified yesterday that you never

15   touched -- and today as well, you never touched Ms. Dailey's

16   vagina, correct?

17   A.   That's correct.

18   Q.   And you didn't put your penis inside of it, correct?

19   A.   That's correct.

20   Q.   Can you tell the jury how it is you know she wasn't, as you

21   testified yesterday?

22   A.   Whatever -- I don't know exactly what the mishap was, as I

23   say, the alignment.  Wherever I was touching -- whatever part

24   of her body I was touching wasn't lubricated.  So I guess

25   that's not a totally accurate statement if I wasn't in the

Nikos Hecht - Cross

1   right place, but it didn't -- it wasn't wet.

2   Q.  Well, sir, if you didn't touch her vagina with your hand,

3   right?

4   A.  Correct.

5   Q.  And you didn't touch it with your penis, right?

6   A.  I touched --

7   Q.  That's what you testified, you didn't touch her vagina with

8   your penis, correct?

9   A.  I said I don't think I touched it.

10  Q.  Did you touch it with your mouth?

11  A.  No.

12  Q.  How did you know Ms. Dailey's vagina was allegedly not

13  lubricated?

14         MR. PLACHY:  Asked and answered, Your Honor.

15         THE COURT:  Overruled.

16  A.  Whatever area I did touch, and it might not have been -- I

17  don't think it was the right place, that was not a lubricated

18  area.  So I made that leap.  That's maybe not precise.

19  BY MS. ALTMAN:

20  Q.  So you made the leap that maybe her leg wasn't lubricated.

21  Is that the leap you made?

22  A.  I don't know where I was on her body.

23  Q.  Okay.  But you did testify under oath to this jury, sir, to

24  suggest that her vagina was not lubricated, correct?  That's

25  what you said under oath, right?

Nikos Hecht - Cross

1   *A.*   Yes.

2   *Q.*   And you wanted this jury to believe that Ms. Dailey, her

3   vagina was not lubricated, even though according to your own

4   testimony, you have no independent recollection of putting your

5   mouth on her vagina, putting your hand on her vagina or putting

6   your penis anywhere near her vagina, correct?

7   *A.*   No.   It was near her vagina.

8   *Q.*   Okay.   Let me ask you this.

9        Have you ever had the occasion where you had your

10   penis somewhere other than around -- other than in someone's

11   vagina where you are able to somehow discern whether or not

12   they were lubricated?

13        *MR. PLACHY:*   Objection, relevance and argumentative.

14        *THE COURT:*   Overruled.

15   *A.*   Can you ask me again?

16   *BY MS. ALTMAN:*

17   *Q.*   Yeah, I can.   So I am just trying to understand your

18   testimony because yesterday I think you wanted this jury to

19   believe that Ms. Dailey was not lubricated, right?   That's what

20   you said, right?

21   *A.*   Yes.

22   *Q.*   Just yes or no.

23   *A.*   Yes, yes.

24   *Q.*   And you also said you didn't have intercourse with

25   Ms. Dailey, correct?

 1   A.  That's correct.

 2          THE COURT:  That's been asked and answered how many

 3   times now, a dozen?  Come on.  You are wasting the jury's time.

 4          MS. ALTMAN:  I apologize, Your Honor.

 5   BY MS. ALTMAN:

 6   Q.  How is it, Mr. Hecht, having not touched Ms. Dailey's

 7   vagina you knew that she was lubricated such that you would

 8   want this jury to believe that statement you made under oath

 9   yesterday?

10          MR. PLACHY:  Asked and answered, Your Honor.

11          THE COURT:  Overruled.  Last time.

12   A.  The place that I attempted to penetrate Ms. Dailey was not

13   lubricated.  It was either the right place or nearby in the

14   wrong place, but that place wasn't lubricated.

15   BY MS. ALTMAN:

16   Q.  Okay.  So, sir, you testified yesterday that Ms. Dailey

17   wasn't wearing underwear, right?

18   A.  She was not.

19   Q.  And you also testified that Ms. Dailey pulled down her own

20   pants, right?

21   A.  That's right.

22   Q.  How do you know she wasn't wearing underwear?  If she

23   pulled down her own pants, she could have pulled her underwear

24   down at the same time, right?

25   A.  I saw just the pants.

Nikos Hecht - Cross

1  *Q.*  So in the dark when Ms. Dailey is on her knees and she

2  pulled down her pants and you are standing up, you inspected

3  her shorts to see if there were underwear in them?

4  *A.*  I saw only one piece of clothing and it was maybe 2 feet

5  away and I just saw her shorts.  I didn't see any underwear.

6  *Q.*  Now, at this time when you are leaning over Ms. Dailey and

7  you are on your knees, I just want to make sure I understand,

8  were you erect or were you not erect?

9        *THE COURT:*  We have gone over that.  On to the next

10  question.

11  *BY MS. ALTMAN:*

12  *Q.*  Sir, you were not suggesting to the jury yesterday -- you

13  had some testimony, I believe it was with Mr. Plachy, about how

14  you and your wife divorced, correct?

15  *A.*  We are divorced.

16  *Q.*  Right.  And you were not suggesting to this jury that the

17  alleged incident as you described it with Ms. Dailey had

18  anything to do with your divorce, were you?

19        *MR. PLACHY:*  Objection, 402, 403 and the *in limine*

20  order.

21        *THE COURT:*  Overruled.

22  *A.*  There was trouble at that time and before that time in my

23  marriage.  My wife -- we were having a difficult time and there

24  were a number of causes.  That didn't help.

25  *BY MS. ALTMAN:*

Nikos Hecht - Cross

1  *Q.* Well, you didn't tell her about the incident with

2  Ms. Dailey, correct?

3  *A.* I did not.

4  *Q.* But the incident with Ms. Dailey somehow didn't help in

5  your marriage, the incident that you never told your wife

6  about?

7  *A.* Laura Kaplan told her.

8  *Q.* Okay.  So you mentioned that there were other things going

9  on?

10  *A.* There were a lot of -- a lot of -- some personal things,

11  yes.

12  *Q.* Okay.  And you mentioned that to the jury, correct?

13  *A.* Just did, yes.

14  *Q.* And did any of it have to do with Ms. Dailey?  That's my

15  question.

16      *MR. PLACHY:* Objection, asked and answered, 402, 403,

17  the *in limine* order.

18      *THE COURT:* Sustained.

19  *BY MS. ALTMAN:*

20  *Q.* Now, I just have a couple more questions, and one of them

21  was about the dinner itself.  And I just want to make sure I

22  understood your testimony.

23      You said the incident with Ms. Dailey happened before

24  dinner, correct?

25  *A.* Correct.

Nikos Hecht - Cross

1   *Q.* And then you had dinner, right?

2   *A.* That's right.

3   *Q.* And I think the sequence of events was some kind of bean

4   salad, fried chicken and then dessert, right?

5   *A.* That's right.  There was some pizza that the kids had

6   earlier and some of the adults had, were taking some.

7   *Q.* Did all of the food, meaning for the adults and for the

8   kids, come out at the same time?

9   *A.* No, not at the same time, but it was in rapid sequence.

10  *Q.* And I am just trying to understand.  When you say by the

11  same -- at the same time, I am saying did all of the -- let's

12  call it the first course come out together?  You know, they

13  came out, they served everybody the first course, which I guess

14  was the bean salad.  And then they came out and put all of the

15  food for the adults and the kids, understanding that there may

16  be multiple people having to carry it, but at the same time the

17  adults were served and the kids were served the first course,

18  the second course and then dessert, right?

19       *MR. PLACHY:*  I am sorry, Your Honor.  That's a

20  compound question.

21       *THE COURT:*  I don't think it's probably something he

22  doesn't understand.  Overruled.

23  *A.* The kids, I recall the kids having some pizza before the

24  adults had the bean salad, as you are saying, the chicken and

25  the dessert, and the adults grabbed some pizza as well off the

Nikos Hecht - Cross

1    kids' side.

2    *BY MS. ALTMAN:*

3    *Q.* Again, I just want to understand the timing.

4         You think the kids -- there may have been some pizza

5    on the table that adults had and kids had?

6    *A.* That's right.  I think there was.

7    *Q.* And then after that was the progression of the bean salad,

8    then the fried chicken, then the dessert, correct?

9    *A.* Yes.

10   *Q.* I wanted to orient you because I wanted to understand from

11   the time which you sat back down at the table after the

12   exchange with Ms. Dailey to the time that you left, what was

13   that period of time?

14   *A.* It was reasonably short.  It was a eat-and-go and I would

15   say about 30 minutes.

16   *Q.* 30 minutes.  And, sir, I just have just one or two more

17   questions.

18        You testified yesterday in a way as to suggest to this

19   jury that the day after this exchange with Ms. Dailey you

20   received a call on your cellphone from Las Ventanas, correct?

21   *A.* I did.

22   *Q.* And you said it in a way as to suggest to this jury that

23   Ms. Dailey called you, didn't you?

24   *A.* I believe it was, but I -- of course, Las Ventanas has a

25   lot of people and it could have been somebody else, but I don't

 1  have interaction, didn't have anything going on with them at

 2  the time.

 3  Q.  Well, you didn't have anything going on with Ms. Dailey

 4  either, right?

 5  A.  I think, unfortunately, we did have that -- that incident.

 6  Q.  Well, you stopped it, though, right?  And according to you,

 7  you didn't want to be found out.  You didn't want to be caught.

 8  You didn't want to have anything to do with Ms. Dailey after

 9  that point, correct?

10  A.  Correct.  That's why I didn't answer the phone.

11  Q.  Right.  And I get that.  I am just trying to understand how

12  you can sit in front of this jury under oath and suggest to

13  this jury that that call that doesn't say Ms. Dailey's name,

14  when the Kaplans were staying at Las Ventanas, correct?

15  A.  Correct.

16  Q.  And Jeanne Andlinger and Gery Andlinger were staying at Las

17  Ventanas?

18  A.  Correct.

19  Q.  Did you have other friends that were in town?

20  A.  No.

21  Q.  As you sit here today under oath, can you look the jury in

22  the eye and tell them that you know it was Ms. Dailey that

23  allegedly called you?

24  A.  I am highly confident.  None of those other people even

25  have my number or would have reason to call, but I can't say

Nikos Hecht - Redirect

1   for sure.  You know, I don't know who at Las Ventanas.  I just

2   know that the -- the hotel number.

3   Q.  And if you only know the hotel number and it only said Las

4   Ventanas, how can you tell this jury that you're highly

5   confident it was Ms. Dailey?

6   A.  I have no other business, no other reason for anyone to

7   call me from there, so it seemed likely and logical.  She had

8   my number and was staying there, so however confident that is;

9   but I agree, it's not a hundred percent dispositive that it was

10  her.

11          MS. ALTMAN:  I have no further questions, Your Honor.

12          THE COURT:  Thank you.

13          Redirect?

14          MR. PLACHY:  Very briefly, Your Honor.

15                    **REDIRECT EXAMINATION**

16  BY MR. PLACHY:

17  Q.  Mr. Hecht, I would like to redirect your attention to

18  Page 276 of your deposition.

19  A.  I am there.

20  Q.  Do you recall Ms. Altman asking you some questions about

21  your deposition testimony on that page?

22  A.  I do.

23  Q.  She asked you questions about whether or not your

24  deposition testimony was consistent with your testimony

25  yesterday.  Do you recall that?

1   *A.*  I do.

2   *Q.*  Specifically she asked you about whether or not the kiss

3   came before the dirty talk.  Do you remember that?

4   *A.*  Right.  We were discussing that.

5   *Q.*  And she also asked you some questions about whether you

6   ever disclosed in your deposition that Ms. Dailey had told you

7   that she never had kids.  Do you remember that question?

8   *A.*  I do.

9   *Q.*  We can do this just with one little segment.  If you would

10  look at Line 20 on that page.  Do you have that?

11  *A.*  I do.

12  *Q.*  And the question there was:  Tell us about that.  What did

13  she say?

14         Do you see that?

15  *A.*  I do.

16  *Q.*  So they are asking what Ms. Dailey said to you?

17  *A.*  That's right.

18  *Q.*  And your answer, just to make sure I read this correctly,

19  was:  She started talking about how tight her pussy was, how

20  good it was, how I would love it, and started kissing me before

21  that, and -- and then there is hyphen, correct?

22  *A.*  Correct.

23  *Q.*  Then another question got asked?

24  *A.*  That's right.

25  *Q.*  And the question was:  She kissed you, correct?

 1   *A.*  Yes.

 2   *Q.*  And you said she did.

 3   *A.*  Yes.

 4   *Q.*  So my question is when you were describing what Ms. Dailey

 5   said to you, was your answer interrupted by another question?

 6   *A.*  Clearly.

 7   *Q.*  Okay.  And when they -- when you were describing this

 8   event, did you say in your deposition, she started kissing me

 9   before the dirty talk?

10   *A.*  That's what I said.  That's what I was referring to.

11          *MR. PLACHY:*  Thank you, Mr. Hecht.

12          Nothing further, Your Honor.

13          *THE COURT:*  Questions from the jury?

14      (At the bench:)

15          *THE COURT:*  14.

16          *MS. ALTMAN:*  We don't object.

17          *MR. PLACHY:*  I think the last question we can ask him.

18   There was no discovery on that point, so --

19          *THE COURT:*  Object or don't object?

20          *MR. PLACHY:*  Don't object.

21          *THE COURT:*  15.

22          *MR. PLACHY:*  Object to No. 1, Your Honor.

23          *MS. ALTMAN:*  We don't object, Your Honor.  We don't

24   object to any of them.

25          *MR. PLACHY:*  We object to the first question, 402, 403

1    and the *in limine* orders.

2         MS. ALTMAN:  We believe he opened the door, Your

3    Honor.

4         MR. PLACHY:  Only because you asked him.

5         MS. ALTMAN:  No.  When I asked him if he intended to

6    suggest to the jury --

7         THE COURT:  The objection is overruled.  I think that

8    door was opened.  I wish it hadn't been.

9         No. 16.

10        MR. PLACHY:  I don't think we have any objection, Your

11   Honor.

12        MS. ALTMAN:  We have neither, Your Honor.

13        THE COURT:  No. 17.

14        MR. PLACHY:  Object to the first one.

15        MS. ALTMAN:  We don't object to either, Your Honor.

16        MR. PLACHY:  I object to the language sexual assault.

17   I don't want to get into Warfel here, but they are asking has

18   he ever been accused of raping anyone before.  The answer to

19   that is no.

20        THE COURT:  Right.  If the Warfel involved a sexual

21   assault, then I probably would have let it in, but it does not.

22        MR. PLACHY:  It does not.  I just worry that question

23   is vague enough that he is not going to know how to answer it.

24        THE COURT:  Are you afraid that the answer is yes?

25        MR. PLACHY:  No, I am not at all, but he is in a

1  difficult spot.  And the second one is redundant of the first

2  one.

3          THE COURT:  Same question.  Okay.

4          MS. ALTMAN:  We don't have any objection, Your Honor.

5          THE COURT:  Yes.  I heard you.  All right.  It will be

6  permitted.

7          MR. PLACHY:  Inquiry as to that question?

8          THE COURT:  That's right.

9      (In open court:)

10  BY THE COURT:

11  Q.  Mr. Hecht, several questions from the jurors.

12          Question:  When did your deposition take place?

13          You can probably look at the deposition.

14  A.  Yeah, I will have to.  September 29th, 2016.

15  Q.  Next question:  When did you first learn about Ms. Dailey's

16  lawsuit?

17  A.  Days before the newspaper had had it.  You know, maybe like

18  a week or two before.

19  Q.  Well, I don't know that they know when the newspaper had it

20  because I have told them not to read about it in the newspaper.

21  A.  I am sorry.  Let's see.  Actually, I can tell you.  March

22  of 2016.

23  Q.  Question:  Did you pursue the phone record of the call the

24  next day?

25  A.  I did not, except I think we looked at phone records at

1   some point.  And the Cabo phone records -- when my phone is

2   down in Cabo, I think there is some trouble seeing where it

3   comes from.  I think that was the difficulty, but I saw Las

4   Ventanas come up on the phone, but I don't have the record.

5   *Q.*  Question:  Do you frequently cheat on your wife?

6   *A.*  I didn't -- I didn't frequently.  I have cheated beyond

7   that time, but frequent, no.

8   *Q.*  Question:  The boys heard grunting.  If you didn't

9   penetrate, why were you grunting?

10  *A.*  I could speculate and give a couple reasons, but it could

11  be the attempt to go in.  It could be the going down on the

12  ground.  I don't know what -- what the grunting sounded like.

13  It wasn't inside Ms. Dailey.

14  *Q.*  Question:  If you were looking for the kids, why would you

15  link arms?

16  *A.*  I don't remember linking arms.  As I said, everyone has

17  recalled that.  I don't.  It's not -- it's sort of an

18  old-fashioned way to walk, but I can't say that it didn't

19  happen.  And I am sort of persuaded by all the people saying

20  that's what they saw.

21  *Q.*  Question:  If your wife and Sarah were joking with you

22  about Ms. Dailey's flirting, why would you walk down the path

23  with her?  What were your thoughts at that point?

24  *A.*  I didn't link the two episodes.  One was teasing.  And, I

25  mean, depending on how you are with your friends or spouse, it

Sara Willis - Direct

1   wasn't a -- an accusation.  It was just, you know, hey, that

2   girl seems interested.  That woman seems interested in you and

3   just to laugh it off.  I didn't feel there was any suspicion by

4   my wife or Sarah; but nevertheless, standing alone walking down

5   the path was stupid enough.  And I hadn't thought of it the way

6   that question was, but combining the two definitely was

7   stupider.

8   Q.  Next question:  If your penis was erect during oral sex,

9   why couldn't sex with penetration happen?

10  A.  I lost some of that erection by the time I was down on the

11  grass.

12  Q.  Question:  Have you ever been accused of sexual assault

13  prior to this case?

14  A.  No.

15          THE COURT:  Those are the questions.

16          Follow-up?

17          MS. ALTMAN:  No, Your Honor.

18          MR. PLACHY:  No, Your Honor.

19          THE COURT:  Okay.  Thank you, Mr. Hecht.

20          Does anybody need a break before we take the next

21  witness?  Keep going?

22          Okay.  Next witness.

23      (**Sara Willis** was sworn.)

24          THE WITNESS:  I do.

25                        **DIRECT EXAMINATION**

Sara Willis - Direct

1    *BY MR. PLACHY:*

2    *Q.*   Good morning.

3    *A.*   Good morning.

4    *Q.*   Can you please tell the jury your name.

5    *A.*   Sara Willis.

6    *Q.*   Ms. Willis, where do you live?

7    *A.*   In Eugene, Oregon.

8    *Q.*   Do you have kids?

9    *A.*   I have three kids -- four kids.

10   *Q.*   Forgot about one?

11   *A.*   She is out of the house.

12   *Q.*   How old are your kids?

13   *A.*   25, 16, 13 and 10.

14   *Q.*   I understand from some testimony yesterday you are an

15   entrepreneur of sorts.

16          When did you start your first business?

17   *A.*   When I was 16.

18   *Q.*   Tell us about that.

19   *A.*   It was a board short company in --

20          *THE COURT:*  Can you put the microphone up a little

21   closer so you project a little better?

22          *THE WITNESS:*  Sorry.

23   *BY MR. PLACHY:*

24   *Q.*   Go ahead.

25   *A.*   I started a shorts company when I was 16.  My grandmother

1    bought me a serger, and I sold those in local stores in my home

2    town of Eugene.

3    *Q.*  Was that a successful business at age 16?

4    *A.*  It was until I had too many orders and I had to -- I just

5    quit because I couldn't deal with whatever the next step would

6    be.

7    *Q.*  Have you owned other businesses over the years?

8    *A.*  I have.

9    *Q.*  Tell us, have you ever owned a business in Mexico?

10   *A.*  I have.

11   *Q.*  How about Cabo San Lucas, Mexico, to narrow it down?

12   *A.*  I had a restaurant there and a bar.

13   *Q.*  When was that?

14   *A.*  It would have opened in 1995.

15   *Q.*  How did you come to go down to Cabo in '95?

16   *A.*  I was a single mother living in Santa Cruz with my oldest

17   daughter, Ellen.  And I had a friend who lived down there and

18   met someone through her preschool that she became friends with

19   that was also living down there, Gloria Patrick.

20   *Q.*  What were you doing for a living in Cabo in the mid

21   nineties?

22   *A.*  I was doing -- when I first moved down, I arrived to the

23   home of a mutual friend, who I also met through the same

24   family, and she worked at a resort called the Palmia.  And she

25   got me a catering job the next couple of days working as a

Sara Willis - Direct

 1  private chef.

 2  Q.  Did you ultimately open a restaurant down there?

 3  A.  I did.

 4  Q.  What was it called?

 5  A.  Fandango.

 6  Q.  How did you finance that business?

 7  A.  Through a couple of clients that I had met through my

 8  private chef.

 9  Q.  How did that restaurant do?

10  A.  Very well.

11  Q.  You mentioned you owned a bar as well?

12  A.  I did open a bar when my 13-year-old son was born.  And it

13  was too much for a mother with a new baby being up until

14  3:00 in the morning, so that was short-lived.  It was only open

15  for about nine months.

16  Q.  Did you ever own a restaurant in the United States?

17  A.  I have owned a few in the United States.

18  Q.  One called Red Agave?

19  A.  Red Agave.

20  Q.  Tell us about that.

21  A.  I opened Red Agave -- I was in Mexico and an old high

22  school friend of mine said there was a turnkey opportunity for

23  me to open this new place and would I be interested in

24  partnering up with her.  She had been in the service portion of

25  restaurants working as the front of the house and she asked if

1    I wanted to go up and look at this place.

2    Q.   How did that restaurant do?

3    A.   Very well.

4    Q.   Were you operating restaurants in 2008 when the economy

5    turned down?

6    A.   I did.  At that point I owned Red Agave's, El Vaquero and

7    Two Asados in Eugene.

8    Q.   What happened to those businesses when the economy got

9    tough?

10   A.   Actually, my business partner and I, before things -- the

11   downturn, we decided to go into a different business, which was

12   a cocktail mixer company with hydro-pressure pasteurization.

13   It was kind of a new -- what they call cold pressed now, but we

14   were trying to go into that.

15        So we put Red Agave on the market and we actually sold

16   that for quite a bit of money, but then we, being immature

17   business people, I guess, we didn't understand what was

18   happening with the economy.  And the bank called the loans that

19   we had for El Vaquero and the Two Asados, so we eventually had

20   to file bankruptcy.

21   Q.   So what did you do after those businesses?

22   A.   I went back to Mexico to regroup.

23   Q.   Where in Mexico?

24   A.   I was married still at the time and I had a home in Mexico

25   in Cabo San Lucas.

Sara Willis - Direct

1   Q.  So what were you doing for a living when you went back to

2   Mexico?

3   A.  The same thing that I was doing before I opened any of the

4   businesses, which was catering for clients.

5   Q.  Any clients whose names we might recognize?

6          MR. KAPLAN:  Objection, relevance.

7          THE COURT:  Is it something to do with the people

8   involved here?

9          MR. PLACHY:  It's leading up to that, Your Honor.

10  It's very brief.

11         THE COURT:  Overruled.

12  A.  I worked for various football and movie stars, Barbara

13  Streisand, big names like that.  But in addition, I also worked

14  again for people that had initially invested in Fandango, so

15  Mr. Baughman and Ballard Smith, who were kind of long-term

16  clients of mine.

17  BY MR. PLACHY:

18  Q.  Did that ultimately lead to you meeting the Hecht family?

19  A.  It did.

20  Q.  When did you first meet Nikos Hecht?

21  A.  2010, October, I believe.

22  Q.  How did you meet Nikos and I assume his wife, Allison?

23  A.  Yeah.  Actually, when we lived -- when I first moved to

24  Mexico with just my daughter, one of the first friends that we

25  made down there was a family with two young girls who then

 1   became adults.  And Wendy worked for Nikos and Allison and she

 2   couldn't make the job.  You know, she couldn't make this

 3   particular job.  And she said, I have got this great person for

 4   you, Sara.  You should meet them.

 5           So I went in to work for their two-week vacation.  It

 6   was when they were -- I think it was the first time they had

 7   been in their new home.

 8   Q.  And did you interview to become the chef for the Hechts?

 9   A.  I guess if cooking for them for two weeks is interviewing,

10   kind of.

11   Q.  Fair enough.  Fair enough.

12           Did they ultimately decide to hire you on a full-time

13   basis?

14   A.  They didn't at that particular trip.  I hadn't said in any

15   means that I was committed to only working for them, and so I

16   had a couple other jobs, actually, in the same development.

17   One of them was a neighbor, which was another kind of a big

18   name California person.  And I came back to work the next day

19   and Nikos and Allison sat me down and said, We would really

20   love to have you just working full-time for us.

21           And I had never done that type of -- I hadn't done a

22   job that was full-time full-time.  I had worked frequently for

23   the Baughmans and for Ballard, but not like on a salary basis.

24   Q.  So you did agree to start working exclusively for the

25   Hechts at that point?

1    *A.*   I did with the exclusion that if there was something that

2    the bow mans needed, because I had been with them prior, which

3    was they didn't go down very often, that they would be

4    understanding if I took that job.

5    *Q.*   Who is that bowman guy?

6    *A.*   Peter Baughman.  He was part of the Deep Purple rock group.

7    *Q.*   So when you started working for the Hechts, was it just at

8    their home in Cabo?

9    *A.*   It was.

10   *Q.*   Did that change over time?

11   *A.*   Well, I did -- Wendy was their -- Wendy is the girl I

12   mentioned that got me the job in the first place, and she

13   worked and lived in Aspen.  And so she had much less

14   experience, so there was a few times when I would go up and

15   do -- like they didn't have events very often, but like a --

16   maybe a benefit.  I did a benefit for the Aspen Art Museum.  I

17   did a couple of birthday parties.  If it was bigger events, I

18   would go up and do that.

19   *Q.*   Then did you ultimately begin to kind of work on a regular

20   basis at the Hecht home in Aspen, as well as in Cabo?

21          *MR. KAPLAN:*  Objection, leading.

22          *THE COURT:*  Overruled.

23   *A.*   That in 2004 -- I think that you've already said that I am

24   an entrepreneur and trying to operate businesses.  And although

25   I did have a good salary with them, I had gotten divorced in

1    that period of time and always -- I was needing to make a

2    little bit more money.

3           So when I found out they had lost their chef and Wendy

4    had quit in Aspen, they had a different chef in the interim

5    time and then she had quit, I suggested that I -- it would be

6    great for both of us if I could have some more hours.  I share

7    custody with my kids and my husband has them for the same 10

8    days a month that I go to work, so it would work out for me to

9    make my -- expand my job duties to Aspen as well.

10   *BY MR. PLACHY:*

11   *Q.*  Are you still employed by Mr. Hecht?

12   *A.*  Yes.

13   *Q.*  Mr. Hecht testified yesterday, I believe, that you have

14   recently given notice; is that true?

15          *MR. KAPLAN:*  Objection, Your Honor, leading.

16          *THE COURT:*  Yes, it is, but it's not a controversial

17   point.  Wait until we get there and then I will sustain your

18   objection.  Overruled.

19   *A.*  So, yes, I have given notice for the end of the summer.

20   *BY MR. PLACHY:*

21   *Q.*  Why are you leaving employment with Mr. Hecht?

22   *A.*  I have actually -- I have a business now that seems to be

23   going well.  I started another side business.  It's called

24   Saucefly, and it's a food-based business.  And I have been

25   comfortable in this job for a long time and I feel like I need

Sara Willis - Direct

1   to, you know, make the break back to my entrepreneurial stuff

2   that I want to focus on.

3   *Q.*  Are you excited about the change?

4   *A.*  I am.  I am nervous, but I am excited.

5   *Q.*  Let's switch gears.

6          Did you travel with the Hecht family to Cabo San Lucas

7   in March 2014?

8   *A.*  I didn't travel with them, but I worked that week.

9   *Q.*  You were working?

10  *A.*  Yes.

11  *Q.*  What were your job responsibilities that week?

12  *A.*  My normal duties, which would be picking them up from the

13  airport, shopping, food preparation.  I have another girl that

14  works with me, Monte Bell.  So if there was any things that

15  needed to be got ahead of time, she would have helped as well.

16  So just normal stuff.

17  *Q.*  Where did you stay when you were working for the Hechts

18  that week in Cabo?

19  *A.*  I stayed the first few days in the la casita.  That's the

20  guest house, I guess you call it.

21  *Q.*  On the Hecht property?

22  *A.*  Yes.

23  *Q.*  Do you usually stay in that guest house when you work in

24  Cabo?

25  *A.*  Once I moved back to Oregon with my family and did not have

 1   a home there anymore, then I did stay there; but that wasn't

 2   from the beginning, but for a couple years.

 3   Q.  Do you typically stay in the guest house when you are down

 4   there?

 5   A.  Yeah.

 6   Q.  Does the Hecht family ever come into the guest house when

 7   you are staying there?

 8   A.  Sure.

 9   Q.  Tell us about that.

10   A.  The kids to watch TV with me, Nikos to watch a basketball

11   game, I guess to kind of find me if they need something.  It's

12   their house, so...

13   Q.  In March 2014, did the Andlingers and Ms. Dailey come over

14   to the Hecht home for drinks?

15   A.  Yes.

16   Q.  Did you work that gathering?

17   A.  I did.

18   Q.  What were you doing?

19   A.  The same thing, making cocktails, appetizers.

20   Q.  What time of day was that party?

21   A.  Before dinner.

22   Q.  Did Ms. Dailey attend that party?

23   A.  Uh-huh.

24   Q.  Had you ever met her before that evening?

25   A.  I don't recall when I invited -- I went up to the

1   Andlingers' place that they were renting and passed along the

2   information as to what time it would start.  And I can't

3   remember if I met her or her mother with -- I met the dad for

4   the first time that time.

5   Q.  Do you remember meeting Ms. Dailey at the Hecht home that

6   night?

7   A.  I do.

8   Q.  Did you get a chance to observe her that evening?

9   A.  I did.

10  Q.  Do you remember anything about Ms. Dailey's appearance that

11  night?

12  A.  I thought she was very glammed up.

13  Q.  Glammed up, what does that mean?

14  A.  Lots of makeup and hair fixed.

15  Q.  How old did you think she was?

16  A.  Late fifties.

17  Q.  So what are you doing during this drinks party, for lack of

18  a better term?

19  A.  Offering people drinks, welcoming them.  I usually get the

20  door, making sure people have what they need.

21  Q.  Is there a fire pit at the Hecht home in Cabo?

22  A.  There is.

23  Q.  Do the Hechts use that fire pit often?

24  A.  Not all the time.  I think Nikos probably uses it to like

25  make the house look better.  So if there is guests over, they

1   would light the fireplaces and the fire pit.

2   Q.   At any point that evening did you see Ms. Dailey interact

3   with Nikos Hecht?

4   A.   I did.

5   Q.   Can you tell us what you saw?

6   A.   I felt that she was like not chewing his ear, but like

7   wanting to talk to him.

8   Q.   When you say trying to talk to him, what does that mean?

9   A.   Just having conversation, you know, talking to him.

10   Q.   Did you hear any of those conversations?

11   A.   No.

12   Q.   While Ms. Dailey and the Andlingers were in the Hecht home

13   that night, were plans made to have a dinner at Flora Farms?

14   A.   Yes.

15   Q.   How did that come about?

16   A.   Allison and Jeanne were discussing -- I was just checking

17   on people and getting them cocktails or whatever they might

18   need, and they were discussing trying to have a get-together

19   and how great Flora was.  And I think Jeanne said they tried to

20   get in, but they couldn't.  And so Allison was like, oh, this

21   is great.  Sara can really make that happen for us, and then

22   called me over and said, Can you make this happen?

23   Q.   Why would they call you over to make that happen?

24   A.   Well, I mean, I was around and they just wanted to see if I

25   could make the reservation when they were there.

Sara Willis - Direct

1   Q.  When you had this conversation, you mentioned Allison and

2   Jeanne were present.  Was Ms. Dailey present when these plans

3   were being made?

4   A.  I don't remember that, no.

5   Q.  So were you able to make that reservation at Flora Farms?

6   A.  I was -- I feel fairly certain that it was -- I don't know

7   if it was a hundred percent confirmed, but I got Erika, who was

8   the event coordinator, on the phone.  And this is just to give

9   a little bit of information is that this restaurant is actually

10  owned by the woman that first brought me down to Mexico, so she

11  is the mom of the friend of my daughter, Gloria.  So she has

12  always been very kind to me as far as accommodating for the

13  Hechts or for whatever, but it was spring break.  They had

14  300-plus dinners planned on the main dining floor.  So to

15  squeeze it in, they agreed to do what we call a private party.

16  So it costs a little bit more and it was in the potting shed,

17  so it was a little more special.

18  Q.  Is the potting shed a different area of the facility than

19  the restaurant itself?

20  A.  Yeah.  That's why I would speak to Erika instead of a

21  regular reservation person.

22  Q.  We will come back to Flora Farms in a minute.  Let me wrap

23  this up.

24          At the end of the drinks party, did you see the

25  Andlingers and Ms. Dailey leave the Hecht home?

Sara Willis - Direct

 1  A.  I did.

 2  Q.  Through what door of the house did they leave?

 3  A.  The front door.

 4  Q.  Let's go ahead and pull up Exhibit 111, which has already

 5  been admitted.

 6       Ms. Willis, this is Exhibit 111.  Can you tell us what

 7  we are seeing here?

 8  A.  You are saying Ms. Willis, like me?

 9  Q.  I did, yes.  I was asking you.

10  A.  That's the door, the entrance door.

11  Q.  The front door through which Ms. Dailey and the Andlingers

12  left?

13  A.  Uh-huh.

14  Q.  As Ms. Dailey and the Andlingers were leaving that evening,

15  where were you?

16  A.  At the bottom of the stairs.  Do you want me to point?

17  Q.  If you have that little stylus, you can actually draw a

18  mark on there.

19       And where was Mr. Hecht?

20  A.  I am marking on the couch, but it's behind the couch.

21  Q.  You say you are marking on the couch, but he was behind the

22  couch.

23  A.  Yeah, you can't really see it here, but there is a space of

24  maybe 4 feet behind the couch.

25  Q.  So you are saying he was between the couch and the stair

Sara Willis - Direct

1   railing?

2   *A.*   Yes.

3   *Q.*   Got it.  Was anyone else standing there?

4   *A.*   Allison.

5   *Q.*   Where was Allison?

6   *A.*   On the other side right there.

7   *Q.*   Also on the far side of the couch?

8   *A.*   Yes.

9   *Q.*   So as the Andlingers and Ms. Dailey were leaving the home

10  that night, how did they get to the front door?  Show us the

11  path.

12  *A.*   Well, you go around the back of this white couch that you

13  can't see, and then you would go up here and then out the door.

14  And I was -- I am looking at that X and probably I was more

15  like closer to the kitchen.  I would say actually it would

16  be -- can I rewrite on here?

17  *Q.*   You are going to have to do it all over again, but I will

18  do it for you.

19  *A.*   I think I might have more of the technique now.

20          So I would have been more right here.  It was more

21  like Nikos and Allison were in a position that they would be

22  saying bye out the door as they were waving and I was kind of

23  on the edge.

24  *Q.*   Did you see Mr. Hecht follow Ms. Dailey up the stairs as

25  she was leaving?

Sara Willis - Direct

1   A.  No, I did not.

2   Q.  Did he stay on the ground floor the whole time?

3   A.  Uh-huh.

4   Q.  Is that a yes, ma'am?

5   A.  Yes.

6   Q.  As Ms. Dailey was leaving the Andlingers, did Mr. Hecht say

7   anything to Ms. Dailey?

8   A.  No.

9   Q.  Did you hear him saying anything to Ms. Dailey about her

10  physical appearance?

11  A.  I did not.

12  Q.  Did you hear him say anything about men liking women with a

13  little meat on their bones?

14  A.  I did not.

15  Q.  Were you standing with Mr. Hecht the entire time as

16  Ms. Dailey and the Andlingers were leaving?

17  A.  Yes.

18  Q.  After Ms. Dailey and the Andlingers left, did you, Nikos

19  and Allison kind of stay there where you have drawn on the

20  exhibit?

21  A.  For a minute.

22  Q.  Did you make a statement at that time based on what you

23  just observed between Nikos and Ms. Dailey?

24  A.  I did.

25  Q.  Did that statement describe what you just observed between

1    Nikos and Ms. Dailey?

2    *A.*   The what?

3    *Q.*   Did your statement describe what you just observed between

4    Nikos and Ms. Dailey?

5    *A.*   I was teasing him.

6    *Q.*   Tell us what you said.

7    *A.*   I said something like, She was on you like white on rice or

8    she was hot for you or something.

9    *Q.*   How did he react?

10   *A.*   He smiled.

11   *Q.*   Say anything?

12   *A.*   Huh-uh.

13   *Q.*   Let's shift gears and talk about Flora Farms.  You sound

14   like you are familiar with that restaurant.

15   *A.*   I am.

16   *Q.*   Tell us, what is Flora Farms?

17   *A.*   Oh, not this anymore?

18          Okay.  It started out as a farmers market.  And my

19   friend Gloria had been integral in that kind of community

20   activities and things like that.  And it grew into this

21   farm-to-table very popular -- people called it like

22   tuscanesque-type place.  I think it's probably -- it's now

23   turned into a development.  They have culinary cottages and

24   it's just expanding like wild fire and a popular restaurant.

25   There are stores down there.  It's a main destination

1   restaurant.

2   Q.  Did you actually attend the dinner at Flora Farms that

3   night?

4   A.  I did.

5   Q.  Let's take a look at Exhibit 126, which has already been

6   admitted.

7         Ms. Willis, what is this?

8   A.  This is an aerial view of Flora.

9   Q.  If you could grab your stylus again.

10        Where was the dinner itself held that night?

11  A.  Like mark on it?

12  Q.  Yes, please.

13  A.  I was trying to draw the table, but I was off.

14  Q.  Is that the area that you referred to earlier as the

15  potting shed?

16  A.  That's the potting shed.

17  Q.  Where is the restaurant itself?  There has been some

18  testimony about some jewelry shops.  I think people call them

19  pop-up shops or something.  Where are those?  And is there a

20  long grassy path that runs next to the potting shed where the

21  dinner was held?

22  A.  Do you want me to mark on there?  I think something is

23  wrong with my thing.  It's not going anywhere.

24  Q.  Is it off a little bit?

25  A.  Yeah.

Sara Willis - Direct

1  *Q.*  So it's that path along the lines you just drew?

2  *A.*  Uh-huh.

3  *Q.*  Let's look at one other picture, Exhibit 124, which has

4  also been admitted.  Let me take your Xs off there.

5       Is this picture familiar to you, ma'am?

6  *A.*  Yes.

7  *Q.*  Is that the grassy path you were just describing for us?

8  *A.*  Yes.

9  *Q.*  What's the structure on the left?

10  *A.*  That's the potting shed.

11  *Q.*  Now, did all of the guests that night at Flora Farms gather

12  at or near the potting shed before dinner?

13  *A.*  Yes.

14  *Q.*  What were the guests doing as they arrived?

15  *A.*  Just start marking on it again?

16  *Q.*  Or you can describe it or mark it.

17  *A.*  Okay.  To the left it goes back a little bit further right

18  there.  There is a little more grass right there.  And waiters

19  came out and had the welcoming cocktail and the women were

20  standing right there.  And the men kind of congregated over

21  here fairly quickly.  They had like welcome cocktails.

22  *Q.*  So the men and women were in different groups?

23  *A.*  Yeah, maybe not immediately, but they broke off into

24  different groups.

25  *Q.*  So once they broke off into different groups, who was in

Sara Willis - Direct

1    the men's group, if you will?

2    A.   All the men.

3    Q.   Do you recall who that was?

4    A.   Andy Hecht, Mr. Andlinger, the Hechts' friends that

5    attended that night, the husband, which I don't know his name,

6    Nikos.

7    Q.   And you have already told us where the women were, that's

8    great.   What were you doing prior to dinner?

9    A.   Well, first I just made sure it the Flora was very well

10   staffed so I felt like everybody was taken care of with drinks.

11   And I basically spent most of my time at a table like in the

12   back side of the potting shed.

13   Q.   Let's go back to 126 and show us where the table was that

14   you just mentioned.

15   A.   Okay.   So this potting shed has some overhangs on each side

16   that wouldn't have been -- the interior part is more enclosed

17   with bricks, but very open, and then on this -- that's wrong.

18   Q.   Want me to clear that?

19   A.   Yeah.

20   Q.   Clear it again?   It's not working?

21   A.   I am just not figuring it out.

22   Q.   So what kind -- was this the big dining table where the

23   whole group was?

24   A.   No?   There was like an area of high tops, so bar-size

25   tables with stools.

1    Q.   Okay.  And what were you doing as you are sitting at that

2    table?

3    A.   Just making sure -- I was just observing.

4    Q.   From that vantage point could you see the groups of men and

5    women you just testified to?

6    A.   Yeah.  This picture actually shows what I was describing in

7    the other picture that there is a bigger area of grass, you

8    know, that you can't see when you are looking down the row.  So

9    that's kind of where the women were and so I could see them

10   perfectly.  And then there is a little bit of bricks that I

11   would have been able to see the men, but not necessarily every,

12   you know, not all of the men there.

13   Q.   At some point did you make an effort to get people seated

14   for dinner?

15   A.   I did.

16   Q.   Tell us what you did.

17   A.   The whole -- the whole from beginning to end?

18   Q.   Go ahead and get started and --

19   A.   Okay, okay.  Well, I mean, I did other things before I

20   started getting people ready for dinner, I guess.

21   Q.   That's okay.  We are just trying to keep things moving, so

22   unless you think it's important.

23   A.   Okay.  Well, I -- time was going by and I checked in with

24   Allison to see if she was ready to have dinner.  I felt that --

25   I didn't feel that -- one of my kind of agreements with Erika

1    was that she was pretty busy and that I was kind of in charge

2    of this party, so it was my responsibility to make sure that

3    the dinners were coming out when they were supposed to.  So I

4    asked Allison if they were going to be sitting down soon, and

5    she didn't seem interested in sitting down at all and said they

6    were going to be going to the stores in a little bit and not

7    worry about hurrying it.

8    Q.  Did you ever actually see the group of women go to the

9    stores?

10   A.  I did.  Not right that moment.  She just told me that they

11   were going to.

12   Q.  When did you see them walk to the shops?

13   A.  Well, after I talked to her, I think I asked her if I could

14   get pizza for the kids or something because it was getting

15   late.  I wasn't a hundred percent sure on whether I asked her

16   or if I just did that, but I ordered a couple of pizzas and

17   then came back and sat down again just because she had said

18   they weren't interested in having dinner yet.

19          And then they took off, I don't know how much longer.

20   I was still sitting there watching people.

21   Q.  You said they took off?

22   A.  The women left to go to the stores.

23   Q.  You saw them walk to the stores?

24   A.  I saw them leave.  I was assuming since she said they were

25   going to the stores.

1  Q.  Okay.  What happened next?

2  A.  Erika came to check in with me to see what was going on

3  because it was -- time was going by.

4  Q.  And what did Erika have to say?

5  A.  I just said I thought this -- I have asked people to sit

6  already, but I can try to make it happen.  And then she went

7  back do her office.  And I decided I should probably check in

8  with Nikos and see if he could get people to sit down.

9  Q.  So did you then go to find Mr. Hecht?

10  A.  Uh-huh.

11  Q.  Did you find him?

12  A.  Uh-huh, yes.

13  Q.  And tell us what happened next.

14  A.  I walked over to the guys, and he saw me coming over there

15  and kind of stepped off and came to talk to me.  And I said,

16  Can I talk to you?  And he said, Let's talk and walk.  And I

17  said, Okay.

18        So he came out and -- do you want me to draw on there?

19  Q.  Sure.

20  A.  We walked down about, you know, a third of the way or so

21  that little path right there.  And I said, you know, we have

22  got to get this show on the road.  And he said, I can't do

23  anything.  I know, I am sorry, it's so boring.  And I said,

24  It's okay.  I just feel like it's kind of my responsibility to

25  get this thing going.  And then I said, Well, why don't you

Sara Willis - Direct

1   help me get the kids together.  Go find your kids and I will

2   start the kids' meals.

Q.  So you walked down that path.  You have drawn that you went

4   the third of the way down.  Where did you go next?

A.  I came back and then I went to tell Erika that I was going

6   to feed the kids first.

Q.  Did you and Mr. Hecht come back together or did you come

8   back on your own?

A.  Well, we walked back down the path, and then I went to the

10  kitchen -- well, to the office first.

Q.  And you went to the office of the restaurant?

12  A.  Uh-huh.

Q.  What happened there?

14  A.  I just told Erika that I had it under control, that I was

15  going to fire the kids' in a couple minutes, thinking that the

16  adults would soon follow.

Q.  You said fire the kids'.  What does that mean?

18  A.  Tell the kitchen that it's time to start the dinners.

Q.  So after you had that conversation with Erika, what did you

20  do next?

A.  I came back to find Nikos and see if he had found the kids.

Q.  You came back to where?  I am sorry.

A.  Well, the kids were playing on that long, wide, grassy

24  field.

Q.  When was that?

Sara Willis - Direct

 1   *A.*   Earlier in the night.

 2   *Q.*   So did you go back to the table, then?

 3   *A.*   No.  I went back to find Nikos.

 4   *Q.*   So where did you go?

 5   *A.*   I went back down the path, the large path.  I walked down

 6   the path.

 7   *Q.*   Can you put an X on the path you are referring to just so

 8   we are clear.

 9   *A.*   Yeah.

10   *Q.*   So you said you started walking down the path.

11   *A.*   I did.

12   *Q.*   Were you walking away from the table?

13   *A.*   Uh-huh.

14   *Q.*   Is that path lighted?

15   *A.*   About half the whole path.  It actually extends further

16   than in the picture, but about half of what you see, I think.

17   *Q.*   The lights, how far down do the lights go?

18   *A.*   Probably about that far.

19   *Q.*   So you started walking down the path.  What happened next?

20   *A.*   I walked about halfway down the path and noticed that Nikos

21   and Suzanna were standing off to the side.

22   *Q.*   Off to the side of the path?

23   *A.*   Uh-huh.

24   *Q.*   Were they in the area that's lighted?

25   *A.*   Just past the lights.

Sara Willis - Direct

1  Q.  Was it dark at this time?

2  A.  Dark.

3  Q.  Were the two of them alone on the path?

4  A.  They were.

5  Q.  Now, it's dark.  Could you see them clearly?

6  A.  I -- yes.

7  Q.  When you see Mr. Hecht and Ms. Dailey standing there, did

8  you go up and talk to them?

9  A.  No.

10  Q.  Why not?

11  A.  I felt like they were -- they were standing very close.  I

12  was just -- I didn't want to interrupt.  I thought I would just

13  wait for a minute until they finished talking.

14  Q.  You said they were very close.  Tell us how they were

15  positioned in relation to one another.

16  A.  Facing each other.

17  Q.  How far apart were they?

18  A.  8 inches.  I don't know.

19  Q.  We have had a lot of people give distances, and so I am --

20  can you show us how far they were?

21  A.  Standing closer than what seemed to be something that I

22  would want to interrupt.

23  Q.  How far away were you from Mr. Hecht and Ms. Dailey at that

24  point?  Maybe we can do it this way.  In relation to how far

25  apart you and I are right now, how far were you?

1  A.  The way that I was gauging it when I have thought about it

2  is about halfway -- I was about halfway down the path where

3  lights were, and they were just beyond the lights, like just

4  barely beyond the end of the lights.

5  Q.  Could you tell it was Ms. Dailey?

6  A.  I could.

7  Q.  How could you tell?

8  A.  Well, I would have to -- I could tell it was her, but I

9  also made a guess based on what I had seen before.  Her hair

10  was the same.  And it just didn't surprise me that they were

11  having a close conversation.

12  Q.  What happened next?

13  A.  I stood there for a moment and then I saw Suzanna grab his

14  jeans in the front and get down on her knees.

15  Q.  Did you see Mr. Hecht guide Ms. Dailey's hands to his

16  pants?

17  A.  No.

18        MR. KAPLAN:  Objection, leading.

19        THE COURT:  Sustained.

20        MR. KAPLAN:  Move to strike.

21        THE COURT:  Stricken.

22  BY MR. PLACHY:

23  Q.  When you saw Ms. Dailey move her hands to Mr. Hecht's

24  pants, was she standing up?

25  A.  Uh-huh.

713

Sara Willis - Direct

1  Q.  Did Mr. Hecht do anything that you saw to cause Ms. Dailey

2  to go to the ground?

3       MR. KAPLAN:  Objection, leading, calls for

4  speculation.

5       THE COURT:  Sustained.

6  BY MR. PLACHY:

7  Q.  Did it appear to you, ma'am, that Ms. Dailey went to her

8  knees voluntarily?

9       MR. KAPLAN:  Objection, leading, speculation.

10      THE COURT:  Just ask her what she saw.

11 BY MR. PLACHY:

12 Q.  So what did you see, Ms. Willis?

13 A.  That's all I saw.  I made the assumption that she was going

14 to give him a blow-job and I turned around quickly.

15 Q.  Why did you turn around?

16 A.  I was embarrassed.

17 Q.  You mentioned the group of men.  Did you see them on the

18 path?

19 A.  I did.

20 Q.  Do you see anyone else around Mr. Hecht and Ms. Dailey?

21 A.  No.

22 Q.  What did you do?

23 A.  I went back to the kitchen.

24 Q.  Back -- how did you get to the kitchen?  What did you do

25 when you got to the kitchen?

Sara Willis - Direct

1    *A.* I told them to fire the kids' dinners.

2    *Q.* What next?

3    *A.* I came back towards the table and saw that the women had

4    come back from the store and then decided to go back to the

5    kitchen and fire the rest of the food.

6    *Q.* You said the rest of the food. What do you mean by that?

7    *A.* Well, the other, you know, 10 or so meals.

8    *Q.* What happened next?

9    *A.* I fired the food. I came back to the table. Everybody was

10   arriving to the table. I do remember helping Ms. Andlinger's

11   mom find a different chair because she was sitting on a bench,

12   which were uncomfortable, and then just had accommodated and

13   then went back and ate. I was a little bit flustered, I think.

14   *Q.* I want to show you some photographs of the dinner that

15   night that were taken by Ms. Dailey. Let's take a look at

16   Exhibit 9, which has already been admitted.

17          What food is on the table here, Ms. Willis?

18   *A.* Mashed potatoes, gravy, fried chicken.

19   *Q.* What course of the meal was that?

20   *A.* That would be the main course.

21   *Q.* Was this photo taken before or after you saw Mr. Hecht and

22   Ms. Dailey?

23   *A.* After.

24          *MR. KAPLAN:* Objection, calls for speculation.

25          *THE COURT:* No, overruled. Let's gets a foundation,

Sara Willis - Direct

1   though.  Did she see the pictures being taken?

2   *BY MR. PLACHY:*

3   *Q.*  Did you see the pictures being taken?

4   *A.*  No.

5   *Q.*  Judging from the food that's on the table, Ms. Willis.

6          *MR. KAPLAN:*  Your Honor, I renew my objection.

7          *THE COURT:*  All right.  Sustained.

8   *BY MR. PLACHY:*

9   *Q.*  Ms. Willis, take a look at Exhibit 19, if we could blow

10  that up a little bit.

11          What food do we see on the table here?

12  *A.*  Fried chicken and mashed potatoes.

13  *Q.*  Judging by the food on the table, Ms. Willis, was this

14  picture taken before or after you were out on the path?

15  *A.*  After.

16          *MR. KAPLAN:*  Objection, Your Honor.

17          *THE COURT:*  Sustained.

18          *MR. KAPLAN:*  Move to strike.

19          *THE COURT:*  Granted.

20  *BY MR. PLACHY:*

21  *Q.*  Ms. Willis, had any food been served for the adults, at

22  least, by the time you saw Mr. Hecht and Ms. Dailey on the

23  path?

24  *A.*  No.

25  *Q.*  Let's take a look at Exhibit 24.  And this one was taken

Sara Willis - Direct

1   from a distance, but Brett, if we can zoom in on those plates.

2         What are we seeing here?

3   A.   It's dessert.   It's either banana cream pie or coconut

4   cream pie.   That's what they serve on fried chicken night.

5   Q.   How can you tell that was dessert?

6   A.   I can't really tell in that photograph, but when it was

7   smaller -- the table is clear.   It's a small plate and I can

8   see that there is whipped cream on top of the pie.

9   Q.   So did you eat dinner at the table with all the guests?

10  A.   I did not.

11  Q.   At some point did you return to the table?

12  A.   I did.

13  Q.   When was that?

14  A.   It would have been right around dessert.

15  Q.   And what happened?

16  A.   I was just checking to see if -- first I checked to see if

17  people were cold and they need blankets.   It was getting cold.

18  And then I was just kind of checking how close they were to

19  leaving because I had to deal with the bill.

20  Q.   Did people stay around and mingle after dinner was over?

21  A.   No.   It was cold.

22  Q.   Did anyone take you up on your offer for blankets?

23  A.   I don't think so, no.

24  Q.   Was there any time after dinner for people to wander off

25  and see the gardens?

Sara Willis - Cross

1   *A.*   I don't recall anyone wandering off after dinner.

2          *MR. KAPLAN:*   Your Honor, it's a non-responsive answer.

3          *THE COURT:*   Overruled --

4          *MR. PLACHY:*   I have nothing further, Your Honor.

5   Thank you.

6          *THE COURT:*   Cross-examination or break.   Break?

7          (Jury excused.)

8       (Recess at 10:54 a.m.)

9       (Reconvened at 11:06 a.m.)

10      Jury present:

11          *THE COURT:*   Okay.   Cross-examination.

12                      **CROSS-EXAMINATION**

13   *BY MR. KAPLAN:*

14   *Q.*   Good morning, Ms. Willis.

15   *A.*   Hi.

16   *Q.*   My name is Aryeh Kaplan.   I am one of Ms. Dailey's lawyers.

17   I am going to be asking some questions, okay?

18   *A.*   Okay.

19   *Q.*   We have never met, right?

20   *A.*   Right.

21   *Q.*   Ma'am, you are here today.   You are testifying for your

22   employer, Mr. Hecht; is that right?

23   *A.*   Yes.

24   *Q.*   Now, I understand based on what you said during your direct

25   examination that you put in your notice; is that right?

Sara Willis - Cross

1   A.   I have given notice.

2   Q.   When did you put in your notice, ma'am?

3   A.   A couple months ago.

4   Q.   So would that be after the deposition you gave in this

5   case?

6   A.   I don't recall exactly.

7   Q.   Well, let me represent to you that your deposition was at

8   the end of January of 2017, so just about 90 days ago, if my

9   math was right. Was it after that time?

10  A.   Well, actually it wasn't a firm resignation because I have

11  another chef.  There is another chef that I am responsible for,

12  so she has some commitments that I have already given her time

13  off for.  I am not sure exactly the date that the resignation

14  was talked about.  The resignation is going to be at the end of

15  the summer when I open my first retail location.

16  Q.   So it's your testimony it's going to be at the end of the

17  summer; is that right?

18  A.   Uh-huh.

19  Q.   And as I understand it from your testimony, you are

20  somewhat of an entrepreneur, ma'am, right?

21  A.   I think so.

22  Q.   And that's something you are proud of?

23  A.   I am.

24  Q.   What you want to do, as I understand it, is go out there

25  and take your concept, Saucefly, and grow it.

Sara Willis - Cross

1    A.  Right.

2    Q.  You feel comfortable doing it because I imagine you have

3    got traction there, right?

4    A.  Yes.

5    Q.  So around the time that you decided you were going to

6    resign, I am assuming -- tell me if I am wrong -- that you were

7    comfortable in making that decision, right?

8    A.  It's always scary to leave a good job.

9    Q.  But you wouldn't leave a good job unless you had a

10   financial mechanism to actually pay your bills, right?

11   A.  That's right.

12   Q.  You have bills, correct, ma'am?

13   A.  I do have bills.

14   Q.  We all have bills, right?

15          In this case, you actually have some bills that you

16   have to pay to Mr. Hecht at some point; is that right?

17   A.  Yes.

18   Q.  Let me be specific.  You began working for this defendant,

19   for Mr. Hecht, about seven or eight years ago; is that right?

20   A.  Uh-huh.

21   Q.  At that time, ma'am, it wasn't just Mr. Hecht.  It was

22   actually Mr. Hecht and Mrs. Hecht, right?

23   A.  Uh-huh.

24   Q.  They were married, right?

25   A.  Yes.

1   *Q.*  And there came a time when you had an opportunity to sort

2   of interview with them, right?

3   *A.*  I have already explained that.  Yes, I had a two-week trial

4   period.

5   *Q.*  You actually had a conversation, ma'am, where you talked

6   about sort of the terms of your employment, right?

7   *A.*  Yes.

8   *Q.*  And what I am referencing, ma'am, is that as I understand

9   it, and I want to use your words, that when you met with the

10  Hechts, you said, I'll be your private chef if you invest

11  $200,000 in my company; is that right?

12  *A.*  I did.

13  *Q.*  Those were your words, right?

14  *A.*  Yes.

15  *Q.*  That was seven or eight years ago, right?  Is that a yes?

16  *A.*  Yes.

17  *Q.*  Now, you obviously asked them for the money, right?

18  *A.*  I did.

19  *Q.*  But Mr. and Mrs. Hecht did not make an investment at that

20  time; agreed?

21  *A.*  No.

22  *Q.*  So they gave you $200,000.

23  *A.*  I said no.

24  *Q.*  So I am sorry.  You are saying no as in no, they did not

25  give you the money, correct?

Sara Willis - Cross

1   A.   Correct.

2   Q.   The first time, ma'am, that Mr. Hecht invested a

3   substantial amount of money or gave you a substantial amount of

4   money you would agree was after March 25th of 2014.  Yes or no?

5   A.   He did not give me any money.

6   Q.   Well, let me put it differently.

7   A.   Okay.

8   Q.   After March 25th of 2014, you received -- we will call it a

9   loan.  You received a loan from Mr. Hecht to buy land, right?

10  A.   It is a loan, so you can call it a loan, but it's a loan.

11  He didn't give me any money.

12  Q.   You received a loan from Mr. Hecht, correct?

13  A.   Correct.

14  Q.   That was to buy land.

15  A.   That's correct.

16  Q.   After March 25th of 2014, you received another loan from

17  Mr. Hecht to build a home on that land, right?

18  A.   That's correct.

19  Q.   And after March 25th of 2014, ma'am, you also received an

20  investment from Mr. Hecht in your company; is that right?

21  A.   Correct.

22  Q.   And the company I am referring to is Saucefly?

23  A.   Correct.

24  Q.   That's the company that you are moving on to, right?

25  A.   Correct.

Sara Willis - Cross

1  Q.  And so when you say that you are no longer going to be

2  working with Mr. Hecht, you are not telling the jury that you

3  are not going to have anything to do with him, right?

4  A.  Correct.

5  Q.  Because he is, in fact, I think one of two investors in

6  that company?

7  A.  Correct.

8  Q.  That money that you received as a loan after March 25th of

9  2014, you spent that money on the things that you needed to

10 invest in, right?

11 A.  Are you referring to the real estate loan for property in

12 which he held a deed in trust against or are you referring to

13 the construction loan, which he also had a promissory note and

14 a deed in trust against.

15 Q.  I am referring to all three.

16 A.  All three together?

17 Q.  We can do them one by one.

18 A.  I just want to be clear.

19 Q.  Absolutely, and I appreciate that.  We will be clear.

20       The money that you received as a loan to purchase the

21 land --

22 A.  Yes.

23 Q.  You purchased the land, right?

24 A.  I did.

25 Q.  You spent the money, right?

1   *A.*   I did.

2   *Q.*   The money you received to build the home, you received that

3   money?

4   *A.*   I did.

5   *Q.*   And you spent the money.

6   *A.*   I did.

7   *Q.*   And the money you received to invest in your company,

8   ma'am, you invested the money, right?

9   *A.*   I did.

10   *Q.*   All after March 25th of 2014.

11   *A.*   Correct.

12   *Q.*   And I understand that there is a certain amount that you

13   still owe to pay back to Mr. Hecht, right?

14   *A.*   Correct.

15   *Q.*   You owe that money sitting here today in court.

16   *A.*   I do.

17   *Q.*   And as I said, you currently are an employee of Mr. Hecht,

18   correct?

19   *A.*   Uh-huh.

20   *Q.*   But fast-forwarding along, Saucefly, can you describe for

21   us what Saucefly is, ma'am?

22   *A.*   It's a monthly subscription box for organic sauces.

23   *Q.*   So can you just describe a little bit more for us what that

24   means?

25   *A.*   Okay.  Well, I have members, members that sign up for a

724

1  box.  It's similar to like Blue Apron, but the products are

2  preprepared.  So you have sauces that are organic that are

3  preprepared and they are shipped to people.

4  Q.  And you charge them for that.

5  A.  I do.

6  Q.  And I would imagine that you have to spend a certain amount

7  of money to create the product that you are selling, right?

8  A.  I do.

9  Q.  And then you obviously charge them and hopefully on a

10 margin you make money, right?

11 A.  Right.

12 Q.  So that is again the company that you are going to be

13 focused on growing as soon as you leave Mr. Hecht's employ.

14 A.  Plus I am specifically opening a retail location on

15 September 1st, so it will be a little bit different business at

16 that point.

17 Q.  Okay.  As of the time, ma'am, approximately that you

18 decided that you were going to leave or give notice to

19 Mr. Hecht, how many subscribers?  What was your base?

20 A.  30.

21 Q.  About 30 people.  And how much money are you charging them

22 a month?

23 A.  A hundred dollars.

24 Q.  So it's $3,000 a month?

25 A.  That's correct.

Sara Willis - Cross

1   Q.   Is that more or less than you are currently being paid by

2   Mr. Hecht?

3   A.   Less.

4   Q.   Now, ma'am, I keep saying Mr. Hecht because right now you

5   don't work for both Ms. Hecht and Mr. Hecht, right?

6   A.   No.

7   Q.   They were divorced.

8   A.   Yes.

9   Q.   And you are familiar with that divorce, right?

10  A.   Somewhat.

11  Q.   When I say familiar, you were still an employee at that

12  point, right?

13  A.   Yes.

14  Q.   And this divorce, this occurred after all the discussion,

15  the description of the events that you say you saw in Cabo,

16  right?

17  A.   Correct.

18  Q.   And I am not saying or suggesting that one is related to

19  the other.  I am just saying in terms of timing, right?

20  A.   Correct.

21  Q.   But despite that fact, at the conclusion of that marriage,

22  you continued working for Mr. Hecht, right?

23  A.   I did.

24  Q.   So you didn't say, you know what, I am going to go

25  part-time for both of these folks.

Sara Willis - Cross

1    A.   No.

2    Q.   And to this day you are full-time for Mr. Hecht.

3    A.   Correct.

4    Q.   Now, part of the reason why is you really like Mr. Hecht,

5    right?

6    A.   I do.

7    Q.   And I am using your words.  I think you said you found

8    him -- you said you find him interesting, right?

9    A.   Uh-huh.

10   Q.   That he thinks outside of the box.

11   A.   I don't remember saying that specifically, but if you want

12   to show me testimony that says that.

13   Q.   Well, do you disagree with that?

14   A.   That he thinks outside the box?

15   Q.   Yes, ma'am.

16   A.   I guess there is a lot of definitions for that.

17   Q.   I am just asking for yours.  Do you think he thinks outside

18   the box?

19   A.   In the business sense?

20   Q.   In any sense.

21   A.   I may have said that, so if you want to show me where I

22   said that and I can expand on what the references were to and

23   then I can be more clear, but that wouldn't be something that

24   would be my main, you know, attribute towards what I think

25   about Nikos.

Sara Willis - Cross

1    Q.   You described him as funny.

2    A.   As what?

3    Q.   Funny.

4    A.   Funny.

5    Q.   In fact, you said that you had a funny chatting

6    relationship, right?

7    A.   Sometimes, yes.

8    Q.   Well, you felt that way before March 25th, 2014, right?

9    A.   Yes.

10   Q.   And you continue to feel that way today.

11   A.   Yes.

12   Q.   Now, ma'am, we talked a little bit about Mr. Hecht's home

13   in Cabo.

14   A.   Okay.

15   Q.   I would imagine you are very familiar with that home,

16   right?

17   A.   I am.

18   Q.   Because I think as his lawyer asked you during your

19   examination, oftentimes when you work you actually stay -- we

20   will call it on the property.

21   A.   Correct.

22   Q.   And you were asked questions about whether Mr. Hecht visits

23   you at times, right?

24   A.   Uh-huh.

25   Q.   I think you said, well, he comes.  Sometimes the kids

Sara Willis - Cross

1    comes.  And my question is a little bit different, ma'am.

2         Isn't it true that you spend time alone with him up

3    there at times?

4    A.  We have.

5    Q.  You spend time alone with him at times; agreed?

6    A.  Agreed.

7    Q.  Now, let's focus on the cocktail hour.  Let's turn to that

8    period of time.

9         So about how long was that entire event from the time

10   that folks showed up to the time that everybody went home?

11   A.  I would say not very long.  I can't be specific, maybe an

12   hour.

13   Q.  So during that hour period of time, your job, ma'am, is to

14   put together the cocktails.  I think that's what you said,

15   right?

16   A.  And food.

17   Q.  And food.

18        Would it be fair to say that that night you were

19   outnumbered?

20   A.  What does that mean?

21   Q.  Meaning there were more people that needed to be served

22   than there were people to serve them.

23   A.  You would never have a one-on-one serving situation.

24   Q.  I understand that, but my question is you were responsible

25   for getting everybody drinks and food, right?

Sara Willis - Cross

1   *A.*  Well, there is two of us, me and Monte Bell.

2   *Q.*  How many other guests were there?

3   *A.*  You probably know the exact answer.  What was it, six,

4   seven.

5   *Q.*  Was it more than two?

6   *A.*  It was.

7   *Q.*  Three?

8   *A.*  Yes, I was outnumbered.

9   *Q.*  As far as the cooking, you were doing the cooking?

10  *A.*  Monte Bell and myself.

11  *Q.*  We saw a picture of the Hecht residence.  There is that

12  staircase.  At one point you are talking about people coming in

13  and going and where you were, but we didn't see the kitchen.

14  Ma'am, is that because the kitchen isn't in direct proximity to

15  that?

16  *A.*  It's very close to that.

17  *Q.*  But it doesn't view directly to the stairs.

18  *A.*  You can see the stairs from the kitchen.

19  *Q.*  You weren't in the kitchen?

20  *A.*  No.

21  *Q.*  You were by the stairs.

22  *A.*  Uh-huh.

23  *Q.*  But your responsibility that night was to make sure the

24  drinks were served?

25  *A.*  Uh-huh.

Sara Willis - Cross

1   Q.   And to serve the food?

2   A.   Yeah.  I also greet people.  And as they were leaving, they

3   were walking out the door, I was standing there.

4   Q.   You are not testifying, ma'am, that you spent the duration

5   of that evening side by side with Mr. Hecht, are you?

6   A.   That I spent the duration of the evening during the

7   cocktail hour side by side?  No, I am not testifying to that.

8   Q.   Or that you even spent the bulk of the night with him.

9   A.   No.

10  Q.   And I have to assume that because you had to focus on a

11  whole lot of things at once, right?

12  A.   It actually wasn't that complicated.  We had two appetizers

13  and Monte Bell was in the kitchen.  She worked for me for 15

14  years, so we have a pretty good rapport as far as when things

15  need to be done.  She knows what to do.  I think we did coconut

16  prawns and crostini, so I would not say I was scattered with a

17  group that size, if that's what you are trying to infer.

18  Q.   I wasn't trying to infer anything.

19  A.   Well, you are saying that I am outnumbered, which doesn't

20  make any sense, but ...

21  Q.   Well, why don't I rephrase it.  We will just be very clear.

22  I don't mean to say this in a way that's upsetting or

23  confusing.  I am literally trying to understand the mechanics

24  of that night, okay?

25  A.   Okay.

Sara Willis - Cross

1    Q.  Because you said, it's your testimony that Mr. Hecht was --

2    or Ms. Dailey was like white on rice.  Remember that?

3    A.  I do.

4    Q.  And it seemed like she was trying to chew his ear off; is

5    that right?

6    A.  I said one or the other in my deposition.  And just now I

7    couldn't recall which one I actually said, but something like

8    that, chiding like that.  I noticed it.  I wouldn't have said

9    it had I not.  I was teasing him, but it was very obvious to

10   me.

11   Q.  Why don't you tell us everything that you said to him in

12   front of his wife that night about Ms. Dailey.

13   A.  Why don't I tell you everything?

14   Q.  What else did you say?

15   A.  I said I thought she was pretty old.

16   Q.  Okay.

17   A.  Like twice his age.

18   Q.  Okay.  Anything else?

19   A.  That would be it.  It was gross.

20   Q.  Anything else?

21   A.  No.  You mean prior to the also saying, She really was hot

22   for you?

23   Q.  Uh-huh.

24   A.  That also.

25   Q.  And your testimony is you said these things to Mr. Hecht.

Sara Willis - Cross

1   A.   Uh-huh.

2   Q.   And you said them in front of his wife at the time?

3   A.   Uh-huh.

4   Q.   Now, my understanding, ma'am, is that you were not very

5   good friends with Mrs. Hecht.  Is that fair to say?

6   A.   No, it's not fair to say.

7   Q.   Is it true, ma'am, that she accused you of having sex with

8   Mr. Hecht at one point?

9          MR. PLACHY:  Objection, hearsay, 402, 403.

10         THE COURT:  Objection overruled.  You can answer that

11  question.

12  A.   When they returned to Mexico -- I want -- can I respond to

13  the other question first or this one?

14  BY MR. KAPLAN:

15  Q.   Ma'am, my question is a yes or no question, and I will

16  repeat it.

17  A.   Okay.

18  Q.   Ma'am, isn't it true --

19  A.   Yes.

20  Q.   -- that Mr. Hecht's wife accused you of having sex with

21  Mr. Hecht?

22  A.   Yes.

23  Q.   Yes or no?

24  A.   Yes.

25  Q.   And your testimony, though, is that that night you both

733

Sara Willis - Cross

1    were comfortable joking around the fact that this woman was

2    like white on rice on him, right?

3    A.  Correct.

4    Q.  Now, when you said this in front of Mr. Hecht, did he say

5    that's just ridiculous?

6    A.  No.

7    Q.  You've got to be kidding me?

8    A.  No.

9    Q.  Did Ms. Hecht say that's just insane?

10   A.  No, she said, She is your type.

11   Q.  Is that what she said?

12   A.  Uh-huh.  She said something like, Well, she is your type.

13   Q.  Did she accuse you at one point of being Mr. Hecht's type?

14   A.  No.

15   Q.  She never said in front of you that you are his type?

16   A.  No.

17   Q.  In any event, ma'am, you testified that this all happened

18   in front of Mr. Hecht that night.

19   A.  Yes.

20   Q.  And he was there for it and he sort of laughed it off,

21   right?

22   A.  Uh-huh.

23   Q.  You described him as somebody who has a good sense of

24   humor?

25   A.  I think so.

Sara Willis - Cross

1    Q.  And let's go to Flora Farms.

2    A.  Am I able to clarify something?

3    Q.  I am sure you will when your lawyer asks you questions, but

4    for the time being I want to make sure you answer mine.

5            Ma'am, let's pull up -- let's start here.  I think the

6    word you used is that you attended dinner at Flora Farms.  You

7    attended the dinner, right?

8    A.  No.  I was the coordinator for the dinner, but I was there.

9    I was present.

10   Q.  When you say you were present, you weren't sitting at

11   dinner eating with everybody, right?

12   A.  No.

13   Q.  Because your responsibility that night, and I think I am

14   using roughly your words, was to make sure that everybody was

15   fed and the reservation was honored and you moved people along,

16   right?

17   A.  Yes.  I was coordinating it.

18   Q.  It sounds to me based on your testimony that the proprietor

19   of that restaurant -- and I am sorry, I don't recall her name.

20   A.  The owner?

21   Q.  Yes?

22   A.  Gloria.

23   Q.  Gloria.  You are very good friends with her?

24   A.  I am.

25   Q.  Best friends?

Sara Willis - Cross

1   A.   No.

2   Q.   Just very close?

3   A.   Uh-huh.

4   Q.   She sort of did you a favor by squeezing in a huge party of

5   people.

6   A.   It wasn't her.  She wasn't in town, but her staff does me

7   favors like that.

8   Q.   But the restaurant did, right?

9   A.   Right.

10   Q.   And it sounded to me again like you felt as though there

11   was sort of an urgency to get the evening going, right?

12   A.   Well, it was my responsibility.  They had 300 other guests,

13   and to have this group that I had booked be the last people

14   sitting there would be embarrassing to me and if the staff has

15   to stay later.  It's just part of coordinating dinner, so yeah,

16   I had an urgency to get the food going.

17   Q.   Can we pull up 126, please?

18         Do you remember looking at this photo, ma'am?

19   A.   I do.

20   Q.   It's an aerial photograph of Flora Farms, right?

21   A.   Correct.

22   Q.   My first question for you, ma'am, is after this evening,

23   the evening we are talking about, the evening where the rough

24   location is photographed in this picture, did you ever go to

25   Mexico with Mr. Hecht's lawyers to walk them through Flora

Sara Willis - Cross

1   Farms?

2   *A.*   I did.

3   *Q.*   When you went there, ma'am, who flew you down?

4   *A.*   I am sure -- I was going down to do something with my kids,

5   so Nikos probably paid for half of the ticket, but I was going

6   to be with my kids.

7   *Q.*   So this is Flora Farms, right?

8   *A.*   Uh-huh.

9   *Q.*   That's the location, correct?

10  *A.*   Correct.

11  *Q.*   And you were there after March 25th, 2014, with Mr. Hecht's

12  lawyers, right?

13  *A.*   Correct.

14  *Q.*   Let's take it down for a second.

15  *A.*   Lawyer.

16  *Q.*   Lawyer.  Let's talk about that.

17  *A.*   Not lawyers.

18  *Q.*   Why don't you describe for us, for the jury, how it came to

19  be that you ended up going down to Flora Farms to meet

20  Mr. Hecht's lawyer.

21  *A.*   Well, I suggested that I was going down to pick up my

22  children from their father who lived there, and I would be

23  happy to show him the house and the farm and have a combined

24  trip.

25  *Q.*   Ma'am, how did you know that seeing the house or the farm

Sara Willis - Cross

1   was even an issue?

2   A.   I can't remember.

3   Q.   Well, would it be fair to say, ma'am, that you had been

4   talking to Mr. Hecht about what had happened?

5   A.   To Mr. Hecht?  Actually, like when did I hear of what was

6   going on?

7   Q.   No.  My question, ma'am, is I am trying to understand why

8   you went down there in the first place.  I want the jury to

9   understand why you went to Mexico and met with Mr. Hecht's

10  lawyer at that location.

11  A.   Because they were dealing with the case and I was familiar

12  with the location.

13  Q.   So you volunteered to give them a hand, right?

14  A.   I guess, yeah.

15  Q.   Let's bring it back up, please.

16          So you went down there to that location.  And is that

17  a pretty good sort of depiction of the general area that you

18  traveled in that night when you were dealing with the families

19  at Flora Farms?

20  A.   Yes.

21  Q.   How much time did you spend with his lawyers down there at

22  the farm?

23  A.   Very briefly.

24  Q.   So an hour?

25  A.   Less.

Sara Willis - Cross

1    Q.  Less than an hour.  And what did you tell them?

2    A.  I just showed -- I think they had some other photographs

3    that were incorrect, and so I was showing him where the correct

4    location was.

5    Q.  And how did you know about those other photos?

6    A.  I was shown the photos.

7    Q.  By who, ma'am?

8    A.  An investigator, I guess.

9    Q.  So let's take -- let's back up even further.

10         When was the first time that you talked with an

11   investigator or Mr. Hecht's investigator about this case?

12   A.  I don't know a date.

13   Q.  Was it before you saw the photos?

14   A.  Which -- did I --

15   Q.  Let's be clear.  You just testified, ma'am, that you went

16   down to Mexico because you had seen some photos you thought

17   were wrong, correct?

18   A.  Correct.

19   Q.  You volunteered to go to Mexico for Mr. Hecht to correct

20   that error.

21   A.  I was going already to deal with my children, to pick them

22   up from their dad.  And if it would be helpful, I was saying

23   this would be a good time for me to go.

24   Q.  So you said you wanted to be helpful, then.

25   A.  Yes.

Sara Willis - Cross

1    Q.  And, of course, during that period of time, just like now,

2    you were working for Mr. Hecht, right?

3    A.  Yes.

4    Q.  Before I ask you about the investigator, we have been

5    talking about you working for Mr. Hecht.  So I want you to

6    clarify something for all of us.  When you say that you work

7    for Mr. Hecht, it's not 365 days a year, right, ma'am?

8    A.  No.

9    Q.  It's not 180 days a year, right, ma'am?

10   A.  No.

11   Q.  It's about 90 days; is that right?

12   A.  90 days.  No, wait.  It's 10 days a month, so it's 120

13   days.

14   Q.  So 120 days.  So you work 120 days.  Is that your

15   testimony?

16   A.  Wait, is that right?  Yeah, that's right.

17   Q.  Take your time.

18   A.  It's 10 days a month.

19   Q.  So you work 120 days a year for him?

20   A.  Yes.

21   Q.  How much do you get paid?

22   A.  $82,000.

23   Q.  You are paid $82,000 a year to work for those 120 days.

24   A.  Uh-huh.

25   Q.  When you went there to Flora Farms, ma'am, was that one of

Sara Willis - Cross

 1 | those 120 days?

 2 | *A.*  Possibly.

 3 | *Q.*  Well, I want you to think back, ma'am.

 4 | *A.*  I would have to have a calendar because some days --

 5 | actually, I have three children and an ex-husband that we

 6 | switch on and off, which is why this job has worked for me so

 7 | well, because he is -- Nikos is pretty accommodating.  If I

 8 | can't specifically be there on another day because he has

 9 | another chef I can coordinate with, so my dates are not

10 | specific.  I have to coordinate with an ex-husband who lives in

11 | Mexico who comes to my house who watches the children in order

12 | for me to go to work.  So if you need to know specifically, I

13 | need to look at flight records and a calendar.  I cannot answer

14 | that.

15 | *Q.*  Ma'am, did you look at those before you came to testify

16 | today?

17 | *A.*  No.

18 | *Q.*  You discussed some other folks that you worked for in the

19 | past, like the Baughmans.

20 | *A.*  Uh-huh.

21 | *Q.*  And I think you said a football player?

22 | *A.*  Ballard Smith.  He was the manager of the Padres.  I worked

23 | for Dr. J, Julius Erving.

24 | *Q.*  Great basketball player.

25 | *A.*  He is the only guy I have ever taken a picture with.

Sara Willis - Cross

1   That's my only star.

2   Q.  Did you ever stay in his guest house, ma'am?

3   A.  I lived with Ballard Smith on his property during the

4   summer.

5   Q.  I am talking about Dr. J, ma'am.

6   A.  Did I live with him?

7   Q.  Yeah.

8   A.  No.

9   Q.  Did you ever stay at his guest house alone with him?

10  A.  No.  It was just a two-day gig.

11  Q.  It was just for two days.

12  A.  Most of the jobs are just for a couple days.

13  Q.  Would it be fair to say Mr. Hecht is your main employer?

14  A.  Definitely.

15  Q.  I have been calling him Mr. Hecht.  You refer to him as

16  Nikos, right?

17  A.  Sure.

18  Q.  You are comfortable calling him Nikos.

19  A.  Yes.

20  Q.  Because Nikos is your friend, right?

21  A.  Yes.

22  Q.  So anyway, you are down there at Flora Farms and you are

23  walking Mr. Hecht's investigators -- or his lawyer, his lawyer

24  around?

25  A.  His lawyer.

Sara Willis - Cross

1   Q.   What was the lawyer's name?

2   A.   Doug.

3   Q.   Do you know what his last name was?

4   A.   Tumminello.

5   Q.   Did you point out to him where the kitchen was, ma'am?

6   A.   Mainly -- yes.

7   Q.   Am I correct in that photograph that it's the -- it's in

8   that area where there is an orange roof?

9   A.   That's the pizza oven.

10   Q.   Where is the kitchen?

11   A.   The cold kitchen.  Do you want me to draw on it?

12   Q.   That would be fine.

13   A.   The cold kitchen is right there, so all of the prep work

14   and cold items come out of that.  The hot kitchen is mostly

15   right here.

16   Q.   I see.  Would it be fair to say that there is -- I am going

17   to try to write, too.  I guarantee mine is a lot worse than

18   yours.  There is a significant difference, there is a distance

19   between those two locations, ma'am?

20   A.   What do you mean significant?  Compared to what?

21   Q.   Well, compared to just walking right around here.

22   A.   I don't think significant -- I don't think that's something

23   to go against.  Significant, five versus 25?  What do you mean,

24   significant?

25   Q.   That's fair.  Was it more than 10 steps?

Sara Willis - Cross

1    A.   Yes.

2    Q.   20?

3    A.   More than 20 steps.

4    Q.   More than a hundred steps?

5    A.   I couldn't count in steps.

6    Q.   Is it fair to say just in terms of relative distance

7    looking at this map, if you can, ma'am, that the distance

8    between that kitchen and the area where the -- I think called

9    the potting?

10   A.   Potting shed?

11   Q.   Potting shed is greater than the distance between here and

12   here, because it certainly looks that way.

13   A.   Greater than?

14   Q.   Yes, ma'am.

15   A.   I would say it's pretty close.

16   Q.   Do you think it's --

17   A.   It seemed like it would not be that hard to measure that.

18   Q.   Did you measure it when you were Mr. Tumminello?

19   A.   I didn't.

20   Q.   You didn't measure it.

21   A.   I didn't spend very much time with him there.  I just

22   brought him to the farm, said to the people that were there,

23   This guy is going to be looking around, and that was it.

24   Q.   Now, by I guess just looking at all this that night, ma'am,

25   I think you testified that that night you were coming out to

Sara Willis - Cross

1   see Mr. Hecht and talk to him about getting people going,

2   right?

3   A.   Yes.

4   Q.   All right.  Because I think it was your testimony that you

5   felt this pressure because you wanted to keep the train moving,

6   so to speak, right?

7   A.   Uh-huh.

8   Q.   I guess my first question for you, ma'am, is wouldn't you

9   agree that the fastest way to make people sit down is when

10  there is food on the table?

11  A.   Definitely not.

12  Q.   So it's your testimony that you have to coax people there

13  at what time, 6:30, to sit down and eat fried chicken?

14  A.   Well, I can say for having been in the restaurant business

15  for 25, 30 years, you don't put food on the table until people

16  are sitting down.  It's going to get cold.  I would never put

17  food on the table.  We put some pizzas out for the kids maybe,

18  but I would never put food on the table to get people to sit

19  down, although I did feel that if I got the kids to sit down,

20  people would get the hint that they were supposed to eat.

21  Q.   But dinner that night, ma'am, dinner was served

22  family-style, right?

23  A.   It was family-style.

24  Q.   Dinner was served family-style, which means those courses

25  we talked about before, like the fried chicken and the beans,

Sara Willis - Cross

1  all that sort of coming out at once, various tranches, but sort

2  of at once.

3  A.   The appetizers -- because there is actually so much food

4  that comes out in these family-style dishes, there would not

5  really be room on the table to have everything at once.  You

6  would have to do -- the appetizers would come out and we clear

7  and then the main course.

8  Q.   Okay.  I guess my question is a little different.  I think

9  I wasn't clear.

10       My question is when fried chicken came out, it came

11  out for everybody, right?

12  A.   The kids' came out first, I would imagine.

13  Q.   That wasn't my question.  I understand that you want to

14  talk about --

15  A.   Okay.  You are saying for everybody.

16  Q.   Yes.  So in other words, they didn't serve Mr. Hecht fried

17  chicken first --

18  A.   No.

19  Q.   -- and then go to another person, right?

20  A.   No.

21  Q.   They didn't go to Mr. Hecht first and give him mashed

22  potatoes and then go to another person.

23  A.   It was family-style.

24  Q.   To be clear, fried chicken came out for everybody at once,

25  right?

1   *A.* Can I ask you when you are saying that, I don't think that

2   that's clear because I ordered the kids' meals to be delivered

3   first, so it's impossible.  If you are saying the adult side of

4   the table, yes.

5   *Q.* Ma'am, my question is it was served family-style, correct?

6   *A.* Yes.

7   *Q.* I am not asking about what's possible.  I am just asking

8   whether the food was served family-style.  Yes or no?

9   *A.* No, you weren't.  You said at the same time.  Family-style,

10  yes.

11  *Q.* So you just take issue with what family-style means, then.

12  *A.* At the same time is different from family-style.  At the

13  same time means everybody at the table got the food at the same

14  time to me.  Family-style is they were shared platters and they

15  wouldn't be given individual plates.  If you are just asking me

16  if everybody was served at the same time as far as the adult

17  section, yes.

18  *Q.* So all that food we are talking about, ma'am, is it

19  accurate to say it's being cooked in this general location?

20  *A.* No.

21  *Q.* Maybe you can correct that for us, then.

22        So in order to get the food out or when you go to the

23  kitchen and say, Fire up the food, you are going like this, I

24  assume, but tell me if I am wrong.

25  *A.* You are wrong.

1   Q.  Then show me how.  I am going to erase it.  Go ahead.

2          Okay.  So you are walking from that area into this, I

3   suppose, kitchen area.

4   A.  Uh-huh.

5   Q.  Right?  And you are telling them to fire up the food?

6   A.  Uh-huh.

7   Q.  Then you turn around and you are walking back, right?

8   A.  Uh-huh.

9   Q.  How long does that take, ma'am, every time you do it?

10  A.  A couple of minutes.  It depends on if I had to like find

11  the person that I was going to fire the food or -- just to walk

12  back and forth would be a couple of minutes.

13  Q.  A couple minutes each way or total or you really don't

14  know?

15  A.  I don't know.

16  Q.  And regardless, your testimony is --

17  A.  I am probably walking quickly.  I am not like lollygagging.

18  Q.  When you are -- by the way, when you are doing it, because

19  I see there is no path here in the area you are going back and

20  forth.

21  A.  There is a path.

22  Q.  There is a path there?

23  A.  Yeah.

24  Q.  Was it dark?

25  A.  It's a brick path.

Sara Willis - Cross

1  Q.  Do you see that brick path in this picture, ma'am?

2  A.  I think my pencil might have been off, but I believe it's

3  right -- it's just above where I drew that line.  If I erase

4  it, I can make it correct or try.

5  Q.  Go ahead.

6  A.  You can see in this picture there is bricks right there.

7  Q.  I don't really see the bricks, but that's fine.  That's

8  generally where you walk.

9  A.  They are there.  They have always been there.  They are

10  there today.

11  Q.  I absolutely believe you.

12       When you are walking back and forth, it's dark at that

13  point?

14  A.  The bar is pretty well lit.  There is usually lights over

15  in this little waiting area.  It's not too dark to see.  There

16  is lights in the potting shed.

17  Q.  My question is when you are walking on that path, I don't

18  see in the photograph any lights lighting the way, right?

19  A.  Well, there is no lights in this photograph, but there are

20  lights usually up at Flora.

21  Q.  There are lights on that path?

22  A.  No.  There is usually lights in the bar and there is lights

23  in the potting shed.  There is lights on the outside patio,

24  which would be extending past the edge of the roof of the bar.

25  And there is lights on the partial part of that green path.

Sara Willis - Cross

1   Q.  But there is no lights here, right?

2   A.  Correct.

3   Q.  Okay.  So you are walking back and forth kind of at a fast

4   pace, right, on this brick path in between the buildings.

5   A.  Right.

6   Q.  The potting shed and the area you have to go through to get

7   to the kitchen because, as you said --

8   A.  Well, it's bar.  It's clearly lit.  I am walking through

9   the bar to get to the kitchen.

10  Q.  I appreciate that.  That's not my question.

11         My question is are there lights where I have drawn

12  those lines?

13  A.  No.

14  Q.  And that night when you are walking back and forth, how lit

15  was it, meaning how light was the sky at that point?

16  A.  I don't think it was totally dark.  I don't know.

17  Q.  So you don't know.

18  A.  I don't know how light the sky was, no.

19  Q.  Ms. Willis, is it fair to say that you are really focused

20  going back and forth between the kitchen to get the food out

21  and everybody fed so you can move everybody along?

22  A.  Yeah, I don't actually deliver any of the food, but moving

23  along the dinner.

24  Q.  I don't want to talk over you, so you are the coordinator

25  that night, correct?

Sara Willis - Cross

1  A.  Correct.

2  Q.  Which means you need to make sure everybody eats and

3  everybody leaves, right?

4  A.  Correct.

5  Q.  That was your focus that night, right?

6  A.  Correct.

7  Q.  Your focus is going to the kitchen and making sure the food

8  gets fired up, right?

9  A.  Correct.

10  Q.  Making sure the food arrives at the table, right?

11  A.  Correct.

12  Q.  And that people sit down at the table and eat the food

13  that's put out, right?

14  A.  Correct.

15  Q.  You are not testifying to this jury, ma'am, that you were

16  sitting here or even here or here or here keeping a constant

17  eye like white on rice on Mr. Hecht, right?

18  A.  Well, that was the other day; but, yes, I was sitting the

19  majority of the time.  As we already discussed, it takes two or

20  three minutes to walk back and forth.  I walked back and forth.

21  If you want to estimate based on besides just the testimony

22  that I have already given when I was trying to get the people

23  to sit down, I think we were talking about -- I would like to

24  review it if you want to be specific, but we are talking about

25  one, two, three, four, five, maybe six times.

Sara Willis - Cross

 1        So if it takes me three or four minutes to walk back

 2   and forth each time, about 24 minutes, and we were there for a

 3   couple of hours.  The rest of the time I was seated at that

 4   high-top observing whether people needed things from me.  There

 5   was plenty of waiters.  And then after everyone was seated, I

 6   went back to the pizza bar and had a meal myself.  So I

 7   wasn't -- to try to say that I was not seated at the bar when I

 8   was seated, that would be incorrect.

 9   Q.  I never asked if you were sitting at the bar.

10   A.  You said I spent the majority of the time walking back and

11   forth.

12   Q.  No, I didn't say that either.  I appreciate your answer

13   because as I understand what you just said, ma'am, for that

14   24-minute period that led up to dinner, your focus was trying

15   to get dinner on the table, correct?

16   A.  The 24 minutes period.  There was much more time than the

17   24 minutes that led up to dinner.  I am just calculating.  If

18   you wanted to -- I was contradicting your statement to me that

19   I spent the majority of the time, so I was just hypothetically

20   doing some math.

21        So if you want to ask me a question in a different

22   way, that's fine, but I don't agree with that.  There was much

23   more time -- this is like -- I didn't realize you were going to

24   be so hostile.

25        MR. KAPLAN:  Your Honor, I move to strike and ask that

Sara Willis - Cross

1    the witness --

2            *THE COURT:*  Let's have question and answer.

3    *BY MR. KAPLAN:*

4    *Q.*  Ma'am, your testimony is that until dinner was served, your

5    focus was getting dinner served.

6    *A.*  And making sure -- yes.

7    *Q.*  Your focus was making sure that once it was served, people

8    were sitting down, right?

9    *A.*  Correct.

10   *Q.*  Because as you have testified, you wanted to make sure that

11   people ate and then left in a timely manner, correct?

12   *A.*  Correct.

13   *Q.*  So during this period of time that we are talking about

14   when you were discussing Mr. Hecht and Ms. Dailey, your focus

15   was not on Mr. Hecht and Ms. Dailey.  Yes or no?

16   *A.*  Rephrase that.  Say it again.

17   *Q.*  Ma'am, during the period of time that you have discussed

18   observing Mr. Hecht and Ms. Dailey, your focus was on getting

19   the food on the table and getting people seated.  Yes or no?

20   *A.*  During the time that I was -- I feel like that was

21   confusing, but my focus was getting the food on the table

22   during the time that I observed Mr. Hecht and Ms. Dailey, yes.

23   *Q.*  This path, ma'am, this is the path where you said at some

24   point you saw Mr. Hecht and you thought you saw Ms. Dailey down

25   past the lights, correct?

Sara Willis - Cross

1    A.   Correct.

2    Q.   All right.  Am I accurate in saying that there is no

3    obstruction that would keep anybody from looking down and

4    seeing down the path?

5    A.   The lights would have caused it to be difficult to see, I

6    think.  Obstruction, as far as like something in the way, no.

7    Q.   A tree, was there a tree in the path?

8    A.   No.

9    Q.   No?  So in other words, if you can see down that path, then

10   anybody else who is standing around can see down that path.

11   A.   Well, I walked halfway down the path, but yes, if people

12   were walking around, they could have seen.

13   Q.   Now, before you walked down that path, ma'am, you testified

14   that you came out to speak to Mr. Hecht about rounding up the

15   kids.  Do you remember that?

16   A.   I do.

17   Q.   And when you told Mr. Hecht that, it's your testimony that

18   you didn't walk over to Mr. Hecht and just tell him what you

19   had to say right where he was at the time, right?

20   A.   Huh-uh.

21   Q.   You didn't walk over to Mr. Hecht and just say, Nikos,

22   round up the kids; agreed?

23   A.   No.

24   Q.   It's your testimony, ma'am, that you actually walked away

25   from where everybody else was and went down that path, correct?

Sara Willis - Cross

1   *A.* Correct.

2   *Q.* Because why, ma'am?  Why would you walk away from a group

3   of people to communicate that Mr. Hecht needed to actually get

4   the people to dinner?

5   *A.* We were -- Nikos said something like, Let's walk and talk.

6   And we were discussing -- he was saying, I am sorry this is so

7   boring.  And I said, That doesn't matter to me.  Let's just

8   kind of -- I would like your help in moving this along.

9   *Q.* Ma'am, you agree with me that Mr. Hecht could have said

10   that to you right where you were standing and he was standing

11   originally, right?

12   *A.* Definitely.

13   *Q.* He didn't need a private conversation.

14   *A.* I mean, it did because he said, These people are boring.

15   *Q.* Okay.

16   *A.* He said, These people are boring or he was just kind of

17   like joking with me like this is -- I don't like these

18   functions.  It's boring.  And then at the table I think the

19   older boys were sitting at the table, so we just walked a

20   little bit beyond the table.

21   *Q.* So you wanted to be alone?

22   *A.* Sure.

23   *Q.* You didn't want whatever was talked about --

24   *A.* It didn't really matter.  It wasn't something secretive.

25   We just walked a few feet down the path and came back.

Sara Willis - Cross

1   Q.  I am just asking, ma'am, because there is nothing keeping

2   you from walking over to the children and asking them to go to

3   the table, right?

4   A.  Yeah, I wouldn't have rounded up the kids on my own.

5   Q.  When you work in Cabo for Hecht, you wear many hats, right?

6   You have many jobs?

7   A.  I do.

8   Q.  They include cooking, right?

9   A.  Yes.

10  Q.  Driving?

11  A.  Driving.

12  Q.  You also do childcare.  You work with his kids.  You help

13  out with his kids?

14  A.  I do.

15  Q.  You knew his kids very well.

16  A.  Uh-huh.

17  Q.  You knew his kids very well because you actually lived at

18  that house at times in Cabo.

19  A.  That's correct.

20  Q.  You even lived on the property when Mr. Hecht would fly you

21  from your home to his home to cook in Aspen.

22  A.  Correct.

23  Q.  These are very familiar people to you.

24  A.  Yes.

25  Q.  You knew Mr. Hecht's father, Andrew Hecht?

Sara Willis - Cross

 1  A.  I do.

 2  Q.  You know him on a first name basis?

 3  A.  Uh-huh.

 4  Q.  Very familiar with him?

 5  A.  Very familiar.

 6  Q.  You just testified not long ago that you were also -- you

 7  were very familiar with Allison Hecht, right?

 8  A.  Uh-huh.

 9  Q.  You would have been uncomfortable talking with Allison

10  Hecht, right?

11  A.  Uh-huh.

12  Q.  There is no reason you would feel uncomfortable walking

13  over to Levi Hecht and saying, Come on, let's sit down for

14  dinner, right?

15  A.  So Levi Hecht was at the time, I think, four, maybe.  He

16  was a baby.  Currently in the job that I do in Aspen I would

17  never take the children away from what they were doing with

18  their parents and make them sit down even if I had hot food.

19  So no, no matter how comfortable I am, I don't tell them when

20  they have to eat.

21  Q.  Just taking a couple steps back there.  You are not telling

22  the jury that Mr. Hecht was playing with his kids at the time,

23  right?

24  A.  The kids were playing in the grass.

25  Q.  I understand that.  But you just said you wouldn't feel

Sara Willis - Cross

1   comfortable taking kids away from their parents.

2   *A.*  I guess what I was trying to explain is that I would not be

3   the person that says you have to sit down.  Analise would.

4   Analise could have.

5   *Q.*  Ma'am, in any event, we can agree there is nothing

6   controversial about trying to get people to sit around a table,

7   right?

8   *A.*  No.

9   *Q.*  But in any event, after you had that conversation, you took

10  that walk back.  You walked there and you take this walk back

11  here again, right?

12  *A.*  This time I went back to the office to tell Erika -- which

13  is over there.

14  *Q.*  It's further away.

15  *A.*  Uh-huh.

16  *Q.*  Further away from where the kitchen was?

17  *A.*  On the other side of the kitchen.

18  *Q.*  Further away from where the table was, right?

19  *A.*  Correct.

20  *Q.*  Further away from the kids?

21  *A.*  Correct.

22  *Q.*  A longer walk back.

23  *A.*  Correct.

24  *Q.*  So over the course of that conversation, how long did that

25  take you, ma'am?  Do you recall?

Sara Willis - Cross

1   A.   With Erika?

2   Q.   Yes.

3   A.   I just told her I had it under control.  I was going to get

4   the kids to sit down first and that would hopefully encourage

5   the adults to go quickly after that.

6   Q.   A couple minutes?

7   A.   Talking to her?

8   Q.   Uh-huh.

9   A.   A couple minutes.

10  Q.   And then you take that walk.  Do you go to the kitchen at

11  that point, ma'am?

12  A.   No, I don't go to the kitchen at that point.  I just tell

13  Erika.  I may have said we are going to get ready to fire.  I

14  could have just stopped in and said we are going to get ready

15  to fire.

16  Q.   You don't recall?

17  A.   I am not positive.

18  Q.   When you say you are getting ready to fire at that point,

19  you are getting ready to fire food.

20  A.   Correct.

21  Q.   When I say food, I am talking about everybody's food.

22  A.   No, the kids' food.

23  Q.   It's your testimony you are just firing up the kids' food

24  at this point.

25  A.   Correct.  The adults were not back from the store.

Sara Willis - Cross

1  Q.  Before you left that area where you had the private

2  conversation with Mr. Hecht, can you draw where the kids were

3  playing?

4  A.  I did not see the girls.  I knew that Levi and the younger

5  boys were playing like just right around over here on the

6  grassy path just running around.

7  Q.  Just running around?

8  A.  Uh-huh.

9  Q.  And the men, where were the men?

10        And then it's your testimony that at some point later

11  you walk back.  Can you show us how you walked back from the

12  office through the kitchen through the table area to the path?

13  Got it.

14        Ma'am, when you are walking back and forth and doing

15  all this, I am assuming it's getting darker outside, right?

16  A.  It's pretty dark.

17  Q.  It's certainly not as light at this point as it was, say,

18  maybe 30 minutes ago?

19  A.  Probably not.

20  Q.  Your testimony is at that point you go to the path because

21  you are looking for Mr. Hecht again?

22  A.  Uh-huh.

23  Q.  Why were you looking for Mr. Hecht again?

24  A.  Just to see if he had found the kids.

25  Q.  When you walked back, it's your testimony you couldn't find

Sara Willis - Cross

 1   the kids?

 2   *A.*  I wasn't going to round up the kids.  I wanted him to round

 3   up the kids.  So if that was my job -- if it wouldn't have been

 4   successful for him to get the kids, I probably would have done

 5   it anyway, but I was going back to see if this is happening,

 6   it's not happening.

 7   *Q.*  In light of the relationship you had with Ms. Hecht, could

 8   you have asked her to round up the kids?

 9   *A.*  She was at the store.

10   *Q.*  Did you go to her?

11   *A.*  Did I go find her, no.

12   *Q.*  It's your testimony she was not back from the store at this

13   point.

14   *A.*  No.

15   *Q.*  She wasn't back from the store at the point in which you

16   walk down the path.  I just want to be clear, right?

17   *A.*  Yeah.

18   *Q.*  The other women, you said the other women, were they at the

19   store with her?

20   *A.*  I assume so.

21   *Q.*  So the other women, so that would include somebody like

22   Jeanne Andlinger, for example.

23   *A.*  Uh-huh.

24   *Q.*  She was at the store at that time?

25   *A.*  Uh-huh.

Sara Willis - Cross

1   Q.   And Allison Hecht, she was at the store at the time?

2   A.   I mean, I don't know that they were at the store, but I

3   didn't see them when I was walking back by.

4   Q.   I understand.  But it's your testimony that all the women

5   are at the store and the kids are -- did you see the kids when

6   you walked down that path with Mr. Hecht?

7   A.   I didn't.

8   Q.   Didn't see them anywhere?

9   A.   On my return trip, no, I didn't.

10  Q.   Was it because it was too dark?

11  A.   They were kind of running in and out of the bushes.  I

12  didn't see them on the path.

13  Q.   What bushes, ma'am?

14  A.   Well, the plants on the sides.

15  Q.   Which plants, ma'am?

16  A.   They were kind of like running around being crazy.

17  Q.   So when you walked down that path and you eventually see

18  what you thought was Mr. Hecht and Ms. Dailey, it's your

19  testimony that there are children running in and out of the

20  bushes on both sides?

21  A.   No.  I didn't see any kids at that time.

22  Q.   Okay.  So I am just trying to clear this up.

23  A.   Okay.  No problem.

24  Q.   You come back.  You have gone to the kitchen, say, Fire it

25  up.  You come back.  You are looking for Mr. Hecht again,

Sara Willis - Cross

1    right?

2    A.   Yes.

3    Q.   Because your testimony is you wanted to round up the kids,

4    rights?

5    A.   I wanted to see if he had been successful in getting the

6    kids.

7    Q.   If he had been successful in getting the kids, would they

8    have been at the table, do you think?

9    A.   I don't know.

10   Q.   Well, ma'am, if you wanted him to round up the kids and he

11   had rounded up the kids, the kids would be at the table, right?

12   A.   Correct.

13   Q.   And then you just testified a moment ago that you didn't

14   see the kids, right?

15   A.   Correct.

16   Q.   But that they were running in and out of the bushes or the

17   shrubs or whatever you want to call them.

18   A.   That was before.  That's why I knew the kids were in that

19   direction, so that's where I walked to look for Mr. Hecht

20   because I believed that's where he would have been looking for

21   them.

22   Q.   So you said this a couple times.  You said you knew because

23   before they were there, right?

24   A.   Uh-huh.

25   Q.   So you assumed.

Sara Willis - Cross

1   *A.*  I assumed.

2   *Q.*  Just the same way that when you looked down that path, you

3   assumed, right, that you saw Ms. Dailey with Mr. Hecht.

4   *A.*  I saw Ms. Dailey with Mr. Hecht.

5   *Q.*  Well, ma'am, I understand your testimony, but you didn't

6   walk over to them when you saw them together, correct?

7   *A.*  No.

8   *Q.*  You didn't walk over to Mr. Hecht who, by the way, at that

9   point when you first saw him, according to you, was face to

10  face with another person, right?

11  *A.*  Uh-huh.

12  *Q.*  You could have run over to him and said, Round up the kids,

13  Nikos, right?

14  *A.*  No.  I felt -- I wouldn't have run over to him, but I

15  noticed that they were standing closer than normal in the dark,

16  so I just paused for a second to see if they would finish.  I

17  assumed they would finish talking and I would say, Hey, are the

18  kids ready?

19  *Q.*  You paused -- they paused for a moment and you watched that

20  pause.  Is that your testimony?

21  *A.*  No.  I said I paused.

22  *Q.*  You paused.  Could you, would you have been able to hear a

23  voice given the distance between the two of you at that point?

24  *A.*  If someone said, Sarah?

25  *Q.*  Yeah.

Sara Willis - Cross

1   A.   Sure.

2   Q.   So let me give you an example.  You are there on the path

3   that night, right?

4   A.   Uh-huh.

5   Q.   It's your testimony that you are looking -- an unobstructed

6   view to Mr. Hecht, right?

7   A.   Yes.

8   Q.   And you just testified that you knew it was Ms. Dailey,

9   correct?

10  A.   Uh-huh.

11  Q.   Okay.  My question for you, ma'am, given the distance

12  between the parties and the fact you could see them, would you

13  agree that you would be able to hear what they were saying?

14  A.   No.  I said if someone yelled out, Sara.  If someone was

15  talking quietly, no.

16  Q.   Your testimony is you wouldn't have been able to hear.

17  A.   No.

18  Q.   But you would be able to see?

19  A.   Uh-huh.

20  Q.   And see that they were 8 inches away from each other.

21  A.   Close.

22  Q.   Close.  8 inches, 10 inches?

23  A.   I would say 8 inches.

24  Q.   8 inches, okay.  And if you had said -- I know you said

25  Sara, but if you had said Nikos while that was happening, would

Sara Willis - Cross

1   he have heard you?

2   *A.*   Probably.

3   *Q.*   If you would have said Nikos, would he have turned his

4   head?

5   *A.*   Uh-huh.

6           *MR. PLACHY:*   Objection, calls for speculation.

7           *THE COURT:*   Sustained.

8   *BY MR. KAPLAN:*

9   *Q.*   Ma'am, do you think you could have gotten Mr. Hecht's

10  attention?

11  *A.*   For sure.

12  *Q.*   And you chose not to do that?

13  *A.*   I did.

14  *Q.*   I know you've testified to what you think you saw.

15          You would agree with me, ma'am, that it's what you

16  think you saw, right?

17  *A.*   No.  I saw what I saw.

18  *Q.*   I know you say you saw what you saw.  But you are not

19  telling this jury that you saw physical contact, actual skin on

20  skin contact between Mr. Hecht and Ms. Dailey from your vantage

21  point.

22  *A.*   No, I am not.

23  *Q.*   In fact, it's your testimony that when you thought you were

24  going to see something, rather than yell, you actually turned

25  around, right?

Sara Willis - Cross

1   A.   I did.

2   Q.   You walked away.

3   A.   Uh-huh.

4   Q.   You walked away back to where, ma'am?

5   A.   Back to the kitchen.

6   Q.   Not to Ms. Hecht.

7   A.   No.  She wasn't back yet.

8   Q.   You didn't get Ms. Hecht to round up the kids at that

9   point.

10  A.   No, I was -- I was upset.

11  Q.   You were upset.  You were offended, right?

12  A.   Well, I was -- it seemed like embarrassing to me also

13  because I felt responsible as part of the person who brought

14  them there.

15  Q.   I just want to focus on that because I want to make sure we

16  all understand.

17       When you were standing there, was anybody on your left

18  or your right?

19  A.   No.

20  Q.   When you were standing there, was there anybody to your

21  knowledge right behind you?

22  A.   No.

23  Q.   The women you described were nowhere around, right?

24  A.   No.

25  Q.   The children you described were nowhere around, right?

Sara Willis - Cross

1   A.   I didn't see children.

2   Q.   As far as you have told the jury, it's literally you on a

3   path by yourself looking at Mr. Hecht and someone who you think

4   is Ms. Dailey.

5   A.   The men are behind me on the path.

6   Q.   So when you saw what you saw, you would have to turn and

7   walk past the men.

8   A.   I did.

9   Q.   And you would assume they saw the same thing, right?

10  A.   No.  I looked.  I feel like I looked to see if people were

11  noticing and I went straight to the kitchen.

12  Q.   So it's your testimony that they didn't seem to notice

13  anything.

14  A.   No.

15  Q.   Or to put it differently, as you are walking back from

16  seeing the thing that you thought was about to happen,

17  Mr. Hecht's father didn't say, What just happened, Sara?

18  A.   No.

19  Q.   He didn't pull you aside and say, What just happened, Sara?

20  A.   No.

21  Q.   As far as you knew, you were the only person, right?

22  A.   Correct.

23  Q.   But it's your testimony you were upset because you were

24  embarrassed about what was happening?

25  A.   Yeah.

Sara Willis - Cross

1   *Q.* How much was dinner that night?

2   *A.* It was close to 5,000.

3   *Q.* $5,000, about $5,000?

4   *A.* The deposit was 2,500. I am not sure what the final bill

5   was, but the deposit was 50 percent.

6   *Q.* Is it your testimony that after these folks paid $5,000 for

7   dinner, that they would have had to rush out and leave? They

8   couldn't take their time?

9   *A.* Oh, nobody was forcing them to rush. It was cold. People

10  were ready to go.

11  *Q.* But I thought you said earlier because it was very crowded

12  that night, you wanted to keep things moving along.

13  *A.* Just to get the food on the table, yeah.

14  *Q.* But presumably you want to get food on the table so people

15  can eat and leave, right?

16  *A.* I don't think -- no. The idea isn't that you are forcing

17  people to leave. It's more of just timing like the chicken is

18  preprepared and, you know, to have quality product and that

19  kind of stuff.

20  *Q.* So if the kids wanted to take their time, they could have

21  taken their time. You didn't need to cook the food

22  immediately, right?

23  *A.* No. I just thought you were referring to after they ate.

24  *Q.* With respect to Mr. Hecht, ma'am, or any of the guests,

25  there was no rush to feed them; is that right?

1   *A.*   There was, yeah.  We wanted to get food on the table.  You

2   just said could they have stayed afterwards if they wanted to

3   and they could have if they wanted to, but it was cold and

4   late.

5   *Q.*   So what was the rush to have people sit down and eat,

6   ma'am?  Can you tell us what the rush was?

7   *A.*   Yes.  It's fried chicken night and everything is

8   preprepared.  There is 300 other served dinners at the -- in

9   the restaurant, as I explained.  And it is the normal protocol

10  that people prepare things.  And when the kitchen is finished,

11  they get to wrap it up and go home.

12          In general, at Flora Farms we have a lot of they call

13  them Chilangos, people from Mexico City who tend to stay late,

14  so the waiters are unavailable if they need to stay late.  But

15  the main thing is getting the kitchen -- getting through that

16  part of it.

17          *THE COURT:*  Mr. Kaplan, are you close to being done?

18          *MR. KAPLAN:*  Very close, Your Honor, within just a

19  couple of questions.  I am wrapping up.  I understand.

20  *BY MR. KAPLAN:*

21  *Q.*   Ma'am, you testified earlier that you saw or you described

22  what Ms. Dailey was doing that night as glomming onto

23  Mr. Hecht.  You used the word glomming.  What does that mean?

24  *A.*   Just wanting his attention.

25  *Q.*   Did Mr. Hecht say to you that he thought Ms. Dailey was

Sara Willis - Cross

 1  glomming onto him?

 2  *A.*  No.

 3  *Q.*  Did Mr. Hecht say to you that he thought Ms. Dailey was

 4  flirting with him?

 5  *A.*  No.

 6  *Q.*  Did Mr. Hecht say to you that night, wow, ma'am, she

 7  really, she was into me.

 8  *A.*  No.

 9  *Q.*  None of those words came out of his mouth.

10  *A.*  No.  It seemed pretty obvious to me.  I thought everybody

11  noticed.

12  *Q.*  It didn't seem pretty obvious to Mr. Hecht, right?

13  *A.*  Well, he didn't say it to me.  I don't know.

14  *Q.*  And to be clear, ma'am, you would describe yourself as

15  Mr. Hecht's friend, right?

16  *A.*  Correct.

17  *Q.*  Not just his employee, his friend, right?

18  *A.*  Yes.

19  *Q.*  And you have described yourself, ma'am, not just as your

20  friend.  You described him as your loyal friend; is that right?

21  *A.*  Sure.

22  *Q.*  Is that right, ma'am?

23  *A.*  Is he a loyal friend to me?

24  *Q.*  Are you a loyal friend to Mr. Hecht?

25  *A.*  Yes.

Sara Willis - Cross

1          MR. KAPLAN:  Your Honor, may I just have a moment to

2    confer.

3          THE COURT:  A moment.

4          MR. KAPLAN:  Thank you, ma'am.

5          THE COURT:  All right.  Julie, are the jurors' meals

6    here?

7          COURT DEPUTY CLERK:  They are, Your Honor.

8          THE COURT:  So lunch is back there for you today.

9    Before we break for lunch, though, are you going to call any

10   other witnesses?

11         MR. PLACHY:  We have two very short videos, I think

12   less than 20 minutes combined, and one more witness, Andy

13   Hecht, who I think will take 15 to 20 minutes on direct, Your

14   Honor.

15         THE COURT:  That's a lot of time cumulatively.  Is it

16   necessary for you to call all those?

17         MR. PLACHY:  I believe so, Your Honor, yes.

18         THE COURT:  Would 1:00 o'clock work for you today?

19   All right.  1:00 o'clock.

20         (Jury excused.)

21         THE COURT:  Very quickly, what is the deal with jury

22   instructions?

23         MS. RIVAUX:  Your Honor, on the jury instructions, I

24   think the main issue is -- I think we agreed on the

25   apprehension instruction.

Sara Willis - Cross

1          THE COURT:  Just tell me what you don't agree on.

2          MS. RIVAUX:  The ones we don't agree on I think are 13

3   and the consent being an affirmative defense or an element.

4          THE COURT:  All right.  13, I already edited that.

5          MS. RIVAUX:  If that stays edited, then we are fine

6   with that.

7          MS. McHUGH:  Your Honor, respectfully, yesterday you

8   had asked if Colorado had ever adopted the Restatement, and I

9   wasn't able to answer that question.  But I looked it up and

10  Colorado has adopted the Restatement and has used that

11  definition of consent, so I think that action or inaction is

12  appropriate.

13         THE COURT:  Is that true?

14         MS. RIVAUX:  I found another case, it's the *Lindeman*

15  case that also cites the Restatement.  And in that case it's

16  both an affirmative defense and it does not reference inaction.

17         MS. McHUGH:  Your Honor, in the *Lindeman* case the

18  issue was not whether it was action, inaction.  The issue was

19  whether it was legal consent.  The person was about 15 years

20  old and they actually didn't cite to the Restatement for that

21  issue.  They cited to the same jury instruction we are talking

22  about.

23         But in another case out of the District of Colorado

24  Judge Martinez actually went in and used that exact same

25  definition from the Restatement.  Further, the Colorado Supreme

Sara Willis - Cross

1    Court has used that definition from the Restatement of action

2    and inaction.

3         MS. RIVAUX:  I would just add one thing on the

4    Restatement itself, Your Honor.  There is Comment D in

5    Section 892 that says:  In determining whether conduct would be

6    understood by a reasonable person as indicating consent, the

7    customs of the community are to be taken into account.  This is

8    true particularly of silence or inaction.

9         THE COURT:  Okay.  It sounds to me like Ms. McHugh has

10   the better of it and we will leave Instruction 13 the way it

11   originally was drafted.

12        What about this burden of proof issue?

13        MS. RIVAUX:  We believe under the *Lindeman* case,

14   that's a District of Colorado case, stating that consent is an

15   affirmative defense.

16        MS. McHUGH:  Your Honor, the *Lindeman* case and there

17   is another case, two cases out of the District of Colorado that

18   both say consent is an affirmative defense.  In those cases,

19   they cite to a Colorado Court of Appeals case and that case

20   says only that consent is a defense.

21        In both of the cases cited by Ms. Rivaux, the issue

22   before the Court was not whether -- who had the burden of proof

23   on consent, so the court really didn't get into it, but they

24   did say affirmative defense.  It is an affirmative defense, so

25   it's a close issue.

Sara Willis - Cross

1          But if you look at the case that is actually cited by

2   both of those cases, it's *Espander*.  And that's what it says

3   is:  The law in Colorado distinguishes between an action based

4   on no consent (battery) and one based on lack of informed

5   consent.

6          It's a medical battery case.  And that's all those

7   cases are relying on, so Colorado has never said it's an

8   affirmative defense.  Instead, the way Colorado has described

9   consent is that it is inherent in the very nature of battery.

10  I think that that example comes from the Colorado Supreme Court

11  in *People v. Medina*, where it says:  The common law action of

12  battery developed out of the law's recognition of an

13  individual's interest in personal autonomy and bodily

14  integrity-that is, the right of a person to participate in and

15  make decisions about his own body.

16         So when you look at a battery claim as arising from

17  the recognition of a person's ability, the plaintiff's ability

18  to make decisions about her own body, it seems fundamental that

19  to prove such a claim, it must be plaintiff's burden to show

20  that, in fact, the physical contact was inconsistent with what

21  she consented to.

22         *MS. RIVAUX:*  Your Honor, I would just respond with one

23  thing.  If the element is a lack of consent and there is then a

24  definition of a consent being inaction, then anything that for

25  Ms. Dailey -- if the plaintiff had the burden to prove a lack

Sara Willis - Cross

1    of consent and then consent is proven by inaction, so simply

2    the fact that she didn't scream, didn't fight back, didn't move

3    in the moment when she is being sexually assaulted would mean

4    that she consented.

5         THE COURT:  All right.  I have heard enough.

6         The standard instruction in the jury instruction book

7    makes it an affirmative defense.  It doesn't sound to me like

8    there is any clear law that says that is wrong, and I will

9    leave it the way I did it.  I will leave Instruction 13 intact

10   which makes it an affirmative defense that includes the

11   additional language.

12        Now, I told you all yesterday I didn't think it would

13   make any difference because the jury is going to decide which

14   one of these people to believe.  And the wording of this

15   instruction isn't going to change that.  This is compared to

16   the big issue in this case trivial and it instead becomes a

17   verdict loser risk.

18        MS. RIVAUX:  Your Honor, the one thing, that's why we

19   had suggested that we take the instruction and make it an

20   element and make the consent an element and instead take out --

21   so it would be an element exactly the way the defendant has

22   asked for it, but not have the additional language of inaction.

23   I think that's where the difficulty is.

24        THE COURT:  I never heard you say that.  You have

25   insisted that it was an affirmative defense until this very

Sara Willis - Cross

1   second.

2         MS. RIVAUX:  But we had suggested to them this morning

3   as we were looking at it that we would agree that because the

4   real problem here is the problem of inaction.  And because if

5   they want that language of inaction, it becomes very

6   inconsistent with the definition of having to prove lack of

7   consent the way they have been arguing this case.

8         THE COURT:  All right.  So there is no agreement.

9         MS. RIVAUX:  No.

10         THE COURT:  So it will stay the way it is and you will

11   take your chances.  I think you are both -- I think in

12   particular plaintiff is taking a risk that if I were the

13   plaintiff counsel I wouldn't take.

14         All right.  That's it.

15         MS. McHUGH:  Your Honor, we did agree to the parties

16   modifying seven and eight.  There was an element missing from

17   Instruction 7 as per the model instructions, and I have it

18   red-lined as agreed to both parties, if I could approach.

19         THE COURT:  All right.

20         MS. RIVAUX:  Your Honor, we had agreed to the verdict

21   form.

22         THE COURT:  You already said that.  You folks are the

23   masters of repetition, I must say.

24         Now, verdict form, it's good.

25         MS. McHUGH:  Yes, thank you, Your Honor.

Sara Willis - Redirect

 1          THE COURT:  See you at 1:00 o'clock.

 2      (Recess at 12:11 p.m.)

 3      (Reconvened at 12:58 p.m.)

 4          MS. ALTMAN:  Can I just grab the client?

 5          THE COURT:  As I said before, you really should rein

 6  yourself in this afternoon.  You have got a restless couple of

 7  jurors.  If you get up there and try to speak for an hour, you

 8  will lose them after 20 minutes, guaranteed.

 9          MR. PLACHY:  Thank you, Your Honor.  Very briefly.

10                      **REDIRECT EXAMINATION**

11  BY MR. PLACHY:

12  Q.  Ms. Willis, when Allison Hecht accused you of having an

13  affair of Mr. Hecht, what did you say in response?

14  A.  That it was not true.

15  Q.  Have you ever had a romantic relationship with Mr. Hecht?

16  A.  No.

17  Q.  How is your relationship with Allison Hecht today?

18  A.  Good, very well.

19          MR. PLACHY:  Thank you.  Nothing further, Your Honor.

20          THE COURT:  Questions from the jury.

21      (At the bench:)

22          THE COURT:  18.

23          MR. KAPLAN:  I have no objection.

24          MR. PLACHY:  No objection.

25          THE COURT:  And 19.

Sara Willis - Redirect

1      MR. KAPLAN:  I have no objection.

2      MR. PLACHY:  No objection.

3 BY THE COURT:

4 Q.  Ms. Willis, a couple, three questions from jurors for you.

5      Question:  Did you ever confront Mr. Hecht about what

6 you witnessed them doing on the path?

7 A.  I didn't confront him.

8 Q.  Did you discuss it with him?

9 A.  On April 20th when he and Allison first came back to --

10 when he first came to Mexico after the event, she brought it up

11 to me.  And I just kind of, you know, on the side like, you

12 know, you are ridiculous.  We didn't have a back-and-forth

13 discussion about it.

14 Q.  Did you and Mr. Hecht have a back-and-forth discussion

15 about what you saw?

16 A.  No.

17 Q.  Question:  Do you still work for those other families that

18 you mentioned earlier?

19 A.  No.

20 Q.  Or any other families as needed?

21 A.  At this point, no.  If Saucefly was not to pan out, I would

22 probably go back to working part-time down there just because I

23 have -- in short, ability to earn money for my family.

24 Q.  Question:  Did Mrs. Hecht think you had an affair with

25 Mr. Hecht before or after this incident?

Andrew Hecht - Direct

1    *A.*  She -- when they came back on his birthday trip, which was

2    April 20th, in the kitchen she came to me and said that Laura

3    Kaplan had told her that the boys had seen me having sex at

4    Flora Farm and Suzanna having sex at Flora Farm.  Was that the

5    full question?

6           THE COURT:  All right.  Any other questions from the

7    jurors?

8           Follow-up questions?

9           *MR. KAPLAN:*  No, Your Honor.  Thank you.

10          *MR. PLACHY:*  No, Your Honor.

11          THE COURT:  Thank you, Ms. Willis.  You are excused

12   and free to leave or, if you'd like, free to stay and watch.

13          Next?

14          *MR. PLACHY:*  So Your Honor, we have two very short

15   videos to play.  The first is a video of Allison Hecht.

16          (Videotape of Allison Hecht was played.)

17          *MR. PLACHY:*  Your Honor, the last video is Laura

18   Kaplan.

19          (Videotape of Laura Kaplan was played.)

20          *MR. PLACHY:*  For our final witness, Your Honor, we

21   call Andrew Hecht.

22      (**Andrew Hecht** was sworn.)

23          *THE WITNESS:*  I do.

24                      **DIRECT EXAMINATION**

25   *BY MR. PLACHY:*

Andrew Hecht - Direct

1    Q.  Good afternoon, sir.

2            Please tell us your name.

3    A.  Andrew Hecht.

4    Q.  Are you the father of Nikos Hecht?

5    A.  I am.

6    Q.  Mr. Hecht, where do you live?

7    A.  Aspen, Colorado.

8    Q.  How long have you lived in Aspen?

9    A.  46 years.

10   Q.  What do you do for a living, sir?

11   A.  I am a lawyer.

12   Q.  Are you married?

13   A.  I am married.  My wife is somewhere here.

14   Q.  How long have you been married?

15   A.  We have been married for -- 1980, so almost 37 years.

16   Q.  Congratulations.

17           Do you have children?

18   A.  We have three children, two by a prior marriage from me and

19   one together.

20   Q.  Was Nikos from the prior marriage?

21   A.  Yes.

22   Q.  Nikos gave you three grandchildren, correct?

23   A.  Yes.

24   Q.  What are their names?

25   A.  Thea is the oldest, Amelia is the next one and Levi is the

Andrew Hecht - Direct

1   youngest.

2   *Q.*   You get to see them often?

3   *A.*   Yes.

4   *Q.*   Tell us about your relationship with your grandkids.

5   *A.*   It's great.  It's my pleasure in life.  I have seven all

6   together, but --

7   *Q.*   I didn't mean to leave the other ones out.

8          Did you spring break at Nikos' home in Cabo San Lucas

9   during March of 2014?

10  *A.*   Yes.

11  *Q.*   Tell us about your trip.

12  *A.*   We went there first with friends who live in Cabo and

13  stayed with them for two or three days, and then we moved to

14  Nikos' house for another two or three days.

15  *Q.*   What did you do during the vacation?

16  *A.*   Nothing.  We did mostly nothing.

17  *Q.*   Sounds like a great vacation.

18         Was there a dinner that week at a restaurant called

19  Flora Farms?

20  *A.*   Yes.

21  *Q.*   Did you and Jody attend?

22  *A.*   We did.

23  *Q.*   Had you ever been to Flora Farms before that night?

24  *A.*   Yes.

25  *Q.*   Are you familiar with the general layout of Flora Farms?

Andrew Hecht - Direct

1    A.  Yes.  It's very small.

2    Q.  This is a photograph that's been previously entered into

3    evidence, and I am going to ask you to use this to help

4    describe your testimony for the jury.  It may be helpful for

5    you, sir, there is a little stylus I think should be on the top

6    of your computer that you can use to draw on the screen, if

7    necessary.

8         Where at Flora Farms was the dinner held that night?

9    A.  Okay.  So that's the main restaurant.  This is where the

10   dinner was that night.  I am not drawing very well.

11   Q.  When you arrived, did you go directly to that area that you

12   just identified?

13   A.  When we arrived, I went with Nikos and the friend from Cabo

14   to this spot, and there I stood for most of the night.

15   Q.  What did you do while you were standing there?

16   A.  I talked with Nikos and Gery Andlinger and my friend, Willy

17   Jordan.

18   Q.  Do you recall what was discussed?

19   A.  Well, Gery and I discussed his background and what he did.

20   I was sort of fascinated with his European business endeavors.

21   And he asked me about my father and my history, and Willy

22   Jordan sort of listened and chimed in occasionally, but that

23   was sort of where we were.

24   Q.  Nikos has told us already about his grandfather, the tennis

25   player.  Was that your father?

Andrew Hecht - Direct

1   A.   That was my father.

2   Q.   Were food and drinks being served when you arrived?

3   A.   We were all given a punch, a mixed drink punch, a sweet

4   drink, yeah.

5   Q.   Did you drink that drink?

6   A.   I held it and I drank a little bit of it.

7   Q.   Just a bit?

8   A.   A bit.

9   Q.   You mentioned that you and the men stood on that spot where

10   you marked.  How long did you stand there?

11   A.   I would say at least an hour.

12   Q.   Was Nikos there that entire time?

13   A.   He was there most of the time.  I am not sure if he was

14   there the entire time.

15   Q.   Other than -- well, let me ask you this.  Did you stay in

16   that spot until dinner was served?

17   A.   I did, except for a brief time I walked probably 20 or

18   30 feet up this path because my grandson, Levi, was playing,

19   and he came down do see me, so I greeted him there.

20   Q.   If you answered this already, Mr. Hecht, I apologize.

21       How long were you standing there before dinner was

22   served?

23   A.   It felt like about an hour.  It could have been 45 minutes,

24   something like that.

25   Q.   What was the lighting like when everyone sat down for

1   dinner?

2   A.  It had started to get dark and chilly.

3   Q.  When you set done for dinner, can you describe the evening

4   for us?

5   A.  It was sort of nondescript.  Everybody sat down at a long

6   table where I have drawn it.  And I sat next to Jeanne

7   Andlinger's mother and Gery Andlinger and, yeah, she was on my

8   left and he was on my right.

9   Q.  Prior to dinner at Flora Farms that night, had you ever met

10  Suzanna Dailey?

11  A.  No.

12  Q.  Did you meet her that night?

13  A.  Yes.

14  Q.  Do you recall observing her that night?

15  A.  She was wandering through the whole dinner taking pictures

16  from beginning to end, and she took a picture of me with my

17  grandson, Levi.

18  Q.  We will get to that in just a second.

19          Did you ever see Ms. Dailey acting as if she were

20  upset that night?

21  A.  No.

22  Q.  Did you see your son, Nikos, and Ms. Dailey interact at any

23  time during the evening?

24  A.  I did not.

25  Q.  You mentioned that Ms. Dailey was taking photographs.

1   Let's pull up, if we can, a photograph that was previously

2   admitted into evidence.  It's Exhibit 29.

3        Mr. Hecht, do you recognize that photograph?

4   A.  I do.

5   Q.  Who are those two young men in that picture?

6   A.  The young man on my head is my grandson, Levi, and I am the

7   only other one in the picture.

8   Q.  Do you know who took that picture?

9   A.  I think it was Ms. Dailey because she was taking all the

10  pictures that night.

11  Q.  When during the evening was this picture taken?

12  A.  Sometime before dinner, I think it was when I walked up the

13  path to greet Levi who was coming down the path.

14  Q.  Ms. Dailey has testified that when this picture was taken,

15  you told her that this was the closest Levi had ever let you

16  get to him.  Did you say that to her?

17  A.  It would have had no meaning because we are extremely

18  close.

19  Q.  We've heard that the restaurant served fried chicken for

20  dinner and pie for dessert.  Was there in your memory a gap in

21  time between when the fried chicken dinner was finished and the

22  dessert was served?

23  A.  It all went very quickly because it was getting cold and

24  there was some of us who are older and it was uncomfortable, so

25  everyone sort of wanted to get through dinner because it had

Andrew Hecht - Direct

1   taken so long to serve dinner and finally be finished.

2   *Q.*  Did people hang around and mingle after dessert was served?

3   *A.*  No.

4   *Q.*  Let's move forward in time, Mr. Hecht.

5          After you returned to Aspen, did Jean Andlinger come

6   visit you in your office?

7   *A.*  She did.

8   *Q.*  How long after the Flora Farms dinner was that?

9   *A.*  I think it was sometime before June, but I am not

10  absolutely positive.

11  *Q.*  What year?  Sorry.  2014?

12  *A.*  Oh, 2014.

13  *Q.*  Did she make an appointment to see you or did she just show

14  up?

15  *A.*  She just came to my office.

16  *Q.*  Did you know her before that?

17  *A.*  I knew Jeanne just casually, socially from seeing her at

18  parties.

19  *Q.*  During that meeting, did she tell you something had

20  happened at the dinner at Flora Farms?

21  *A.*  She told me that Nikos and Ms. Dailey, Suzanna, had some

22  sort of sexual encounter, that her son observed something,

23  movement up and down.  And she thought that they both used very

24  bad judgment.  And she felt that her sister probably was

25  flattered because Nikos was so much younger, but she was upset

Andrew Hecht - Direct

 1   with both of them and said they used very bad judgment.

 2   Q.  Did she ever describe what happened between Nikos and

 3   Ms. Dailey that night at Flora Farms as a rape?

 4   A.  Absolutely not.

 5   Q.  Did she ever describe what happened between Nikos and

 6   Ms. Dailey that night as an assault?

 7   A.  Absolutely not.

 8   Q.  Mr. Hecht, how did you first learn that Ms. Dailey was

 9   accusing your son of rape?

10          MR. KAPLAN:  Objection to form, Your Honor.

11          THE COURT:  Overruled.

12   A.  Shall I go ahead?

13          Sometime in August of 2015, the sheriff in Aspen,

14   Pitkin County, called me and said that Ms. Dailey had come to

15   his office and said that she was raped by my son and that's how

16   I learned.

17   BY MR. PLACHY:

18   Q.  Was the conversation you just described with Sheriff

19   DiSalvia, did that take place before or after your meeting with

20   Ms. Andlinger?

21   A.  That was almost a year, I think a year and a half

22   afterwards.

23          MR. PLACHY:  I have nothing further, Your Honor.

24   Thank you.

25          THE COURT:  Cross-examination.

1      MR. KAPLAN:  May I inquire, Your Honor?

2      THE COURT:  That's what cross-examination is for.

3      MR. KAPLAN:  I understand.

4                          **CROSS-EXAMINATION**

5  *BY MR. KAPLAN:*

6  *Q.*  Good afternoon, sir.  I am one of Ms. Dailey's lawyers.  I

7  am going to ask you some questions.

8  *A.*  Sure.

9  *Q.*  Mr. Hecht, I am correct that you are Nikos Hecht's father,

10 right?

11 *A.*  Yes.

12 *Q.*  And I think you already said that you are a lawyer.

13 *A.*  Yes.

14 *Q.*  And you've practiced for over 30 years, about 30 years?

15 *A.*  Since 1970.

16 *Q.*  Okay, so for a substantial amount of time.

17 *A.*  Yes.

18 *Q.*  Now, what I want to do is actually speak to you about three

19 things today.  I want to talk to you today about Flora Farms,

20 talk to you a little bit about how you found out about what you

21 just testified to and your relationship with your son, okay?

22 So let's do the first.  Actually, we will take it in this

23 order.

24        You mentioned Sheriff DiSalvo, right?

25 *A.*  Yes.

Andrew Hecht - Cross

1   *Q.* You testified about Sheriff DiSalvo telling you about a

2   lawsuit, right?

3   *A.* No.  He told me that he was visited by Ms. Dailey, who told

4   him that this had occurred.

5   *Q.* Thank you.  So he told you, just to be clear, that

6   Ms. Dailey told him that Mr. Hecht had raped her.

7   *A.* Yes.

8   *Q.* Serious allegation, obviously.  You would agree, right?

9   *A.* Very.

10  *Q.* Sheriff DiSalvo, sir, is the sheriff in Aspen, right?

11  *A.* Yes.

12  *Q.* That's where you live, correct?

13  *A.* Yes.

14  *Q.* And you have lived in Aspen for quite a bit of time; is

15  that right?

16  *A.* Yes.

17  *Q.* Now, you actually know Sheriff DiSalvo more than on a

18  professional level.  Is that a fair statement?

19  *A.* Very casually.

20  *Q.* When you say casual or when I say more than just

21  professional, really what I mean is you have had dinner with he

22  and his wife, correct?

23  *A.* Yes.

24  *Q.* And not on a one off occasion, right?

25  *A.* Twice.

1    Q.   Twice.  You had dinner alone with he and his wife, right?

2    A.   Yes.

3    Q.   In any event, when Sheriff DiSalvo told you about that

4    conversation with Ms. Dailey, he came to speak with you, right?

5    A.   I don't know if he came to speak to me or I saw him on the

6    street, but some version.

7    Q.   So the sheriff in Aspen was then approached by Ms. Dailey,

8    who said your son had raped her, approached you on the street

9    or came to your office to tell you about that conversation,

10   right?

11   A.   Yes.

12   Q.   I want to make sure we are very clear about this.

13        That conversation, that was not at a police station,

14   correct?

15   A.   It was not.

16   Q.   And that was not a recorded conversation, correct?

17   A.   Correct.

18   Q.   It was not a conversation where you were asked to provide a

19   witness list, right?

20   A.   Excuse me?

21   Q.   A witness list, a list of individuals who were at dinner at

22   Flora Farms, right?

23   A.   I am not sure I understand.

24   Q.   I will back up.

25   A.   Yeah.

Andrew Hecht - Cross

1   Q.  Again, we are starting with the sheriff in Aspen tells you

2   that your son has -- that Ms. Dailey has said that your son

3   raped her, right?

4   A.  Yes.

5   Q.  Sheriff DiSalvo is a law enforcement officer.  We agree?

6   A.  Yes.

7   Q.  And, sir, my question for you is during that conversation,

8   you were not asked to give a sworn statement, for example,

9   correct?

10  A.  Correct.

11  Q.  You were not told that you were being investigated.

12  A.  Correct.

13  Q.  Sheriff DiSalvo did not say, Mr. Hecht, may I have your

14  cellphone or your son's cellphone to see if you have any

15  communications about that evening, correct?

16  A.  Correct.

17  Q.  He didn't ask you for any e-mails, right?

18  A.  Correct.

19  Q.  Didn't ask you about anything that actually happened that

20  night.  Am I correct about that?

21  A.  Correct.

22  Q.  He was essentially just telling you what Ms. Dailey had

23  told him as a police officer.

24  A.  A sheriff, yes, as a law enforcement officer.

25  Q.  He literally recounted that Ms. Dailey said your son had

1   raped her.

2   *A.*   Yes.

3   *Q.*   So now I want to talk about Flora Farms, all right?

4   *A.*   Sure.

5   *Q.*   Before Flora Farms, you had never met Ms. Dailey; agreed?

6   *A.*   Correct.

7   *Q.*   You had never talked to her?

8   *A.*   Correct.

9   *Q.*   And I think it was your testimony in your deposition that

10  you wouldn't even have known who she was, right?

11  *A.*   When I meet somebody two years ago, I have trouble placing

12  a face, so I probably wouldn't identify her.

13  *Q.*   And I understand that.  And I guess what I am saying is she

14  wasn't a priority for you that night, right?

15  *A.*   No.  I was just noticing lots of pictures, but wasn't a

16  priority, no.

17  *Q.*   In fact, sir, you were really enjoying your time with your

18  grandkids, right?

19  *A.*   No.  I only spent 15 minutes or so with my grandkids.  I

20  was mostly with Gery Andlinger, my friend and Nikos, and then

21  at dinner with Jeanne's mother, Ms. Dailey's mother.

22  *Q.*   Let me put it differently.  You were enjoying an evening

23  with your friends and family, right?

24  *A.*   Yes.

25  *Q.*   And at that time am I correct that Ms. Dailey was neither

Andrew Hecht - Cross

1  of those two things, friends or family, right?

2  A.  Correct.

3  Q.  So your focus really would have been on the gentlemen that

4  you were standing with outside on that path, right, for that

5  period of time?

6  A.  For the dinner or while --

7  Q.  No, while you were standing outside.  Let me go back.

8  A.  Okay.

9  Q.  My understanding is that you were sort of posted on the --

10  in that path area with Mr. Hecht and two other gentlemen,

11  Mr. Andlinger and another friend of yours; is that true?

12  A.  Yes.

13  Q.  And you were enjoying yourself and you gentlemen were, for

14  lack of a better term, schmoozing?

15  A.  Yes.

16  Q.  You were talking to each other and enjoying conversation,

17  right?

18  A.  Yes.

19  Q.  Your son while you were out there, Mr. Hecht, was part of

20  that conversation, right?

21  A.  Yes.

22  Q.  And then everybody has dinner, right?

23  A.  Yes.

24  Q.  You enjoyed dinner because you were spending time with

25  friends and family, correct?

Andrew Hecht - Cross

 1  A.  Yes.

 2  Q.  That dinner and your enjoyment during that dinner was not

 3  revolving around Ms. Dailey, right?

 4  A.  Correct.

 5  Q.  And, in fact, sir, I believe it's your testimony that you

 6  really didn't know and you don't know of any interaction or

 7  conversations, anything that happened between Mr. Hecht and

 8  Ms. Dailey during that evening, right?

 9  A.  Correct.

10  Q.  You didn't personally observe with your eyes anything from

11  that path, right?

12  A.  Correct.

13  Q.  And you didn't personally hear anything with your ears at

14  the table, right?

15  A.  Correct.

16  Q.  Again, you had dinner and you left, right?

17  A.  Yes.

18  Q.  So now I want to talk a little bit more about the third

19  component, your relationship with your son.

20  A.  Sure.

21  Q.  You talked about Jeanne Andlinger, right?

22  A.  Yes.

23  Q.  At the time point Ms. Andlinger came and spoke to you -- we

24  will talk about what she said, but at the point in time she

25  spoke with you, sir, Mr. Hecht, Nikos Hecht, your son, had not

1   told you what had happened, correct?

2   *A.*   Correct.

3   *Q.*   So let's be very clear here.  Regardless of what

4   Ms. Andlinger said to you in your office that day, regardless

5   of what she said, at that point in time you were unaware that

6   anything had happened at Flora Farms between your son, Nikos

7   Hecht, and Ms. Dailey, right?

8   *A.*   Correct.

9   *Q.*   This was the first time.

10   *A.*   Correct.

11   *Q.*   And putting aside what was said, it had to be upsetting,

12   agreed?

13   *A.*   I felt it was very inappropriate if it occurred.

14   *Q.*   I understand.  And just so that we are again on the same

15   page, that's a conversation that was private between you and

16   Ms. Andlinger, right?

17   *A.*   Say that again?

18   *Q.*   A conversation that was private between you and

19   Ms. Andlinger, right?

20   *A.*   Yes.

21   *Q.*   In other words, a conversation between two people behind a

22   closed door, right?

23   *A.*   Yes.

24   *Q.*   And at the end of that conversation, sir, you didn't call

25   your son, Mr. Hecht, and have him come into the office and talk

Andrew Hecht - Cross

1  to him about it, correct?

2  A.  No.

3  Q.  Because I think it's your testimony that that whole thing,

4  that interaction, regardless of what it was, is outside of your

5  purview.  I am using your words.  Is that right?

6  A.  Yeah.  I mean, I explained it, but -- yeah, it's outside my

7  purview, whatever that means.

8  Q.  Now, Mr. Hecht, we established you are a lawyer, but you

9  are not just a lawyer.  You are actually Mr. Hecht's lawyer,

10  your son's lawyer, right?

11  A.  For many matters, yes.

12  Q.  When we say many matters, more than one case, right?

13  A.  Yeah.

14  Q.  Or two?

15  A.  Real estate, mostly real estate and real estate-related

16  matters, yes.

17  Q.  It's about 10 different matters.  Does that sound right?

18  A.  Could be.

19  Q.  At any given time when you are working for Mr. Hecht, your

20  son who is here, I would imagine that even though he is your

21  son, you are charging him, no?

22  A.  For some things because -- if I am not working on the

23  matter.

24  Q.  If you are working on the matter, you do it for him just

25  because he is your son, right?

1   A.   Yeah, I suppose that's part of it.

2   Q.   So you are his lawyer.  And then you actually have a

3   relationship as business partners; is that right, sir?

4   A.   Yes.

5   Q.   And as business partners, you two work together to do

6   development work; is that right?

7   A.   Yes.

8   Q.   And in addition to being a lawyer and a business partner, I

9   understand that you are the trustee to some of his trusts; is

10  that true?

11  A.   Yes.

12  Q.   These trusts that are trusts in favor of individuals like

13  his children?

14  A.   Yes.

15  Q.   Children who I believe you have said, and understandably

16  so, you love tremendously, right?

17  A.   Yes.

18  Q.   You would agree with me, sir, that as your son's lawyer,

19  you want what's best for him, right?

20  A.   Yes.

21  Q.   As his business partner, sir, you are invested with him in

22  making sure that he is doing well.  You want him to do well as

23  your business partner, right?

24  A.   Yes.

25  Q.   And as the trustee over his trusts that are in favor of

Andrew Hecht - Cross

1  people like his children, sir, you don't want bad things to

2  fall on your son; agreed?

3  *A.* Correct. I don't have control over a lot of things that

4  happen, but --

5  *Q.* And I understand that.

6         And, sir, he is your son, so you love him a great

7  deal, correct?

8  *A.* Say that again.

9  *Q.* You love him a great deal?

10 *A.* I do.

11 *Q.* And you don't want to see anything bad. Obviously, you are

12 not in control of everything, I understand that, but you don't

13 want to see anything bad happen to him, right?

14 *A.* Sure.

15 *Q.* I just have one additional question, sir, a question I

16 should have asked you before.

17         During that conversation with Ms. Andlinger behind

18 closed doors, sir, you said what Ms. Andlinger said to you. Do

19 you recall that?

20 *A.* Yes.

21 *Q.* What did you say to her?

22 *A.* I said I knew nothing about it. And if it occurred, it was

23 inappropriate behavior on both parts.

24         *MR. KAPLAN:* Thank you, Your Honor.

25         *MR. PLACHY:* Nothing further, Your Honor.

1          *THE COURT:* Questions from the jurors?  No?

2          All right, Mr. Hecht.  Thank you for your testimony.

3   You are excused and free to go or welcome to stay and watch, if

4   you'd like.

5          That concludes the defense evidence?

6          *MR. PLACHY:* Defense rests, Your Honor.

7          *THE COURT:* All right.  I will deem any motions

8   renewed and rulings the same.

9          Will there be any rebuttal evidence?

10         *MS. ALTMAN:* No, Your Honor.

11         *THE COURT:* All right.  The evidence is closed.

12         Now, while we have been doing this, I understand that

13  two or three more changes were suggested to the jury

14  instructions, but they appear to be typos and you have made

15  those.

16         *COURT DEPUTY CLERK:* I have to go get them off the

17  copier.

18         *THE COURT:* Okay.  What's going to happen is I am

19  going to read the instructions to you.  There are 23.  And then

20  I am going to discuss the jury verdict form with you.  And then

21  the lawyers can make their final speeches and you will be able

22  to deliberate.

23         *MS. LaBRANCHE:* Your Honor, may I run out for just a

24  moment and I will be right back?

25         *MS. ALTMAN:* May I follow her?  Thank you, Your Honor.

1          THE COURT:  Anybody who needs to use the restroom or

2    otherwise leave the building or the courtroom may do so.

3          (Brief recess.)

4          THE COURT:  Would counsel waive the recording of the

5    reading of the instructions?

6          MS. ALTMAN:  Yes, Your Honor.

7          MS. LaBRANCHE:  Yes, Your Honor.

8          (The jury instructions and verdict form was read to

9    the jury by the Court.)

10         THE COURT:  That is the verdict form.  Those are the

11   instructions, except for No. 23.

12         MS. ALTMAN:  Your Honor, I apologize.  There is

13   actually a typo on number -- where it says Question 8, it says

14   if you answered yes to Question 8.  I believe that should be 7,

15   if you answered yes to Question 7.

16         THE COURT:  You are right.  If you answer yes to

17   Question 7.  It wouldn't make much sense if you answered yes to

18   Question 8.  Obviously, that should have been 7.  Good eyes.

19   We proof these things and proof them again and we always miss

20   something.

21         Okay.  Now, closing argument for the plaintiff.

22                        **CLOSING ARGUMENT**

23         MS. ALTMAN:  Good afternoon, everyone.  And I know I

24   speak for everyone in the room.  We really do appreciate all of

25   your time and your patience and listening to the arguments.

1          I know you may recall when we met for the first time

2    and the first time I got to speak to you, one of the things I

3    asked you was whether or not you were going to have an issue

4    with making a decision when you have very, very different

5    versions of the same story.  And as I recall, all of you agreed

6    that that would not be an issue for you.  And I think after

7    sitting through this for fours days, there are very, very

8    different versions of the same story.

9          But one of the most important things for us today is

10   that you all are going to be the voice, the scream, the

11   reaction that Ms. Dailey could not have, did not have, could

12   not summon on the day that Nikos had violated, had assaulted

13   her in Cabo San Lucas when she could not scream, when she was

14   struck by fear, when she was afraid and scared and not sure

15   what was going to happen from one minute to the next.  She had

16   no voice.  She could say nothing.  She was paralyzed.  She was

17   numb.  She was scared.

18         But today you have the opportunity to be the voice for

19   Ms. Dailey, to scream for her, to let the defendant know that

20   what he did was wrong, that it's unacceptable, that's illegal,

21   that it's improper.  And we believe at the end of the day as

22   you have heard the evidence come in this week and as we will

23   talk about now, we believe the only credible evidence, the only

24   credible evidence -- and you heard the Court's instruction

25   about you as jurors, right, judges without robes, you get to

1    evaluate the body language of people, what they said, what you

2    heard and how their body moved and evaluate their credibility.

3    Were they telling truth or not?

4          It's very important, your judgment of whether someone

5    is telling the truth or not.  It's very, very important because

6    this week what you saw and what you heard were very different

7    stories.  But let's talk about the only people, the only people

8    who actually witnessed what happened.

9          There are four of them.  It's Ms. Dailey, my client,

10   who is with me here today.  Nikos Hecht, you heard from him.

11   And there were two other witnesses and two other witnesses

12   only.  There was Tristan Andlinger and it was George Cathers.

13   And you heard from all of them in the plaintiff's case in

14   chief.  I apologize, Mr. Hecht was in the defendant's case, but

15   you heard from the Court that it was our burden of proof and it

16   is.

17         We must prove to you by a preponderance of the

18   evidence each of our claims.  And I heard it described to me by

19   a very wise person what preponderance of the evidence means is

20   if you took a bowl and filled it half up with jelly beans and

21   dropped one more in, that's a preponderance of the evidence.

22   It's just slightly more when you are weighing it out as to who

23   is telling the truth.

24         So let's talk about the evidence, the credible

25   evidence in this case.  You heard Ms. Dailey's testimony.

 1   Ms. Dailey testified before you and she talked about exactly

 2   what happened, that she was taking pictures of the individuals

 3   at the table and little Levi Hecht, and you saw some of those

 4   pictures.  You saw that Ms. Dailey testified that she took all

 5   of those pictures, all of those pictures during dinner, and

 6   that the event happened after dinner.

 7        And I want you to remember that because we are going

 8   to look at some of those pictures.  And those pictures --

 9   forget what Ms. Dailey says and forget what Mr. Hecht says for

10   a minute.  When you see those pictures, you will know that

11   Ms. Dailey's version of the truth is the only version of the

12   truth; that Mr. Hecht's version of the truth that the rape

13   occurred before or, as he called consensual sex or not sex,

14   depending upon which version of his story you believe or which

15   time he said it, he says it happened before dinner.

16        So Ms. Dailey testified that she was on the path in

17   that grassy area right by the pavilion.

18        And if you could call up Exhibit 124.

19        You will see a picture of the pavilion and that she

20   was taking pictures in the area adjacent -- right adjacent to

21   the pavilion.  And that while she was standing there, Mr. Hecht

22   came up to her, offered to show her the garden.  You even heard

23   Mr. Hecht's witness, Ms. Sara Willis, testified that the lights

24   went halfway down the path.  And you heard numerous witnesses

25   testify that it was dusk.  Wasn't completely dark, wasn't

804

1   completely light, but it was dusk and that the path was lit

2   halfway down.  And, in fact, you heard Mr. Hecht say that he

3   thought the area where he was standing was from the end of this

4   courtroom to the end of that courtroom, to the end of the other

5   side.  It's not very far at all.

6          And again, that's another fact that you are going to

7   have to think about because you heard some other evidence that

8   according to Ms. Willis, there were three gentlemen standing at

9   the end of that path.  And you heard Andy Hecht testify just a

10  moment ago that he stood at the end of that path, the end of

11  the path the entire time until dinner was served, stood there

12  the whole time, according to him.

13         Now, Mr. Hecht offers his arm.  They walk down the

14  path together.  According to Ms. Dailey, who testified before

15  you, they walked down the path.  And then when they got

16  slightly down the path, maybe 30, 40, 50 feet, at some point he

17  grabbed her by the back of the neck with force.  He held her

18  tightly and he pulled her face into his.

19         She was scared.  She was frightened.  And we can all

20  talk about how we would react in the same situation, but until

21  you are in that situation, right, I am sure we all think of our

22  fright and flight responses, but until you are standing in her

23  shoes on that day, none of us can judge whether she should have

24  screamed, should have kicked him or should have hit him.

25         All you can judge is did you believe Ms. Dailey.  Did

1    you believe that when he grabbed her from behind the neck, that

2    she was terrified, that she was frightened, that she didn't

3    know what was going to happen next.  Then he forcibly kissed

4    her.  He pulled her to the ground and then he raped her.  He

5    absolutely raped her.

6           And while Mr. Hecht you heard on the stand was unable

7    to determine at any point in time where his penis was,

8    Ms. Dailey noticed where it was.  It was inside of her.  You

9    heard her testimony.  She didn't ask him to rape her.  She

10   didn't ask him to touch her.  All she wanted to do was enjoy

11   her family and friends.

12          And how do we know when you heard Mr. Hecht testify

13   that all of this was instigated by this 65-year-old woman at

14   the time, who had never met him before with the exception of a

15   few days earlier for one hour, for one hour, that this woman

16   felt so emboldened and so comfortable to walk up to really

17   virtually a stranger, virtually a stranger with his wife there,

18   with his children there, with her mother there, who I know you

19   all heard she loves with every inch of her heart, who she has

20   cared for for 10 years, and her nephew who she loves, that this

21   woman would walk up to this man on this path and start talking

22   dirty to him.

23          And I don't think I need to repeat the vile things

24   that Mr. Hecht suggested to you that she said, but I think your

25   own judgment and your own wisdom and your own observation will

 1   tell you that that did not happen.  It could not happen.  It

 2   would not happen and it didn't happen.  And, in fact, it makes

 3   no sense whatsoever.  It makes no sense.

 4        What it is, though, it's just more of what you saw in

 5   the opening statement of the defendant.  It's the typical

 6   victim blaming.  That's what you see all the time.  It must

 7   have been the woman.

 8        So let's talk about what Ms. Dailey was wearing,

 9   right, because that seems to be of great interest.  She was

10   wearing by everyone's account baggy cargo shorts, I believe

11   Jeanne referred to them as pedal pushers, baggy cargo shorts

12   down to the knee and a loose peasant blouse.  So if we are

13   going to blame the victim, it can't be based on that outfit

14   because it clearly wasn't seductive in any way.  But that's

15   what they want to talk about because they want you, as they

16   always do, to blame the victim.

17        Somehow Ms. Dailey, by her outfit, must have suggested

18   to Mr. Hecht that she was so attracted to him, she wore the

19   same outfit.  And according to what you heard, which I know you

20   heard was not true when you heard Ms. Dailey testify, they

21   wanted you to actually believe for a minute that Ms. Dailey

22   went through the effort of shaving or somehow cleaning up her

23   pubic area in anticipation of this great event, this event that

24   she wanted to happen so bad.  In fact, according to the

25   defendant, she was glomming on to him.  She was so flirtatious

1   with him.

2          But you heard -- even if you believed the defendant,

3   and I cannot see how anyone could given his testimony in this

4   courtroom, even if you believed him, does anyone think saying

5   to somebody, "You are the king of the castle" is flirtatious?

6   Is that something that screams to you, using your common sense,

7   that I want to have sex with you?

8          And you heard Mr. Hecht say she never touched him.

9   Even in his version of what happened at his house that night,

10  she never touched him.  She never said anything provocative to

11  him.  And the brief moments that they were speaking were a

12  minute, two minutes.  That's what happened at his house that

13  night.

14         And you heard Ms. Andlinger's testimony and you heard

15  Suzy Dailey's testimony that they were with Allison Hecht the

16  whole time.  And, in fact, everyone seems to agree that when

17  men and women get together, they separate.  The men go to one

18  side and the women go to the other, and that's what happened at

19  the Hecht home that night.  It's also what happened at Flora

20  Farms.

21         So now let's talk about Flora Farms.  What happened at

22  Flora Farms?  You sat through Ms. Dailey's testimony.  I

23  believe the only credible testimony is Ms. Dailey's testimony

24  because you heard Mr. Hecht's testimony.  I don't know if you

25  heard what I heard, but clearly there was nothing he said that

 1   matched up.  He was all over the place.  He would tell one

 2   story one way and one story another, and it reminds me of what

 3   I tell my children all the time.  You can never tell the same

 4   story twice if you are telling the truth.  It just never works

 5   out.  That's why you have to tell the truth in the first

 6   instance.

 7        Now, how do we know what the truth is here?  In the

 8   case of Ms. Dailey, you just don't have her testimony before

 9   you, which I think was powerful and compelling and, most

10   importantly, truthful.  You can also rely upon the pictures you

11   saw.

12        If you could call up, please, Exhibit 10.  Thank you.

13        So that's Tristan and George.  And why is this picture

14   of significance?  Two guys hanging out having fried chicken.

15   The reason it's important is twofold.  No. 1, Ms. Dailey,

16   Tristan Andlinger, George Cathers and Jeanne Andlinger, every

17   single one of them said it happened after dinner.  Four people,

18   four separate people said it happened after dinner.  Mr. Hecht

19   said it happened before dinner.  And, in fact, his paid chef

20   corroborated him.  And I am going to show you how that's

21   impossible.

22        Because you heard Tristan Andlinger's testimony,

23   correct?  And he is a young boy and he ate a lot during that

24   deposition.  I hope we can -- everybody in the room can agree

25   on that.  He was eating the whole time.  But one thing he said

```
 1    that should ring out to you, he was so upset by what he saw, by
 2    what he saw, which according to him happened only a short time
 3    before he left, he didn't even say goodbye to his aunt, who he
 4    loves with all of his heart.  He didn't even say goodbye.  He
 5    just left.
 6           So you ask yourself using your common sense, this
 7    young man who was so upset by what he saw, do you think he sat
 8    for a picture after that?  Do you think Tristan Andlinger and
 9    George Cathers, given what you heard from them and how upset
10    they were and what Tristan Andlinger said, that he left right
11    afterwards and he didn't even say goodbye to his beloved aunt,
12    sat for that picture after that?  Does that make sense to you?
13    Does that sound like the truth?  It can't be truth.  That
14    picture was taken, as Ms. Dailey testified, during dinner.  And
15    the brutal rape of Ms. Dailey occurred after dinner.  And we
16    know that for another reason.
17           If you could call up, please, Exhibit 19.
18           Now, you all have seen a lot of this picture.  That's
19    the defendant in this case, Defendant Hecht.  And Defendant
20    Hecht wants you to believe -- he wants you to believe that that
21    picture was taken, that that picture was taken after what he
22    claimed to be this consensual sexual encounter which
23    apparently, according to him, didn't involve penetration and
24    didn't involve intercourse.  That picture was taken.
25           And you remember his testimony, his testimony.
```

1    Ms. Dailey was embarrassed.  I mean, he had left her there.  He

2    had jumped up because he finally found a conscience, according

3    to him.  And he walked down the pathway and he left her there.

4    But according to him, he wants you to believe that Ms. Dailey,

5    embarrassed and ashamed, actually went up to him afterwards and

6    asked to take his picture?  Does that make sense to you?  Does

7    that make any sense at all?  It doesn't.  It does not.

8           And the reason it also doesn't make sense even if you

9    don't want to believe anything I just said, let's believe Andy

10   Hecht, because Andy Hecht just testified only moments ago that

11   he stood in the same spot at the end of the pathway the whole

12   time not moving until he ate dinner.  And he stood there for an

13   hour.

14          And, now, couple that with Sara Willis' testimony.

15   What did Sara Willis tell you?  Sara Willis told you that the

16   women -- that about the hour before the dinner, right, were

17   still in the jewelry store.  Do you remember that testimony

18   from Ms. Willis?  All the women were in the jewelry store.

19   According to Ms. Willis, the women had not come back from the

20   jewelry store at the time at which she saw or didn't see what

21   she claims to be, what could have been or may have been, if she

22   had stayed around to watch, a blow job, but she doesn't know

23   because she left.  But what she did say is that the women had

24   not come back from the jewelry store.  So why do we know that

25   the rape happened after dinner?  Because the women were at the

1   jewelry store and Ms. Dailey was one of them.

2         You heard from Jeanne Andlinger that Ms. Dailey was

3   with her at the jewelry store.  You heard from Ms. Dailey that

4   she was with her sister, Allison Hecht and Laura Kaplan at the

5   jewelry store.  That's what we know.

6         What do we also know?  You heard Mr. Hecht testify,

7   probably more than you wanted to at my questioning, that he

8   never, he never, never, never once put his penis inside her

9   vagina.  He didn't penetrate.  And I could go at length about

10  his incredible testimony, but let's just focus on that for a

11  minute.

12        He never had sex with her.  He never had intercourse

13  with her.  Ask yourself then, how is it that two young boys who

14  have no dog in this hunt, two young boys testified that they

15  saw that man, clearly Mr. Hecht, on top of Ms. Dailey, Tristan

16  testified thrusting into her for at least three minutes, three

17  minutes until he ran off scared.

18        And note for the record, he wasn't scared of

19  Ms. Dailey.  Do you remember who he said he was afraid of?  He

20  was afraid of Mr. Hecht.  He was afraid of Mr. Hecht seeing

21  him.  That's what he said.

22        George Cathers testified under oath -- a young boy.

23  You have got to evaluate their credibility and watch their

24  demeanor, both of them clearly telling the truth -- that he saw

25  Mr. Hecht on top of Ms. Dailey for five to seven minutes

 1    thrusting into her.  So you have to decide who is telling the

 2    truth.

 3           Three of the four independent witnesses, right, three

 4    of the four people that were there say absolutely,

 5    unequivocally, intercourse occurred.  And only one of them says

 6    it didn't.  And who was that one?  It's Mr. Hecht.  And you

 7    heard his fantastical story.  It was a narcissistic fantasy at

 8    best.  It makes no sense and it's untrue.  And when you think

 9    about the evidence, when you think about the witnesses you

10    observed, you know it makes no sense.

11           So let's talk about you just heard from Laura Kaplan.

12    Laura Kaplan testified the very next day, the very next day she

13    spoke to Jeanne Andlinger.  And her recollection of what

14    Ms. Andlinger told her was that Nikos Hecht took Ms. Dailey

15    into the bushes and pulled her pants down.  And I will skip the

16    descriptive narrative of his genitals, but that's what Laura

17    Kaplan said the very next day.

18           Now, you heard from Mr. Hecht, Nikos Hecht never even

19    told his father.  And he never told his wife and he never told

20    his children and he never told a soul because he wanted to keep

21    it a secret.  He didn't want anybody to know because he

22    admitted to you on more than one occasion, it's okay to be

23    deceptive.  It's okay to try and lie, correct?  It's okay not

24    to tell the truth.  Omission, sins of omission; but omission,

25    sins of omission are as great as sins of commission.

1           You heard what Ms. Kaplan said but there is more

2     evidence that what supports Ms. Dailey said.  You recall

3     Dr. McGuigan.  Dr. McGuigan testified before you, and she has

4     been treating Ms. Dailey for a long, long time dealing with

5     everyday stuff.  You heard the defendant again victim blaming.

6     Oh, well, she must be so frail.  I guess if you were raped but

7     you have had other issues in your life, it just doesn't matter.

8     Let's just forget it.  You don't deserve anything because, you

9     know, you're -- let's just talk about your dog died and you

10    were sad and one day you felt like you were gaining a few

11    pounds.  You heard what they did.  You heard their focus.

12          The fact that Ms. Dailey has chosen to live a life

13    where she wants to know herself better and wants to open up --

14    and we are going to talk for a minute about those records which

15    she never knew and Dr. McGuigan never knew would see the light

16    of day, would never be shown to anyone.  And what do those

17    records say?

18          If you could please pull up Exhibit 204.012 and 013.

19    That's okay.  She will work on that, but I will remind you what

20    it was.  That was the first visit that Ms. Dailey had after she

21    came back from Cabo San Lucas, the very first visit.

22    Dr. McGuigan goes through a detailed account of what Ms. Dailey

23    told her.  And why that matters, aside from the fact that

24    Ms. Dailey had no reason to hide anything because this is a

25    record that would never be seen by anyone, but what matters

1  most about this record is the exact same story, the exact same

2  fact pattern that Ms. Dailey told you when she testified.

3       She didn't misunderstand facts and she didn't forget

4  this and not remember that and needed to go look at her

5  deposition.  She told you what happened to her.  This is the

6  record.  And let's read it.  She said:  Client reported sexual

7  assault in Mexico.  She was at dinner with family and friends,

8  Jeanne and Gery, mom and Suzy, Nikos and Allison, Tristan and

9  Nikos' son, another couple from Colorado and their son.  After

10 dinner, after dinner.  Ms. Dailey's story, Ms. Dailey's truth

11 has always been the same.  She has never had to change because

12 it's the truth.

13      And as I said, if you tell stories, you can never tell

14 the same one twice.  So after dinner Nikos asked if she had

15 seen the gardens.  They were beautiful.  We were walking and he

16 grabbed me by the back of my neck, pushed me down.  I felt like

17 a victim.  I was pinned.  The client stated she told him to

18 stop.  Wait.  He didn't listen.  I felt numb.  The client is

19 asking herself, why would he do this?  I am 65 years old.  He

20 is a younger man.  I was wearing my shorts and a peasant top.

21 I didn't suspect it at all.  I felt safe, family and friends.

22 Why should I be concerned?

23      Days after, this is April 4th, and I don't think it's

24 disputed in any way that the rape of her was on March 25th.

25 Her first visit she told the therapist what happened.  She told

1    it in excruciating detail, the same detail that you heard.  She

2    didn't have to scramble to look at depos and recreate and say,

3    oh, maybe I got it wrong or I don't remember this and I don't

4    remember where my penis was and maybe it was on the grass and

5    maybe it was on her leg.  It's the same story.  She has always

6    been consistent.  She has always been consistent.

7          And there are other medical records that are in

8    evidence.  For example, 204.14, and we don't have to go through

9    them all now, but you will see in that medical record the exact

10   same thing, the exact same thing every time.  And when she

11   called Sheriff DiSalvo, the exact same thing.  And when she

12   spoke to Lisa Miller, the exact same thing.  Her truth has

13   always been what you know it to be, the truth, because you

14   watched her testify and you saw her demeanor, and you were able

15   to evaluate her credibility.

16         And you saw Jeanne testify.  And I think the most

17   difficult thing, because one of the things you got to observe

18   was the family dynamic.  And one of the things you saw, right,

19   that this woman who had been brutally raped in that moment when

20   she is shocked and she is terrified and she didn't know what to

21   do, do you know who she thought of?  Instead of herself, she

22   thought of her mother.  That's who she thought of.

23         I think that's really, really compelling to think that

24   this woman who was brutally raped by this man, instead of

25   thinking about her, instead of thinking about what she would do

 1   for herself, thought again about her mother and not wanting to

 2   disrupt her mother and not wanting to bother her little nephew

 3   and not wanting to disrupt anyone else.  She thought of others.

 4        But the very next morning she told her sister what

 5   happened, and then she suffered in silence until she could get

 6   back to the United States and talk to her therapist.  She

 7   thought of others.  She thought of her mother, the love she had

 8   for her mother that you heard extensively about.  And I know

 9   the defendants are going to come in again and make a lot of hay

10   out of the fact that, oh, well, Ms. Dailey should have

11   screamed.  She should have hit him.  She should have violently

12   attacked this man while she was terrified on the floor.

13        Let's talk about that, being terrified on the floor.

14   You heard this defendant tell you that this woman who was so

15   aroused, so aroused that she had to happen upon him on the

16   pathway and start talking in a way that I think we all agree

17   didn't happen.  But if you want to for one second think about

18   could that have happened or is it possible, all you have to do

19   is listen to the testimony of Tristan and George.

20        How is it that if this woman was so engaged and so

21   interested and so hot for this guy, she laid on the ground

22   motionless, motionless, not one word, not one movement,

23   nothing, nothing.  And you heard it from two young boys.

24        So if you want to believe the defendant that she was

25   so interested and so attracted to him, how does that make sense

1  to you?  How is that credible given the testimony of two

2  eyewitnesses who watched her lay there motionless on her back

3  not saying one word, not one peep?  In fact, the defendant

4  himself acknowledged she didn't say a peep.  So all of the

5  sudden that dirty talk.  I don't know.  There is silence.

6  There is radio silence.

7          What else do we know?  We heard from the defendant.

8  He said all kinds of fantastical things, but none of them make

9  sense.  He never put his penis inside her, but she wasn't

10  lubricated.  It was dark out, but he claims she had no pubic

11  hair.  The story doesn't make sense.  It doesn't make sense at

12  all.  And I think you will see that when you reflect upon the

13  evidence.

14          So what else do we know?  We know, as the Court told

15  you, that the fact that Ms. Dailey in her life has had ups and

16  downs, like every other one of us, lost dogs, lost friendships,

17  maybe put on a few pounds.  Maybe taking care of our parents is

18  stressful.  That doesn't matter. That's a side show, a side

19  show that the defendants want you to go down.  It's a smoky

20  mirror.

21          Because at the end of the day you take this plaintiff,

22  you take Ms. Dailey, just as she is with whatever things that

23  happened in her life.  That's how you take her.  And you don't

24  get to punish her because maybe she suffered from depression or

25  maybe she suffered from the loss of a nephew as you heard.

 1   That doesn't matter.

 2        The question, the only question for you today is did

 3   that man rape her?  Did he rape her?  And you have to decide

 4   based upon the evidence that's presented to you whether he did

 5   or not, because if you find that he raped her, then the

 6   plaintiffs win, then the plaintiffs win.  And that's really at

 7   the beginning and end of it the only thing you have to

 8   evaluate.  Did Nikos Hecht rape Ms. Dailey?  If he did, then

 9   Ms. Dailey prevails.

10        And I am going to talk to you just briefly about a few

11   of the claims as the Court advised you, and the Court is going

12   to advise you on the law.  And I am just a mouthpiece.  The

13   evidence is what you observe in this courtroom, the people

14   talking to you sworn under oath and the depositions that you

15   saw and the pictures and the medical records.

16        I do just want to mention just a couple other things.

17   One of the things on the medical record, and I don't know if we

18   are able to pull it up, but I will bring it to your attention.

19   It's Exhibit 201.016.  And if she can't bring it up, I will

20   tell you about it.  You saw Mr. Tumminello bring up this

21   medical record, and it's a medical record of Dr. McGuigan.  And

22   I will represent to you it's all going to go back to you in the

23   jury room.

24        But he only showed you like the top of the document.

25   He never showed you the bottom of it.  It's just another piece

1   of evidence that you can think about when you are evaluating

2   the credibility of the witnesses because this particular record

3   of Dr. McGuigan says that this woman, Ms. Dailey, suffered from

4   osteoporosis.  And not only did she suffer from osteoporosis,

5   her records reflect that she had terrible fear that she was

6   going to fracture a bone, that she was going to hurt herself.

7         And so I just suggest to you that maybe when you are

8   thinking about this fantastical story that you heard where

9   Ms. Dailey got on her knees to perform oral sex on Mr. Hecht

10  for about 10 or 20 seconds, how likely it is that she would

11  have done that.  Again, it's just something else for you to

12  consider, but I think all of the evidence shows that

13  Ms. Dailey's truth is the only truth.

14        The Court instructed you with respect to the jury

15  instructions on the law.  We have three claims.  One is for

16  assault, one is for battery, and one is for intentional

17  infliction of emotional distress.  Those claims we believe we

18  have proven to you by a preponderance of the evidence.  The

19  bowl of jelly beans halfway filled, one more jelly bean meets

20  the standard for a preponderance of the evidence.  And you are

21  going to be able to look at that in there in the jury room.

22        The assault claim is one I just want to orient you to.

23  It's for you to evaluate whether or not after Mr. Hecht grabbed

24  her by the neck, she had a fear, an apprehension, of immediate

25  physical harm, of physical harm that was to follow.  We submit

1    to you that her testimony demonstrates without equivocation

2    that she did.

3           She had no idea what was going to happen.  She didn't

4    know what was going on.  She didn't know that he was going to

5    rape her, and it was one series of things after the other.  We

6    believe that the actual credible evidence will show that she

7    has demonstrated her assault claim.

8           The battery claim relates to a physical contact.  You

9    heard both Ms. Dailey and Mr. Hecht acknowledge that there was

10   physical contact.  The only thing you will need to evaluate is

11   whether or not Ms. Dailey consented to that.  And the

12   defendants have the burden of proof to show you that Ms. Dailey

13   consented to the assault and to the physical contact.

14          The last claim is an emotional distress claim.  What

15   does that mean?  That means has Ms. Dailey suffered

16   emotionally, mentally, as a result of what happened to her that

17   night.  And again, I think the credible evidence -- you heard

18   Dr. McGuigan testify.  You heard Ms. Dailey testify.  I think

19   that's going to be really important.

20          And I think something else that I would like you to

21   think about when you go back into the jury room, because again,

22   I think it's a natural tendency for us to look at people and

23   say that they should react the same way.  And I know you heard

24   Ms. Andlinger testify, and I think one of the questions that

25   was asked was how, if she thought her sister was raped, did she

 1    not talk to her that night?  And you heard Ms. Andlinger

 2    explain to you why.

 3          That's the reason.  She was caring for her elderly

 4    husband.  Suzy was caring for her mother.  But most

 5    importantly, as her sister, she wanted to honor what Suzy felt

 6    comfortable doing.  She wanted to honor her sister.  And that's

 7    because good, bad or indifferent, they have great family love.

 8    They are a family.  And no family is perfect and no person

 9    responds perfectly, but I think when you think about

10    Ms. Andlinger's testimony, I think it is very compelling

11    because she loves her sister and she just wanted to make sure

12    she was okay and that she did what was best for her sister.

13          We also have claimed in this case punitive damages.

14    And I know you heard the Court tell you that punitive damages

15    is the one that has a different burden of proof, beyond a

16    reasonable doubt, and he talked to you about that.  But what

17    punitive damages means, as the Court told you, it's to punish

18    the defendant.  It's to say, you, Defendant Hecht, you did

19    something wrong.  It's not right what you did.

20          And if you saw that picture -- can you bring up

21    Exhibit 19?  And I promise you I am just about done.  Look at

22    that picture.  That picture is worth more than a thousand words

23    because that's a picture taken only shortly before he raped

24    Ms. Dailey.  And just look at his face.  Look at his

25    expression.

 1           That is a man who saw what he wanted and decided he

 2   was going to take it.  He saw something he wanted, whether it

 3   was because he was bored, whatever the reason was, he saw what

 4   he wanted and he decided he was going to take it because he is

 5   rich and entitled and he thought he could do it.  And he

 6   thought he could get away with it.  And it's going to be up to

 7   you to decide whether or not he can.

 8           And when you are thinking about, well, how do you

 9   really evaluate, how do you decide what somebody suffered in a

10   case like this where somebody has been raped?  What is that

11   worth?  How do you put a value on it?  And everyone struggles

12   with that.  It's difficult.  And you guys, I am not going to

13   say your job is easy, but I would submit to you one suggestion.

14           You heard that Ms. Dailey has spent so far $12,000

15   with her therapist, but we know that this has gone on for her

16   for the past three years.  And you heard Dr. McGuigan testify

17   extensively about how her life is different today from how it

18   was before.  You heard her sister talk about it as well.

19           So I would submit to you, $1 for every minute, for

20   every minute of every day for the past three years that

21   Ms. Dailey has had to suffer, so that's $1 -- I had to write

22   out the math because I am not so good, so it's $1, so that

23   would be $60 an hour, $1,440 a day.  And it's $524,000 a year

24   for three years for Ms. Dailey, non-economic damages.

25           And then ask yourself whether the defendant's willful,

1  wanton, egregious acts make you want to punish him more.  And I

2  submit if you agree, and I think the evidence warrants it, that

3  what he did to her was brazen and intentional and egregious and

4  horrible, then you say for yourself, well, Mr. Hecht -- I

5  believe he testified he was 46.  Let Mr. Hecht pay $1 for every

6  minute for every hour for every day until he turns 65, when he

7  is at the time in his life when he should be able to enjoy

8  himself, spend time with family, spend time with friends,

9  right?  So let him do that so that for every day until now

10  until he is 65, when Ms. Dailey should have been enjoying her

11  life, he has to remember what he did to Ms. Dailey.

12         Thank you.

13         *THE COURT:*  Thank you.

14         Anybody need a break before the next speech?

15         Closing for the defendant.

16                    **CLOSING ARGUMENT**

17         *MS. LaBRANCHE:*  Thank you, Your Honor.

18         This isn't a he said/she said case.  This is a they

19  said/she said case.  And it would not even have to be that if

20  Ms. Dailey hadn't burned the shorts she was wearing that night

21  that potentially contained the only physical evidence in this

22  case, shorts which, remember, she burned on April 7th of 2014,

23  a week after she first spoke to a civil lawyer, not a criminal

24  lawyer, a civil lawyer, a civil lawyer who told her to start

25  making a file about Mr. Hecht.

 1          And she talked to that civil lawyer before she ever

 2    went and saw Dr. McGuigan and gave her that -- and gave her her

 3    recitation.  She talked to the civil lawyer before she ever did

 4    that.

 5          Now, ladies and gentlemen, Ms. Altman talks to you

 6    about one jelly bean.  And I think we all know this case is so

 7    much more serious than that.  And so you need to understand and

 8    there can't be any mistake that the plaintiff has the burden of

 9    proving this case, and she hasn't.  I told you during opening

10    that you were going to hear from three eyewitnesses and you

11    did.  Sara Willis came in.  You saw Tristan Andlinger by

12    deposition and you saw George Cathers by deposition.  Each of

13    them testified about a piece of the night that they saw.

14          Now, both Tristan and George talked about how they saw

15    Mr. Hecht on the pathway, and then they saw Ms. Dailey come on

16    him.  That's what they testified to.  That's what they said.

17    And then they saw the two of them walk down the path beyond the

18    lights arm in arm.  Each of these boys described what they saw

19    that night as suspicious, suspicious enough that they left,

20    they ran around the table, they went all the way up through the

21    fields to try and find where Mr. Hecht and Ms. Dailey had gone,

22    what it was that they were sneaking off to do.  And the boys

23    lost them for they said about 90 seconds.

24          And that's where Sara Willis picked up.  And she told

25    you that she saw Mr. Hecht and Ms. Dailey on that path.  You

 1   saw Ms. Willis.  Does it seem to you like she is a pushover

 2   that's going to do something that she doesn't want to do?  She

 3   is going to come in and say something that she doesn't want to

 4   say?  She told you that she saw Ms. Dailey bend down in front

 5   of Mr. Hecht and saw her go to his jeans.

 6        And then she didn't want to see anything else.  She

 7   was angry and she was annoyed and she left.  And she went to

 8   the kitchen and she said, you know what, just fire all the rest

 9   of the food.  She already started the kids and she said, Just

10   fry all the rest of it because I want to get this done.  And

11   when she left, Tristan and George caught up with them and they

12   saw them on the ground.  And they saw Ms. Dailey laying on the

13   ground with her legs spread.  They saw her arms up over her

14   head.

15        I agree with one thing Ms. Altman said, and that is

16   that the testimony of Tristan and George was very sincere.

17   They were 14 and 15 years old that night at Flora Farms, but we

18   all know that kids that age are much more sophisticated than

19   they used to be.  The very fact that they saw something was

20   potentially going on and followed them kind of shows that

21   sophistication.

22        And while they were sitting there watching Mr. Hecht

23   and Ms. Dailey on the ground, they probably had a hundred

24   things running through their head.  And Tristan specifically

25   told us that he went through a checklist in his mind.  Neither

1    of them thought that this was a rape.  Neither of them thought

2    that this was an assault.  What they both thought was the

3    truth, that this was two consenting adults.

4              And they so believed that that they got up and they

5    ran back and told Tristan's mom that these two were an item and

6    then later told her that they were doing it.  They both told

7    you, and they were sincere and they were truthful, that if they

8    had thought Mr. Hecht was hurting Ms. Dailey, they would have

9    interrupted that.  They would have stopped that.  They would

10   have gotten help.  But that's not what they saw.

11             And, you know, it wasn't comfortable for either of

12   them to see this nor was it comfortable for them to have to

13   admit that they giggled about it and laughed about it because

14   that's what 14-year-old boys do when they walk in and they

15   catch two people messing around.  That's what these two boys

16   saw.  And that's what this was.  This was consensual actions

17   between consenting adults.

18             And you know that because you heard about how

19   Ms. Dailey acted that night after the encounter.  You heard she

20   went back to the table in her white shorts with no underwear.

21   And I know Ms. Altman wants you to believe that I am trying to

22   victim shame her and say that somehow, I don't know, was she

23   asking for it because she was wearing white cargo shorts?  Of

24   course not.

25             The point is if you are wearing white shorts and no

```
 1   underwear and you have been brutally violently raped, and by
 2   your own testimony there is semen and there is blood, does it
 3   really make sense that you just go back to the dinner table?
 4   You don't go to the bathroom.  You don't clean yourself up.
 5   You just go back and sit at the dinner table in those shorts?
 6   That doesn't make sense.  And then you destroy them after you
 7   talk to a civil lawyer.  And it's not just that she went back
 8   in those shorts without cleaning up.  It's that she went and
 9   sat next to Mr. Hecht.  She went and sat next to him and she
10   tried to talk to him.
11          And the other thing that you -- one of the other
12   things that you heard during the trial that shows this was a
13   consensual act between consensual adults is you heard from
14   Ms. Dailey's sister, Jeanne Andlinger.  Now, when Jeanne
15   Andlinger was on the stand, it's clear she loves her sister and
16   her sister loves her.  It's clear that Jeanne Andlinger would
17   do anything for her sister.  She probably has literally given
18   her sister her shirt off her back.  That's what she seems like.
19          And you are telling me that if Jeanne Andlinger
20   thought her sister had been brutally, violently assaulted that
21   night, she would have just gotten to the villas and said, bye,
22   see you tomorrow.  That doesn't make any sense.  That doesn't
23   make any sense.  What Jeanne knew was what Tristan had told
24   her, that he saw Mr. Hecht and Ms. Dailey having consensual
25   sex.  That's what she knew.
```

1          And she thought, you know what?  It's kind of another

2    Suzy drama.  I have my husband I need to go take care of.  I

3    just -- I can't do it right now.  I am tired.  We will deal

4    with it tomorrow.  That's what happened that night.

5          And think about it.  If Ms. Dailey, if she had

6    actually really been brutally, violently raped that night,

7    would she have said to her sister, oh, okay, yeah, I will just

8    talk to you tomorrow?  That doesn't make any sense.  And I know

9    now they want to come in and they want to say, well, we were

10   taking care of mom.  Mom was so sick.  We had to have the

11   doctor in.  We had to do this.  We had to do that.  They are

12   laying out at the pool the next day when they are talking about

13   the encounter.

14         Mr. Hecht told you that for him this case is about

15   justice and it's about clearing his name.  And when you all go

16   back into the jury room, you are going to have a lot of

17   questions.  And, frankly that's why we picked all of you.  We

18   talked to a bunch of people.  It was very thoughtful.  We all

19   agree this is who we wanted to hear all these facts.

20         So you are going to do that.  You are going to go back

21   and you are going to have these questions.  And one of the

22   questions is going to be, why would Ms. Dailey lie, right?

23   That's going to be one of your questions.  And the answer is, I

24   don't know.

25         Maybe she was humiliated.  We know that she testified

1    she was humiliated.  And maybe she was ashamed because we know

2    that she testified that she was ashamed.  Maybe it's what her

3    sister said, that Suzy always has to be in control, or maybe it

4    was what one of the jurors said when I was talking to you guys

5    on Tuesday.  One of the jurors said, you know, maybe she saw

6    this as an opportunity she could capitalize on.  I don't know.

7    I really don't know.  But what you need to know is it's not up

8    to us to prove what her motive is.  They have the burden here.

9    We don't have to prove that.

10         Now, in order for what happened that night at Flora

11   Farms to have gone the way Ms. Dailey has described it,

12   Mr. Hecht would have had to have been clairvoyant or had a

13   premunition because he would have somehow had to know that he

14   could lure Ms. Dailey away down the path, that he could grab

15   her and slam her to the ground, that he could violate her in

16   the most offensive way possible and that she wouldn't do

17   anything.  He had to have known that.

18         And he would be gambling everything he has on her

19   silence.  He would gamble going to a Mexican prison.  He would

20   gamble losing his wife and kids.  He would gamble losing his

21   relationship with his father.

22         And you have to remember Mr. Hecht and Ms. Dailey

23   didn't know each other, so how could he have possibly known

24   that?  How could he have possibly known that?  How could he

25   have known she wouldn't scream when her family was just feet

 1   away?  And how could he have known she wouldn't fight back?   I

 2   know Ms. Altman just said she had osteoporosis, but Ms. Dailey

 3   was a pilates instructor.  She had been doing it for 13 years

 4   at that point in time.  That gives you strength.  He didn't

 5   know that.  He didn't know that.

 6        And how could he have possibly known that after he got

 7   back up and went to the table, that she wouldn't come there,

 8   throw things around and confront him in front of everybody,

 9   that she wouldn't have run to the restaurant and gone and

10   grabbed their phone and called the police?  He wouldn't have

11   known that.  There was no way for him to know that.

12        And you heard Ms. Dailey testify that Mr. Hecht never

13   threatened her.  He never told her she had to be quiet.  He

14   never told her she couldn't say anything to anybody, none of

15   that, because it wasn't him luring her away.  It was two

16   consenting adults going down that path together.  It makes no

17   sense.

18        You heard Mr. Hecht.  You saw Mr. Hecht.  You saw his

19   dad testify.  The only way this entire night makes sense is

20   consent.  That's the only way it makes sense.  It's consistent

21   with the evidence you've heard.  It's consistent with how

22   Ms. Dailey acted.  It's consistent with how her sister acted.

23        Ms. Dailey cannot meet her burden.  She just hasn't.

24   She has not met her burden in this case.  And I want to show

25   you a few jury instructions I want you to concentrate on when

 1   you are back in deliberations.  And they kind of can be grouped

 2   together.

 3        So Jury Instruction 7 and 9 have to do with assault

 4   and battery.  So the first one is 7, which has to do with

 5   assault.  I have highlighted for you what I really think is

 6   important here, and that is they have to prove that Mr. Hecht

 7   intended to cause harmful or offensive contact.

 8        Now, because Ms. Dailey was a willing participant that

 9   night on that path, they cannot meet that element.  They just

10   haven't.  And it's the exact same one that they would have to

11   meet for a charge of battery.  And they haven't met that

12   either?

13        And the Court instructed you that there is an

14   affirmative defense called consent, right?  So I don't think

15   you have to get there because she didn't meet her burden; but

16   if you did, if you did, Mr. Hecht has proven consent.  To prove

17   consent he has to show that Ms. Dailey by words or conduct

18   consented or led Mr. Hecht reasonably to believe that she

19   consented.  It may be manifested by words, actions or

20   inactions.

21        Think about what you know about what happened that

22   night and what happened in the nights leading up to it.

23        And the second claim you are going to have is

24   intentional infliction of emotional distress.  Now, in order

25   for Ms. Dailey to prove all of these elements, she has to prove

1  that Mr. Hecht engaged in extreme and outrageous conduct.  You

2  are going to get a jury instruction, No. 15, that's going to

3  tell you conduct is not extreme and outrageous if she consented

4  to it.  So she hasn't met her burden here either.

5          And I understand that Ms. Dailey and her sister both

6  came in and they both testified here, but they have convenient

7  stories.  They tried to cover up fatal flaws in her case and

8  they tried to not have you guys hear the bad facts, flaws like

9  the timing.

10          The timing in this case, Ms. Dailey testified on

11  direct all of this took place after dinner, and that's what her

12  attorney just said.  And then I got up and I said, but wait a

13  second.  That's not what you said before because before when

14  you testified at your deposition, you said after you got up,

15  you went back to the table and the chicken was just starting to

16  be served.  And we went back and forth and went back and forth.

17  So finally we went ahead and we had that exhibit entered into

18  evidence here.  So look at 221 when you get back there.  That

19  shows you exactly what it was that Ms. Dailey said.

20          And the reason that Ms. Dailey had to testify that it

21  happened after dinner is because of those pictures, because if

22  you were assaulted before dinner, how you do you explain those

23  pictures away, those pictures where she is walking around and

24  taking pictures of everyone.  Ms. Dailey said in her complaint

25  that she originally filed -- remember, I also asked her this.

```
 1    I asked her about when she had testified, how she verified, she
 2    read the complaint.  And, yes, the timing was right.  And in
 3    that complaint it said during dinner, but before dinner was
 4    served.  That's when she went down the path.
 5              MS. ALTMAN:  I apologize.  We went over this.  That's
 6    not what the complaint said.  And I recall Your Honor
 7    instructed her specifically at the time that be careful what
 8    you ask for.  And she put the complaint down and now she is
 9    trying to testify about it.
10              THE COURT:  Let's not talk about the complaint.
11              MS. LaBRANCHE:  That's fine.
12              Ladies and gentlemen, you have heard different
13    accounts of when it was that Ms. Dailey and Mr. Hecht walked
14    down that path.  And, frankly, you don't have to decide if it
15    was before or after dinner.  What you can do instead is you can
16    think of Ms. Dailey's testimony about what the light was like
17    because she said when they walked down that pathway, it was
18    dusk.  The sun was starting to set, right?
19              But look at these pictures.  I am going to pull up for
20    you Exhibit 6.  This is a picture Ms. Dailey testified she took
21    at dinner.  Look at that.  Look how black that is.  That is
22    pitch black.  That's not dusk.  It's not before dusk.
23              Go to Exhibit 7, please.  Same thing.  Look in the
24    background, pitch black.  Exhibit 48?  And Exhibit 19?
25              Now, Exhibit 19, maybe not a good picture of
```

```
 1   Mr. Hecht.  It's kind of odd looking.  And think about what
 2   makes sense.  Does he have a smile on because he is thinking,
 3   oh, yeah, I just saw what I want, or does he actually have a
 4   smile for the reason he explained, which is he is back at the
 5   table.  He is trying to avoid her.  And she walks up and wants
 6   to take a picture.  Is that an awkward smile?  I mean, that's
 7   an awkward smile.
 8             You can take it down.
 9             Now, like I said, you don't have to decide if this is
10   before or after dinner because the one thing that everyone
11   agrees on is that it was before dessert.  The boys said it was
12   before dessert.  Jeanne Andlinger said she talked to the boys
13   for the first time between dinner and dessert.  Everyone agrees
14   it was before dessert.
15             Can you pull up Exhibit 24?
16             Ladies and gentlemen, Sara Willis was on the stand
17   today and she testified, oh, yeah, on that plate that's that
18   cream pie.  That's dessert.  So even under Ms. Dailey's time,
19   even if you believe her time frame, she still went back to the
20   table and continued taking pictures.
21             I already know.  When Jeanne and Ms. Dailey got back
22   to the villas, they didn't call the police.  They didn't call a
23   doctor.  Ms. Andlinger said to her, I already know.  And if you
24   remember, she didn't testify about that on direct.  That wasn't
25   something she wanted to talk about.
```

1          But when I got up and asked her questions about it,

2     she kind of fought me a little bit.  And I got out her

3     deposition transcript, and ultimately she agreed, you know

4     what?  That is what she said.  And she didn't want to admit

5     that.  She didn't want you to hear that she said that because,

6     I already know, I will talk to you in the morning, is her being

7     short with Ms. Dailey and it's her being kind of dismissive.

8          And it also lets you know that Ms. Dailey went back to

9     her villa that night knowing that her sister knew that she had

10     just hooked up with Mr. Hecht, knowing that her sister was kind

11     of mad, her sister who financially supports her.  And it gave

12     Ms. Dailey that whole night to think about what had happened

13     before she talked to her sister the next day.  Ms. Andlinger

14     didn't want you to know that.

15          One of the other things that the plaintiff didn't want

16     you to know that I had to get out for you was the comments that

17     Mr. Hecht made to Ms. Dailey, not the comment itself.  We

18     talked about that.  I am talking about Ms. Dailey's reaction to

19     that comment because when Ms. Dailey testified on direct, she

20     said, I didn't really think too much of it.  I kind of blew it

21     off.  I got up and said, wait a second.  That's not what you

22     said before.  When we deposed you, you said you were very

23     uncomfortable.  It was vulgar.  You were disgusted.  It was

24     offensive.

25          And she didn't want to tell you that.  And the reason

 1   she didn't want to tell you that is because if, in fact, he

 2   made those comments and she felt that way, why would she have

 3   gone for a walk with him in the garden?  That doesn't make

 4   sense.  She didn't want to hear those facts and so I had to

 5   bring those out for you.

 6         And I don't want to spend too much time, but you all

 7   heard that Ms. Andlinger was adamant that she did not talk to

 8   Allison Hecht at all.  She was adamant that she told Laura

 9   Kaplan rape and assault.  She was adamant that she told Andy

10   Hecht that Nikos assaulted, sexually assaulted her sister.

11         None of those people said that.  Allison Hecht said,

12   yeah, she actually did call me.  She is denying it, but she had

13   called me and she apologized for the affair.  And Laura Kaplan

14   said, yeah, like, you know, but she didn't say rape.  She

15   didn't say sexual assault.  The first time I heard that was an

16   allegation was after Ms. Dailey sued.  That was the first time

17   I heard that.

18         And Andy Hecht told you that what Jeanne Andlinger

19   said is what makes the most sense in this case, that both

20   Mr. Hecht and Ms. Dailey had very bad judgment that night.

21         I have to very briefly address with you Dr. McGuigan.

22   And I told you guys in opening that you were going to hear a

23   lot of horrible symptoms that Ms. Dailey had experienced during

24   her life, and that the plaintiff was going to tell you that

25   this had to -- a rape had to have occurred; otherwise, she

1    wouldn't experience those symptoms.  We talked about that.

2          And so they brought Dr. McGuigan in and put her up on

3    the stand.  And they asked her some questions and they showed

4    her three medical records, three of her doctors' notes.  And

5    they went through all those symptoms, all those horrible

6    sounding symptoms there, just the three that they wanted you to

7    see.

8          And then because of that Mr. Tumminello had to get up,

9    and he didn't to want do this yesterday.  He didn't want to

10   embarrass Ms. Dailey.  He didn't want to make anyone

11   uncomfortable and he certainly didn't want to waste your time.

12   But Ms. Dailey and Dr. McGuigan had both testified that these

13   were new and different symptoms than what she had before, and

14   he had to show you that's not true.  She has been dealing with

15   these issues for a long, long time.

16         And as it relates to Dr. McGuigan, she is not just

17   Ms. Dailey's therapist.  She is clearly also her friend.  And

18   she testified that they spend time together outside of their

19   sessions.  They have gone to monasteries.  They meditate

20   together.  And when she was testifying yesterday, she wasn't

21   testifying as an independent medical provider.  She was

22   testifying as Ms. Dailey's friend and she was testifying as

23   Ms. Dailey's advocate, and that's all I really want to say

24   about that.

25         Ladies and Gentlemen of the Jury, the Judge just read

 1   you the verdict forms.  They sounded really confusing, so I

 2   want to show you how easy they actually are.  The verdict form:

 3            Question No. 1:  Did plaintiff, Suzanna Dailey, prove

 4   by a preponderance of the evidence her claim of assault?  No.

 5            Did she prove battery?  No.

 6            Did Nikos prove consent?  Yes.

 7            Did Suzanna Dailey prove extreme and outrageous

 8   conduct?  No.

 9            You answer those four questions and you are done.  You

10   get to skip to the last page.  You get to sign the form and you

11   get to be done.  It's not that confusing.  It doesn't have to

12   be.

13            I want to leave you with this.  We have all done

14   things in life that we regret, and Mr. Hecht has admitted that

15   that's what happened that night at Flora Farms.  He has come in

16   here and he has admitted it.  He wished he had never gone down

17   that path with Ms. Dailey and he wished that they had never

18   done what they did.  But sometimes your regret can be so

19   intense that you can kind of convince yourself that maybe you

20   weren't an active participant in something that you were and

21   maybe you didn't really choose to do something that you chose

22   to do.

23            And Ms. Dailey may very well genuinely believe that

24   right now.  She may.  As she sits before you today, she may

25   genuinely believe that.  But three eyewitnesses were there and

1    three eyewitnesses saw what went on that night and all three

2    eyewitnesses saw consent.  And Ms. Dailey's action and

3    Ms. Andlinger's actions, they say consent too.  What Mr. Hecht

4    and Ms. Dailey did that night was wrong, but like I said the

5    first day, it wasn't rape.

6         Thank you.

7         THE COURT:  All right.  Thank you.

8         Rebuttal speech.

9                        **REBUTTAL ARGUMENT**

10        MS. ALTMAN:  So this is the last time I will get to

11   talk to you today.  And what just happened sort of reminds me

12   of a famous saying by Will Rogers, and it's, Where you stand

13   depends on where you sit.  But the good news is you are all

14   sitting in this jury room for the past four days.  And you are

15   going to remember that numerous things that counsel just told

16   you are absolutely false.  That isn't what the evidence show.

17        So, for example, counsel just told you, she just

18   represented to you that Ms. Dailey, before she saw her

19   psychologist, before she saw anyone, before she saw anyone, she

20   saw a lawyer.  You were here.  She must have thought you

21   weren't paying attention because that's not what happened.

22        The evidence was clear that Ms. Dailey, just two days

23   after she got back, she went to her therapist.  And that

24   therapist note was created and it was created never knowing it

25   was going to see the light of day.  And it was not until

1    several weeks or a month later that she for the first time

2    spoke to a lawyer who happened to be her friend.  That's what

3    the evidence showed.

4           And what counsel just told you --

5           MS. LaBRANCHE:  Objection, Your Honor.  That misstates

6    the evidence.  And I understand it's argument, but it misstates

7    the evidence.

8           THE COURT:  Well, guess who gets to decide that, not

9    you, not me, them.

10          Onward.

11          MS. ALTMAN:  You were here.  You heard it.  You don't

12   have to rely on me or counsel.  You heard the testimony.  The

13   testimony was clear.  She got back.  Within a couple days --

14   she got back on a Monday, and by that Wednesday or Thursday she

15   saw her therapist.  And she didn't speak to her friend, a

16   retired lawyer, for three weeks or four weeks after she

17   returned.  That was the evidence and that evidence is

18   unrefuted.  The defendants put on no countervailing evidence to

19   suggest that wasn't true.  That's what happened.

20          So now let's talk about the shorts.  We all heard

21   about the shorts.  Ms. Dailey told you what happened.  A few

22   days after she went to her therapist, she was distraught.  She

23   was sad.  She didn't know what to do.  She didn't like seeing

24   the shorts all the time.  It was upsetting for her.  And she

25   burned them, at the time never thinking that she would be

1    sitting here today because, as Ms. Dailey told you and as

2    Ms. Andlinger told you, she was just trying to process what

3    happened, trying to understand how it could happen, trying to

4    come to grips with her feelings, those emotions, the trauma,

5    the shock.  She wasn't thinking as she might have thought

6    clearer in the light of day a year down the road or two years

7    down the road or three years down the road.

8            She burned them.  She told you she burned them.  It

9    wasn't a secret and she told you.  It wasn't because she had

10   spoken to a lawyer at any time.  She spoke to a lawyer much

11   later and that's what the evidence showed.

12           So she talked about Tristan and George.  You both

13   saw -- you all saw Tristan and George.  They were two lovely

14   young men who are now older teenagers who at the time were 14

15   and 14 years old who had no idea, because Ms. Dailey did not

16   scream and she did not kick, and there is no dispute about

17   that.  There is no dispute about that.  She didn't scream.  She

18   didn't hit him.  She laid there stoically praying for it to be

19   over, and that is consistent with what both of those gentlemen

20   saw.

21           The only person they heard a sound from was Mr. Hecht

22   grunting, Mr. Hecht, the same man who told you he had no

23   intercourse and did not penetrate Ms. Dailey.  Both of those

24   boys heard him grunting, but not a word from Ms. Dailey.  And

25   they both told you she laid there like a stone, just laying

 1   there, just praying and hoping he would finish.  That's what

 2   they said.

 3        But to suggest to you that those two young boys who

 4   had no way of knowing a rape was going on would somehow just

 5   inject themselves into that situation, she wants you to believe

 6   that they would do that under those circumstances.  And reason

 7   and common sense tells you no 13-year-old boy, when he sees

 8   what they have testified they saw, with no word from Ms. Dailey

 9   and no screaming is going to run in and separate them or go run

10   back and bring people to the scene.  It doesn't -- it defies

11   common sense.  It defies common sense.

12        Now, importantly, what she did tell you that is, in

13   fact, true and that both witnesses testified, both Tristan and

14   George, was that it was a mere 90 seconds, 90 seconds from when

15   they saw Ms. Dailey and Mr. Hecht go down the path until they

16   caught up with them again.  They both said that.  And she

17   admitted it.  She just told you that.

18        So why is that important?  How is it, how is it that

19   Mr. Hecht's tale, the walk down through the looking glass could

20   have ever happen in 90 seconds?  Think about what he told you

21   what had occurred between when they locked arms and to when

22   they were on the ground.  Ms. Dailey engaged in significant

23   dirty talk.  She apparently, according to him, touched herself.

24   She pulled his pants down.  She took her own clothes down.  She

25   gave him at least oral sex for some period of time.

 1          But by the time those boys were there, he was already

 2   on top of her, penetrating her, having intercourse and

 3   grunting.  You ask yourself whether the defendant's story can

 4   fit within that 90 seconds.  It doesn't make sense and it's not

 5   the truth.

 6          Now, Ms. Willis.  Ms. Willis testifies to one thing

 7   and one thing only.  I believe your credibility conclusion

 8   should be that she testified to what her loyal boss needed her

 9   to testify.  That's what she did.  You saw her demeanor.  You

10   saw the way she reacted when she was questioned.  And you heard

11   the only thing she says, the only thing she said, she saw them

12   on the path.  They were facing each other, and then Ms. Dailey

13   allegedly got on her knees.  And that's all she saw, nothing

14   else.

15          But she did say there were a bunch of men at the

16   bottom of the path.  She did say that.  She said the kids were

17   running around on the pathway.  And we already went through her

18   story about how this happened before dinner just doesn't match

19   up because the credible evidence shows that Ms. Dailey was in

20   the jewelry store prior to dinner, so it could not have

21   happened before dinner.

22          Now, she brought up Jeanne Andlinger, Jeanne

23   Andlinger, who she suggests that if Ms. Andlinger thought that

24   her sister was raped, she would have immediately gone to her

25   that night.  And I think that was again a question for the

1   jury, and I think it's a reasonable question to ask yourself.

2   I think it is, but I think you have to listen to the testimony

3   and in context.

4           First of all, Ms. Andlinger was extremely credible.

5   She didn't fight with anyone as juxtaposed with Ms. Willis.

6   She was forthright and she told you, In hindsight, I regretted

7   not speaking in more detail with my sister that night, but I

8   was traumatized for my son and I was the ward of this

9   13-year-old boy.  And I was dealing with my husband and we were

10  dealing with my mother.  And I was trying to yield to what my

11  sister wanted.

12          And she also told you while she knew that there had to

13  be something awry, that her sister who she has known her whole

14  life wouldn't just go off in the bushes, a 65-year-old woman,

15  with a stranger where her mother who she worships is there and

16  her nephew.  While she knew that wouldn't happen, she didn't

17  know exactly what happened.  All she knew is what her son told

18  her.

19          But what they decided is that they were going to talk

20  the next day.  And contrary to what counsel told you, they

21  didn't talk about it out by the pool.  Both Ms. Dailey and

22  Ms. Andlinger testified that they spoke in Ms. Dailey's private

23  room.  That's what the testimony was.  That's what the evidence

24  was.  They didn't go out by the pool having mai tais.  They had

25  an hour-long discussion in Ms. Dailey's room where they talked

 1    about what happened in detail.  And Ms. Dailey, Jeanne asked

 2    her, what do you want to do?  What can you do?  How are you

 3    doing?  What can I do?  And Ms. Dailey said she just needed to

 4    think.

 5           But one thing she was very clear about, she did not

 6    want to involve her mother.  She didn't want to involve her

 7    mother.  So she made the decision that she made to wait and go

 8    home and just try and think through it and decide what to do.

 9           And it's very easy for people standing on the outside

10    to say, well, then I guess you weren't raped because you didn't

11    react the way I think you should have.  But that's not the way

12    it goes.  People respond to situations differently.  And you

13    were the one that got to listen to Ms. Dailey testify and

14    Ms. Andlinger testify, and you can juxtapose that with the

15    testimony of the defendant and you will make a decision on who

16    is telling truth and who is not.

17           And I think everyone in the room completely trusts

18    that you will make the right decision.  You sat here patiently.

19    You listened to all the evidence.  And we do very much

20    appreciate it.

21           One of the things that she also asked you to consider

22    is, well, what kind of gamble would Mr. Hecht have taken that

23    Ms. Dailey wouldn't say anything to anyone?  I don't know what

24    a rapist ever thinks about that.  How many rapists have you

25    ever heard sit around and evaluate whether or not their victim

1    is going to tell somebody?  That isn't the way it works.  He

2    took what he wanted at that moment for whatever reasons he

3    decided and he was willing to live with the consequences.  And

4    I think he thought the consequence was that she wasn't going to

5    say a word.  That's what he thought.

6         But you heard the testimony.  You decide what was

7    going in his mind and whether he was testifying truthfully.

8    And, interestingly, one of the things that was also brought up

9    was the comments about being humiliated and ashamed.  Those

10   comments were brought up in the context of therapy.  And who

11   wouldn't be humiliated and ashamed if they were brutally raped?

12   Who wouldn't be?  Who wouldn't question what did I do to bring

13   this on me?  I feel ashamed.  I feel dirty.  I feel like a dog.

14   That's normal.  And you heard Dr. McGuigan testify that her

15   reaction to what happened was extremely normal.

16        Now, she also, counsel, represented to you -- or I

17   submit to you you were here for the testimony, you will

18   decide -- that Ms. Dailey allegedly said in her deposition that

19   the pictures were taken, the pictures were taken after the rape

20   and their excuse to the sexual encounter, however you want to

21   call it, but you heard her read Ms. Dailey's testimony.  And

22   what Ms. Dailey said both under oath in her deposition and here

23   today was the chicken had already been served, that the

24   pictures were taken during dinner.  That's what the evidence

25   said.

1          I know that the defendant wants to craft the narrative

2     that it happened before because that's what Nikos Hecht said

3     under oath, but that's not what Tristan Andlinger said.   And

4     even counsel said you should believe Tristan Andlinger.   That's

5     not what George Cathers said.   And even counsel said you should

6     believe George Cathers.   It's not what Jeanne Andlinger said

7     and it's not what Suzy Dailey said.

8          Now, I leave it for you to evaluate, assuming you

9     believe the credible evidence supports Ms. Dailey's claim,

10    whether or not what the defendant did to her was extreme and

11    outrageous.   I don't think there is any definition of extreme

12    and outrageous that wouldn't include what he did to her under

13    any scenario, under any definition.   It just wouldn't.   What he

14    did was extreme and outrageous and it, in fact, was willful and

15    wanton warranting punitive damages because what he did to her

16    was rip her soul from her body.   And now she walks around every

17    single day like a zombie, like a body without a soul.

18         That's what he did to her.   We may never know the

19    reasons why.   I don't know the reason why and you are not going

20    to know the reason why, but we do know that he raped her

21    because all of the credible evidence shows that he did.   And

22    his story is fantastical.   It's fantastical.   In fact, he

23    admitted in his lifetime such a thing had never happened.

24         A couple things, and then I am going to talk you for

25    just one second about the verdict form.   Counsel also said that

 1   the pictures were taken, I guess, after the chicken and before

 2   dessert.  As I mentioned to you, that was not her testimony.

 3   Neither Jeanne Andlinger, not Tristan -- as you may recall,

 4   Tristan said 10 minutes from when he witnessed that they left.

 5   They left.  They were gone.  Both him, Tristan, George, they

 6   left.

 7           And Jeanne Andlinger said that when she spoke to

 8   Tristan, it was before they were leaving, both times after

 9   dessert and the second time at the gate before they were

10   leaving.  That's what the evidence says.  And what the lawyers

11   says is not evidence.  So you have to use your own recall of

12   what you heard these witnesses testify over the past four days.

13           Now, Allison Hecht, you heard her deposition.  And

14   when she wasn't pleading the Fifth, the only thing she said

15   was, I think I recall maybe Jeanne Andlinger called me.  You

16   also recall in her deposition testimony that she basically

17   doesn't remember anything for the past three years because her

18   life was in shambles due to her deteriorating relationship with

19   her husband.

20           But she was very clear.  She said, I don't know.  I

21   think I recall.  I don't know.  She wasn't sure.  But you did

22   hear Jeanne Andlinger, who came into court to appear for you,

23   who came from New York City to testify before you.  She said

24   without equivocation, without hesitation, I absolutely have

25   never called Allison Hecht ever, ever.

1              Laura Kaplan, Laura Kaplan's story is absolutely

2    consistent with Ms. Dailey's and with Jeanne Andlinger's.

3    Laura Kaplan testified that Jeanne Andlinger told her Nikos had

4    grabbed her, pulled her in the bushes and pulled her pants

5    down.  There is nothing about that description that says

6    consensual sex, nothing, nothing, and yet counsel wants you to

7    believe somehow that that's the case.

8              I think counsel also suggested that certain medical

9    records were cherry-picked as it were.  No one on the

10   plaintiff's side of the table has ever told you that Ms. Dailey

11   didn't have personal issues before the rape.  Absolutely, she

12   did.  In fact, Ms. Dailey told you she suffered from depression

13   and was on medication, but lived a full and rich life.  Yes,

14   she had bad days.  Yes, she had good days, but she had joy in

15   her life.  You also heard her testify how her life is different

16   today robbed of a soul.

17             And you heard Dr. McGuigan testify to the same thing.

18   Yes, she had a problem, whether it was dealing with family

19   issues or her dog dying or whatever it was, but she was

20   compliant.  She took her medication.  And she took all of these

21   steps every day of her life to lead a good life and try to be

22   happy and to try to find joy and to try and make herself a

23   better person, like going to therapy, which is the whole point.

24             So to suggest to you that because Ms. Dailey went to

25   therapy before that she was somehow irreparably broken and

1  could not have possibly suffered any harm by the fact that this

2  man brutally raped you I think is an insult to your

3  intelligence.  Absolutely someone can have depression and then

4  be raped and the distinct harms are two different things.

5         Now, finally I would like to talk to you for only one

6  second about the verdict form.  Counsel showed you on the Elmo

7  to check the box no for plaintiff's claim, the first claim.  We

8  have to prove by a preponderance of the evidence.  There is no

9  dispute, it is our burden of proof.  It is the plaintiff's

10  burden to show you that Ms. Dailey was -- suffered a battery,

11  that she was assaulted and that she suffered intentional

12  infliction or emotional distress.  It is our burden.

13         We do not shift that burden and we believe that the

14  credible evidence demonstrates that each of these claims she

15  should prevail on.  So assuming you agree, for Question 1 your

16  answer should be yes.  For Question 2, your answer should be

17  yes.

18         Question 3 relates to their affirmative defense of

19  consent, and the answer should be a resounding no because the

20  only evidence you heard that would support consent is what

21  Mr. Hecht told you, whichever version you believe of his story,

22  because it changed over and over and over again.  The answer to

23  No. 3 we submit should be no.

24         The answer to No. 4 should be yes.

25         And then on economic losses you heard Ms. Dailey

 1    testify that to date she has had approximately $12,000 in

 2    medical expenses.  And we talked a moment ago about

 3    non-economic damages and that's really up to you.  We trust you

 4    completely to do what's just and what's right based upon the

 5    evidence.  I tried to model for you what I think is just and

 6    right, and that's $1 for every minute for every hour for every

 7    day for the past three years that Ms. Dailey has had to suffer,

 8    has had to relive this trauma, has had to think about her

 9    self-worth, has had to walk around like a hollow, shallow a

10    human being.

11         And then on punitive damages, which is on the last

12    page, Question 7, we submit to you again the answer should be:

13    Do you find the defendant's conduct was malicious or willful or

14    wanton beyond a reasonable doubt?  We submit to you that that

15    answer is yes, but it's going to be up to you to decide when

16    you go into the jury room.  And if you decide that answer is

17    yes, again it's going to be up to you to decide what that

18    damage should be, how you repay somebody or repatriate somebody

19    or try in some way to punish the defendant for what he did, for

20    what he took for this then 65-year-old woman in an environment

21    where she was with friends and family and trusted.

22         And I submitted to you before and I throw it out to

23    you again, but it really is your decision.  It's up to you.

24    It's not up to anyone else.  I submit to you that the way to

25    punish Mr. Hecht is to make him pay $1 for every minute every

1   hour of every day from now until he turns 65 so he can think

2   about what he did to Ms. Dailey.

3           Thank you, and thank you again for your service.

4           THE COURT:  Thank you.  We have the one instruction

5   left, ladies and gentlemen.  It's short.

6           (Jury instruction was read to the jury by the Court.)

7           THE COURT:  When you go out to deliberate, folks, you

8   can take breaks as you wish.  You don't have to ask.  It's up

9   to you, but if you are not behind closed doors by yourselves as

10  a group of seven, please don't talk about the case.

11          If you have a question about something, the foreperson

12  should notify Julie, the bailiff, that you have a question.

13  Write it out.  If it's something that we can answer, we will.

14  We can't give you more evidence.  We are going to give you the

15  evidence that's been admitted, but we can't start over and ask

16  for more, but anything else, maybe some confusion about an

17  instruction or whatever, write it out.  She will notify me.  I

18  have to confer with the lawyers and try to get you an answer.

19          There is no time limit here.  You can come out with a

20  decision in 30 minutes or 30 days.  That's entirely up to you.

21  You should not be rushed.  You should take the amount of time

22  that you collectively believe is needed to reach the right

23  verdict.  You don't have to reach that verdict today.  That,

24  too, is up to you.  It's not an easy thing to ask you to do to

25  resolve this, but that's exactly what we are asking you to do.

1          Now, I am going to give the verdict form that I wrote

2     on -- it's the original just like yours, except that it's got

3     the original handwriting where I filled in those numbers -- I

4     am going to give that to the bailiff and I will ask your

5     foreperson ultimately use the original.  You all have copies,

6     you can write on them, doodle on them, whatever, but in the end

7     we will use this one, if you wouldn't mind.  I need to give the

8     bailiff an oath first.

9          (Bailiff was sworn):

10          *BAILIFF:*  I will.

11          *THE COURT:*  All right.  Here is the original verdict.

12     It is 4:02 p.m., and we will be in recess for the jury to

13     deliberate.

14          (Jury excused to deliberate:)

15          If you are going to stay around, fine.  If you are

16     not, we need to know how to get in touch with you quickly.

17     Since it's Friday at 4:02, you might want to just hang around

18     instead of going back to your offices or hotels because we will

19     know soon enough if they feel they can reach a verdict or if

20     they feel like they need to come back Monday, and we will keep

21     you apprized.

22          *MS. ALTMAN:*  Your Honor, we will be in the witness

23     room.  We will wait here.

24          *THE COURT:*  All right.  And to the extent that Julie

25     might need your help in getting the admitted exhibits to them,

1    please help her with that.

2           Good luck to everybody.

3           (Recess at 4:05 p.m.)

4           (Reconvened at 4:56 p.m.)

5           *MS. LaBRANCHE:*  Your Honor, may I step out and get

6    everyone else from my side?

7           *THE COURT:*  Yes, and please do get everyone else.  I

8    don't want to hold these people any longer.

9           *MR. TUMMINELLO:*  Clearing security, sir.

10          *THE COURT:*  Well, it must be a heck of a secure

11   operation because he was clearing security at least five

12   minutes ago.

13          *MR. PLACHY:*  Your Honor, let's proceed, if that's all

14   right with you.

15          *THE COURT:*  5:00 o'clock, at 5:00 o'clock we will

16   proceed.

17          (Jury present.)

18          Members of the jury, have you reached a verdict?

19          *THE FOREPERSON:*  We have.

20          *THE COURT:*  Would the foreperson please hand the

21   verdict to the bailiff.  Julie always hands me the verdict

22   upside down, which she did here, because there are a couple

23   things I would like to say and then we will take the verdict.

24          First and foremost, I would say thank you for your

25   service, each and every one of you.  This was not the typical

 1   case that I hear in federal court.  Indeed, it's somewhat

 2   unusual in a civil case to have two stories that are so

 3   diametrically opposite, so in my mind that presented a

 4   challenge to you, not to mention the time the case took to try,

 5   so your service is respected and appreciated.

 6           Secondly, you may now speak with anybody you want

 7   about the case.  You can read anything you want to about the

 8   case.  You can follow the media accounts.  I don't know if

 9   there has been anything locally, but there certainly has been

10   in Aspen.  By the same token, if you do not want to talk about

11   the case or your verdict, that is perfectly okay.  So, for

12   example, if a reporter or a lawyer involved or anybody were to

13   ask you if you would like to visit about the case, that's up to

14   you.  You can say no or yes.

15           Finally, it's 5:00 o'clock on Friday, but if any of

16   you would like to stay after for a few minutes, I would be

17   happy to come into your room and answer your questions and meet

18   you personally, receive your complaints, explain things that

19   might still be a mystery.  I am happy to do that.  I enjoy

20   meeting people on my juries.  But once you walk through that

21   door, you are free to go.  You don't have to wait and talk to

22   anybody.  That's just if you want, okay?

23           All right.  The Court will announce the verdict in the

24   case of Suzanna F. Dailey, plaintiff, versus Nikos Hecht,

25   defendant.

1      We, the jury, unanimously answer the questions posed

2   by the Court as follows:

3      Question 1:  Did plaintiff Suzanna Dailey prove, by a

4   preponderance of the evidence, her claim of assault, as defined

5   in Jury Instruction No. 7?

6      Answer:  No.

7      Question No. 2:  Did plaintiff Suzanna Dailey prove,

8   by a preponderance of the evidence, her claim of battery as

9   defined in Jury Instruction No. 9?

10      Answer:  No.

11      Question 3:  Did defendant Nikos Hecht prove, by a

12   preponderance of the evidence, consent as defined in Jury

13   Instruction No. 13?

14      Answer:  Yes.

15      Question 4:  Did plaintiff Suzanna Dailey prove, by a

16   preponderance of the evidence, her claim of extreme and

17   outrageous conduct, as defined in Jury Instruction No. 14?

18      Answer:  No.

19      And for that reason the questions were not answered.

20      And for the foreperson, have I correctly read the

21   verdict?

22      *THE FOREPERSON:*  Yes.

23      *THE COURT:*  Plaintiff's side, do you wish to have the

24   jury polled?

25      *MR. KAPLAN:*  Yes, Your Honor.

1          *THE COURT:*  All right.  What that means, folks, is

2     that I ask each of you individually one by one if this is your

3     verdict, do you agree with the verdict.  So if there is any

4     second thought or any doubt or any hesitation, this is the time

5     you would express yourself.

6              I am just going to go in the order in which I have on

7     my original chart, not where you necessarily are now.

8              *THE COURT:*  Robert Bosshart, is this your verdict,

9     sir?

10             *JUROR:*  Yes, Your Honor.

11             *THE COURT:*  Terrance Willis, is this your verdict?

12             *JUROR:*  Yes, Your Honor.

13             *THE COURT:*  Stacey Fettkether, is this your verdict?

14             *JUROR:*  Yes, Your Honor.

15             *THE COURT:*  Amanda Jandik, is this your verdict?

16             *JUROR:*  Yes, Your Honor.

17             *THE COURT:*  Elizabeth Callan, is this your verdict?

18             *JUROR:*  Yes, Your Honor.

19             *THE COURT:*  Kenya Russell is this your verdict?

20             *JUROR:*  Yes, Your Honor.

21             *THE COURT:*  And Sharlyn Flaxer; this your verdict,

22     ma'am?

23             *JUROR:*  Yes, Your Honor.

24             *THE COURT:*  All right.  The jurors, each and every

25     one, has subscribed to the verdict.  And for that, ladies and

1    gentlemen, I thank you for your service.  It's much

2    appreciated, much respected.  You are now free to go.

3              (Jury excused.)

4              The jury has now been excused.  Does either side have

5    anything further they wish to put on the record at this time?

6              Plaintiff, anything further?

7              MS. ALTMAN:  Not that I am aware of at the moment,

8    Your Honor.  We would just like, if we could, to consult.  And

9    we don't know whether or not there is any post-trial, any kind

10   of briefing that would need to be done.  I don't think so, but

11   I would like the opportunity to reflect, if that's okay.

12             THE COURT:  Well, yes, you have that chance.  You have

13   what is it, 15 days to file post-trial motions.  Is that going

14   to work?

15             MS. ALTMAN:  Yes, Your Honor.

16             THE COURT:  All right.

17             MR. PLACHY:  Nothing from the defense, Your Honor.

18             THE COURT:  All right.  Well, Ms. Dailey, I wish you

19   the best in the future.  Same to you, Mr. Hecht.

20             We will be in recess.

21         (Recess at 5:06 p.m.)

22

23

24

25

1                                    INDEX

2   WITNESSES

3      Nikos Hecht

4          Cross-Examination Continued By Ms. Altman        639

5          Redirect Examination By Mr. Plachy              679

6      Sara Willis

7          Direct Examination By Mr. Plachy               686

8          Cross-examination By Mr. Kaplan                717

9          Redirect Examination By Mr. Plachy             777

10     Andrew Hecht

11         Direct Examination By Mr. Plachy               779

12         Cross-examination By Mr. Kaplan                788

13  CLOSING ARGUMENTS

14     By Ms. Altman                                    800

15     By Ms. LaBranche                                 823

16     Rebuttal Argument By Ms. Altman                  839

17                       REPORTER'S CERTIFICATE

18     I certify that the foregoing is a correct transcript from

19  the record of proceedings in the above-entitled matter.  Dated

20  at Denver, Colorado, this 23rd day of January, 2018.

21

22                              S/Janet M. Coppock

23

24

25